### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | | |
|---|---|---|---|
| HERBERT WHITLOCK, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. | 08 CV 2055 |
| | ) | | |
| CITY OF PARIS, et al., | ) | Honorable Judge Harold A. Baker | |
| | ) | Magistrate Judge David G. Bernthal | |
| Defendants. | ) | | |

### CERTAIN DEFENDANTS' MOTION TO DISMISS COUNTS II, III AND V

Defendants, City of Paris, Gene Ray, James Parrish and Jack Eckerty, by their attorney,

James G. Sotos of James G. Sotos & Associates, Ltd., and Michael McFatridge, by his attorney,

Terry A. Ekl of Ekl Williams, PLLC, (collectively "Certain Defendants") pursuant to Federal

Rule of Civil Procedure 12(b)(6), move to dismiss Counts II, III & V of Plaintiff's Complaint.  In

support thereof, Defendants state as follows:

1.     On February 27, 2008, Plaintiff ("Whitlock") filed an 11-count Complaint

(attached hereto as Exhibit A), in which he purports to set forth the following claims:

| | |
|---|---|
| Count I | §1983 Due Process |
| Count II | §1983 Malicious Prosecution |
| Count III | §1983 False Imprisonment |
| Count IV | §1983 *Monell* Claim Against City of Paris |
| Count V | State Law False Imprisonment |
| Count VI | State Law Malicious Prosecution |
| Count VII | State Law Intentional Infliction of Emotional Distress |
| Count VIII | State Law Conspiracy |
| Count IX | State Law *Respondeat Superior* Claim |

Count X          State Law Indemnification Against the City of Paris

Count XI         State Law Indemnification Against Edgar County and It's State's
Attorney's Office

2.     Whitlock alleges that he was arrested on a warrant on February 19, 1987.
(Compl., Exhibit A, ¶ 33.)  An Edgar County grand jury subsequently indicted him on March 10,
1987 for the charges of arson and murder.  (*Id*. ¶ 36.)  In August of 1987, Whitlock was
convicted of murder and sentenced.  (*Id*. at ¶¶ 43, 51.)  On September 6, 2007, the Illinois
Appellate Court for the Fourth District reversed the judgment and conviction and remanded
Whitlock's case for a new trial.  (*Id*. at ¶ 99.)  Whitlock alleges that he was released from custody
on January 8, 2002, when the State *nolle prosequied* the case.  (*Id*. at ¶ 100.)

3.     Count II (§1983 malicious prosecution) fails to state a claim for which relief may
be granted.   The Seventh Circuit does not recognize a constitutional tort of malicious
prosecution where a state-law remedy exists.  *Newsome v. McCabe*, 256 F.3d 747,751 (7th Cir.
2001).  Illinois recognizes the tort of malicious prosecution.  *Mutual Medical Plans, Inc. v.
County of Peoria*, 309 F.Supp. 1067, 1078 (C.D. Ill. 2004).  As such, the only remedy for any
malicious prosecution claim Whitlock may have, arises solely under state law and Count II of
Whitlock's Complaint must be dismissed.

4.     Counts III (§1983 false imprisonment) and V (state law false imprisonment) are
time barred.  Pursuant to the accrual rule set forth in *Wallace v. Kato,* 127 S.Ct. 1091, 1097
(2007), the two-year statute of limitations for Whitlock's §1983 false imprisonment claim and
one year statute of limitation for his state law false imprisonment claim began to run when he
was detained by legal process.  Whitlock claims that he was indicted by a grand jury on March
10, 1987.  As a result, his false imprisonment claims, filed on February 28, 2008 are untimely
and must be dismissed.

2

5.    Alternatively, Whitlock's allegation that he was arrested pursuant to an arrest warrant bars him from raising any claim for false imprisonment under federal or state law (counts III and V).  An arrest under a judicially issued arrest warrant cannot give rise to a false imprisonment claim. *Davis v. Temple,* 284 Ill.App.3d 983, 989 (5th Dist. 1996)  "A warrant is legal process and so, a complaint about conduct pursuant to it is a challenge to legal process and thus resembles malicious prosecution."  *Ouzounian v. Sheahan,* 2004 WL 1146124, *3 (N.D. Ill. 2004) citing *Gauger v. Hendle*, 349 Ill.App.3d 354, 361 (7th Cir. 2003).

6.    Other than counts II, III and V, which Certain Defendants now seek to dismiss, Certain Defendants have answered the remaining Counts against them in Whitlock's Complaint.

WHEREFORE, Certain Defendants respectfully request this Court grant their Motion to Dismiss Counts II, III and V of Whitlock's Complaint.

Date:   April 28, 2008                    RESPECTFULLY SUBMITTED,

s/ James G. Sotos
Attorney for Defendants, City of Paris, Gene Ray,
James Parrish, and Jack Eckerty
JAMES G. SOTOS & ASSOCIATES, LTD.
550 East Devon Avenue, Suite 150
Itasca, IL  60143-2632
Tel:  (630) 735-3300
Fax:  (630) 773-0980
jsotos@jsotoslaw.com

s/ Terry A. Ekl
Attorney for Defendant Michael McFatridge
EKL WILLIAMS PLLC
Two Arboretum Lakes
901 Warrenville Road, Suite 175
Lisle, Illinois 60532
Tel:     (630) 654-0045
Fax:     (630) 654-0150
tekl@cewpc.com

3

## CERTIFICATE OF SERVICE

The undersigned having first been duly sworn under oath, states that he electronically filed a complete copy of the foregoing **Certain Defendants' Motion to Dismiss Counts II, III & V** with the Clerk of the Court on **April 28, 2008** using the CM/ECF system, which will send notification of such filing to the following counsel of record:  See Attached Service List.

A copy of such filing was also sent via United States Mail to:

Deborah Rienbolt, *pro se*
2116 East Keys Avenue
Springfiled, Illinois 62702

s/ James G. Sotos
James G. Sotos
JAMES G. SOTOS & ASSOCIATES, LTD.
550 East Devon Avenue, Suite 150
Itasca, IL  60143-2632
Telephone:  (630) 735-3300
Fax:  (630) 773-0980
jsotos@jsotoslaw.com

*Attorney for Defendants, City of Paris,*
*Gene Ray, James Parrish, and Jack Eckerty*

## SERVICE LIST
### HERBERT WHITLOCK v. CITY OF PARIS, ET AL., 08 CV 2055

**Attorneys for Herbert Whitlock:**

Ronald Balson, Carrie A. Hall
MICHAEL BEST & FRIEDRICH LLP
Two Prudential Plaza
180 North Stetson Avenue, Suite 2000
Chicago, Illinois 60601
Tel:        (312) 222-0800
Fax:       (312) 222-0818
E-mail:   rhbalson@michaelbest.com
              cahall@michaelbest.com

Richard S. Kling, Susana Ortiz
CHICAGO KENT LAW OFFICES
565 West Adams Street, Suite 600
Chicago, IL  60611-3691
Tel:        (312) 906-5155
Fax:       (312) 906-5299
E-mail:   rkling@kentlaw.edu
              sortiz@kentlaw.edu

**Attorneys for Charles E. Brueggemann, Diane Carper, Steven M. Fermon, Kevin Kaupus, and Andre Parker:**

Karen L. McNaught
(also counsel for Jack Eckerty)
Illinois Attorney General
500 S. Second Street
Springfield, IL  62706
Tel:        (217) 782-1841
Fax:       (217) 524-5091
E-mail:   kmcnaught@atg.state.il.us

Iain D. Johnston
JOHNSTON GREENE LLC
542 South Dearborn Street, Suite 1310
Chicago, IL 60605
Tel:        (312) 341-3900
Fax:       (312) 341-0700
E-mail:   ijohnston@johnstongreene.com

**Attorneys for Edgar County**:

Michael E. Raub; James C. Kearns;
Brian M.
HEYL, ROYSTER, VOELKER & ALLEN
102 East Main Street
Suite 3000
P.O. Box 129
Urbana, Illinois 61801-0129
Tel:        (217) 344-0060
Fax:       (217) 344-9295
E-mail:   mraub@hrva.com
              jkearns@hrva.com
              bsmith@hrva.com

**Attorneys for Michael McFatridge:**

Terry A. Ekl; Vincent C. Mancini
EKL & WILLIAMS, PLLC
Two Arboretum Lakes
901 Warrenville Road, Suite 175
Lisle, Illinois 60532
Tel:        (630) 654-0045
Fax:       (630) 654-0150
E-mail:   tekl@cewpc.com
              vmancini@cewpc.com
              pprovenzale@cewpc.com

5

E-FILED
Monday, 28 April, 2008  01:50:44 PM
Clerk, U.S. District Court, ILCD

*Whitlock v. City of Paris, et al.*
Case No. 08 CV 2055
Our Case No. 2034

# EXHIBIT A

E-FILED

Wednesday, 27 February, 2008 02:53:47 PM

Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| HERBERT WHITLOCK, | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.** |
| v. | ) | |
| | ) | |
| **CITY OF PARIS, Present and Former** | ) | **JURY TRIAL DEMANDED** |
| **Paris Police Officials Chief Gene Ray and** | ) | |
| **Detective James Parrish; former Illinois** | ) | |
| **State Trooper Jack Eckerty; former** | ) | |
| **Edgar County State's Attorney Michael** | ) | |
| **McFatridge; EDGAR COUNTY; and** | ) | |
| **Illinois State Police Officials Steven M.** | ) | |
| **Fermon, Diane Carper, Charles E.** | ) | |
| **Brueggemann, Andre Parker, Kenneth** | ) | |
| **Kaupus and Jeff Marlow; and Deborah** | ) | |
| **Rienbolt,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### COMPLAINT

NOW COMES Plaintiff, HERBERT WHITLOCK ("Whitlock"), by and through his

attorneys, Ronald H. Balson and Carrie A. Hall of the firm of Michael Best & Friedrich LLP,

and Richard S. Kling and Susana Ortiz of the Law Offices of Richard Kling, complaining of the

Defendants, and states as follows:

### I. JURISDICTION AND VENUE

1.    Jurisdiction of this matter is invoked upon this Court by virtue of 42 U.S.C. §

1983 et. Seq.; 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States, Articles

Four, Five, Six and Fourteen; and supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

2.      Venue is proper in the Central District of Illinois under 28 U.S.C. § 1391(b).
Defendants, or some of them, reside and/or formerly resided in this judicial district. A
substantial part of the events giving rise to the claims asserted herein occurred within this
district.

