**E-FILED**
Monday, 28 April, 2008  04:32:05 PM
Clerk, U.S. District Court, ILCD

1402.001

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

HERBERT WHITLOCK,

                Plaintiff,

           v.                No.:        **08 CV 2055**

CITY OF PARIS, Present and Former Paris    Judge
Police Officials Chief Gene Ray and
Detective James Parrish; former Illinois State    Magistrate Judge
Trooper Jack Eckerty; former Edgar County
State's Attorney Michael McFatridge;
EDGAR COUNTY; and Illinois State Police
Officials Steven M. Fermon, Diane Carper,
Charles E. Brueggemann, Andre Parker, and
Kenneth Kaupus,

                Defendants.

## DEFENDANT, MICHAEL MCFATRIDGE'S ANSWER TO COMPLAINT

    NOW COMES, Defendant, MICHAEL MCFATRIDGE, by and through his attorneys, EKL

WILLIAMS PLLC and answers said complaint as follows:

### I. JURISDICTION AND VENUE

_____1._____Jurisdiction of this matter is invoked upon this Court by virtue of 42 U.S.C § 1983

et. Seq.; 28 U.S.C. § 1331 and 1343 (a); the Constitution of the United States, Articles Four, Five,

Six and Fourteen; and supplemental jurisdiction, as codified in 28 U. S.C. § 1367(a).

**ANSWER:**    Defendant McFatridge admits that Plaintiff seeks to invoke the jurisdiction of the

           Court in the manner stated.

    2.     Venue is proper in the Central District of Illinois under 28 U. S. C. § 1391 (b).

Defendants, or some of them, reside and/or formerly resided in this judicial district. A Substantial

part of the events giving rise to the claims asserted herein occurred within his district.

**ANSWER**:     Defendant McFatrdige admits that venue is proper and the parties reside, or at the

time the events allegedly took place, formerly resided in this judicial district.

Defendant denies that many of the events took place as alleged by Plaintiff.

## II. PARTIES

3,     Plaintiff, Herbert Whitlock, is a sixty-one year old man and a citizen of the state of

Illinois.

**ANSWER**:     Admit.

4.     Defendant Gene Ray ("Ray") was a duly appointed and sworn Chief of the Police

Department of the City of Paris, Illinois. He was a final policy marker for the City of Paris in police

matters, including police investigations, was personally in charge of the homicide investigation of

Karen and Dyke Rhodes and is sued in his individual capacity.

**ANSWER**:     Defendant McFatridge admits that Gene Ray was a duly appointed and sworn Chief

of the Paris Police Department, participated in the Rhoads murder investigation, and

is sued in his individual capacity. Defendant neither admits nor denies the allegation

that Gene Ray was the "final policymaker for the City of Paris" as this constitutes a

legal conclusion.

5.     Defendant James Parrish ("Parrish") was a duly appointed and sworn Paris Police

detective who was the lead Paris police investigator in the Rhoads homicide investigation and is sued

in his individual capacity.

**ANSWER**:     Defendant McFatridge admits that James Parrish was a duly appointed and sworn

Paris Police detective, was one of the investigators assigned to the Rhoads murder investigation, and is sued in his individual capacity.

6.     Defendant City of Paris is an Illinois municipal corporation and, as such, is responsible for the policies, practices and customs of the Paris Police Department and its Chief of Police. Defendant City of Paris was the employer of Defendants Ray and Parrish. The City of Paris is responsible for the acts of Defendants Ray and Parrish while acting within the scope of their employment.

**ANSWER**:     Defendant McFatridge admits that the City of Paris is an Illinois municipal corporation and employed Defendants Ray and Parrish. Defendant lacks sufficient knowledge to admit or deny the remaining allegations; therefore, denies the same.

7.     Defendant Jack Eckerty ("Eckerty") was duly appointed and sworn Illinois State Police ("ISP") trooper who was the lead state police investigator in the Rhoads homicide investigation and is sued in his individual capacity.

**ANSWER**:     Defendant McFatridge lacks sufficient knowledge to admit or deny this allegation; therefore, denies the same.

8.     Defendant Michael McFatridge ("McFatridge") was the Edgar County State's Attorney and is sued in his individual capacity.

**ANSWER**:     Defendant McFatridge admits Plaintiff's claims seek relief against him in his individual capacity as Edgar County's State's Attorney.

9.     Defendant Edgar County is a governmental entity within the State of Illinois, which consists in part of is Edgar County State's Attorney's Office (hereinafter referred to as SAO). Edgar county and the State's Attorney's Office are necessary parties to this lawsuit.

**ANSWER**:    Defendant McFatridge admits that Edgar County is a governmental entity within the State of Illinois, which consists in part of its Edgar County's State's Attorney's Office.  Defendant neither admits nor denies the allegation that "Edgar County and the Edgar County State's Attorney's Office are necessary parties" as this constitutes a legal conclusion.

10.    Defendants Steven M. Fermon ("Fermon"), Diane Carper("Carper"), Charles E. Brueggemann ("Brueggemann"), Andre Parker ("Parker"), Kenneth Kaupus ("Kaupus") and Jeff Marlow ("Marlow") (the "ISP Defendants") were duly appointed and sworn command level ISP officials who supervised the agency's investigation of the Rhoads murders and are sued in their individual capacities.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this allegation; therefore, denies the same.

11.    At all times relevant to this action, the ISP Defendants acted within the scope of his or her employment and under the color of the laws, regulations and customs of the state of Illinois. Each Defendant's actions constituted "state action" as defined under federal law.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this allegation; therefore, denies the same.

12.    Defendant Deborah Rienbolt ("Rienbolt") is a private citizen of the state of Illinois.

**ANSWER**:    Admit.

### III. FACTS COMMON TO ALL COUNTS

13.    In the early morning hours of July 6, 1986, Dyke and Karen Rhoads were stabbed to death in their home in Paris, Illinois, and their house was set on fire.

**ANSWER**:        Admit.

14.        Defendants Ray, Parrish, Eckerty and McFatridge were responsible for investigating the homicides.  They jointly participated in said investigation commencing shortly after the crimes were discovered.

**ANSWER**:        To the extent that this paragraph is directed at Defendant McFatridge, Defendant admits that Defendants Ray and Parish participated in the investigation into the Rhoads murders.  Defendant denies all remaining allegations.

15.        Defendants Ray, Parrish, Eckerty and McFatridge discovered facts disclosing the identities of several credible suspects, including a prominent and influential Paris businessman (the "Paris businessman"), who shortly after the murders offered a $25,000 reward.  Defendant Parrish had employment relationships off and on with the Paris businessman.

**ANSWER**:        To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

16.        Despite the existence of substantial facts leading to the identification of credible suspects, Defendants Ray, Parrish, Eckerty and McFatridge did not pursue them, but instead jointly pursued a course of conduct designed to deflect the investigation away from the Paris businessman, to quickly and expediently bring about a conviction and gain public and political favor by promptly solving the murders.  To that end, they conspired to accuse and convict Gordon Randy Steidl ("Steidl") and Herbert Whitlock for these crimes.  Defendants Ray, Parrish, Eckerty and McFatridge then and there conspired and commenced acts in furtherance of fabricating and creating a case against Steidl and Whitlock.

**ANSWER**:        To the extent that this paragraph is directed at Defendant McFatridge, Defendant

denies this paragraph.

17.    On or about July 9, 1986, directly after the Paris businessman offered the reward at local bars, Defendants Parrish and Eckerty, at the direction and approval and/or with the knowledge of Defendant Ray and McFatridge, and without any physical evidence linking Whitlock to the crimes, took Whitlock into custody and questioned him.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

18.    Although Whitlock denied any connection to the crimes and provided a truthful alibi, Defendants Ray, Parrish, Eckerty and McFatridge continued to pursue him.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

19.    On September 19, 20, and 21, 1986, Defendants Ray, Parrish, Eckerty and McFatridge interviewed Darrell Herrington ("Herrington"), who they knew had five drunken-driving convictions and two convictions for passing bad checks, was considered the "town drunk" and frequented the bars where the reward had been offered.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant admits that Darrell Herrington was interviewed by Defendants Ray, Parish, and Eckerty.  Defendant lacks sufficient knowledge of the remaining allegations in this paragraph to admit or deny these allegations.

