IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| HERBERT WHITLOCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 CV 2055 |
| | ) | |
| CITY OF PARIS, et al. | ) | Judge Harold A. Baker |
| | ) | Magistrate Judge David G. Bernthal |
| Defendants. | ) | |

### DEFENDANT GENE RAY'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendant Gene Ray, by his attorneys, James G. Sotos and Elizabeth A. Ekl of James G.

Sotos & Associates, Ltd., in answer to Plaintiff's Complaint states the following onto this

Honorable Court:

### I. JURISDICTION AND VENUE

1.      Jurisdiction of this matter is invoked upon this Court by virtue of 42 U.S.C. §

1983 et. Seq.; 28 U.S.C. §§ 1331 and 1343(a); the Constitution of The United States, Articles

Four, Five, Six and Fourteen; and supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

**ANSWER:**      Defendant Ray admits that Plaintiff seeks to invoke the jurisdiction of the Court in
the manner stated but denies that Plaintiff is entitled to any relief in this matter.

2.      Venue is proper in the Central District of Illinois under 28 U.S.C. § 1391 (b).

Defendants, or some of them, reside and/or formerly resided in this judicial district. A substantial

part of the events giving rise to the claims asserted herein occurred within this district.

**ANSWER:**      Defendant Ray admits that venue is proper and that the parties reside and/or
formerly resided in this judicial district.   Defendant Ray denies that many of the
events asserted in Plaintiff's Complaint occurred.

## II.  PARTIES

3.     Plaintiff, Herbert Whitlock, is a sixty-one-year-old man and a citizen of the state of Illinois.

**ANSWER:**    Defendant Ray admits the averments contained in paragraph 3.

4.     Defendant Gene Ray ('Ray") was a duly appointed and sworn Chief of the Police Department of the City of Paris, Illinois.  He was a final policymaker for the City of Paris in police matters, including police investigations, was personally in charge of the homicide investigation of Karen and Dyke Rhoads and is sued in his individual capacity.

**ANSWER:**    Defendant Ray admits that he was a duly appointed and sworn Chief of the Paris Police Department; participated in the Rhodes murder investigation; and is sued in his individual capacity.  Defendant Ray makes no answer to the averment that he was a "final policymaker for the City of Paris" as such averment is a legal conclusion.

5.     Defendant James Parrish ("Parrish") was a duly appointed and sworn Paris Police detective who was the lead Paris police investigator in the Rhoads homicide investigation and is sued in his individual capacity.

**ANSWER:**    Defendant Ray admits that Defendant Parrish was a duly appointed and sworn Paris Police Detective who was an investigator in the Rhoads homicide investigation.  Defendant Ray makes no answer to the remaining averments contained in paragraph 5 as they are not directed at this Defendant.

6.     Defendant City of Paris is an Illinois municipal corporation and, as such, is responsible for the policies, practices and customs of the Paris Police Department and its Chief of Police. Defendant City of Paris was the employer of Defendants Ray and Parrish. The City of Paris is responsible for the acts of Defendants Ray and Parrish while acting within the scope of their employment.

2

**ANSWER:**    Defendant Ray admits that Defendant City of Paris is a municipal corporation incorporated under the laws of Illinois, that the Paris Police Department is an administrative department of the City and that Chief of Police and police detective are positions within the Paris Police Department.  Defendant Ray makes no answer to the remaining averments contained in paragraph 6 as they are not directed at this Defendant.

7.    Defendant Jack Eckerty ("Eckerty") was a duly appointed and sworn Illinois State Police ('ISP") trooper who was the lead state police investigator in the Rhoads homicide investigation and is sued in his individual capacity.

**ANSWER:**    Defendant Ray makes no answer to the averments contained in paragraph 7 as they are not directed at this Defendant.

8.    Defendant Michael McFatridge ("McFatridge") was the Edgar County State's Attorney and is sued in his individual capacity.

**ANSWER:**    Defendant Ray makes no answer to the averments contained in paragraph 8 as they are not directed at this Defendant.

9.    Defendant Edgar County is a governmental entity within the state of Illinois, which consists in part of its Edgar County State's Attorney's Office (hereinafter referred to as SAO). Edgar County and the State's Attorney's Office are necessary parties to the lawsuit.

**ANSWER:**    Defendant Ray makes no answer to the averments contained in paragraph 9 as they are not directed at this Defendant.

10.    Defendants Steven M. Fermon ('Fermon"), Diane Carpet ('Carper"), Charles E. Brueggemann ("Brueggemann"), Andre Parker ("Parker"), Kenneth Kaupus ("Kaupus") and Jeff Marlow ("Marlow") (the "ISP Defendants") were duly appointed and sworn command level ISP officials who supervised that agency's investigation of the Rhoads murders and are sued in their individual capacities.

**ANSWER:**   Defendant Ray makes no answer to the averments contained in paragraph 10 as they are not directed at this Defendant.

11.     At all times relevant to this action, the ISP Defendants acted within the scope of his or her employment and under the color of the laws, regulations and customs of the state of Illinois.  Each Defendant's actions constituted "state action" as defined under federal law.

**ANSWER:**   Defendant Ray makes no answer to the averments contained in paragraph 11 as they are not directed at this Defendant.

12.     Defendant Deborah Rienbolt ("Rienbolt") is a private citizen of the state of Illinois.

**ANSWER:**   Defendant Ray makes no answer to the averments contained in paragraph 12 as they are not directed at this Defendant.

### III.  FACTS COMMON TO ALL COUNTS

13.     In the early morning hours of July 6, 1986, Dyke and Karen Rhoads were stabbed to death in their home in Paris, Illinois, and their house was set on fire.

**ANSWER:**   Defendant Ray admits the averments contained in paragraph 13.

14.     Defendants Ray, Parrish, Eckerty and McFatridge were responsible for investigating the homicides.  They jointly participated in said investigation commencing shortly after the crimes were discovered.

**ANSWER:**   To the extent that averments contained in paragraph 14 are directed at him, Defendant Ray admits that he participated in the investigation into the murders of Dyke and Karen Rhoads.

15.     Defendant Ray, Parrish, Eckerty, McFatridge discovered facts disclosing the identities of several credible suspects, including a prominent and influential Paris businessman

4

('the Paris businessman"), who shortly after the murders offered a $25,000 reward. Defendant

Parrish had employment relationships off and on with the Paris businessman.

**ANSWER:**    Defendant Ray admits that the Paris businessman offered a $25,000 reward
shortly after the murders. To the extent the remaining averments contained in
paragraph 15 are directed at him, Defendant Ray denies those averments.

16.    Despite the existence of substantial facts leading to the identification of credible

suspects, Defendants Ray, Parrish, Eckerty, and McFatridge did not pursue them, but instead

jointly pursued a course of conduct designed to deflect the investigation away from the Paris

businessman, to quickly and expediently bring about a conviction and gain public and political

favor by promptly solving the murders. To that end, they conspired to accuse and convict Gordon

Randy Steidl ("Steidl") and Herbert Whitlock for these crimes. Defendants Ray, Parrish, Eckerty

and McFatridge then and there conspired and commenced acts on furtherance of fabrication and

creating a case against Steidl and Whitlock.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 16.

17.    On or about July 9, 1986, directly after the Paris businessman offered the reward

at local bars, Defendants Parrish and Eckerty, at the direction and approval and/or with the

knowledge of defendants Ray and McFatridge, and without any physical evidence linking

Whitlock to the crimes, took Whitlock into custody and questioned him.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 17.

18.    Although Whitlock denied any connection to the crimes and provided a truthful

alibi, Defendants Ray, Parrish, Eckerty and McFatridge continued to pursue him.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 18.

5

19.     On September 19, 20 and 21, 1986, Defendants Ray, Parrish, Eckerty and McFatridge interviewed Darrell Herrington ("Herrington"), who they knew had five drunken-driving convictions and two convictions for passing bad checks, was considered the 'town drunk" and frequented the bars where the reward had been offered.

**ANSWER:**     Defendant Ray admits that on or about September 21, 1986, he interviewed Darrell Herrington with Defendants Parrish, Eckerty and McFatridge and that at that time he had knowledge that Darrell Herrington was considered the town drunk and was known to frequent bars in the Paris area. Defendant Ray denies that he had knowledge about the remaining averments in paragraph 19 at the time of the interview.

20.     Herrington told Defendants Ray, Parrish, Eckerty and McFatridge that he was present at the scene of the Rhoads murders and that two men, "Jim and Ed," committed the crimes.

**ANSWER:**     Defendant Ray admits that Herrington first told Defendants Parrish and Ray that he was present at the scene and first stated that persons named "Jim and Ed" committed the Rhoads murders. Herrington then immediately stated that it was really "Herbie" Whitlock and "Randy" Steidl who committed the murders.

21.     On information and belief, Herrington also told the Defendants he had been drinking hard liquor nearly nonstop since noon on July 5, and that by the time the bars closed, he was stumbling drunk and lapsing into unconsciousness.

**ANSWER:**     Defendant Ray admits that Herrington told said defendants he began drinking hard liquor sometime in the afternoon of July 5 and continued drinking throughout the evening until the bars closed. Defendant Ray denies the remaining averments in paragraph 21.

