**E-FILED**
Monday, 09 June, 2008  02:08:58 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | | |
|---|---|---|
| HERBERT WHITLOCK, | ) | |
| | ) | |
| Plaintiff, | ) | No. 08 CV 2055 |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF PARIS, Present and Former | ) | JURY TRIAL DEMANDED |
| Paris Police Officials Chief Gene Ray and | ) | |
| Detective James Parrish; former Illinois | ) | |
| State Trooper Jack Eckerty; former | ) | |
| Edgar County State's Attorney Michael | ) | |
| McFatridge; EDGAR COUNTY; and | ) | |
| Illinois State Police Officials Steven M. | ) | |
| Fermon, Diane Carper, Charles E. | ) | |
| Brueggemann, Andre Parker, Kenneth | ) | |
| Kaupus and Jeff Marlow; and Deborah | ) | |
| Rienbolt, | ) | |
| | ) | |
| Defendants. | ) | |

## ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT

Defendants, Steven Fermon, Diane Carper, Charles Brueggemann, Andre Parker,

Kenneth Kaupas and Jeff Marlow (the "ISP Defendants") by their counsel, Special Assistant

Attorney General Iain D. Johnston of Johnston Greene LLC, state the following as their Answer

and Affirmative Defenses.

## I.      JURISDICTION AND VENUE

1.      Jurisdiction of this matter is invoked upon this Court by virtue of 42 U.S.C. §
1983 et. seq.; 28 U.S.C. §§1331 and 1343(a); the Constitution of the United States, Articles Four,
Five, Six and Fourteen; and supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

**ANSWER:**    Admit.

2.    Venue is proper in the Central District of Illinois under 28 U.S.C. § 1391(b). Defendants, or some of them, reside and/or formerly resided in this judicial district. A substantial part of the events giving rise to the claims asserted herein occurred within this district.

**ANSWER:**    Admit.


## II.    PARTIES

3.    Plaintiff, Herbert Whitlock, is a sixty-one-year-old man and a citizen of the state of Illinois.

**ANSWER:**    Defendants admit that Plaintiff is a man, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.


4.    Defendant Gene Ray ("Ray") was a duly appointed and sworn Chief of the Police Department of the City of Paris, Illinois. He was a final policymaker for the City of Paris in police matters, including police investigations, was personally in charge of the homicide investigation of Karen and Dyke Rhoads and is sued in his individual capacity.

**ANSWER:**    Defendants Fermon, Carper, Brueggemann, Parker and Kaupas are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.  Defendant Marlow admits that Gene Ray was the Chief of Police, but is without knowledge or information sufficient to form a belief as to the remaining averments.


5.    Defendant James Parrish ("Parrish") was a duly appointed and sworn Paris Police detective who was the lead Paris police investigator in the Rhoads homicide investigation and is sued in his individual capacity.

**ANSWER:**    Defendants Fermon, Carper, Brueggemann, Parker and Kaupas are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.  Defendant Marlow admits that James Parrish was a Paris Police detective and investigated the Rhoads homicide, but is without knowledge or information sufficient to form a belief as to the remaining averments.

6.      Defendant City of Paris is an Illinois municipal corporation and, as such, is responsible for the policies, practices and customs of the Paris Police Department and its Chief of Police. Defendant City of Paris was the employer of Defendants Ray and Parrish. The City of Paris is responsible for the acts of Defendants Ray and Parrish while acting within the scope of their employment.

**ANSWER:**      Defendants admit that the City of Paris is an Illinois municipal corporation that

employed Ray and Parrish but are without knowledge or information sufficient to form a belief

as to the truth of the remaining averments.

7.      Defendant Jack Eckerty ("Eckerty") was a duly appointed and sworn Illinois State Police ("ISP") trooper who was the lead state police investigator in the Rhoads homicide investigation and is sued in his individual capacity.

**ANSWER:**      Defendants admit that Eckerty was an Illinois State Police employee who was

involved in the Rhoads homicide investigation, but are without knowledge or information

sufficient to form a belief as to the truth of the remaining averments.

8.      Defendant Michael McFatridge ("McFatridge") was the Edgar County State's Attorney and is sued in his individual capacity.

**ANSWER:**      Defendants Fermon, Carper, Brueggemann, Parker and Kaupas are without

knowledge or information sufficient to form a belief as to the truth of the averments in this

paragraph.  Defendant Marlow admits that McFatridge was the Edgar County State's Attorney,

but is without knowledge or information sufficient to form a belief as to the remaining

averments.

9.      Defendant Edgar County is a governmental entity within the state of Illinois, which consists in part of its Edgar County State's Attorney's Office (hereinafter referred to as SAO). Edgar County and the State's Attorney's Office are necessary parties to this lawsuit.

**ANSWER:**      Defendants admit that Edgar County is a governmental entity, but are without

knowledge or information sufficient to form a belief as to the truth of the remaining averments in

this paragraph.

10.    Defendants Steven M. Fermon ("Fermon"), Diane Carper ("Carper"), Charles E. Brueggemann ("Brueggemann"), Andre Parker ("Parker"), Kenneth Kaupus [sic] ("Kaupus" [sic]) and Jeff Marlow ("Marlow") (the "ISP Defendants") were duly appointed and sworn command level ISP officials who supervised that agency's investigation of the Rhoads murders and are sued in their individual capacities.

**ANSWER:**    Defendants Fermon, Carper, Brueggemann and Parker admit that they are or were ISP command level ISP officials, but deny that they supervised the ISP's investigation of the Rhoads murders.  Defendant Kaupas admits that he is a duly sworn command level ISP official and that after Plaintiff was tried and convicted for the murders of Dyke and Karen Rhoads and had his convictions affirmed on direct and post-conviction appeal, for a short period of time, he supervised the ISP's investigation into the murders of the Rhoads.  Defendant Marlow denies that he is or was a command level ISP official or that he supervised the investigation into the murders of the Rhoads.

11.    At all times relevant to this action, the ISP Defendants acted within the scope of his or her employment and under the color of the laws, regulations and customs of the state of Illinois. Each Defendant's actions constituted "state action" as defined under federal law.

**ANSWER:**    Defendants admit that they acted within the scope of their employment, under color of law and that their actions constituted state action, but Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

12.    Defendant Deborah Rienbolt ("Rienbolt") is a private citizen of the state of Illinois.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

### III.    FACTS COMMON TO ALL COUNTS

13.    In the early morning hours of July 6, 1986, Dyke and Karen Rhoads were stabbed to death in their home in Paris, Illinois, and their house was set on fire.

**ANSWER:**    Admit.


14.    Defendants Ray, Parrish, Eckerty and McFatridge were responsible for investigating the homicides. They jointly participated in said investigation commencing shortly after the crimes were discovered.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to

the truth of the averments in this paragraph.


15.    Defendants Ray, Parrish, Eckerty and McFatridge discovered facts disclosing the identities of several credible suspects, including a prominent and influential Paris businessman (the "Paris businessman"), who shortly after the murders offered a $25,000 reward. Defendant Parrish had employment relationships off and on with the Paris businessman.

**ANSWER:**    Defendants' answer to this paragraph and all subsequent paragraphs referring to

the "Paris businessman" assumes that this person is Robert Morgan.   Based upon that

assumption, Defendants Fermon, Carper, Brueggemann and Parker are without knowledge or

information sufficient to form a belief as to the truth of the averments in this paragraph.

Defendant Kaupas admits that Robert Morgan is a prominent Paris, Illinois businessman, who

offered a reward for information regarding the murders because he was requested to do so by a

friend of Karen Rhoads, and affirmatively states that the basis for his ability to answer some of

the averments in this paragraph is information contained in the ISP case file, but is without

knowledge or information sufficient to form a belief as to the truth of the remaining averments.

Defendant Marlow admits that Robert Morgan offered a $25,000 reward for information relating

to the murders because Morgan was requested to do so by a friend of Karen Rhoads, and admits

that Defendant Parrish may have worked as a Paris Police Department patrolman before

resigning to work for Robert Morgan after which he returned to the Paris Police Department, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

16.     Despite the existence of substantial facts leading to the identification of credible suspects, Defendants Ray, Parrish, Eckerty and McFatridge did not pursue them, but instead jointly pursued a course of conduct designed to deflect the investigation away from the Paris businessman, to quickly and expediently bring about a conviction and gain public and political favor by promptly solving the murders. To that end, they conspired to accuse and convict Gordon Randy Steidl ("Steidl") and Herbert Whitlock for these crimes. Defendants Ray, Parrish, Eckerty and McFatridge then and there conspired and commenced acts in furtherance of fabricating and creating a case against Steidl and Whitlock.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

17.     On or about July 9, 1986, directly after the Paris businessman offered the reward at local bars, Defendants Parrish and Eckerty, at the direction and approval and/or with the knowledge of defendants Ray and McFatridge, and without any physical evidence linking Whitlock to the crimes, took Whitlock into custody and questioned him.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

18.     Although Whitlock denied any connection to the crimes and provided a truthful alibi, Defendants Ray, Parrish, Eckerty and McFatridge continued to pursue him.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

19.     On September 19, 20 and 21, 1986, Defendants Ray, Parrish, Eckerty and McFatridge interviewed Darrell Herrington ("Herrington"), who they knew had five drunken-driving convictions and two convictions for passing bad checks, was considered the "town drunk" and frequented the bars where the reward had been offered.

**ANSWER:**     Defendants Fermon, Carper, Brueggemann and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

6

Defendants Kaupas and Marlow admit that Herrington was interviewed, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph, and affirmatively state that the basis for their ability to answer some the averments in this paragraph is information contained in the ISP case file.

20.    Herrington told Defendants Ray, Parrish, Eckerty and McFatridge that he was present at the scene of the Rhoads murders and that two men, "Jim and Ed," committed the crimes.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

21.    On information and belief, Herrington also told these Defendants he had been drinking hard liquor nearly nonstop since noon on July 5, and that by the time the bars closed, he was stumbling drunk and lapsing into unconsciousness.

