IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| **HERBERT WHITLOCK,** | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **No. 08 CV 2055** |
| v. | ) | |
| | ) | |
| **CITY OF PARIS, Present and Former** | ) | **JURY TRIAL DEMANDED** |
| **Paris Police Officials Chief Gene Ray and** | ) | |
| **Detective James Parrish; former Illinois** | ) | |
| **State Trooper Jack Eckerty; former** | ) | |
| **Edgar County State's Attorney Michael** | ) | |
| **McFatridge; EDGAR COUNTY; and** | ) | |
| **Illinois State Police Officials Steven M.** | ) | |
| **Fermon, Diane Carper, Charles E.** | ) | |
| **Brueggemann, Andre Parker, Kenneth** | ) | |
| **Kaupus and Jeff Marlow; and Deborah** | ) | |
| **Rienbolt,** | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO CURRENT ILLINOIS STATE POLICE OFFICIALS'
MOTION TO DISMISS FOR JUDGMENT ON THE PLEADINGS FOR COUNTS II
AND III OF THE COMPLAINT**

NOW COMES Plaintiff, Herbert Whitlock ("Whitlock"), by and through his attorneys, Ronald H. Balson and Carrie A. Hall of Michael Best & Friedrich LLP and Richard S. Kling and Susana Ortiz of the Law Offices of Richard Kling, and as and for his Response To Current Illinois State Police Officials' Motion To Dismiss For Judgment On The Pleadings For Counts II And III Of The Complaint (the "CISP Defendants") submits the following statement of facts and memorandum of law. For the reasons set forth hereinafter, Whitlock prays that the motion be denied in its entirety.

1

## I. Introduction

Whitlock has filed an eleven count Complaint arising out of his arrest, prosecution, post-conviction proceedings and his twenty-one year incarceration. He has alleged that the CISP Defendants, and each of them, engaged in willful, egregious conduct which, along with the conduct of the other Defendants, deprived him of his liberty from 1987 to 2008. He has sought relief under a variety of theories, both as federal and state based causes of action. The CISP Defendants have moved for Judgment on the Pleadings in two of the counts: the federal malicious prosecution count (Count II) and the federal false imprisonment count (Count III).

## II. Plaintiff States a Cause of Action for §1983 Violations based on Malicious Prosecution

### A. Factual Predicate

1.  In his Complaint, Plaintiff has alleged that the CISP Defendants Fermon, Carper, Brueggemann and Parker obtained full knowledge of the concealed, withheld and suppressed exculpatory evidence which was existing at the time of Whitlock's arrest, conviction and post-conviction proceedings, and had an affirmative duty under *Brady v. Maryland,* 373 U.S. 83 (1963), to disclose this evidence to Whitlock and his attorneys. (Complaint, ¶77). But rather than so advise Whitlock, his attorneys or the courts, CISP Defendants Fermon, Carper, Brueggemann and Parker, along with other Defendants Ray, Parrish, Eckerty and McFatridge, kept mum and took steps actively to keep the evidence concealed. (Complaint, ¶77). Whitlock had a right to be informed about *Brady* material at all stages of his defense, including all post-conviction proceedings and his clemency petition.

2.  At the time of the involvement of the CISP Defendants, Whitlock was actively pursuing post-conviction proceedings. In addition, his clemency petition was filed in December 2002 and was considered by the Governor in January 2003. Plaintiff alleges that the CISP

Defendants opposed the clemency petition and further suppressed the knowledge of the favorable and exculpatory evidence. (Complaint, ¶86). On June 11, 2004, Plaintiff filed a second amended petition for post-conviction relief. He was given an evidentiary hearing. Without the full benefit of the suppressed and concealed exculpatory evidence, the hearing resulted in a denial of the petition. On September 6, 2007, the Fourth Circuit ordered a new trial based, in part, upon the failure to disclose favorable or exculpatory evidence.