## II. PARTIES

3.      Plaintiff, Herbert Whitlock, is a sixty-one-year-old man and a citizen of the state
of Illinois.

4.      Defendant Gene Ray ("Ray") was a duly appointed and sworn Chief of the Police
Department of the City of Paris, Illinois. He was a final policymaker for the City of Paris in
police matters, including police investigations, was personally in charge of the homicide
investigation of Karen and Dyke Rhoads and is sued in his individual capacity.

5.      Defendant James Parrish ("Parrish") was a duly appointed and sworn Paris Police
detective who was the lead Paris police investigator in the Rhoads homicide investigation and is
sued in his individual capacity.

6.      Defendant City of Paris is an Illinois municipal corporation and, as such, is
responsible for the policies, practices and customs of the Paris Police Department and its Chief
of Police. Defendant City of Paris was the employer of Defendants Ray and Parrish. The City of
Paris is responsible for the acts of Defendants Ray and Parrish while acting within the scope of
their employment.

7.      Defendant Jack Eckerty ("Eckerty") was a duly appointed and sworn Illinois State
Police ("ISP") trooper who was the lead state police investigator in the Rhoads homicide
investigation and is sued in his individual capacity.

2

8.     Defendant Michael McFatridge ("McFatridge") was the Edgar County State's Attorney and is sued in his individual capacity.

9.     Defendant Edgar County is a governmental entity within the state of Illinois, which consists in part of its Edgar County State's Attorney's Office (hereinafter referred to as SAO). Edgar County and the State's Attorney's Office are necessary parties to this lawsuit.

10.     Defendants Steven M. Fermon ("Fermon"), Diane Carper ("Carper"), Charles E. Brueggemann ("Brueggemann"), Andre Parker ("Parker"), Kenneth Kaupus ("Kaupus") and Jeff Marlow ("Marlow") (the "ISP Defendants") were duly appointed and sworn command level ISP officials who supervised that agency's investigation of the Rhoads murders and are sued in their individual capacities.

11.     At all times relevant to this action, the ISP Defendants acted within the scope of his or her employment and under the color of the laws, regulations and customs of the state of Illinois. Each Defendant's actions constituted "state action" as defined under federal law.

12.     Defendant Deborah Rienbolt ("Rienbolt") is a private citizen of the state of Illinois.

### III. FACTS COMMON TO ALL COUNTS

13.     In the early morning hours of July 6, 1986, Dyke and Karen Rhoads were stabbed to death in their home in Paris, Illinois, and their house was set on fire.

14.     Defendants Ray, Parrish, Eckerty and McFatridge were responsible for investigating the homicides. They jointly participated in said investigation commencing shortly after the crimes were discovered.

15.     Defendants Ray, Parrish, Eckerty and McFatridge discovered facts disclosing the identities of several credible suspects, including a prominent and influential Paris businessman

(the "Paris businessman"), who shortly after the murders offered a $25,000 reward. Defendant Parrish had employment relationships off and on with the Paris businessman.

16. Despite the existence of substantial facts leading to the identification of credible suspects, Defendants Ray, Parrish, Eckerty and McFatridge did not pursue them, but instead jointly pursued a course of conduct designed to deflect the investigation away from the Paris businessman, to quickly and expediently bring about a conviction and gain public and political favor by promptly solving the murders. To that end, they conspired to accuse and convict Gordon Randy Steidl ("Steidl") and Herbert Whitlock for these crimes. Defendants Ray, Parrish, Eckerty and McFatridge then and there conspired and commenced acts in furtherance of fabricating and creating a case against Steidl and Whitlock.

17. On or about July 9, 1986, directly after the Paris businessman offered the reward at local bars, Defendants Parrish and Eckerty, at the direction and approval and/or with the knowledge of defendants Ray and McFatridge, and without any physical evidence linking Whitlock to the crimes, took Whitlock into custody and questioned him.

18. Although Whitlock denied any connection to the crimes and provided a truthful alibi, Defendants Ray, Parrish, Eckerty and McFatridge continued to pursue him.

19. On September 19, 20 and 21, 1986, Defendants Ray, Parrish, Eckerty and McFatridge interviewed Darrell Herrington ("Herrington"), who they knew had five drunken-driving convictions and two convictions for passing bad checks, was considered the "town drunk" and frequented the bars where the reward had been offered.

20. Herrington told Defendants Ray, Parrish, Eckerty and McFatridge that he was present at the scene of the Rhoads murders and that two men, "Jim and Ed," committed the crimes.

4

21.    On information and belief, Herrington also told these Defendants he had been

drinking hard liquor nearly nonstop since noon on July 5, and that by the time the bars closed, he

was stumbling drunk and lapsing into unconsciousness.

22.    During Herrington's three days of interrogation, Defendants subjected Herrington

to suggestion, coercion and manipulation and plied him with liquor and promises. As a result of

Defendants joint efforts, Herrington changed his story from Jim and Ed to Steidl and Whitlock as

the persons whom he had accompanied to the scene of the murders. Herrington was never

charged with any crimes related to the Rhoads murders.

23.    Armed with Herrington's coerced, manipulated, manufactured and suggested false

statement, Defendants Ray, Parrish, Eckerty and McFatridge, without probable cause, obtained a

warrant to electronically eavesdrop on conversations of Whitlock. Their plan was to use

Herrington as a wired informant to entrap Whitlock into making inculpatory statements. The

plan failed. Despite their efforts, Whitlock steadfastly maintained he had no connection with the

crime. Even though the scheme proved unsuccessful, Defendants Ray, Parrish, Eckerty and

McFatridge were not dissuaded and continued to pursue their scheme to accuse and convict

Steidl and Whitlock.

24.    Defendants Ray, Parrish, Eckerty and McFatridge subjected Herrington to a

polygraph examination on September 29, 1986. Concerning direct questions asked by the

examiner about whether Herrington was truthful when he accused Steidl and Whitlock, the

examiner found that Herrington engaged in "purposeful non-cooperation…(consistent with) not

telling the truth" as to "one or more" of the questions.

25.    Fearing that Herrington's fabricated statement would not withstand further

polygraph scrutiny, Defendants Ray, Parrish, Eckerty and McFatridge did not follow the

examiner's recommendation that Herrington be subjected to another polygraph examination. Lacking a credible witness, they decided not to charge Steidl and Whitlock with the murders at that time. Nevertheless, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, officially recorded Herrington's fabricated and discredited story in the Paris police reports, but intentionally suppressed and concealed from those reports the highly exculpatory evidence concerning "Jim and Ed," the lie detector test and its results, and that Herrington's story was the product of their coercion, fabrication, manipulation, suggestion, promises, financial rewards and alcohol.

26.     For the next several months, Defendants Ray, Parrish, Eckerty and McFatridge continued to meet with Herrington and to use coercive, suggestive and manipulative tactics, promises, rewards, liquor and, on at least one occasion, suggestions by hypnosis, in order to further manufacture and fabricate a more believable, story about Steidl and Whitlock.

27.     Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, suppressed and concealed from their official reports, the continued coercion, manipulation, suggestion, fabrication, promises and rewards, as well as the content of Herrington's statements taken under hypnosis.

28.     On February 16, 1987, seven months after the yet unsolved murders, knowing that they had no credible evidence to charge Steidl and Whitlock, Defendants Ray, Parrish, Eckerty and McFatridge began to meet with another completely unstable individual, a known alcoholic and drug addict, Defendant Rienbolt, who was on felony probation and whom Parrish had previously pressured to be his informant.

29.     Defendant Parrish accused Rienbolt of involvement in the murders, and, despite her denials, Defendants Parrish and Eckerty, under the supervision and with the participation

6

and/or knowledge of Defendants Ray and McFatridge, continued to interrogate Rienbolt about the crimes.

30.    During the interrogations, Defendants Parrish and Eckerty, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, repeatedly pressured and challenged Rienbolt that she was present at the crime scene and participated in the murders with Steidl and Whitlock, which they postulated took place because Dyke Rhoads backed out of a drug deal.