20.    Herrington told Defendant Ray, Parrish, Eckerty and McFatridge that he was present at the scene of the Rhoads murders and that two men, "Jim and Ed, " committed the crimes.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant

lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same. Defendant McFatridge answers further that Herrington stated that Plaintiff and Gordon Randy Steidl committed the murders.

21.     On information and belief, Herrington also told these Defendants he had been drinking hard liquor nearly nonstop since noon on July 5, and that by the time the bars closed, he was stumbling drunk and lapsing into unconsciousness.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph. Defendant lacks sufficient knowledge to admit or deny what, if anything, Herrington stated to other defendants.

22.     During Herrington's three days of interrogation, Defendant subjected Herrington to suggestion, coercion and manipulation and plied him with liquor and promises. As a result of the Defendants joint efforts, Herrington changed his story from Jim and Ed to Steidl and Whitlock as the persons whom he had accompanied to the scene of the murders. Herrington was never charged with any crimes related to the Rhoads murder.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

23.     Armed with Herrington's coerced, manipulated, manufactured and suggested false statement, Defendants Ray, Parrish, Eckerty and McFatridge, without probable cause, obtained a warrant to electronically eavesdrop on conversations of Whitlock. Their plan was to use Herrington as a wired informant to entrap Whitlock into making inculpatory statements. The plan failed. Despite their efforts, Whitlock steadfastly maintained he had no connection with the crime. Even though the scheme proved unsuccessful, Defendants Ray, Parrish, Eckerty and McFatridge were not

dissuaded and continued to pursue their scheme to accuse and convict Steidl and Whitlock.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant McFatridge admits that Defendant Eckerty petitioned the Court for an order authorizing the use of an electronic eavesdropping device for the purpose of overhearing and/or recording conversations between Darryl Herrington, a consenting party, Plaintiff, Gordon Randy Steidl, and unknown third-parties, and that based on a finding of reasonable cause, Judge Ralph S. Pearman authorized the use of said device.  Defendant McFatridge denies the remaining allegations in this paragraph.

24.    Defendants Ray, Parrish, Eckerty and McFatridge subjected Herrington to a polygraph examination on September 29, 2986.  Concerning direct questions asked by the examiner about whether Herrington was truthful when he accused Steidl and Whitlock, the examiner found that Herrington engaged in "purposeful non-cooperation...(consistent with) not telling the truth" as to "one or more" of the questions.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

25.    Fearing the Herrington's fabricated statement would not withstand further polygraph scrutiny, Defendants Ray, Parrish, Eckerty and McFatridge did not follow the examiner's recommendations that Herrington be subjected to another polygraph examination.  Lacking a credible witness, they decided not to charge Steidl and Whitlock with the murders at that time. Nevertheless, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, officially recorded Herrington's fabricated and discredited story in the Paris police reports, but intentionally suppressed and concealed from those reports the highly exculpatory

evidence concerning "Jim and Ed," the lie detector test and its results, and that Herrington's story was the product of their coercion, fabrication, manipulation, suggestion, promises, financial rewards and alcohol.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

26.     For the next several months, Defendants Ray, Parrish, Eckerty and McFatridge continued to meet with Herrington and to use coercive, suggestive and manipulative tactics, promises, rewards, liquor and, on at least one occasion, suggestions by hypnosis, in order to further manufacture and fabricate a more believable, story about Steidl and Whitlock.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

27.     Defendant Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, suppressed and concealed from their official reports, the continued coercion, manipulation, suggestion, fabrication, promises and rewards, as well as the content of Herrington's statements taken under hypnosis.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

28.     On February 16, 1987, seven months after the yet unsolved murders, knowing that they had no credible evidence to charge Steidl and Whitlock, Defendants Ray, Parrish, Eckerty and McFatridge began to meet with another completely unstable individual, a known alcoholic and drug addict, Defendant Rienbolt, who was on felony probation and whom Parrish had previously pressured to be his informant.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

29.     Defendant Parrish accused Rienbolt of involvement in the murders, and, despite her denials, Defendants Parrish and Eckerty, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, continued to interrogate Rienbolt about the crimes.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

30.     During the interrogations, Defendant Parrish and Eckerty, under the supervision and with participation and/or knowledge of Defendants Ray and McFatridge, repeatedly pressured and challenged Rienbolt that she was present at the crime scene and participated in the murders with Steidl and Whitlock, which they postulated took place because Dyke Rhoads backed out of a drug deal.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

31.     Defendants made promises of financial rewards, coerced, pressured, suggested and manipulated Defendant Rienbolt to create the story that her husband's knife really belonged to Whitlock and that Whitlock had given it to her shortly after the crime with blood on it.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

32.     Defendant Rienbolt told to Defendants Parrish and Eckerty that she had gone to work at the Paris Health Center and later consumed vast quantities of drugs and alcohol on July 5, 1986. Defendant Rienbolt did not originally say she witnessed Steidl and/or Whitlock commit the murders

and arson.  Nevertheless, Defendants Parrish and Eckerty caused Rienbolt to change her story and make false statements that she didn't go to work, that she saw Steidl, Whitlock and Herrington together the night before the murders and other false statements about Whitlock and the scene of the murders.  Defendant Rienbolt knew her statements were false and that they would be used to accuse and prosecute Steidl and Whitlock, but she agreed with Defendants to be an active participant and knowingly provide false statements to accuse and prosecute Steidl and Whitlock.  On the basis of these coerced, manipulated, manufactured, and suggested false statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable cause, a warrant to electronically overhear conversations of Steidl and Whitlock, and tried to use Defendant Rienbolt as a wired informant to entrap Whitlock at an AA meeting into making false inculpatory statements.  Defendants Rienbolt willingly attempted to trap him, but try as she may, Whitlock steadfastly and truthfully denied involvement.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

33.     On February 19, 1987, on the basis of knowingly fabricated and false statements Defendants Ray, Parrish, Eckerty and McFatridge obtained arrest warrants for Steidl and Whitlock for the murders of Karen and Dyke Rhoads and for arson and caused them to be arrested for said crimes.  Following their arrest, when questioned at the jail, both Steidl and Whitlock truthfully denied involvement in the crimes.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant admits that arrest warrants were obtained for Plaintiff and Gordon Randy Steidl for the murders of Dyke and Karen Rhoads, but denies the remaining allegations.

34.     Defendants Parrish and Eckerty, with the knowledge and approval of Defendant Ray and McFatridge, wrote and recorded Defendant Rienbolt's manufactured story in official police reports, while suppressing from those reports the highly exculpatory information on how these statements were obtained and that they were false and incredible, contrary to physical and other evidence and based on fabrication, coercion, suggestion, threats, promises, alcohol and drugs.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

35.     On the basis of these coerced, manipulated, manufactured and suggested false statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable cause, a warrant to seize hair, saliva and blood from the persons Steidl or Whitlock, but searches did not lead to any inculpatory evidence against either Steidl or Whitlock, but Defendants continued to wrongfully pursue their scheme to accuse and prosecute Steidl and Whitlock.

**ANSWER**:     Defendant McFatridge admits that a warrant was obtained from a judge, who after finding probable cause, ordered the seizure of hair, saliva and blood from Plaintiff and Steidl.  Defendant denies the remaining allegations.

36.     Using Defendant Rienbolt's and Herrington's false statements, Defendants wrongfully charged Steidl and Whitlock by information with murder and arson.  On March 10, 1987, Steidl and Whitlock were indicted for these crimes by the Edgar County Grand Jury after Defendant Parrish presented false information, including these statements and perjured testimony to the Grand Jury. Acting in concert with Defendants Ray, Parrish, Eckerty and McFatridge, Defendant Rienbolt willfully and knowingly offered false testimony to the Grand Jury in an effort to have Steidl and Whitlock indicted.

**ANSWER**:    Defendant McFatridge admits that Plaintiff and Steidl were charged by information with arson and murder, and on March 10, 1987, were indicted for these crimes by the Edgar County Grand Jury. Defendant denies the remaining allegations.

37.    Defendants Ray, Parrish and Eckerty specifically suppressed from the Grand Jury exculpatory evidence which, if known to the Grand Jury, would have demonstrated that these statements were false, coerced, manipulated, manufactured and suggested, that Steidl and Whitlock were innocent, that the Defendants had identified other likely suspects unrelated to Steidl and Whitlock, all of which would have likely resulted in a "no bill" and a failure to indict.