22.     During Herrington's three days of interrogation, Defendants subjected Herrington to suggestion, coercion and manipulation and plied him with liquor and promises. As a result of the Defendants joint efforts, Herrington changed his story from Jim and Ed to Steidl and

6

Whitlock as the persons whom he had accompanied to the scene pf the murders. Herrington was never charged with any of the crimes related to the Rhoads murders.

**ANSWER:**    Defendant Ray admits that Herrington was never charged with any of the crimes related to the Rhoads murders and denies the remaining averments contained in paragraph 22.

23.    Armed with Herrington's coerced, manipulated, manufactured and suggested false statement, Defendant Ray, Parrish, Eckerty and McFatridge, without probable cause, obtained a warrant to electronically eavesdrop on conversations of Whitlock.  Their plan was to use Herrington as a wired informant to entrap Whitlock into making inculpatory statements.  The plan failed.  Despite their efforts, Whitlock steadfastly maintained he had no connection with the crime.  Even though the scheme proved unsuccessful, Defendants Ray, Parrish, Eckerty and McFatridge were not dissuaded and continued to pursue their scheme to accuse and convict Steidl and Whitlock.

**ANSWER:**    Defendant Ray admits that Defendant Eckerty petitioned the court for an order authorizing the use of an electronic eavesdropping device for the purpose of overhearing and/or recording conversations between Darryl Herrington, a consenting party; Plaintiff; Herbert Whitlock; and unknown third parties, and that based on a finding of reasonable cause, Judge Ralph S. Pearman authorized the use of said eavesdropping device.  Defendant Ray denies the remaining averments contained in paragraph 23.

24.    Defendants Ray, Parrish, Eckerty and McFatridge subjected Herrington to a polygraph examination on September 29, 1986.  Concerning direct questions asked by the examiner about whether Herrington was truthful when he accused Steidl and Whitlock, the examiner found that Herrington engaged in "purposeful non-cooperation... (consistent with) not telling the truth" as to "one or more" of the questions.

**ANSWER:**     Defendant Ray denies that Defendants Ray, Parrish, Eckerty and McFatridge subjected Herrington to a polygraph examination. Defendant Ray admits that Herrington submitted to a polygraph examination on September 29, 1986 given by polygraph examiner, Mark Murphy. Mark Murphy issued a report dated October 15, 1986 that stated that Murphy was "precluded from rendering any opinion to his truthfulness to [the questions asked] " due to Herrington's "acts of purposeful noncooperation [] during his polygraph examination" and that "[i]t has been the experience of the examiner [] that when a subject purposefully distorts his polygraph records, he is usually not telling the truth to one or more of the issues under investigation." Murphy's report does not indicate that Herrington was asked direct questions by the examiner about "whether Herrington was truthful when he accused Steidl and Whitlock."

25.     Fearing that Herrington's fabricated statement would not withstand further polygraph scrutiny, Defendants Ray, Parrish, Eckerty and McFatridge did not follow the examiner's recommendation that Herrington be subjected to another polygraph examination. Lacking a credible witness, they decided not to charge Steidl and Whitlock with the murders at that time. Nevertheless, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, officially recorded Herrington's fabricated and discredited story in the Paris police reports, but intentionally suppressed and concealed from those reports the highly exculpatory evidence concerning "Jim and Ed," the lie detector test and its results, and that Herrington's story was the product of their coercion, fabrication, and manipulation, suggestion, promises, financial rewards and alcohol.

**ANSWER:**     Defendant Ray admits that Plaintiff and Whitlock were not charged with murder following the polygraph examination of Herrington on September 29, 1986, that Herrington was not subjected to another polygraph examination and that Defendants documented Herrington's statements. Defendant Ray denies the remaining averments contained in paragraph 25.

26.     For the next several months, Defendants Ray, Parrish, Eckerty and McFatridge continued to meet with Herrington and to use coercive, suggestive and manipulative tactics,

8

promises, rewards, liquor and, on at least one occasion, suggestions by hypnosis, in order to

further manufacture and fabricate a more believable, story about Steidl and Whitlock.

**ANSWER:**   Defendant Ray admits that Defendants met with and interviewed Herrington
during the next several months.  Defendant Ray denies the remaining averments
contained in paragraph 26.

27.   Defendants Parrish and Eckerty, with the knowledge and approval of Defendants

Ray and McFatridge, suppressed and concealed from their official reports, the continued

coercion, manipulation, suggestion, fabrication, promises and rewards, as well as the content of

Herrington's statements taken under hypnosis.

**ANSWER:**   Defendant Ray denies the averments contained in paragraph 27.

28.   On February 16, 1987, seven months after the yet unsolved murders, knowing that

they had no credible evidence to charge Steidl and Whitlock, Defendants Ray, Parrish, Eckerty

and McFatridge began to meet with another completely unstable individual, a known alcoholic

and drug addict, Defendant Rienbolt, who was on felony probation and whom Parrish had

previously pressured to be his informant.

**ANSWER:**   Defendant Ray denies the averments contained in paragraph 28.

29.   Defendant Parrish accused Rienbolt of involvement in the murders, and, despite

her denials, Defendants Parrish and Eckerty, under the supervision and with the participation

and/or knowledge of Defendants Ray and McFatridge, continued to interrogate Rienbolt about

the crimes.

**ANSWER:**   Defendant Ray admits that Deborah Rienbolt was interviewed by Defendants
Eckerty and Parrish on February 17, 1987 regarding her knowledge and/or
involvement in the Rhoads murders.  Defendant Ray denies the remaining
averments contained in paragraph 29.

30.     During the interrogations, Defendants Parrish and Eckerty, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, repeatedly pressured and challenged Rienbolt that she was present at the crime scene and participated in the murders with Steidl and Whitlock, which they postulated took place because Dyke Rhoads backed out of a drug deal.

**ANSWER:**     Defendant Ray denies the averments contained in paragraph 30.

31.     Defendants made promises of financial rewards, coerced, pressured, suggested and manipulated Defendant Rienbolt to create the story that her husband's knife really belonged to Whitlock and that Whitlock had given it to her shortly after the crime with blood on it.

**ANSWER:**     Defendant Ray denies the averments contained in paragraph 31.

32.     Defendant Rienbolt told to Defendants Parrish and Eckerty that she had gone to work at the Paris Health Center and later consumed vast quantities of drugs and alcohol on July 5, 1986.  Defendant Rienbolt did not originally say she witnessed Steidl and/or Whitlock commit the murders and arson.  Nevertheless, Defendants Parrish and Eckerty caused Rienbolt to change her story and make false statements that she didn't go to work, that she saw Steidl, Whitlock and Herrington together the night before the murders and other false statements about Whitlock and the scene of the murders.  Defendant Rienbolt knew her statements were false and that they would be used to accuse and prosecute Steidl and Whitlock, but she agreed with Defendants to be an active participant and knowingly provide false statements to accuse and prosecute Steidl and Whitlock.  On the basis of these coerced, manipulated, manufactured, and suggested false statements, Defendants Ray, Parrish, Eckerty, and McFatridge also obtained, without probable cause, a warrant to electronically overhear conversations of Steidl and Whitlock, and tried to use

10

Defendant Rienbolt as a wired informant to entrap Whitlock at an AA meeting into making false

inculpatory statements. Defendant Rienbolt willingly attempted to trap him, but try as he may,

Whitlock steadfastly and truthfully denied involvement.

**ANSWER:** Defendant Ray admits that during Rienbolt's initial conversation with Parrish and
Eckerty, she did not tell them that she witnessed Steidl and/or Whitlock commit
the murders and arson. Defendant Ray admits that on February 19, 1987,
Defendant Eckerty petitioned Judge Richard Scott of the Fifth Judicial Circuit
Court in Edgar County and obtained an order authorizing the use of an
eavesdropping device for the purpose of overhearing and/or recording
conversations between Rienbolt, Whitlock and unknown third parties but denies
that the warrant was obtained without probable cause and for the purpose of
entrapping Whitlock. Defendant Ray denies the remaining averments in
paragraph 32.

33. On February 19, 1987, on the basis of knowingly fabricated and false statements.

Defendants Ray, Parrish, Eckerty and McFatridge obtained arrest warrants for Steidl and

Whitlock for the murders of Karen and Dyke Rhoads and for arson and caused them to be

arrested for said crimes. Following their arrest, when questioned at the jail, both Steidl and

Whitlock truthfully denied involvement in their crimes.

**ANSWER:** Defendant Ray admits that on February 19, 1987, arrest warrants were obtained
for Steidl and Whitlock for the murders of Karen and Dyke Rhoads and for arson
and Steidl and Whitlock were arrested on those warrants. Defendant Ray further
admits that Steidl and Whitlock both denied involvement in the crimes when
questioned on February 19, 1987. Defendant Ray denies the remaining averments
contained in paragraph 33.

34. Defendants Parrish and Eckerty, with the knowledge and approval of Defendants

Ray and McFatridge, wrote and recorded Defendant Rienbolt's manufactured story in official

police reports, while suppressing from those reports the highly exculpatory information on how

these statements were obtained and that they were false and incredible, contrary to physical and

11

other evidence and based on fabrication, coercion, suggestion, threats, promises, alcohol and

drugs.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 34.