**ANSWER:**    To any extent the term "Defendants" in this paragraph refers to Fermon, Carper, Brueggemann, Parker, Kaupas and Marlow, Defendants deny the averments in this paragraph. To the extent the term "Defendants" means those defendants identified in paragraph 20 or any other "defendant," Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

22.    During Herrington's three days of interrogation, Defendants subjected Herrington to suggestion, coercion and manipulation and plied him with liquor and promises. As a result of Defendants joint efforts, Herrington changed his story from Jim and Ed to Steidl and Whitlock as the persons whom he had accompanied to the scene of the murders. Herrington was never charged with any crimes related to the Rhoads murders.

**ANSWER:**    To any extent the term "Defendants" in this paragraph refers to Fermon, Carper, Brueggemann, Parker, Kaupas and Marlow, Defendants deny the averments in this paragraph. To the extent the term "Defendants" means those defendants identified in paragraph 20 or any

other "defendant," Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

23.    Armed with Herrington's coerced, manipulated, manufactured and suggested false statement, Defendants Ray, Parrish, Eckerty and McFatridge, without probable cause, obtained a warrant to electronically eavesdrop on conversations of Whitlock. Their plan was to use Herrington as a wired informant to entrap Whitlock into making inculpatory statements. The plan failed. Despite their efforts, Whitlock steadfastly maintained he had no connection with the crime. Even though the scheme proved unsuccessful, Defendants Ray, Parrish, Eckerty and McFatridge were not dissuaded and continued to pursue their scheme to accuse and convict Steidl and Whitlock.

**ANSWER:**    Defendants Fermon, Carper, Brueggemann and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendants Kaupas and Marlow admit that Herrington was outfitted with an overhear device and that Herrington spoke with Steidl and Whitlock when he possessed this device but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph and affirmatively state that the basis for their ability to answer some of the averments in this paragraph is information contained in the ISP case file.

24.    Defendants Ray, Parrish, Eckerty and McFatridge subjected Herrington to a polygraph examination on September 29, 1986. Concerning direct questions asked by the examiner about whether Herrington was truthful when he accused Steidl and Whitlock, the examiner found that Herrington engaged in "purposeful non-cooperation...(consistent with) not telling the truth" as to "one or more" of the questions.

**ANSWER:**    Defendants Fermon, Carper, Brueggemann and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendants Kaupas and Marlow admit that on about September 29, 1986, Herrington was given a polygraph examination and that for some questions the examiner found that Herrington engaged in purposeful non-cooperation in answering some questions but deny that one of these questions was whether "Herrington was truthful when he accused Steidl and Whitlock," but are

without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph and affirmatively state that the basis for their ability to answer some of the averments in this paragraph is information contained in the ISP case file.

25.    Fearing that Herrington's fabricated statement would not withstand further polygraph scrutiny, Defendants Ray, Parrish, Eckerty and McFatridge did not follow the examiner's recommendation that Herrington be subjected to another polygraph examination. Lacking a credible witness, they decided not to charge Steidl and Whitlock with the murders at that time. Nevertheless, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, officially recorded Herrington's fabricated and discredited story in the Paris police reports, but intentionally suppressed and concealed from those reports the highly exculpatory evidence concerning "Jim and Ed," the lie detector test and its results, and that Herrington's story was the product of their coercion, fabrication, manipulation, suggestion, promises, financial rewards and alcohol.

**ANSWER:**    Defendants Fermon, Carper, Brueggemann and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendants Kaupas and Marlow admit that statements attributable to Herrington are contained in the ISP case file but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph and affirmatively state that the basis for their ability to answer some of the averments in this paragraph is information contained in the ISP case file.

26.    For the next several months, Defendants Ray, Parrish, Eckerty and McFatridge continued to meet with Herrington and to use coercive, suggestive and manipulative tactics, promises, rewards, liquor and, on at least one occasion, suggestions by hypnosis, in order to further manufacture and fabricate a more believable, story about Steidl and Whitlock.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

27.    Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, suppressed and concealed from their official reports, the continued coercion, manipulation, suggestion, fabrication, promises and rewards, as well as the content of Herrington's statements taken under hypnosis.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

28.    On February 16, 1987, seven months after the yet unsolved murders, knowing that they had no credible evidence to charge Steidl and Whitlock, Defendants Ray, Parrish, Eckerty and McFatridge began to meet with another completely unstable individual, a known alcoholic and drug addict, Defendant Rienbolt, who was on felony probation and whom Parrish had previously pressured to be his informant.

**ANSWER:**    Defendants Fermon, Carper, Brueggemann and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendants Kaupas and Marlow admit that Rienbolt, who was an alcoholic and drug addict, was interviewed regarding the murders of the Rhoads, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph and affirmatively state that the basis for their ability to answer some of the averments in this paragraph is information contained in the ISP case file.

29.    Defendant Parrish accused Rienbolt of involvement in the murders, and, despite her denials, Defendants Parrish and Eckerty, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, continued to interrogate Rienbolt about the crimes.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

30.    During the interrogations, Defendants Parrish and Eckerty, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, repeatedly pressured and challenged Rienbolt that she was present at the crime scene and participated in the murders with Steidl and Whitlock, which they postulated took place because Dyke Rhoads backed out of a drug deal.

10

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

31.    Defendants made promises of financial rewards, coerced, pressured, suggested and manipulated Defendant Rienbolt to create the story that her husband's knife really belonged to Whitlock and that Whitlock had given it to her shortly after the crime with blood on it.

**ANSWER:**    To the extent that the term "Defendants" refers in any way to Fermon, Carper, Brueggemann, Parker, Kaupas or Marlow, Defendants deny all averments.  To the extent the term "Defendants" means other defendants in this litigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

32.    Defendant Rienbolt told to Defendants Parrish and Eckerty that she had gone to work at the Paris Health Center and later consumed vast quantities of drugs and alcohol on July 5, 1986. Defendant Rienbolt did not originally say she witnessed Steidl and/or Whitlock commit the murders and arson. Nevertheless, Defendants Parrish and Eckerty caused Rienbolt to change her story and make false statements that she didn't go to work, that she saw Steidl, Whitlock and Herrington together the night before the murders and other false statements about Whitlock and the scene of the murders. Defendant Rienbolt knew her statements were false and that they would be used to accuse and prosecute Steidl and Whitlock, but she agreed with Defendants to be an active participant and knowingly provide false statements to accuse and prosecute Steidl and Whitlock. On the basis of these coerced, manipulated, manufactured, and suggested false statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable cause, a warrant to electronically overhear conversations of Steidl and Whitlock, and tried to use Defendant Rienbolt as a wired informant to entrap Whitlock at an AA meeting into making false inculpatory statements. Defendant Rienbolt willingly attempted to trap him, but try as she may, Whitlock steadfastly and truthfully denied involvement.

**ANSWER:**    To the extent that the term "Defendants" refers in any way to Fermon, Carper, Brueggemann, Parker, Kaupas or Marlow, Defendants deny all averments.  To the extent the term "Defendants" means other defendants in this litigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

33.    On February 19, 1987, on the basis of knowingly fabricated and false statements, Defendants Ray, Parrish, Eckerty and McFatridge obtained arrest warrants for Steidl and Whitlock for the murders of Karen and Dyke Rhoads and for arson and caused them to be

arrested for said crimes. Following their arrest, when questioned at the jail, both Steidl and Whitlock truthfully denied involvement in the crimes.

**ANSWER:**     Defendants Fermon, Carper, Brueggemann and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendants Kaupas and Marlow admit that arrest warrants were obtained, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph and affirmatively state that the basis for their ability to answer some of the averments in this paragraph is information contained in the ISP case file.

34.     Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, wrote and recorded Defendant Rienbolt's manufactured story in official police reports, while suppressing from those reports the highly exculpatory information on how these statements were obtained and that they were false and incredible, contrary to physical and other evidence and based on fabrication, coercion, suggestion, threats, promises, alcohol and drugs.

**ANSWER:**     Defendants Fermon, Carper, Brueggemann and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendants Kaupas and Marlow admit that Rienbolt's statements were recorded in official police reports, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph and affirmatively state that the basis for their ability to answer some of the averments in this paragraph is information contained in the ISP case file.

35.     On the basis of these coerced, manipulated, manufactured and suggested false statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable cause, a warrant to seize hair, saliva and blood from the persons of Steidl and Whitlock. These searches did not lead to any inculpatory evidence against either Steidl or Whitlock, but Defendants continued to wrongfully pursue their scheme to accuse and prosecute Steidl and Whitlock.

**ANSWER:**     To the extent that the term "Defendants" refers in any way to Fermon, Carper, Brueggemann, Parker, Kaupas or Marlow, Defendants deny all averments.   To the extent the

term "Defendants" means other defendants named in this litigation, Defendants answer as

follows: Defendants Fermon, Carper, Brueggemann and Parker are without knowledge or

information sufficient to form a belief as to the truth of the averments in this paragraph.

Defendants Kaupas and Marlow admit that warrants were obtained to seize certain evidence

from Steidl and Whitlock, but are without knowledge or information sufficient to form a belief as

to the truth of the remaining averments in this paragraph and affirmatively state that the basis for

their ability to answer some of the averments in this paragraph is information contained in the

ISP case file.

36.    Using Defendant Rienbolt's and Herrington's false statements, Defendants
wrongfully charged Steidl and Whitlock by information with murder and arson. On March 10,
1987, Steidl and Whitlock were indicted for these crimes by the Edgar County Grand Jury after
Defendant Parrish presented false information, including these statements and perjured testimony
to the Grand Jury. Acting in concert with Defendants Ray, Parrish, Eckerty and McFatridge,
Defendant Rienbolt willfully and knowingly offered false testimony to the Grand Jury in an
effort to have Steidl and Whitlock indicted.

**ANSWER**:    To any extent the term "Defendants" as used in the first sentence includes

Fermon, Carper, Brueggemann, Parker, Kaupas and Marlow, Defendants deny the first sentence.

Defendants admit that Steidl and Whitlock were indicted by an Edgar County Grand Jury, but

deny all remaining averments.  If the term "Defendants" as used in the first sentence refers to

other defendants in this case, then Defendants are without knowledge or information sufficient to

form a belief as to the truth of averments in this sentence.

37.    Defendants Ray, Parrish and Eckerty specifically suppressed from the Grand Jury
exculpatory evidence which, if known to the Grand Jury, would have demonstrated that these
statements were false, coerced, manipulated, manufactured and suggested, that Steidl and
Whitlock were innocent, that the Defendants had identified other likely suspects unrelated to
Steidl and Whitlock, all of which would have likely resulted in a "no bill" and a failure to indict.