    3.    On April 27, 2000, following the receipt of a letter from Randy Steidl's investigator, Sam Nolen, the Director of the Illinois State Police ("ISP"), assigned, through the chain of command, Lieutenant Michale Callahan to investigate the homicides and file a report. (Complaint, ¶69). At this same time, the ISP was alerted to the fact that the 48 Hours television program was running a story on the possibility of Whitlock and Steidl's wrongful conviction.

    4.    Callahan's memo was completed on May 17, 2000, and sent back up the chain of command. (Complaint, ¶71). The seven page, single spaced report was a scathing commentary on the trial and concluded that Whitlock and Steidl did not receive a fair trial. The report pointed out thirty-eight separate material contradictions and supplied substantial information about the existence of other persons who were credible suspects in the homicide.

    5.    Among the evidentiary contradictions, Callahan noted:

- Defendants Parrish and McFatridge had witness Carol Robinson lie on the stand about whether she saw Herrington and Steidl together on July 5th;
- Herrington's time line did not fit with the crime;
- A polygraph examiner found purposeful noncooperation of Herrington and the examiner's recommendation that Herrington be re-examined was rejected by the Defendants;
- Rienbolt's testimony that she skipped work on the night of July 5th and was with Steidl and Whitlock was refuted by numerous witnesses;
- Rienbolt's testimony that a broken lamp was used in the homicides was refuted by the testimony of the fire examiners;

- Rienbolt later recanted her testimony that she was present at the murders and that Steidl was involved;

- Rienbolt lied about the knife;

- Rienbolt admitted that Parrish led her into her false testimony;

- Herrington testified he was at Joe's Bar with Steidl and Whitlock at 8:30 p.m. and they all went to the Horseshoe Bar, while Defendant Rienbolt testified she was with them at the same time at the Tap Room Bar;

- Herrington described the crime scene, placing Dyke Rhoads on the floor with shorts on and Karen Rhoads on the bed with panties on. The firemen said they were totally nude;

- Defendant Rienbolt stated that she went to the American Legion Bar with Barbara Furry. Barbara Furry stated that she has never gone to the bars with Defendant Rienbolt and she was not at the American Legion July 5, 1986;

- Defendant Rienbolt implausibly stated that Steidl and Whitlock took showers at the Rhoads' house after the murders;

- Herrington stated that Whitlock had a clump of Karen Rhoads' hair in his hand. The autopsy report shows no hair torn from Karen Rhoads' head.

(Complaint, ¶72).

6. Callahan also pointed out the viability of Bob Morgan (and his associates) as credible suspects who should have been considered and further investigated by the ISP. The details were as follows:

- Karen Rhoads was employed by the Paris businessman as a secretary and he frequently visited her apartment;

- The Paris businessman was a suspect in two prior homicides including the murder of a former secretary;

- Karen Rhoads said that she had seen the Paris businessman and an employee load a large sum of cash and a machine gun in the Paris businessman's car;

- Karen Rhoads had told the Paris businessman the Friday prior to the murders that she was quitting her job, that he forbade her from doing so and a big argument ensued. Karen wrote a letter later found on her desk which read "I'm still with Bob. He says my bonus will be real big this year. Believe me it had better;"

- Two of the Paris businessman's employees, who were known as his "right hand men," were implicated in the Rhoads murders;

- The Paris businessman arrived on the scene just as the investigators did and offered his theory about the murders;

- Immediately after the murders, the Paris businessman offered a $25,000 reward in local bars for information on the murders. Herrington later stated that the Paris businessman offered him $25,000 and a job to keep his mouth shut;
- Herrington also told Ray and Parrish that the Paris businessman was at the scene of the murders at the time they occurred;
- Parrish worked for the Paris businessman during a six-month suspension prior to the murders.

(Complaint, ¶73).

7. Callahan's report was supplemented with further investigations and further written memos distributed to the CISP Defendants. The findings in the memos were shared and discussed with the CISP Defendants, including at meetings in Springfield in May 2000, April 2001, November 2001 and January 2003.

8. Whitlock's Complaint alleged that a full investigation and further efforts to discover the complicity of Morgan were thwarted by the combined efforts of the CISP Defendants. (Complaint, ¶76).