31.    Defendants made promises of financial rewards, coerced, pressured, suggested and manipulated Defendant Rienbolt to create the story that her husband's knife really belonged to Whitlock and that Whitlock had given it to her shortly after the crime with blood on it.

32.    Defendant Rienbolt told to Defendants Parrish and Eckerty that she had gone to work at the Paris Health Center and later consumed vast quantities of drugs and alcohol on July 5, 1986. Defendant Rienbolt did not originally say she witnessed Steidl and/or Whitlock commit the murders and arson. Nevertheless, Defendants Parrish and Eckerty caused Rienbolt to change her story and make false statements that she didn't go to work, that she saw Steidl, Whitlock and Herrington together the night before the murders and other false statements about Whitlock and the scene of the murders. Defendant Rienbolt knew her statements were false and that they would be used to accuse and prosecute Steidl and Whitlock, but she agreed with Defendants to be an active participant and knowingly provide false statements to accuse and prosecute Steidl and Whitlock. On the basis of these coerced, manipulated, manufactured, and suggested false statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable cause, a warrant to electronically overhear conversations of Steidl and Whitlock, and tried to use Defendant Rienbolt as a wired informant to entrap Whitlock at an AA meeting into making false

7

inculpatory statements. Defendant Rienbolt willingly attempted to trap him, but try as she may, Whitlock steadfastly and truthfully denied involvement.

33.     On February 19, 1987, on the basis of knowingly fabricated and false statements, Defendants Ray, Parrish, Eckerty and McFatridge obtained arrest warrants for Steidl and Whitlock for the murders of Karen and Dyke Rhoads and for arson and caused them to be arrested for said crimes. Following their arrest, when questioned at the jail, both Steidl and Whitlock truthfully denied involvement in the crimes.

34.     Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, wrote and recorded Defendant Rienbolt's manufactured story in official police reports, while suppressing from those reports the highly exculpatory information on how these statements were obtained and that they were false and incredible, contrary to physical and other evidence and based on fabrication, coercion, suggestion, threats, promises, alcohol and drugs.

35.     On the basis of these coerced, manipulated, manufactured and suggested false statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable cause, a warrant to seize hair, saliva and blood from the persons of Steidl and Whitlock. These searches did not lead to any inculpatory evidence against either Steidl or Whitlock, but Defendants continued to wrongfully pursue their scheme to accuse and prosecute Steidl and Whitlock.

36.     Using Defendant Rienbolt's and Herrington's false statements, Defendants wrongfully charged Steidl and Whitlock by information with murder and arson. On March 10, 1987, Steidl and Whitlock were indicted for these crimes by the Edgar County Grand Jury after Defendant Parrish presented false information, including these statements and perjured testimony

8

to the Grand Jury. Acting in concert with Defendants Ray, Parrish, Eckerty and McFatridge,

Defendant Rienbolt willfully and knowingly offered false testimony to the Grand Jury in an

effort to have Steidl and Whitlock indicted.

37.    Defendants Ray, Parrish and Eckerty specifically suppressed from the Grand Jury

exculpatory evidence which, if known to the Grand Jury, would have demonstrated that these

statements were false, coerced, manipulated, manufactured and suggested, that Steidl and

Whitlock were innocent, that the Defendants had identified other likely suspects unrelated to

Steidl and Whitlock, all of which would have likely resulted in a "no bill" and a failure to indict.

38.    Defendants Ray, Parrish, Eckerty and McFatridge continued to urge Defendant

Rienbolt to fabricate further stories, using, *inter alia*, threats of physical force, threats of

prosecution, promises of leniency, promises of money and drug treatment. Defendant Rienbolt,

who was continually under the influence of alcohol and drugs, made further fabrications

concerning the murders, to wit:

a.    On March 29, 1987, Defendant Parrish, under the supervision and with the

participation and/or knowledge of Defendants Ray, Eckerty and McFatridge interrogated

Rienbolt and induced her to falsely state that on the night of the murders, Whitlock made

statements to her that he, Steidl and Herrington were going to the Rhoads' house to deal with

Dyke concerning drugs, that she gave her husband's knife to Whitlock, that she was present at

the scene of the crimes, that she heard screaming, saw the bodies and later got the knife back

from Whitlock with blood on it.

b.    In early April 1987, Defendants Parrish and Eckerty, under the supervision

and with the participation and/or knowledge of Defendants Ray and McFatridge, again

interrogated Rienbolt on several occasions and compelled and induced her to further fabricate the

9

story that she was present at the crime scene and physically restrained Karen Rhoads while Steidl and Whitlock stabbed Dyke Rhoads multiple times and then stabbed Karen Rhoads multiple times and that Steidl and Whitlock later paid her money not to talk.

39.    In March and April of 1987, Defendants Parrish and Eckerty, with the participation and/or knowledge and approval of Defendants Ray and McFatridge, similarly coerced, manipulated and suggested false statements from other witnesses, including Curtis Smith and Carol Robinson, in an attempt to corroborate portions of Defendant Rienbolt's testimony. Defendants Parrish and Eckerty intimidated witnesses by shouting at them, threatening to put them in jail, shaking their fists, smacking their fists on the table and kicking chairs. On one occasion Defendant Parrish so violently intimidated a witness named Barbara Furry, who was nine months pregnant, that he caused her to urinate on herself.

40.    Additionally, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, wrote and recorded these coerced, manipulated, suggested and manufactured false stories and statements of Defendant Rienbolt, Smith and Robinson in official police reports while suppressing from those reports the highly exculpatory information that these statements were false and incredible, obtained by coercion and intimidation, were contrary to physical and other evidence and based on fabrication, suggestion, threats and promises.

41.    In an attempt to influence public opinion and prospective jurors, Defendant McFatridge made numerous false pretrial public statements to the media concerning Steidl, Whitlock and the evidence against them, which statements were widely reported in the press. McFatridge's statements violated the Illinois Rules of Professional Conduct, specifically Rule 3.6, prohibiting publication of opinions on the guilt or innocence of accused persons.

10

42.    In order to insure that Defendant Rienbolt would continue to tell her false story at Steidl's and Whitlock's trials, the Defendants first put her into a drug treatment center, then placed her under house arrest and coerced and enticed her into pleading guilty to the charge of concealing a homicidal death, in exchange for a lenient sentence, the payment of her "relocation expenses" and other rewards. As part of this coercive agreement, the Defendants obtained Defendant Rienbolt's signature on a six-page statement of "facts" which recited her prior coerced, suggested, fabricated, manipulated, false and incredible statements about the crime. This "agreement" further provided that she could be charged with, and tried for, additional crimes if she did not testify consistently with her statement and the Defendants made it clear to her that these additional crimes included murder, with a possible sentence of death.

43.    Whitlock was tried in May of 1987 in Edgar County, Illinois. On the basis of the fabricated and manufactured evidence and because exculpatory materials were concealed from Whitlock and his attorney, the jury returned a verdict of guilty of the murder of Karen Rhoads, which it would not have done but for the wrongful conduct of Defendants Ray, Parrish, Eckerty, McFatridge and Rienbolt.

44.    In June of 1987, Steidl was tried and convicted of murder and arson in Vermilion County, and on June 16, 1987, sentenced to death on the basis of similar false and fabricated evidence and concealed exculpatory materials.

45.    During the course of their trials, Defendant McFatridge, with the cooperation of Defendants Ray, Parrish and Eckerty, did not reveal and took affirmative measures to withhold and suppress the following exculpatory materials favorable to Steidl and Whitlock:

a.    That there were numerous credible leads pointing to other suspects, including a prominent and influential Paris businessman;

11

b.    That witnesses were threatened and intimidated;

c.    There were failed polygraph tests by prosecution witnesses;

d.    There were money and favors given to prosecution witnesses in exchange for their testimony;

e.    Defendants arranged to give witnesses hypnotic suggestions;

f.    The Defendants provided alcohol to witnesses before and during the time they were giving statements;

g.    Herrington believed the murders were committed by two men named "Jim and Ed;"

h.    There was a cut on Herrington's hand the night of the murders.

i.    Defendants failed and refused to submit Herrington's blood standard to the ISP lab;

j.    Defendant Rienbolt testified she saw a piece of broken lamp in Steidl's hand. The lamp was not broken until after the fire;

k.    That Defendant Rienbolt originally stated that she saw a broken vase which did not exist;

l.    That witnesses had identified someone other than Whitlock as a perpetrator;

m.    That prosecution trial witnesses were coached in their testimony and provided with fabricated stories; and

n.    That there was a previous business relationship between Defendant Parrish and the Paris businessman.

46.     The officers and the prosecutors had a legal duty under *Brady v. Maryland,* 373

U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny to disclose the foregoing, along

with all evidence favorable to Whitlock. Notwithstanding their duty, Defendants Ray, Parrish,

Eckerty and McFatridge refused to disclose the foregoing and, in fact, concealed and deliberately

obstructed access to exculpatory information. Following the trial and conviction, other ISP

employees who became aware of the undisclosed and concealed information, including

Defendants Fermon, Carper, Brueggemann and Kaupus, had an affirmative *Brady* duty to

disclose.