**ANSWER**:    Defendant McFatridge denies this paragraph.

38.    Defendants Ray, Parrish, Eckerty and McFatridge continued to urge Defendant Rienbolt to fabricate further stories using, *inter alia*, threats of physical force, threats of prosecution, promises of leniency, promises of money and drug treatment. Defendant Rienbolt who was continually under the influence of alcohol and drugs, made further fabrications concerning the murders, to with:

a.    On March 29, 2987, Defendant Parrish, under the supervision and with the participation and/or knowledge of Defendants Ray, Eckerty and McFatridge interrogated Rienbolt and induced her to falsely state that on the night of the murders, Whitlock made statements to her that he, Steidl and Herrington were going to the Rhoads' house to deal with Dyke concerning drugs, that she gave her husband's knife to Whitlock, that she was present at the scene of the crimes, that she heard screaming, saw the bodies and later got the knife back from Whitlock with blood on it.

b.    In early April 1987, Defendants Parrish and Eckerty, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, again interrogated Rienbolt

on several occasions and compelled and induced her to further fabricate the story that she was present at the crime scene and physically restrained Karen Rhoads while Steidl and Whitlock stabbed Dyke Rhoads multiple times and then stabbed Karen Rhoads multiple times and that Steidl and Whitlock later paid her money not to talk.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

39.    In March and April of 1987, Defendants Parrish and Eckerty, with the participation and/or knowledge and approval of Defendants Ray and McFatridge, similarly coerced, manipulated and suggested false statements from other witnesses, including Curtis Smith and Carol Robinson, in an attempt to corroborate portions of Defendant Rienbolt's testimony. Defendants Parrish and Eckerty intimidated witnesses by shouting at them, threatening to put them in jail, shaking their fists, smacking their fists on the table and kicking chairs. On one occasion Defendant Parrish so violently intimidated a witness named Barbara Furry, who was nine month pregnant, that he caused her to urinate on herself.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

40.    Additionally, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, wrote and recorded these coerced, manipulated, suggested and manufactured false stories and statements of Defendant Rienbolt, Smith and Robinson in official police reports while suppressing from those reports the highly exculpatory information that these statements were false and incredible, obtained by coercion and intimidation, were contrary to physical and other evidence and based on fabrication, suggestion, threats and promises.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

41.    In an attempt to influence public opinion and prospective jurors, Defendant McFatridge made numerous false pretrial public statements to the media concerning Steidl, Whitlock and the evidence against them, which statements were widely reported in the press.  McFatridge's statements violated the Illinois Rules of Professional Conduct, specifically Rule 3.6, prohibiting publication of opinions on th guilty or innocence of accused persons.

**ANSWER**:    Defendant McFatridge admits issuing statements to the media concerning the charges brought against Plaintiff and Steidl, but deny all remaining allegations.

42.    In order to insure that Defendant Rienbolt would continue to tell her false story at Steidl's and Whitlock's trials, the Defendants first put her into a drug treatment center, then placed her under house arrest and coerced and enticed her into pleading guilty to the charge of concealing a homicidal death, in exchange for a lenient sentence, the payment of her "relocation expenses" and other rewards.  As part of his coercive agreement, the Defendants obtained Defendant Rienbolt's signature on a six-page statement of "facts" which recited her prior coerced, suggested, fabricated, manipulated false and incredible statements about the crime.  This "agreement" further provided that she could be charged with, and tried for, additional crimes if she did not testify consistently with her statement and the Defendants made it clear to her that these additional crimes included murder, with possible sentence of death.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

43.    Whitlock was tried in May of 1987 in Edgar County, Illinois.  On the basis of the

fabricated and manufactured evidence and because exculpatory materials were concealed from Whitlock and his attorney, the jury returned a verdict of guilty of the murder of Karen Rhoads, which it would not have done but for the wrongful conduct of Defendants Ray, Parrish, Eckerty, McFatridge and Rienbolt.

**ANSWER**:     Defendant McFatridge admits that Plaintiff was tried and convicted of the murder of Karen Rhoads in May of 1987.  Defendant denies all remaining allegations.

44.     In June of 1987, Steidl was tried and convicted of murder and arson in Vermilion County, and on June 16, 1987, sentenced to death on the basis of similar false and fabricated evidence and concealed exculpatory materials.

**ANSWER**:     Defendant McFatridge admits that Steidl was tried and convicted of the murders of Dyke and Karen Rhoads in June of 1987, and subsequently sentenced to death. Defendant denies all remaining allegations.

45.     During the course of their trials, Defendant McFatridge, with the cooperation of Defendants Ray, Parrish and Eckerty did not reveal and took affirmative measures to withhold and suppress the following exculpatory materials favorable to Steidl and Whitlock:

a.     That there were numerous credible leads pointing to other suspects including a prominent and influential Paris businessman;

b.     That witnesses were threatened and intimidated;

c.     There were failed polygraph tests by prosecution witnesses;

d.     There were money and favors given to prosecution witnesses in exchange for their testimony;

e.     Defendants arranged to give witnesses hypnotic suggestions;

f.    The Defendants provided alcohol to witnesses before and during the time they were giving statements;

g.    Herrington believed the murders were committed by two men named "Jim and Ed;"

h.    There was a cut on Herrington's hand the night of the murders;

I.    Defendants failed and refused to submit Herrington's blood standard to the ISP lab;

j.    Defendant Rienbolt testified she saw a piece of broken lamp in Steidl's hand.  The lamp was not broken until after the fire;

k.    That Defendant Rienbolt originally stated that she saw a broken vase, which did not exist;

l.    That witnesses had identified someone other than Whitlock as a perpetrator;

m.    That prosecution trial witnesses were coached in their testimony and provided with fabricated stories; and

n.    That there was a previous business relationship between Defendant Parrish and the Paris businessman.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph and all subparagraphs contained therein.

46.    The officers and the prosecutors had a legal duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 11194, 10 L.Ed.2d 215 (1963) and its progeny to disclose the foregoing, along with all evidence favorable to Whitlock.  Notwithstanding their duty, Defendants Ray, Parrish, Eckerty and McFatridge refused to disclose the foregoing and, in fact, concealed and deliberately obstructed access to exculpatory information.  Following the trial and conviction, other ISP employees who became aware of the undisclosed and concealed information, including Defendants Fermon, Carper,

Brueggemann and Kaupus, had an affirmative *Brady* duty to disclose.

**ANSWER**:    Admit the legal proposition determined by the case of <u>*Brady v. Maryland*</u>, but to the extent that this paragraph is directed at Defendant McFatridge, Defendant denies all remaining allegations.

47.    Defendants Ray, Parrish, Eckerty and McFatridge suppressed from Whitlock and his lawyers, the Judge who presided over his case and the jury that convicted Whitlock all of the highly exculpatory evidence set forth above, as well as evidence of other potential suspects and promises of leniency and payments that the Defendants made to Defendant Deborah Rienbolt.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

48.    Despite their exhaustive attempts to do so, the Defendants neither developed nor presented at trial, nor thereafter, any physical evidence, such as hair samples, fingerprints, bloodstains, footwear patterns or other scientific evidence, which linked Whitlock to the crime scene.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

49.    Directly after his conviction and sentencing, Whitlock filed a notice of appeal and a post-conviction petition challenging his conviction.  The Attorney General's Office represented the State in these post-trial proceedings.

**ANSWER**:    Admit.

50.    After the trial and during the post-trial proceedings, Defendants Ray, Parrish, Eckerty and McFatridge continued to suppress and withhold the exculpatory materials from Whitlock.  Being unaware of the exculpatory material, *Brady* issues which should have been considered were not

effectively raised in post-conviction proceedings.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

51.     Shortly after Whitlock's conviction and sentencing in August of 1987, Herrington and his wife told Defendants Ray, Parrish and other Paris police officers that 1) Herringont had lied in his testimony at trial; 2)that he saw the Paris businessman at the bottom of the Rhoads' stairs just after the murders and before he saw Steidl and Whitlock; 3)that Steidl and Whitlock had walked in after the crime rather than having committed it; 4)that the Paris businessman said to Herrington, "You didn't see me," and later offered him $25,000 in cash and $25,000 in property and a job with a promise he would not have to work, to keep his mouth shut; and 5) that the Paris businessman was shipping narcotics in bags of dog food produced by one of his companies.

**ANSWER**:     Defendant McFatridge lacks sufficient knowledge to admit or deny the allegations of this paragraph; therefore, he denies the same.