35.    On the basis of these coerced, manipulated, manufacture and suggested false

statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable

cause, a warrant to seize hair, saliva and blood from the persons of Steidl and Whitlock. These

searches did not lead to any inculpatory evidence against Steidl and Whitlock, but Defendants

continued to wrongfully pursue their scheme to accuse and prosecute Steidl and Whitlock.

**ANSWER:**    Defendant Ray admits that a warrant was obtained from a judge, who after a
finding of probable cause, ordered the seizure of hair, saliva and blood from the
persons of Steidl and Whitlock and that the searches did not lead to inculpatory
evidence.  Defendant Ray denies the remaining averments contained in paragraph
35.

36.    Using Defendant Rienbolt's and Herrington false statements, Defendants

wrongfully charged Steidl and Whitlock by information with murder and arson.  On March 10,

1987, Steidl and Whitlock were indicted for these crimes by the Edgar County Grand Jury after

Defendant Parrish presented false information, including these statements and perjured testimony

to the Grand Jury.  Acting in concert with Defendants Ray, Parrish, Eckerty and McFatridge,

Defendant Rienbolt willfully and knowingly offered false testimony to the Grand Jury in an effort

to have Steidl and Whitlock indicted.

**ANSWER:**    Defendant Ray admits that Steidl and Whitlock were charged by information with
arson and murder and on March 10, 1987 were indicted for these crimes by the
Edgar County Grand Jury.  Defendant Ray denies the remaining averments
contained in paragraph 36.

37.     Defendants Ray, Parrish, and Eckerty specifically suppressed from the Grand Jury exculpatory evidence which, if known to the Grand Jury, would have demonstrated that these statements were false, coerced, manipulated, manufactures and suggested, that Steidl and Whitlock were innocent, that the Defendants had identified other likely suspects unrelated to Steidl and Whitlock, all of which would have likely resulted in a "no bill" and a failure to indict.

**ANSWER:**     Defendant Ray denies the averments contained in paragraph 37.

38.     Defendants Ray, Parrish, Eckerty and McFatridge continued to urge Defendant Rienbolt to fabricate further stories, using, *inter alia*, threats of physical force, threats of prosecution, promises of leniency, promises of money and drug treatment.  Defendant Rienbolt, who was continually under the influence of alcohol and drugs, made further fabrications concerning the murders, to wit:

a.     On March 29, 1987, Defendant Parrish, under the supervision and with the participation and/or knowledge of Defendants Ray, Eckerty and McFatridge interrogated Rienbolt and induced her to falsely state that on the night of the murders, Whitlock made statements to her that he, Steidl and Herrington were going to the Rhoads' house to deal with Dyke concerning drugs, that she gave her husband's knife to Whitlock, that she was present at the scene of the crimes, that she heard screaming, saw the bodies and later got the knife back from Whitlock with blood on it.

b.     In early April 1987, Defendants Parrish and Eckerty, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, again interrogated Rienbolt on several occasions and compelled and induced her to further fabricate the story that she was present at the crime scene and physically restrained Karen Rhoads while Steidl

13

and Whitlock stabbed Dyke Rhoads multiple times and then stabbed Karen Rhoads multiple

times and that Steidl and Whitlock later paid her money not to talk.

**ANSWER:**    Defendant Ray denies the allegations contained in paragraph 38.

39.    In March and April of 1987, Defendants Parrish and Eckerty, with the

participation and/or knowledge and approval of Defendants Ray and McFatridge, similarly

coerced, manipulated and suggested false statements from other witnesses, including Curtis

Smith and Carol Robinson, in an attempt to corroborate portions of Defendant Rienbolt's

testimony.  Defendants Parrish and Eckerty intimidated witnesses by shouting at them,

threatening to put them in jail, shaking their fists, smacking their fists on the table and kicking

chairs.  On one occasion Defendant Parrish so violently intimidated a witness named Barbara

Furry, who was nine months pregnant, that he caused her to urinate on herself.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 39.

40.    Additionally, Defendants Parrish and Eckerty, with the knowledge and approval

of Defendants Ray and McFatridge, wrote and recorded these coerced, manipulated, suggested

and manufactured false stories and statements of Defendant Rienbolt, Smith and Robinson in

official police reports while suppressing from those reports, the highly exculpatory information

that these statements were false and incredible, obtained by coercion and intimidation, were

contrary to physical and other evidence and based on fabrication, suggestion, threats and

promises.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 40.

41.    In an attempt to influence public opinion and prospective jurors, Defendant

McFatridge made numerous false pretrial public statements to the media concerning Steidl,

14

Whitlock, and the evidence against them, which statements were widely reported in the press.

McFatridge's statements violated the Illinois Rules of Professional Conduct, specifically Rule

3.6, prohibiting publication of opinions on the guilt or innocence of accused persons.

**ANSWER:**     Defendant Ray makes no answer to the averments contained in paragraph 41 as
they are not directed at this Defendant.

42.     In order to insure that Defendant Rienbolt would continue to tell her false story at

Steidl's and Whitlock's trials, the Defendants first put her into a drug treatment center, then

placed her under house arrest and coerced and enticed her into pleading guilty to the charge of

concealing a homicidal death, in exchange for a lenient sentence, the payment of her "relocation

expenses" and other rewards.  As part of this coercive agreement, the Defendants obtained

Defendant Rienbolt's signature on a six-page statement of "facts" which recited her prior

coerced, suggested, fabricated, manipulated, false and incredible statements about the crime.

This "agreement" further provided that she could be charged with, and tried for, additional

crimes if she did not testify consistently with her statement, and the Defendants made it clear to

her that these additional crimes included murder, with a possible sentence of death.

**ANSWER:**     Defendant Ray denies the averments contained in paragraph 48 of Plaintiff's
Complaint.

43.     Whitlock was tried in May of 1987 in Edgar County, Illinois.  On the basis of the

fabricated and manufactured evidence and because exculpatory materials were concealed from

Whitlock and his attorney, the jury returned a verdict of guilty of the murder of Karen Rhoads,

which it would not have done but for the wrongful conduct of Defendants Ray, Parrish, Eckerty,

McFatridge and Rienbolt.

**ANSWER:**     Defendant Ray admits that Whitlock was tried and convicted of the murder of Karen Rhoads in May of 1987 in Edgar County, Illinois.  Defendant Ray denies the remaining averments contained in paragraph 43 to the extent they are directed at him.

44.     In June of 1987, Steidl was tried and convicted of murder and arson in Vermilion County, and on June 16, 1987, sentenced to death on the basis of similar false and fabricated evidence and concealed exculpatory materials.

**ANSWER:**     Defendant Ray admits that Steidl was tried and convicted of murder and arson in Vermilion County in June of 1987 and was subsequently sentenced to death on June 16, 1987.  Defendant Ray denies the remaining averments contained in paragraph 44.

45.     During the course of their trials, Defendant McFatridge, with the cooperation of Defendants Ray, Parrish and Eckerty, did not reveal and took affirmative measures to withhold and suppress the following exculpatory materials favorable to Steidl and Whitlock:

a.     That there were numerous credible leads point to other suspects, including a prominent and influential Paris businessman;

b.     That witnesses were threatened and intimidated;

c.     There were failed polygraph tests by prosecution witnesses;

d.     There were money and favors given to prosecution witnesses in exchange for their testimony;

e.     Defendants arranged to give witnesses hypnotic suggestions;

f.     The Defendants provided alcohol to witnesses before and during the time they were giving statements;

g.     Herrington believed the murders were committed by two men named "Jim and Ed;

16

       h.     There was a cut on Herrington's hand the night of the murders.

       i.     Defendants failed and refused to submit Herrington's blood standard to the ISP lab;

       j.     Defendant Rienbolt testified she saw a piece of broken lamp in Steidl's hand.  The lamp was not broken until after the fire;

       k.     That Defendant Rienbolt originally stated that she saw a broken vase which did not exist;

       l.     That witnesses had identified someone other than Whitlock as a perpetrator;

       m.     That prosecution trial witnesses were coached in their testimony and provided with fabricated stories; and

       n.     That there was a previous business relationship between Defendant Parrish and the Paris businessman.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 45.

    46.    The officers and prosecutors had a legal duty under *Brady v. Maryland*, 373 U.S.83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny to disclose the foregoing, along with all evidence favorable to Whitlock.  Notwithstanding their duty, Defendants Ray, Parrish, Eckerty and McFatridge refused to disclose the foregoing and, in fact, concealed and deliberately obstructed access to exculpatory information.  Following the trial and conviction, other ISP employees who became aware of the undisclosed and concealed information, including Defendants Fermon, Carper, Brueggemann and Kaupus, had an affirmative *Brady* duty to disclose.

17

**ANSWER:**    Defendant Ray makes no response to the legal conclusions contained in paragraph 46 and further denies that he failed to comply with his obligation to disclose evidence in connection with the proceedings against Whitlock.

47.    Defendants Ray, Parrish, Eckerty and McFatridge suppressed from Whitlock and his lawyers, the Judge who presided over his case and the jury that convicted Whitlock all of the highly exculpatory evidence set forth above, as well as evidence of other potential suspects, and promises of leniency and payments that the Defendants made to Defendant Deborah Rienbolt.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 47.