**ANSWER**:    To any extent the term "Defendants" includes Fermon, Carper, Brueggemann,

Parker, Kaupas and Marlow, Defendants deny the averments in this paragraph.  To the extent the

term "Defendants" refers to other defendants, Defendants are without knowledge or information

sufficient to form a belief as to the truth of the averments in this paragraph.

38.     Defendants Ray, Parrish, Eckerty and McFatridge continued to urge Defendant Rienbolt to fabricate further stories, using, *inter alia*, threats of physical force, threats of prosecution, promises of leniency, promises of money and drug treatment. Defendant Rienbolt, who was continually under the influence of alcohol and drugs, made further fabrications concerning the murders, to wit:

a.     On March 29, 1987, Defendant Parrish, under the supervision and with the participation and/or knowledge of Defendants Ray, Eckerty and McFatridge interrogated Rienbolt and induced her to falsely state that on the night of the murders, Whitlock made statements to her that he, Steidl and Herrington were going to the Rhoads' house to deal with Dyke concerning drugs, that she gave her husband's knife to Whitlock, that she was present at the scene of the crimes, that she heard screaming, saw the bodies and later got the knife back from Whitlock with blood on it.

b.     In early April 1987, Defendants Parrish and Eckerty, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, again interrogated Rienbolt on several occasions and compelled and induced her to further fabricate the story that she was present at the crime scene and physically restrained Karen Rhoads while Steidl and Whitlock stabbed Dyke Rhoads multiple times and then stabbed Karen Rhoads multiple times and that Steidl and Whitlock later paid her money not to talk.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief as to

the truth of the averments in this paragraph.

39.     In March and April of 1987, Defendants Parrish and Eckerty, with the participation and/or knowledge and approval of Defendants Ray and McFatridge, similarly coerced, manipulated and suggested false statements from other witnesses, including Curtis Smith and Carol Robinson, in an attempt to corroborate portions of Defendant Rienbolt's testimony. Defendants Parrish and Eckerty intimidated witnesses by shouting at them, threatening to put them in jail, shaking their fists, smacking their fists on the table and kicking chairs. On one occasion Defendant Parrish so violently intimidated a witness named Barbara Furry, who was nine months pregnant, that he caused her to urinate on herself.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief as to

the truth of the averments in this paragraph.

40.    Additionally, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, wrote and recorded these coerced, manipulated, suggested and manufactured false stories and statements of Defendant Rienbolt, Smith and Robinson in official police reports while suppressing from those reports the highly exculpatory information that these statements were false and incredible, obtained by coercion and intimidation, were contrary to physical and other evidence and based on fabrication, suggestion, threats and promises.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

41.    In an attempt to influence public opinion and prospective jurors, Defendant McFatridge made numerous false pretrial public statements to the media concerning Steidl, Whitlock and the evidence against them, which statements were widely reported in the press. McFatridge's statements violated the Illinois Rules of Professional Conduct, specifically Rule 3.6, prohibiting publication of opinions on the guilt or innocence of accused persons.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

42.    In order to insure that Defendant Rienbolt would continue to tell her false story at Steidl's and Whitlock's trials, the Defendants first put her into a drug treatment center, then placed her under house arrest and coerced and enticed her into pleading guilty to the charge of concealing a homicidal death, in exchange for a lenient sentence, the payment of her "relocation expenses" and other rewards. As part of this coercive agreement, the Defendants obtained Defendant Rienbolt's signature on a six-page statement of "facts" which recited her prior coerced, suggested, fabricated, manipulated, false and incredible statements about the crime. This "agreement" further provided that she could be charged with, and tried for, additional crimes if she did not testify consistently with her statement and the Defendants made it clear to her that these additional crimes included murder, with a possible sentence of death.

**ANSWER:**    To any extent the term "Defendants" includes Fermon, Carper, Brueggemann, Parker, Kaupas and Marlow, Defendants deny the averments in this paragraph.  To the extent the term "Defendants" refers to other defendants, Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

43.    Whitlock was tried in May of 1987 in Edgar County, Illinois. On the basis of the fabricated and manufactured evidence and because exculpatory materials were concealed from Whitlock and his attorney, the jury returned a verdict of guilty of the murder of Karen Rhoads,

which it would not have done but for the wrongful conduct of Defendants Ray, Parrish, Eckerty, McFatridge and Rienbolt.

**ANSWER:**    Defendants admit that Whitlock was tried and convicted for the murder of Karen

Rhoads, but are without knowledge or information sufficient to form a belief as to the truth of the

remaining averments.

44.    In June of 1987, Steidl was tried and convicted of murder and arson in Vermilion County, and on June 16, 1987, sentenced to death on the basis of similar false and fabricated evidence and concealed exculpatory materials.

**ANSWER:**    Defendants admit that Steidl was tried and convicted of murder and originally

sentenced to death, but are without knowledge or information sufficient to form a belief as to the

truth of the remaining averments.

45.    During the course of their trials, Defendant McFatridge, with the cooperation of Defendants Ray, Parrish and Eckerty, did not reveal and took affirmative measures to withhold and suppress the following exculpatory materials favorable to Steidl and Whitlock:

a.    That there were numerous credible leads pointing to other suspects, including a prominent and influential Paris businessman;

b.    That witnesses were threatened and intimidated;

c.    There were failed polygraph tests by prosecution witnesses;

d.    There were money and favors given to prosecution witnesses in exchange for their testimony;

e.    Defendants arranged to give witnesses hypnotic suggestions;

f.    The Defendants provided alcohol to witnesses before and during the time they were giving statements;

g.    Herrington believed the murders were committed by two men named "Jim and Ed;"

h.    There was a cut on Herrington's hand the night of the murders.

i.    Defendants failed and refused to submit Herrington's blood standard to the ISP lab;

j.    Defendant Rienbolt testified she saw a piece of broken lamp in Steidl's hand. The lamp was not broken until after the fire;

k.    That Defendant Rienbolt originally stated that she saw a broken vase which did not exist;

l.    That witnesses had identified someone other than Whitlock as a perpetrator;

m.    That prosecution trial witnesses were coached in their testimony and provided with fabricated stories; and

n.    That there was a previous business relationship between Defendant Fairish and the Paris businessman.

**ANSWER:**    To any extent the term "Defendants" includes Fermon, Carper, Brueggemann, Parker, Kaupas and Marlow, Defendants deny the averments in this paragraph.  To the extent the term "Defendants" refers to other defendants, Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

46.    The officers and the prosecutors had a legal duty under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny to disclose the foregoing, along with all evidence favorable to Whitlock. Notwithstanding their duty, Defendants Ray, Parrish, Eckerty and McFatridge refused to disclose the foregoing and, in fact, concealed and deliberately obstructed access to exculpatory information. Following the trial and conviction, other ISP employees who became aware of the undisclosed and concealed information, including Defendants Fermon, Carper, Brueggemann and Kaupus, had an affirmative Brady duty to disclose.

**ANSWER:**    Defendants deny that they became aware of any undisclosed and concealed evidence and are without knowledge or information sufficient to form a belief as to the truth of the remaining averments except as to the legal conclusions to which Defendants are not required to answer.

47.    Defendants Ray, Parrish, Eckerty and McFatridge suppressed from Whitlock and his lawyers, the Judge who presided over his case and the jury that convicted Whitlock all of the highly exculpatory evidence set forth above, as well as evidence of other potential suspects and promises of leniency and payments that the Defendants made to Defendant Deborah Rienbolt.

**ANSWER:**    To any extent the term "Defendants" includes Fermon, Carper, Brueggemann, Parker, Kaupas and Marlow, Defendants deny the averments in this paragraph.  To the extent the term "Defendants" refers to other defendants, Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

48.    Despite their exhaustive attempts to do so, the Defendants neither developed nor presented at trial, nor thereafter, any physical evidence, such as hair samples, fingerprints, bloodstains, footwear patterns or other scientific evidence, which linked Whitlock to the crime scene.

**ANSWER:**    To any extent the term "Defendants" includes Fermon, Carper, Brueggemann, Parker, Kaupas and Marlow, Defendants deny the averments in this paragraph as none of them were involved in any way at the trial.  To the extent the term "Defendants" refers to other defendants, Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

49.    Directly after his conviction and sentencing, Whitlock filed a notice of appeal and a post-conviction petition challenging his conviction. The Attorney General's Office represented the State in these post-trial proceedings.

**ANSWER:**    Admit.

50.    After the trial and during the post-trial proceedings, Defendants Ray, Parrish, Eckerty and McFatridge continued to suppress and withhold the exculpatory materials from Whitlock. Being unaware of the exculpatory material, Brady issues which should have been considered were not effectively raised in post-conviction proceedings.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

51.    Shortly after Whitlock's conviction and sentencing in August of 1987, Herrington and his wife told Defendants Ray, Parrish and other Paris police officers that 1) Herrington had lied in his testimony at trial; 2) that he saw the Paris businessman at the bottom of the Rhoads' stairs just after the murders and before he saw Steidl and Whitlock; 3) that Steidl and Whitlock had walked in after the crime rather than having committed it; 4) that the Paris businessman said

to Herrington, "You didn't see me," and later offered him $25,000 in cash, $25,000 in property and a job with the promise he would not have to work, to keep his mouth shut; and 5) that the Paris businessman was shipping narcotics in bags of dog food produced by one of his companies.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

52.    Defendants Ray and Parrish recorded these highly exculpatory statements in notes and in a police report during the time Whitlock was appealing his case, but they concealed them and did not disclose them to Whitlock or his attorneys. They suppressed the report and the retraction with the knowledge and/or at the direction and with the approval of Defendant McFatridge from Steidl and Whitlock, their lawyers and the Courts who were considering the appeals and post-conviction proceedings. These notes and reports remained suppressed until 1998 when investigator Bill Clutter discovered them in a police storage garage.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

53.    After Herrington's recantation, Defendants took affirmative steps to convince him to repudiate his recantation, including helping him get his revoked drivers license reinstated. Defendants Parrish and McFatridge intervened on Herrington's behalf with the Office of the Illinois Secretary of State in an attempt to help Herrington get his revoked driver's license restored, despite his five DUI convictions. They successfully restored his driving privileges and even obtained a waiver of fines related to the convictions. Defendants' efforts were not disclosed to Whitlock or his attorneys.