9. The Complaint further alleges that the CISP Defendants "caused the wealth of exculpatory evidence uncovered by Callahan to be withheld from Steidl and Whitlock during the time they were petitioning for release." (Complaint, ¶80).

10. The Complaint also recites that both Steidl and Whitlock petitioned for a pardon on the basis of their innocence (Complaint, ¶81). Following a call from the Governor's office, Callahan briefed the CISP Defendants Fermon, Carper and Brueggeman on the information he discovered. (Complaint, ¶85). Fermon, Carper and Brueggemen "opposed the petitions and ordered Callahan to offer no opinion and supply no exculpatory evidence to the Governor or his representative." (Complaint, ¶86).

11. Despite their knowledge that Steidl had been released and the Attorney General's office had declined to retry him, and despite their knowledge of the details uncovered in the

5

Callahan investigation, the CISP Defendants, and Marlow in particular, pursued Whitlock's continued incarceration. Marlow "scoured the country trying to get witnesses to testify against Whitlock," (Complaint, ¶93), "suggesting stories to them," and intimidating witnesses. (Complaint, ¶97).

### B. Memorandum of Law

12. The CISP Defendants rely on the 2001 decision of *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), and urge this Court to dismiss Count II because the Seventh Circuit held in that particular case, at that time, that the existence of a state malicious prosecution remedy barred a §1983 malicious prosecution cause of action for Newsome.

13. Two Supreme Court decisions, one issued recently (*Wallace v. Kato,* 127 S.Ct. 1091 (2007)), fully explore the relationship between a §1983 action for damages for unconstitutional confinement and the tort of malicious prosecution. In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Court unmistakably treated an action for malicious prosecution as redressable under §1983. Noting that, "We have repeatedly noted that 42 U.S.C. 1983 creates a species of tort liability," *Id.* at 483, the Court went on to say that, "The common law cause of action for <u>malicious prosecution</u> provides the closest analogy to claims of the type here [unconstitutional confinement] because, unlike the related cause of action for false arrest or imprisonment, it permits damages for confinement imposed pursuant to legal process." *Id.* at 484. (emphasis added)

14. The Supreme Court in *Heck* also noted that "…a successful malicious prosecution plaintiff may recover, in addition to general damages, 'compensation for any arrest or imprisonment, including damages for discomfort or injury to his health, or loss of time and deprivation of the society.'" *Id.* at 484 (quoting Prosser and Keeton on Torts 888 (5th ed. 1984)).

6

15. Although *Heck* focused on whether a §1983 malicious prosecution claim could be brought by a prisoner while his habeas corpus petition was pending and before his conviction was reversed, the court's reasoning made it abundantly clear that malicious prosecution was cognizable under §1983. "We hold that, in order to recover damages for allegedly <u>unconstitutional conviction or imprisonment</u>, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, <u>a §1983 plaintiff</u> must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. 2254." 512 U.S. at 486-87 (emphasis added). Of course, in this case, the unconstitutional conviction and imprisonment has been overturned and Whitlock has been released.

16. To further punctuate the principle, the Court held, "Under our analysis, the statute of limitations poses no difficulty while the state challenges [to the conviction] are being pursued, <u>since the §1983 claim has not yet arisen</u>." *Id.* at 489 (emphasis added). The Court's reasoning thus equates the wrongful incarceration with the pendency of the §1983 cause of action. The logical corollary is that once state challenges are completed, as in Whitlock, the §1983 claim has ripened. The *Heck* Court went on to say, "…a §1983 cause of action for damages attributable to an unconstitutional conviction or sentence [which the Court has already identified as akin to malicious prosecution] does not accrue until the conviction or sentence has been invalidated." *Id.* at 489-90.

17. In the 2007 *Wallace* decision, the Supreme Court also discussed the nature of an unconstitutional confinement claim. 127 S.Ct. 1091 (2007). The *Wallace* Court held, "…unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious

7

prosecution, which remedies detention accompanied, not by absence of legal process, but by wrongful institution of legal process." *Wallace*, 127 S.Ct. at 1096.