47.     Defendants Ray, Parrish, Eckerty and McFatridge suppressed from Whitlock and

his lawyers, the Judge who presided over his case and the jury that convicted Whitlock all of the

highly exculpatory evidence set forth above, as well as evidence of other potential suspects and

promises of leniency and payments that the Defendants made to Defendant Deborah Rienbolt.

48.     Despite their exhaustive attempts to do so, the Defendants neither developed nor

presented at trial, nor thereafter, any physical evidence, such as hair samples, fingerprints,

bloodstains, footwear patterns or other scientific evidence, which linked Whitlock to the crime

scene.

49.     Directly after his conviction and sentencing, Whitlock filed a notice of appeal and

a post-conviction petition challenging his conviction. The Attorney General's Office represented

the State in these post-trial proceedings.

50.     After the trial and during the post-trial proceedings, Defendants Ray, Parrish,

Eckerty and McFatridge continued to suppress and withhold the exculpatory materials from

Whitlock. Being unaware of the exculpatory material, *Brady* issues which should have been

considered were not effectively raised in post-conviction proceedings.

51. Shortly after Whitlock's conviction and sentencing in August of 1987, Herrington and his wife told Defendants Ray, Parrish and other Paris police officers that 1) Herrington had lied in his testimony at trial; 2) that he saw the Paris businessman at the bottom of the Rhoads' stairs just after the murders and before he saw Steidl and Whitlock; 3) that Steidl and Whitlock had walked in after the crime rather than having committed it; 4) that the Paris businessman said to Herrington, "You didn't see me," and later offered him $25,000 in cash, $25,000 in property and a job with the promise he would not have to work, to keep his mouth shut; and 5) that the Paris businessman was shipping narcotics in bags of dog food produced by one of his companies.

52. Defendants Ray and Parrish recorded these highly exculpatory statements in notes and in a police report during the time Whitlock was appealing his case, but they concealed them and did not disclose them to Whitlock or his attorneys. They suppressed the report and the retraction with the knowledge and/or at the direction and with the approval of Defendant McFatridge from Steidl and Whitlock, their lawyers and the Courts who were considering the appeals and post-conviction proceedings. These notes and reports remained suppressed until 1998 when investigator Bill Clutter discovered them in a police storage garage.

53. After Herrington's recantation, Defendants took affirmative steps to convince him to repudiate his recantation, including helping him get his revoked drivers license reinstated. Defendants Parrish and McFatridge intervened on Herrington's behalf with the Office of the Illinois Secretary of State in an attempt to help Herrington get his revoked driver's license restored, despite his five DUI convictions. They successfully restored his driving privileges and even obtained a waiver of fines related to the convictions. Defendants' efforts were not disclosed to Whitlock or his attorneys.

14

54.     Later in 1988, Defendant Rienbolt, while in prison and acting as an informant for a Federal Marshal who was looking for a federal fugitive named James "Jim" Slifer, informed him that Slifer had ordered and was present for the Rhoads murders.

55.     Defendant Rienbolt became the subject of a Federal investigation for allegedly making false statements to federal authorities, and in January of 1989, McFatridge intervened with the U.S. attorney's office on her behalf.  Neither his intervention nor Rienbolt's statement about Slifer were disclosed to Steidl or Whitlock.

56.     In January of 1989, Defendant Rienbolt recanted her trial testimony.  She told Steidl's appellate lawyer that 1) Steidl "did not take part in the killings of Dyke and Karen Rhoads and was not present when the murders took place," 2) that James Slifer "was personally present in the Rhoads bedroom at the time of the murders," 3) that Cheryl Costa "had some involvement with Slifer and the murders," and 4) that Darrell Herrington was not present at the scene of the murders. Additionally, she signed an affidavit which stated that she knew "Randy Steidl did not stab either Dyke or Karen Rhoads," and that she "repeatedly told the police and the prosecutor that Randy Steidl did not stab either Dyke or Karen Rhoads, but the police and the prosecutor ignored my statements."

57.     Defendants Parrish and McFatridge, upon learning of Defendant Rienbolt's recantations, which among other things implicated them and their fellow Defendants in suborning perjury and obstructing justice, threatened and intimidated Defendant Rienbolt.  As a result of Defendants' threats, she repudiated her recantation.

58.     Whitlock subsequently filed a post-conviction petition which raised, *inter alia*, the testimony of Herrington and Rienbolt and their recantations.

15

59.    In response to this filing, Defendant McFatridge, continuing his false publicity
campaign, again made false and prejudicial public statements in response to Plaintiff's evidence,
discrediting the recantations and again falsely claiming that "one fact will never change --- that
Herbert R. Whitlock and Gordon R. Steidl are responsible for the deaths of Dyke and Karen
Rhoads." Such a statement posed a serious and imminent threat to the fairness of the
adjudicative proceedings and constituted an impermissible published opinion on the guilt of
Whitlock in violation of Supreme Court Rule 3.6 (Illinois Rules of Professional Conduct).

60.    As a consequence, Herrington's and Rienbolt's original false, manufactured and
coerced testimony and their wrongfully induced repudiations of their recantations as aforesaid,
the Defendants' continued concealment and suppression of highly exculpatory evidence,
Defendants Parrish's and Eckerty's false and perjurious testimony at the hearing, the continued
highly prejudicial atmosphere engendered by this false evidence and Defendant McFatridge's
publicity campaign, the trial Judge denied Whitlock's post-conviction petition.

61.    Defendant McFatridge resigned his position as State's Attorney of Edgar County
in early 1991.

62.    On September 28, 1988, the Illinois Appellate Court for the Fourth District,
basing its decision on the trial court record, containing the same coerced, suggested, fabricated
and manipulated evidence and being unaware of the highly exculpatory evidence which had been
concealed and suppressed, affirmed Whitlock's conviction and sentence and the denial of his
post-conviction petition.

63.    On March 6, 1990, Whitlock filed a petition for habeas corpus in the United
States District Court for the Central District of Illinois. As a direct consequence of 1) all of the
false testimony, statements and repudiations of recantations which were coerced, suggested,

fabricated, manipulated and purchased by Defendants Ray, Parrish, Eckerty and McFatridge, and

2) the Defendants' continued concealment and suppression of highly exculpatory evidence, and

3) Defendant McFatridge's publicity campaign, Whitlock's habeas corpus petition was

ultimately dismissed. On June 8, 1992, Whitlock filed a second petition for habeas corpus in the

United States District Court for the Central District of Illinois which was similarly dismissed as a

consequence of the wrongful conduct of Defendants as aforesaid.

64.    In February 1996, Defendant Rienbolt gave a sworn court reported and

videotaped statement to Steidl's lawyers in which she swore that her prior statements and

testimony were false. She further swore she had not been present at the scene of the murders,

that the knife she provided was not the murder weapon and that she had no knowledge of Steidl

having been involved in the crime. She also averred that Defendants Ray, Parrish, Eckerty and

McFatridge coerced, manipulated and helped her fabricate her statements and trial testimony

which falsely inculpated Steidl and Whitlock.

65.    Less than a week after her 1996 recantation, Defendant Rienbolt met with

Defendants Parrish, Eckerty and McFatridge and, on information and belief, because of their

threats and coercion, retracted her recantation of the previous week.

66.    On September 18, 1997, the Illinois Supreme Court reversed the dismissal of

Steidl's amended post-conviction petition holding that he was entitled to an evidentiary hearing.

Defendants knew that Steidl's success in his hearing would have had a concomitant benefit for

Whitlock.

67.    In 1998, the trial court conducted a post-conviction evidentiary hearing for Steidl.

Defendants again introduced their fabricated evidence and again suppressed exculpatory

material, all in an effort to have the court deny the petition. Defendant McFatridge gave false

and perjured testimony at Steidl's hearing, in which he denied any misconduct by himself or any other of the Defendants, and Defendants Ray, Parrish, Eckerty and McFatridge continued to conceal and suppress from this hearing all of the exculpatory evidence discussed above. Their wrongful conduct was designed to continue the wrongful incarceration of Steidl, which they knew would have a parallel effect on Whitlock. Their conduct was also designed to cover up Defendants' wrongful acts and omissions in the prosecution, conviction and post-trial proceeding of both Steidl and Whitlock.

68.    On December 11, 1998, the trial court again denied Steidl's post-conviction relief on his conviction, although the court did grant Steidl a new sentencing hearing, at which the state declined to pursue the death penalty. On February 18, 1999, Steidl was resentenced to natural life imprisonment. The Illinois Appellate Court affirmed denial of this post-conviction petition on December 5, 2000, and the Illinois Supreme Court denied leave to appeal on April 4, 2001.

69.    In 1999, following a national conference, Northwestern University professor David Protess and his Innocence Project sent a team of student investigators from the Center on Wrongful Convictions. The contradictions and anomalies which manifested themselves were also featured in television reports. The disclosures led to the appointment of ISP Lieutenant Michale Callahan ("Callahan") in April 2000 who was assigned to investigate the Steidl and Whitlock convictions.