52.     Defendants Ray and Parrish recorded these highly exculpatory statements in notes and in police reports during the time Whitlock was appealing his case, but they concealed them and did not disclose them to Whitlock or his attorneys.  They suppressed the report and the retraction with the knowledge and/or at the direction and with the approval of Defendant McFatridge from Steidl and Whitlock, their lawyers and the Courts who were considering the appeals and post-conviction proceedings.  These notes and reports remained suppressed until 1998 when investigator Bill Clutter discovered them in a police storage garage.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

53.     After Herrington's recantation, Defendants took affirmative steps to convince him to repudiate his recantation, including helping him get his revoked drivers license reinstated. Defendants Parrish and McFatridge intervened on Herrington's behalf with the Office of the Illinois Secretary of State in an attempt to help Herrington get his revoked driver's license restored, despite his five DUI convictions.  They successfully restored his driving privileges and even obtained a waiver of fines related to the convictions.  Defendants' efforts were not disclosed to Whitlock or his attorneys.

**ANSWER**:     Defendant McFatridge admits to writing a letter to the Illinois Secretary of State regarding Herrington's attempt to restore his driving privileges, but denies all remaining allegations.

54.     Later in 1988, Defendant Rienbolt, while in prison and acting as an informant for a Federal marshal who was looking for a federal fugitive named James "Jim" Slifer, informed him that Slifer had ordered and was present for the Rhoads murders.

**ANSWER**:     Defendant McFatridge lacks sufficient knowledge to admit or deny these allegations; therefore, he denies the same.

55.     Defendant Rienbolt became the subject of a Federal investigation for allegedly making false statements to federal authorities, and in January of 1989, McFatridge intervened with the U.S. attorney's office on her behalf.  Neither his intervention nor Rienbolt's statement about Slifer were disclosed to Steidl or Whitlock.

**ANSWER**:     Defendant McFatridge recalls communication with federal law enforcement authorities, but does not recall the specifics of this communication or whether it involved Rienbolt or Slifer; therefore, he lacks sufficient knowledge to admit or deny

these allegations and denies the same.

56.    In January of 1989, Defendant Rienbolt recanted her trial testimony.  She told Steidl's appellate lawyer that 1)Steidl "did not take part in the killings of Dyke and Karen Rhoads and was not present when the murders took place," 2) that James Slifer "was personally present in the Rhoads bedroom at the time of the murders," 3) that Cheryl Costa "had some involvement with Slifer and the murders," and 4) that Darrell Herrington was not present at the scene of the murders. Additionally, she signed an affidavit which stated that she knew "Randy Steidl did not stab either Dyke or Karen Rhoads, but the police and the prosecutor ignored my statements."

**ANSWER**:    Admit that Reinbolt signed an affidavit, but deny all remaining allegations.

57.    Defendants Parrish and McFatridge, upon learning of Defendant Rienbolt's recantations, which among other things implicated them and their fellow Defendants in suborning perjury and obstructing justice, threatened and intimidated Defendant Rienbolt.  As a result of Defendants' threats, she repudiated her recantation.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

58.    Whitlock subsequently filed a post-conviction petition which raised, *inter alia*, the testimony of Herrington and Rienbolt and their recantations.

**ANSWER**:    Admit.

59.    In response to this filing, Defendant McFatridge, continuing his false publicity campaign, again made false and prejudicial public statements in response to Plaintiff's evidence, discrediting the recantations and again falsely claiming that "one fact will never change - that Herbert R. Whitlock and Gordon R. Steidl are responsible for the deaths of Dyke and Karen

Rhoads." Such a statement posed a serious and imminent threat to the fairness of the adjudicative proceedings and constituted an impermissible published opinion on the guilt of Whitlock in violation of Supreme Court Rule 3.6 (Illinois Rules of Professional Conduct.)

**ANSWER**:    Defendant McFatridge denies this paragraph.

60.    As a consequence, Herrington's and Rienbolt's original false, manufactured and coerced testimony and their wrongfully induced repudiations of their recantations as aforesaid, the Defendants' continued concealment and suppression of highly exculpatory evidence, Defendants Parrish's and Eckerty's false and perjurious testimony at the hearing, the continued highly prejudicial atmosphere engendered by this false evidence and Defendant McFatridge's a publicity campaign, the trial Judge denied Whitlock's post-conviction petition.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

61.    Defendant McFatridge resigned his position as State's Attorney of Edgar County in early 1991.

**ANSWER**:    Defendant McFatridge does not recall the specific date he resigned, but admits that he resigned his position effective December 31, 1991.

62.    On September 29, 2988, the Illinois Appellate Court for the Fourth District, basing its decision on the trial court record, containing the same coerced, suggested, fabricated and manipulated evidence and being unaware of the highly exculpatory evidence which had been concealed and suppressed, affirmed Whitlock's conviction and sentence and the denial of his post-conviction petition.

**ANSWER**:    Admit the ruling, but deny all remaining allegations.

63.    On March 6, 1990, Whitlock filed a petition for habeas corpus in the United States District Court for the Central District of Illinois.  As a direct consequences of 1) all of the false testimony, statements and repudiations of recantations which were coerced, suggested, fabricated, manipulated and purchased by Defendants Ray, Parrish, Eckerty and McFatridge, and 2) Defendants' continued concealment and suppression of highly exculpatory evidence, and 3) Defendant McFatridge's publicity campaign, Whitlock's habeas corpus petition was ultimately dismissed.  On June 8, 1992, Whitlock filed a second petition for habeas corpus in the United States District Court for the Central District of Illinois which was similarly dismissed as a consequence of the wrongful conduct of Defendants as aforesaid.

**ANSWER**:    Admit Plaintiff filed two petitions for habeas corpus, which were dismissed, but deny all remaining allegations.

64.    In February 1996, Defendant Rienbolt gave a sworn court reported and videotaped statement to Steidl's lawyers in which she swore that her prior statements and testimony were false. She further swore she had not been present at the scene of the murders, that the knife she provided was not the murder weapon and that she had not knowledge of Steidl having been involved in the crime.  She also averred that Defendants Ray, Parrish, Eckerty and McFatridge coerced, manipulated and helped her fabricate her statements and trial testimony which falsely inculpated Steidl and Whitlock.

**ANSWER**:    Defendant McFatridge admits that Reinbolt gave a sworn court reported and videotaped statement in February of 1996, but lacks sufficient knowledge to admit or deny the remaining allegations of this paragraph; therefore, he denies the same.

65.    Less than a week after her 1996 recantation, Defendant Rienbolt met with Defendants Parrish, Eckerty and McFatridge and, on information and belief, because of their threats and coercion, retracted her recantation of the previous week.

ANSWER:    Defendant McFatridge admits that Reinbolt retracted her recantation, but denies the remaining allegations of this paragraph. Answering further, Defendant McFatridge was no longer the State's Attorney at this time.

66.    On September 18, 1997, the Illinois Supreme Court reversed the dismissal of Steidl's amended post-conviction petition holding that he was entitled to an evidentiary hearing. Defendant knew that Steidl's success in his hearing would have had a concomitant benefit for Whitlock.

ANSWER:    Defendant McFatridge admits that the Illinois Supreme Court reversed the dismissal of Steidl's amended post-conviction petition, but to the extent that this paragraph is directed at Defendant McFatridge, Defendant denies the remaining allegations.

67.    In 1998, the trial court conducted a post-conviction evidentiary hearing for Steidl. Defendants again introduced their fabricated evidence and again suppressed exculpatory material, all in an effort to have the court deny the petition. Defendant McFatridge gave false and perjured testimony at Steidl's hearing, in which he denied any misconduct by himself or any other of the Defendants, and Defendants Ray, Parrish, Eckerty and McFatridge continued to conceal and suppress from this hearing all of the exculpatory evidence discussed above. Their wrongful conduct was designed to continue the wrongful incarceration of Steidl, which they knew would have a parallel effect on Whitlock. Their conduct was also designed to cover up Defendant's wrongful acts and omissions in the prosecution, conviction and post-trial proceeding of both Steidl and Whitlock.

ANSWER:    Defendant McFatridge admits that a post-conviction hearing took place in 1998, but

to the extent that the remaining allegations are directed at Defendant McFatridge, Defendant denies this paragraph.