48.    Despite their exhaustive attempts to do so, the Defendants neither developed nor presented at trial, nor thereafter, any physical evidence, such as hair samples, fingerprints, bloodstains, footwear patterns or other scientific evidence, which linked Whitlock to the crime scene.

**ANSWER:**    Defendant Ray admits that despite an intensive investigation, no physical evidence, such as hair samples, fingerprints, bloodstains, footwear patterns or other scientific evidence was located linking Whitlock to the crime scene.

49.    Directly after his conviction and sentencing, Whitlock filed a notice of appeal, and a post-conviction petition challenging his conviction.  The Attorney General's Office represented the State in these post trial proceedings.

**ANSWER:**    Defendant Ray admits that Whitlock filed a timely notice of appeal on August 11, 1987.  Defendant Ray further admits that Whitlock filed successive post-judgment petitions and motions challenging his conviction and that the Illinois Attorney General's Office represented the State during some of the post-trial proceedings. Defendant Ray denies that the Attorney General's Office represented the State in all of the post trial proceedings.

50.    After the trial and during the post-trial proceedings, Defendants Ray, Parrish, Eckerty, and McFatridge continued to suppress and withhold exculpatory materials from

18

Whitlock. Being unaware of the exculpatory material, *Brady* issues which should have been considered were not effectively raised in post-conviction proceedings.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 50.

51.    Shortly after Whitlock's conviction and sentencing in August of 1987, Herrington and his wife told Defendants Ray, Parrish and other Paris police officers that 1) Herrington had lied in his testimony at trial; 2) that he saw the Paris businessman at the bottom of the Rhoads' stairs just after the murders and before he saw Plaintiff and Whitlock; 3) that Steidl and Whitlock had walked in after the crime rather than having committed it; 4) that the Paris businessman said to Herrington, "You didn't see me," and later offered him $25,000 in cash, $25,000 in property, and a job with the promise he would not have to work, to keep his mouth shut; and 5) that the Paris businessman was shipping narcotics in bags of dog food produced by one of his companies.

**ANSWER:**    Defendant Ray admits that he had a conversation with Darrell and Betty Herrington after Whitlock's conviction and sentencing but denies the content of the statement as set forth in paragraph 51 and denies that Whitlock's conviction and sentence were in August of 1987.

52.    Defendants Ray and Parrish recorded these highly exculpatory statements in notes and a police report during the time Whitlock was appealing his case, but they concealed them and did not disclose them to Whitlock or his attorneys. They suppressed the report and the retraction with the knowledge and/or at the direction and with the approval of Defendant McFatridge from Steidl and Whitlock, their lawyers and the Courts who were considering the appeals and post-conviction proceedings. These notes and reports remained suppressed until 1998 when investigator Bill Clutter discovered them in a police storage garage.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 52.

19

53.    After Herrington's recantation, Defendants took affirmative steps to convince him to repudiate his recantation, including helping him get his revoked drivers license reinstated. Defendants Parrish and McFatridge intervened on Herrington's behalf with the Office of the Illinois secretary of State in an attempt to help Herrington get his revoked driver's license restored, despite his five DUI convictions. They successfully restored his driving privileges and even obtained a waiver of fines related to the convictions. Defendants' efforts were not disclosed to Whitlock or his attorneys.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 53 to the extent those averments are directed at him.

54.    Later in 1988, Defendant Rienbolt, while in prison and acting as an informant for a Federal Marshal who was looking for a federal fugitive named James "Jim" Slifer, informed him that Slifer had ordered and was present for the Rhoads murders.

**ANSWER:**    Defendant Ray is without knowledge or information sufficient to form a belief as to the truth or falsity of the averments of paragraph 54 of Plaintiff's Complaint.

55.    Defendant Rienbolt became the subject of a Federal investigation for allegedly making false statements to federal authorities, and in January of 1989, McFatridge intervened with the U.S. attorney's office on her behalf. Neither his intervention nor Rienbolt's statement about Slifer were disclosed to Steidl or Whitlock.

**ANSWER:**    Defendant Ray is without knowledge or information sufficient to form a belief as to the truth or falsity of the averments of paragraph 55.

56.    In January of 1989, Defendant Rienbolt recanted her trial testimony. She told Steidl's appellate lawyer that 1) Steidl "did not take part in the killings of Dyke and Karen Rhoads and was not present when the murders took place," 2) that James Slifer "was personally

20

present in the Rhoads bedroom at the time of the murders," 3) that Cheryl Costa "had some involvement with Slifer and the murders," and 4) that Darrell Herrington was not present at the scene of the murders.  Additionally, she signed an affidavit which stated that she knew "Randy Steidl did not stab either Dyke or Karen Rhoads," and that she "repeatedly told the police and the prosecutor that Randy Steidl did not stab either Dyke or Karen Rhoads but the police and the prosecutor ignored my statements."

**ANSWER:**     Defendant Ray admits that Rienbolt signed an affidavit for Steidl's appellate lawyer.  Defendant Ray denies the remaining averments of paragraph 56.

57.     Defendants Parrish and McFatridge, upon learning of Defendant Rienbolt's recantations, which among other things implicated them and their fellow Defendants in suborning perjury and obstructing justice, threatened and intimidated Defendant Rienbolt.  As a result of Defendants' threats, she repudiated her recantation.

**ANSWER:**     To the extent they are directed at him, Defendant Ray denies the averments contained in paragraph 57.

58.     Whitlock subsequently filed a post-conviction petition which raised, *inter alia*, the testimony of Herrington and Rienbolt and their recantations.

**ANSWER:**     Defendant Ray admits that Whitlock filed numerous post-conviction petitions and pleadings which raised*, inter alia*, allegations regarding the testimony of Herrington and Rienbolt.

59.     In response to this filing, Defendant McFatridge, continuing his false publicity campaign, again made false and prejudicial public statements in response to Plaintiff's evidence, discrediting the recantations, and again falsely claiming that "one fact will never change - - - that Herbert R. Whitlock and Gordon R. Steidl are responsible for the deaths of Dyke and Karen Rhoads."  Such a statement posed a serious and imminent threat to the fairness of the

adjudicative proceedings and constituted an impermissible published opinion on the guilt of

Whitlock in violation of Supreme Court 3.6 (Illinois Rules of Professional Conduct.)

**ANSWER:**    Defendant Ray makes no answer to the averments of paragraph 59 as they are not
directed at this Defendant.

60.    As a consequence, Herrington's and Rienbolt's original false, manufactured and

coerced testimony and their wrongfully induced repudiations of their recantations as aforesaid,

the Defendants' continued concealment and suppression of highly exculpatory evidence,

Defendants Parrish's and Eckerty's false and perjurious testimony at the hearing, the continued

highly prejudicial atmosphere engendered by this false evidence and Defendant McFatridge's

publicity campaign, the trial Judge denied Whitlock's post-conviction petition.

**ANSWER:**    Defendant Ray admits that the trial judge denied Whitlock post-conviction relief
but denies the remaining averments contained in paragraph 60.

61.    Defendant McFatridge resigned his position as State's Attorney of Edgar County

in early 1991.

**ANSWER:**    Defendant Ray admits the averments contained in paragraph 61.

62.    On September 28, 1988, the Illinois Appellate Court for Fourth District, basing its

decision on the trial court record, containing the same coerced, suggested, fabricated and

manipulated evidence and being unaware of the highly exculpatory evidence which had been

concealed and suppressed, affirmed Whitlock's conviction and sentence and the denial of his

post-conviction petition.

**ANSWER:**    Defendant Ray admits that on September 28, 1988, the Illinois Appellate Court
for the Fourth District affirmed Whitlock's conviction and sentence (*People v.
Whitlock*, 528 N.E.3d 1371 (4th Dist. 1988)) but denies the remaining averments
contained in paragraph 62.

22

63.    On March 6, 1990, Whitlock filed a petition for habeas corpus in the United

States District Court for the Central District of Illinois.  As a direct consequence of 1) all of the

false testimony, statements and repudiations of recantations which were coerced, suggested,

fabricated, manipulated and purchased by Defendants Ray, Parrish, Eckerty and McFatridge, and

2) the Defendants' continued concealment and suppression of highly exculpatory evidence, and

3) Defendant McFatridge's publicity campaign, Whitlock's habeas corpus petition was ultimately

dismissed.  On June 8, 1992, Whitlock filed a second petition for habeas corpus in the United

States District Court for the Central District of Illinois which was similarly dismissed as a

consequence of the wrongful conduct of Defendants as aforesaid.

**ANSWER:**    Defendant Ray admits that Whitlock filed petitions for habeas corpus in the
United States District Court for the Central District on March 6, 1990 and June 8,
1992 and that both petitions were ultimately dismissed but denies the remaining
averments contained in paragraph 63.

64.    In February of 1996, Defendant Rienbolt gave a sworn court reported and

videotaped statement to Steidl's lawyers in which she swore that her prior statements and

testimony were false.  She further swore she had not been present at the scene of the murders,

that the knife she provided was not the murder weapon and that she had no knowledge of Steidl

having been involved in the crime.  She also averred that Defendants Ray, Parrish, Eckerty and

McFatridge coerced, manipulated and helped her fabricate her statements and trial testimony

which falsely inculpated Steidl and Whitlock.