**ANSWER:**    Defendants were not involved in any way in developing or presenting evidence at Plaintiff's trial, appeals and post-conviction proceedings and only became aware of some of the claims Plaintiff is making years after Plaintiff claims to have first learned of Herrington's recantation, facts that Plaintiff and his attorney know.  Accordingly, Defendants Fermon, Carper, Brueggemann, Parker, Kaupas and Marlow deny all averments in this paragraph if the term "Defendants" is meant to include them in any way.  If the term "Defendants" refers only to other defendants in this case, then Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

54.    Later in 1988, Defendant Rienbolt, while in prison and acting as an informant for a Federal Marshal who was looking for a federal fugitive named James "Jim" Slifer, informed him that Slifer had ordered and was present for the Rhoads murders.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

55.    Defendant Rienbolt became the subject of a Federal investigation for allegedly making false statements to federal authorities, and in January of 1989, McFatridge intervened with the U.S. attorney's office on her behalf. Neither his intervention nor Rienbolt's statement about Slifer were disclosed to Steidl or Whitlock.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

56.    In January of 1989, Defendant Rienbolt recanted her trial testimony. She told Steidl's appellate lawyer that 1) Steidl "did not take part in the killings of Dyke and Karen Rhoads and was not present when the murders took place," 2) that James Slifer "was personally present in the Rhoads bedroom at the time of the murders," 3) that Cheryl Costa "had some involvement with Slifer and the murders," and 4) that Darrell Herrington was not present at the scene of the murders. Additionally, she signed an affidavit which stated that she knew "Randy Steidl did not stab either Dyke or Karen Rhoads," and that she "repeatedly told the police and the prosecutor that Randy Steidl did not stab either Dyke or Karen Rhoads, but the police and the prosecutor ignored my statements."

**ANSWER:**    Defendants admit that Rienbolt recanted her trial testimony (a recantation she later retracted), but are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

57.    Defendants Parrish and McFatridge, upon learning of Defendant Rienbolt's recantations, which among other things implicated them and their fellow Defendants in suborning perjury and obstructing justice, threatened and intimidated Defendant Rienbolt. As a result of Defendants' threats, she repudiated her recantation.

**ANSWER:**    To any extent the term "Defendants" includes Fermon, Carper, Brueggemann, Parker, Kaupas and Marlow, Defendants deny the averments in this paragraph. To the extent the term "Defendants" refers to other defendants, Defendants answer as follows: Defendants deny

that Rienbolt ever implicated them, alleged, asserted or stated in any manner that they were involved in wrongdoing of any kind as it relates to Plaintiff. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

58.    Whitlock subsequently filed a post-conviction petition which raised, *inter alia*, the testimony of Herrington and Rienbolt and their recantations.

**ANSWER:**    Defendants admit that Plaintiff filed a post-conviction petition, raising among other things, Herrington and Rienbolt's recantations.

59.    In response to this filing, Defendant McFatridge, continuing his false publicity campaign, again made false and prejudicial public statements in response to Plaintiffs evidence, discrediting the recantations and again falsely claiming that "one fact will never change — that Herbert R. Whitlock and Gordon R. Steidl are responsible for the deaths of Dyke and Karen Rhoads." Such a statement posed a serious and imminent threat to the fairness of the adjudicative proceedings and constituted an impermissible published opinion on the guilt of Whitlock in violation of Supreme Court Rule 3.6 (Illinois Rules of Professional Conduct).

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

60.    As a consequence, Herrington's and Rienbolt's original false, manufactured and coerced testimony and their wrongfully induced repudiations of their recantations as aforesaid, the Defendants' continued concealment and suppression of highly exculpatory evidence, Defendants Parrish's and Eckerty's false and perjurious testimony at the hearing, the continued highly prejudicial atmosphere engendered by this false evidence and Defendant McFatridge's publicity campaign, the trial Judge denied Whitlock's post-conviction petition.

**ANSWER:**    If the term "Defendants" refers to Defendants Fermon, Carper, Brueggemann, Parker, Kaupas and Marlow, then they deny that they suppressed any exculpatory evidence, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments. If the term "Defendants" refers to other defendants in this case, then they are without

knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

61.     Defendant McFatridge resigned his position as State's Attorney of Edgar County in early 1991.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

62.     On September 28, 1988, the Illinois Appellate Court for the Fourth District, basing its decision on the trial court record, containing the same coerced, suggested, fabricated and manipulated evidence and being unaware of the highly exculpatory evidence which had been concealed and suppressed, affirmed Whitlock's conviction and sentence and the denial of his post-conviction petition.

**ANSWER:**     Defendants admit that Plaintiff's conviction and sentence were affirmed on appeal and in his post-conviction hearing, but deny that they coerced, suggested, fabricated or manipulated evidence and are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

63.     On March 6, 1990, Whitlock filed a petition for habeas corpus in the United States District Court for the Central District of Illinois. As a direct consequence of 1) all of the false testimony, statements and repudiations of recantations which were coerced, suggested, fabricated, manipulated and purchased by Defendants Ray, Parrish, Eckerty and McFatridge, and 2) the Defendants' continued concealment and suppression of highly exculpatory evidence, and 3) Defendant McFatridge's publicity campaign, Whitlock's habeas corpus petition was ultimately dismissed. On June 8, 1992, Whitlock filed a second petition for habeas corpus in the United States District Court for the Central District of Illinois which was similarly dismissed as a consequence of the wrongful conduct of Defendants as aforesaid.

**ANSWER:**     Defendants admit that Plaintiff filed two habeas corpus proceedings that were denied, but deny they concealed or suppressed exculpatory evidence and deny that the reasons alleged for the denial of the habeas corpus petitions were the reasons given by the Federal District Court Judge.  Defendants are without knowledge or information sufficient to form a belief as to the truth of any remaining averments.

64.     In February 1996, Defendant Rienbolt gave a sworn court reported and videotaped statement to Steidl's lawyers in which she swore that her prior statements and testimony were false. She further swore she had not been present at the scene of the murders, that the knife she provided was not the murder weapon and that she had no knowledge of Steidl having been involved in the crime. She also averred that Defendants Ray, Parrish, Eckerty and McFatridge coerced, manipulated and helped her fabricate her statements and trial testimony which falsely inculpated Steidl and Whitlock.

**ANSWER:**   Defendants admit that they learned, years later, that Rienbolt recanted her testimony (a recantation that she later retracted) but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

65.     Less than a week after her 1996 recantation, Defendant Rienbolt met with Defendants Parrish, Eckerty and McFatridge and, on information and belief, because of their threats and coercion, retracted her recantation of the previous week.

**ANSWER:**   Defendants admit that they learned, years later, that Rienbolt retracted her recantation but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

66.     On September 18, 1997, the Illinois Supreme Court reversed the dismissal of Steidl's amended post-conviction petition holding that he was entitled to an evidentiary hearing. Defendants knew that Steidl's success in his hearing would have had a concomitant benefit for Whitlock.

**ANSWER:**   To any extent the term "Defendants" refers to Defendants Fermon, Carper, Brueggemann, Parker, Kaupas and Marlow, they deny the averments, except to admit that the Supreme Court reversed the dismissal of the amended post-conviction hearing.  To the extent that the term "Defendants" refers to other defendants in this case, then Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, except to admit that they learned, years later, that the Supreme Court reversed the dismissal of the amended post-conviction hearing.

67.    In 1998, the trial court conducted a post-conviction evidentiary hearing for Steidl. Defendants again introduced their fabricated evidence and again suppressed exculpatory material, all in an effort to have the court deny the petition. Defendant McFatridge gave false and perjured testimony at Steidl's hearing, in which he denied any misconduct by himself or any other of the Defendants, and Defendants Ray, Parrish, Eckerty and McFatridge continued to conceal and suppress from this hearing all of the exculpatory evidence discussed above. Their wrongful conduct was designed to continue the wrongful incarceration of Steidl, which they knew would have a parallel effect on Whitlock. Their conduct was also designed to cover up Defendants' wrongful acts and omissions in the prosecution, conviction and post-trial proceeding of both Steidl and Whitlock.

**ANSWER:**    To any extent the term "Defendants" refers to Defendants Fermon, Carper, Brueggemann, Parker, Kaupas and Marlow, they deny the averments, except to admit that they learned, years later, that a post-conviction hearing was held.   To the extent that the term "Defendants" refers to other defendants in this case, then Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.


68.    On December 11, 1998, the trial court again denied Steidl's post-conviction relief on his conviction, although the court did grant Steidl a new sentencing hearing, at which the state declined to pursue the death penalty. On February 18, 1999, Steidl was resentenced to natural life imprisonment. The Illinois Appellate Court affirmed denial of this post-conviction petition on December 5, 2000, and the Illinois Supreme Court denied leave to appeal on April 4, 2001.

**ANSWER:**    Defendants admit that they learned, years later, that the trial court denied Steidl's post-conviction relief, granted him a new sentencing hearing and that the State declined to pursue the death penalty, resulting in a sentence of natural life imprisonment, and that the Illinois Appellate Court affirmed the denial and the Supreme Court denied leave to appeal, and are without knowledge or information sufficient to form a belief as to any remaining averments.


69.    In 1999, following a national conference, Northwestern University professor David Protess and his Innocence Project sent a team of student investigators from the Center on Wrongful Convictions. The contradictions and anomalies which manifested themselves were also featured in television reports. The disclosures led to the appointment of ISP Lieutenant Michale Callahan ("Callahan") in April 2000 who was assigned to investigate the Steidl and Whitlock convictions.