18. The Seventh Circuit in *Newsome,* which was decided after *Heck* <u>but</u> <u>before</u> <u>Wallace</u>, and on its unique factual circumstances, did hold that "…malicious prosecution is not tenable as an independent constitutional theory." *Newsome*, 256 F.3d at 753. In doing so, the Seventh Circuit based its decision on its interpretation of the Supreme Court's decision in *Albright v. Oliver*, 510 U.S. 266 (1994). The basis for the *Albright* decision remains unclear: four of the justices reasoned that probable cause was the exclusive domain of the Fourth Amendment, one justice considered it to be substantive due process and two of the justices (with whom the Seventh Circuit chose to cast its lot) reasoned that remedies available to Albright under state law for wrongful prosecution provided him with due process, and thus, in the words of the Seventh Circuit, "…knocks out any constitutional theory of malicious prosecution." *Newsome* at 750.

19. To begin with, it is important to recognize the factual distinctions between *Albright* and Whitlock. Albright was arrested and prosecuted for selling an innocent substance that looked like a drug. His charges were dismissed because they did not state an offense under Illinois law. Albright never went to prison, never lost his freedom and was never subjected to an unconstitutionally unfair trial. Albright's unsuccessful §1983 claim sought damages for infringement of his substantive due process rights to be free of prosecution without probable cause. He did not claim that Illinois denied him procedural due process guaranteed by the Fourteenth Amendment.

20. The Seventh Circuit likened Albright's §1983 suit to a "garden-variety public-officer defamation case," *Albright v. Oliver*, 975 F.2d 343, 347 (7th Cir. 1992), and held that

since there was no federally protected right (such as "exclusion from an occupation" *Id.* at 347), then the "heavy weaponry of constitutional litigation can be left at rest." *Id.* at 347.

21.  The Supreme Court affirmed the Seventh Circuit, but did so in four separate written opinions. The majority opinion, authored by Chief Justice Rehnquist and joined by Justices O'Conner, Scalia and Ginsburg, noted that the "…Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it," *Albright*, 510 U.S. 260, 274 (1994), and expressed no opinion whether Albright would have succeeded had he alleged violations of his Fourth Amendment rights. They affirmed because "…substantive due process…can afford him no relief." *Id.* at 274.

22.  The separate opinion filed by Justices Kennedy and Thomas, the one the Seventh Circuit chose to adopt for its *Newsome* ruling, examined Albright's claim under the "*Parrat* rule" extracted from *Parrat v. Taylor,* 451 U.S. 527 (1981). *Id.* at 284. Simply stated, *Parrat* cautioned against turning every minor suit against a state actor (such as "nothing more than an automobile accident" *Parrat*, 451 U.S. at 544) into a constitutional violation under §1983. But *Parrat* did not change the law. Justices Kennedy and Thomas wrote about the "outer limits" of *Parrat*, stating, "Yet it is fair to say that courts, including our own, have been cautious in invoking the rule of *Parrat* (citation omitted). That hesitancy is in part a recognition of the important role federal courts have assumed in elaborating vital constitutional guarantees against arbitrary or oppressive state action. We want to leave an avenue open for recourse where we think the federal power ought to be vindicated." *Albright*, 510 U.S. at 284-285.

23.  Far from setting a hard and fast rule "knocking out" §1983 claims if a state remedy is also available, Justices Kennedy and Thomas viewed the existence of state remedies in the negative. In other words, they held that a §1983 action would certainly be appropriate if a

9

state <u>did not</u> afford a remedy. The specific language was as follows: "That said, if a State did not provide a tort remedy for malicious prosecution, there would be force to the argument that the <u>malicious initiation of a baseless criminal prosecution</u> infringes an interest protected by the Due Process Clause and enforceable under 1983. (Citations omitted.) But given the state tort remedy, we need not conduct that inquiry <u>in this case</u>." *Id.* at 286 (emphasis added). It is important to note that Albright's claim was limited to the initiation of a prosecution, not the actual prosecution, trial and post-conviction proceedings, and, as stated before, Albright did not lose his liberty.