70.    At the time of his appointment, Callahan was the District 10 Investigations Commander.

71.    Following exhaustive research into the Rhoads' murders and the Steidl and Whitlock trials, Callahan wrote a detailed memo which he sent to ISP Captain John Strohl on May 17, 2000. The memo was circulated up the ISP chain of command to Defendants Carper

18

and Parker and later to Defendant Fermon. Callahan documented a wealth of evidence gathered during his review, all of which supported his conclusion that Steidl and Whitlock "had not been proven guilty beyond a reasonable doubt," and that the Paris businessman "was at one time and should still be the focus of the investigation."

72.    Among the facts, findings and conclusions included in this memorandum of May 17, 2000, were thirty-eight separate contradictions and material falsehoods found in Defendant Rienbolt's and Herrington's testimony, including the following:

- Defendants Parrish and McFatridge had witness Carol Robinson lie on the stand about whether she saw Herrington and Steidl together on July 5th;
- Herrington's time line did not fit with the crime;
- A polygraph examiner found purposeful non cooperation of Herrington and the examiner's recommendation that Herrington be re-examined was rejected by the Defendants;
- Rienbolt's testimony that she skipped work on the night of July 5th and was with Steidl and Whitlock was refuted by numerous witnesses;
- Rienbolt's testimony that a broken lamp was used in the homicides was refuted by the testimony of the fire examiners;
- Rienbolt later recanted her testimony that she was present at the murders and that Steidl was involved;
- Rienbolt lied about the knife;
- Rienbolt admitted that Parrish led her into her false testimony;
- Herrington testified he was at Joe's Bar with Steidl and Whitlock at 8:30 p.m. and they all went to the Horseshoe Bar, while Defendant Rienbolt testified she was with them at the same time at the Tap Room Bar;
- Herrington described the crime scene, placing Dyke Rhoads on the floor with shorts on and Karen Rhoads on the bed with panties on. The firemen said they were totally nude;
- Defendant Rienbolt stated that she went to the American Legion Bar with Barbara Furry. Barbara Furry stated that she has never gone to the bars with Defendant Rienbolt and she was not at the American Legion July 5, 1986;
- Defendant Rienbolt implausibly stated that Steidl and Whitlock took showers at the Rhoads' house after the murders.

- Herrington stated that Whitlock had a clump of Karen Rhoads' hair in his hand. The autopsy report shows no hair torn from Karen Rhoads' head.

73. In this May 17, 2000, memorandum, Callahan further set forth evidence which

supported the determination that the Paris businessman and several of his employees were, and

continued to be, suspects in the Rhoads murders, in other related homicides and in organized

crime and narcotics trafficking. Callahan found that Defendant Parrish had a connection to the

Paris businessman. Callahan found that much of this highly exculpatory evidence was known to

Defendants Ray, Parrish, Eckerty and McFatridge and was suppressed from Steidl and Whitlock,

including:

- Karen Rhoads was employed by the Paris businessman as a secretary and he frequently visited her apartment;
- The Paris businessman was a suspect in two prior homicides including the murder of a former secretary;
- Karen Rhoads said that she had seen the Paris businessman and an employee load a large sum of cash and a machine gun in the Paris businessman's car;
- Karen Rhoads had told the Paris businessman the Friday prior to the murders that she was quitting her job, that he forbade her from doing so and a big argument ensued. Karen wrote a letter later found on her desk which read "I'm still with Bob. He says my bonus will be real big this year. Believe me it had better;"
- Two of the Paris businessman's employees, who were known as his "right hand men," were implicated in the Rhoads murders;
- The Paris businessman arrived on the scene just as the investigators did and offered his theory about the murders;
- Immediately after the murders, the Paris businessman offered a $25,000 reward in local bars for information on the murders. Herrington later stated that the Paris businessman offered him $25,000 and a job to keep his mouth shut;
- Herrington also told Ray and Parrish that the Paris businessman was at the scene of the murders at the time they occurred;
- Parrish worked for the Paris businessman during a six-month suspension prior to the murders.

74. Callahan continued his investigation, and in July of 2000 and August of 2001, he

wrote further memos to his superiors. Those memos were also disseminated to Carper and

20

Parker, and later to Defendant Fermon. In these memos, he provided further details about his interviews which were exculpatory to Steidl and Whitlock. Much of what Callahan reported was known to Defendants Ray, Parrish, Eckerty and McFatridge at all times and was withheld and suppressed from Steidl and Whitlock. These memos, totaling twenty-eight pages of details, containing exculpatory evidence and investigative findings and discussing the connection of the Paris businessman to the Rhoads murders were delivered to Defendants Fermon, Carper and Parker, but not disclosed to Steidl, Whitlock or their attorneys at that time.

75.    Defendant Eckerty, other law enforcement agents and Eckerty's s wife contacted Callahan to tell him that Eckerty was a "good cop" and that Callahan should not ruin his reputation. Eckerty also offered to sell Callahan a houseboat at his cost. Callahan suggested a full scale reinvestigation, focusing in large part on the Paris businessman.

76.    Upon receipt of all the evidence and investigative findings reported by Callahan and in an effort to cover up the wrongdoing of Defendants Ray, Parrish, Eckerty and McFatridge, Defendants Fermon, Carper, Brueggemann and Parker refused a full investigation of the Rhoads case because, as Carper put it, it was "too politically sensitive." Defendants Fermon, Carper, Brueggmann and Parker allowed only an investigation of the Paris businessman, limited to intelligence gathering. Then they removed Callahan from the Rhoads case and ordered him to focus on assignments other than the Rhoads murders and the Paris businessman. They demoted Callahan and transferred him from his investigative post and, with Defendant Kaupus, launched an effort to discredit Callahan's evidence, findings and recommendations.

77.    Once they obtained full knowledge of the concealed, withheld and suppressed exculpatory evidence which was existing at the time of Whitlock's arrest, conviction and post-conviction proceedings, Defendants Fermon, Carper, Brueggemann and Parker had an

21

affirmative duty under *Brady* to disclose this evidence to Whitlock and his attorneys. But rather than so advise Whitlock, his attorneys or the courts, Defendants Fermon, Carper, Brueggemann and Parker, along with Defendants Ray, Parrish, Eckerty and McFatridge, kept mum and took steps actively to keep the evidence concealed. Whitlock had a right to be informed about *Brady* material.

78.     As a result of his demotion, Callahan brought a civil suit accusing Fermon and Carper of violating his free speech and of retaliatory demotion. A jury awarded $700,000 in favor of Callahan and against Fermon and Carper.

79.     Because Defendants Fermon, Carper, Brueggemann, Parker and Kaupus suppressed the investigation into the Rhoads murders, the development of further evidence exculpatory to Steidl and Whitlock which would have resulted therefrom was thwarted.

80.     These same Defendants caused the wealth of exculpatory evidence uncovered by Callahan to be withheld from Steidl and Whitlock during the period of time they were petitioning for release. Callahan's information, when combined with the previously concealed information, would have likely resulted in their exoneration and release.

81.     Steidl and Whitlock filed petitions for executive clemency with the Governor of the state of Illinois in which they asked for a pardon on the basis of their innocence.

82.     When he learned of their petitions for clemency, Defendant McFatridge launched a public campaign opposing the freeing of Steidl and Whitlock by pardon, clemency or any collateral relief. In so doing, he again made false public statements which prejudiced Steidl and Whitlock and their legitimate claims of innocence, for a new trial and for release, which they were seeking in post-conviction, habeas and clemency and pardon proceedings.

83. On information and belief, a representative of the Governor called Callahan, informing him that the Governor was prepared to pardon Steidl and Whitlock if Callahan could represent to him that, based on his investigation, they were innocent.

84. On information and belief, Callahan, who was required to seek approval from his superiors before providing such an official statement, contacted the Defendants who were his superiors in the chain of command and immediately sought such approval.

85. On information and belief, Callahan provided a detailed briefing at a lengthy meeting attended by Defendants Fermon, Carper, Brueggemann and others where he presented all the evidence and findings set forth above and articulated his opinion, supported by all this evidence, that Steidl and Whitlock had not only not been proven guilty beyond a reasonable doubt, but that they were innocent and that the jury never heard the truth. Callahan also told these Defendants that there was no credible evidence against Steidl and Whitlock, that the two so-called eye witnesses had been completely discredited, that he strongly suspected that the wrongdoing by Parrish, Eckerty and McFatridge and the Paris businessman should continue to be the focus of the investigation.

86. At the briefing, Defendants Fermon, Carper and Brueggemann opposed Callahan's evidence and took the position that he should not be permitted to inform the Governor's representative that Steidl and Whitlock were innocent. On information and belief, Callahan was ordered to offer no opinion and supply no exculpatory evidence to the Governor or his representative.

87. Because of the obstruction and suppression of Callahan's findings and opinions by Defendants Fermon, Carper and Brueggemann, combined with the previous and continuing

suppression of evidence by all Defendants, the Governor declined to make a determination on
Steidl and Whitlock's request for clemency and their requests remain pending to this date.

88.    On June 17, 2003, the Federal District Court granted Steidl's petition for writ of
habeas corpus, which had been filed on October 5, 2001, vacating Steidl's conviction with a
finding that "acquittal was reasonably probable if the jury had heard all of the evidence" and
allowing the state 120 days to release or retry him.