68.     On December 11, 1998, the trial court again denied Steidl's post-conviction relief on his conviction, although the court did grant Steidl a new sentencing hearing, at which the state declined to pursue the death penalty.  On February 18, 1999, Steidl was resentenced to natural life imprisonment.  The Illinois Appellate Court affirmed denial of this post-conviction petition on December 5, 2000, and the Illinois Supreme Court denied leave to appeal on April 4, 2001.

**ANSWER**:     Admit.

69.     In 1999, following a national conference, Northwestern University professor David Protess and his Innocence Project sent a team of student investigators from the Center of Wrongful Convictions.  The contradictions and anomalies which manifested themselves were also featured in television reports.  The disclosures led to the appointment of ISP Lieutenant Michael Callahan ("Callahan") in April 2000 who was assigned to investigate the Steidl and Whitlock convictions.

**ANSWER**:     Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

70.     At the time of his appointment, Callahan was the District 10 Investigations Commander.

**ANSWER**:     Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

71.     Following exhaustive research into the Rhoads' murders and the Steidl and Whitlock trials, Callahan wrote a detailed memo which he sent to ISP Captain John Strohl on May 17, 2000. The memo was circulated up the ISP chain of command to Defendants Carper and Parker and later

to Defendant Fermon. Callahan documented a wealth of evidence gathered during his interview, all of which supported his conclusion that Steidl and Whitlock "had not been proven guilty beyond a reasonable doubt," and that the Paris businessman "was at one and should still be the focus of the investigations."

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

72.    Among the facts, findings and conclusions included in this memorandum of May 17, 2000, were thirty-eight separate contradictions and material falsehoods found in Defendant Rienbolt's and Herrington's testimony, including the following:

- Defendants Parrish and McFatridge had witness Carol Robinson lie on the stand about whether she saw Herrington and Steidl together on July 5th;

- Herrington's time line did not fit with the crime;

- A polygraph examiner found purposeful non cooperation of Herrington and the examiner's recommendation that Herrington be re-examined was rejected by the Defendants;

- Rienbolt's testimony that she skipped work on the night of July 5th and was with Steidl and Whitlock was refuted by numerous witnesses;

- Reinbolt's testimony that a broken lamp was used in the homicides was refuted by the testimony of the fire examiners;

- Rienbolt later recanted her testimony that she was present at the murders and that Steidl was involved;

- Rienbolt lied about the knife;

- Rienbolt admitted that Parrish led her into her false testimony;

- Herrington testified he was Joe's Bar with Steidl and Whitlock at 8:30 p.m. and they all went to the Horseshoe Bar, while Defendant Rienbolt testified she was with them at the same time at the Tap Room Bar;

- Herrington described the crime scene, placing Dyke Rhoads on the floor with shorts on and Karen Rhoads on the bed with panties on. The firemen said they were totally nude;

- Defendant Rienbolt stated that she went to the American Legion Bar the Barbara Furry. Barbara Furry stated she has never gone to the bars with Defendant Rienbolt and she was not at the American Legion July 5, 1986;

- Defendant Rienbolt implausibly stated that Steidl and Whitlock took showers at the Rhoads' house after the murders;

- Herrington stated that Whitlock had a clump of Karen Rhoads' hair in his hand. The autopsy report shows no hair torn from Karen Rhoads' head.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph;

therefore, he denies the same.

73.    In this May 17, 2000, memorandum, Callahan further set forth evidence which supported the determination that the Paris businessman and several of his employees were, and continued to be, suspects in the Rhoads murders, in other related homicides and in organized crime and narcotics trafficking. Callahan found that Defendant Parrish had a connection to the Paris businessman. Callahan found that much of this highly exculpatory evidence was known to Defendant Ray, Parrish, Eckerty and McFatridge and was suppressed from Steidl and Whitlock, including;

- Karen Rhoads was employed by the Paris businessman as a secretary and he frequently visited her apartment;

- The Paris businessman was a suspect in two prior homicides including the murder of a former secretary;

- Karen Rhoads said that she had seen the Paris businessman and an employee load a large sum of cash and a machine gun in the Paris businessman's car;

- Karen Rhoads had told the Paris businessman the Friday prior to the murders that she was quitting her job, that he forbade her from doing so and a big argument ensued. Karen wrote a letter later found on her desk with read "I'm still with Bob. He says

my bonus will be real big this year.  Believe me it had better;"

- Two of the Paris businessman's employees, who were known as his "right hand men," were implicated in the Rhoads murders;

- The Paris businessman arrived on the scene just as the investigators did and offered his theory about the murders;

- Immediately after the murders, the Paris businessman offered a $25,000 reward in local bars for information on the murders.  Herrington later stated that the Paris businessman offered him $25,000 and a job to keep his mouth shut;

- Herrington told Ray and Parrish that the Paris businessman was at the scene of the murders at the time they occurred;

- Parrish worked for the Paris businessman during a six-month suspension prior to the murders.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph;

therefore, he denies the same.

74.    Callahan continued his investigation, and in July of 2000 and August of 2001, he wrote further memos to his superiors.  Those memos were also disseminated to Carper and Parker, and later to Defendant Fermon.  In these memos, he provided further details about his interviews which were exculpatory to Steidl and Whitlock.  Much of what Callahan reported was known to Defendant Ray, Parrish, Eckerty and McFatridge at all times and was withheld and suppressed from Steidl and Whitlock.  These memos, totaling twenty-eight pages of details, containing exculpatory evidence and investigative findings and discussing the connection of the Paris businessman to the Rhoads murders were delivered to Defendants Fermon, Carper and Parker, but not disclosed to Steidl, Whitlock or their attorneys at the time.

**ANSWER**:    Defendant McFatridge denies withholding and suppressing any evidence.  Regarding

the remaining allegations, Defendant lacks sufficient knowledge to admit or deny this

paragraph; therefore, he denies the same.

75.    Defendant Eckerty, other law enforcement agents and Eckerty's wife contacted Callahan to tell him that Eckerty was a "good cop" and that Callahan should not ruin his reputation. Eckerty also offered to sell Callahan a houseboat at his cost.  Callahan suggested a full scale reinvestigation, focusing in large part on the Paris businessman.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

76.    Upon receipt of all the evidence and investigative findings reported by Callahan in an effort to cover up the wrongdoing of Defendants Ray, Parrish, Eckerty and McFatridge, Defendants Fermon, Carper, Brueggemann and Parker refused a full investigation of the Rhoads case because, as Carper put it, it was "too politically sensitive." Defendant Fermon, Carper, Brueggmann and Parker allowed only an investigation of the Paris businessman, limited to intelligence gathering. Then they removed Callahan from the Rhoads case and ordered him to focus on assignments other than the Rhoads murders and the Paris businessman.  They demoted Callahan and transferred him form his investigative pos and, with Defendant Kaupus, launched an effort to discredit Callahan's evidence, findings and recommendations.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

77.    Once they obtained full knowledge of the concealed, withheld and suppressed exculpatory evidence which was existing at the time of Whitlock's arrest, conviction and post-conviction proceedings, Defendants Fermon, Carper, Brueggemann and Parker had an affirmative duty under *Brady* to disclose this evidence to Whitlock and his attorneys.  But rather than so advise

Whitlock, his attorneys or the courts, Defendant Fermon, Carper, Brueggemann and Parker, along with Defendant Ray, Parrish, Eckerty and McFatridge, kept mum and took steps actively to keep the evidence concealed.  Whitlock had a right to be informed about *Brady* material.

**ANSWER**:    Defendant McFatridge denies withholding and suppressing any evidence.  Regarding the remaining allegations, Defendant lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

78.    As a result of his demotion, Callahan brought a civil suit accusing Fermon and Carper of violating his free speech and of retaliatory demotion.  A jury awarded $700,000 in favor of Callahan and against Fermon and Carper.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

79.    Because Defendants Fermon, Carper, Brueggemann, Parker and Kaupus suppressed the investigation into the Rhoads murders, the development of further evidence exculpatory to Steidl and Whitlock which would have resulted therefrom was thwarted.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

80.    These same Defendants caused the wealth of exculpatory evidence uncovered by Callahan to be withheld from Steidl and Whitlock during the period of time they were petitioning for release.  Callahan's information, when combined with the previously concealed information would have likely resulted in their exoneration and release.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

81.     Steidl and Whitlock filed petitions for executive clemency with the Governor of the state of Illinois in which they asked for a pardon on the basis of their innocence.