**ANSWER:**    Defendant Ray admits that Rienbolt gave a court reported and video-taped
statement in February of 1996, during which she testified that she was not at the
Rhoads' house the night they were killed; that to her knowledge the knife she
provided had not been used to kill Dyke and Karen Rhoads; and that she had no
knowledge of Plaintiff being involved in the crime.  Defendant Ray is without

23

knowledge or information sufficient to form a belief regarding the truth or falsity of the remaining averments in paragraph 64.

65.    Less than a week after her 1996 recantation, Defendant Rienbolt met with Defendants Parrish, Eckerty and McFatridge and, on information and belief, because of their threats and coercion, retracted her recantation of the previous week.

**ANSWER:**    Defendant Ray admits that Rienbolt retracted her February 1996 recantation but denies the remaining averments in paragraph 65.

66.    On September 18, 1997, the Illinois Supreme Court reversed the dismissal of Steidl's amended post-conviction petition holding that he was entitled to an evidentiary hearing. Defendants knew that Steidl's success in his hearing would have had a concomitant benefit for Whitlock.

**ANSWER:**    Defendant Ray admits that the Illinois Supreme Court reversed the dismissal of Plaintiff's amended post-conviction petition on September 18, 1997 and remanded the case for an evidentiary hearing.  Defendant Ray denies the remaining averments contained in paragraph 66.

67.    In 1998, the trial court conducted a post-conviction evidentiary hearing for Steidl. Defendants again introduced their fabricated evidence and again suppressed exculpatory material, all in an effort to have the court deny the petition.  Defendant McFatridge gave false and perjured testimony at Steidl's hearing, in which he denied any misconduct by himself or any other of the Defendants, and Defendants Ray, Parrish, Eckerty and McFatridge continued to conceal and suppress from this hearing all of the exculpatory evidence discussed above.  Their wrongful conduct was designed to continue the wrongful incarceration of Steidl, which they knew would have a parallel effect on Whitlock.  Their conduct was also designed to cover up Defendants'

wrongful acts and omissions in the prosecution, conviction and post-trial proceeding of both

Steidl and Whitlock.

**ANSWER:**    Defendant Ray admits that the trial court conducted a post-conviction evidentiary hearing for Steidl in 1998 but denies the remaining averments in paragraph 67.

68.    On December 11, 1998, the trial court again denied Steidl's post-conviction relief

on his conviction, although the court did grant Steidl a new sentencing hearing, at which the state

declined to pursue the death penalty.  On February 18, 1999, Steidl was resentenced to natural

life imprisonment.  The Illinois Appellate Court affirmed denial of his post-conviction petition

on December 5, 2000, and the Illinois Supreme Court denied leave to appeal on April 4, 2001.

**ANSWER:**    Defendant Ray admits the averments contained in paragraph 68.

69.    In 1999, following a national conference, Northwestern University professor

David Protess and his Innocence Project sent a team of student investigators from the Center on

Wrongful Convictions.  The contradictions and anomalies which manifested themselves were

also featured in television reports.  The disclosures led to the appointment of ISP Lieutenant

Michale Callahan ("Callahan") in April 2000 who was assigned to investigate the Steidl and

Whitlock convictions.

**ANSWER:**    Defendant Ray is without knowledge or information sufficient to form a belief as to the truth or falsity of the averments contained in paragraph 69.

70.    At the time of his appointment, Callahan was the District 10 Investigations

Commander.

**ANSWER:**    Defendant Ray admits that in or about mid-April, 2000, when Illinois State Police Lieutenant Michale Callahan was assigned to review the Rhoads murders, he was the District 10 Investigations Commander.

71.    Following exhaustive research into the Rhoads' murders and the Steidl and Whitlock trials, Callahan wrote a detailed memo which he sent to ISP Captain John Strohl on May 17, 2000.  The memo was circulated up the ISP chain of command to Defendants Carper and Parker and later to Defendant Fermon.  Callahan documented a wealth of evidence gathered during his review, all of which supported his conclusion that Steidl and Whitlock "had not been proven guilty beyond a reasonable doubt," and that the Paris businessman "was at one time and should still be the focus of the investigation."

**ANSWER:**    Defendant Ray is without knowledge or information sufficient to form a belief regarding the truth or falsity of the averments in paragraph 71.

72.    Among the facts, findings and conclusions included in this memorandum of May 17, 2000, were thirty-eight separate contradictions and material falsehoods found in Defendant Rienbolt's and Herrington's testimony, including the following:

- Defendants Parrish and McFatridge had witness Carol Robinson lie on the stand as to whether she saw Herrington and Steidl together on July 5th;
- Herrington's time line did not fit with the crime;
- A polygraph examiner found purposeful non cooperation of Herrington and the examiner's recommendation that Herrington be re-examined was rejected by the Defendants;
- Rienbolt's testimony that she skipped work on the night of July 5th and was with Steidl and Whitlock was refuted by numerous witnesses;
- Rienbolt's testimony that a broken lamp was used in the homicides was refuted by the testimony of the fire examiners;
- Rienbolt later recanted her testimony that she was present at the murders and that Steidl was involved;
- Rienbolt lied about the knife;
- Rienbolt admitted that Parrish led her into her false testimony;
- Herrington testified he was a Joe's Bar with Steidl and Whitlock at 8:30 p.m. and they all went to the Horseshoe Bar, while Defendant Rienbolt testified she was with them at the same time at the Tap Room Bar;
- Herrington described the crime scene, placing Dyke Rhoads on the floor with shorts on and Karen Rhoads on the bed with panties on.  The firemen said they were totally nude;

26

- Defendant Rienbolt stated that she went to the American Legion Bar with Barbara Furry. Barbara Furry stated that she has never gone to the bars with Defendant Rienbolt and she was not at the American Legion July 5, 1986;
- Defendant Rienbolt implausibly stated that Steidl and Whitlock took showers at the Rhoads' house after the murders.
- Herrington stated that Whitlock had a clump of Karen Rhoads' hair in his hand. The autopsy report shows no hair torn from Karen Rhoads' head.

**ANSWER:**    Defendant Ray admits only that Callahan created a memorandum dated May 17, 2000 which contains purported contradictions of Rienbolt and Herrington set forth in 38 bullet points.

73.    In this May 17, 2000, memorandum, Callahan further set forth evidence which supported the determination that the Paris businessman and several of his employees were, and continued to be, suspects in the Rhoads murders; in other related homicides and in organized crime and narcotics trafficking. Callahan found that Defendant Parrish had a connection to the Paris businessman. Callahan found that much of this highly exculpatory evidence was known to Defendants Ray, Parrish, Eckerty and McFatridge and was suppressed from Steidl and Whitlock including:

- Karen Rhoads was employed by the Paris businessman as a secretary and he frequently visited her apartment;
- The Paris businessman was a suspect in two prior homicides including the murder of a former secretary;
- Karen Rhoads said that she had seen the Paris businessman and an employee load a large sum of cash and a machine gun in the Paris businessman's car;
- Karen Rhoads had told the Paris businessman the Friday prior to the murders that she was quitting her job, that he forbade her from doing so and a big argument ensued. Karen wrote a letter found on her desk which read, "I'm still with Bob. He says my bonus will be real big this year. Believe me it had better;"
- Two of the Paris businessman's employees, who were known as his "right hand men," were implicated in the Rhoads murders;
- The Paris businessman arrived on the scene just as the investigators did and offered his theory about the murders;

27

- Immediately after the murders, the Paris businessman offered a $25,000 reward in local bars for information on the murders. Herrington later stated that the Paris businessman offered him $25,000 and a job to keep his mouth shut;
- Herrington also told Parish and Ray that the Paris businessman was at the scene of the murders at the time they occurred;
- Parrish worked for the Paris businessman during a six-month suspension prior to the murders.

**ANSWER:**    Defendant Ray admits that Callahan's May 17, 2000 memorandum purports to set forth the information contained in paragraph 73 but denies that he was aware of and suppressed any "highly exculpatory evidence" from Steidl and Whitlock.

74.    Callahan continued his investigation, and in July of 2000 and August of 2001, he wrote further memos to his superiors. Those memos were also disseminated to Carper and Parker, and later to Defendant Fermon. In these memos he provided further details about his interviews which were exculpatory to Steidl and Whitlock. Much of what Callahan reported was known to Defendants Ray, Parrish, Eckerty and McFatridge at all times and was withheld and suppressed from Steidl and Whitlock. These memos, totaling twenty-eight pages of details, containing exculpatory evidence and investigative findings and discussing the connection of the Paris businessman to the Rhoads murders were delivered to Defendants Fermon, Carper and Parker, but not disclosed to Steidl, Whitlock or their attorneys at that time.

**ANSWER:**    Defendant Ray denies that he was aware of, withheld and suppressed any exculpatory evidence from Steidl and Whitlock. Defendant Ray is without knowledge or information sufficient to form a belief regarding the truth or falsity of the remaining averments in paragraph 74.

75.    Defendant Eckerty, other law enforcement agents and Eckerty's wife contacted Callahan to tell him that Eckerty was a "good cop" and that Callahan should not ruin his reputation. Eckerty also offered to sell Callahan a houseboat at his cost. Callahan suggested a full scale investigation, focusing in large part on the Paris businessman.