**ANSWER:** Defendants Carper, Fermon, Kaupas and Marlow admit that Northwestern University students went to Paris, Illinois, and that their actions were featured in an episode of "48 Hours." Defendant Kaupas is without knowledge or information sufficient to form a belief as to the truth of the remaining averments except that he learned of Callahan's assignment in 2003; and answering further states that in April 2000, he was the Zone Commander in Zone 2 based in Rockford, Illinois and was never in Callahan's chain of command. Defendant Parker is without knowledge or information sufficient to form a belief as to any truth of the remaining averments except that pursuant to a letter written by Bill Clutter, who was the private investigator for Steidl's attorney, to Director Sam Nolen requesting a review of Steidl's proceedings, the request was approved and sent to the Region for action. Defendant Fermon is without knowledge or information sufficient to form a belief as to the truth of the remaining averments except that he later learned that Callahan was assigned to review the Rhoads matter in response to a letter; and answering further states that he was not within Callahan's chain of command in April 2000. Defendant Carper admits that in April 2000, Callahan was assigned to review the Rhoads murders in response to a letter from Bill Clutter, who was an investigator for Steidl's attorney, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments. Defendant Brueggemann admits that he later learned that Callahan was assigned to review the Rhoads murders but is without knowledge or information sufficient to form a belief as to the truth of any remaining averments; answering further Defendant Brueggemann states that he was not within Callahan's chain of command in April 2000. Defendant Marlow admits that he later learned that Callahan was assigned to review the initial investigation conducted years earlier by other law enforcement personnel.

70.     At the time of his appointment, Callahan was the District 10 Investigations Commander.

**ANSWER:**     Defendants admit that when Callahan was assigned to review the Rhoads matter, he held the position of Lieutenant and that he was the Commander of District 10 Investigations.

71.     Following exhaustive research into the Rhoads' murders and the Steidl and Whitlock trials, Callahan wrote a detailed memo which he sent to ISP Captain John Strohl on May 17, 2000. The memo was circulated up the ISP chain of command to Defendants Carper and Parker and later to Defendant Fermon. Callahan documented a wealth of evidence gathered during his review, all of which supported his conclusion that Steidl and Whitlock "had not been proven guilty beyond a reasonable doubt," and that the Paris businessman "was at one time and should still be the focus of the investigation."

**ANSWER:**     Defendants deny that Callahan conducted an exhaustive research into the Rhoads' murders and the Steidl and Whitlock trial, and affirmatively state that Callahan has repeatedly testified that he never even read the transcripts of the Steidl and Whitlock trials.  Defendants admit that Callahan authored a memorandum dated May 17, 2000, which Defendants Carper and Parker learned of (and which Defendant Fermon did not see until late 2001) and which were disclosed to the prosecutor handling the appeal and the State's Attorney for Edgar County. Defendants admit that Callahan reached certain conclusions in the May 17, 2000 memorandum, including his specific assertion that Whitlock was a viable suspect for the murders of the Rhoads. Defendants deny that the May 17, 2000 memorandum states that Steidl and Whitlock "had not been proven guilty beyond a reasonable doubt" and that Robert Morgan (or any "Paris businessman") "was at one time and should still be the focus of the investigation."

72.     Among the facts, findings and conclusions included in this memorandum of May 17, 2000, were thirty-eight separate contradictions and material falsehoods found in Defendant Rienbolt's and Herrington's testimony, including the following:

- Defendants Parrish and McFatridge had witness Carol Robinson lie on the stand about whether she saw Herrington and Steidl together on July 5th;

- Herrington's time line did not fit with the crime;

- A polygraph examiner found purposeful non cooperation of Herrington and the examiner's recommendation that Herrington be re-examined was rejected by the Defendants;

- Rienbolt's testimony that she skipped work on the night of July 5th and was with Steidl and Whitlock was refuted by numerous witnesses;

- Rienbolt's testimony that a broken lamp was used in the homicides was refuted by the testimony of the fire examiners;

- Rienbolt later recanted her testimony that she was present at the murders and that Steidl was involved;

- Rienbolt lied about the knife;

- Rienbolt admitted that Parrish led her into her false testimony;

- Herrington testified he was at Joe's Bar with Steidl and Whitlock at 8:30 p.m. and they all went to the Horseshoe Bar, while Defendant Rienbolt testified she was with them at the same time at the Tap Room Bar;

- Herrington described the crime scene, placing Dyke Rhoads on the floor with shorts on and Karen Rhoads on the bed with panties on. The firemen said they were totally nude;

- Defendant Rienbolt stated that she went to the American Legion Bar with Barbara Furry. Barbara Furry stated that she has never gone to the bars with Defendant Rienbolt and she was not at the American Legion July 5, 1986;

- Defendant Rienbolt implausibly stated that Steidl and Whitlock took showers at the Rhoads' house after the murders.

- Herrington stated that Whitlock had a clump of Karen Rhoads' hair in his hand. The autopsy report shows no hair torn from Karen Rhoads' head.

**ANSWER:**    Defendants deny that the May 17, 2000 contained facts and that the list accurately reflects the statements in the memorandum, including, but not limited to the averment that they rejected a recommendation that Herrington be re-polygraphed.  Defendants admit that the May 17, 2000, memorandum contains certain statements but state that averments appear to contain Plaintiff's attorneys' views as to what the memorandum states rather than actually quoting the memorandum, and therefore, Defendants deny the memorandum contains those statements.

Defendants affirmatively state that the May 17, 2000, memorandum was provided to the Edgar County State's Attorney Matt Sullivan, as evidenced in part by the memorandum itself. Additionally, each of the alleged 38 "contradictions" was provided to the Illinois Attorney General's Office, which was handling the appeals at the time.

73.   In this May 17, 2000, memorandum, Callahan further set forth evidence which supported the determination that the Paris businessman and several of his employees were, and continued to be, suspects in the Rhoads murders, in other related homicides and in organized crime and narcotics trafficking. Callahan found that Defendant Parrish had a connection to the Paris businessman. Callahan found that much of this highly exculpatory evidence was known to Defendants Ray, Parrish, Eckerty and McFatridge and was suppressed from Steidl and Whitlock, including:

- Karen Rhoads was employed by the Paris businessman as a secretary and he frequently visited her apartment;

- The Paris businessman was a suspect in two prior homicides including the murder of a former secretary;

- Karen Rhoads said that she had seen the Paris businessman and an employee load a large sum of cash and a machine gun in the Paris businessman's car;

- Karen Rhoads had told the Paris businessman the Friday prior to the murders that she was quitting her job, that he forbade her from doing so and a big argument ensued. Karen wrote a letter later found on her desk which read "I'm still with Bob. He says my bonus will be real big this year. Believe me it had better;"

- Two of the Paris businessman's employees, who were known as his "right hand men," were implicated in the Rhoads murders;

- The Paris businessman arrived on the scene just as the investigators did and offered his theory about the murders;

- Immediately after the murders, the Paris businessman offered a $25,000 reward in local bars for information on the murders. Herrington later stated that the Paris businessman offered him $25,000 and a job to keep his mouth shut;

- Herrington also told Ray and Parrish that the Paris businessman was at the scene of the murders at the time they occurred;

- Parrish worked for the Paris businessman during a six-month suspension prior to the murders.

**ANSWER:**    Defendants deny that the May 17, 2000 memorandum sets forth evidence, deny they suppressed evidence and deny that the May 17, 2000 states that much of the referenced "exculpatory information" was suppressed, and are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

74.    Callahan continued his investigation, and in July of 2000 and August of 2001, he wrote further memos to his superiors. Those memos were also disseminated to Carper and Parker, and later to Defendant Fermon. In these memos, he provided further details about his interviews which were exculpatory to Steidl and Whitlock. Much of what Callahan reported was known to Defendants Ray, Parrish, Eckerty and McFatridge at all times and was withheld and suppressed from Steidl and Whitlock. These memos, totaling twenty-eight pages of details, containing exculpatory evidence and investigative findings and discussing the connection of the Paris businessman to the Rhoads murders were delivered to Defendants Fermon, Carper and Parker, but not disclosed to Steidl, Whitlock or their attorneys at that time.

**ANSWER:**    Defendants admit that Callahan wrote memoranda dated July of 2000 and August of 2001.  Defendants deny seeing these memoranda at the time they were allegedly authored. Defendants deny that these memoranda contained exculpatory evidence connecting Robert Morgan to the Rhoads homicides.  Defendants are without knowledge or information sufficient to form a belief as to what Defendants Ray, Parrish, Eckerty and McFatridge knew or allegedly withheld and allegedly suppressed.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments regarding whether "these memos" were disclosed to "Steidl, Whitlock or their attorneys at that time," but affirmatively state that the information contained in the May 17, 2000 memorandum was disclosed to both the Illinois Attorney General's Office, which was handling Steidl's appeal, and to the Edgar County State's Attorney's Office.

75.     Defendant Eckerty, other law enforcement agents and Eckerty's s wife contacted Callahan to tell him that Eckerty was a "good cop" and that Callahan should not ruin his reputation. Eckerty also offered to sell Callahan a houseboat at his cost. Callahan suggested a full scale reinvestigation, focusing in large part on the Paris businessman.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief of the truth of the averments in this paragraph.  Defendants deny that Callahan suggested "a full scale reinvestigation, focusing in large part on" Robert Morgan.  Answering further, an extensive investigation into Robert Morgan was being conducted.

76.     Upon receipt of all the evidence and investigative findings reported by Callahan and in an effort to cover up the wrongdoing of Defendants Ray, Parrish, Eckerty and McFatridge, Defendants Fermon, Carper, Brueggemann and Parker refused a full investigation of the Rhoads case because, as Carper put it, it was "too politically sensitive." Defendants Fermon, Carper, Brueggmann and Parker allowed only an investigation of the Paris businessman, limited to intelligence gathering. Then they removed Callahan from the Rhoads case and ordered him to focus on assignments other than the Rhoads murders and the Paris businessman. They demoted Callahan and transferred him from his investigative post and, with Defendant Kaupus, launched an effort to discredit Callahan's evidence, findings and recommendations.

**ANSWER:**     Defendants deny, except to that they admit that Callahan was laterally transferred at the same time Fermon was laterally transferred.

77.     Once they obtained full knowledge of the concealed, withheld and suppressed exculpatory evidence which was existing at the time of Whitlock's arrest, conviction and post-conviction proceedings, Defendants Fermon, Carper, Brueggemann and Parker had an affirmative duty under Brady to disclose this evidence to Whitlock and his attorneys. But rather than so advise Whitlock, his attorneys or the courts, Defendants Fermon, Carper, Brueggemann and Parker, along with Defendants Ray, Parrish, Eckerty and McFatridge, kept mum and took steps actively to keep the evidence concealed. Whitlock had a right to be informed about Brady material.