24. Since the *Newsome* decision, the Supreme Court has had occasion for further discourse on the subject. The *Wallace* court, six years later, in 2007, noted that the issue was far from settled. 127 S.Ct. 1091 (2007). The *Wallace* opinion said, "We have never explored the contours of a Fourth Amendment malicious-prosecution suit under §1983…and we do not do so here." *Wallace*, 127 S.Ct. at 1096, n 2.

25. The *Wallace* decision appears to leave the door open in situations of wrongful detention, by stating that from and after the issuance of process or arraignment, "…any damages recoverable <u>must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than the detention itself</u>." *Id.* at 1096 (emphasis added). It then becomes a question whether the wrongful use of judicial process committed by state actors, depriving a person of his liberty, states a constitutional claim for violation of procedural due process when the malicious prosecution is designed to, and does in fact, deny a person the right to a fair trial and fair post-conviction relief.

26. The *Newsome* court quite clearly conceded that claims for wrongful detention based on violations of *Brady* "establish a violation of the due process clause for which [officers]

10

do not have immunity." *Newsome*, 256 F.3d at 753. In acknowleding the suitability of federal forums for redressing violations of constitutional due process in general, and recognizing that the *Brady* rule was derived from the due process clause of the Fourteenth Amendment, the Seventh Circuit in the matter of *Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007), held that Steidl "has alleged facts that, if true, show a <u>constitutional violation</u> on the part of ISP officials." *Steidl*, 493 F.3d at 632 (emphasis added).

27. In more recent language, which may be interpreted as further defining the *Newsome* decision, the Seventh Circuit stated, "[*Newsome*] had held that because there is no constitutional right not to be prosecuted without probable cause, a plaintiff could not state a section 1983 claim simply by showing that he was wrongly prosecuted <u>but rather must establish that he was deprived of a specific constitutional right, such as the right to a fair trial</u>." *Holmes v. Hoffman Estates*, 511 F.3d 673, 683 (7th Cir. 2007) (citing its decision in *Penn v. Harris*, 296 F.3d 573, 576-577 (7th Cir. 2002)) (emphasis added). In our case, Whitlock has alleged that the malicious prosecution deprived him not only of a fair trial, but of a right to fair post-conviction proceedings and a fair clemency hearing. Further, in *Holmes*, the Seventh Circuit went on to say, "The plaintiff in *Penn* had failed to [allege the deprivation of a right to a fair trial], and for that reason we concluded that his section 1983 claim was defective and the district court had properly disposed of it on summary judgment." *Id.*

28. Given the foregoing reasoning, it seems logical to assume that §1983 claims redressing *Brady* violations which have as their consequence, a corruption of the judicial process and a resultant wrongful detention (both of which *Newsome* clearly concedes are cognizable in Federal Court), will also state a viable cause of action that the *Wallace* decision would characterize as "malicious prosecution." To construe otherwise, one must presume that the

Supreme Court in *Albright* chose to remove all civil *Brady* claims from the §1983 umbrella, a step the U.S. Supreme Court Justices did not articulate and no court has held. The CISP Defendants do not argue, nor could they credibly assert, that all Constitutional due process violations are precluded by the existence of analogous state tort relief. It seems anomalous that two such remedies, malicious prosecution and false imprisonment, should be thus singled out and excluded from the panoply of relief available to the §1983 plaintiff.

### III. Whitlock's False Imprisonment Claims Are Valid Against the CISP Defendants Because of their Active Complicity in Continuing Whitlock's Wrongful Incarceration

29. Count III of the Complaint asserts a §1983 cause of action for false imprisonment. In pertinent part, it states as follows:

"These same Defendants [Ray, Parrish, Eckerty and McFatridge] together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, individually, <u>jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents</u>, caused the <u>continuation of Whitlock's wrongful conviction</u> and caused him to be <u>continually and falsely imprisoned</u>, by a) coercing, intimidating, constructing and/or fabricating the false statements, testimony and other evidence; b) withholding and concealing from Whitlock and his defense attorneys, from the judges, juries, <u>post-trial prosecutors and from the Governor and his staff, all of who were involved in Whitlock's post-conviction proceedings</u>, the highly exculpatory and exonerating evidence that these statements, testimony and other evidence were false, totally unreliable, fabricated, manipulated, suggested and coerced; c) suppressing from these same persons additional highly exculpatory and exonerating evidence and documents which further exonerated Whitlock and his co-defendant, including evidence of other more likely suspects; d) writing false reports and giving and tendering false testimony and statements at the Grand Jury, at trial and at post-conviction and habeas corpus proceedings; e) improperly influencing the judges, juries and executive bodies and officials hearing and considering Whitlock's case, and the post-trial prosecutors who continued his prosecution, *inter alia*, by making false public statements; f) obstructing investigations which would have led to discovery of further exculpatory evidence and g) the additional wrongdoing set forth above, thereby unconstitutionally depriving Whitlock of his liberty, causing him to be falsely imprisoned and violating his rights to due process, all as guaranteed by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution."

(Complaint, ¶112).

30.     False Imprisonment and Malicious Prosecution are frequently asserted together. Although the actions are similar, and frequently overlapping, Illinois distinguishes them by requiring a false imprisonment plaintiff to "show [he] was unreasonably restrained without probable cause" (*Ross v. Mauro Chevrolet*, 369 Ill. App.3d 794, 798 (1st Dist., 2006)) and a malicious prosecution plaintiff to "show 1) the commencement or continuation of an original criminal or civil proceeding by defendants, 2) termination of the proceeding in favor of plaintiff,[1] 3) the absence of probable cause for the proceeding, 4) the presence of malice on defendants' part and 5) damages resulting to plaintiff." *Id*, p. 801.

31.     To succeed on a claim for false imprisonment, a plaintiff must show that he was restrained unreasonably or without probable cause. "A claim for false imprisonment requires a showing that 'the plaintiff was restrained <u>or</u> arrested by the defendant, and that the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff.'" *Reynolds v. Menard*, 850 N.E.2d 831, 837 (1st Dist. 2006) (emphasis added).

32.     The CISP Defendants, in concert with the other defendants, affirmatively took steps to continue Whitlock's imprisonment. With knowledge that there was no reasonable grounds for Whitlock's initial restraint, arrest or continued incarceration, the CISP Defendants suppressed exculpatory materials from the judicial system and the Governor's office, prevented Callahan's investigation from proceeding, severely limited the scope of the investigation and ultimately reassigned the investigators, all in an effort to prevent Whitlock's release from prison.

---

[1] The Illinois Supreme Court has ruled that in a malicious prosecution action, a *nolle prosequi* is a termination in favor of the accused, absent 1) an agreement with the accused, 2) misconduct by the accused preventing a trial, 3) mercy requested and accepted by the accused, 4) the institution of new criminal proceedings or 5) the impossibility of bringing the accused to trial. *Swick v. Liautaud*, 662 N.E.2d 1238, 1243 (Ill. 1996). Obviously, none of those exceptions are present in the Whitlock case.

Put another way, the CISP Defendants knowingly held the key to Whitlock's freedom and buried it away.

33. The initial arrest was accomplished by Defendants Ray, Parrish, Eckerty and McFatridge without probable cause or reasonable grounds. It was a product of fabrication, manipulation and knowingly false testimony. As alleged in the Complaint, it was part of a scheme to prosecute two innocent men for the sake of expedience, to deflect the investigation from other credible suspects and for political gain. Beginning in 2000, when the CISP Defendants became aware of the egregious circumstances and chose to actively support and cover-up the original scheme, the unconstitutional arrest and imprisonment of Whitlock and Steidl, they became, in essence, accessories after the fact. Their liability became coterminous with the other defendants, reviving the original tort, and, as a result, continuing the unlawful and unconstitutional detention of Whitlock.

34. The same arguments which justify bringing §1983 to redress torts committed by state actors, the same arguments set forth above relative to malicious prosecution, apply equally here. The U.S. Supreme Court has recognized the breadth of §1983 actions to redress tort actions. As argued above, "We have repeatedly noted that 42 U.S.C. 1983 creates a species of tort liability," *Wallace* 127 S.Ct. at 483. That tort liability would also include false imprisonment.