89.    Attorney General Lisa Madigan announced she would not appeal the order,
stating that after carefully reviewing the evidence, her office found that information favoring the
defense was never disclosed, and that Steidl was thus entitled to a new trial.

90.    In a last ditch effort to continue to hold Steidl in custody, Defendant McFatridge
made additional false public statements, including one to the Paris Beacon News, in which he
attacked Attorney General Lisa Madigan for her decision not to appeal the District Court's
decision, recited again the false evidence which he and his co-Defendants had manufactured and
coerced, falsely denied that he and his co-Defendants suppressed exculpatory evidence and
falsely claimed that Steidl was guilty of the brutal murders.

91.    Steidl was released from Danville Correctional Center on May 28, 2004, after
serving seventeen years in prison, twelve of them on Death Row, for two murders the
Defendants knew be did not commit.

92.    Despite the fact that the Federal District Court had found that Steidl's trial would
have probably resulted in acquittal and despite the fact that Whitlock was convicted on the very
same basis, Whitlock was not released. Despite the fact that the Illinois Attorney General
believed that information favoring Steidl's defense was never disclosed and that the same
evidence was concealed from Whitlock, all efforts to release Whitlock were strenuously opposed

by Defendants. Neither the Illinois Attorney General nor the Office of the State Appellate

Prosecutor agreed to afford Whitlock the same treatment as Steidl. Whitlock was forced to

continue in his imprisonment for a crime he did not commit.

93. On June 11, 2004, Whitlock filed a second amended petition for post-conviction

relief. Rather than concede that Whitlock was no more culpable than his co-defendant Steidl,

who the state refused to retry, the Office of the State Appellate Prosecutor, with the active

assistance of Defendants Eckerty and Marlow, vigorously opposed Whitlock's petition and

sought his continued incarceration. Defendant Marlow, who also became aware of the wealth of

exculpatory evidence, scoured the country trying to get witnesses to testify against Whitlock.

94. The following was adduced at Whitlock's post-conviction hearing:

- Defendant Eckerty admitted he provided Herrington with alcohol "to help
  him relax" before his Grand Jury testimony.

- Gary Wheat, a Paris police officer, stated that he stayed with Herrington in
  Defendant Parrish's cabin and provided Herrington with alcoholic beverages.

- Defendant Eckerty stated that Herrington made an "eavesdropping"
  telephone call to Whitlock on September 25, 1986, from Parrish's cabin
  while drinking alcohol they provided.

- Debra Helton, a forensic scientist with the ISP crime laboratory, submitted a
  stipulated affidavit which stated that she began to screen items of evidence
  for human blood. Helton was told that Herrington had a cut on his hand and
  she requested Herrington's blood standard. Defendants Parrish, Eckerty and
  McFatridge failed and refused to forward Herrington's blood standard to her
  for testing.

- Dr. John Murphy, the State's pathologist testified that he had removed the
  sternum from Dyke Rhoads body because he had found a "defect," a knife
  wound in the sternum. He preserved the sternum in case anyone wished to
  examine it for tool marks (distinctive to a particular knife blade). No such
  examination was ever done.

- Dr. Murphy testified that either the Rienbolt knife or the knife found in the
  sink could have been the murder weapon.

- Donald Tankersky, an arson investigator for the State Fire Marshall, testified
  that the lamp was in fact not broken until after the fire. The interior was

25

white and free of soot. Rienbolt had testified she saw broken, a piece in
Steidl's hand at the time of the murders

- Whitlock presented Dr. Baden, a forensic pathologist, certified in all three of
  pathologies sub-specialties. He had performed more than 20,000 forensic
  autopsies. He concluded to a reasonable degree of medical certainty that the
  Rienbolt knife did not cause the fatal wound on Dyke Rhoads.
- Dr. Baden also concluded to a reasonable degree of medical certainty that the
  Rienbolt knife could not have inflicted Karen Rhoads' wound, but that the
  sink knife could have done so.

95.     Despite the overwhelming evidence at the post-conviction hearing and despite the

fact that the state had decided its evidence was insufficient to retry Steidl, Defendant Eckerty,

along with Prosecutor David Rands, strenuously opposed Whitlock's petition, submitted the

same fabricated, manipulated and false evidence it used to originally convict him and urged the

court to deny the petition.

96.     Due in part to 1) the continued reliance on the fabricated, manipulated, coerced

and false testimony, on the withholding and suppression of exculpatory evidence, 2) the

suppression of the Callahan report and refusal to permit the further investigation, 3) the

continued efforts of Defendants to prevent investigation of other credible suspects including the

Paris businessman and 4) continued efforts of Defendants not to admit their mistakes, the trial

court denied Whitlock's post-conviction petition. Whitlock continued to be incarcerated in the

penitentiary despite his innocence.

97.     Whitlock appealed the denial of his petition to the Illinois Appellate Court for the

Fourth District. During 2006 and continuing into 2007, the Office of the State Appellate

Prosecutor, aided by Defendant Marlow, continued in their attempts to manufacture evidence

against Whitlock and defeat his appeal. Defendant Marlow continued to interview potential

witnesses strongly suggesting stories to them. On one occasion, he visited Ovid Chambers in

Florida and screamed and forcefully told him that he knew Whitlock was with him in the Rhoads

26

house the night of the murders and that Chambers should so testify.  Chambers denied such a
story and declined.

98.    Jennifer Aper, a scientist at the ISP crime lab, who has possession of items of
physical evidence recovered from the crime scene, was told not to perform mitochondrial DNA
tests.  Without such tests, the tissue and blood samples cannot be compared to other credible
suspects, including those presently incarcerated in other institutions.

99.    On September 6, 2007, the Illinois Appellate Court for the Fourth District issued a
53-page opinion finding *inter alia* that the "State violated *Brady* by suppressing [evidence.]"
The Court held, "We find a reasonable probability that but for these errors, considered
cumulatively the verdict would have been different." (p. 2)  The Court reversed the judgment
and conviction and remanded the case back for a new trial.

100.    Despite the Appellate Court's decision, Defendants still objected to Whitlock's
release.  Whitlock sought to be released on bond so that he could spend Christmas 2007 with his
daughter and grandchild, but the state argued against it.  Whitlock was finally released on
January 8, 2008, when the state *nolle prosequied* the case.

**COUNT I**
**(42 U.S.C. § 1983 Claim for Deprivation of Right to Fair Trial, Deprivation of Due Process
and for Wrongful Conviction)**

101.    Plaintiff realleges paragraphs 1 through 100.

102.    Article 42 U.S.C. § 1983 provides, in pertinent part, as follows:

> "Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress...."

103.    Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge,

individually, jointly and in conspiracy with each other and with certain other named and

unnamed private individuals and law enforcement agents, caused the wrongful charging,

prosecution and conviction of Whitlock, and these same Defendants, together with Defendants

Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff

Marlow, individually, jointly and in conspiracy with each other and with certain other named and

unnamed private individuals and law enforcement agents, caused the continuation of said

wrongful conviction, by a) coercing, intimidating, constructing and/or fabricating the false and

totally unreliable statements, testimony and other evidence which formed the basis for

Whitlock's charging, prosecution and conviction; b) withholding and concealing from

Whitlock's defense attorneys, and the judges, juries, post-trial prosecutors and the Governor and

his staff, who were involved in Whitlock's criminal proceedings, the highly exculpatory and

exonerating evidence that these statements, testimony and other evidence were false, totally

unreliable, fabricated, manipulated, suggested and coerced; c) suppressing from these same

persons additional highly exculpatory and exonerating evidence and documents which further

exonerated Steidl and Whitlock and his co-defendant, including evidence of other more likely

suspects; d) writing false reports and giving and tendering false testimony and statements at the

Grand Jury, at trial and at post-conviction and habeas corpus proceedings; e) improperly

influencing the judges, juries and executive bodies and officials hearing and considering

Whitlock's case, and the post-trial prosecutors who continued his prosecution, *inter alia*, by

making false public statements and f) obstructing investigations which would have led to

discovery of further exculpatory evidence, and by the additional wrongdoing set forth above,

thereby unconstitutionally depriving Whitlock of his liberty, violating his right to a fair and

impartial trial and violating his rights to due process, all as guaranteed by the Fourteenth
Amendment to the United States Constitution.

104.    The actions of Defendants Gene Ray, James Parrish, Jack Eckerty, Michael
McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles
Brueggemann and Jeff Marlow in depriving Whitlock of his liberty, his right to a fair trial and
his right to due process were a direct and proximate cause of the injuries to Whitlock which are
set forth above.

WHEREFORE, Herbert Whitlock demands judgment against Defendants Gene Ray,
James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker,
Charles Brueggemann and Jeff Marlow for substantial compensatory damages in excess of
twenty million dollars, and because these Defendants acted maliciously, willfully, wantonly
and/or with reckless disregard for Whitlock's constitutional rights, for substantial punitive
damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems
equitable and just.