**ANSWER**:     Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

82.     When he learned of their petitions for clemency, Defendant McFatridge launched a public campaign opposing the freeing of Steidl and Whitlock by pardon, clemency or any collateral relief.  In so doing, he again made false public statements which prejudiced Steidl and Whitlock and their legitimate claims of innocence, for a new trial and for release, which they were seeking in post-conviction, habeas and clemency and pardon proceedings.

**ANSWER**:     Deny.

83.     On information and belief, a representative of the Governor called Callahan informing him that the Governor was prepared to pardon Steidl and Whitlock if Callahan could represent to him that, based on his investigation, they were innocent.

**ANSWER**:     Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

84.     On information and belief, Callahan, who was required to seek approval from his superiors before providing such an official statement, contacted the Defendants who were his superiors in the chain of command and immediately sought such approval.

**ANSWER**:     Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

85.     On information and belief, Callahan provided a detailed briefing at a lengthy meeting attended by Defendants Fermon, Carper, Brueggemann and others where he presented all the evidence

and findings set forth above and articulated his opinion, supported by all this evidence, that Steidl and Whitlock had not only been proven guilty beyond a reasonable doubt, but that they were innocent and that the jury never heard the truth.  Callahan also told these Defendants that there was no credible evidence against Steidl and Whitlock, that the two so-called eye witnesses had been completely discredited, that he strongly suspected that the wrongdoing by Parrish, Eckerty and McFatridge and the Paris businessman should continue to be the focus of the investigation.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

86.    At the briefing, Defendants Fermon, Carper and Brueggemann opposed Callahan's evidence and took the position that he should not be permitted to inform the Governor's representative that Steidl and Whitlock were innocent.  On information and belief, Callahan was ordered to offer no opinion and supply no exculpatory evidence to the Governor or his representative.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

87.    Because of the obstruction and suppression of Callahan's findings and opinions by Defendants Fermon, Carper and Brueggemann, combined with the previous and continuing suppression of evidence by all Defendants, the Governor declined to make a determination on Steidl and Whitlock's request for clemency and their requests remain pending to this date.

**ANSWER**:    Defendant McFatridge denies withholding and suppressing any evidence.  Regarding the remaining allegations, Defendant lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

88.    On June 17, 2003, the Federal District Court granted Steidl's petition for writ of

habeas corpus, which had been filed on October 5, 2001, vacating Steidl's conviction with a finding that "acquittal was reasonably probable if the jury had heard all of the evidence" and allowing the state 120 days to release or retry him.

**ANSWER**:    Admit.

89.    Attorney General Lisa Madigan announced she would not appeal the order, stating that after carefully reviewing the evidence, her office found that information favoring the defense was never disclosed, and that Steidl was thus entitled to a new trial.

**ANSWER**:    Defendant McFatridge admits that Attorney General Lisa Madigan decided not to appeal for the reasons stated; however, Defendant denies the allegation that information favoring the defense was never disclosed or that Plaintiff was entitled to a new trial.

90.    In a last ditch effort to continue to hold Steidl in custody, Defendant McFatridge made additional false public statements, including one to the Paris Beacon News, in which he attacked Attorney General Lisa Madigan for her decision not to appeal the District Court's decision, recited again the false evidence which he and his co-Defendants had manufactured and coerced, falsely denied that he and his co-Defendants suppressed exculpatory evidence and falsely claimed that Steidl was guilty of the brutal murders.

**ANSWER**:    Deny.

91.    Steidl was released from Danville Correctional Center on May 28, 2004, after serving seventeen years in prison, twelve of them on Death Row, for two murders the Defendants knew be (sic) did not commit.

**ANSWER**:    Admit Steidl was released from prison, but deny all remaining allegations.

92.    Despite the fact that the Federal District Court had found that Steidl's trial would have probably resulted in acquittal and despite the fact that Whitlock was convicted on the very same basis, Whitlock was not released. Despite the fact that the Illinois Attorney General believed that information favoring Steidl's defense was never disclosed and that the same evidence was concealed from Whitlock, all efforts to release Whitlock were strenuously opposed by Defendant.  Neither the Illinois Attorney General nor the Office of the State Appellate Prosecutor agreed to afford Whitlock the same treatment as Steidl.  Whitlock was forced to continue in his imprisonment for a crime he did not commit.

**ANSWER**:    Admit that Plaintiff was not released from prison, but deny all remaining allegations.

93.    On June 11, 2004, Whitlock filed a second amended petition for post-conviction relief. Rather than concede that Whitlock was no more culpable than his co-defendant Steidl, who the state refused to retry, the Office of the State Appellate Prosecutor, with the active assistance of Defendants Eckerty and Marlow, vigorously opposed Whitlock's petition and sought his continued incarceration. Defendant Marlow, who also became aware of the wealth of exculpatory evidence, scoured the country trying to get witnesses to testify against Whitlock.

**ANSWER**:    Defendant McFatridge admits Plaintiff filed a second amended petition for post-conviction relief, but denies all remaining allegations.

94.    The following was adduced at Whitlock's post-conviction hearing:

- Defendant Eckerty admitted he provided Herrington with alcohol "to help him relax" before his Grand Jury testimony.

- Gary Wheat, a Paris police officer, stated that he stayed with Herrington in Defendant Parrish's cabin and provided Herrington with alcoholic beverages.

- Defendant Eckerty stated that Herrington made an "eavesdropping" telephone call to Whitlock on September 25, 1986, from Parrish's cabin while drinking alcohol they

provided.

- Debra Helton, a forensic scientist with the ISP crime laboratory, submitted a stipulated affidavit which stated that she began to screen items of evidence for human blood. Helton was told that Herrington had a cut on his hand and she requested Herrington's blood standard. Defendants Parrish, Eckerty and McFatridge failed and refused to forward Herrington's blood standard to her for testing.

- Dr. John Murphy, the State's pathologist testified that he had removed the sternum from Dyke Rhoads body because he found a "defect," a knife wound in the sternum. He preserved the sternum in case anyone wished to examine it for tool marks (distinctive to a particular knife blade). No such examination was ever done.

- Dr. Murphy testified that either the Rienbolt knife or the knife found in the sink could have been the murder weapon.

- Donald Tankersky, an arson investigator for the State Fire Marshall, testified that the lamp was in fact not broken until after the fire. The interior was white and free of soot. Rienbolt had testified she saw broken, a piece in Steidl's hand at the time of the murders.

- Whitlock presented Dr. Baden, a forensic pathologist, certified in all three of pathologies sub-specialties. He had performed more than 20,000 forensic autopsies. He concluded to a reasonable degree of medical certainty that the Rienbolt knife did not cause the fatal wound on Dyke Rhoads.

- Dr. Baden also concluded to a reasonable degree of medical certainty that the Rienbolt knife could not have inflicted Karen Rhoads' wound, but that the sink knife could have done so.

**ANSWER**:     Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph and

all subparagraphs contained therein; therefore, he denies the same.

95.     Despite the overwhelming evidence at the post-conviction hearing and despite the fact

that the state had decided its evidence was insufficient to retry Steidl, Defendant Eckerty, along with

Prosecutor David Rands, strenuously opposed Whitlock's petition, submitted the same fabricated,

manipulated and false evidence it used to originally convict him and urged the court to deny the

petition.

**ANSWER**:    Defendant McFatridge denies fabricating, manipulating, withholding and suppressing any evidence.   Regarding the remaining allegations, Defendant lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

96.    Due in part to 1) the continued reliance on the fabricated, manipulated, coerced and false testimony, on the withholding and suppression of exculpatory evidence, 2) the suppression of the Callahan report and refusal to permit the further investigation, 3) the continued efforts of Defendants to prevent investigation of other credible suspects including the Paris businessman and 4) continued efforts of Defendants not to admit their mistakes, the trial court denied Whitlock's post-conviction petition.  Whitlock continued to be incarcerated in the penitentiary despite his innocence.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

97.    Whitlock appealed the denial of his petition to the Illinois Appellate Court for the Fourth District.  During 2006 and continuing into 2007, the Office of the State Appellate Prosecutor, aided by Defendant Marlow, continued in their attempts to manufacture evidence against Whitlock and defeat his appeal.  Defendant Marlow continued to interview potential witnesses strongly suggesting stories to them.  On one occasion, he visited Ovid Chambers in Florida and screamed and forcefully told him that he knew Whitlock was with him in the Rhoads house the night of the murders and that Chambers should so testify.  Chambers denied such a story and declined.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

98.    Jennifer Aper, a scientist at the ISP crime lab, who has possession of items of physical evidence recovered from the crime scene, was told not to perform mitochondrial DNA tests.  Without

tests, the tissue and blood samples cannot be compared to other credible suspects, including those presently incarcerated in other institutions.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

99.    On September 6, 2007, the Illinois Appellate Court for the Fourth District issued a 53-page opinion finding *inter alia* that the "State violated *Brady* by suppressing [evidence.]" The Court held, "We find a reasonable probability that but for these errors, considered cumulatively the verdict would have been different." (p.2) The Court reversed the judgement and conviction and remanded the case back for a new trial.