28

**ANSWER:** Defendant Ray is without knowledge or information sufficient to form a belief regarding the truth or falsity of the averments in paragraph 75.

76.    Upon receipt of all the evidence and investigative findings reported by Callahan and in an effort to cover up the wrongdoing of Defendants Ray, Parrish, Eckerty and McFatridge, Defendants Fermon, Carper, Brueggemann and Parker refused a full investigation of the Rhoads case because, as Carper put it, it was 'too politically sensitive." Defendants Fermon, Carper, Brueggmann and Parker allowed only an investigation into the Paris businessman, limited to intelligence gathering. Then they removed Callahan from the Rhoads case and ordered him to focus on assignments other than the Rhoads murders and the Paris businessman. They demoted Callahan and transferred him from his investigative post and, with Defendant Kaupus, launched an effort to discredit Callahan's evidence, findings and recommendations.

**ANSWER:** Defendant Ray denies any wrongdoing and makes no answer to the remaining averments contained in paragraph 76 as they are not directed at this Defendant.

77.    Once they obtained full knowledge of the concealed, withheld and suppressed exculpatory evidence which was existing at the time of Whitlock's arrest, conviction and post-conviction proceedings, Defendants Fermon, Carper, Brueggemann and Parker had an affirmative duty under *Brady* to disclose this evidence to Whitlock and his attorneys. But rather than so advise Whitlock, his attorneys or the courts, Defendants Fermon, Carper, Brueggemann and Parker, along with Defendants Ray, Parrish, Eckerty and McFatridge, kept mum and took steps actively to keep the evidence concealed. Whitlock had a right to be informed about *Brady* material.

**ANSWER:** Defendant Ray denies the averments contained in paragraph 77 to the extent they are directed at this Defendant.

29

78.     As a result of his demotion, Callahan brought a civil suit accusing Fermon and Carper of violating his free speech and of retaliatory demotion.  A jury awarded $700,000 in favor of Callahan and against Fermon and Carper.

**ANSWER:**     Defendant Ray admits the averments contained in paragraph 78.

79.     Because Defendants Fermon, Carper, Brueggemann, Parker and Kaupus suppressed the investigation into the Rhoads murders, the development of further evidence exculpatory to Steidl and Whitlock which would have resulted therefrom was thwarted.

**ANSWER:**     Defendant Ray makes no answer to the averments contained in paragraph 79 of Plaintiff's Complaint as they are not directed at this Defendant.

80.     These same Defendants caused the wealth of exculpatory evidence uncovered by Callahan to be withheld from Steidl and Whitlock during the period of time they were petitioning for release.  Callahan's information, when combined with the previously concealed information, would have likely resulted in their exoneration and release.

**ANSWER:**     Defendant Ray denies the averments contained in paragraph 80 of Plaintiff's Complaint to the extent they are directed at this Defendant.

81.     Steidl and Whitlock filed petitions for executive clemency with the Governor of the state of Illinois in which they asked for a pardon on the basis of innocence.

**ANSWER:**     Defendant Ray admits the averments contained in paragraph 81.

82.     When he learned of their petitions for clemency, Defendant McFatridge launched a public campaign opposing the freeing of Steidl and Whitlock by pardon, clemency, or any collateral relief.  In so doing, he again made false public statements which prejudiced Steidl and Whitlock and their legitimate claims of innocence, for a new trial and for release, which they were seeking in post-conviction, habeas and clemency and pardon proceedings.

30

**ANSWER:**    Defendant Ray makes no answer to the averments contained in paragraph 82 as they are not directed as this Defendant.

83.    On information and belief, a representative of the Governor called Callahan, informing him that the Governor was prepared to pardon Steidl and Whitlock if Callahan could represent to him that, based on his investigation, they were innocent.

**ANSWER:**    Defendant Ray is without knowledge or information sufficient to form a belief regarding the truth or falsity of the averments in paragraph 83.

84.    On information and belief, Callahan who required to seek approval from his superiors before providing such an official statement, contacted the Defendants who were his superiors in the chain of command and immediately sought such approval.

**ANSWER:**    Defendant Ray is without knowledge or information sufficient to form a belief regarding the truth or falsity of the averments in paragraph 84.

85.    On information and belief, Callahan provided a detailed briefing at a lengthy meeting attended by Defendants Fermon, Carper, Brueggemann and others where he presented all the evidence and findings set forth above and articulated his opinion, supported by all this evidence, that Steidl and Whitlock had not only not been proven guilty beyond a reasonable doubt, but that they were innocent and that the jury never heard the truth.  Callahan also told these Defendants that there was no credible evidence against Steidl and Whitlock, that the two so-called eye witnesses had been completely discredited, that he strongly suspected that the wrongdoing by Parrish, Eckerty and McFatridge and the Paris businessman should continue to be the focus of the investigation.

**ANSWER:**    Defendant Ray is without knowledge or information sufficient to form a belief regarding the truth or falsity of the averments in paragraph 85.

31

86.      At the briefing, Defendants Fermon, Carper and Brueggemann opposed

Callahan's evidence and took the position that he should not be permitted to inform the

Governor's representative that Steidl and Whitlock were innocent.  On information and belief,

Callahan was ordered to offer no opinion and supply no exculpatory evidence to the Governor or

his representative.

**ANSWER:**      Defendant Ray is without knowledge or information sufficient to form a belief
                regarding the truth or falsity of the averments in paragraph 86.

87.      Because of the obstruction and suppression of Callahan's findings and opinions by

Defendants Fermon, Carper and Brueggemann, combined with the previous and continuing

suppression of evidence by all Defendants, the Governor declined to make a determination on

Steidl and Whitlock's request for clemency and their requests remain pending to this date.

**ANSWER:**      Defendant Ray admits that former Governor Ryan did not grant Plaintiff and
                Whitlock pardons based on innocence before leaving office.  Defendant Ray
                denies the remaining averments in paragraph 87.

88.      On June 17, 2003, the Federal District Court granted Steidl's petition for writ of

habeas corpus, which had been filed on October 5, 2001, vacating Plaintiff's conviction with a

finding that "acquittal was reasonably probable if the jury had heard all of the evidence" and

allowing the state 120 days to release or retry him.

**ANSWER:**      Defendant Ray admits the averments contained in paragraph 88 of Plaintiff's
                Complaint.

89.      Attorney General Lisa Madigan announced she would not appeal the order, stating

that after carefully reviewing the evidence, her office found that information favoring the defense

was never disclosed, and that Steidl was thus entitled to a new trial.

**ANSWER:**      Defendant Ray admits the averments contained in paragraph 89.

32

90.    In a last ditch effort to continue to hold Steidl in custody, Defendant McFatridge made additional false public statements, including one to the Paris Beacon News in which he attacked Attorney General Lisa Madigan for her decision not to appeal the District Court's decision, recited again the false evidence which he and his co-Defendants had manufactured and coerced, falsely denied that he and his co-Defendants suppressed exculpatory evidence and falsely claimed that Plaintiff was guilty of the brutal murders.

**ANSWER:**    Defendant Ray makes no answer to the averments in paragraph 90 as they are not directed at this Defendant.

91.    Steidl was released from Danville Correctional Center on May 28, 2004, after serving seventeen years in prison, twelve of them on Death Row, for two murders the Defendants knew he did not commit.

**ANSWER:**    Defendant Ray admits that Plaintiff was released from Danville Correctional Center on May 28, 2004 after having been incarcerated for seventeen years. Defendant Ray denies the remaining averments contained in paragraph 91.

92.    Despite the fact that the Federal District Court had found that Steidl's trial would have probably resulted in acquittal and despite the fact that Whitlock was convicted on the very same basis, Whitlock was not released.  Despite the fact that the Illinois Attorney General believed that information favoring Steidl's defense was never disclosed and that the same evidence was concealed from Whitlock, all efforts to release Whitlock were strenuously opposed by Defendants.  Neither the Illinois Attorney General nor the Office of the State Appellate Prosecutor agreed to afford Whitlock the same treatment as Steidl.  Whitlock was forced to continue his imprisonment for a crime he did not commit.

**ANSWER:**    Defendant Ray admits that Whitlock was not released from prison but denies the remaining averments in paragraph 92.

33

93.     On June 11, 2004, Whitlock filed a second amended petition for post-conviction relief.  Rather than concede that Whitlock was no more culpable than his co-defendant Steidl, who the state refused to retry, the Office of the State Appellate Prosecutor, with the active assistance of Defendants Eckerty and Marlow, vigorously opposed Whitlock's petition and sought his continued incarceration.  Defendant Marlow, who also became aware of the wealth of exculpatory evidence, scoured the country trying to get witnesses to testify against Whitlock.

**ANSWER:**     Defendant Ray admits that Whitlock filed petition for post-conviction relief but he is without sufficient knowledge to admit or deny the remaining averments contained in paragraph 93.

94.     The following was adduced at Whitlock's post-conviction hearing:

•     Defendant Eckerty admitted he provided Herrington with alcohol "to help him relax" before his Grand Jury testimony.

**ANSWER:**     Defendant Ray denies Whitlock's characterization of Eckerty's testimony but admits that Eckerty testified that he provided Herrington with alcohol the night before Herrington was going to testify at the grand jury and that Eckerty testified that, "[Herrington] was given a motel room.  He was nervous.  And he just wanted to relax."  (Testimony of Jack Eckerty on April 15, 2005.)