**ANSWER:**     Defendants deny the factual averments contained in this paragraph, neither admit nor deny the legal conclusions.

78.    As a result of his demotion, Callahan brought a civil suit accusing Fermon and Carper of violating his free speech and of retaliatory demotion. A jury awarded $700,000 in favor of Callahan and against Fermon and Carper.

**ANSWER:**    Defendants deny the averments in this paragraph except that they admit that Callahan filed a civil suit against Brueggemann, Fermon and Carper and that a judgment was entered against Fermon and Carper, but not Brueggemann, and that the judgment against Fermon and Carper was reversed.

79.    Because Defendants Fermon, Carper, Brueggemann, Parker and Kaupus suppressed the investigation into the Rhoads murders, the development of further evidence exculpatory to Steidl and Whitlock which would have resulted therefrom was thwarted.

**ANSWER:**    Deny.

80.    These same Defendants caused the wealth of exculpatory evidence uncovered by Callahan to be withheld from Steidl and Whitlock during the period of time they were petitioning for release. Callahan's information, when combined with the previously concealed information, would have likely resulted in their exoneration and release.

**ANSWER:**    Deny.

81.    Steidl and Whitlock filed petitions for executive clemency with the Governor of the state of Illinois in which they asked for a pardon on the basis of their innocence.

**ANSWER:**    Admit.

82.    When he learned of their petitions for clemency, Defendant McFatridge launched a public campaign opposing the freeing of Steidl and Whitlock by pardon, clemency or any collateral relief. In so doing, he again made false public statements which prejudiced Steidl and Whitlock and their legitimate claims of innocence, for a new trial and for release, which they were seeking in post-conviction, habeas and clemency and pardon proceedings.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

83.    On information and belief, a representative of the Governor called Callahan, informing him that the Governor was prepared to pardon Steidl and Whitlock if Callahan could represent to him that, based on his investigation, they were innocent.

**ANSWER:**    Defendants Carper, Brueggemann and Fermon are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph except to admit that Callahan claimed that a representative from the Governor's office contacted him to discuss Steidl and Whitlock. Defendants Parker, Kaupas and Marlow are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

84.    On information and belief, Callahan, who was required to seek approval from his superiors before providing such an official statement, contacted the Defendants who were his superiors in the chain of command and immediately sought such approval.

**ANSWER:**    Defendants Carper, Brueggemann and Fermon admit that Callahan informed them of the alleged contact by the Governor's office and that they were, at that time, superiors in Callahan's chain of command. Defendants Parker, Kaupas and Marlow deny that Callahan contacted them and deny that they were superiors within Callahan's chain of command and are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

85.    On information and belief, Callahan provided a detailed briefing at a lengthy meeting attended by Defendants Fermon, Carper, Brueggemann and others where he presented all the evidence and findings set forth above and articulated his opinion, supported by all this evidence, that Steidl and Whitlock had not only not been proven guilty beyond a reasonable doubt, but that they were innocent and that the jury never heard the truth. Callahan also told these Defendants that there was no credible evidence against Steidl and Whitlock, that the two so-called eye witnesses had been completely discredited, that he strongly suspected that the wrongdoing by Parrish, Eckerty and McFatridge and the Paris businessman should continue to be the focus of the investigation.

**ANSWER:**    Defendants Brueggemann, Carper and Fermon admit that at a meeting, called by Brueggemann and Carper, during which they attended certain parts, Callahan voiced his opinions

32

regarding the murders of Dyke and Karen Rhoads and Robert Morgan (including that Robert

Morgan should be investigated), but deny that Callahan claimed that Steidl and Whitlock were

innocent and that he "strongly suspected wrongdoing by Parrish, Eckerty and McFatridge," and

affirmatively state that Callahan has testified to the contrary. Defendants Parker, Kaupas and

Marlow are without knowledge or information sufficient to form a belief as to the truth of the

averments in this paragraph.

86.    At the briefing, Defendants Fermon, Carper and Brueggemann opposed
Callahan's evidence and took the position that he should not be permitted to inform the
Governor's representative that Steidl and Whitlock were innocent. On information and belief,
Callahan was ordered to offer no opinion and supply no exculpatory evidence to the Governor or
his representative.

**ANSWER:**    Defendants Brueggemann, Carper and Fermon deny the averments in this

paragraph. Defendants Parker, Kaupas and Marlow are without knowledge or information

sufficient to form a belief as to the truth of the averments in this paragraph.

87.    Because of the obstruction and suppression of Callahan's findings and opinions by
Defendants Fermon, Carper and Brueggemann, combined with the previous and continuing
suppression of evidence by all Defendants, the Governor declined to make a determination on
Steidl and Whitlock's request for clemency and their requests remain pending to this date.

**ANSWER:**    Defendants deny all averments in this paragraph except that they are without

knowledge or information sufficient to form a belief as to the truth of whether Steidl and

Whitlock's request for clemency remains pending.

88.    On June 17, 2003, the Federal District Court granted Steidl's petition for writ of
habeas corpus, which had been filed on October 5, 2001, vacating Steidl's conviction with a
finding that "acquittal was reasonably probable if the jury had heard all of the evidence" and
allowing the state 120 days to release or retry him.

**ANSWER:**    Defendants admit that on about June 17, 2003, the United States District Court

granted Steidl's petition for writ of habeas corpus on the basis that he received ineffective

assistance of counsel by S. John Muller at Steidl's trial, and affirmatively state that the Court's order does not find any wrong doing by Defendants and in fact does not mention the Defendants at all. Defendants also deny the attempted connotation of the carefully excised quote from the Court order and state that the Plaintiff has taken this quote completely out of context.

89.    Attorney General Lisa Madigan announced she would not appeal the order, stating that after carefully reviewing the evidence, her office found that information favoring the defense was never disclosed, and that Steidl was thus entitled to a new trial.

**ANSWER:**    Defendants admit that Attorney General Lisa Madigan announced that she would not appeal the Court's order granting the petition for writ of habeas corpus, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

90.    In a last ditch effort to continue to hold Steidl in custody, Defendant McFatridge made additional false public statements, including one to the Paris Beacon News, in which he attacked Attorney General Lisa Madigan for her decision not to appeal the District Court's decision, recited again the false evidence which he and his co-Defendants had manufactured and coerced, falsely denied that he and his co-Defendants suppressed exculpatory evidence and falsely claimed that Steidl was guilty of the brutal murders.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph except to the extent that if Plaintiff is averring that they manufactured and coerced false evidence or suppressed evidence, they deny any such averments.

91.    Steidl was released from Danville Correctional Center on May 28, 2004, after serving seventeen years in prison, twelve of them on Death Row, for two murders the Defendants knew be did not commit.

**ANSWER:**    Defendants admit that on about May 28, 2004, Steidl was released from the custody of the Illinois Department of Corrections. Defendants deny that they knew Steidl did not

commit the murders of the Rhoads.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

92.     Despite the fact that the Federal District Court had found that Steidl's trial would have probably resulted in acquittal and despite the fact that Whitlock was convicted on the very same basis, Whitlock was not released. Despite the fact that the Illinois Attorney General believed that information favoring Steidl's defense was never disclosed and that the same evidence was concealed from Whitlock, all efforts to release Whitlock were strenuously opposed by Defendants. Neither the Illinois Attorney General nor the Office of the State Appellate Prosecutor agreed to afford Whitlock the same treatment as Steidl. Whitlock was forced to continue in his imprisonment for a crime he did not commit.

**ANSWER:**     Defendants deny that the District Court found that Steidl's trial would have probably resulted in acquittal and that Whitlock was convicted on the very same basis (indeed the United States Court of Appeals has described several of Whitlock's statements as "highly damaging admissions"), but admit that Whitlock was not released when Steidl was released. Defendants deny that they strenuously opposed all efforts to release Whitlock, and are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

93.     On June 11, 2004, Whitlock filed a second amended petition for post-conviction relief. Rather than concede that Whitlock was no more culpable than his co-defendant Steidl, who the state refused to retry, the Office of the State Appellate Prosecutor, with the active assistance of Defendants Eckerty and Marlow, vigorously opposed Whitlock's petition and sought his continued incarceration. Defendant Marlow, who also became aware of the wealth of exculpatory evidence, scoured the country trying to get witnesses to testify against Whitlock.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in the first two sentences of this paragraph, except that Defendant Marlow denies he vigorously opposed Whitlock's petition and sought Whitlock's continued incarceration.  Defendant Marlow admits that he scoured the country to find information relating to the Rhoads homicides, but denies that he tried to get witnesses to testify against Whitlock. Defendants Carper, Brueggemann, Fermon, Parker and Kaupas are without knowledge or

information sufficient to form a belief as to the truth of what information Marlow obtained or what Marlow did during his investigation.

94.     The following was adduced at Whitlock's post-conviction hearing:

- Defendant Eckerty admitted he provided Herrington with alcohol "to help him relax" before his Grand Jury testimony.

- Gary Wheat, a Paris police officer, stated that he stayed with Herrington in Defendant Parrish's cabin and provided Herrington with alcoholic beverages.

- Defendant Eckerty stated that Herrington made an "eavesdropping" telephone call to Whitlock on September 25, 1986, from Parrish's cabin while drinking alcohol they provided.

- Debra Helton, a forensic scientist with the ISP crime laboratory, submitted a stipulated affidavit which stated that she began to screen items of evidence for human blood. Helton was told that Herrington had a cut on his hand and she requested Herrington's blood standard. Defendants Parrish, Eckerty and McFatridge failed and refused to forward Herrington's blood standard to her for testing.

- Dr. John Murphy, the State's pathologist testified that he had removed the sternum from Dyke Rhoads body because he had found a "defect," a knife wound in the sternum. He preserved the sternum in case anyone wished to examine it for tool marks (distinctive to a particular knife blade). No such examination was ever done.

- Dr. Murphy testified that either the Rienbolt knife or the knife found in the sink could have been the murder weapon.

- Donald Tankersky, an arson investigator for the State Fire Marshall, testified that the lamp was in fact not broken until after the fire. The interior was white and free of soot. Rienbolt had testified she saw broken, a piece in Steidl's hand at the time of the murders Whitlock presented Dr. Baden, a forensic pathologist, certified in all three of pathologies sub-specialties. He had performed more than 20,000 forensic autopsies. He concluded to a reasonable degree of medical certainty that the Rienbolt knife did not cause the fatal wound on Dyke Rhoads.