### IV. The CISP Defendants Do Not Have Qualified Immunity on Either the Malicious Prosecution Claim or the False Imprisonment Claim

35. The CISP Defendants are seeking to resuscitate their unsuccessful argument on qualified immunity, which has now been settled by the Seventh Circuit in *Steidl v. Fermon,* 494 F.3d 623 (7th Cir. 2007). At the heart of Whitlock's constitutional claims, whether in Count I, II or III, are the allegations that the CISP Defendants knowingly

14

suppressed favorable and exculpatory material. To the extent their conduct amounts to a denial of due process, malicious prosecution or false imprisonment, it is <u>clear</u> that the <u>conduct</u> itself is redressable in a §1983 cause of action.

36.     The Seventh Circuit stated, "We are persuaded that the ISP Officials, and indeed all of the police officers involved in this case, had ample notice that the knowing suppression of exculpatory material that was in the files at the time of the trial violated the defendant's constitutional rights." *Id*, p. 633.

37.     The Court also held, "Supervisors in the Illinois State Police cannot have thought that they were permitted deliberately to obstruct the access to this evidence of the post-trial conviction court and the Governor's Office, which has its own role to play in the state's criminal justice system." *Id*.

38.     Finally, the Seventh Circuit disposed of the qualified immunity argument, stating, "We therefore conclude that the district court correctly denied the ISP Officials' motion for dismissal based on qualified immunity." *Id*.

39.     The CISP Defendants seek to circumvent this holding by asserting that the case law on malicious prosecution is not clearly established, arguing *Newsome* again. The CISP Defendants miss the point. It isn't the holding in *Newsome,* or a "conflict exist[ing] among the circuits" (CISP Defendants' motion, p. 9) which is determinative of the issue. The focus must be on the egregious <u>behavior</u> of the defendants. To that end, the Seventh Circuit cited two Supreme Court cases and stated, "both of which focused on whether a reasonable person would know that the <u>challenged behavior</u> violated a constitutional right, and held that there need not be case law on the point so long as the official has 'fair warning' that her <u>conduct was impermissible</u>." *Id*. (emphasis added).

### V. The False Imprisonment Claim is Not Time-Barred

40. The CISP Defendants assert that "Moreover, because of the lapse of years, any such claim would be time barred." (CISP Defendants' Motion, p. 12). In considering the application of the statute of limitations, the court must observe: 1) the statute was tolled by the wrongful detention until Whitlock's release and 2) the indictment and subsequent conviction were procured by continuing corrupt and unconstitutional means, which were revived and perpetuated by the conduct of the CISP Defendants and which did not cease until shortly before his release.

41. Justice Scalia authored both the *Wallace* and the *Heck* opinions, so they must be read in conjunction and deemed to be compatible. In *Heck*, he wrote, "Even a prisoner who has fully exhausted available state remedies has no cause of action under 1983 <u>unless and until</u> the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus." *Heck*, 512 U.S. at 489 (emphasis added). So, to the extent a cause of action is proper for false imprisonment under §1983, it does not ripen until Whitlock's release.

42. Although in *Wallace,* Justice Scalia stated that the "Limitations period begins to run when the alleged false imprisonment ends," *Wallace,* 127 S.Ct. at 1096, he recognized that "it is 'the standard rule' that [accrual occurs] when the plaintiff has <u>complete</u> and present cause of action." *Id.* at 1095. Emphasis Added. *Wallace* was factually distinguishable. The wrongful conduct all occurred prior to the plaintiff's trial. He was thereafter imprisoned, not by anything that was contemporaneously done to keep him in prison, but by the unconstitutional conduct that occurred at the time of his arrest. Those facts differ markedly from Whitlock who was subject to wrongful conduct throughout his twenty-one year incarceration, begun initially by Ray, Parrish,

16

Eckerty and McFatridge and carried on in later years by the CISP Defendants. Thus, the tortious conduct was not completed until Whitlock's release.