### COUNT II
### (42 U.S.C. § 1983 - Malicious Prosecution)

105.    Plaintiff realleges paragraphs 1 through 100.

106.    The actions of Defendants Gene Ray, James Parrish, Jack Eckerty and Michael
McFatridge, individually, jointly and in conspiracy with each other and with certain other named
and unnamed private individuals and law enforcement agents acting under color of state law
wrongfully arresting, imprisoning, prosecuting and causing the conviction and sentencing of
Whitlock, amounted to malicious prosecution in violation of rights decreed to Whitlock by the
Fourth, Fifth and Fourteenth Amendments of the Constitution. Defendants Steven Fermon,
Diane Carper, Charles Brueggemann, Andre Parker, Kenneth Kaupus and Jeff Marlow,

29

individually, jointly and in conspiracy with each other and with certain other named and

unnamed private individuals and law enforcement agents acting under color of state law, caused

the continued incarceration of Whitlock through all of the post-conviction proceedings and

continuing for twenty-one years, without probable cause, egregiously depriving him of his liberty

without due process, and violated Plaintiff's Fourth, Fifth and Fourteenth Amendment rights.

107.    Article 42 U.S.C. § 1983 provides, in pertinent part, as follows:

"Every person who, under color of any statute, ordinance, regulation,
custom, or usage, of any State or Territory or the District of Columbia,
subjects, or causes to be subjected, any citizen of the United States or
other person within the jurisdiction thereof to the deprivation of any
rights, privileges, or immunities secured by the Constitution and laws,
shall be liable to the party injured in an action at law, suit in equity, or
other proper proceeding for redress...."

108.    Defendants Ray, Parrish, Eckerty and McFatridge initiated the criminal

proceedings with the aid and assistance of Defendant Rienbolt, Herrington and others. The

criminal proceedings were ultimately resolved in Whitlock's favor, resulting in his release on

January 8, 2008. As set forth aforesaid, the initiation of the criminal proceeding was malicious

and without probable cause and, as a consequence, Whitlock suffered a deprivation of his liberty.

109.    The actions of the Defendants as aforesaid were so egregious that they violated

Whitlock's rights to due process and subjected Whitlock to the deprivation of his rights,

privileges and immunities secured by the United States Constitution and laws and were the direct

and proximate cause of Whitlock's injuries and damages.

WHEREFORE, Plaintiff Herbert Whitlock demands judgment against Defendants Gene

Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre

Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow for compensatory damages in

excess of twenty million dollars, and because these Defendants acted maliciously, willfully,

wantonly, and/or with reckless disregard for Whitlock's Constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT III
### (False Imprisonment)

110.    Plaintiff realleges paragraphs 1 through 100.

111.    Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the wrongful charging, false arrest, wrongful prosecution and conviction of Whitlock.

112.    These same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the continuation of Whitlock's wrongful conviction and caused him to be continually and falsely imprisoned, by a) coercing, intimidating, constructing and/or fabricating the false statements, testimony and other evidence; b) withholding and concealing from Whitlock and his defense attorneys, from the judges, juries, post-trial prosecutors and from the Governor and his staff, all of who were involved in Whitlock's post-conviction proceedings, the highly exculpatory and exonerating evidence that these statements, testimony and other evidence were false, totally unreliable, fabricated, manipulated, suggested and coerced; c) suppressing from these same persons additional highly exculpatory and exonerating evidence and documents which further exonerated Steidl and Whitlock and his co-defendant, including evidence of other more likely suspects; d) writing false reports and giving and tendering false testimony and statements at the Grand Jury, at trial and at post-conviction and habeas corpus

31

proceedings; e) improperly influencing the judges, juries and executive bodies and officials

hearing and considering Whitlock's case, and the post-trial prosecutors who continued his

prosecution, *inter alia*, by making false public statements; f) obstructing investigations which

would have led to discovery of further exculpatory evidence and g) the additional wrongdoing

set forth above, thereby unconstitutionally depriving Whitlock of his liberty, causing him to be

falsely imprisoned and violating his rights to due process, all as guaranteed by the Fourth, Fifth

and Fourteenth Amendments to the United States Constitution.

113.    The actions of Defendants Gene Ray, James Parrish, Jack Eckerty, Michael

McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles

Brueggemann and Jeff Marlow in depriving Whitlock of his liberty, his right not to be falsely

imprisoned and his right to due process were a direct and proximate cause of the injuries to

Whitlock which are set forth above.

WHEREFORE, Herbert Whitlock demands judgment against Defendants Gene Ray,

James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker,

Charles Brueggemann and Jeff Marlow for substantial compensatory damages in excess of

twenty million dollars, and because these Defendants acted maliciously, willfully, wantonly

and/or with reckless disregard for Whitlock's constitutional rights, for substantial punitive

damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems

equitable and just.

## COUNT IV
### (42 U.S.C. § 1983 *Monell* Policy Claim Against City of Paris)

114.    Plaintiff realleges paragraphs 1 through 100.

115.    The actions of Defendants Gene Ray, James Parrish, Michael McFatridge and

Jack Eckerty as alleged above, were done pursuant to one or more interrelated *de facto* policies,

practices and/or customs of the Defendant City of Paris, its Police Department and Police Chiefs, together with the Edgar County State's Attorney and its States Attorney's Office, which was acting pursuant to, find as an agent of, the city of Paris.

116.    At all times material to this complaint, Defendant City of Paris and its Police Department, Police Chiefs, together with the Edgar County State's Attorney and its States Attorney's Office , which was acting as an agent of the City of Paris and pursuant to its policies and practices, had interrelated *de facto* policies, practices and customs, which included, *inter alia*:

a.    conducting physically, psychologically or otherwise illegally or improperly coercive and intimidating interrogations of witnesses, suspects and arrestees in order to obtain false statements, testimony and other false inculpatory evidence, and wrongful arrests, prosecutions and convictions;

b.    filing false reports and giving false statements and testimony about said interrogations and evidence, and fabricating parts or all of said evidence; suppressing evidence concerning said interrogations, confessions and evidence; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions and evidence obtained during said interrogations; and otherwise covering up the true nature of said interrogations, confessions and evidence;

c.    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of coercion and related physical and other abuse of suspects, witnesses and other citizens; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or

33

improperly coercive questioning or interrogation of witnesses, suspects, arrestees and other citizens, including, but not limited to, persons who were physically and/or psychologically abused during questioning;

d.   the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a, b and c above, whereby police officers refused to report or otherwise covered up instances of police misconduct and/or the fabrication, suppression and destruction of evidence of which they were aware, despite their obligation under the law and police regulations to report such violations.  Said code of silence also includes police officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability or criminal charges, and perjuring themselves in criminal cases where they and their fellow officers have coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant; and

e.   the practice of covering-up wrongdoing by members of the police force and prosecutors, the suppressing and withholding exonerating, exculpatory and/or other evidence favorable to criminal defendants which were not turned over to the prosecuting attorneys and/or defense lawyers.

117.   The patterns and practices set forth above were well known both before and after Plaintiff was wrongfully arrested, charged, imprisoned and convicted, including by the commanding and supervisory Defendants named herein, who participated in the cover-up and suppression of evidence and the wrongful prosecution and conviction of the Plaintiff, his co-defendant and other victims, *inter alia*, in the manner set forth in this complaint.

34

118.    Said interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference, encouraged, *inter alia*, the coercing of false statements and testimony from suspects, witnesses and arrestees, by abusive tactics and techniques; the fabrication, manipulation and alteration of witness statements, testimony, and other false evidence; the suppression of evidence of abuse and other exculpatory evidence; the intimidation of witnesses; the making of false statements and reports; the giving of false testimony and the pursuit and continuation of frame-ups and other wrongful convictions and false arrests and imprisonments of innocent persons, and were, separately and together, a direct and proximate cause of the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators and the injuries suffered by the Plaintiff.

119.    The involvement in, and ratification of, the unconstitutional actions set forth above by Defendant Paris Police Chief Gene Ray, who was acting as a final policymaker for the city of Paris in police matters, including, but not limited to, police interrogations and investigations, also establishes that said Constitutional violations were directly and proximately caused by Defendant City of Paris.

WHEREFORE, Plaintiff Herbert Whitlock demands judgment against Defendant City of Paris for substantial compensatory damages in excess of twenty million dollars, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

### COUNT V
### (State Law Claim for False Imprisonment)

120.    Plaintiff realleges paragraphs 1 through 100.

121.    The imprisonment of Plaintiff, without probable cause, by Defendants Ray, Parrish, Eckerty and McFatridge, individually, jointly and in conspiracy with each other and with

certain other named and unnamed private individuals and law enforcement agents; and its

continuation by these Defendants, together with Defendants Fermon, Carper, Parker, Kaupus,

Brueggemann and Marlow, individually, jointly and in conspiracy with each other and with

certain other named and unnamed private individuals and law enforcement agents, constituted

the tort of false arrest and imprisonment under Illinois law.

122.     Defendants' actions in arresting and imprisoning Plaintiff were willful and
wanton.

WHEREFORE, Plaintiff Herbert Whitlock demands compensatory damages in excess of

twenty million dollars against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael

McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles

Brueggemann and Jeff Marlow, punitive damages, and such other and additional relief as this

court deems just and equitable.