**ANSWER**:    Defendant McFatridge admits the ruling, but denies all remaining allegations.

100.    Despite the Appellate Court's decision, Defendants still objected to Whitlock's release. Whitlock sought to be released on bond so that he could spend Christmas 2007 with his daughter and grandchild, but the state argued against it.  Whitlock was finally released on January 8, 2008, when the state *nolle prosequied* the case.

**ANSWER**:    Defendant McFatridge lacks sufficient knowledge to admit or deny this paragraph; therefore, he denies the same.

## COUNT I
### (42 U.S.C. § 1983 Claim for Deprivation of Right to Fair Trial, Deprivation of Due Process and for Wrongful Conviction)

101.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER**:    See Answers to Paragraphs 1 through 100.

102.    Article 42 U.S.C § 1983 provides, in pertinent part, as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit inequity, or other proper proceeding for redress...."

**ANSWER**:    Admit.

103.    Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the wrongful charging , prosecution and conviction of Whitlock, and these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the continuation of said wrongful convictions, by a)coercing, intimidating, constructing and/or fabricating the false and totally unreliable statements, testimony and other evidence which formed the basis for Whitlock's charging, prosecution and conviction; b) withholding and concealing from Whitlock's defense attorneys, and the judges, juries, post-trial prosecutors and the Governor and his staff, who were involved in Whitlock's criminal proceedings, the highly exculpatory and exonerating evidence that these statements, testimony and other evidence were false, totally unreliable, fabricated, manipulated, suggested and coerced; c) suppressing from these same persons additional highly exculpatory and exonerating evidence and documents which further exonerated Steidl and Whitlock and his co-defendant, including evidence of other more likely suspects; d) writing false reports and giving and tendering false testimony and statements at the Grand Jury, at trial and at post-conviction and habeas corpus proceedings; e) improperly influencing the judges, juries and executive bodies and officials hearing and considering Whitlock's case, and the

post-trial prosecutors who continued his prosecution, *inter alia*, by making false public statements and f) obstructing investigations which would have led to discovery of further exculpatory evidence, and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Whitlock of his liberty, violating his right to a fair and impartial trial and violating his rights to due process, all as guaranteed by the Fourteenth Amendment to the United States Constitution.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

104.    The actions of Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow is depriving Whitlock of his liberty, his right to a fair trial and his right to due process were a direct and proximate cause of the injuries to Whitlock which are set forth above.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

WHEREFORE, Defendant, Michael McFatridge, denies that Plaintiff is entitled to any judgment against him and prays this Honorable Court enter judgment in his favor and award him the costs of this action, attorney's fees and such other relief as this Court deems equitable and just.

## COUNT II
### (42 U.S.C. § 1983 - Malicious Prosecution)

Defendant McFatridge has moved to dismiss this Count.

## COUNT III
### (False Imprisonment)

Defendant McFatridge has moved to dismiss this Count.

## COUNT IV
### (42 U.S.C § 1983 *Monell* Policy Claim Against City of Paris)

114.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER**:    See Answers to Paragraphs 1 through 100.

115.    The actions of Defendants Gene Ray, James Parrish, Michael McFatridge and Jack Eckerty as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Paris , its Police Department and Police Chiefs together with the Edgar County State's Attorney and is State's Attorney's Office, which was acting pursuant to, find as an agent of, the city of Paris.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

116.    At all times material to this complaint, Defendant City of Paris and its Police Department, Police Chiefs, together with the Edgar County State's Attorney and its State's Attorney's Office, which was acting as an agent of the City of Paris and pursuant to its policies and practices, had interrelated *de facto* policies, practices and customs, which included, *inter alia*

a.    conducting physically, psychologically or otherwise illegally or improperly coercive and intimidating interrogations of witnesses, suspects and arrestees in order to obtain false statements, testimony and other false inculpatory evidence, and wrongful arrests, prosecutions and convictions;

b.    filing false reports and giving false statements and testimony about said interrogations and evidence, and fabricating parts of all of said evidence; suppressing evidence concerning said interrogations, confessions and evidence; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions and

evidence obtained during said interrogations; and otherwise covering up the true nature of said interrogations, confessions and evidence;

c.    failing to property train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of coercion and related physical and other abuse of suspects, witnesses and other citizens; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful conviction; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or improperly coercive questioning or interrogation of witnesses, suspects, arrestees and other citizens, including, but not limited to, persons who were physically and/or psychologically abused during questioning;

d.    the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a,b and c above, whereby police officers refused to report or otherwise covered up instances of police misconduct and/or the fabrication, suppression and destruction of evidence of which they were aware, despite their obligation under the law and police regulations to report such violations. Said code of silence also includes police officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability or criminal charges, and perjuring themselves in criminal cases where they and their fellow officers have coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant; and

e.    the practice of covering -up wrongdoing by members of the police force and prosecutors, the suppressing and withholding exonerating, exculpatory and/or other evidence favorable to criminal defendant which were not turned over to the prosecuting attorneys and/or defense lawyers.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

117.    The patterns and practices set forth above were well known both before and after Plaintiff was wrongfully arrested, charged , imprisoned and convicted, including by the commanding and supervisory Defendants named herein, who participated in the cover-up and suppression of evidence and the wrongful prosecution and conviction of the Plaintiff, his co-defendant and other victims, *inter alia*, in the manner set forth in this complaint.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

118.    Said interrelated polices, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference, encouraged, *inter alia*, the coercing of false statements and testimony from suspects, witnesses and arrestees, by abusive tactics and techniques; the fabrication, manipulation and alteration of witness statements, testimony, and other false evidence; the suppression of evidence of abuse and other exculpatory evidence; the intimidation of witnesses; the making of false statements and reports; the giving of false testimony and the pursuit and continuation of frame-ups and other wrongful convictions and false arrests and imprisonments of innocent persons, and were, separately and together, a direct and proximate cause of the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators

and the injuries suffered by the Plaintiff.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

119.    The involvement in, and ratification of, the unconstitutional actions set forth above by Defendant Paris Police Chief Gene Ray, who was acting as a final policymaker for the city of Paris in police matters , including, but not limited to, police interrogations and investigations, also establishes that said Constitutional violations were directly and proximately caused by Defendant City of Paris.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

WHEREFORE, Defendant, Michael McFatridge, denies that Plaintiff is entitled to any judgment against him and prays this Honorable Court enter judgment in his favor and award him the costs of this action, attorney's fees and such other relief as this Court deems equitable and just.

## COUNT V
### (State Law Claim for False Imprisonment)

Defendant McFatridge has moved to dismiss this Count.

## COUNT VI
### (State Law Claim for Malicious Prosecution)

123.    Plaintiff realleges paragraphs 1 through 100 and 105 through 109.

**ANSWER**:    See Answers to Paragraphs 1 through 100 and 105 through 109.

124.    Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge,

individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, initiated a malicious prosecution without probable cause against Plaintiff, and these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, continued said prosecution, again with probable cause. Said prosecution was ultimately terminated in Plaintiff's favor. The Defendants' actions were done in a willful and wanton manner and directly and proximately caused the injury and damage to Plaintiff as set forth above.

**ANSWER**:     To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

WHEREFORE, Defendant, Michael McFatridge, denies that Plaintiff is entitled to any judgment against him and prays this Honorable Court enter judgment in his favor and award him the costs of this action, attorney's fees and such other relief as this Court deems equitable and just.

## COUNT VII
### (State Law Claim for Intentional Infliction of Emotional Distress)

125.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER**:     See Answers to Paragraphs 1 through 100.