•     Gary Wheat, a Paris police officer, stated that he stayed with Herrington in Defendant Parrish's cabin and provided Herrington with alcoholic beverages.

**ANSWER:**     Defendant Ray is without knowledge or information sufficient to form a belief regarding the truth or falsity of the averments regarding statements purportedly made by Gary Wheat.

•     Defendant Eckerty stated that Herrington made an "eavesdropping" telephone call to Whitlock on September 25, 1986, from Parrish's cabin while drinking alcohol they provided.

**ANSWER:**     Defendant Ray denies that Eckerty stated that Herrington made an "eavesdropping" telephone call to Whitlock on September 25, 1986, from Parrish's cabin while drinking alcohol they provided.

34

- Debra Helton, a forensic scientist with the ISP crime laboratory, submitted a stipulated affidavit which stated that she began to screen items of evidence for human blood. Helton was told that Herrington had cut his hand and she requested Herrington's blood standard. Defendants Parrish, Eckerty and McFatridge failed and refused to forward Herrington's blood standard to her for testing.

**ANSWER:**     Defendant Ray is without knowledge or information sufficient to form a belief regarding the truth or falsity of the averments regarding Debra Helton.

- Dr. John Murphy, the State's pathologist testified that he had removed the sternum from Dyke Rhoads body because he had found a "defect," a knife wound in the sternum. He preserved the sternum in case anyone wished to examine it for tool marks (distinctive to a particular knife blade). No such examination was ever done.

**ANSWER:**     Defendant Ray denies that Dr. John Murphy testified at Whitlock's post-conviction hearing.

- Dr. Murphy testified that either the Rienbolt knife or the knife found in the sink could have been the murder weapon.

**ANSWER:**     Defendant Ray denies that Dr. John Murphy testified at Whitlock's post-conviction hearing.

- Donald Tankersley, an arson investigator for the State Fire Marshall, testified that the lamp was in fact not broken until after the fire. The interior was white and free of soot. Rienbolt had testified she saw broken, a piece in Steidl's hand at the time of the murders

**ANSWER:**     Defendant Ray denies that Donald Tankersley testified at Whitlock's post-conviction hearing.

- Whitlock presented Dr. Baden, a forensic pathologist, certified in all three pathologies sub-specialties. He had performed more than 20,000 forensic autopsies. He concluded to a reasonable degree of medical certainty that the Rienbolt knife did not cause the fatal wound on Dyke Rhoads.

**ANSWER:**     Defendant Ray denies that Dr. Baden testified at Whitlock's post-conviction hearing.

- Dr. Baden also concluded to a reasonable degree of medical certainty that the Rienbolt knife could not have inflicted Karen Rhoads' wound, but that the sink knife could have done so.

**ANSWER:**    Defendant Ray denies that Dr. Baden testified at Whitlock's post-conviction hearing.

95.    Despite the overwhelming evidence at the post-conviction hearing and despite the fact that the state had decided its evidence was insufficient to retry Steidl, Defendant Eckerty, along with Prosecutor David Rands, strenuously opposed Whitlock's petition, submitted the same fabricated, manipulated and false evidence it used to originally convict him and urged the court to deny the petition.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 95.

96.    Due in part to 1) the continued reliance on the fabricated, manipulated, coerced and false testimony, on the withholding and suppression of exculpatory evidence, 2) the suppression of the Callahan report and refusal to permit the further investigation, 3) the continued efforts of Defendants to prevent investigation of other credible suspects including the Paris businessman and 4) continued efforts of Defendants not to admit their mistakes, the trial court denied Whitlock's post-conviction petition. Whitlock continued to be incarcerated in the penitentiary despite his innocence.

**ANSWER:**    Defendant Ray admits that the trial court denied Whitlock's post-conviction petition but denies the remaining averments contained in paragraph 96.

97.    Whitlock appealed the denial of his petition to the Illinois Appellate Court for the Fourth District.  During 2006 and continuing into 2007, the Office of the State Appellate Prosecutor, aided by Defendant Marlow, continued in their attempts to manufacture evidence against Whitlock and defeat his appeal.  Defendant Marlow continued to interview potential witnesses strongly suggesting stories to them.  On one occasion, he visited Ovid Chambers in Florida and screamed and forcefully told him that he knew Whitlock was with him in the Rhoads

36

house the night of the murders and that Chambers should so testify. Chambers denied such a story and declined.

**ANSWER:**   Defendant Ray admits that Whitlock appealed the denial of his petition to the Illinois Appellate Court for the Fourth District.  Defendant Ray makes no answer to the remaining averments in paragraph 97 as they are not directed at this Defendant.

98.    Jennifer Aper, a scientist at the ISP crime lab, who has possession of items of physical evidence recovered from the crime scene, was told not to perform mitochondrial DNA tests. Without such tests, the tissue and blood samples cannot be compared to other credible suspects, including those presently incarcerated in other institutions.

**ANSWER:**   Defendant Ray is without knowledge or information sufficient to form a belief regarding the truth or falsity of the averments contained in paragraph 98.

99.    On September 6, 2007, the Illinois Appellate Court for the Fourth District issued a 53-page opinion finding *inter alia* that the "State violated *Brady* by suppressing [evidence.]" The Court held, "We find a reasonable probability that but for these errors, considered cumulatively the verdict would have been different." (p. 2) The Court reversed the judgement and conviction and remanded the case back for a new trial.

**ANSWER:**   Defendant Ray admits the averments contained in paragraph 99.

100.    Despite the Appellate Court's decision, Defendants still objected to Whitlock's release.  Whitlock sought to be released on bond so that he could spend Christmas 2007 with his daughter and grandchild, but the state argued against it.  Whitlock was finally released on January 8, 2008, when the state *nolle prosequied* the case.

**ANSWER:**   Defendant Ray is without knowledge or information sufficient to form a belief regarding the truth or falsity of the averments contained in paragraph 100.

## COUNT I
### (42 U.S.C. § 1983 Claim for Deprivation of Right to Fair Trial, Deprivation of Due Process and for Wrongful Conviction)

101.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER:**    Defendant Ray adopts his responses to paragraphs 1 through 100 as if fully set forth in response to paragraph 101.

102.    Article 42 U.S.C. § 1983 provides, in pertinent part, as follows:

> "Every person who, under color of any statue, ordinance, regulation custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress..."

**ANSWER:**    Defendant Ray admits the averments contained in paragraph 102.

103.    Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the wrongful charging, prosecution and conviction of Whitlock, and these same Defendants, together with Defendants Steve Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the continuation of said wrongful conviction, by a) coercing, intimidating, constructing and/or fabricating the false and totally unreliable statements, testimony and other evidence which formed the basis of Whitlock's charging, prosecution and conviction; b) withholding and concealing from Whitlock's defense attorneys, and the judges, juries, post-trial prosecutors and the Governor and his staff, who were involved in Whitlock's criminal proceedings, the highly exculpatory and exonerating evidence

38

that these statements, testimony and other evidence were false, totally unreliable, fabricated,

manipulated, suggested and coerced; c) suppressing from these same persons additional highly

exculpatory and exonerating evidence and documents which further exonerated Steidl and

Whitlock and his co-defendant, including evidence of other more likely suspects; d) writing false

reports and giving and tendering false testimony and statements at the Grand Jury, at trial and at

post-conviction and habeas corpus proceedings; e) improperly influencing the judges, juries and

executive bodies and officials hearing and considering Whitlock's case, and the post-trial

prosecutors who continued his prosecution, *inter alia*, by making false public statements and f)

obstructing investigations which would have led to discovery of further exculpatory evidence,

and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Whitlock

of his liberty, violating his right to a fair and impartial trial and violating his rights to due

process, all as guaranteed by the Fourth Amendment to the United States Constitution.

**ANSWER:**     Defendant Ray denies the averments contained in paragraph 103.

104.     The actions of Defendants Gene Ray, James Parrish, Jack Eckerty, Michael

McFatridge, Steve Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann

and Jeff Marlow in depriving Whitlock of his liberty, his right to a fair trial and his right to due

process were a direct and proximate cause of the injuries to Whitlock which are set forth above.

**ANSWER:**     Defendant Ray denies the averments contained in paragraph 104.

WHEREFORE, Defendant Ray denies that Plaintiff is entitled to any judgment

whatsoever against him, and prays this Honorable Court will enter judgment in his favor and

allow for the costs of defending this lawsuit.

## COUNT II
### (42 U.S.C. § 1983- Malicious Prosecution)

Defendant Ray has filed a motion to dismiss Count II of Plaintiff's Complaint.

## COUNT III
### (False Imprisonment)

Defendant Ray has filed a motion to dismiss Count III of Plaintiff's Complaint.

## COUNT IV
### (42 U.S.C. § 1983 *Monell* Policy Claim Against City Of Paris)

Defendant Ray makes no response to Count IV as Count IV is not directed at this

Defendant.

## Count V
### (State Law Claim for False Imprisonment)

Defendant Ray has filed a motion to dismiss Count V of Plaintiff's Complaint.