- Dr. Baden also concluded to a reasonable degree of medical certainty that the Rienbolt knife could not have inflicted Karen Rhoads' wound, but that the sink knife could have done so.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to

the truth of the averments in this paragraph.

      95.    Despite the overwhelming evidence at the post-conviction hearing and despite the
fact that the state had decided its evidence was insufficient to retry Steidl, Defendant Eckerty,
along with Prosecutor David Rands, strenuously opposed Whitlock's petition, submitted the same
fabricated, manipulated and false evidence it used to originally convict him and urged the court
to deny the petition.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to

the truth of the averments in this paragraph.

      96.    Due in part to 1) the continued reliance on the fabricated, manipulated, coerced
and false testimony, on the withholding and suppression of exculpatory evidence, 2) the
suppression of the Callahan report and refusal to permit the further investigation, 3) the
continued efforts of Defendants to prevent investigation of other credible suspects including the
Paris businessman and 4) continued efforts of Defendants not to admit their mistakes, the trial
court denied Whitlock's post-conviction petition. Whitlock continued to be incarcerated in the
penitentiary despite his innocence.

**ANSWER:**    Defendants deny that the Callahan report was suppressed, deny that they refused

to permit further investigation, and prevented investigation of Robert Morgan.  Defendants are

without knowledge or information sufficient to form a belief as to the truth of the remaining

averments.

      97.    Whitlock appealed the denial of his petition to the Illinois Appellate Court for the
Fourth District. During 2006 and continuing into 2007, the Office of the State Appellate
Prosecutor, aided by Defendant Marlow, continued in their attempts to manufacture evidence
against Whitlock and defeat his appeal. Defendant Marlow continued to interview potential
witnesses strongly suggesting stories to them. On one occasion, he visited Ovid Chambers in
Florida and screamed and forcefully told him that he knew Whitlock was with him in the Rhoads
house the night of the murders and that Chambers should so testify. Chambers denied such a
story and declined.

**ANSWER:**    Defendants Carper, Brueggemann, Fermon, Parker and Kaupas are without

knowledge or information sufficient to form a belief as to the truth of the averments in this

paragraph.  Defendant Marlow admits that he continued to interview potential witnesses but

denies that he strongly suggested stories to them. Defendant Marlow admits that he visited Ovid

Chambers in Florida but denies the remaining averments.

98.     Jennifer Aper, a scientist at the ISP crime lab, who has possession of items of physical evidence recovered from the crime scene, was told not to perform mitochondrial DNA tests. Without such tests, the tissue and blood samples cannot be compared to other credible suspects, including those presently incarcerated in other institutions.

**ANSWER:**     Defendants admit that Jennifer Aper is a scientist at the ISP crime lab who

possessed physical evidence recovered from the crime scene but deny that she was told not to

perform mitochondrial DNA tests, and affirmatively state that the Illinois State Police does not

perform mitochondrial DNA testing and that there is no mitochondrial DNA data base to

compare such results with other suspects including those incarcerated in other institutions.

99.     On September 6, 2007, the Illinois Appellate Court for the Fourth District issued a 53-page opinion finding *inter alia* that the "State violated *Brady* by suppressing [evidence.]" The Court held, "We find a reasonable probability that but for these errors, considered cumulatively the verdict would have been different." (p. 2) The Court reversed the judgment and conviction and remanded the case back for a new trial.

**ANSWER:**     Defendants admit that the judgment was reversed and remanded for a new trial

but are without knowledge or information sufficient to form a belief as to the truth of the

remaining averments.

100.     Despite the Appellate Court's decision, Defendants still objected to Whitlock's release. Whitlock sought to be released on bond so that he could spend Christmas 2007 with his daughter and grandchild, but the state argued against it. Whitlock was finally released on January 8, 2008, when the state *nolle prosequied* the case.

**ANSWER:**     Defendants deny that they objected to Whitlock's release and admit that Whitlock

was eventually released, but are without knowledge or information sufficient to form a belief as

to the truth of the remaining averments.

## COUNT I
### (42 U.S.C. § 1983 Claim for Deprivation of Right to Fair Trial, Deprivation of Due Process and for Wrongful Conviction)

101.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER:**    Defendants restate their answers to paragraphs 1 through 100 as if fully stated herein.

102.    Article 42 U.S.C. § 1983 provides, in pertinent part, as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

**ANSWER:**    Admit that this is a partial quotation of 42 U.S.C. §1983.

103.    Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the wrongful charging, prosecution and conviction of Whitlock, and these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the continuation of said wrongful conviction, by a) coercing, intimidating, constructing and/or fabricating the false and totally unreliable statements, testimony and other evidence which formed the basis for Whitlock's charging, prosecution and conviction; b) withholding and concealing from Whitlock's defense attorneys, and the judges, juries, post-trial prosecutors and the Governor and his staff, who were involved in Whitlock's criminal proceedings, the highly exculpatory and exonerating evidence that these statements, testimony and other evidence were false, totally unreliable, fabricated, manipulated, suggested and coerced; c) suppressing from these same persons additional highly exculpatory and exonerating evidence and documents which further exonerated Steidl and Whitlock and his co-defendant, including evidence of other more likely suspects; d) writing false reports and giving and tendering false testimony and statements at the Grand Jury, at trial and at post-conviction and habeas corpus proceedings; e) improperly influencing the judges, juries and executive bodies and officials hearing and considering Whitlock's case, and the post-trial prosecutors who continued his prosecution, *inter alia*, by making false public statements and l) obstructing investigations which would have led to discovery of further

exculpatory evidence, and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Whitlock of his liberty, violating his right to a fair and impartial trial and violating his rights to due process, all as guaranteed by the Fourteenth Amendment to the United States Constitution.

**ANSWER:**    Deny.

104.    The actions of Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow in depriving Whitlock of his liberty, his right to a fair trial and his right to due process were a direct and proximate cause of the injuries to Whitlock which are set forth above.

**ANSWER:**    Deny.

## COUNT II
### (42 U.S.C. § 1983 - Malicious Prosecution)

105.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER:**    Defendants restate their answers to paragraphs 1 through 100 as if fully stated herein.

106.    The actions of Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents acting under color of state law wrongfully arresting, imprisoning, prosecuting and causing the conviction and sentencing of Whitlock, amounted to malicious prosecution in violation of rights decreed to Whitlock by the Fourth, Fifth and Fourteenth Amendments of the Constitution. Defendants Steven Fermon, Diane Carper, Charles Brueggemann, Andre Parker, Kenneth Kaupus and Jeff Marlow, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents acting under color of state law, caused the continued incarceration of Whitlock through all of the post-conviction proceedings and continuing for twenty-one years, without probable cause, egregiously depriving him of his liberty without due process, and violated Plaintiffs Fourth, Fifth and Fourteenth Amendment rights.

**ANSWER:**    Deny.

107.    Article 42 U.S.C. § 1983 provides, in pertinent part, as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

**ANSWER:**    Admit that 42 U.S.C. §1983 states this in part.

108.    Defendants Ray, Parrish, Eckerty and McFatridge initiated the criminal proceedings with the aid and assistance of Defendant Rienbolt, Herrington and others. The criminal proceedings were ultimately resolved in Whitlock's favor, resulting in his release on January 8, 2008. As set forth aforesaid, the initiation of the criminal proceeding was malicious and without probable cause and, as a consequence, Whitlock suffered a deprivation of his liberty.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

109.    The actions of the Defendants as aforesaid were so egregious that they violated Whitlock's rights to due process and subjected Whitlock to the deprivation of his rights, privileges and immunities secured by the United States Constitution and laws and were the direct and proximate cause of Whitlock's injuries and damages.

**ANSWER:**    Deny.

## COUNT III
### (False Imprisonment)

110.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER:**    Defendants restate their answers to paragraphs 1 through 100 as if fully stated herein.

111.    Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the wrongful charging, false arrest, wrongful prosecution and conviction of Whitlock.

**ANSWER:**    To any extent the Defendants are "certain other named and unnamed private individuals and law enforcement agents," they deny these allegations.

112.    These same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the continuation of Whitlock's wrongful conviction and caused him to be continually and falsely imprisoned, by a) coercing, intimidating, constructing and/or fabricating the false statements, testimony and other evidence; b) withholding and concealing from Whitlock and his defense attorneys, from the judges, juries, post-trial prosecutors and from the Governor and his staff, all of who were involved in Whitlock's post-conviction proceedings, the highly exculpatory and exonerating evidence that these statements, testimony and other evidence were false, totally unreliable, fabricated, manipulated, suggested and coerced; c) suppressing from these same persons additional highly exculpatory and exonerating evidence and documents which further exonerated Steidl and Whitlock and his co-defendant, including evidence of other more likely suspects; d) writing false reports and giving and tendering false testimony and statements at the Grand Jury, at trial and at post-conviction and habeas corpus proceedings; e) improperly influencing the judges, juries and executive bodies and officials hearing and considering Whitlock's case, and the post-trial prosecutors who continued his prosecution, *inter alia*, by making false public statements; f) obstructing investigations which would have led to discovery of further exculpatory evidence and g) the additional wrongdoing set forth above, thereby unconstitutionally depriving Whitlock of his liberty, causing him to be falsely imprisoned and violating his rights to due process, all as guaranteed by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

**ANSWER:**    Deny.

113.    The actions of Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow in depriving Whitlock of his liberty, his right not to be falsely imprisoned and his right to due process were a direct and proximate cause of the injuries to Whitlock which are set forth above.