43.  Illinois liberally provides for the equitable tolling of the statute of limitations. The court in *Dunn v. Grant Hospital of Chicago*, No. 95 C 3699, 1997 WL 51450 (N.D. Ill., Jan. 30, 1997), applying Illinois law, explained the circumstances under which a statute of limitation is tolled:

> The equitable tolling doctrine does not require that the plaintiff show any misconduct on the part of the defendant. Instead, equitable tolling permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim. The doctrine assumes that the plaintiff knows that he has been injured, and thus the statute of limitations is deemed to have begun to run. However, the statute of limitations can be equitably tolled when the plaintiff cannot obtain information necessary to decide whether the injury is due to wrongdoing and, if so, wrongdoing by the defendant, or when the plaintiff is excusably ignorant of the limitations period.

*Dunn* at *3 (internal quotations omitted). *See also Moore v. Morales*, 415 F. Supp. 2d 891 (N.D. Ill. 2006) (denying a motion to dismiss because the plaintiff pleaded sufficient facts for the statute of limitation to be tolled).

44.  The Complaint alleges that the CISP Defendants gained knowledge of the concealed and suppressed favorable and exculpatory material, diverted the investigation from other credible suspects and manipulated and fabricated testimony. Having full knowledge of the conduct which resulted in Whitlock's wrongful arrest and incarceration, the CISP Defendants made it their own by taking steps to perpetuate and cover-up the false imprisonment. Illinois would deem this to be a continuing tort.

### IV.  Conclusion

For the foregoing reasons, Plaintiff Herbert Whitlock prays that the CISP Defendants' motion to dismiss Counts II and III be denied.

...
...

                            HERBERT WHITLOCK

              By:    /s/ Ronald H. Balson
                      One of his attorneys

Ronald H. Balson (ARDC #00105074)
rhbalson@michaelbest.com
Carrie A. Hall (ARDC #6269884)
cahall@michaelbest.com
Michael Best & Friedrich LLP
Two Prudential Plaza
180 North Stetson Avenue, Suite 2000
Chicago, IL 60601
(312) 222-0800
Fax: (312) 222-0818

- and -

Richard S. Kling  rkling@kentlaw.edu
Susana Ortiz  sortiz@kentlaw.edu
Law Offices of Richard Kling
565 West Adams Street, 6th Floor
Chicago, IL 60661-3691
(312) 906-5155
Fax: (312) 906-5299

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a copy of the foregoing Plaintiff's Response to Current Illinois State Police Officials' Motion to Dismiss for Judgment on the Pleadings for Counts II and III of the Complaint was served upon the following counsel via the Court's CM/ECF system on the 7th day of August 2008, before the hour of 6:00 p.m.:

Attorneys for City of Paris, Gene Ray, James Parrish and Jack Eckerty:
James G. Sotos   Elizabeth A. Ekl   Sara M. Cliffe
jsotos@jsotoslaw.com   eekl@jsotoslaw.com   scliffe@jsotoslaw.com

Attorneys for Michael McFatridge:
Terry A. Ekl   Vincent C. Mancini
tekl@eklwilliams.com   vmancini@eklwilliams.com

Attorneys for Edgar County:
Michael E. Raub   Brian M. Smith
mraub@hrva.com   bsmith@hrva.com

Attorneys for Steven M. Fermon, Diane Carper, Charles E. Brueggemann, Andre Parker, Kenneth Kaupas and Jeff Marlow:
Iain D. Johnston   Heidi Steiner
ijohnston@johnstongreene.com   hsteiner@johnstongreene.com

A copy of the foregoing Plaintiff's Response to Current Illinois State Police Officials' Motion to Dismiss for Judgment on the Pleadings for Counts II and III of the Complaint was served upon the following defendant via U.S. First-Class Mail on the 7th day of August 2008, by deposit at Two Prudential Plaza, 180 North Stetson Avenue, Chicago, IL 60601:

Deborah Rienbolt
2116 East Keys Avenue
Springfield, IL 62702

/s/ Ronald H. Balson

S:\CLIENT\023996\0001\C0875656.2