### COUNT VI
### (State Law Claim for Malicious Prosecution)

123.     Plaintiff realleges paragraphs 1 through 100 and 105 through 109.

124.     Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge,

individually, jointly and in conspiracy with each other and with certain other named and

unnamed private individuals and law enforcement agents, initiated a malicious prosecution

without probable cause against Plaintiff, and these same Defendants, together with Defendants

Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff

Marlow, individually, jointly and in conspiracy with each other and with certain other named and

unnamed private individuals and law enforcement agents, continued said prosecution, again

without probable cause. Said prosecution was ultimately terminated in Plaintiff's favor. The

Defendants' actions were done in a willful and wanton manner and directly and proximately

caused the injury and damage to Plaintiff as set forth above.

WHEREFORE, Herbert Whitlock demands actual or compensatory damages in excess of

twenty million dollars against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael

McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles

Brueggemann and Jeff Marlow and, because these Defendants acted in a malicious, willful

and/or wanton manner toward Plaintiff, punitive damages, and such other and additional relief as

this Court deems equitable and just.

### COUNT VII
### (State Law Claim for Intentional Infliction of Emotional Distress)

125.    Plaintiff realleges paragraphs 1 through 100.

126.    Defendants Gene Ray, James Parrish, Jack Eckerty, Gene Ray and Michael

McFatridge, individually, jointly and in conspiracy, with each other and with Defendant Rienbolt

and certain other named and unnamed private individuals and law enforcement agents, engaged

in extreme and outrageous conduct by, *inter alia*, constructing, coercing, intimidating,

manipulating, fabricating, suggesting and altering the evidence against Plaintiff, by knowingly

providing false testimony, by procuring Whitlock's prosecution, conviction and imprisonment

for heinous crimes he did not commit, and by making false and defamatory public statements by

falsely repudiating recantations and by concealing exculpatory evidence.  Additionally, these

same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker,

Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, individually, jointly and in conspiracy

with each other and with certain other named and unnamed private individuals and law

enforcement agents, engaged in additional extreme and outrageous conduct by suppressing

additional exculpatory evidence, by continuing Plaintiff's wrongful conviction and false

imprisonment, by refusing to properly investigate, and by otherwise abusing Plaintiff.

127.    Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge,

Deborah Rienbolt Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles

Brueggemann and Jeff Marlow intended, by subjecting Plaintiff to such humiliating, degrading

conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause

Plaintiff and his family severe emotional distress.

128.    As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was

injured and has experienced, and continues to experience, severe emotional distress, including

fear of execution, nightmares, sleep disruption, symptoms of post traumatic stress disorder,

anxiety, depression and difficulty in focusing or concentrating.

WHEREFORE, Plaintiff Herbert Whitlock demands judgment against Defendants Gene

Ray, James Parrish, Jack Eckerty, Michael McFatridge, Deborah Rienbolt, Steven Fermon,

Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow for

compensatory damages in excess of twenty million dollars plus the costs of this action and such

other relief as this Court deems equitable and just.

## COUNT VIII
### (State Claim for Conspiracy)

129.    Plaintiff realleges paragraphs 1 through 100.

130.    Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge,

Deborah Rienbolt, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles

Brueggemann and Jeff Marlow, with other unsued co-conspirators and other police and

prosecutorial investigative, supervisory and command personnel, together reached an

understanding, engaged in a course of conduct and otherwise jointly acted and/or conspired

38

among and between themselves to falsely imprison and/or to continue said imprisonment, to maliciously prosecute and/or continue said prosecution, and to intentionally inflict severe emotional distress on Plaintiff.

131.    In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in the Facts above.

132.    Said conspirac(ies) and overt acts were and are continuing in nature and were and are a proximate cause of Plaintiff's tortuous injuries under state law, as set forth above.

133.    Defendants' and their co-conspirators' overt acts, as set forth above; which were committed jointly and/or while conspiring together to falsely imprison, maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

WHEREFORE, Plaintiff Herbert Whitlock demands compensatory damages in excess of twenty million dollars, jointly and severally, from Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Deborah Rienbolt, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, and because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

### COUNT IX
### (State Law Respondeat Superior Claim)

134.    Plaintiff realleges paragraphs 1 through 100.

135.    Defendants Gene Ray and James Parrish were, at all times material to this complaint, employees of the Defendant City of Paris, were acting within the scope of their employment and their acts which violated state law are directly chargeable to the Defendant City of Paris under state law pursuant to *respondeat superior*.

39

WHEREFORE, Plaintiff Herbert Whitlock demands judgment against the City of Paris

for any and all compensatory damages awarded on Plaintiff's state law claims, plus the costs of

this action and whatever additional relief this Court deems equitable and just.

**COUNT X**
**(745 ILCS 10/9-102 and Common Law Claims Against the City of Paris)**

136.    Plaintiff realleges paragraphs 1 through 100.

137.    Defendant City of Paris was the employer of Defendants Gene Ray and James

Parrish at all times relevant and material to this complaint.

138.    These Defendants committed the acts alleged above under color of law and in the

scope of their employment as employees of the City of Paris.

WHEREFORE, Plaintiff, pursuant to 745 ILCS § 10/9-102, and otherwise pursuant to

law, demands judgment against the Defendant City of Paris, in the amounts awarded to Plaintiff

against the individual Defendants as damages, attorneys' fees, costs and interest, and for

whatever additional relief this Court deems equitable and just.

**COUNT XI**
**(Edgar County and its State's Attorneys' Office)**

139.    Plaintiff realleges paragraphs 1 through 100.

140.    Defendant Edgar County and its State's Attorneys' Office was the employer of

Defendant McFatridge, who was acting in the scope of his employment as an employee of Edgar

County and its State's Attorneys' Office and who committed the wrongful acts complained of

herein within the course and scope of his employment, and said County is therefore responsible

for any judgment entered against Defendant McFatridge and is therefore a necessary party

hereto.

40

WHEREFORE, Plaintiff Herbert Whitlock demands judgment against Edgar County and

the Edgar County State's Attorneys' Office in the amounts awarded to Plaintiff against

Defendant McFatridge as damages, costs and interest, and for whatever additional relief this

Court deems equitable and just.

**Plaintiff Demands A Jury Trial on all Counts of the Complaint**

Dated:  February 27, 2008                    Respectfully submitted,

                                             HERBERT WHITLOCK

                                             By:
                                             One of his Attorneys

Ronald H. Balson  rhbalson@michaelbest.com
Carrie A. Hall  cahall@michaelbest.com
Michael Best & Friedrich LLP
Two Prudential Plaza
180 North Stetson Avenue, Suite 2000
Chicago, IL 60601
(312) 222-0800
Fax:  (312) 222-0818

- and -

Richard S. Kling  rkling@kentlaw.edu
Susana Ortiz  sortiz@kentlaw.edu
Law Offices of Richard Kling
565 West Adams Street, 6th Floor
Chicago, IL 60661-3691
(312) 906-5155
Fax:  (312) 906-5299

S:\CLIENT\023996\0001\A2424607.5

≈JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| WHITLOCK, HERBERT | CITY OF PARIS, ET AL. |

| | | |
|---|---|---|
| **(b)** County of Residence of First Listed Plaintiff __Edgar__ <br> (EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant __Edgar__ <br> (IN U.S. PLAINTIFF CASES ONLY) <br> NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. | |
| **(c)** Attorney's (Firm Name, Address, and Telephone Number) <br> See attachment. | Attorneys (If Known) | |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | **PERSONAL INJURY** | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 362 Personal Injury - Med. Malpractice | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 365 Personal Injury - Product Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

| VI. CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): <br> 42 U.S.C. § 1983 <br> Brief description of cause: <br> Civil rights. |
|---|---|

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ <br> In excess of $20,000,000 | CHECK YES only if demanded in complaint: <br> JURY DEMAND: ☒ Yes ☐ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | (See instructions): JUDGE _____ | DOCKET NUMBER _____ |
|---|---|---|

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 02/27/2008 | |

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| HERBERT WHITLOCK, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. |
| v. | ) | |
| | ) | |
| CITY OF PARIS, Present and Former | ) | JURY TRIAL DEMANDED |
| Paris Police Officials Chief Gene Ray and | ) | |
| Detective James Parrish; former Illinois | ) | |
| State Trooper Jack Eckerty; former | ) | |
| Edgar County State's Attorney Michael | ) | |
| McFatridge; EDGAR COUNTY; and | ) | |
| Illinois State Police Officials Steven M. | ) | |
| Fermon, Diane Carper, Charles E. | ) | |
| Brueggemann, Andre Parker, Kenneth | ) | |
| Kaupus and Jeff Marlow; David Rands, | ) | |
| Illinois Special Prosecutor, and Deborah | ) | |
| Rienbolt, | ) | |
| | ) | |
| Defendants. | ) | |

## ATTORNEYS FOR PLAINTIFF

Ronald H. Balson rhbalson@michaelbest.com
Carrie A. Hall cahall@michaelbest.com
Michael Best & Friedrich LLP
Two Prudential Plaza
180 North Stetson Avenue, Suite 2000
Chicago, IL 60601
(312) 222-0800
Fax: (312) 222-0818

- and -

Richard S. Kling rkling@kentlaw.edu
Susana Ortiz sortiz@kentlaw.edu
Law Offices of Richard Kling
565 West Adams Street, 6th Floor
Chicago, IL 60661-3691
(312) 906-5155
Fax: (312) 906-5299