126.    Defendants Gene Ray, James Parrish, Jack Eckerty, Gene Ray and Michael McFatridge, individually, jointly and in conspiracy, with each other and with Defendant Rienbolt and certain other named and unnamed private individuals and law enforcement agents, engaged in extreme and outrageous conduct by, *inter alia*, constructing, coercing, intimidating, manipulating, fabricating, suggesting and altering the evidence against Plaintiff, by knowingly providing false

testimony, by procuring Whitlock's prosecution, conviction and imprisonment for heinous crimes he did not commit, and by making false and defamatory public statements by falsely repudiating recantations and by concealing exculpatory evidence. Additionally, these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, engaged in additional extreme and outrageous conduct by suppressing additional exculpatory evidence, by continuing Plaintiff's wrongful conviction and false imprisonment, by refusing to properly investigate, and by otherwise abusing Plaintiff.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

127.    Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Deborah Rienbolt., Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict sever emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

128.    As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was injured and has experienced, and continues to experience, sever emotional distress, including fear of execution, nightmares, sleep disruption, symptoms of post traumatic stress disorder, anxiety, depression and difficulty in focusing or concentrating.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant

denies this paragraph.

WHEREFORE, Defendant, Michael McFatridge, denies that Plaintiff is entitled to any

judgment against him and prays this Honorable Court enter judgment in his favor and award him the

costs of this action, attorney's fees and such other relief as this Court deems equitable and just.

## COUNTY VIII
### (State Claim for Conspiracy)

129.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER**:    See Answers to Paragraphs 1 through 100.

130.    Defendants, Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Deborah

Rienbolt, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggeman and

Jeff Marlow, with other unused co-conspirators and other police and prosecutorial investigative,

supervisory and command personnel, together reached an understanding, engaged in a course of

conduct and otherwise jointly acted and/or conspired among and between themselves to falsely

imprison and/or to continue said imprisonment, to maliciously prosecute and/or continue said

prosecution, and to intentionally inflict severe emotional distress to Plaintiff.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant

denies this paragraph.

131.    In furtherance of this conspiracy or conspiracies, the Defendants named above,

together with their unused co-conspirators, committed the overt acts set forth in the Facts above.

**ANSWER**:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant

denies this paragraph.

132.    Said conspirac(ies) and overt acts were and are continuing in nature and were and are a proximate cause of Plaintiff's tortuous injuries under state law, as set forth above.

ANSWER:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

133.    Defendants' and their co-conspirators' overt acts, as set forth above; which were committed jointly and /or while conspiring together to falsely imprison, maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

ANSWER:    To the extent that this paragraph is directed at Defendant McFatridge, Defendant denies this paragraph.

WHEREFORE, Defendant, Michael McFatridge, denies that Plaintiff is entitled to any judgment against him and prays this Honorable Court enter judgment in his favor and award him the costs of this action, attorney's fees and such other relief as this Court deems equitable and just.


## COUNT IX
### (State Law Respondeat Superior Claim)

134.    Plaintiff realleges paragraphs 1 through 100.

ANSWER:    Defendant McFatridge makes no answer to this Count IX of Plaintiff's Complaint as Count IX is not directed at him.

135.    Defendant Gene Ray and James Parrish were, at all times material to this complaint, employees of the Defendant City of Paris, were acting within the scope of their employment and their acts which violated state law are directly chargeable to the Defendant City of Paris under state law

pursuant to *respondeat superior*.

**ANSWER**:    Defendant McFatridge makes no answer to this Count IX of Plaintiff's Complaint as Count IX is not directed at him.

WHEREFORE, Defendant, Michael McFatridge, denies that Plaintiff is entitled to any judgment against him and prays this Honorable Court enter judgment in his favor and award him the costs of this action, attorney's fees and such other relief as this Court deems equitable and just.

## COUNT X
### (745 ILCS 10/9-102 and Common Law Claims Against the City of Paris)

136.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER**:    Defendant McFatridge makes no answer to this Count X of Plaintiff's Complaint as Count X is not directed at him.

137.    Defendant City of Paris was the employer of Defendants Gene Ray and James Parrish at all times relevant and material to this complaint.

**ANSWER**:    Defendant McFatridge makes no answer to this Count X of Plaintiff's Complaint as Count X is not directed at him.

138.    These Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Paris.

**ANSWER**:    Defendant McFatridge makes no answer to this Count X of Plaintiff's Complaint as Count X is not directed at him.

WHEREFORE, Defendant, Michael McFatridge, denies that Plaintiff is entitled to any judgment against him and prays this Honorable Court enter judgment in his favor and award him the

costs of this action, attorney's fees and such other relief as this Court deems equitable and just.

## COUNT XI
### (Edgar County and its State's Attorneys' Office)

139.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER**:    Defendant McFatridge makes no answer to this Count XI of Plaintiff's Complaint as Count XI is not directed at him.

140.    Defendant Edgar County and its State's Attorneys' Office was the employer of Defendant McFatridge, who was acting in the scope of his employment as an employee of Edgar County and its State's Attorneys' Office and who committed the wrongful acts complained of herein within the course and scope of his employment, and said County is therefore responsible for any judgment entered against Defendant McFatridge and is therefore a necessary party hereto.

**ANSWER**:    Defendant McFatridge makes no answer to this Count XI of Plaintiff's Complaint as Count XI is not directed at him.

WHEREFORE, Defendant, Michael McFatridge, denies that Plaintiff is entitled to any judgment against him and prays this Honorable Court enter judgment in his favor and award him the costs of this action, attorney's fees and such other relief as this Court deems equitable and just.

## FIRST AFFIRMATIVE DEFENSE

NOW COMES Defendant MICHAEL McFATRIDGE, by and through his attorneys, EKL WILLIAMS, PLLC, and for his first affirmative defense, states as follows:

Defendant McFatridge was at all relevant times acting in his capacity as a prosecutor for Edgar County, thus entitling him to absolute prosecutorial immunity.

WHEREFORE, Defendant McFatridge denies that Plaintiff is entitled to any judgment whatsoever against him, and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## SECOND AFFIRMATIVE DEFENSE

NOW COMES Defendant MICHAEL McFATRIDGE, by and through his attorneys, EKL WILLIAMS, PLLC, and for his second affirmative defense, states as follows:

Defendant McFatridge did not violate clearly established constitutional rights of which a reasonable person would have known, thus entitling him to qualified immunity.

WHEREFORE, Defendant McFatridge denies that Plaintiff is entitled to any judgment whatsoever against him, and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## THIRD AFFIRMATIVE DEFENSE

NOW COMES Defendant MICHAEL McFATRIDGE, by and through his attorneys, EKL WILLIAMS, PLLC, and for his third affirmative defense, states as follows:

With respect to Plaintiff's State Law Claims, Defendant McFatridge is immune from liability for the conduct alleged in Plaintiff's Complaint based on the provisions of the Illinois Tort Immunity Act.

WHEREFORE, Defendant McFatridge denies that Plaintiff is entitled to any judgment whatsoever against him, and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## FOURTH AFFIRMATIVE DEFENSE

NOW COMES Defendant MICHAEL McFATRIDGE, by and through his attorneys, EKL WILLIAMS, PLLC, and for his fourth affirmative defense, states as follows:

Plaintiff's claims against Defendant McFatridge are barred in whole or in part by the applicable statute of limitations.

WHEREFORE, Defendant McFatridge denies that Plaintiff is entitled to any judgment whatsoever against him, and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## FIFTH AFFIRMATIVE DEFENSE

NOW COMES Defendant MICHAEL McFATRIDGE, by and through his attorneys, EKL WILLIAMS, PLLC, and for his fifth affirmative defense, states as follows:

Plaintiff's Complaint alleging a claim for malicious prosecution against Defendant McFatridge is barred because probable cause existed for Plaintiff's arrest.

WHEREFORE, Defendant McFatridge denies that Plaintiff is entitled to any judgment whatsoever against him, and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

## DEFENDANT MICHAEL McFATRIDGE'S JURY DEMAND

Defendant, Michael McFatridge, hereby demands a trial by jury pursuant to Federal Rules of

Civil Procedure 38(b) on all issues so triable.

Respectfully submitted by:


By: **s/ Vincent C.  Mancini**
Attorneys for Michael McFatridge


Terry A.  Ekl
Vincent C.  Mancini
EKL WILLIAMS, PLLC
901 Warrenville Road, Suite 175
Lisle, IL 60532
(630) 654-0045
(630) 654-0150 *Facsimile*
ARDC# 6243417
vmancini@eklwilliams.com