## COUNT VI
### (State Law Claim for Malicious Prosecution)

123.    Plaintiff realleges paragraphs 1 through 100 and 105 through 109.

**ANSWER:**    Defendant Ray adopts his responses to paragraphs 1 through 100 and 105 through 109 as if fully set forth in response to paragraph 123.

124.    Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge,

individually, jointly and in conspiracy with each other and with certain other named and

unnamed private individuals and law enforcement agents, initiated a malicious prosecution

without probable cause against Plaintiff, and these same Defendants, together with Defendants

Steve Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff

Marlow, individually, jointly and in conspiracy with each other and with certain other named and

unnamed private individuals and law enforcement agents, continued said prosecution, again

40

without probable cause. Said prosecution was ultimately terminated in Plaintiff's favor. The

Defendants' actions were done in willful  and wanton manner and directly and proximately

caused the injury and damage to Plaintiff as set forth above.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 124.

WHEREFORE, Defendant Ray denies that Plaintiff is entitled to any judgment

whatsoever against him, and prays this Honorable Court will enter judgment in his favor and

allow for the costs of defending this lawsuit.

### COUNT VII
### (State Law Claim for Intentional Infliction of Emotional Distress)

125.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER:**    Defendant Ray adopts his responses to paragraphs 1 through 100 as if fully set
forth in response to paragraph 125.

126.    Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge,

individually, jointly and in conspiracy with each other and with Defendant Rienbolt and certain

other named and unnamed private individuals and law enforcement agents, engaged in extreme

and outrageous conduct, *inter alia*, constructing, coercing, intimidating, manipulating,

fabricating, suggesting and altering the evidence against Plaintiff, by knowingly providing false

testimony, by procuring Whitlock's prosecution, conviction and imprisonment for heinous

crimes he did not commit, and by making false and defamatory public statements by falsely

repudiating recantations and by concealing exculpatory evidence. Additionally, these same

Defendants, together with Defendants Steve Fermon, Diane Carper, Andre Parker, Kenneth

Kaupus, Charles Brueggemann and Jeff Marlow, individually, jointly and in conspiracy with

each other and with certain other named and unnamed private individuals and law enforcement

agents, engaged in additional extreme and outrageous conduct by suppressing additional exculpatory evidence, by continuing Plaintiff's wrongful conviction and false imprisonment, by refusing to properly investigate, and by otherwise abusing Plaintiff.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 126.

127.    Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Deborah Rienbolt, Steve Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 127.

128.    As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was injured and has experienced, and continues to experience, severe emotional distress, including fear of execution, nightmares, sleep disruption, symptoms of post traumatic stress disorder, anxiety, depression and difficulty in focusing or concentrating.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 128.

WHEREFORE, Defendant Ray denies that Plaintiff is entitled to any judgment whatsoever against him, and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

### COUNT VIII
### (State Claim for Conspiracy)

129.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER:**    Defendant Ray adopts his responses to paragraphs 1 through 100 as if fully set forth in response to paragraph 129.

42

130.    Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Deborah Rienbolt, Steve Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, with other unsued co-conspirators and other police and prosecutorial investigative, supervisory and command personnel, together reached an understanding, engaged in a course of conduct and otherwise jointly acted and/or conspired among and between themselves to falsely imprison and/or continue said imprisonment, to maliciously prosecute and/or continue said prosecution, and to intentionally inflict severe emotional distress to Plaintiff.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 130.

131.    In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in the Facts above.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 131.

132.    Said conspirac(ies) and overt acts were and are continuing in nature and were and are proximate cause of Plaintiff's tortuous injuries under state law, set forth above.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 132.

133.    Defendants' and their co-conspirators' overt acts, as set forth above; which were committed jointly and/or while conspiring together to falsely imprison, maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

**ANSWER:**    Defendant Ray denies the averments contained in paragraph 133.

WHEREFORE, Defendant Ray denies that Plaintiff is entitled to any judgment whatsoever against him, and prays this Honorable Court will enter judgment in his favor and allow for the costs of defending this lawsuit.

43

## COUNT IX
### (State Law Respondeat Superior Claim)

Defendant Ray makes no response to Count IX as Count IX is not directed at this Defendant.

## COUNT X
### (745 ILCS 10/9-102 and Common Law Claims Against the City of Paris)

Defendant Ray makes no response to Count X as Count X is not directed at this Defendant.

## COUNT XI
### (Edgar County and its State's Attorney's Office)

Defendant Ray makes no response to Count XI as Count XI is not directed at this Defendant.

## AFFIRMATIVE DEFENSES

NOW COMES defendant Gene Ray, through counsel, without prejudice to his denials and all other statements in his answer and elsewhere, and for his affirmative defenses to Plaintiff's Complaint states as follows:

1.      Defendant Ray did not violate clearly established constitutional rights of which a reasonable person would have known, thus entitling him to qualified immunity.

2.      With respect to Plaintiff's state law claims, Defendant Ray is immune from liability for the conduct alleged in Plaintiff's Complaint based on the various provisions of the Illinois Tort Immunity Act, including but not limited to, §§ 2-201 and 2-202.

3.      Plaintiff's claims against Defendant Ray are barred in whole or in part by the applicable statute of limitations.

4.      Count VI of Plaintiff's Complaint, alleging a claim for malicious prosecution against Defendant Ray, is barred because probable cause existed for Plaintiff's arrest.

## **JURY DEMAND**

Defendant, Gene Ray, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Date:   April 28, 2008                              RESPECTFULLY SUBMITTED,

s/ Elizabeth A. Ekl
Elizabeth A. Ekl, Attorney No. 06242840
JAMES G. SOTOS & ASSOCIATES, LTD.
550 East Devon Avenue, Suite 150
Itasca, IL  60143-2632
Telephone:  (630) 735-3300
Fax:  (630) 773-0980
eae@jsotoslaw.com

*Attorney for Defendants, City of Paris, Gene Ray, James Parrish, and Jack Eckerty*

## <u>CERTIFICATE OF SERVICE</u>

       The undersigned having first been duly sworn under oath, states that she electronically filed a complete copy of the foregoing **Defendant Gene Ray's Answer to Complaint and Affirmative Defenses** with the Clerk of the Court on **April 28, 2008** using the CM/ECF system, which will send notification of such filing to the following counsel of record: See Attached Service List.

s/ Elizabeth A. Ekl _____

Elizabeth A. Ekl, Attorney No. 06242840

JAMES G. SOTOS & ASSOCIATES, LTD.

550 East Devon Avenue, Suite 150

Itasca, IL  60143-2632

Telephone:  (630) 735-3300

Fax:  (630) 773-0980

jsotos@jsotoslaw.com

*Attorney for Defendants, City of Paris, Gene Ray,*
*James Parrish, and Jack Eckerty*

**SERVICE LIST**
**HERBERT WHITLOCK v. CITY OF PARIS, ET AL., 08 CV 2055**

**Attorneys for Herbert Whitlock:**

| | |
|---|---|
| Ronald Balson, Carrie A. Hall | Richard S. Kling, Susana Ortiz |
| MICHAEL BEST & FRIEDRICH LLP | CHICAGO KENT LAW OFFICES |
| Two Prudential Plaza | 565 West Adams Street, Suite 600 |
| 180 North Stetson Avenue, Suite 2000 | Chicago, IL  60611-3691 |
| Chicago, Illinois 60601 | Tel:        (312) 906-5155 |
| Tel:        (312) 222-0800 | Fax:       (312) 906-5299 |
| Fax:       (312) 222-0818 | E-mail:    rkling@kentlaw.edu |
| E-mail:    rhbalson@michaelbest.com | sortiz@kentlaw.edu |
| cahall@michaelbest.com | |

**Attorneys for Charles E. Brueggemann, Diane Carper, Steven M. Fermon, Kevin Kaupus, and Andre Parker:**

| | |
|---|---|
| Karen L. McNaught | Iain D. Johnston |
| (also counsel for Jack Eckerty) | JOHNSTON GREENE LLC |
| Illinois Attorney General | 542 South Dearborn Street, Suite 1310 |
| 500 S. Second Street | Chicago, IL 60605 |
| Springfield, IL  62706 | Tel:        (312) 341-3900 |
| Tel:        (217) 782-1841 | Fax:       (312) 341-0700 |
| Fax:       (217) 524-5091 | E-mail:    ijohnston@johnstongreene.com |
| E-mail:    kmcnaught@atg.state.il.us | |

**Attorneys for Edgar County:**

| | |
|---|---|
| Michael E. Raub; James C. Kearns; | Terry A. Ekl; Vincent C. Mancini |
| Brian M. | EKL & WILLIAMS, PLLC |
| HEYL, ROYSTER, VOELKER & ALLEN | Two Arboretum Lakes |
| 102 East Main Street | 901 Warrenville Road, Suite 175 |
| Suite 3000 | Lisle, Illinois 60532 |
| P.O. Box 129 | Tel:        (630) 654-0045 |
| Urbana, Illinois 61801-0129 | Fax:       (630) 654-0150 |
| Tel:        (217) 344-0060 | E-mail:    tekl@cewpc.com |
| Fax:       (217) 344-9295 | vmancini@cewpc.com |
| E-mail:    mraub@hrva.com | pprovenzale@cewpc.com |
| jkearns@hrva.com | |
| bsmith@hrva.com | |

**Attorneys for Michael McFatridge:**

47