**ANSWER:**    Deny.

## COUNT IV
### (42 U.S.C. § 1983 *Monell* Policy Claim Against City of Paris)

114.     Plaintiff realleges paragraphs 1 through 100.

**ANSWER:**     Defendants restate their answers to paragraphs 1 through 100 as if fully stated herein.

115.     The actions of Defendants Gene Ray, James Parrish, Michael McFatridge and Jack Eckerty as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Paris, its Police Department and Police Chiefs, together with the Edgar County State's Attorney and its States Attorney's Office, which was acting pursuant to, find as an agent of, the city of Paris.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

116.     At all times material to this complaint, Defendant City of Paris and its Police Department, Police Chiefs, together with the Edgar County State's Attorney and its States Attorney's Office, which was acting as an agent of the City of Paris and pursuant to its policies and practices, had interrelated *de facto* policies, practices and customs, which included, *inter alia*:

a.     conducting physically, psychologically or otherwise illegally or improperly coercive and intimidating interrogations of witnesses, suspects and arrestees in order to obtain false statements, testimony and other false inculpatory evidence, and wrongful arrests, prosecutions and convictions;

b.     filing false reports and giving false statements and testimony about said interrogations and evidence, and fabricating parts or all of said evidence; suppressing evidence concerning said interrogations, confessions and evidence; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions and evidence obtained during said interrogations; and otherwise covering up the true nature of said interrogations, confessions and evidence;

c.     failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of coercion and related physical and other abuse of suspects, witnesses and other citizens; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or improperly coercive questioning or interrogation of witnesses, suspects, arrestees and other citizens, including, but not limited to, persons who were physically and/or psychologically abused during questioning;

43

d.     the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a, b and c above, whereby police officers refused to report or otherwise covered up instances of police misconduct and/or the fabrication, suppression and destruction of evidence of which they were aware, despite their obligation under the law and police regulations to report such violations. Said code of silence also includes police officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability or criminal charges, and perjuring themselves in criminal cases where they and their fellow officers have coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant; and

e.     the practice of covering-up wrongdoing by members of the police force and prosecutors, the suppressing and withholding exonerating, exculpatory and/or other evidence favorable to criminal defendants which were not turned over to the prosecuting attorneys and/or defense lawyers.

**ANSWER:**     To any extent the any of the alleged misconduct is directed against Carper, Parker, Brueggemann, Kaupas, Fermon and Marlow, Defendants deny the averments in this paragraph. To the extent that the alleged misconduct is directed against other defendants in this case, Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

117.     The patterns and practices set forth above were well known both before and after Plaintiff was wrongfully arrested, charged, imprisoned and convicted, including by the commanding and supervisory Defendants named herein, who participated in the cover-up and suppression of evidence and the wrongful prosecution and conviction of the Plaintiff, his co-defendant and other victims, *inter alia*, in the manner set forth in this complaint.

**ANSWER:**     To any extent the term "Defendants" refers to Carper, Parker, Brueggemann, Kaupas, Fermon and Marlow, Defendants deny the averments in this paragraph.  To the extent the term "Defendants" means other defendants in this case, Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

118.     Said interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference, encouraged, *inter alia*, the coercing of false statements and testimony from suspects, witnesses and arrestees, by abusive tactics and techniques; the fabrication, manipulation and alteration of witness statements, testimony, and other false evidence; the suppression of evidence of abuse

44

and other exculpatory evidence; the intimidation of witnesses; the making of false statements and reports; the giving of false testimony and the pursuit and continuation of frame-ups and other wrongful convictions and false arrests and imprisonments of innocent persons, and were, separately and together, a direct and proximate cause of the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators and the injuries suffered by the Plaintiff.

**ANSWER:**    To any extent the term "Defendants" refers to Carper, Parker, Brueggemann, Kaupas, Fermon and Marlow, Defendants deny the averments in this paragraph. To the extent the term "Defendants" means other defendants in this case, Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

119.    The involvement in, and ratification of, the unconstitutional actions set forth above by Defendant Paris Police Chief Gene Ray, who was acting as a final policymaker for the city of Paris in police matters, including, but not limited to, police interrogations and investigations, also establishes that said Constitutional violations were directly and proximately caused by Defendant City of Paris.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

## COUNT V
### (State Law Claim for False Imprisonment)

120.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER:**    Defendants restate their answers to paragraphs 1 through 100 as if fully stated herein.

121.    The imprisonment of Plaintiff, without probable cause, by Defendants Ray, Parrish, Eckerty and McFatridge, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents; and its continuation by these Defendants, together with Defendants Fermon, Carper, Parker, Kaupus, Brueggemann and Marlow, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, constituted the tort of false arrest and imprisonment under Illinois law.

**ANSWER:**    Deny.

122.    Defendants' actions in arresting and imprisoning Plaintiff were willful and wanton.

**ANSWER:**    Deny.


## COUNT VI
### (State Law Claim for Malicious Prosecution)

123.    Plaintiff realleges paragraphs 1 through 100 and 105 through 109.

**ANSWER:**    Defendants restate their answers to paragraph 1 through 100 and 105 through 109 as if fully stated herein.


124.    Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, initiated a malicious prosecution without probable cause against Plaintiff, and these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, continued said prosecution, again without probable cause. Said prosecution was ultimately terminated in Plaintiffs favor. The Defendants' actions were done in a willful and wanton manner and directly and proximately caused the injury and damage to Plaintiff as set forth above.

**ANSWER:**    Deny.


## COUNT VII
### (State Law Claim for Intentional Infliction of Emotional Distress)

125.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER:**    Defendants restated their answers to paragraphs 1 through 100 as if fully stated herein.


126.    Defendants Gene Ray, James Parrish, Jack Eckerty, Gene Ray and Michael McFatridge, individually, jointly and in conspiracy, with each other and with Defendant Rienbolt

46

and certain other named and unnamed private individuals and law enforcement agents, engaged in extreme and outrageous conduct by, *inter alia*, constructing, coercing, intimidating, manipulating, fabricating, suggesting and altering the evidence against Plaintiff, by knowingly providing false testimony, by procuring Whitlock's prosecution, conviction and imprisonment for heinous crimes he did not commit, and by making false and defamatory public statements by falsely repudiating recantations and by concealing exculpatory evidence. Additionally, these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, engaged in additional extreme and outrageous conduct by suppressing additional exculpatory evidence, by continuing Plaintiffs wrongful conviction and false imprisonment, by refusing to properly investigate, and by otherwise abusing Plaintiff.

**ANSWER:**    Deny.

127.    Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Deborah Rienbolt Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.

**ANSWER:**    Deny.

128.    As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was injured and has experienced, and continues to experience, severe emotional distress, including fear of execution, nightmares, sleep disruption, symptoms of post traumatic stress disorder, anxiety, depression and difficulty in focusing or concentrating.

**ANSWER:**    Deny.

## COUNT VIII
### (State Claim for Conspiracy)

129.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER:**    Defendants restate their answers to paragraphs 1 through 100 as if fully stated herein.

47

130.    Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Deborah Rienbolt, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, with other unsued co-conspirators and other police and prosecutorial investigative, supervisory and command personnel, together reached an understanding, engaged in a course of conduct and otherwise jointly acted and/or conspired among and between themselves to falsely imprison and/or to continue said imprisonment, to maliciously prosecute and/or continue said prosecution, and to intentionally inflict severe emotional distress on Plaintiff.

**ANSWER:**    Deny.

131.    In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in the Facts above.

**ANSWER:**    Deny.

132.    Said conspirac(ies) and overt acts were and are continuing in nature and were and are a proximate cause of Plaintiff s tortuous injuries under state law, as set forth above.

**ANSWER:**    Deny.

133.    Defendants' and their co-conspirators' overt acts, as set forth above; which were committed jointly and/or while conspiring together to falsely imprison, maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

**ANSWER:**    Deny.

## COUNT IX
### (State Law Respondeat Superior Claim)

134.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER:**    Defendants restate their answers to paragraphs 1 through 100 as if fully stated herein.

135.    Defendants Gene Ray and James Parrish were, at all times material to this complaint, employees of the Defendant City of Paris, were acting within the scope of their employment and their acts which violated state law are directly chargeable to the Defendant City of Paris under state law pursuant to *respondeat superior*.

**ANSWER**:    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.


## COUNT X
### (745 ILCS 10/9-102 and Common Law Claims Against the City of Paris)

136.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER**:    Defendants restate their answers to paragraphs 1 through 100 as if fully stated herein.


137.    Defendant City of Paris was the employer of Defendants Gene Ray and James Parrish at all times relevant and material to this complaint.

**ANSWER**:    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.


138.    These Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Paris.

**ANSWER**:    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.


## COUNT XI
### (Edgar County and its State's Attorneys' Office)

139.    Plaintiff realleges paragraphs 1 through 100.

**ANSWER:**    Defendants restate their answers to paragraphs 1 through 100 as if fully stated herein.

140.    Defendant Edgar County and its State's Attorneys' Office was the employer of Defendant McFatridge, who was acting in the scope of his employment as an employee of Edgar County and its State's Attorneys' Office and who committed the wrongful acts complained of herein within the course and scope of his employment, and said County is therefore responsible for any judgment entered against Defendant McFatridge and is therefore a necessary party hereto.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

## **AFFIRMATIVE DEFENSES**

1.  Plaintiff's federal claims are barred by qualified immunity as there was no clearly established constitutional right at the time Defendants acted so that a reasonable official would know their conduct was unlawful.

2.  Plaintiff's state law claims are barred by absolute immunity and public official's immunity as Defendants acted in good faith, exercising their discretion and made a policy determination.

3.  Plaintiff's state law claims are barred by sovereign immunity because the Defendants were acting within the scope of their State employment and the suit is essentially one against the State.

4.  Plaintiff's claims are barred by judicial estoppel because he previously and repeatedly argued before several courts that his incarceration was the result of ineffective assistance of counsel.

5.  Plaintiff's claims are barred by collateral estoppel.

6.  Plaintiff's claims are barred by the statute of limitations as he did not file this matter until more than 2 years lapsed from the time the claims accrued.

## **JURY DEMAND**

Defendants demand a trial by jury on all issues so triable.


WHEREFORE, Defendants Fermon, Carper, Brueggemann, Parker, Kaupas and Marlow request that judgment be entered in their favor and against Plaintiff and that Defendants be paid their reasonable costs, expenses and attorneys' fees in defending this action.


Respectfully submitted,


s/ Iain D. Johnston
Iain D. Johnston
Bar Number: 6204667
Attorney for Defendants
Carper, Fermon, Kaupas, Parker,
Brueggemann and Marlow
Johnston Greene LLC
542 South Dearborn Street
Suite 1310
Chicago, IL  60605
Phone: (312) 341-3900
Fax: (312) 341-0700
Email:ijohnston@johnstongreene.com