```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE CENTRAL DISTRICT OF ILLINOIS
 3                     STATE OF ILLINOIS
 4
     GORDON RANDY STEIDL,
 5            Plaintiff,
                  vs.                  No. 05-CV-2127
 6   CITY OF PARIS, Present and Former
     Paris Police Officials Chief
 7   Gene Ray and Detective James Parrish;
     former Illinois State Trooper Jack
 8   Eckerty; former Edgar County
     State's Attorney Michael McFatridge;
 9   EDGAR COUNTY; and Illinois State
     Police Officials Steven M. Fermon,
10   Diane Carper, Charles E. Brueggemann
     Andre Parker and Kenneth Kaupus,
11                   Defendants.
     ------------------------------------
12   HERBERT WHITLOCK,
                 Plaintiff,
13                vs.                   No. 08-CV-2055
     CITY OF PARIS, Present and Former
14   Paris Police Officials Chief Gene
     Ray and Detective James Parrish;
15   former Illinois State Trooper Jack
     Eckerty; former Edgar County
16   State's Attorney Michael McFatridge;
     EDGAR COUNTY; and Illinois State
17   Police Officials Steven M. Fermon,
     Diane Carper, Charles E. Brueggemann
18   Andre Parker, Kenneth Kaupus and
     Jeff Marlow; and Debra Rienbolt,
19                   Defendants.
20           DEPOSITION OF DENNIS WALLER
                 November 13, 2009
21                 10:00 a.m.
22
           Barbara A. Glover, CSR # 084-001223
23      Area Wide Reporting and Video Conferencing
              301 West White Street
24         Champaign, Illinois  61820          800.747.6789
```

```
 1      APPEARANCES:
 2

        For Plaintiff Gordon Randy Steidl:
 3

                Jan Susler and Flint Taylor
 4              People's Law Office
                1180 N. Milwaukee Avenue, 3rd Floor
 5              Chicago, Illinois   60622
                773.235.0070 ext. 118
 6
 7

        For Plaintiff Herbert Whitlock:
 8

                Ronald Balson
 9              Michael, Best & Friedrich, LLP
                Two Prudential Plaza
10              180 North Stetson Avenue, Suite 2000
                Chicago, Illinois   60601
11              312.222.0800
12
13      For Defendant Edgar County:
14

                Michael Raub
15              Heyl, Royster, Voelker & Allen
               102 East Main Street, Suite 300
16              Urbana, Illinois   61801
                217.344.0060
17
18

        For Defendants Steven M. Fermon, Diane Carper,
19      Charles E. Brueggemann, Andre Parker, Kenneth
        Kaupus and Jeffrey Marlow:
20
21              Iain Johnston
                Johnston Greene, LLC
22              542 South Dearborn Street, Suite 1310
                Chicago, Illinois   60605
23              312.341.9720
24
```

```
1    For Defendant Michael McFatridge:

2
                Vincent Mancini
3               Ekl Williams
                901 Warrenville Road, Suite 175
4               Lisle, Illinois   60532
                630.654.0045

5

6

7    For Defendants City of Paris, James Parrish, Jack
     Eckerty and Gene Ray:

8

9               Elizabeth A. Ekl
                James G. Sotos & Associates
10              550 East Devon, Suite 150
                Itasca, Illinois   60143
11              630.735.3300

12

13   For Defendants Jeff Marlow and Andre Parker:

14
                Webber & Thies
15              Kara Wade, appearing telephonically
                202 Lincoln Square
16              Urbana, Illinois    61801
                217.367.1126

17

18

19

20

21

22

23

24
```

1                          I N D E X

2

3

4       EXAMINATION CONDUCTED BY:                    PAGE

5

              By:  Ms. Ekl                           5
6             By:  Mr. Johnston                     249
              By:  Mr. Mancini                      303
7             By:  Mr. Raub                         328
              By:  Mr. Taylor                       332
8             By:  Mr. Balson                       349
              By:  Ms. Ekl                          351

9

10

11                      E X H I B I T S

12      EXHIBIT                                      PAGE

13

        Waller Exhibit No. 1                        11
14      Waller Exhibit No. 2                        101
        Waller Exhibit No. 3                        103
15      Waller Exhibit No. 4                        167
        Waller Exhibit No. 5                        176
16      Waller Group Exhibit No. 6                  185
        Waller Exhibit No. 7                        334
17      Waller Exhibit No. 8                        337

18

19

20

21

22

23

24

5

```
 1                    DENNIS WALLER
 2    the deponent herein, called as a witness, after
 3    having been first duly sworn, was examined and
 4    testified as follows:
 5
 6              EXAMINATION CONDUCTED
 7              BY:  MS. EKL
 8
 9         Q.   For the record, this is the deposition
10    of Dennis Waller being taken in both the cases of
11    Steidl versus City of Paris and Whitlock versus
12    City of Paris that were filed in the Central
13    District of Illinois.  The deposition is being
14    taken pursuant to notice of plaintiffs'
15    attorneys.
16              Mr. Waller, could you please state
17    your first and last name and spell your last name
18    for the record?
19         A.   Dennis Waller, W-a-l-l-e-r.
20         Q.   And, Mr. Waller, I don't know if you
21    recall.  I've met you before.  My name is
22    Elizabeth Ekl.  In these proceedings I represent
23    the City of Paris, Gene Ray, Jack Eckerty, and
24    Jim Parrish.  I met you before in the Hobley
```

1    matter several years ago.

2         A.   Okay.

3         Q.   You were hired in this case to render

4    opinions regarding police practices.   Is that

5    correct?

6         A.   No, ma'am.

7         Q.   What were you hired to do?

8         A.   I was hired to make an objective

9    assessment of the information and then provide

10   opinions, and then if they determined those

11   opinions were useful, then they would use it.   If

12   not, they would not.

13        Q.   You were hired by Randy Steidl's

14   attorneys as well as Herbert Whitlock's

15   attorneys?

16        A.   Yes, ma'am.

17        Q.   And your opinions are in relation to

18   the area of police practices.   Is that correct?

19        A.   That is correct.

20        Q.   Who are you employed by?  Who is your

21   employer?

22        A.   I'm the principal partner, owner and

23   operator of Waller & Associates, LLC.

24        Q.   And what percentage of that business

1    do you own?

2         A.    Probably 95 percent.

3         Q.    Where is that business located?

4         A.    Brookfield, Wisconsin.

5         Q.    And what's the address there?

6         A.    14665 West Lisbon Road, L-i-s-b-o-n,

7    Suite 2F, as in Frank, Brookfield, 53005.

8         Q.    What is the business of Waller &

9    Associates?

10        A.    Two-fold:  It's a form for conducting

11   consulting and sometimes expert witness

12   testimony, primarily in police-related

13   litigation, and also we are a licensed private

14   detective agency.

15        Q.    Approximately how much of the

16   company's income is derived from private

17   investigative work?

18        A.    It varies by year.  Somewhere probably

19   between 20, 25 percent.

20        Q.    And approximately what percentage is

21   derived from consulting work?

22        A.    The rest.

23        Q.    You also mentioned expert testimony.

24   Are you lumping expert together in with

1    consulting?

2         A.    Actually, expert witness testimony is

3    -- probably hours-wise is a small percentage.    I

4    mean if you consider I do a lot of depositions.

5    I sometimes testify in court, but the primary

6    bulk of the work I do is case review and

7    development of opinions and reports, that sort of

8    thing.

9         Q.    Including cases in which you

10   ultimately don't have to write a written opinion,

11   approximately how many cases do you review each

12   year?

13        A.    It varies.    Probably between 25 and

14   40.

15        Q.    Can you approximate out of those 25 to

16   40 cases a percentage of how many you actually

17   end up rendering opinions where you have to write

18   written reports?

19        A.    No.    I couldn't give you an accurate

20   percentage.    It would just be a guess.    It

21   varies.

22        Q.    Would you say that generally it's more

23   than 50 percent of the cases?

24        A.    Where I render a report?

1        Q.    Yes.

2        A.    A written report, yes, ma'am.

3        Q.    In regard to expert testimony, in what

4    types of cases have you rendered opinions and

5    have you testified as an expert?

6        A.    The primary areas deal with use of

7    force, vehicle pursuits, and investigative

8    practices.  There's also other issues:  training,

9    discipline, personnel matters, administrative

10    issues, but the majority of the cases I work on

11    deal with either use of force, pursuits, or

12    investigations.

13        Q.    Of those cases, about what percentage

14    of those are you hired by the plaintiffs'

15    attorneys?

16        A.    Overall, I'm retained approximately 55

17    percent by defense and about 45 percent by

18    plaintiff.

19        Q.    And I guess I should ask, are those

20    primarily civil cases, or do you also

21    occasionally render opinions in criminal cases?

22        A.    Occasionally.  A very small

23    percentage.  So I guess the correct answer to

24    your question would be primarily civil.

1      Q.    What was the company Waller &

2    Associates income for the year 2009?

3      A.    I don't know.  We're not done yet.

4      Q.    How about 2008?

5      A.    I don't have an exact figure.  It was

6    over three hundred thousand, the gross.

7      Q.    Do you, yourself, derive any income

8    from any other source other than your employment

9    through Waller & Associates?

10     A.    I have a small retirement from the

11   State of Wisconsin Retirement System.  My wife is

12   employed full-time.  I think that's primarily it.

13     Q.    And the money that you derive from the

14   State of Wisconsin is that from your previous

15   employment in law enforcement or --

16     A.    In law enforcement and as an

17   instructor at the University of Wisconsin,

18   Platteville.

19     Q.    Is that previous employment with the

20   University of Wisconsin, or are you still

21   currently on their payroll?

22     A.    Previous.  That was full time.

23            MS. EKL:  Let's go ahead and mark this

24   as Exhibit No. 1.

1                    (At this point the court reporter

2                    marked Waller Exhibit No. 1 for

3                    purposes of identification.)

4    BY MS. EKL:

5          Q.   I'm handing you what we've marked

6    Exhibit No. 1.

7          A.   Yes, ma'am.

8          Q.   Can you take a look at that and tell

9    me what all is comprised in that stack of

10   documents that's been marked as Exhibit 1?

11         A.   The first three pages are my --

12   comprise my curriculum vitae.  The fourth page is

13   a fee schedule for consulting and expert witness

14   services, and the last pages are a list of trial

15   and deposition testimony from June of 2004 to the

16   present, and the present was -- I guess it was

17   inclusive of October 2nd.

18         Q.   And that would have been October 2nd

19   of this year?

20         A.   Yes, ma'am.

21         Q.   Then the last page of that exhibit

22   appears to be a facsimile cover dated

23   October 2nd, 2009, between yourself and

24   Ms. Susler.  Is that correct?

1          A.    I'm sorry.

2          Q.    It's not on your copy.  Never mind.

3    Never mind.

4          A.    Just for clarification, the list of

5    cases would be through October 1st, 2009.

6          Q.    Since October 1st of 2009, have there

7    been any additional cases that you've testified

8    in in either a deposition or at trial or some

9    sort of hearing?

10         A.    Yes, ma'am.

11         Q.    What are the names of those cases?

12         A.    One I remember offhand would be

13   Thornton versus City of Jackson, et al., and that

14   would be in Hinds County Circuit Court,

15   Mississippi.  The attorney who retained me is

16   J. Christopher Klotz, K-l-o-t-z, and there may

17   have been another deposition and/or trial.  I

18   don't recall that offhand.

19         Q.    Your testimony in the Thornton case,

20   was that in a deposition or at trial?

21         A.    Trial, ma'am.

22         Q.    And were you hired by the plaintiff or

23   the defendant in that case?

24         A.    I was hired by the plaintiff's

1    attorney, but the plaintiff was actually a police

2    officer.

3         Q.    What type of a case was that?

4         A.    Police pursuit.  It was an off duty

5    police officer, uninvolved third party had severe

6    injuries.

7         Q.    We were also provided with a facsimile

8    cover sheet that indicates as of October 2nd of

9    2009 that you had billed and been paid

10   approximately $30,000.  Does that sound accurate

11   to you?

12        A.    As of the time.

13        Q.    As of that time?

14        A.    Yes, ma'am.

15        Q.    Okay.  Has that changed since October

16   2nd?  Have you been paid additional money in

17   relation to these cases?

18        A.    I might have received a partial

19   payment.  I don't recall specifically.  I know

20   that there is a substantial amount outstanding.

21        Q.    The facsimile cover references that

22   that you estimate billing another $18,500.  This

23   was as of October 2nd, 2009.

24              Would that have been inclusive of the

1  additional money that you received plus what's

2  outstanding, or is there something more out

3  there?

4          A.   I'm sorry.  Could you repeat the

5  question?

6          Q.   Sure.  Sure.  The facsimile cover

7  indicates that you estimated billing from October

8  2nd until -- let me just read this to you:

9  Combined with expenses that were incurred, I

10  estimate billing another $18,500 as of 5:00 p.m.

11  October 2nd, 2009.

12              Have you, in fact, incurred or billed

13  them another $18,500 on top of the $30,000?

14          A.   I think it's been more than that,

15  ma'am.

16          Q.   And how much do you think that it's

17  been?

18          A.   I don't know.  I would say that

19  we're -- I mean a guess, without crunching the

20  numbers, it would be probably about 350 hours, so

21  multiply that by two hundred.

22          Q.   Directing you specifically to the

23  third -- I believe it's the third page, the fee

24  schedule --

1          A.    That would be the fourth page, ma'am.

2          Q.    I'm sorry, fourth page.  It indicates

3    that your retainer in these cases was $4,000.  Is

4    that correct?

5          A.    Yes, ma'am.

6          Q.    Is that your -- the retainer that you

7    regularly request in connection with your

8    consulting, or is that different than what you

9    normally charge?

10         A.    That is my standard retainer.

11         Q.    And your hourly rate is $200 an hour?

12         A.    Yes, ma'am.

13         Q.    This also indicates that you charge a

14   minimum of $2,000 per deposition as well as two

15   thousand per business day for trial.  Correct?

16         A.    Yes, ma'am.

17         Q.    Your curriculum vitae on the first

18   page indicates that your current occupation is as

19   a police practices consultant or expert witness

20   and certified legal investigator.  Correct?

21         A.    Yes, ma'am.

22         Q.    Have you had -- have you held that as

23   your occupation since 1992, both of those

24   different positions?

1          A.    Yes, ma'am.

2          Q.    Is that when you formed Waller &

3     Associates?

4          A.    That's when I -- there have been a

5     couple minor name changes, but, yes, ma'am,

6     that's when I formulated my own company in '92.

7          Q.    So since '92 you've been working for

8     yourself under one name or another?

9          A.    Yes, ma'am.

10         Q.    In what jurisdictions have you been

11    hired as a police practices consultant?

12         A.    Well, in 32 states, so I'll try to

13    list them off the top of my head, if you'd like.

14    California, Nevada, Illinois, Minnesota, Iowa,

15    Michigan, Wisconsin, Missouri, Kentucky,

16    Tennessee, Mississippi, Florida, Georgia, New

17    Jersey, Pennsylvania, New York, Maine -- there

18    have been a couple I believe in South Dakota,

19    possibly Wyoming.  I'm not sure if I said

20    Arizona, New Mexico, Arkansas, Texas, Kansas --

21    I'm not sure about Kansas.  It's Kansas City, but

22    I think those are all Missouri cases; Indiana,

23    Ohio.

24              Off the top of my head -- I'm not sure

 1    if I've got 32, but that's...

 2         Q.    And I take it you've also been --

 3    well, I know from personal experience you've also

 4    been hired in other cases in Illinois.  Correct?

 5         A.    Many cases in Illinois, yes, ma'am.

 6         Q.    Have you testified in each of those

 7    jurisdictions?

 8         A.    Probably not.  If you talk about trial

 9    testimony?

10         Q.    Correct.

11         A.    Probably not in all of them.  Would

12    you like me to try to give you a --

13         Q.    That's okay.  And approximately how

14    many states have you been qualified by a judge as

15    an expert in the field of police practices?

16         A.    In every state where I've testified.

17         Q.    Approximately how many states, though,

18    have you testified in in the field of police

19    practices?

20         A.    Well, that's where I've testified.

21    Idaho is also another one.  Every place I've

22    testified I've been accepted as an expert witness

23    in police practices, so Texas, Idaho, Nevada,

24    Illinois, Indiana, Michigan, Wisconsin,

1    Minnesota, Iowa, Arkansas, Mississippi, Alabama,

2    Florida, Georgia, New Jersey.  I think

3    Pennsylvania.  I was hired by the Attorney

4    General's Office there; Arizona, the Attorney

5    General's Office there; Texas Attorney General's

6    Office; City of Atlanta.

7           That's off the top of my head.

8        Q.   Have you been qualified by a judge in

9    the area of police practices in both state court

10   and federal court?

11       A.   Yes, ma'am.

12       Q.   Have your opinions ever been barred in

13   any court of law?

14       A.   Not to my knowledge.

15       Q.   When you say certified legal

16   investigator, could you describe what you mean by

17   that?

18       A.   The National Association of Legal

19   Investigators, referred to by the acronym NALI,

20   has a certification process.  It's very

21   comprehensive.

22           It includes day-long testing which

23   includes a very comprehensive written test,

24   essays.  You have to write a position paper.  You

1    have to go through a review of -- I think two

2    different panel reviews:  one I think dealing

3    with ethics and one dealing with general

4    knowledge, and there's a requirement that --

5    experience and background, so once you complete

6    all that and you maintain -- you get the

7    certification.

8            Then every three years you have to

9    have so many continuing education credits in

10   approved areas to maintain it, and I've

11   maintained that since 1988.

12       Q.   What's the difference between -- if

13   any, between a legal investigator and a private

14   investigator that's not certified?

15       A.   Well, pretty much anybody who can get

16   a license can be a private investigator.

17            A certified legal investigator, I

18   think there's less than 125 in the country, so

19   it's -- it's a -- shows or it proves an

20   established degree of competence that's much

21   higher than simply getting your license and

22   putting out your shingle.

23       Q.   Is there some difference in terms of

24   the area of expertise as an investigator?  I

1    guess I'm just trying to figure out exactly what

2    that means to be a legal investigator as opposed

3    to any other type of investigator?

4         A.    That's the designation.  I guess it

5    deals primarily with the legal system, both

6    criminal and civil, as opposed to maybe an

7    insurance investigator or adjustor, that sort of

8    thing.

9         Q.    Do you currently hold any other type

10   of certifications?

11        A.    Again, I don't know how to answer that

12   question specifically.  I have a number of

13   certifications in law enforcement that some would

14   probably -- would just have to be reactivated.

15             Others, I would have to go through a

16   recertification process, and those deal with

17   specialized instructor status in law enforcement.

18        Q.    But I'm talking about as of today,

19   ones that are currently active, not ones that you

20   could reactivate but ones that are currently

21   active.

22        A.    Well, I've been trained as an Assessor

23   for the Commission on Accreditation for Law

24   Enforcement Agencies.  I'm assuming that that's

1    still active.

2              I'm a diplomate of the American Board

3    of Law Enforcement Experts.  That is still

4    active; a Fellow of the American College of

5    Forensic Examiners, that's still active.

6         Q.    Are those also certifications, or are

7    those associations?

8         A.    I don't know how to answer that.  It's

9    a status.  I'm sure that you have to meet certain

10   requirements to obtain that status, so I'm

11   assuming those are certifications.

12        Q.    Do you receive anything in the mail

13   yearly saying you need a certain number of

14   continuing education classes in order to meet a

15   certification for those positions, or what do you

16   need to continue to hold those positions?

17        A.    No, ma'am, I don't.  Based on the -- I

18   think the tenure of how long I've held those

19   positions, at least the diplomate and fellow

20   status, I do not need to meet any ongoing

21   requirements.

22        Q.    Prior to becoming a consultant and

23   expert witness you were in law enforcement for a

24   number of years.  Correct?

 1        A.    Both law enforcement, education, and

 2   training, yes, ma'am.

 3        Q.    When did you first become a law

 4   enforcement officer?

 5        A.    My first sworn position was in 1969.

 6   Between my junior and senior years at Michigan

 7   State University I was with the Flint, Michigan,

 8   Police Department.

 9        Q.    And what was your position or title

10   with the Flint Police Department?

11        A.    Police officer.

12        Q.    What type of training did you undergo

13   while you were with the Flint Police Department?

14        A.    An extremely abbreviated academy,

15   probably about 48 hours, and then we were

16   assigned as a second officer in a two-man --

17   two-man assignment or two officer assignment.

18        Q.    How big was the Flint Police

19   Department?

20        A.    My best guess or recollection was it

21   was about three or four hundred officers back

22   then, and this was summer employment that was --

23   did a two-fold purpose.  They were trying to

24   attract college-educated police officers for

1    employment, full-term employment, and also it

2    gave them an additional base of manpower in the

3    summer months.

4         Q.   Was it considered an internship, or

5    was it a full-time position or something else?

6         A.   Full-time paid position, but it was a

7    temporary position.

8         Q.   Okay.  So how many months,

9    approximately, were you with the Flint Police

10   Department?

11        A.   About four.

12        Q.   Where did you go from there?

13        A.   Back to school.

14        Q.   What was your next full-time law

15   enforcement position?

16        A.   Full-time was with Metro Dade Police

17   Department in -- are you talking about sworn

18   position?

19        Q.   Right.

20        A.   Full time with Metro Dade Police

21   Department in Miami.

22        Q.   Prior to working for Metro Dade you

23   worked as the Washtenaw County Sheriff's

24   Department for a period of time?

1          A.    Yes, ma'am.

2          Q.    And what type of position did you hold

3     there?

4          A.    I was a part-time deputy sheriff.

5          Q.    When you went to Washtenaw, did you

6     participate in any additional training from when

7     you were at Flint?

8          A.    Yes, ma'am.

9          Q.    What additional training did you

10    receive at Washtenaw?

11         A.    Firearms, crowd control, I worked at

12    times with their training unit, involved with

13    developing different training programs; also --

14    let's see, that's the best I can remember.

15         Q.    What type of training programs were

16    you developing after you -- while you were with

17    Washtenaw?

18         A.    Well, I had a dual function at that

19    time.  My full-time employment was as a regional

20    police planner with the Southeast Michigan

21    Council of Governments out of -- covered the

22    seven counties surrounding Detroit, including the

23    City of Detroit, and one of those counties was

24    Washtenaw, and so my regular full-time employment

1    was I was the staff person to review all federal

2    law enforcement and organized crime grants for

3    the region, and part of that I helped agencies

4    develop different grants for different programs,

5    so -- and part of that was an effort to develop

6    regional cooperative agreements.

7            So we worked on developing regional

8    law enforcement training academies, because these

9    different agencies would have -- like Detroit

10   Police Department had and academy, Wayne County

11   Sheriff had an academy, Oakland Sheriff had their

12   academy throughout, and what we were trying to do

13   is develop a regional concept where you could

14   have better academies serving a variety of areas

15   to promote professionalism, so I was involved in

16   that and then funneling the grants that dealt

17   with law enforcement training then within

18   Washtenaw County Sheriff's Department,

19   occasionally working on funding sources but also

20   the development of actual -- I think it was

21   primarily in-service training topics at the time.

22       Q.   So when you were working with the

23   training unit, was that in your capacity as a

24   regional police planner, or was that in your

1    capacity as a deputy for Washtenaw, or was it

2    somehow combined?

3         A.    Primarily as a part-time deputy, and

4    sometimes, you know, that division was a little

5    blurred.

6         Q.    Were you, yourself, actually doing the

7    training, or were you -- how was your -- let me

8    rephrase that.

9              What was your involvement or role in

10   the development of these in-house training

11   programs?

12        A.    I worked with a sergeant and the

13   lieutenant in the training, and what I would do

14   is advise them what other agencies were doing and

15   sometimes I would get course curriculums, that

16   sort of thing, present it to them and then help

17   them establish a curriculum to provide training

18   for the personnel in Washtenaw County.

19        Q.    So at that early stage of your career,

20   you weren't actually out there being the one to

21   train the officers, though.  Is that correct?

22        A.    Actually, during that time I became a

23   Certified Law Enforcement Instructor in Michigan.

24   I did -- I participated in some training.

1             It was -- but, again, I had other

2    responsibilities, a full-time job.  I was going

3    to grad school part-time, and I was doing that.

4        Q.   As a regional police planner were

5    there any other things you were involved in other

6    than what you've just described in terms of

7    reviewing the grants and working with developing

8    training programs?

9        A.   Yes, ma'am.  I drafted the regional

10   goals and guidelines to promote regionalism in

11   the economy of scale.  I was the primary staff

12   person in there and responsible for doing that

13   annually.

14             I also -- you have to remember that

15   the seven counties surrounding Detroit were kind

16   of like Chicago and the contiguous counties.  We

17   had a greater population than the rest of the

18   state.

19             Our regional staff was I think five or

20   ten times bigger than the state staff, so the

21   conduit came from the feds through the state to

22   the region.  Southeast Michigan got the lion's

23   share of the funding, and consequently we had

24   that ongoing relationship with the state and

 1   beyond them with the law enforcement assistance

 2   administration, so we ended up doing some

 3   things -- staff things for the state just because

 4   they were minimally staffed, and we had the

 5   people.

 6        Q.   I understand.  How many other people

 7   did you work with that had similar type duties

 8   and responsibilities?

 9        A.   Don't hold -- I think when -- at one

10   point there was -- just a rough guess, would

11   probably be 15 to 20 staff people just in public

12   safety.

13             Now, Southeast Michigan Council of

14   Governments had other glamorous things like

15   infrastructure, water quality.  You know, those

16   were things that I really wasn't involved in.

17             We were just involved -- the staff for

18   public safety, and part of that planning

19   component was, I would say, somewhere between 15

20   and 20.

21             That may be a little high or may be a

22   little low.  It was a long time ago.

23        Q.   Was -- your position as a regional

24   police planner was that considered a full-time

 1    position or a part-time position?

 2         A.    Full time.

 3         Q.    So how much of your time did you spend

 4    as a -- working as a regional police planner

 5    during the period of time when you were also a

 6    part-time deputy?

 7         A.    That was kind of, again, you worked

 8    more when -- it wasn't a regular eight-hour day.

 9              If you were helping a particular

10    agency in the seven counties develop a grant, you

11    might spend two or three days, ten, 12-hour days

12    with them; have to go into downtown Detroit for

13    staff meetings and that.

14              Other times, sometimes you would be

15    out talking to different agencies, you know, that

16    they would say, well, we want to submit a

17    proposal for police community relations, so part

18    of my responsibilities would be to go to talk to

19    the chief or the relevant administrators and say:

20    Here is reality.  Here is how much money is in

21    there for southeast Michigan.  Here are the

22    priorities for that.

23              Your grant either does fit or does not

24    fit in here.  If you want to change it, you may

 1    have a chance for funding or, you know, you don't

 2    have a snowball's chance of being funded, because

 3    that money is basically committed to Detroit or

 4    somewhere else and let them know before we went

 5    and did a whole lot of work and then say but next

 6    year, you're in a different funding cycle.  This

 7    is -- these are the areas in -- where they're

 8    looking for grant applications in the general

 9    area that you want to be funded, so maybe not

10    this year but next year, and so forth and so on.

11           So part of it was the informal

12    communications and development, the establishment

13    of rapport and then, you know, while I was there,

14    where do you send your people to be trained, you

15    know.  It could be -- depending on which county

16    it was, well, we send them to Detroit PD or we

17    send them wherever we can get them in.  Okay?

18           Would you be interested in a regional

19    training consortium, you know, da, da, da, da, if

20    you could get, you know, and they were always

21    interested if they could get funding.  That was

22    the carrot.

23           Q.   How much time did you then spend in

24    addition to doing all that as a deputy?  When you

1   say it's part-time, how many, approximately, per

2   week did you work then as a deputy?

3          A.    As a general rule, usually worked the

4   shift on the road and then other things.  If the

5   students were rioting at the University of

6   Michigan, you would get called out for that.  If

7   there was a big football game, sometimes I would

8   work crowd control with that.

9              If the administrative captain had a

10  pet project, you know, I would get an opportunity

11  frequently.

12         Q.    About how many hours do you think?

13         A.    It varied.  I mean a minimum of eight

14  to probably 24, 40 at times, but that was rare.

15         Q.    Why was it that you left your position

16  as a regional police planner in 1971?

17         A.    The law enforcement assistance

18  administration was winding down.  It was a great

19  idea in the late '60s.  It had peaked its

20  funding.  It was going down.

21             I was positioned where, I don't know,

22  I could probably still be working there, if I

23  wanted, I was high enough up, but there were some

24  layoffs and such, and I realized that I wanted

1    to -- needed more experience as a full-time law

2    enforcement officer; was looking for an

3    opportunity to do that.

4              I don't recall exactly what was going

5    on at the time.  I know that the positions in the

6    Detroit area that people had talked to me about

7    before were kind of dried up or frozen, and there

8    was -- we were connected to Metro Dade through

9    Michigan State University, so I applied and went

10   down there.

11       Q.   Your CV indicates that you were a

12   deputy sheriff from 1970 to '71.  How many actual

13   months did that include?

14       A.   I was actually hired as a deputy

15   before I graduated.  They offered me a full-time

16   position working drugs.  I turned it down, so --

17   and then probably until I started the academy in

18   Metro Dade, which, I don't know, May or June

19   of '71.

20       Q.   So when did you -- how many months,

21   though, would that be?  When did you start in '70

22   through May or June of '71?

23       A.   Sometime in late winter, early spring

24   through -- so a little over a year.

1          Q.    And in regard to your employment

2    with -- as a regional police planner, again, you

3    listed 1970 to '71.  About how many months did

4    you do that?

5          A.    About a year.  It was my first

6    full-time job out of college.

7          Q.    You went -- first went to Metro Dade

8    in 1971.  What month was that when you started?

9          A.    I don't recall exactly.  It was May or

10   June, whenever -- the academy was 20 weeks.  I

11   graduated in the end of October, toward the end

12   of October.

13         Q.    So you're saying that you started in

14   May or June.  That's when you actually entered

15   the academy, and then it was after that period of

16   time the 20 weeks that you then came out as a

17   sworn officer?

18         A.    Yes, ma'am.

19         Q.    Okay.  How many officers were there at

20   Metro Dade while you were there, approximately?

21         A.    My guess would be somewhere between

22   two and three thousand.

23         Q.    And during the time period that you

24   were there, which your CV indicates was from '71

1      to '72, what positions or titles did you hold?

2           A.    Police officer.

3           Q.    Were you there for -- well,

4      approximately how many months were you there?

5           A.    I think 19, something like that.

6      Eighteen, 19.

7           Q.    And that included the period of time

8      when you were doing that 20 weeks of training?

9           A.    Yes, ma'am.

10          Q.    Why was it that you left Metro Dade?

11          A.    I had started grad school when I lived

12     in Michigan.  I wanted to go back.

13                Our shift rotation with Metro Dade was

14     such that it conflicted with the shift -- or with

15     the course offerings at Florida International

16     University, so I had planned to go with Miami

17     Beach, but between when I left Metro Dade and

18     before I could start with Miami Beach, I broke my

19     knee and ankle in a motorcycle accident, so --

20     and then when I was healthy again, there was a

21     hiring freeze, affirmative action lawsuit or

22     something, and so I went with South Miami.  They

23     offered me a position.

24          Q.    As a police officer with Metro Dade

1    what types of responsibilities did you have?

2          A.    I did a variety of things.  I was

3    primarily road patrol.  I had a lot of friends

4    that worked in vice intelligence and narcotics,

5    and I was -- I had a lot of street sources, so

6    they would frequently bring me in on overtime or

7    give me a designated assignment to work with them

8    when they were doing arrest warrants, search

9    warrants, because they always like a uniform

10   around to go in first or to be the -- make sure

11   that nobody can say we didn't know they were

12   police.

13          So I did a lot of work on both

14   extra -- overtime assignments with them and -- or

15   be temporarily reassigned, and that was pretty

16   much it.

17          Q.    When you said you had --

18          A.    Excuse me.  And I worked -- I was

19   assigned to the crowd control detachment for both

20   '72 conventions, the Democratic and Republic ones

21   at Miami Beach.

22          Q.    When you said that you had a lot of

23   street sources, what -- could you describe what

24   you mean by street sources?  I want to make sure

1    my understanding is the same as yours.

2         A.    Basically prostitutes, drug users,

3    drug dealers, people who hung around in the bars.

4              I was very active, wrote a lot of

5    interview cards or field interrogation cards, so

6    I would develop information.

7              A lot of times, you know, one

8    prostitute was mad at another or a pimp beat her

9    up, or what have you, then they might give you

10   information, or the same way with small time drug

11   dealers, that sort of thing.

12        Q.    Would you then -- when you said that

13   you had friends who were in vice, would you then

14   kind of steer those sources toward your fellow

15   officers that were in vice so that they could use

16   the information in their own investigations?

17        A.    Yeah, two-fold.  Those are guys I

18   trusted enough that they weren't going to burn

19   one of my street sources.  It's not like dealing

20   with the feds, but the -- or give them

21   information and say, look, you know, I heard on

22   the street that so and so is operating out of

23   this location or this car.  Here's the tag

24   number.

1              I ran the tag, but I can't get close,

2     because I'm a marked squad.  You might want to

3     watch it, so they would do that.

4              If that worked out, they were going to

5     try to flip that person and go up the food chain,

6     you know.

7              They would frequently invite me along

8     when they made the arrest, and then -- because

9     that would sometimes help me credibility-wise and

10    give me -- you know, the people on the street

11    knew that I was connected to these guys that they

12    didn't want to see coming around.

13    Q.   So were -- would you say the majority

14    of these street sources, would you consider them

15    confidential?  They weren't people that you would

16    actually provide their names to other law

17    enforcement officers to use in the course of an

18    investigation?

19    A.   They weren't long-term like listed

20    as -- well, first of all, any money I gave them,

21    it came out of my pocket, so that was very

22    minimal.  You know, I might buy them a cup of

23    coffee or give them money for some beer, but, you

24    know, that they were going to go and -- on their

 1    own, but that was extremely minimal.

 2                 There wasn't -- at my level there

 3    wasn't a -- funds available.

 4                 Later on when I was a detective and

 5    you had an ongoing informant, you wrote it up,

 6    that sort of thing, you put -- you could get

 7    department funds, and you had to account for

 8    those.

 9                 There's a formal procedure, but this

10    was a more casual street level.  You know,

11    sometimes if our shift rotated, sometimes I

12    wouldn't see the people who were out late at

13    night, you know, for some time.

14        Q.   So were there occasions when you would

15    get just some basic information, and you just

16    turned the information that you learned from your

17    street sources over to vice, and then they could

18    investigate it further and develop it as they saw

19    fit?

20        A.   It was vice intelligence, narcotics,

21    yeah, or, you know, there was -- you've got cars

22    with New Jersey plates are in -- I worked in a

23    very low income/high crime area, so if you had --

24    it wasn't a big tourist draw.

1          If you saw, you know, expensive cars,

2     people dressed that didn't fit the area, okay,

3     give that to them for intelligence, and then they

4     would work it up, or if you could find an excuse

5     to stop them for, you know, a traffic violation

6     or something, you could identify them and -- so

7     you could either -- you could do it one of two

8     ways:  You could write the information down on a

9     piece of paper, or when you got through with your

10    field interrogation card, to turn that in, make a

11    copy, and then forward it to the people for

12    special attention maybe with a note on it or

13    something.

14         Q.   The information that you were

15    receiving were there times when you would just

16    turn it over verbally to a detective and say,

17    hey, I heard this out on the street.  You might

18    want to look into some tip that I learned from

19    one of my sources?

20         A.   Well, you've got to remember several

21    of these guys were guys that I socialized with

22    when we were off duty, so we rode motorcycles

23    together, we would attend parties together, so

24    that, to our spouses' chagrin, would be the

1    general topic of conversation, so, sure,

2    sometimes that was passed on verbally, or, you

3    know, hey, have you seen so and so lately?  You

4    know, no, or I would ask them, I said, you know,

5    the guy used to hang around at Eddie's Dive-in

6    Bar.

7           Oh, no, he's over at the Liberty City

8    Pool now, so, okay, you know, so it would be back

9    and forth.

10         Q.   Back then were there any type of

11   policies or practices within the department that

12   required you to keep detailed accounting of who

13   you learned information from and where you -- who

14   you gave the information to once you learned it?

15         A.   I'm sure there was if you were working

16   a long-term investigation, but not at the street

17   level for uniformed officers.

18           I mean I might get information one

19   time from a source that might dry up.  I may

20   never see them again, what have you, or it might

21   be a regular basis, but it was more informal.

22         Q.   And the same thing in regard to times

23   when you might give them money for coffee or

24   money for beer or something, were there any type

1    of policies or procedures at that point in time

2    when you were with Metro Dade for how you would,

3    if all, document what you were giving them?

4         A.   No, it would be it was usually like a

5    buck, maybe two, and it was like, you know, they

6    would say?  Hey, officer, let me hold a dollar.

7              Hey, if you want to hold a dollar,

8    it's going to cost you some information.  Tell me

9    about somebody or, you know, and you go -- or it

10   would be -- well, I remember one street

11   prostitute lived with a drug dealer, and I had

12   arrested her a number of times on nuisance

13   violations, and she just said, leave me -- what

14   do I have to do to make you go away?  You're

15   hurting my business.

16             I said give me some information.

17             Well, I'm not going to tell you about

18   whoever she was living you in the motel room.

19             I said, well, don't tell me about him.

20   Tell me about his competition.

21             So, you know, if I get your boyfriend,

22   I get him, but, you know, why don't you help me

23   with somebody else which helps your boyfriend's

24   business?

1           So sometimes they would do that.  I

2    mean it was never anything where you would --

3    first of all, I didn't have the money at the time

4    to be giving any significant amounts to people,

5    and it really wasn't my job, but to develop a

6    relationship with somebody, you know, they didn't

7    have any money, and they weren't working, you

8    know, let them hold a dollar or two.

9           Q.   Would there be times when someone

10   would say maybe, for example, I can't pay one of

11   my bills.  Can you pay a bill, or can you give me

12   money toward my phone?

13          A.   No.  If that was going to be the case,

14   you know, I could refer them to the VIN squad who

15   could them formalize the process, and then they

16   would be working with somebody else, but I mean

17   back then a lot of the people that we were

18   dealing with, they didn't have phones.

19          They didn't -- you know, their phone

20   was wherever the bar that they hung out in or

21   their -- I mean that was so long ago, they had

22   pay phones then.

23          Q.   I remember those days.

24          A.   You don't look that old.

1          Q.    Thank you.  After you left Metro Dade,

2     you went to work for Carol Management Company.

3     Is that correct?

4          A.    Yes, ma'am.

5          Q.    Is that where you went to work after

6     you were injured during that motorcycle accident?

7          A.    Yes, ma'am.

8          Q.    Your CV indicates that you worked from

9     there from 1973 to 1974.  Correct?

10         A.    Yes, ma'am.

11         Q.    Approximately how many months did that

12    encompass?

13         A.    It was about 12 months.

14         Q.    What were your duties with Carol

15    Management Company?

16         A.    I was a security investigator, and

17    also I was assigned different projects while I

18    was there.

19              One time -- actually, it was a fun

20    job.  I helped coordinate the security for the

21    Doral Eastern Open.  Carol Management owned the

22    Doral Country Club and Hotel, so that is really

23    interesting.

24              Sometimes they would have big society

1    galas, I guess is what you would call them, where

2    there would be literally tens or thousands or

3    hundreds of thousands of dollars of jewels and

4    stuff around, so that we would formulate a plan,

5    and we would have both police and security people

6    just making sure nobody planned a carjacking in

7    the area that we -- you know, or a smash and grab

8    or what have you.

9            There was -- I was also tasked with

10   monitoring -- we worked closely with Metro Dade

11   organized crime division, and so we would monitor

12   organized crime -- known organized crime figures

13   who would come and stay at -- at the Doral Hotel

14   and facilitate information requests, monitoring

15   who came to visit them, because it was a

16   controlled access property, so if you drove in

17   the gate, you had to say who you were coming to

18   see, so we would -- who they were coming to see.

19            Then we would have a tag number and

20   that, and so we would provide that information,

21   and then I kept a -- I guess a flow chart of

22   people who frequented those properties who were

23   known associates of or known actors in organized

24   crime, and sometimes they would come out and do

1    surveillances with us.   Sometimes we would

2    provide information.   It was back and forth.

3              Every once in a while we would get

4    high priced prostitution rings that would try to

5    rent rooms and -- so when we got word of that,

6    then we would bring an organized crime vice at

7    the department level.

8         Q.   What type of -- what type of company

9    is Carol Management?

10        A.   It's a property -- or is or was, they

11   had three or four showpieces in Florida:   The

12   Doral Hotel on the beach, the Doral Country Club

13   and Hotel, I think the Newport Beach Hotel, three

14   or four down there.

15             And then their primary properties were

16   in New York and New Jersey, hotels in Manhattan

17   and parking garages, apartment complexes

18   throughout the metropolitan New York/New Jersey

19   area.

20             That's where the big -- the bulk of

21   their, I guess, properties or operations were.

22   The showpieces were in south Florida.

23        Q.   Were you assigned specifically to

24   certain properties in Florida to -- where you

1    worked, or were there -- were you on a rotating

2    basis?  How did that operate?

3         A.   I actually ended up in New York/New

4    Jersey for a few weeks, was offered the position

5    of Assistant Corporate Director of Security, so I

6    went around and did a survey of their properties

7    and met the personnel and different things and at

8    various times worked at different properties in

9    south Florida.  Primarily I was based out of the

10   country club.

11        Q.   I take it your job specifically for

12   Carol Management Company was to protect their

13   property or the people that came onto their

14   property?

15        A.   Protect the property and the guests,

16   yes, make sure it was a safe environment.

17        Q.   As far as your role in monitoring

18   organized crime figures, where were you learning

19   who those people were that you were to keep track

20   of?

21        A.   They were monitored by a variety of

22   federal and other law enforcement agencies, and

23   we had a good working relationship.  The majority

24   of investigators at Carol Management were former

1    police officers, so they would come to us.  We

2    would get approval from the corporate director,

3    and they would get involved in that.

4            I had a good friend that I graduated

5    from school who was with the -- he was a special

6    agent, organized crime, for the Attorney

7    General's task force in Michigan, so if he knew

8    of people coming down to south Florida, he

9    would -- you know, that sort of thing.

10       Q.   Is it fair to say that you were

11   basically assisting them in whatever

12   investigation they were conducting and by

13   providing them with information as opposed to you

14   doing an active investigation of these people

15   that were coming onto the property?

16       A.   My -- I guess my assignment was just

17   to basically monitor that and know who the

18   players were and make the corporate director

19   aware of who was doing what, and we were a -- the

20   practice was to cooperate with both local and

21   federal law enforcement.

22       Q.   Okay.  Why did you leave Carol

23   Management Company?

24       A.   I rehabbed my leg to where I didn't

1  walk like Marshal Dillon's Chester, and -- so it

2  was back a hundred percent physically.

3          Miami Beach had a hiring freeze

4  because of an affirmative action lawsuit.  A

5  friend had -- advised there was an opening with

6  South Miami.  I went there.

7          Q.    How long were you at South Miami PD?

8          A.    I think a little over two and a half

9  years.

10         Q.    And when you started there, what was

11  your position or title?

12         A.    Patrol officer.  A short time after

13  that, it was field training officer.

14         Q.    You left there in 1976?

15         A.    Yes, ma'am.

16         Q.    What was your rank or your title when

17  you left?

18         A.    Sergeant.

19         Q.    When you started with South Miami PD,

20  did you take any additional training courses as

21  part of that job?

22         A.    Additional training, you mean as basic

23  training or advanced training?

24         Q.    Any type of training.

1         A.    Yes, ma'am.  I had, well, the

2    in-service training that we were provided.  At

3    one time I was the -- also the department

4    training officer there, so I was developing it

5    and taking -- participating in it, but firearms

6    training, defensive tactics training, supervised

7    retraining, criminal investigation training,

8    that's -- there may have been some others, but

9    that's what I recollect.

10        Q.    Prior to starting at South Miami PD,

11   have you had any training in criminal

12   investigations?

13        A.    In the course work at Michigan State

14   University, it was more hands-on at some courses,

15   like criminal investigation and criminalistics,

16   or whatever it was back at that -- it was more

17   hands-on at that time.

18             Those -- it was more -- wasn't as

19   theoretical as some of the other courses in the

20   school police administration.

21             Other than that, the basic -- again,

22   you went through the basic investigative stuff in

23   your 20-week training at Metro Dade, so that was

24   pretty much it.

1                I had worked for a year in the private

2      sector working with different agencies, so some

3      of that was active involvement, like in

4      surveillance or where to, you know, learning how

5      to pull records, sources of information, that

6      sort of thing.

7          Q.    So certainly working with other people

8      that had more experience you learned on the job?

9          A.    Yes, ma'am.

10         Q.    Is that basically what you're

11     describing?  How many hours of criminal

12     investigations training did you receive when you

13     were in South Miami PD?

14         A.    Eighty, I believe.

15         Q.    Where was it that you received that

16     training specifically?

17         A.    Through Metro Dade.  I was assigned

18     there, went and received the training through

19     them.

20              (At this point a short recess was

21               taken.)

22     BY MS. EKL:

23         Q.    We are talking about South Miami

24     Police Department.  How long were you a patrol

1    officer there?

2        A.    For about a year.

3        Q.    And what -- what did you do in your

4    capacity as a field training officer?

5        A.    When we would have now hires, either

6    right from an academy or somebody from another

7    agency that left that agency and came with South

8    Miami, would train them with regard to department

9    policies and procedures and get them acclimated

10   to the area and aware of different patrol hazards

11   and issues, that sort of thing.

12            I mean it would depend, if they were a

13   new hire and never had any experience or somebody

14   who had experience but didn't know the area.

15       Q.    And how long did you work as a field

16   training officer?

17       A.    Until I got promoted to detective.

18       Q.    And when was that?

19       A.    About a year.

20       Q.    So you worked there about a year in

21   patrol, and then that next year is when you

22   went -- became a detective, or was there

23   something in between?

24       A.    Well, I was on the swat team also, but

1    the -- went from patrol to detective.

2         Q.    Did you have to undergo any additional

3    training in order to become a detective?

4         A.    That's when I went to the 80 hours.

5         Q.    Okay.  And then at what point in time

6    did you become a sergeant?

7         A.    August of -- well, about a year and a

8    half after I started I was promoted.

9         Q.    So would that be about --

10        A.    August of '75, I think.

11        Q.    So you were in patrol for a year, then

12   you became a detective.  Would it have been about

13   six months after you were a detective that you

14   became a sergeant?

15        A.    Approximately.

16        Q.    How many officers were there in the

17   South Miami Police Department at that time?

18        A.    My guess is about 45.

19        Q.    And during the point in time when you

20   were a detective, how many detectives were

21   full-time employed with the department?

22        A.    It varied, probably seven or eight,

23   and then sometimes we had people assigned to work

24   drugs, which they may have been detached to the

1   detective bureau, or they may have been operating

2   independently.

3       Q.   And you indicated that at some point

4   you were also a part of the swat team?

5       A.   Yes, ma'am.

6       Q.   Was that swat team part of some type

7   of regional --

8       A.   No, we had our own bread truck and

9   everything.

10      Q.   Okay.  Did you undergo any specific

11  training to become a swat team member?

12      A.   Yes, ma'am, was working on that at the

13  time, and then they disbanded the swat team.

14      Q.   So how long were you a member of the

15  swat team?

16      A.   Three or four months.

17      Q.   So you were still in the process of

18  going through the training when it was disbanded?

19      A.   Yes, ma'am.  Well, we had formulated

20  the unit.  The unit was training as a unit,

21  and -- but...

22      Q.   Was that prior to becoming a

23  detective, or was that part of your duties as a

24  detective you were also a member of the swat

1   team?

2        A.   No, I was in patrol at the time.

3        Q.   As a detective, what types of cases

4   did you work on?

5        A.   Everything from burglaries, sexual

6   assaults, homicides, robberies.

7        Q.   About how many murders did you work on

8   during that approximately a year and a half that

9   you were a detective?

10        A.   I think as primary or secondary

11   investigator, two or three, maybe.

12        Q.   So said during -- you said as a

13   primary or a secondary, so were there times when

14   you were the primary investigator?

15        A.   Yes, ma'am.

16        Q.   Out of those two or three homicides,

17   how many were as primary investigator?

18        A.   At least one.  My partner may have

19   been at another time.

20        Q.   Do you recall the facts and

21   circumstances of that homicide in which you were

22   the primary investigator?

23        A.   One of them it was a who done it, a

24   burglary/homicide.  They killed an elderly woman

1    on Social Security by stuffing her undergarments

2    down her throat -- I mean they were almost down

3    into -- down the esophagus and everything.

4            That's how they -- the cause of death,

5    and it was -- we believed it was in conjunction

6    with a burglary that was a cut screen.

7            There was some evidence of forced

8    entry, and we eventually caught the guy as he

9    left some evidence on the -- some hair samples on

10   the screen with a particular residue that was

11   particularly rare for that southeast Florida, and

12   we were able to limit the number of locations

13   where he might be employed and then through

14   canvassing and repeatedly canvassing and talking

15   to witnesses, we got a description of an

16   individual that was in the area on the date of

17   the incident and what that person was wearing

18   and, in fact, a sample of clothing from that and

19   they linked the hair sample with the particular

20   residue from the item of clothing to the hair

21   sample that was left at the scene, and then from

22   that we got a description, and then we did the

23   leg work checking those areas.

24        Q.   Did you -- well, let me back up.

1    Approximately how many people worked on that

2    homicide with you?

3          A.    To start?  There was my partner and I

4    were the primaries; two or three teams from the

5    county, two or three crime scene units, and then

6    as the weeks progressed, it went to one temporary

7    or an occasional guy from the county to work with

8    my partner and I, and my partner and I narrowed

9    it down, unless there was something in particular

10   going on.

11         Q.    About how long did that case last from

12   the time that the murder occurred until there was

13   a suspect in custody?

14         A.    It seemed like forever, but I think it

15   was probably three or four weeks, because we went

16   on a number of -- we went through all our known

17   burglars and tried to find out when they were --

18   who was incarcerated at the time, who wasn't,

19   people -- I mean it was...

20              It was a lengthy process, a lot of

21   hours.

22         Q.    And were you involved then in

23   interviewing or interrogating some of these other

24   known burglars to see if they had any involvement

1    in the case?

2         A.    Interviewing, interrogating, photo

3    line-ups, regular line-ups in the jail, depending

4    on when they chose to change their residency;

5    obtaining evidence cooperatively, obtaining

6    evidence with court orders when they wouldn't

7    cooperate.

8              Just -- I mean it became a real grind,

9    but we were, you know, eliminating possibilities,

10   and what took us so long and what -- we were

11   actually pretty lucky, it was about the third

12   canvass we found some people that hadn't been

13   talked to the first two times that were -- could

14   give us a description of the individual, and --

15   but that individual wasn't one of the -- our

16   regular burglars or a known person to operate in

17   that area.  For some reason, he just showed up,

18   and it was -- I mean it was a tragic crime.

19             This lady didn't have any money and

20   living by herself in a boarding house with a

21   bathroom down the hall and so...

22        Q.   So is it fair to say initially when

23   you didn't have a description of the offender,

24   part of the process of trying to investigate the

1   case you kind of looked at your other known

2   burglars in the area?  That would be the group of

3   people that you looked at?

4        A.   Well, we knew that it was a burglar,

5   because of the -- our belief was that it was a

6   burglary/homicide because of the manner of entry,

7   and so then we were looking at the people who

8   were known burglars, but we really didn't have

9   any known burglars that had a history of either

10  beating people.

11          Most of ours were, you know, either --

12  if they went into a building that was occupied,

13  it was a surprise to them, so we didn't know if

14  this woman -- I mean she was -- just a very small

15  room, if she had surprised the individual or, you

16  know, and it was a reaction or what, but first we

17  thought it was possibly sexual assault, but she

18  hadn't been sexually assaulted.

19       Q.   And then did the focus kind of steer

20  away from those -- the usual suspects, so to

21  speak, once you had a description of the actual

22  burglar or offender?

23       A.   Well, the actual burglar -- well, the

24  person that we had a description didn't fit the

1    people that we knew were operating there.

2              I mean we did a number of things.  We

3    looked at old burglars who had been released from

4    prison lately that might have come back to the

5    area, you know.

6              I think one of the -- we spent time

7    with probation and parole to see, you know, what

8    we could find out in that regard, but we tried to

9    pursue every lead that we had.  I mean some were

10   obviously blind alleys.

11             Others were -- turned out to be more

12   productive, and what happened is going back and

13   squeezing that -- that effort to finally finding

14   -- the third trip finding these people that lived

15   at a place nearby that remembered another

16   person at that and who had left an item of

17   clothing there.

18        Q.   You also mentioned that you worked

19   with two or three teams from the county.  Is that

20   correct?

21        A.   Initially, yes.

22        Q.   Was that something that was a regular

23   practice with South Miami Police Department, that

24   if you had a larger crime, that you would have

1    cooperation or help from other assisting

2    agencies?

3        A.   Metro Dade provided a lot of support

4    to area agencies.  We used their crime lab.  We

5    used -- so we didn't have enough homicides to

6    have a full-time homicide investigator, so I mean

7    we did other investigations, so they came, and

8    they provided us with their assistance and

9    expertise, but there were a lot of homicides in

10   Metro Dade County, and those guys keep really,

11   really busy, so initially I think we had three

12   teams looking over with us the initial scene.

13            Three days later there was one guy

14   that would come by occasionally and see if either

15   he could provide assistance through the county or

16   what we had, and, you know, kick some ideas

17   around.

18       Q.   Prior to working on that murder, other

19   than the 80 hours of general criminal

20   investigation training, did you receive any

21   specific training to, say, police interrogations?

22       A.   Had some in the academy.  I had a

23   course at Michigan State, interviewing and

24   interrogation.  The -- so, you know, the -- I had

1    somewhat of a background, had some experience on

2    the street.

3        Q.   Is it fair to say that you received

4    some of your training through on the street with

5    other officers that had more experience?

6        A.   Sure.  I think any good professional,

7    you know, always looks -- I mean when I train new

8    officers as a field training officer I would say

9    when you're with me, you do what I do, but when

10   you're with somebody else, you do what they do,

11   but take what you see as the best attributes and

12   try to incorporate those into your style and

13   learn from that, and if you see something bad,

14   try to make sure you don't incorporate that, and

15   so that, you know, you're going to be a composite

16   of your background, your training, and then what

17   you learn from other people.

18            I mean I tried to stress that you are

19   learning something and improving as an ongoing

20   thing.

21       Q.   While you were at South Miami PD was

22   there any other specific training that you can

23   recall other than what you've already testified

24   to?

```
1          A.    The supervisory, the defensive

2    tactics, the -- we did firearms on a fairly

3    regular basis, swat training.

4               I think that was pretty much it.

5    Whenever I had the opportunity, I would go to

6    additional training.

7          Q.    What types of additional training did

8    you attend?

9          A.    About 3,100 hours over my -- I still

10   train somewhat in defensive tactics and firearms

11   now.  I have, you know, the last year or the year

12   before I went to training on investigating

13   allegations of excessive force or use of force.

14         Q.    Back through 1976 up until that point

15   in time when you were working on those three

16   homicides, two or three homicide cases...

17         A.    What was offered.  I think I had

18   supervision and investigations were the

19   primary...

20         Q.    Your CV also mentions that from 1976

21   to 1978 you were coordinator of the criminal

22   justice program at the Craven Community College?

23         A.    Yes, ma'am.

24         Q.    What month did you start -- in 1976
```

1    did you start that job?

2        A.    Probably within a short time after --

3    within a matter of a couple weeks after I left

4    South Miami, and then I worked there about two

5    years.

6        Q.    Why was it that you left South Miami?

7        A.    I was married at the time, had a small

8    child.  Like with many people in law enforcement,

9    the marriage was kind of in jeopardy and looking

10   for a better place to raise my child.

11       Q.    What were your duties or

12   responsibilities as the criminal justice program

13   coordinator?

14       A.    Curriculum development, full-time

15   instructor, trained area law enforcement on --

16   either through development of programs as

17   requested or a contract basis, and -- so

18   primarily -- the primary focus was on the

19   academic curriculum.

20           It was a two-year criminal justice

21   associate degree program, and so teachable time,

22   hire, fire, the part-time instructors, full-time

23   instructors, and everything from textbook

24   selection to articulation agreements with

1    four-year schools, that sort of thing.

2         Q.    When you started at Craven Community

3    College did you start as the coordinator, or did

4    you start as the instructor?

5         A.    I was hired as the coordinator.

6         Q.    You said that you trained area law

7    enforcement.  Was that people who were already

8    sworn officers that you were training, or were

9    these people that were coming to receive their

10   associate degree and then go into law

11   enforcement?

12        A.    No, we trained current law enforcement

13   officers.

14             We were the -- part of the mission of

15   the community college system in North Carolina

16   was to provide services to the communities.  The

17   criminal justice program was one of the things

18   that we were to do, so we either arranged for or

19   provided everything from firearms training,

20   defensive tactics, stress in law enforcement,

21   radar -- radar was something that we would

22   contract through another state agency and bring

23   them in when there was a demand for it.

24             I think we did some interviewing and

1    interrogation training.

2         Q.    You specifically --

3         A.    And one other thing.  We had a

4    satellite campus at the Cherry Point Air Station,

5    so we provided academic courses and training for

6    their MP and law enforcement personnel.

7         Q.    When you say we, are you referring to

8    the program itself through Craven College, so it

9    would encompass beyond just yourself doing the

10   actual training?

11        A.    I did some of it.  I was responsible

12   for the administration of it, so sometimes I

13   would hire particular instructors.  Sometimes I

14   would do it myself.  Sometimes I was part of the

15   instructional team.

16        Q.    What types of classes did you train or

17   teach specifically where you were doing the

18   actual teaching?

19        A.    Interviewing, interrogation.  I think

20   I was involved in the stress in law enforcement;

21   contracted radar, contracted some firearms

22   training and did some.

23        Q.    When you say contracted, what do you

24   mean by that?

1          A.   We would bring somebody in, either a

2   range officer from another -- from an agency

3   outside our district or do that, or sometimes I

4   would run the training.

5          Q.   I just want to make sure I'm clear.

6   My question is specific to when you actually did

7   the training --

8          A.   Okay.

9          Q.   -- as opposed to when you contracted

10   someone else to do it?

11          A.   Some firearms I did.  Some we

12   contracted.  Search -- search and seizure issues,

13   I did.

14          Q.   When you mentioned interviewing and

15   interrogation, was that something that you

16   specifically taught, or was that something where

17   you contracted another person to teach it?

18          A.   I taught it.

19          Q.   Do you remember about what year it was

20   or what years that you taught that?

21          A.   Somewhere between '76 and '78.

22          Q.   So somewhere while you were working

23   for Craven College?

24          A.   Yes, it may have occurred multiple

1    times.  I don't recall.

2         Q.   Was that an individual course, or was

3    that a part of a course?

4         A.   It was more of a -- probably a three

5    or four hour in-service for officers who -- I'm

6    sure we had some investigators, but, you know,

7    street officers and investigators, that sort of

8    thing, either, you know, a refresher type thing.

9         Q.   What kind of training did you receive

10   specifically in interview and interrogation prior

11   to the point in time when you were teaching?

12        A.   Part of the -- well, I had the course

13   at Michigan State initially.  I had experience.

14   I had the 20-week academy, they provided some,

15   and the 80-hour criminal investigation, they did

16   additional.

17        Q.   When you say that you had experience,

18   are you talking about during the point in time

19   when you were a detective, or was that broader?

20   Were you interrogating and questioning witnesses

21   and suspects when you were a patrol officer?

22        A.   Sure.  I mean that's a given.  I think

23   it's an ongoing process.  When I was a security

24   investigator, we did the same thing.  I mean the

1    same principles apply.

2        Q.    Were you ever trained in the Reid

3    technique?

4        A.    Yes, ma'am.

5        Q.    When did you receive that training?

6        A.    From Reid in Chicago.

7        Q.    When was that?

8        A.    Actually, it was 1987, maybe and then

9    subsequent refreshers.

10        Q.    Your curriculum vitae next says that

11    you started with the North Carolina State

12    Fairgrounds Police Department in 1980.  Is that

13    correct?

14        A.    I think I did some consulting for them

15    before that, but that's when the department

16    developed.  It became a police department, so I

17    consulted with the fairgrounds a year prior to

18    that, and then when they were involved in

19    developing their -- a brand new police

20    department, I was involved in doing that and then

21    was named as -- appointed as a lieutenant.

22        Q.    Then you also have on here Director of

23    Law Enforcement Training at Wake Technical

24    College from 1978 to 1983?

1          A.    When I left Craven Community College,

2    I transferred within the community college

3    system, so I left New Burn which was near the

4    coast to Raleigh, which I knew some people in

5    that program, and there were a lot more

6    opportunities in Raleigh, a bigger service

7    population for law enforcement opportunities to

8    teach part-time at some colleges and universities

9    there, so I moved to Raleigh.

10          And then -- and then one of the

11   incentives was that they had stopped their

12   training program at the time that we were going

13   to restart it, and I was basically recruited to

14   run the law enforcement training program.

15          Q.    So when you were recruited and you

16   started there in 1978, did you start as Director

17   of Law Enforcement Training, or did you have some

18   other position or title before that?

19          A.    Well, I was an instructor in the

20   police science program, and part of the thing was

21   when you're doing a -- Wake Technical College had

22   been part of the regional training academy

23   structure within the state of North Carolina.

24          The college president -- and you've

 1     got to remember back then this was the

 2     development of required curriculums.  Every state

 3     pretty much developed their own training and

 4     standards or law enforcement standards board to

 5     say this is the minimum level, and so when the

 6     state did that in North Carolina, the president

 7     of the college said you're not going to tell us

 8     how to do our training program, so we eliminated

 9     it.

10          Then there was a big uproar.  They

11     eventually got rid of that president.  The new

12     president said that's part of our mission.

13          I was brought in and so -- and

14     developed that, and we started doing that, and

15     then we became really involved in the state

16     regional provision of law enforcement training

17     services for all our -- all the agencies in our

18     region.

19          Q.   So when you were working for Wake

20     Technical College, was that you teaching

21     specifically sworn officers, or was this still a

22     combination of people coming in to get, say, an

23     associate's degree?

24          A.   Academically I would teach academic

1    courses at times.  Other times, I was -- when the

2    academy was running, that was my full-time

3    responsibility.

4              So those were, as best I recall, you

5    had to be hired by an agency, and then they were

6    sent for your basic training back then.

7              I don't recall any -- going through,

8    going to training and then try to find a job, so

9    everybody that we had I believe was a sworn

10    officer with some agency.

11        Q.    Okay.

12        A.    And from that area, so then we only --

13    we provided basic law enforcement training.  We

14    provided specialized training.  We provided

15    in-service training.

16        Q.    From the academic standpoint, what

17    kind of classes did you teach?

18        A.    Some voluntarily and some kicking and

19    screaming.

20              At one time or another I probably

21    taught pretty much most of them.  My primary

22    courses were Intro to Criminal Justice System.  I

23    got stuck teaching a drug course a couple times,

24    Applied Psychology For Law Enforcement,

1    Constitutional Law, Criminal Investigation, Crime

2    Scene Investigation.

3              I was part of a team at one time

4    for -- and this was an academic course for

5    criminalistics.  I team taught it with a

6    chemistry instructor.

7              They would teach the hard science.  I

8    would teach the application of the principles,

9    and we would interrelate that with the North

10   Carolina -- with the State Bureau of

11   Investigation Crime Lab, and then, okay, this is,

12   you know, this is the theory.  This is the

13   science.  This is why you do it, and then this is

14   how they do it.

15        Q.   And then after 1978, during what year

16   was the academy actually formed for law

17   enforcement officers where Wake Technical College

18   then became involved in training sworn officers?

19        A.   '79 or '80.

20        Q.   And did you actually yourself train

21   any of those officers, were you more involved in

22   the coordination of it or the policy side of it?

23        A.   Yes.

24        Q.   I'm sorry.

1          A.    To both.  I was actively involved as a

2    trainer.  Initially when my start-up budget was

3    tight I had -- I can't tell you what it was at

4    the time, but I had the highest certification --

5    instructor certification that they give,

6    including academy director, so when we were like

7    with firearms, I would be one of the instructors.

8              I might teach the classroom and then

9    like how to shoot, you know, gun safety, when to

10   shoot, those types of things, and then when they

11   were out at the range, which is multiple hours

12   and multiple instructors, I was generally there

13   as one of those.

14             Vehicle stops and vehicle operations,

15   I was involved in that, but I wasn't the primary

16   instructor, you know, basically administrative

17   and secondary instructor.

18        Q.    Let me just stop you for one second.

19   What do you mean by a secondary instructor?

20        A.    Well, I wasn't -- I was never an EVOC

21   instructor, emergency vehicle operation, so while

22   they were teaching those things, I would line up

23   somebody who had that specialized training to do

24   that training through the skid pans and the

1    serpentine and whatever, and then we would also

2    be doing vehicle stops, so we would have another

3    vehicle, somebody's personal vehicle, okay,

4    here's traffic, a traffic stop, okay, the

5    difference between a typical traffic stop and a

6    higher risk stop where you don't really know how

7    to do those, okay, here's a felony vehicle stop,

8    you know, so you actually get down and do those

9    things, so I was involved with that.

10            I would be monitoring who -- you know,

11   making sure that we were maximizing our training

12   time, people doing the driving, and then other

13   people would be doing ancillary things; some

14   required by the curriculum, some in addition to

15   the curriculum.

16      Q.   Of the times when you were an actual

17   trainer from that period then from 1979 to 18980

18   when you were still at Wake Tech was there any

19   other area other than firearms where you were the

20   actual trainer?

21      A.   '83 I was the actual.

22      Q.   Okay.

23      A.   Yes, ma'am.  I mean I taught

24   components of line supervision, building

1    searches, the basic interviewing, interrogation

2    component in basic training.

3         You had -- you had a whole bunch of

4    units of like a two-hour segment or a four-hour

5    segment or a 12 hour segment, and I was involved

6    in those.

7         The defensive tactics, yes, the core

8    principles of investigation, I taught that.

9    Q.   So, for instance, if someone -- if the

10   college was doing a 40-hour basic training

11   program, you may have, say, two hours that are

12   dedicated to interrogation and interviewing?  Am

13   I understanding that correctly?

14   A.   Well, no.  I think the minimal we had

15   was like six weeks, so 240 hours, plus we had an

16   additional mandatory amount I think of either

17   eight or 16 hours that the chiefs and sheriffs

18   who sent people to us agreed to.

19        I mean usually that was tough to get

20   them to give you a guy.  They had to pay a guy

21   for an extra two days back then, and budgets were

22   tight, but -- so we did additional things.

23        We did building search component.  We

24   did a vehicle stop component hands-on that were

1    in addition to that.

2         Then we did some applications, field

3    applications of different things, and we expanded

4    the required training, I think, from -- I don't

5    know what it was back then, but say it was either

6    eight hours or 12 hours for defensive tactics --

7    arrest and -- defensive and arrest tactics, so

8    ours was 24.

9         Q.   Okay.

10        A.   You know, so we would enhance it and

11   do it, so we felt like we were doing as good or

12   better job than anybody else.

13        Q.   And then when was it specifically that

14   you started at the North Carolina State

15   Fairgrounds PD, in terms of what month?

16        A.   That was 1980, I believe, so whenever

17   they formalized, developed the actual police

18   department, so I might have been out there the

19   year before as a consultant, and then I think

20   1980 I was there as a lieutenant.

21        Q.   So when you were hired, then you were

22   hired as a lieutenant when you went on full time?

23        A.   Hired initially as a consultant, a

24   temporary consultant.  Then hired as lieutenant,

1    yes, ma'am.

2         Q.    Did you have to undergo any specific

3    state training or anything in order to become a

4    lieutenant?

5         A.    I had to meet the state requirements,

6    but since I had already had law enforcement

7    training which far exceeded the minimum state

8    requirements, I had to go through like a checkoff

9    list that was approved by the director of the Law

10   Enforcement Standards Board, so if there was a

11   required course in the academy that I had to,

12   because like North Carolina statutes say, I would

13   sit in that class and then, you know, and -- so

14   then I met the certification requirements.

15        Q.    How many people were in the North

16   Carolina State Fairgrounds Police Department when

17   it first started when you became a lieutenant

18   there?

19        A.    Oh, somewhere between 20 and 25.

20        Q.    And what were the primary duties and

21   responsibilities of just, I guess, starting in

22   general with officers within the North Carolina

23   State Fairgrounds in terms of jurisdiction and

24   what types of things?

1          A.     Actually, they had state-wide

2     authority, because the second most powerful or

3     one of the most powerful people, at least back

4     then, was the Secretary of the Department of

5     Agriculture who was in charge of the fair and the

6     fairgrounds, so we had state-wide jurisdiction.

7               I think we had more authority than the

8     highway patrol, which was kind of foolish, but

9     primarily we functioned -- we worked functions at

10    the fairgrounds, sometimes off.  It was primarily

11    crowd control.

12              We did do some follow-up

13    investigations for specific criminal acts that

14    occurred there.

15              The -- it was a year round operation.

16    During the actual fair, you know, I think nine

17    days I would average about 110 or 120 hours, so I

18    was either working, sleeping, or at the

19    fairgrounds during that time, and so we had the

20    whole gamut of security issues, crowd control.

21              You had the carnies coming in with all

22    the attendant problems that that entails, fights,

23    people getting hurt, that sort of thing.

24         Q.    When you say that there was follow-up

1    investigations of crimes that occurred on the

2    fairgrounds, what types of crimes generally

3    occurred at the fairground?

4         A.   Generally?

5         Q.   Yeah.

6         A.   We tried to minimize that, but I mean

7    you would have thefts.  You would have, you know,

8    assaults.  Fortunately when we -- you know, if we

9    had a large scaled brawl or something, which

10   sometimes occurred on different -- with different

11   venues operating there, that most of the people

12   would be gone before you, so it was primarily

13   preventive and crowd control.

14        Q.   Did you have -- as an officer working

15   with the -- with that police department, did you

16   have arrest powers?

17        A.   Sure.

18        Q.   And did you also work with other

19   agencies then?  If, for instance, you were to

20   arrest someone on the fairgrounds, was there

21   regular processing through the police department

22   on the fairgrounds, or did you then turn them

23   over to like a local county sheriff's office?

24   How did that work?

1          A.    Well, if we could farm them off and

2    get transportation to the jail, county jail, we

3    would.

4                Sometimes that was available, because

5    depending on what was going on, if you took

6    people away from doing crowd control, you know,

7    the sheriff or the city police would realize

8    that, you know, something happened.  They would

9    have to be coming out, so it was -- we had -- and

10   we used off duty deputies and city officers and

11   people from the highway patrol to supplement

12   during different events, so we had a good working

13   relationship, so frequently if we could get

14   somebody to transport for us, we would do the

15   paperwork.  They would do it, and we would send

16   somebody down later on to sign off or do

17   whatever.

18                If we couldn't, we would send one or

19   more officers in one of our squads and send it

20   down, but it sort of fluctuated.

21         Q.    You specifically during that time

22   period how would you describe your duties and

23   responsibilities in relation to these things that

24   were going on at the fairgrounds?

1       A.    I was a -- probably it fluctuated

2  between administrative and training and actual

3  first line supervision, so if there was something

4  going on, I was there as a supervisor, if I was

5  working.

6            At other times, I was -- my

7  responsibility was to make sure that all our

8  people had the required training.  If somebody

9  was deficient in something or if we had somebody

10  that was coming on that we needed to make sure or

11  if we had somebody do something stupid, then went

12  to evaluate, then, okay, you either discipline,

13  training, or you're too much of a liability, and

14  you're out of here, you know, so to do that

15  evaluation and then make the recommendations to

16  the chief.

17       Q.    How many other lieutenants were there

18  at the same time that you worked for the

19  fairgrounds?

20       A.    None.

21       Q.    Did you work on any murder

22  investigations while you were working at the

23  fairgrounds?

24       A.    No, ma'am.

1          Q.    Why did you leave that job?

2          A.    I was offered the Chief of Police job

3    in Ripon, Wisconsin.   R-i-p-o-n.

4          Q.    You were with North Carolina State

5    Fairgrounds for slightly less than three years.

6    Is that accurate?

7          A.    Probably about three and a half.

8          Q.    And do you know why it was you were

9    offered the job as chief of Ripon?

10          A.    They didn't like me?

11               No.   The -- it was an interesting

12    place in procedure.   They had -- they did a

13    national search.   They were looking for a

14    reformed chief.   They had had a bunch of

15    problems.

16               I applied.   My grandparents were from

17    Wisconsin, so I used to come to Wisconsin a lot

18    when I was young, so it just was an unusual

19    hiring process, and I think the first thing was

20    that they had -- the mayor at the time was a

21    professor from Ripon College, and so he had a

22    number of -- I think five questions that you had

23    to submit essays to which eliminated a lot of

24    people from applying to begin with, but I used to

1    do that on occasion just to try to stay sharp, so

2    I sent it in, and I was surprised, because I was

3    the only person they brought in from out of state

4    to interview, and then I was surprised again when

5    they -- after the interview process where they

6    offered me the position.

7         Q.   Did you ever learn from talking to

8    them what it was that caused them to hire you

9    over anyone else that applied for that job?

10        A.   I had a strong background academic in

11   training, and they were looking for -- it was --

12   it was a strong union department.  It had a lot

13   of problems.

14             They had a couple -- well, serious

15   incidents resulting in a lawsuit, but they had a

16   young aggressive city administrator.  They had a

17   very intellectual mayor who was looking to

18   improve the department which had been kind of --

19   up to that point at least the administration had

20   been kind of a good old boy thing, and they were

21   looking to change that mold, and I was young and

22   enthusiastic, and they probably couldn't find

23   anybody else to do it, but they had a -- they had

24   two or three chiefs and a guy that was running

1    the law enforcement training from Fox Valley

2    Technical College in Appleton and some other

3    people who served as advisors.

4                Then they had a day-long interviewing

5    process, so you went through the interviewing --

6    well, psychological testing, individual session

7    with the psychologist, and then meeting with

8    these different people and then an interview from

9    the city police and fire commission and their

10   consultants, so it was really kind of an

11   intriguing process, and I thought a good

12   experience, so I was very surprised when they

13   offered me the position.

14        Q.    How big was the department at that

15   time?

16        A.    Seventeen or 18 officers, I think.

17        Q.    Do you remember how many detectives

18   were in the department?

19        A.    One.  Well, I say -- one primary, and

20   then the captain would also jump in when -- I

21   mean he was -- he was trained as an investigator,

22   and he would -- wore a lot of different hats, so

23   if there was anything serious, he would jump in

24   that too at the time.

1    Q.   You were there until approximately

2    1987?

3    A.   Yes, ma'am.  Mid '87.

4    Q.   While you were at Ripon, did you,

5    yourself, take any additional training courses?

6    A.   Yes, ma'am.

7    Q.   What kind of training courses did you

8    take?

9    A.   Administrative, instructor, internal

10   affairs, supervision.

11        I would use the training and see what

12   was available and then bring those ideas back and

13   either send officers for similar training or

14   develop a program to provide that training within

15   the agency, so I went through a lot of training.

16        The, you know, extension had a police

17   administrative series of programs going.  I went

18   through a number of those, so whenever there was

19   something of interest that I thought would either

20   make me a better officer and administrator, I

21   would go, or I would try to send somebody.

22        And I went through the specialized

23   instructor training certifications for firearms

24   and for defensive and arrest tactics -- well, it

1    was RISC back then, rapid intense specific

2    competencies.

3        Q.    Would you say that the last time that

4    you were actively involved in investigating

5    crimes would have been when you were working with

6    South Miami Police Department?

7        A.    Well, on a regular basis.  If we had a

8    crime in Ripon, I mean I had an investigator who

9    was, you know, doing drug cases and following up

10   burglaries and everything, but the captain and I

11   would be involved.

12            If we had a death, we would do the

13   preliminary death investigation to make sure, you

14   know, is this a suicide, is this a potential

15   homicide, where do we want to go with this, what

16   are we going to do, and then assign follow-up.

17            We had a real who done it type mystery

18   that I got involved in at the local hospital.

19   One of the employees was being stalked and

20   getting these threatening messages, so we were --

21   she lived in one jurisdiction, stayed with her

22   boyfriend or, slash, fiancé in a second

23   jurisdiction and worked in our jurisdiction.

24       Q.    So you worked with other agencies?

1          A.    We were the primary, because most of

2     the stuff was occurring, like notes on her time

3     clock, messages in her car when she was at work,

4     and then some of these things were also occurring

5     elsewhere, so we would coordinate it.

6          Q.    But as far as your active role in the

7     investigation as opposed to just assigning other

8     people to do things or overseeing it as far as

9     being actively involved in questioning witnesses

10    and investigating leads, would that have been

11    back when you were in South Miami?

12         A.    I did it in that case.

13         Q.    Okay.

14         A.    So -- and occasionally, you know, I

15    would be actively involved in that.

16               I mean the advantage/disadvantage for

17    being chief in a small city is, you know, you

18    have to do -- pull on the boots and step in the

19    mud, you know, on occasion, and I did, so I was a

20    hands-on officer.

21               Now, did I do all the day-to-day

22    things?  When I was working on that case at the

23    hospital, it turns out that she was having

24    psychotic episodes and was doing it herself, but

```
 1    that was ongoing for about two or three weeks.

 2              I spent a lot of time on that, so, you

 3    know, was I the primary investigator on that?

 4    Yeah.

 5              If we had theft from the drug cart at

 6    the hospital, the captain and I may go in and do

 7    an initial investigation and assign certain

 8    things to the -- to our investigator to do

 9    whatever, but we would handle it first, so was it

10    day in, day out?  No.  During certain times, yes.

11         Q.   Okay.

12         A.   It was extensive.

13         Q.   From that time period between '83 and

14    '87 were there murders that occurred within the

15    jurisdiction of the Ripon Police Department?

16         A.   There were deaths and I think a couple

17    suicides.  There was a -- I think there was --

18    there was a -- there was a missing -- a girl back

19    then.  I don't know if they ever found her.  I

20    don't recall.  We were involved in that.

21              And also investigations on internal

22    discipline that sometimes I was actively involved

23    in that.  Sometimes I was the -- I guess the

24    arbitrator or the appeal source.
```

1      Q.   Let me go back for just a second.   My

2   initial question was how many murder

3   investigations took place between '83 and '87, so

4   I guess ruling out -- so that you know what I'm

5   talking about, when I say murder, I'm not talking

6   about a suicide or just a --

7      A.   Probably four that we -- death

8   investigations.   None of them turned out to be

9   homicides.

10           That's off the top of my head.

11           Whenever you reach a point where it's

12   appropriate, I could use a short break.

13           MS. EKL:   We can do it right now.

14   That's fine.

15           (At this point a short recess was

16           taken.)

17   BY MS. EKL:

18      Q.   Of the cases that you worked on where

19   you were actively involved in the homicide

20   investigations, did you have to testify in court

21   in any of those cases?

22      A.   Some I did, I think.   It's been, what,

23   30 some years, so I believe I did in the one that

24   I was talking about where -- the who done it one

1    as far as identification and that.

2         Q.    You're talking about the one with the

3    burglar?

4         A.    Yes.

5         Q.    Other than that case, are any other

6    times that you can specifically recall testifying

7    in cases?

8         A.    I know that I have.  I don't have a

9    specific snapshot of it, recollection.

10        Q.    Okay.  Your report indicates that

11   you've been certified as a Police Training

12   Institute instructor in Michigan, Florida, North

13   Carolina, and Wisconsin?

14        A.    Yes, ma'am.

15        Q.    In each of those states did you have

16   to undergo certain testing in order to receive

17   your certification?

18        A.    Michigan and Florida you had to have

19   basic instructor training, and I think turn in a

20   sample lesson plan.

21              North Carolina, it was kind of a stair

22   step, that if you had been a basic instructor

23   then -- and had done so much training, then you

24   get the next level.

        1              And then Wisconsin I had specialized

        2    instructor certifications.  I also had taught on

        3    a general basis, so I'm assuming that when I was

        4    teaching in an academy program that the director

        5    of that would send in my CV or whatever and

        6    background and get approved, specialized approval

        7    for that.

        8         Q.   Did you ever receive any kind of

        9    Police Training Institute instructor

       10    certification out of Illinois?

       11         A.   No, ma'am.

       12         Q.   Have you ever received any training

       13    out of any agencies that were -- any Illinois

       14    agencies?

       15         A.   Yes, ma'am.

       16         Q.   When was that?

       17         A.   When I first came up here I went to a

       18    two-day internal affairs investigation seminar

       19    and the -- one of the primary instructors was a

       20    lieutenant from Chicago PD.

       21              Another internal affairs investigation

       22    course that I attended, I think it was a five day

       23    one, one of the primary instructors was either a

       24    commander or former commander from Chicago PD.

1          I've been to Northwestern a number of

2     times for various training programs.

3          Q.   Prior to -- I'm sorry.

4          A.   Reid was in Chicago.  I'm sure half

5     the people in -- or more in attendance were the

6     local police.

7          I went to a two-week training program

8     at Northwestern for the administration of small

9     law enforcement agencies, and I think I was the

10    only non-Illinois officer or one of a very few,

11    so on a number of occasions.

12         Q.   Prior to 1987, had you received any

13    training regarding investigations from any

14    instructors out of Illinois?

15         A.   Prior to when?

16         Q.   1987.

17         A.   Well, yes, ma'am, internal affairs

18    investigations from -- those instructors were out

19    of Illinois, Northwestern, the Reid program was

20    out of Chicago.

21         Q.   And I thought you said that was in

22    1987 or after, the Reid?

23         A.   I thought you said '87.

24         Q.   Prior to 1987.

 1          A.    Oh --

 2          Q.    And specifically -- specifically in

 3     regard to criminal investigation as opposed to

 4     internal affairs.

 5          A.    Okay.  I don't know why you would

 6     differentiate, but I would have to try to dig

 7     that up and look.  I'm sure that I have, but I

 8     couldn't tell you off the top of my head why.

 9          Q.    When were you first contacted about

10     the Whitlock and Steidl cases?

11          A.    April of 2008.

12          Q.    Had you ever --

13          A.    I'm sorry, 2009.

14          Q.    Had you ever heard of the Rhoads

15     homicides prior to that point in time?

16          A.    I may have in general terms.  Very,

17     very general but nothing specific.

18          Q.    And where was it that you had heard

19     about those cases even in general terms?

20          A.    I don't know.  Either from law

21     enforcement or, as tawdry as it sounds,

22     attorneys.  Just in conversation.

23          Q.    Do you remember what attorneys you

24     spoke to regarding it?

1          A.    No, ma'am.

2          Q.    Do you recall what law enforcement

3     officers you spoke to about the case?

4          A.    Like I said, if I was aware of it, it

5     was just in general -- very, very general terms,

6     not specific.

7          Q.    Do you keep in regular contact with

8     anyone who is either a current Illinois State

9     Police officer or a former Illinois State Police

10    officer?

11         A.    No.

12         Q.    Who contacted you in regard to these

13    cases?

14         A.    Initially Jan Susler.

15         Q.    Had you ever worked with Jan before on

16    any cases?

17         A.    No, ma'am.

18         Q.    Do you know how it was that she

19    received your name, or how it was that she

20    contacted you?

21         A.    Possibly referred by somebody, but I

22    don't recall specifically.

23         Q.    You've done a lot of work over the

24    years with another Chicago attorney by the name

1    of John Loevy.  Correct?

2         A.    With John and his firm, yes, ma'am.

3         Q.    Approximately how many cases have you

4    worked on with Loevy and Loevy?

5         A.    In one form or another, somewhere

6    probably between six and 12.

7         Q.    What was it that Ms. Susler originally

8    told you about the case?

9         A.    It was very vague.  It was very

10   complex.  There was a very short turnaround and

11   have to prioritize the information and do the

12   best I could, if I was going to accept it.

13        Q.    Did she explain to you at all the kind

14   of, for lack of a better way to describe it,

15   there's kind of two parts to the case in terms of

16   two investigations?

17             MR. TAYLOR:  Objection.

18   Mischaracterizes the case.

19   BY MS. EKL:

20        Q.    In a general sense, do you understand

21   what I'm referring to?

22        A.    I think she said there were

23   probably -- I mean you're asking me to recollect

24   a conversation that occurred six, eight months

1     ago, but in general terms I think she gave me an

2     initial appraisal that you had two guys who were

3     investigated, subsequently convicted in a small

4     city.   It was a double homicide, separate

5     homicide trials, so the first issues were the

6     initial investigation and with all the warts

7     there.

8                 Secondly, there was the

9     post-conviction process, the appeals, the

10    potential for clemency, those issues, and then I

11    think another part was the Illinois State Police,

12    the command refusing to investigate or not

13    investigating it, not providing information, so

14    kind of it's hard for me to recall what I knew

15    then versus what I do now, but those -- you know,

16    there was basically -- I know there was -- I

17    recall that ISP was requested to look into a

18    flawed investigation, and Lieutenant Callahan was

19    appointed to review the case, and then they kind

20    of -- the Illinois State Police kind of

21    stonewalled it and didn't investigate.

22                That was the general -- general

23    understanding.

24          Q.   Okay.   When you talk about the -- I

1    think you phrased it the warts that go along with

2    the initial investigation, what specifically were

3    you referring to?

4            MR. TAYLOR:  Objection.  Are you

5    talking about in this conversation?

6    BY MS. EKL:

7        Q.   Correct.

8        A.   I don't recall the specifics, just

9    that there were certain -- she may have told me

10   about the two primary witnesses that were the

11   basis for the conviction.  I don't recall.

12       Q.   Do you remember anything specific that

13   she told you about those two witnesses?

14       A.   Maybe one was a drunk and the other

15   one was a drug addict with other problems.  I

16   mean I don't have a specific recollection.

17       Q.   Okay.  Had you ever heard of Michale

18   Callahan prior to talking to Jan Susler?

19       A.   Again, I don't know if I did in

20   passing.  If -- if somebody -- somewhere some

21   training I went to or whatever had mentioned

22   this -- this whole thing about, you know, you had

23   an investigator working with the Illinois State

24   Police, and he was eventually transferred out and

 1   pushed out of the investigation, so I don't

 2   recall if I did or not.

 3          It may have rang a bell.  It may not

 4   have.  I may have confused it with some other

 5   issue.  Don't know.

 6          Q.   Did you have any general impressions

 7   about the case at the point in time that you were

 8   talking to her, the very first conversation?

 9          A.   Generally I give a caveat that I said,

10   you know, that you look at the -- the attorney

11   that contacts me, whether it be defense or

12   plaintiff, look at the case.

13          You obviously or should know more

14   about it at this point than I do.  You're making

15   representations.

16          Assuming that whatever it is, you

17   know, when I review the case, if it's consistent

18   with what your representations are, then I can

19   probably be of help, or if it's some area where I

20   don't feel comfortable with or feel I have the

21   expertise, I might try to refer them somewhere

22   else.

23          But, you know, the caveat is if you're

24   an attorney, and you've taken ownership of a case

1    and then I review it and I see it a whole lot

2    differently and I can't help you, then I'm going

3    to tell you at the end of the review, so, you

4    know, so that's the caveat that I try to give

5    initially.

6         Q.   And, similarly, do you convey to

7    whoever it is that hires you that if the facts

8    change from what your initial understanding is

9    that your opinions could change?

10        A.   Well, unless you're just a total

11   prostitute as an expert witness, of course.  If

12   the fact situation changes, your opinions may

13   change.

14             I mean I'm not an advocate of a

15   particular position.  It's either consistent with

16   or inconsistent with standards and practices, et

17   cetera.

18        Q.   And would you agree with me that

19   expert opinions have to be based on the specific

20   facts of the case as applied to your area of

21   expertise?

22        A.   Yes.  There has to be a basis or an

23   understanding of a factual basis to give

24   opinions, because -- if you're talking about the

1    application or practices of what the police did

2    at a particular time.

3         Q.   Had you ever heard of Bill Clutter at

4    the point in time when you first talked to

5    Ms. Susler?

6         A.   I may have.

7         Q.   And how --

8         A.   I have a good friend who is an

9    investigator, polygraph examiner for the public

10   defender's office, and he used to work in

11   Chicago, and he does Illinois cases, and he works

12   on the Innocence Project, and my son when he

13   was going to school in Madison worked on the

14   Innocence Project.

15        He's going to law school now in

16   St. Louis, but -- so I may have, and, you know,

17   and that may have in passing, you know, over a

18   beer him saying something about Callahan or

19   Clutter or whatever, but when I saw Clutter's

20   name and read more about it, it seemed to strike

21   some kind of recognition.

22        Q.   What's the name of your friend, the

23   polygraph examiner?

24        A.   Michael Branks.

1      Q.   Do you know when it was that he was

2   employed for the Chicago Police Department?

3      A.   I didn't say with the Chicago Police

4   Department.  He used to work in Chicago.

5      Q.   Okay.  I'm sorry.  He worked for the

6   Public Defender's Office.  Was that in Chicago?

7      A.   No, with the State of Wisconsin now.

8      Q.   Okay.

9      A.   I think he used to be a private

10   investigator in Chicago.  He moved up here.  He's

11   with the state now.

12      Q.   Gotcha.  When you said that he works

13   on the Innocence Project, what Innocence Project

14   are you referring to?

15      A.   Who?

16      Q.   Your friend.  Before I get to your

17   son, first your friend.  We're talking about your

18   friend.

19      A.   Michael Branks.  Well, with the

20   University of Wisconsin Madison Law School

21   Innocence Project.

22      Q.   Okay.  And your son, which Innocence

23   Project does he work with?

24      A.   Well, he did work on that project as

1    an undergraduate.

2         Q.   Do you know how long your son worked

3    with the University of Wisconsin Innocence

4    Project?

5         A.   Probably a year.

6         Q.   How is it determined what documents

7    you would initially review in this case?

8         A.   How was it determined?  Initially

9    there was probably a 30-day turnaround time, and

10   so there was a priority, and I was given probably

11   ten or 12 lengthy depositions, and I pity you if

12   you've had to type all of those up --

13             And reports, exhibits, that sort of

14   thing and try to get through as many as I could

15   within a short period of time, and then

16   subsequently that the time was put back for the

17   deadline for a report.

18        Q.   When I say how was it determined, did

19   you ask her for specific documents, or did she

20   tell you these are the things I think you should

21   review initially?

22        A.   No.  It's a huge case.  These

23   attorneys have been living with it for a long

24   time.  They've been taking the depositions, et

1    cetera, so, you know, basically I need the

2    complaints, a basis for what the issues are that

3    you're looking at.

4            That can come through either looking

5    at the complaint or indirecting with the

6    attorneys, and then I need a meat and potatoes

7    understanding of the facts to the extent, and

8    they -- you know, I have a -- basically a whole

9    four or five shelf storage unit that -- full of

10   all this information.

11           MS. EKL:  All the documents in this

12   case?  All right.  I'm going to go ahead and mark

13   this Exhibit No. 2.

14           (At this point the court reporter

15            marked Waller Exhibit No. 2 for

16            purposes of identification.)

17   BY MS. EKL:

18       Q.   Showing you what's been marked

19   Deposition Exhibit No. 2, do you recognize this

20   document?

21       A.   I think this was with the initial

22   batch of materials that was sent to me.

23       Q.   So would this have been the first set

24   of documents that you received related to the

1  case?

2      A.    I believe so, yes, ma'am.

3      Q.    And I'll just represent to you I

4  received this pursuant to our subpoena that we

5  issued to you before your deposition.

6      A.    Okay.

7      Q.    Was there anything else that you got

8  in the initial batch of documents other than

9  what's listed here which includes the pleadings

10  from both cases?  Actually, the Steidl proposed

11  amended complaint, the Whitlock amended

12  complaint, and then certain deposition

13  transcripts with exhibits.

14      A.    I don't know whether I got the Gary

15  Knight deposition with it or subsequent to that

16  and just listed it there to try to keep track of

17  things at the time.

18          And, again, I don't know if I had part

19  one and two of Callahan's deposition at that

20  particular time or I later received it.  I would

21  have to try to go back and look that up, but

22  basically this was the list.  Those are my check

23  marks.  I added Gary Knight and...

24          MS. EKL:  I'm going to go ahead and

1    mark your report as No. 3.

2              (At this point the court reporter

3              marked Waller Exhibit No. 3 for

4              purposes of identification.)

5    BY MS. EKL:

6         Q.   Showing you what's been marked Exhibit

7    No. 3, do you recognize that document?

8         A.   Yes, ma'am.

9         Q.   And what do you recognize that to be?

10        A.   My opinion report issued October 2nd,

11   2009.

12        Q.   And that consists of 28 pages.  Is

13   that correct?

14        A.   Yes, ma'am.

15        Q.   On page -- well, starting on page 2

16   and continuing on through page 3, it indicates

17   materials reviewed.  Do you see that section?

18        A.   Yes, ma'am.

19        Q.   Is this a complete list of everything

20   that you reviewed in connection with your

21   evaluation of this case, or are there any other

22   documents that are missing from that list?

23        A.   I may have been provided -- well, let

24   me look.

 1                    I think I had some other things such

 2        as timelines and some -- through conversation

 3        with the various attorneys refined issues, that

 4        sort of thing, but primarily I believe this is

 5        pretty comprehensive as far as what I reviewed.

 6             Q.   You actually received timelines from

 7        both Mr. Steidl and Mr. Whitlock's counsel.

 8        Correct?

 9             A.   Yes, ma'am.

10             Q.   What was the purpose of -- or what did

11        you use those timelines for?  Why did you receive

12        those?

13             A.   Sorting, mostly.  There's a huge

14        amount of material and just tried to provide some

15        kind of organization and focus.

16             Q.   And what was your understanding in

17        terms of who prepared those timelines?

18             A.   Well, I think Mr. Balson's office

19        prepared the Whitlock timelines, and Jan and

20        Flint's office prepared the Steidl timeline.

21             Q.   Did you rely on the facts contained

22        within those timelines?

23             A.   No, ma'am.  I just used them as

24        general guidelines.

1      Q.   As you sit here today, can you recall

2   whether or not you after reviewing all the

3   materials determined that some of the information

4   in the timeline was not accurate?

5      A.   I don't recall anything of

6   significance, and I don't recall that particular

7   thought process.

8      Q.   Do you recall in this case reviewing

9   the initial case reports?

10     A.   Yes, ma'am.

11     Q.   At what point in your evaluation did

12  you review the case reports?

13     A.   I think they were provided early on,

14  either at the same time or more contemporaneous

15  with the initial depositions.  I think most of

16  those were listed in exhibits.

17     Q.   Before you came to your deposition

18  here today, what did you do to prepare?

19     A.   I think I've lived with this case for

20  the last several months, tried to structure it

21  into manageable files that I could take with me

22  and locate information in my best attempt to

23  respond to particular questions.

24     Q.   Did you speak to anyone?

1          A.    Sure.   Ongoing conversations with the

2    plaintiffs' attorneys.

3          Q.    And throughout the course of your

4    review in preparation of your report did you

5    speak to both counsel from Mr. Whitlock including

6    Mr. Balson and Ms. Susler's office, or did you

7    just speak primarily to Ms. Susler and

8    Mr. Taylor?

9          A.    No, with all three.

10         Q.    Page 4 of your report lists out a

11   methodology.  Is that correct?

12         A.    Yes, ma'am.

13         Q.    Is this the same methodology that

14   you've used that you generally use in all the

15   cases that you review?

16         A.    In substance, yes, ma'am.

17         Q.    You state in here that the methodology

18   is the same or similar to that utilized by other

19   experienced and respected expert witnesses in the

20   field of police practices.  Do you see that?

21         A.    Yes, ma'am.

22         Q.    How is it that you know that the

23   methodology that you use is the same methodology

24   used by other experts?

    1          A.    I didn't say other experts.  I said

    2    utilized by experienced and respected expert

    3    witnesses.  There are some that don't use a

    4    similar.

    5              The -- because I read so many reports,

    6    you know, there are times when -- there are

    7    multiple experts on a particular case, so I may

    8    get the fellow expert's reports.  He gets a copy

    9    of mine or I'm on the opposite side.

   10              I have to be objective, because I work

   11    both defense and plaintiffs' cases, so there have

   12    been occasions where I'm on the plaintiffs' side

   13    on one case.  There's another expert on the

   14    defense side, and then a year later it's vice

   15    versa, and I look at their reports, and the

   16    experts that I respect and I believe have a lot

   17    of credibility generally follow some type of

   18    methodology that's similar to this.

   19              I think you really have to have a

   20    basis for review.  You have to have an

   21    understanding of the facts.  You know, I think --

   22    so then when you sort through the information and

   23    develop your opinions, there has to be a process.

   24    Otherwise, you're just a shill for whoever hires

1    you.

2        Q.   What are the names of some of the

3    other police practice experts that you are

4    referring to when you say that the ones that you

5    respect and that you think are experienced?

6        A.   Lou Reiter, Kevin Parsons.  If you

7    hadn't asked me, I could have probably just went

8    right down the list.

9            I'm trying to -- there's a guy that's

10   retired from Chicago that refers cases to me, and

11   I refer some to him sometimes, Jim -- Jim Marsh.

12   Usually he has a very high standard, Ken

13   Katsaris.

14       Q.   Do you know how to spell Ken's last

15   name?

16       A.   Yes.

17       Q.   How do you spell it for the court

18   reporter?

19       A.   K-a-t-s-a-r-i-s, I believe.

20       Q.   Not as a spelling test, but...

21       A.   That's my best.  George Kirkham, you

22   know, I've seen the methodology that he uses most

23   of the time which is somewhat similar.

24       Q.   How do you spell George's last name?

1          A.     K-i-r-k-h-a-m.

2                 Those are the names that come to mind.

3    Did I say Kevin Parsons.

4          Q.     Yes.

5          A.     He was kind of my mentor in this area.

6          Q.     Have there ever been occasions where

7    you've been on the opposite side of a case from

8    any of these particular experts where they've

9    rendered opinions for, say, the plaintiff, and

10   you've been on the defense side or vice versa?

11         A.     Sure.  Marsh, Kirkham, Katsaris,

12   Reiter, all of them.

13         Q.     Have you ever had any cases where

14   you've been an expert witness where you've

15   rendered opinions based on a certain fact base

16   and then later learned that some fact or

17   something that you thought was a fact wasn't, in

18   fact, true and changed your opinion?

19         A.     Yes.

20         Q.     How many times has that happened?

21         A.     I've probably been retained close to

22   500 times.  I couldn't pull, you know, a

23   particular number.  That's happened.

24                When that happens, you know, if it's a

1     false assumption or if it proves that was a

2     premise going in and you change that premise,

3     then, of course.

4          Q.   Certainly that's important to maintain

5     your reputation as an expert, that if you're

6     going to render opinions, you want them to be

7     based on facts that are true and accurate.

8     Correct?

9          A.   Yes, ma'am.  Well, the jury makes that

10    determination as far as credibility, but as best

11    you can, you play out a fact scenario.

12               If you -- and if your opinions are

13    based or should be based on a particular fact

14    scenario and you change a significant part of the

15    scenario, you could change your opinions.

16         Q.   Can you recall any of those cases in

17    which you've changed your opinions, the names of

18    any of those cases?

19         A.   I just got through telling you.  I

20    couldn't off the top of my head.

21         Q.   On any of them?

22         A.   No.  I mean...

23         Q.   Has it happened at all in the last,

24    say, five years?

1      A.   Again, I don't have a specific where I

2  recall that happening, because I think -- or I've

3  been and the opposing counsel will say, okay,

4  let's change these facts.  Would your opinion be

5  the same?

6           No, but, you know, I mean that occurs

7  frequently.

8      Q.   You stated the basic methodology I use

9  has always been found acceptable in the 450 plus

10  cases I've reviewed.

11           What do you mean by this, that it's

12  always been found acceptable?

13      A.   I've been using the same format which

14  reflects the methodology for -- since I started

15  and my very first case which was in 1988, I

16  believe, and I copied the methodology from Kevin

17  Parsons who was -- at the time was a

18  preeminent -- one of the preeminent expert

19  witnesses on use of force in the country.

20           And it's withstood the test of time;

21  maybe tweaked it or changed it a little bit, but

22  the basic premise is that.  And it's -- you know,

23  it's not all that different from a scientific

24  methodology.

1           You know, you look at the facts.  You

2      try to account for variables, and then you

3      compare with a known standard, and what do you

4      get?

5           Q.   When you say it's been found

6      acceptable, are you referring to in reference to

7      the people who have hired you or in reference to

8      courts of law?

9           A.   Both.

10          Q.   So you're saying in all of the 450

11     plus cases that you've rendered opinions or I

12     guess -- yes, rendered opinions, a court has

13     never found your methodology to be unacceptable?

14          A.   Not that I'm aware of.

15          Q.   Are you aware of that your opinions

16     have been challenged a number of times in courts?

17          A.   Opinions are like rear ends.

18     Everybody has one.  Some are -- some are nicer

19     than others.  Some are more similar than others,

20     but, you know...

21          MR. TAYLOR:  Let's not go any farther

22     with that.

23     BY MS. EKL:

24          Q.   Let me go back to my question.  Let me

1    ask it again.

2            Are you aware that any of your

3    opinions have been challenged in courts of law?

4        A.   Well, I'm sure that they're challenged

5    frequently.  Opposing experts, counsel, judges,

6    you know, who may know or not know about a

7    particular fact matter.  I mean I don't see that

8    as an issue.

9        Q.   Do you recall points in time where

10   you've testified at trials and you've been

11   limited to only talking about certain opinions?

12       A.   Well, sure.  I mean let's -- I mean

13   that's the trial process.  I mean what goes on in

14   a courtroom is actually a microcosm of the facts

15   that the judge has allowed in and for people to

16   hear, so what may be an issue early is no longer

17   an issue or the judge rules that you don't need

18   an expert to decide that, or what have you.

19            I mean it's the same way with a

20   complaint in a civil matter, you know, you may --

21   you throw out a lot of causes of action.  Some

22   may survive.  Some may not.

23       Q.   Let me go back to what you just said,

24   though.

1                   As far as the court saying that you

2       don't need an expert to render certain opinions,

3       has that happened to you before where you've

4       rendered an opinion and a court has said the jury

5       doesn't need an expert to tell them that, so,

6       therefore, you can't testify to that particular

7       opinion?

8             A.    I believe so.

9             Q.    Would you agree that each

10      investigation presents a unique set of facts?

11            A.    Hopefully.

12            Q.    And so you have to look at each

13      investigation, keeping not only the facts of the

14      particular, say, murder investigation in mind but

15      also the circumstances of where it took place and

16      the people involved?

17            A.    The fact situation is the same.  The

18      protocol, the principles used -- I mean the facts

19      are different in each case, even though there may

20      be similarities.

21                   The protocols and procedures that are

22      used to investigate are pretty much the same.

23            Q.    Well, for instance, if you look at a

24      large police department and a police department,

1    say, like Chicago Police Department, which you've

2    reviewed some of their investigations before.

3    Correct?

4         A.   Yes, ma'am.

5         Q.   And the Chicago Police Department at

6    various times has thousands of officers.

7    Correct?

8         A.   Yes, ma'am.

9         Q.   Would you expect that the policies and

10   practices of a department, such as the Chicago

11   Police Department, to be the same as the policies

12   and practices of a small department, say of like

13   the Ripon department?

14             MR. BALSON:  I object to the form of

15   the question.

16             THE WITNESS:  I would say their

17   general practices and their protocols and the

18   procedures used should be, and I know that when I

19   first went to Ripon, I was very impressed with

20   how well trained the investigators were in the

21   protocols and procedures they used at the time,

22   and I've reviewed hundreds, probably thousands of

23   reports and investigations from Chicago Police

24   Department, and I haven't been similarly as

1    impressed, particularly as a course of conduct,

2    so there are advantages, and they should have --

3    you know, a larger department should have better

4    training, better procedures, more staff services

5    available.

6            Do they always do that?  Do they

7    always take advantage of that?  No.

8        Q.   When you're analyzing a particular

9    case, though, are you taking into consideration

10   the size of the department in looking at their

11   policies and practices?

12       A.   You may or may not, I mean, if that

13   that's relevant to a particular issue, but I'm

14   generally looking at did they follow a protocol?

15   Did they follow a common practice?  Did what

16   they, was that reasonable and rational, or was

17   there potentially a hidden agenda, and was what

18   they did consistent with the hidden agenda and

19   not the protocol?

20           I'm looking at those things.

21           I know what should be done in an

22   investigation, and then I look to see if they

23   have followed through on that.

24           I mean just because you don't have a

1    successful outcome doesn't mean you didn't have a

2    good investigation, but you may have an outcome

3    which wasn't -- didn't occur, because you

4    followed the protocols and procedures.

5         Q.   Would you agree that national

6    standards -- or policies and procedures for

7    police departments have evolved and changed over

8    time?

9         A.   I think that they have developed,

10   certainly, and during my involvement since 1969 I

11   think that you have an awareness of what should

12   be done.  You have much more widespread training.

13        You certainly have a proliferation of

14   training materials and standards, protocols,

15   curricula, that sort of thing, so, yeah, I mean.

16        Q.   Just to give an example, you're

17   obviously familiar with the constitutional case

18   of Miranda.  Correct?

19        A.   Yes, ma'am.

20        Q.   Okay.  And when Miranda came along, it

21   instituted a procedure that law enforcements had

22   to follow where they had to read people their

23   rights before they could be questioned about

24   their involvement in cases, just in a general

1    sense.  Correct?

2         A.   No, ma'am.

3         Q.   What's your understanding of Miranda?

4         A.   That if they were in custody or

5    deprived of their freedom in any way in a

6    significant manner, and they were the focus of an

7    investigation, and you wanted to subsequently use

8    what they said or potentially use what they said,

9    then you must advise them of their rights per

10   Miranda and get a knowing and voluntary waiver.

11        Q.   Would you agree that while that

12   practice may have been followed prior to the

13   point in time that that case came out, it wasn't

14   something that was common or required among law

15   enforcement agencies until the case was decided

16   by the Supreme Court?

17        A.   Well, Escobedo was before Miranda, and

18   there was certain -- you know, I think it was all

19   over the board.

20             Since Miranda and the subsequent

21   related cases, you have -- it's more clearly

22   spelled out, and it's generally followed more on

23   a regular basis than it was in the past.

24        Q.   I guess that's what I'm getting at,

 1    that you would agree as the law kind of evolves,

 2    so do the policies and practices that are

 3    commonly accepted within the law enforcement

 4    community?

 5         A.   I think -- I'm not sure that they

 6    relate -- I mean there is a relationship.  I

 7    don't think that there's necessarily a strong

 8    correlation.  There may be in some cases.

 9    Others, not.

10              I think like investigative procedures

11    and practices, some of it relates to court cases.

12    Others just relates to developments in the field

13    of law enforcement that are separate and apart.

14         Q.   Okay.  One instance of something that

15    has changed over time would be the way that

16    different interrogations are recorded or

17    specifically murder investigations are recorded.

18    Would you agree?

19         A.   Well, they've always been recorded.

20    There's different ways to record them.

21              I mean you had -- in Illinois you had

22    such a plethora of abuse -- I'm not saying that

23    Illinois is isolated in that, but it was

24    nationally prominent, and so you had required --

```
 1    had statutory requirements now, so if you're

 2    doing a murder investigation, it's recorded,

 3    video taped, because to -- in an attempt to avoid

 4    some of the abuses that were endemic in the past.

 5         Q.   So as an expert when you're looking

 6    at, say, if you were evaluating a murder

 7    investigation that took place in 2009, and

 8    they're interviewing a suspect who very clearly

 9    is confessing to a crime, it would be a criticism

10    of that investigation in today's world to say

11    that it wasn't video taped.  Would you agree with

12    that?

13         A.   In Illinois?

14         Q.   Right.  In Illinois.

15         A.   If it was a homicide, then that's --

16    as I understand they're an administrative or

17    statutory requirement.

18         Q.   Taking that same jurisdiction back,

19    say 20 years prior, would you agree that you

20    would have to view the case differently in terms

21    of comparing it to accepted policies and

22    practices back in, say, 1986 as opposed to 2009?

23         A.   Depending -- there are some policies

24    and practices that it would be specific to which
```

1    policy and practice you're talking about.  Would

2    you be required to -- or legally required to

3    video tape back then?  No?  Would it have been a

4    good idea?  Yes.  Would it have precluded

5    potential for abuses?  Yes.

6            Should it have been recorded back then

7    in -- when I say recorded, reported factually

8    what was said?  Yes, it should have been back

9    then just as it should be now.

10       Q.   So when you're analyzing a case, do

11   you look at what the best practices are under

12   today's standards, or are you going back and

13   saying, well, back in 1986, for instance, these

14   are the policies and practices that were

15   generally accepted within the law enforcement

16   community, and this is what I'm applying to this

17   case that I'm evaluating?

18       A.   No, ma'am.  I mean when -- which is

19   otherwise probably a disadvantage in life, an

20   advantage in looking at these cases is I was an

21   investigator back then.  I was aware of what the

22   standards were both nationally and training-wise.

23   I was a practitioner, so I have a good feel for

24   that when you go back 20, 25 years.

1              Otherwise, it's a disadvantage.

2    The -- so you look at it and see what would be a

3    requisite practice.  What would be a standard

4    back then may be different from a requirement

5    now, but the requisite standard, the integrity,

6    the essential principle, that hasn't changed how

7    it's proceeded.

8              If it -- I mean just because you don't

9    video tape an interview or an interrogation back

10   then didn't make it inherently bad.

11             It was inherently bad if you didn't

12   record it.  It brings a taint to it in -- when I

13   say record, either through notes or report, et

14   cetera, the content, but the same way as it would

15   be bad if you didn't do it now.

16        Q.   I guess what my question is in terms

17   of when you're looking at your methodology, and

18   specifically the third one that you've

19   highlighted which is comparing with standards of

20   training and practice, are you comparing what

21   took place in the case against the training --

22   I'm sorry, against the standards of training and

23   practice that are in place today, or do you look

24   back at what the standards of training and

1    practice that were in place back at the time that

2    the investigation occurred?

3         A.    Well, my understanding back then is

4    all the ISP investigators had at least six weeks

5    of investigative training and probably

6    additional -- or whatever what was the basic

7    requirement when they were made -- put in that

8    assignment.

9              You had Detective Wheat and Detective

10   Parrish say we had no training whatsoever to be

11   investigators, but you had at least some of them,

12   the people involved.

13             You had Eckerty having a baseline of

14   training, understanding of the practices and

15   procedures that applied.  I think that that's a

16   given.

17             You have an admission by Parrish and

18   Wheat, we didn't get any training.

19        Q.    Let me stop you for a second.  I'm

20   going to let you say everything you need to say

21   about the factual specifics, but I want to go

22   back to the methodology in terms of what you're

23   comparing -- what standards and training you're

24   using to compare what they had, so are you

1    looking at today's standard practices, or are you

2    looking at, you know, what was in place back in

3    1986?

4          A.   Well, in general, practices haven't

5    changed.  Maybe specific requirements have, but

6    general practices haven't changed significantly.

7          Q.   You reference in here that you -- the

8    standards of training and practice that you look

9    at include relevant Supreme Court cases, for one.

10              Which relevant Supreme Court cases

11    specifically did you rely upon in analyzing this

12    case?

13          A.   Brady comes to mind.  You know, I

14    think that Miranda is another one.  I think that

15    the whole set of cases that establish the

16    exclusionary rule, so I mean those are --

17    probably Brady being one of the most significant;

18    the inconsistency in the application of Miranda

19    on this one.

20          Q.   You also talk about departmental

21    policies and procedures.  What specific

22    departmental policies and procedures are you

23    referring to?

24          A.   Whatever is available that includes

1    written directives, specific procedures, rules

2    and regulations, the adherence to the law

3    enforcement code of ethics, what is available and

4    applicable to that particular agency at that

5    particular time.

6           Q.   So, for instance, you would be looking

7    at the policies and procedures that were in place

8    in the Paris Police Department back in 1986, '87

9    when this investigation was going on?

10          A.   It was a certain baseline there, yes,

11   ma'am.

12          Q.   And in relation to, say, Jack Eckerty,

13   you would be looking at the Illinois State Police

14   policies and practices that were in place back in

15   1986 and 1987 when you're referring to here the

16   departmental policies and procedures?

17          A.   Yes, and what is the national practice

18   of ethical conduct, certainly.  I mean those are

19   things.

20          Q.   Where -- what did you use to determine

21   what the national code of ethics was back in 1986

22   and 1987?

23          A.   Well, life experience.  I think the

24   law enforcement code of ethics has been around as

1    a model.  It's been widely incorporated since the

2    '70s or maybe even before.  I know at least in

3    the 70's.

4              There is reference to -- as

5    rudimentary as it was, there was rules and

6    regulations which required ethical conduct within

7    the Paris Police Department.

8              You had an oath of office or oath of

9    an officer.  You had the law enforcement code of

10   ethics, et cetera, as guidelines for ISP

11   personnel.  You had -- as far as law enforcement.

12             Then you had specific or more specific

13   requirements through various directives, but I

14   mean pretty much those haven't changed, the

15   basis, you know:  concern for the constitutional

16   rights of all individuals, the purpose of an

17   investigation is to determine the truth,

18   fundamental fairness, due process, those are all

19   considerations.

20        Q.    You also have on here applicable

21   state-wide Police Training Institute programs or

22   systems.  Which are you referring to there?

23        A.    I think you had a baseline of training

24   that was required back then which has increased

1    and expanded and improved over the years, but you

2    still had a baseline of training back in the mid

3    '80s that officers were required to complete.

4         Q.   Is that something that you think or

5    you know that there was a baseline of training

6    back in 1986 and 1987?

7         A.   I know that there was.  I don't know

8    specifics, if the individual officers were

9    grandfathered in because they were -- at the

10   time, but by that point in time, Illinois and

11   just every other state that I'm aware of had

12   incorporated baseline training requirements.

13        Q.   Back in 1986 and 1987 what was the

14   baseline of training that was required in

15   Illinois?

16        A.   I don't know specifically.  I know

17   that there was.

18        Q.   So when you say that you're using

19   these as a standard that you're comparing, what

20   did you use for comparison purposes?  You've

21   listed in here applicable state-wise policy

22   training programs or systems, so what were you --

23   what policies -- what programs or systems were

24   you comparing to what was actually done here?

1          A.    Well, as far as criminal

2     investigations, the training provided to ISP

3     officers, knowing that they had a basic academy,

4     so they would have the core.  They had written

5     directives that they were expected to follow, and

6     then they had advanced training in

7     investigations.

8               So that as far as ISP, and I'd have to

9     go back and look at the depositions, but as far

10    as what -- I believe that Parrish went through

11    basic Police Training Institute; so did Wheat and

12    so did Ray, if memory serves me correctly, so

13    that there would be a baseline.

14              The core requirements based on my

15    having been retained in 32 states with varying

16    degrees of sophistication, that the -- I have a

17    pretty good understanding of what the core

18    curriculum included.

19         Q.    So just so I make sure I understand,

20    you're saying that you know that back then they

21    had to undergo this core curriculum and that you

22    have a basic understanding of what that core

23    curriculum consisted of, so then you're comparing

24    what -- you're comparing their actions to this --

1    what they were -- should have been trained in in

2    terms of the core curriculum?

3         A.    Anecdotally what they said they were

4    aware of.  Like Chief Ray, for example, says

5    officers are expected to document when they

6    conduct an interview.  If you're doing an

7    investigation, there are any number of reasons

8    why you document the interview, one of which is

9    so you can make an assessment of credibility if

10   the individual you talk to changes, and if it's a

11   complex situation and you don't record that

12   information, you can't remember.

13        Q.    But going back to the applicable

14   state-wide Police Training Institute programs and

15   systems that you're using as baseline for

16   comparison, you're just saying that's based on

17   your general understanding of what was required

18   back then and what was taught at that time?

19        A.    And what the officers had made

20   reference to as far as knowing what they should

21   be doing, yes, ma'am.

22        Q.    You also talk about model policies,

23   training, and research from such institutes, and

24   then you go on to say:  As the International

1    Association of Chiefs of Police, Police Executive

2    Research Forum, National Criminal Justice

3    Reference Service, and Northwestern University

4    Service For Public Safety.

5           What model policies did you rely upon

6    in comparing what was done here to what was in

7    place back in 1986 and '87 in terms of model

8    policies?

9       A.   I don't recall looking at a specific

10   one.  It would be my general knowledge of what's

11   contained in there as far as investigative

12   procedures.

13      Q.   What research did you rely upon that

14   you used as a comparison of what was done in this

15   case?

16      A.   Totality of my training, education,

17   and experience in law enforcement as an academic

18   instructor, as a police trainer, and as --

19   ongoing as a consultant.

20      Q.   So you're not talking about research

21   that was conducted in some type of -- by some

22   other institute or any of those agencies that

23   you've listed then?

24      A.   Well, I think a lot of their

 1    publications are based on research of best

 2    standards, and over the years that may improve or

 3    change or become more comprehensive, but

 4    certainly the IACP does everything from basic

 5    training keys to model policies to articles in

 6    Police Chief Magazine to training programs, so

 7    they are one source.

 8              PERF is always developing ongoing

 9    things in various areas in the police field.

10    That's cutting edge research.  Sometimes they'll

11    provide a model policy.  Other times just general

12    areas which should be considered.

13              I don't think -- and if you look

14    anecdotally at the responses from everybody from

15    Director Nolan to Deputy Director Brueggemann to

16    Lieutenant Callahan to Agent Marlow, they all

17    pretty much say the purpose of an investigation

18    is to determine the truth.  We're out here to try

19    to ensure justice.

20         Q.   Let's get back to my question, and I

21    want to kind of narrow this a little bit, because

22    my clients are involved in the initial

23    investigation, so as far as the ISP officials

24    that you just related, being Mr. Johnston is

1    going to have an opportunity to ask you about

2    your opinions relating to the ISP officials, you

3    know, Brueggemann and Carper and all of those

4    people.

5             I represent Mr. Parrish, Mr. Ray, and

6    Mr. Eckerty, so in relation to that investigation

7    that took place back in 1986 and 1987 and your

8    evaluation of their investigation, what specific

9    research did you rely upon in evaluating their

10   investigation back in 1986 and 1987?

11       A.   It's just my general overall knowledge

12   and the fact that Eckerty was a member of the

13   Illinois State Police.  He had been trained by

14   them.  He was provided as a resource to the local

15   police because of his expertise in training and

16   anecdotally things that he has said throughout

17   which would indicate to me that he understood the

18   basics or basic requisites for conducting an

19   ethical criminal investigation.

20            On the other hand, you have Chief Ray

21   who indicates, yeah, I know you're supposed to

22   write these things up.  He admits they didn't do

23   it.  He was the supervisor.

24       Q.   Going back.  I'm asking about

1   research, because that's what -- this is in your

2   opinion you said that you're comparing it to

3   research, and I'm just trying to get at what

4   research are you comparing their conduct to?

5        A.   I've repeatedly told you, the research

6   that I'm aware of which are the standards of

7   practice, and that comes from the totality of my

8   training, education, and experience in law

9   enforcement, as an academic instructor, as a law

10  enforcement trainer, and as a consultant.

11       Q.   So you can't point to any specific

12  research or literature that you utilized in

13  making a comparison of what they did to the

14  accepted practices and procedures back in 1986

15  and 1987?

16       A.   I could, but I relied on the totality

17  of my training, education, and experience.

18       Q.   Well, when you say you can, then can

19  you tell me what that is?

20            MR. TAYLOR:  Objection.  Asked and

21  answered.

22            THE WITNESS:  You could go back and

23  show training keys.  You could show protocols

24  from ISP, investigative training curriculas.

1             Those particular things from ISP were

2    not provided.  You could go and look at the

3    recruit curriculum for training.  If you want to

4    go back to the specific training that Wheat and

5    Parrish had, or even Chief Ray, that wasn't

6    provided for me for review, but if you went back

7    to that, there would be certain commonalities

8    with my understanding of what those standards

9    would be.

10        Q.   I understand if it wasn't provided to

11   you, you can't compare it, but I just want to get

12   to the bottom of what you did compare, what you

13   did have that you used as a baseline for

14   comparison?

15        A.   I've told you repeatedly it's the

16   totality of my training, education, and

17   experience four-fold:  as a law enforcement

18   practitioner, as an academic instructor at the

19   college and university level teaching criminal

20   investigation.

21        Q.   There's no specific research --

22        A.   Ma'am, let me finish -- ma'am, ma'am,

23   as a law enforcement trainer, and as a police

24   consultant, police practices consultant.  It's

1    that totality.  I did not -- and I'll tell you

2    however many times you want to ask, go and look

3    at specific sources and quote them.  I did not do

4    that.

5         Q.    That's just what I'm getting at.  You

6    had it in here as research, and I'm just trying

7    to find out if there were specific sources that

8    you relied upon in rendering this opinion other

9    than I understand you're saying based on your

10   training and your background and your experience,

11   but you seem to list other sources in here, and I

12   just want to get to the bottom of what those

13   sources are if, in fact, you did use other

14   sources as comparison.

15        A.    Ma'am, those are things that I

16   typically reviewed in the course of my experience

17   and career, so those were examples.

18             If I was going to quote a specific

19   source, CHLEA standard at 43-1.2, then I would

20   have done that.

21             I did not.  If I was going to say in

22   model policy from the International Association

23   of Chiefs of Police, dated X year, da, da, da,

24   da, da, da, da, da, could I do that if necessary?

1     Sure, I could go back and do specific research.

2     I already know in general terms what it states,

3     so I did not do that.

4              MS. EKL:  We could go ahead and take a

5     lunch break now?  This is a good time.

6              (At this point a noon recess was

7              taken.)

8     BY MS. EKL:

9          Q.   Your understanding of the facts in

10    this case are laid out in your report.  Is that

11    correct?

12         A.   Yes, ma'am.

13         Q.   And that's starting on page 4 and

14    continues through page 7?

15         A.   Yes, ma'am.

16         Q.   Rather than have you go through and

17    try to relay everything out loud right now, I'm

18    assuming that you've had a chance to go through

19    the documents that you received from the

20    attorneys and that formed the basis for these

21    facts, the factual basis that you've laid out in

22    your report.  Is that accurate?

23         A.   Yes, ma'am.

24         Q.   Were there any facts that you learned

 1   from speaking directly to the attorneys that were

 2   not contained in the documents that you received?

 3        A.   I don't believe so, none that I could

 4   differentiate.  I mean I've had many discussions

 5   and reviewed endless documents, so nothing that I

 6   could determine, and I have done abbreviated

 7   opinion reports, last minute things, and if it

 8   was from information based from what an attorney

 9   said, I would have addressed it as such.

10        Q.   Okay.  And as we go through the

11   opinions, I'm going to ask you what specific

12   facts you relied upon, so rather than have you go

13   through all the facts up front --

14        A.   Okay.

15        Q.   So directing you specifically to your

16   opinions in this case, those start on page 7.  Is

17   that correct?

18        A.   Yes, ma'am.

19        Q.   You've kind of laid this out in

20   outline form?

21        A.   Yes, ma'am.

22        Q.   And what you've designated as kind of

23   Subsection A, is this just kind of laying out a

24   background in terms of what your beliefs are

 1    based on your training and experience and

 2    education, your beliefs regarding -- or not your

 3    beliefs but laying out what it was that you

 4    relied upon in formulating your opinions as

 5    opposed to actually setting forth any opinions in

 6    Subsection A?

 7         A.   I don't know how to answer that

 8    question.  I guess I'm confused by it.

 9         Q.   Let me rephrase it.  Yeah.  Let me

10    rephrase it.

11              Does Subsection A contain any of your

12    opinions, or is that just laying out a basis for

13    the opinions that are set forth in later pages?

14         A.   Well, if you accept the premise that I

15    think most knowledgeable people would that the

16    purpose of an investigation is to determine the

17    truth about what happened, then you can call it

18    whatever you will, but I think that's the basic

19    premise.

20         Q.   Okay.

21         A.   And then I have documented why I

22    believe that to be so and referenced it

23    anecdotally also.

24         Q.   Okay.  I'm going to direct you then

1    next to Subsection B where you state:  The

2    original investigative team was composed of

3    State's Attorney Michael McFatridge, ISP Sergeant

4    Jack Eckerty, Paris PD Detective James Parrish,

5    and Paris PD Chief Gene Ray.

6              The actions of McFatridge during the

7    course of the initial homicide investigation were

8    the same as, similar to, or consistent with the

9    function of a criminal investigator.

10              That's an opinion of yours in this

11   case?

12        A.   Yes, ma'am.

13        Q.   Okay.  The term investigative team, is

14   that something that you've used in other

15   opinions?

16        A.   I don't recall.  I mean I don't recall

17   of a specific example.  I may have.

18        Q.   What is it about this case that leads

19   you to believe that those four individuals make

20   up what you've phrased as an investigative team?

21        A.   I think they referred to themselves as

22   such.

23        Q.   You're referring to deposition

24   questions in which Mr. Taylor asked questions

1    referring to them as the investigative team?

2         A.   I can't give you a specific reference

3    page, I don't believe, other than the ones I've

4    listed below the opinion.

5         Q.   The fact that you referred to them as

6    an investigative team, does that have any

7    particular significance in relation to the rest

8    of your opinions in this case?

9         A.   Again, I don't know how to answer that

10   question.  I don't know what it means.

11        Q.   I guess I'm trying to get at the

12   bottom of what investigative team means to you.

13        A.   People who work together on an

14   investigation.

15        Q.   In the course of any investigation,

16   not talking about this one in particular, would

17   you agree that there are certain duties and

18   responsibilities of law enforcement officers, and

19   there's also certain responsibilities of a

20   prosecutor in the case?

21        A.   In any investigation?

22        Q.   Right.

23        A.   No.

24        Q.   Let me -- let me strike that.

1              In any criminal prosecution, that you

2    would have law enforcement officers who have

3    their own duties and roles, and then you would

4    have a prosecutor who has his duty and role?

5         A.   Yes, ma'am, if you're talking about

6    the prosecution of a particular case, that is

7    true.

8         Q.   And in the course of your experience

9    working in a case that's being prosecuted, did

10   you work with a State's Attorney's Office in some

11   kind of capacity?

12        A.   You know, I can only remember calling

13   them if we either needed something or for legal

14   advice.

15             I don't -- off the top of my head, I

16   don't ever recall where a prosecutor or State's

17   Attorney has been integrally involved in the

18   investigation of a matter.

19             I mean it just always -- always has

20   been basically as a reference or a resource until

21   we turn it over to them, and then after they've

22   examined it, they may say we need a little more

23   here or, you know, what charges are you looking

24   at, and, you know, I think this charge is maybe

1    more appropriate because of this evidence or the

2    lack of that evidence, but I don't recall ever

3    being personally involved in a situation that's

4    analogous to this.

5        Q.   Would you agree that there's certain

6    constitutional duties that a law enforcement

7    officer has in terms of information that he has

8    to provide to the State's Attorney?

9        A.   I don't know what you mean by

10   constitutional duties.  I think he has an

11   obligation to be truthful and to be as accurate

12   and fair as possible within the rubric of our

13   constitution, but I don't know that it's a

14   constitutional duty.

15            I think you take an oath of office,

16   and certainly you shouldn't slant it.  You

17   shouldn't withhold information.  You should give

18   whatever information, good or bad, exculpatory,

19   inculpatory to the prosecution and for their

20   determination.

21       Q.   You're familiar with the

22   constitutional case of Brady versus Maryland,

23   obviously.  Correct?

24       A.   Yes, ma'am.

1      Q.    What's your understanding of Brady

2    material?

3      A.    That Brady may be anything that may be

4    exculpatory in nature, excuse the actions, have

5    some influence about determination of the guilt

6    or innocence of the party or potentially the

7    mitigation of sentencing.

8      Q.    And in your experience as a law

9    enforcement officer, how does an officer fulfill

10   their Brady obligations?

11     A.    Very easily.  Two-fold:  Give the

12   prosecutor everything they get and tell the truth

13   and be as complete and thorough as possible.

14   That must be three.  Excuse me.

15     Q.    If an officer were to provide

16   information to a prosecutor in advance of a

17   charge taking place, would you agree that they

18   have -- even though a charge eventually takes

19   place, they've fulfilled their Brady duty as long

20   as the information got there at some point in

21   time, whether it was before the charge took place

22   or after the charge took place?

23          MR. TAYLOR:  Objection.  That's two

24   questions.  Could you read that back, please?

1           MS. EKL:  Sorry.  That just struck me

2     as funny.  I'll rephrase it.

3           MR. TAYLOR:  The question struck me as

4     funny.  That's why I objected.

5           MS. EKL:  I know, but you ask double

6     questions all the time, and I agree.  It was a

7     bad question.

8           THE WITNESS:  Okay.  Kids, let's quit

9     fighting.

10          MS. EKL:  No, I'm not fighting.  I

11    agree which is rare.  All right.

12          MR. JOHNSTON:  Were you going to read

13    the question back?

14    BY MS. EKL:

15       Q.   No, I said I'm rephrasing it.

16          Does Brady impose any obligation on

17    the officer as to when information has to be

18    turned over to the prosecutor?

19       A.   I think in a timely manner and an

20    appropriate manner.  I think it's -- again,

21    fundamental fairness and due process

22    considerations.  You're not supposed to play

23    games with it.  You're not supposed to be cute,

24    hide it, whatever.

 1          I think you lay it out.  Then it's up

 2  to the prosecutor.

 3      Q.  Would you agree that if officers are

 4  investigating a case and they are relaying the

 5  information that they're learning to the

 6  prosecutor on a, say, daily basis, that that

 7  would be fulfilling their obligation of turning

 8  over information in a timely manner?

 9      A.  Maybe on an ongoing basis, but

10  certainly there's a requirement that they record

11  it and forward it.  I think that's also an

12  appropriate part.

13          I think Chief Ray was very profound

14  when he said if you -- if we don't put it in a

15  report, there's no way they're going to know

16  about it, and if that was done deliberately, then

17  it's contrary to the spirit and the letter of the

18  Brady requirement.

19      Q.  Would you agree that there's other

20  methods in which a prosecutor could learn of the

21  information other than it being in a police

22  report?

23      A.  I think the police obligation is to

24  document it.  I think then that fulfills the

 1    requirement, eliminates any question of

 2    impropriety or unethical conduct on the part of

 3    the officers.

 4            And also it doesn't provide the

 5    prosecutor with a lot of wiggle room to say I

 6    never heard that or maybe plausible deniability,

 7    so I think the appropriate standard is -- and law

 8    enforcement officers are taught if it's not in

 9    the report, it didn't happen.

10            You can't justify something later on

11    when you get in trouble, so be complete, be

12    thorough, tell them what you saw, what you

13    learned, what you did, et cetera, include it in

14    the report.  You provide that to the prosecutor.

15    You're done.

16        Q.   My clients in this case are being

17    accused of violating the constitutional rights of

18    two men.  When you analyze this case, were you

19    looking at whether or not their policies and

20    practices were in accordance with accepted

21    policies and practices back at that time in 1986

22    and 1987 or were you looking at in it terms of

23    did they follow the best practices they could

24    have?

 1          A.    You were talking about all three or

 2     just two?

 3          Q.    All three of them.

 4          A.    It wasn't the best practices,

 5     obviously, and I think that they were -- it was

 6     subpar.  They were aware that it should be

 7     reported.  They did not report it.

 8               The supervisor, Chief Ray, was aware

 9     that it wasn't reported or it wasn't contained in

10     reports, and they -- so they were aware that it

11     should be.  They didn't do it.  The supervisor

12     was aware.  That would be indicative of the

13     actual practice.

14          Q.    And I'm talking in a more broad sense.

15     I'm saying in general when you reviewed this

16     case, the investigation in the case, were you

17     looking at trying to determine if there were

18     better ways that they could have acted, or were

19     you trying to determine whether or not they

20     violated the constitutional rights of these two

21     plaintiffs by not following acceptable police

22     practices?

23          A.    I don't think it's my job to determine

24     if they violated constitutional rights.  I think

1    my job was to compare what they did with accepted

2    practices.  What they did was not consistent with

3    accepted practices now or then.

4         Q.   Would you agree that the accepted

5    practice is to relay the information to the

6    prosecutor in some form?

7         A.   No, ma'am.  The accepted practice, as

8    Chief Ray acknowledged, as I think Jack Eckerty

9    would acknowledge was to put it in a report and

10   provide that report or that documentation,

11   whatever manner in which it was done, to the

12   prosecutor.

13        Q.   So are you relying on the fact that

14   you think that all information must be

15   documented -- all Brady information must be

16   documented as opposed to, say, given orally or

17   verbally to the prosecutor as a basis for finding

18   that they didn't properly disclose information?

19        A.   I just got through giving you an

20   analogy about law enforcement training.  If a law

21   enforcement officer uses force, he doesn't put

22   the appropriate justification for the force in a

23   report, later on he's charged with using

24   excessive force or criminal assault.

 1              Officers are trained that because you

 2    didn't document it contemporaneous with the

 3    activity as reasonably as could be done, it's

 4    going to be considered not to happen.  You're

 5    going to be considered to be making it up.

 6    You're going to be considered to be wrongdoing.

 7              That's how officers are trained.

 8    That's how officers were trained in the '70s.

 9    That's how officers are trained in the '80s.

10    That's how officers are still trained, so the

11    problem is if you don't document it, then you're

12    not being held accountable, and they need to be

13    accountable for doing a good investigation.

14         Q.   If an officer conducts an interview

15    and the State's Attorney is present in the room,

16    and the State's Attorney then later documents

17    that interview, but the police officer didn't

18    document the interview, is it your testimony

19    that, (A), the interview didn't happen?

20         A.   Who does the interview?

21         Q.   Does it matter?

22         A.   Yes.  If you're present and as a

23    witness, then maybe you're not required.

24              If you are present and you are the

1    active interviewer or a participant in the

2    interview process, for example, I don't have a

3    problem with one officer asking the questions,

4    the other taking the notes, then they confer --

5    now, let me finish -- and that it's complete, but

6    what I'm saying is if you have -- if you're

7    playing games, and this would be indicative of

8    playing games, because if you're not documenting

9    this for the file, then you can't use it in the

10   future, because it's not going to be available to

11   you.

12          Now, if you have a written report from

13   the State's Attorney, and that's put in the file,

14   and you agree with it, you sign off, and it can

15   be used as you bring in people and take people

16   out of the investigation, no, I don't have a

17   problem with that, but to not have that included

18   in the report, to conceal it in some way, I would

19   say that that cries foul.

20          Q.   So based on your training and

21   experience, it's your belief that unless

22   something is documented, it can't be used?

23          A.   No.  I'm saying officers are trained

24   that if it wasn't documented, it's going --

1    there's going to be allegations that it didn't

2    happen, and to preclude those, officers are

3    trained to document objectively, consistently

4    what they're doing, particularly in something

5    such as a homicide investigation, because it's

6    not going to be just for their use.  It's going

7    to be used by other investigators and

8    subsequently for the use by the prosecutor and

9    subsequently for defense counsel.

10        Q.   Going back to my initial question

11   about Brady, if something isn't documented, but

12   it's told to the prosecutor who can then relay it

13   to the defense, is it your testimony that the

14   officers haven't fulfilled their -- haven't

15   followed appropriate practices?

16        A.   The standard of practice is to

17   document what you observe, what is done in the

18   course of an investigation, particularly a

19   complex investigation so that that information

20   can be utilized later on, and so that is the

21   appropriate standard of practice.

22        Q.   So if the officers, for instance,

23   gathered information on the street, some small

24   piece of information, didn't document it but

1    relayed it to the prosecutor, it's your opinion

2    that that is -- that was improper?

3              MR. TAYLOR:  Object to the vagueness

4    of the term small piece of information.

5              THE WITNESS:  Is it relevant?  Is it

6    material?  Could it be relevant or material if it

7    is?

8              It should be documented.  If Joe Blow

9    walked by and said, "Hi," and -- I don't think

10   you need to document that.

11             If Joe Blow said, "Maybe you should

12   look at, you know, hey, our State's Attorney is a

13   crack head and so and so saw him using cocaine,"

14   and da, da, da, da, da, da, you probably want to

15   document that.

16             Whether you gave it to the State's

17   Attorney or not, you know, that might be a

18   different matter, but certainly if something is

19   significant, the practice is to document it.

20             It has been, it is now, it probably

21   always will be, and if it's not documented, then

22   you can't use it, and it's subject to abuse.

23   That's another reason why you document things.

24

1    BY MS. EKL:

2        Q.   Going back to your own experiences as

3    a law enforcement officer, early on when you were

4    talking about working with your sources on the

5    street, if you received information that's passed

6    along to, say, the vice squad or whatever, did

7    you document every single piece of information

8    that you learned before you passed it on?

9        A.   Ma'am, you're talking apples and

10   oranges, you're talking about ongoing conduct of

11   relatively minor crime versus a complex homicide

12   investigation.

13       Q.   So is it your testimony Brady

14   differentiates between complex murder

15   investigations and some minor crime?

16       A.   No, ma'am.  My information at that

17   time wasn't passed on for the purpose of -- it

18   was passed on for the purpose of further

19   investigation, and so if the officers -- the VIN

20   squad were going to use that, they either had a

21   document that I submitted in the form -- say a

22   copy of a field interrogation card, they could

23   have had written notes, or they could have had a

24   report, if I wrote a report and gave them a copy

```
 1    of it, or if I just pass on the information, and

 2    it's not going to come back as it's just a source

 3    and then they develop it, then I would expect

 4    them to write the report.

 5         Q.   Under Section C of your report you

 6    state that the Paris Police Department had a

 7    pattern and practice of failing to train,

 8    supervise, direct, and discipline police

 9    personnel with regard to the proper means of

10    conducting criminal investigations.  Is that

11    accurate?

12         A.   I didn't follow you word for word, but

13    I believe it sounded pretty accurate.

14         Q.   How was it that you came to that

15    opinion?

16         A.   Well, both Wheat and Parrish indicated

17    they had no training to become a detective, no

18    training with regard to what kind of evidence to

19    document.

20              You had the chief who indicated, yeah,

21    he would expect reports to be written on any

22    interviews and any information that came in on

23    something like this.  He was aware that it had

24    not been, so that's indicative to me of a pattern
```

1    and a practice of not training the officers.

2            Parrish and I believe Wheat admitted

3    they weren't trained as investigators.  They

4    weren't supervised.  They certainly didn't --

5    weren't provided any direction, and they weren't

6    disciplined for doing that, so it was the

7    accepted practice in the Paris Police Department.

8            It's not the accepted practice for a

9    criminal investigation.

10       Q.   What is your understanding of the

11   phrase pattern and practice?

12       A.   It's what they typically did or what

13   was accepted for them doing.  Obviously they

14   didn't have a lot of written directives.  They

15   didn't have formalized -- much of any formalizing

16   training that I'm aware of.  They weren't sent

17   away for extra training, so they admit they had

18   no training.

19            They indicate -- I mean it's obvious

20   that they didn't do reports.  The initial report

21   on Herrington in the two days he was in the

22   custody, care, and control of the members of the

23   Paris Police Department while they were supplying

24   him with alcohol and keeping him in relative

1      isolation, you had no report from those two days.

2           And then you had the same thing with

3      Rienbolt, that Debra Rienbolt comes in.  She

4      gives one of the first of many versions of her

5      testimony.  It's not recorded anywhere, and the

6      next day or two days subsequent to that then they

7      start taking down the information.

8           Q.   You're giving examples of situations

9      within this particular case where Parrish or

10     someone else didn't properly document something.

11     Correct?

12          A.   Neither Parrish, nor Wheat documented

13     anything which occurred with Herrington the first

14     two days.  Parrish did not document other than I

15     believe he may have done a rather nebulous and

16     confusing property receipt for the knife but did

17     not document the initial interview with Rienbolt

18     on the first day.

19          The chief was aware that that

20     wasn't -- there were no reports.  Nothing was

21     written on either occasion.  In fact, the chief

22     was present the first time -- the first five

23     hours with Herrington, so nobody took any notes.

24     Nobody wrote a report.  Nothing was documented.

1          The policy maker for the department is

2     there.  He's aware of it.  He concedes.  At some

3     other point he said, well, if we don't put it in

4     writing, I guess they won't know about asking for

5     it, will they, or some words to that effect, so

6     that is the practice.  That is the accepted

7     practice.

8          I mean you have two different

9     examples, same case, but two separate witnesses,

10     same manner of dealing with them.

11     Q.   So your opinion that there's a pattern

12     is based on the fact that it allegedly happened

13     twice in the same case?

14     A.   And the chief was aware, the chief

15     accepted it, and the chief acknowledges he knew

16     better.

17     Q.   But you acknowledge that you don't

18     have any other evidence to show that there was a

19     practice or a pattern of this happening in any

20     other case with any other officers within the

21     Paris Police Department.  Correct?

22     A.   I don't recall any specifically.  I

23     don't at this point.

24     Q.   In regard to your allegation that

1    Parrish was not trained -- did not receive any

2    training, you're saying that you base that solely

3    on a statement that he made during his

4    deposition?

5            MR. TAYLOR:  Objection.  He didn't say

6    solely.  Form of the question.  Mischaracterizes

7    his testimony.

8    BY MS. EKL:

9        Q.   I'll rephrase it.  What do you base

10   that on, that he didn't receive any training as a

11   detective?

12       A.   His deposition testimony, page 72,

13   Detective Parrish had no training to become a

14   detective.  Page 22, Detective Parrish had no

15   training with regard to what kind of evidence to

16   document.

17           Page 413 through 414, Parrish stated

18   he has never heard of Brady material and is not

19   clear about impeachment; page 415 of his

20   deposition -- Parrish had no formal training

21   about Brady material or impeachment.

22           I'm not sure whether or not this was

23   indicative of that he hadn't been trained, but it

24   certainly was improper not to document the

1    appropriate chain of custody of the knife,

2    because Rienbolt gave the knife to Ann Parrish

3    who gave the knife to Detective Parrish.  A

4    trained detective would want to maintain the

5    chain of custody.

6              Parrish stated at page 73 of his

7    deposition that he wrote down everything when he

8    was a detective, and then he qualified that

9    anything that's relevant went into the report,

10   page 131; everything in my notes went into my

11   handwritten report, page 138; he believed all

12   relevant information was included in his or

13   Eckerty's reports, page 185.

14        Q.   We're getting a little off my

15   question.  We'll get to that in a minute.  I'll

16   let you explain that, but right now I'm talking

17   about what you based your opinion on that Parrish

18   did not receive training.

19              Were you provided with Detective

20   Parrish's personnel file?

21        A.   I may have been.  Maybe that was Chief

22   Ray.  I don't recall at this point in time.

23        Q.   As you sit here today, do you recall

24   every single training course that you've taken

1    over the course of your career?

2         A.   Every single one, no, but I probably

3    have a list that pretty much covers it all.

4         Q.   A list that you've written down?

5         A.   Yes, ma'am.  It's over 3,100 hours,

6    but I can pretty well tell you sum and substance

7    of the training.

8         Q.   As of 1987, what training did you have

9    in regard to criminal investigations?

10        A.   Michigan State University,

11   interviewing and interrogation, criminal

12   investigation.  I believe it was a criminalistics

13   or forensic evidence course.

14        Q.   Let me qualify, because I think -- as

15   a law enforcement officer what training did you

16   have prior to 1987 in criminal investigations.

17             MR. TAYLOR:  I think you already went

18   through this.

19             MS. EKL:  I did, and I didn't get an

20   answer, so I'm asking him if he's expecting

21   Parrish -- he just said I expect him to know it.

22   He said I could lay it out, so if he can lay it

23   out, I want him to, because he couldn't earlier.

24        A.   Well, that's not true, ma'am.  That's

1    your opinion.

2              You keep asking me questions, and you

3    don't want me to answer, so I had the -- and what

4    difference does it make when you get the training

5    whether you happen to be a police officer or not?

6              So the training from Michigan State

7    University that we've gone through, the training

8    in the 20-week academy that dealt in a

9    rudimentary manner with conducting interviews,

10   field interrogations, writing reports, and other

11   aspects of criminal investigation, the 80 hours

12   of criminal investigation training that I

13   received with South Miami Police Department.   I

14   believe that I went -- the Internal Affairs

15   investigations training.

16             There were a number of other

17   interviewing and interrogation courses.   There

18   was also the prep that I did for teaching

19   criminal investigation, crime scene

20   investigation, and criminalistics.   I taught

21   interviewing and interrogation.   I taught

22   criminal investigation at the college level, and

23   I taught it to law enforcement officers.

24        Q.   If Detective Parrish had received 240

1    hours of training initially when he came on the

2    force, he received ten hours of civil liability

3    training, eight hours of drug identification or

4    drug identification and law training, six hours

5    of search and seizure training, six hours of

6    crime scene preservation training, 12 hours of

7    patrol operation management training, 36 hours of

8    physical evidence procedure training, training on

9    investigative hypnosis, eight hours of criminal

10   psychology training, three hours of law

11   enforcement liability training, eight hours of

12   neurolinguistic programming training, training in

13   major case burglaries and robberies, another six

14   hours in crime scene preservation training, would

15   you agree that that's all training that would be

16   utilized by him as a detective up until the point

17   in time when he became a detective?

18        A.   I'm saying that certainly could be,

19   but it contradicts his statement that he made,

20   sworn statement that he had no training to become

21   a detective.

22        Q.   Is that something that you

23   specifically read within his transcript, or is

24   that what you were told?

1      A.    Page 72.  It was a comment that I had

2  recorded.

3      Q.    If Detective Parrish said that he

4  didn't recall specifically now in 2009 what

5  training he received back before 1987 or actually

6  earlier than that, does that contradict your

7  initial understanding of what training he

8  received?

9      A.    No, ma'am.  It doesn't contradict his

10  statement that he wasn't trained to be a

11  detective.  In his mind, if he was answering it

12  truthfully, if he felt that he was adequately

13  trained to be a detective -- I mean he does

14  indicate in one sense that he knows he should be

15  reporting all this.  He does not do that.

16          So I'm just going by what he said in

17  his sworn deposition -- he had no training to be

18  a detective.

19          I think Wheat said something similar.

20  The point is if he had basic training as a police

21  officer, he knows he should be recording it.  He

22  stated he knew that he should be recording it.

23          When you cut me off, I was telling you

24  chapter and verse where he said he knew he should

 1    be recording it.  He did not.

 2        Q.   We're not getting to that part yet.

 3    I'm talking about your opinion that he didn't

 4    have training as a detective.

 5             MR. TAYLOR:  Are you finished?

 6    BY MS. EKL:

 7        Q.   Can I finish my question?

 8             Based on the different hours of

 9    training that I just related to you, had you

10    known that he underwent all of that training,

11    would you agree that he had, in fact,

12    irrespective of what he said in his deposition in

13    2009, that he had, in fact, received training

14    that he utilized as a detective or that he could

15    utilize as a detective?

16        A.   He had some training.  Whether he

17    utilized it or not is another issue.

18             If he was aware of what he should be

19    doing and didn't do it, then that's -- that's

20    intentional.  If he simply failed to do it

21    because he didn't have the training, that's

22    understandable, but I mean you still -- you still

23    have a problem here, so whether he knew better,

24    which he says he did and doesn't do it, then that

 1    implies -- that's consistent with being

 2    deliberate.

 3            If he didn't know any better because

 4    he was inadequately trained, and he says I had no

 5    formal training to be a detective, I had the

 6    basic training to become a law enforcement

 7    officer, this was what -- and I'm assuming that's

 8    what you read from, his basic training breakdown,

 9    and then I received no additional training to

10    becoming a detective, so he was either

11    deliberate, knew better, or had a training issue.

12        Q.   We're skipping ahead here.  You keep

13    talking about his failure to write a report.  I'm

14    talking about your opinion about the Paris Police

15    Department.

16            Under C where it says:  The Paris

17    Police Department had a pattern and practice of

18    failing to train, supervise, direct, and

19    discipline police personnel, and you said the

20    basis for that opinion was, at least in part, the

21    fact that Jim Parrish didn't receive training as

22    a detective.

23            I am not talking about what Jim

24    Parrish did or didn't do as a result of any

 1    training he had or didn't have.  I'm -- right

 2    now, specifically your opinion that the Paris

 3    Police Department had a pattern and practice of

 4    failing to train, if I told you that he had 240

 5    hours of initial training and all of that other

 6    training I'm talking about is in addition to

 7    that, would you agree with me that he did, in

 8    fact, have training, whether he remembers it

 9    today or not?

10         MR. TAYLOR:  I'm going to object,

11    because he's answered that question, and I think

12    that what you're doing is you're ignoring his

13    answer in terms of your questioning, and you're

14    telling him --

15         MS. EKL:  What's your objection?

16         MR. TAYLOR:  My objection is just what

17    I said.

18         MS. EKL:  Well, is it -- if it's form,

19    so I can fix it, if it's foundation -- what's

20    your objection?

21         MR. TAYLOR:  Some of each.  And asked

22    and answered as well.

23    BY MS. EKL:

24         Q.   Okay.  Can you please answer the

1    question?

2         A.   My -- I don't know what your question

3    is anymore, but...

4         Q.   Then let me rephrase it.

5              Had you known that Detective Parrish,

6    in fact, had all the training that I just related

7    to you, would you agree with me that that changes

8    your opinion that the Paris Police Department

9    failed to train him?

10             MR. TAYLOR:  My objection is that's an

11   incomplete and inaccurate hypothetical.

12             THE WITNESS:  I'm going by his

13   actions, and I'm going by the fact that he said

14   he had no training to become a detective.  I

15   think you're arguing semantics on the other.

16             MS. EKL:  All right.  Let's mark this

17   as an exhibit.  I think we're on No. 4.

18             (At this point the court reporter

19             marked Waller Exhibit No. 4 for

20             purposes of identification.)

21   BY MS. EKL:

22        Q.   Mr. Waller, if you could take a look

23   at what we've marked as Deposition Exhibit No. 4,

24   which I will represent to you is a number of

 1    certificates received by Jim Parrish during his

 2    time on the Paris Police Department.

 3              My question to you first is going to

 4    be whether you have seen these before?

 5        A.   I don't specifically recall them.  I'm

 6    not saying that I haven't, but I don't

 7    specifically recall these.

 8              Okay.  And your question, ma'am?

 9        Q.   Having now seen these certificates,

10    including I believe at the very back of that it

11    also lays out the specific areas of training that

12    he received when he was in the Police Training

13    Institute at the beginning of his career in 1977,

14    taking aside whatever your opinions are regarding

15    his actions in this particular case, would you

16    agree with me that it appears that he, in fact,

17    has received training through the Paris Police

18    Department at these various institutes?

19        A.   He has received some training, yes,

20    ma'am.

21        Q.   Now, having been provided with the

22    certificates and with documentation that he, in

23    fact, received training, does that at all change

24    your opinion regarding whether or not the Paris

1     Police Department failed to train him?

2             MR. TAYLOR:  Objection.  Improperly

3     states his opinion incompletely and inaccurately.

4             THE WITNESS:  I would think that it's

5     inconsistent with his statement that he had

6     received no training.  As far as -- I would

7     acknowledge that he certainly had some training

8     as it relates to investigations.

9             Some of this I'm not really sure what

10    it is, but -- or how many hours that were

11    involved, but certainly like crime scene

12    preservation, six hours in September, don't know

13    what year or when, but certainly he had it, or if

14    he was a police officer at the time.

15            The basic photography could be

16    relevant.  Criminal law for investigators, that

17    was in '87.  Hopefully he would have learned

18    things such as impeachment and Brady materials.

19    Forensic death investigation, March 16th through

20    19th, 1987, certainly that should be on point, so

21    certainly some of this training was very

22    consistent with being trained as a criminal

23    investigator.

24

1    BY MS. EKL:

2         Q.   I assume that you similarly did not

3    receive the personnel file for Gary Wheat.  Is

4    that accurate?

5         A.   I don't recall if I did or not.  Was

6    that an exhibit in his deposition?

7         Q.   I don't believe so, but if you, in

8    fact, learned that Gary Wheat had at least a

9    similar amount of training as Jim Parrish, would

10   you -- based on the fact that you told us that

11   your opinion in Section C is based on the

12   training provided or not provided to both Wheat

13   and Parrish, would that change your opinion now

14   knowing that they had, in fact, received

15   training?

16        A.   Then it would be inconsistent with my

17   understanding of what they said.

18             I believe Wheat said the same thing,

19   that he had not been trained as a criminal

20   investigator and just assigned there, but

21   certainly if he had training, then it is what it

22   is.  Then I would have expected him to document

23   his activities with Mr. Herrington as well as I

24   would have Detective Parrish documenting his

1    activities interviewing -- and Chief Ray

2    documenting their interview of Herrington and

3    Detective Parrish documenting his initial

4    interview with Rienbolt.

5        Q.    And, again, before getting to those

6    opinions, as far as your opinion about the Paris

7    Police Department and its failure to train or

8    supervise or direct and discipline police

9    personnel, does this information change that

10   particular opinion regarding the Paris Police

11   Department?

12       A.    Well, certainly not to supervise,

13   direct, and discipline with regard to criminal

14   investigation.

15       Q.    Let's look at discipline.  What

16   evidence do you have that police personnel within

17   the Paris Police Department weren't disciplined?

18       A.    Discipline can be positive or

19   negative.  You have an issue with Parrish and

20   Wheat not documenting their interactions with

21   Mr. Herrington and Chief Ray being aware of it.

22            You have an acknowledgment by Chief

23   Ray that he was aware that Officer Parrish did

24   not document the initial interview with Rienbolt.

 1    You have an issue about chain of custody with the

 2    knife.

 3             You have an ongoing problem of a

 4    plethora of different explanations of the source

 5    of the knife, subsequent statements by Rienbolt,

 6    if there had been proper documentation, if Ray

 7    had properly supervised, as he said, I am aware

 8    you need to write these things down.  I would

 9    expect reports to be turned in for these

10    interviews after they occur.

11             He was aware that they had not been,

12    so that's a failure to discipline.  That's a

13    failure to supervise.

14        Q.   Where -- what evidence do you have

15    that there was a pattern and practice of failure

16    to discipline?

17        A.   You had two extremely important

18    witnesses, the basis for the prosecution for

19    Stienbolt (sic.) and Whitlock, and the initial

20    interview of both was not documented.  It was

21    extremely significant as far as the subsequent

22    change and development of the stories of both of

23    these what you would consider incredible

24    witnesses would have contributed to the

1    documentation, certainly would have contributed

2    to an understanding of just how incredible they

3    were.

4           Q.   So is your pattern and practice or

5    your opinion that that's a pattern and practice

6    of failing to discipline police officers based on

7    the fact that the Paris Police Department didn't

8    discipline Jim Parrish and Gary Wheat?

9           A.   And the chief did nothing -- I mean

10   there's a third instance too.

11            You have the incidence in August, I

12   think, of 1987 when they go out to the Herrington

13   household for a domestic violence situation.

14   They took notes on a piece of scrap paper.

15            Those notes were never entered into

16   the file.  They were given subsequent information

17   which was pretty important as far as determining

18   the truth of what happened or indicating the

19   truthfulness of what happened.  They were never

20   put in the file.  They were never documented, and

21   they were just randomly discovered many years

22   later, so was that indicative of a practice

23   that's known by Chief Ray, condoned by Chief Ray

24   that there is no discipline, there is no

1  supervision, there is no requirement that they

2  follow the practice that he knows is proper and

3  correct?

4             I think so.  You have three separate

5  examples over a period of a year.

6       Q.   So your opinion that there's a pattern

7  and practice of failure to discipline is solely

8  based on Gary Wheat and Jim Parrish's -- the City

9  of Paris's failure to discipline those two

10 officers for things that they did in connection

11 with this case?

12      A.   It would appear that it's their entire

13 investigative unit and the chief of police, yes,

14 ma'am.

15      Q.   What do you think that they should

16 have been disciplined for specifically for

17 violating?

18      A.   Discipline can be a compliment for

19 doing the right thing.  Discipline could be a

20 correction.  Discipline could be punishment for

21 not doing the right thing.  Any and all of the

22 above.

23             Certainly the policy maker, the

24 principal policy maker for the department, Chief

1    Ray, was aware there were three separate

2    incidents, two of which were -- Detective Wheat

3    was involved in all three that Detective Parrish

4    was involved in, and nothing was done.  He just

5    accepted it.

6              He acknowledged that it should have

7    been documented, but there was deliberately

8    hiding it or just accepting substandard work or

9    work inconsistent with the standard of practice.

10        Q.   So it's your opinion that they should

11   have been disciplined for failing to document

12   certain information?

13        A.   No.  My opinion is they should have

14   been documenting the information end of story.

15             The failure to do so was a part of the

16   practice of the Paris Police Department as

17   exhibited by three instances in which Parrish was

18   involved, two instances in which Wheat was

19   involved, all three of which Chief Ray was aware

20   of.

21        Q.   Part of your opinion was based on the

22   fact that you felt that the correct chain of

23   custody of the knife that Rienbolt provided to

24   Ann Parrish was never accurately established in

1    the reports or testimony.

2            What do you believe should have

3    occurred in that instance in terms of how that

4    should have been documented?

5        A.   I think it should have been reported

6    received from Ann Parrish one brown bag

7    containing knife she received from Debra Rienbolt

8    such and such date and time.

9            That way you have a clear cut chain of

10   custody, and everybody involved can then, if

11   necessary, be brought into court and say, yep,

12   that was exactly how I saw it at the time that I

13   had it in my possession.

14       Q.   Have you seen the evidence receipt in

15   connection with that knife?

16       A.   Which one?

17       Q.   I'll show you what we'll mark as

18   Exhibit No. 5.

19            (At this point the court reporter

20            marked Waller Exhibit No. 5 for

21            purposes of identification.)

22   BY MS. EKL:

23       Q.   Mr. Waller, it's in front of you here,

24   Exhibit No. 5?

1          A.   Yes, ma'am.

2          Q.   Have you seen this evidence receipt

3     before?

4          A.   Yes, ma'am.

5          Q.   Is this the type of evidence receipt

6     that you would expect to see in connection with a

7     piece of evidence being collected in relation to

8     an investigation?

9          A.   Yes, ma'am.

10          Q.   And, in fact, on this evidence receipt

11     it shows that on February 16th of 1987 what has

12     been described as a brown sack containing one

13     black handled lock blade knife was received by

14     Jim Parrish from Ann Parrish.  Is that correct?

15          A.   Yes, ma'am.

16          Q.   Have you also seen the testimony of

17     Jim Parrish that he provided to the grand jury

18     about this knife?

19          A.   I'm digging that up now, ma'am.  Yes,

20     ma'am, on page 32, question --

21          Q.   Page 32 of the grand jury testimony?

22          A.   Yes, ma'am.  Question:  And you

23     subsequently obtained the knife from Debra

24     Rienbolt?

1          Answer:  I have the knife in my

2    possession at this time.

3          He did not obtain it from her.

4     Q.   Did not obtain it from who?

5     A.   Debra Rienbolt.  The question was,

6    question:  And you subsequently obtained the

7    knife from Debra Rienbolt?

8          Answer:  I have the knife in my

9    possession at this time.

10    Q.   My only question was whether you had

11   seen his grand jury testimony.  I'm not sure what

12   you're referring -- referencing.

13    A.   Then on page 33, question:  I show you

14   two eight by ten photographs of a locked blade

15   knife with a black handle, and do these

16   photographs truly and accurately depict the knife

17   that you recovered from Debra Rienbolt?

18          Answer:  Yes, sir.

19          Question:  And you obtained this knife

20   from her on, what, February 16th of '87?

21          Answer:  Yes, sir.

22          That's false testimony.  He did not.

23   BY MS. EKL:

24    Q.   Would you agree that the evidence

1    receipt accurately reflects that he, in fact,

2    received the knife from Ann Parrish -- I'll

3    direct you to the bottom section where it says

4    evidence chain, specifically February 16th, 1987,

5    the first entry in relation to that piece of

6    evidence.

7         A.   Actually, that's misleading.  For that

8    to be correct, it should have been on the very

9    top.  Evidence received, chain.  He has it under

10   where it was released.

11        Q.   Well, you see that it has the accurate

12   date, the first date that's listed on this entire

13   piece of paper, February 16th, 1987, at 5:30 p.m.

14   it shows, in fact, that it was --

15        A.   Where do you see that, ma'am?

16        Q.   Near the bottom.

17        A.   That's not the first date.  The first

18   date is up here, 3/25/87.

19        Q.   Would you agree February 16th is

20   before March?

21        A.   If you're doing it chronologically,

22   then it should have been at that point, ma'am.

23        Q.   Okay.  But my point is is that there's

24   an evidence receipt that shows that on the date

1    of February 16th Jim Parrish received a knife

2    from Ann Parrish at 5:30 p.m., even if you

3    believe it should have been higher up in the

4    document?

5           A.   I'm saying it's confusing and

6    misleading.

7           Q.   You would agree with me that Jim

8    Parrish documented that he received the knife

9    from Ann Parrish.  Correct?

10          A.   No, there is no number there.

11          Q.   What number are you referring to?

12          A.   The item of evidence is No. 47.  There

13   is no number in front of Ann Parrish.

14          Q.   All right.  Well, would you expect

15   that Ann Parrish would have assigned it a lab

16   number before she gives it to Jim Parrish?

17          A.   I don't know.  What I would have done

18   was indicated that item No. 1, which was listed

19   up here, was received from Ann Parrish.

20               This doesn't really tell me anything.

21   It's rather confusing, and I don't know if it was

22   intended to be misleading or just ineptitude, but

23   it clearly should have stated that item No. 1, as

24   it's identified up here, came from Ann Parrish.

1            It does not.  You have two items that

2     are referenced, but it's not -- there's nothing

3     here, so, to me, it's very misleading, and

4     certainly it's -- there was an attempt to mislead

5     or absolutely give false testimony in front of

6     the grand jury, so that's what I say about that.

7            It's certainly inappropriate, and I

8     don't understand why, because she's involved in a

9     criminal justice system.  She had supposedly some

10    type of relationship.

11        Q.    There's not a question pending.  Let's

12    move on.

13            MR. TAYLOR:  Excuse me, but had you

14    finished your answer?

15            MS. EKL:  There was no question

16    pending.

17            MR. TAYLOR:  That's not true.

18    BY MS. EKL:

19        Q.    If an officer has received training

20    regarding what information they're to turn over

21    to the prosecution, would you agree that whether

22    they know that to be called Brady training or

23    not, that they have, in fact, received training

24    regarding Brady material?

1          A.   If they are trained to turn everything

2     over, whether it's inculpatory, exculpatory,

3     deals with the weight of the evidence or the

4     weight of potential punishment, guilt or

5     innocence, yes, then whether they call it Brady

6     or not and they followed through, then, yes, that

7     would be indicative that they had received

8     training.

9          If they failed to do that, whether

10    deliberate or omission, then that brings to

11    question whether or not they have received the

12    training.

13         Q.   You wrote in your report that Parrish

14    stated that he wrote down everything when he was

15    a detective.  Anything relevant went into the

16    report.  This is under Subsection B on page 14.

17         And that everything in my notes went

18    into my handwritten report.  He believed that all

19    relevant information was included in his or

20    Eckerty's reports.

21         What, if anything, did you find to be

22    wrong with those statements by Jim Parrish?

23         A.   Well, I thought it was either an

24    outright lie or deliberately misleading, that he

1   was aware that he did not put in the information

2   from Herrington from the first -- first

3   interview, from Rienbolt on her first interview.

4          He did not put in the information they

5   got from Herrington in I believe it's August of

6   '87 in the reports, so if he was aware that he

7   should, he did not follow it, so if he did it

8   deliberately, obviously that's pretty bad.

9          If he did it as -- because he was

10  incompetent, that's kind of bad too.

11      Q.   I just ask that you listen to my

12  question.  We'll get to the next part of it, but

13  the first part was what is wrong with that

14  statement, not taking it to the next step of what

15  he may or may not have done, but is there

16  anything wrong with that statement that you've

17  quoted there in Section B?

18      A.   When you ask me that question, ma'am,

19  I told you based on my understanding of your

20  question which is is there anything wrong, yes,

21  the subsequent actions contradicted that

22  statement.

23      Q.   Okay.  But as far as the statements

24  themselves --

1           A.    In a vacuum, I think that they're

2     accurate.

3           Q.    Okay.

4           A.    And that is -- well, he didn't write

5     it down.  That's inaccurate, and he didn't put

6     relevant -- all the relevant information into the

7     report, and he didn't put his notes into the

8     report we know from August, so I guess it's

9     falsehoods.

10                Should he have done that?  Yes.

11                Did he do that?  No.

12          Q.    You go on in subparagraphs 1 and 2 to

13    show -- or to, I guess, list out things that you

14    believe that he didn't do or that were contrary

15    to his statements in paragraph B.  Correct?

16          A.    Yes, ma'am.

17          Q.    Okay.  Specifically you state that

18    nothing in his reports indicate that Steidl and

19    Whitlock were questioned at the Paris PD on July

20    9th of 1986.  Correct?

21          A.    In a timely manner, yes, ma'am.

22          Q.    Well --

23          A.    I don't think that -- I don't recall

24    any report by Parrish that they were.

1          Q.    Okay.  Is it your belief that if Jim

2    Parrish was involved in questioning either Steidl

3    or Whitlock along with other officers, that he --

4    if the officers write a report, that he also has

5    an additional duty to write a report?

6          A.    If he is the chief investigator for

7    his department, he has an obligation to make sure

8    that somebody documents this in a timely manner

9    and that the circumstances surrounding it were

10   documented in a timely manner, particularly if

11   these two people are going to be their primary

12   suspects.

13              MS. EKL:  I'm going to mark this as

14   group -- what are we on, 6, Group 6?

15              (At this point the court reporter

16               marked Waller Group Exhibit No. 6 for

17               purposes of identification.)

18   BY MS. EKL:

19         Q.    If you could take a look at what I've

20   marked as Deposition Group 6 and ask whether or

21   not you recognize these documents, if they're

22   documents you've seen before?

23              MR. TAYLOR:  These are two different

24   documents, Beth, or three?

1          MS. EKL:  Actually, there's three

2     separate documents.  For the record -- well,

3     they'll be in the record.

4          THE WITNESS:  Well, the page 3, I

5     don't recall ever seeing.  The first two pages of

6     the exhibit, the Illinois State Police

7     investigative reports, I have seen, but page 3 is

8     something new.

9          Q.   Would you agree that --

10         A.   I'm looking at it, ma'am.

11         MR. TAYLOR:  Would you indicate for

12    the record, Beth, am I correct in saying this is

13    a summary of reports done later in 2002 by the

14    ISP, some sort of document that they did that

15    summarizes the first two reports?

16         MS. EKL:  I don't believe it was

17    created in 2002.  It was printed in 2002.

18         MR. TAYLOR:  Well, it was created

19    sometime during the -- subsequent to the ISP

20    getting revolved in the case.  Right?

21         MS. EKL:  I don't believe that, but...

22         MR. TAYLOR:  Okay.  Well, why don't

23    you represent what it is, then?

24              Isn't it part of the -- that 90-page

1    report that the ISP did sometime in 2000 or 2001?

2              MR. RAUB:  You guys produced it.

3              MS. EKL:  I started to try to put it

4    in the record, and Mr. Waller asked me to wait,

5    so I'm going to respect his request to finish

6    reading it, and then I'm going to put it into the

7    record.

8              THE WITNESS:  Well, ma'am, the reason

9    I had asked you to wait was because I had never

10   seen it before and so indicated.

11   BY MS. EKL:

12        Q.   Specifically starting with the first

13   document, first page, would you agree that this

14   is a -- what purports to be an Illinois State

15   Police report prepared by Jack Eckerty

16   documenting the July 9th, 1986, interview of

17   Herbert Whitlock?

18        A.   No, ma'am.  It's not.

19        Q.   All right.  Well, am I accurately

20   reading where it says at the top, reporting

21   agent, Jack Eckerty, and then it states on July

22   9th, 1986?

23        A.   No, ma'am, it doesn't.

24        Q.   I'm sorry, June.  You're right.  On

1    June 9th, 1986, the reporting agent and Agent

2    Bensyl interviewed Herbert Whitlock, and then it

3    goes on to summarize that interview.   Correct?

4         A.   Yes, ma'am.

5         Q.   Assuming that June date is actually a

6    typo and it should be July 9th of 1986, would you

7    agree that this documents the interview that took

8    place on July 9th of 1986?

9         A.   I'm assuming that it did.  It would be

10   consistent with my understanding of what

11   happened.  It's faded out, but I think it's also

12   acknowledged that this was not typed up until

13   March 27th, 1987, after the arrests of

14   Mr. Whitlock and Mr. Steidl.

15        Q.   Regardless of when it was typed up by

16   the typist, the reporting date on this is --

17   well, it states June 9th, 1986.  Correct?

18        A.   Yes, ma'am, it does.

19        Q.   Okay.

20        A.   Which was before the homicides.

21        Q.   Right, so assuming that to be a typo,

22   that it's really July 9th, 1986, would you agree

23   that this was a report that documents that

24   Herbert Whitlock was questioned at the Paris PD

1    on July 9th, 1986?

2         A.   Subsequent testimony has indicated --

3    it says the reporting date is June 9th.  It says

4    on June 9th, so -- but it's been -- there's been

5    testimony that that's what it was intended to

6    represent.

7              There's also testimony to indicate

8    that there was no explanation why it wasn't

9    provided in a timely manner.

10        Q.   But as far as your statement nothing

11   in his reports indicated Steidl and Whitlock were

12   questioned at the Paris PD on July 9th, 1986,

13   would you agree that this report does, in fact,

14   document that questioning?

15        A.   Certainly not on or about July

16   of 1986.  It does not.  These were reports that

17   were prepared, whether incorrectly or whatever,

18   some nine months later.

19        Q.   Do you know what the process was for

20   reports being created within the Paris PD back in

21   1986?

22        A.   Created?  Do you mean by documentation

23   of actual things that occurred or imagination?

24        Q.   I'm not talking about imagination,

1    sir, I'm saying do you know what the process was

2    in the Paris PD back in 1986?

3         A.   To do what?

4         Q.   To document -- or to document

5    information.

6         A.   That you should be writing a report,

7    and it should be in timely, and it should be

8    included in the file for use by all parties.

9         Q.   Do you know what was done in this

10   particular case in terms of how those reports

11   were generated?

12        A.   I guess I am not following your

13   question.

14        Q.   Well, have you talked to anyone or

15   read anything to learn how it was that

16   information came to be in a report?

17             MR. TAYLOR:   Objection.   You asked

18   about the Paris Police Department.   This appears

19   to be an Illinois State Police --

20        Q.   I stand corrected.   Illinois State

21   Police.

22        A.   I believe Eckerty testified that he

23   would draft them and then have them typed, and

24   some of them were typed by McFatridge's

1    secretary, which certainly Lieutenant Callahan

2    indicated that was out of protocol and a bit

3    unusual, and certainly this was not done in a

4    very -- in a timely manner.

5          I mean this was extreme -- you know,

6    and it was subsequent to their actual arrests, so

7    nine months later.

8          Q.   If Jack Eckerty, as it says on the

9    reporting date, assuming that is meant to be July

10   9th, 1986, as he testified wrote out this report

11   in his handwriting and notes July 9th of 1986,

12   would you agree that that would be timely?

13         A.   Not if it wasn't -- not put into the

14   file.

15         Q.   If the notes were put into the file on

16   July 9th, 1986, even though it wasn't actually

17   physically typed up until later, would you agree

18   that it was documented in a timely manner?

19         MR. TAYLOR:  Objection.  That totally

20   inaccurately reflects the facts in the case.

21         MS. EKL:  You don't need to give a

22   speaking objection.

23         MR. TAYLOR:  I'm not.

24         MS. EKL:  Yes, you are.

1          MR. BALSON:  But you're assuming facts

2     not in evidence.

3          MS. EKL:  I'm not assuming facts not

4     in evidence.  I disagree with you, but this is a

5     hypothetical that facts will bear out either way.

6     My question is --

7          MR. TAYLOR:  My objection is it's an

8     inaccurate hypothetical and assumes facts not

9     anywhere in the record.

10         MS. EKL:  All right.

11         MR. TAYLOR:  I'm sorry.  Go ahead.

12         THE WITNESS:  What was the question?

13    BY MS. EKL:

14     Q.   Had Jack Eckerty handwritten out his

15    report on July 9th, 1986, where it was available

16    to the other officers, would you agree that it

17    was prepared in a timely manner?

18     A.   Assuming that it was in the file, it

19    doesn't matter to me whether it's handwritten or

20    typed.

21     Q.   The second page of that report

22    purports to be a report by Tony Snyder, another

23    Illinois State Police officer, which indicates

24    that on Wednesday, July 9th, 1986, at

1    approximately 4:35 p.m. RA, and Detective Jim

2    Parrish interviewed Gordon Steidl.

3              Do you agree with that?

4         A.   That's what it says, yes, ma'am.

5         Q.   And would you agree that if this

6    report was, in fact, prepared either in

7    handwritten form or dictated in some manner by

8    Tony Snyder on July 9th, 1986, that would be a

9    timely documentation of that interview of Gordon

10   Steidl?

11        A.   If it was placed into the file at that

12   point in time, yes, ma'am, and was available for

13   use by those working the case.

14        Q.   What evidence do you have that these

15   were not made available in some form, this

16   information to other officers with either the

17   Illinois State Police or the Paris Police

18   Department?

19        A.   I don't have an indication that it

20   was, only that it was prepared nine months later,

21   and Jack Eckerty did not have an explanation why

22   that happened.

23        Q.   You mentioned Lieutenant Callahan,

24   Lieutenant Callahan's deposition was a deposition

1    that you read early in your examination of the

2    transcripts in this case.   Correct?

3        A.   Yes, ma'am.

4        Q.   Did you rely on the opinions and

5    statements made by Lieutenant Callahan in

6    formulating your own opinions?

7        A.   No, ma'am.   I relied on the totality

8    of my training, education, and experience and

9    my -- in law enforcement as an academic

10   instructor, as a law enforcement trainer, and as

11   a police consultant, and my understanding of the

12   facts, that was part of it, and I think it was in

13   a subsequent document that I reviewed also by

14   Callahan, not just in his deposition.

15       Q.   Do you know if Lieutenant Callahan was

16   an investigator back in 1986 during the time of

17   this investigation -- I'm sorry, an investigator

18   with the Illinois State Police at the time of

19   this investigation?

20       A.   I believe he was.   I think he was a

21   special agent.

22       Q.   And is it your belief that he was

23   personally involved in this investigation and had

24   firsthand knowledge of the things to which you

1    just testified to?

2        A.   No, ma'am.  I mean I'm not exactly

3    sure when he became -- whether he was an agent at

4    that time or not.  He certainly wasn't, to my

5    understanding, involved in this initial

6    investigation in any way, shape, or form.

7        Q.   Did you rely on Lieutenant Callahan

8    saying that he found it unusual that it was typed

9    months later in your opinions that they weren't

10   timely created?

11       A.   Absolutely.  Again, it would go to --

12   that would be very problematic and also very

13   suspicious.  It could be consistent with very

14   sloppy investigative work, or it could be

15   consistent with misconduct.

16           It's very difficult to tell, but

17   certainly it should have been done in a timely

18   manner.  It should have been part of the file,

19   and it should have been prepared and --

20       Q.   I don't think you heard my question.

21   My question was did you rely on Detective

22   Callahan saying that he found it suspicious in

23   formulating your own opinion?

24       A.   No.  I found it suspicious.  I agree

1   with him.  I -- had that happened in a case where

2   I was the supervisor or I was involved in any

3   way, shape, or form, it would be something I

4   would look at with a very jaundiced eye.

5          Q.   Do you know how many witnesses were

6   interviewed between July of 1986 and March

7   of 1987?

8          A.   I don't have an exact number.  I know

9   there was quite a few.

10         Q.   And would you agree that there were --

11  in addition to Parrish and Eckerty, there were

12  also a number of other agents that were also

13  involved in interviewing different witnesses?

14         A.   Yes, ma'am.

15         Q.   Did you read Officer or Detective

16  Snyder's -- Investigator Snyder's deposition

17  transcript?

18         A.   I don't believe so.

19         Q.   If you learned that there were only

20  two secretaries that were responsible for typing

21  up all of the reports generated in this case,

22  would you agree that that helps provide some

23  explanation for why there would be a time lag

24  between when they were prepared by the officers

1   and when they were physically typed up by the

2   secretaries?

3           A.   No, ma'am, particularly when you look

4   at the pattern through the other reports, and you

5   have two separate investigators.

6           Q.   I'm sorry.  I don't understand what

7   you're saying.

8           A.   You have two separate investigators.

9   Eckerty writes one report.  It doesn't -- it's

10  got the wrong date, and it isn't typed until

11  March 27th of 1987; Snyder writing another report

12  about the -- that occurs on the same date --

13  well, assuming that it was July 9th, 1986, and

14  his is typed by a different secretary on March

15  26th, 1987.

16          You see a plethora of other Illinois

17  State Police department reports.  This one we

18  know is done by McFatridge's secretary, the one

19  Eckerty submitted, and we don't know -- I don't

20  think anybody realizes or knows or has identified

21  who MW is, but assuming that it was typed up by

22  personnel of the Illinois State Police, we know

23  that Faye Phillippi -- how do you pronounce that?

24  Nobody knows.

 1              MR. TAYLOR:  Phillippi.

 2              THE WITNESS:  We know that Eckerty and

 3    Ms. Phillippi or Phillippi had --

 4              MR. JOHNSTON:  Just call her Faye.

 5              THE WITNESS:  And Faye had an

 6    inappropriate or extracurricular relationship.

 7    BY MS. EKL:

 8         Q.   What does that have to do with

 9    anything?  The fact that there may have been an

10    inappropriate relationship at some point in time

11    between a secretary and Jack Eckerty, what does

12    that have to do with your opinions in this case?

13         A.   Well, if there was an impropriety, it

14    might indicate duplicity.

15         Q.   Did you read Jack Eckerty's

16    transcript?

17         A.   Of what, the deposition?

18         Q.   Of his deposition.

19         A.   Yes, ma'am.

20         Q.   Okay.  Did you read where he described

21    when it was that he had a relationship with

22    Ms. Phillippi?

23         A.   I don't recall the specific times.

24         Q.   Okay.  Well if he testified that any

 1   relationship he had with her took place many

 2   years after this investigation was concluded and

 3   both of these men had been convicted, is there

 4   any relevance to that relationship to any of your

 5   opinions in this case?

 6              MR. TAYLOR:  Objection to the form of

 7   the question and the use of the term many.

 8              THE WITNESS:  I don't know what

 9   indication it has now.  It's just that it was an

10   inappropriate relationship with that person.

11              That person is involved in a

12   mysterious misdeed, so what happened, what was

13   the relationship, when did it occur?  I don't

14   know.

15              Was there one?  Yes.  Is it indicative

16   of misconduct or sloppy investigative work?  I

17   don't know.  I told you that.

18   BY MS. EKL:

19        Q.   How did you learn about that

20   relationship if you didn't read it in

21   Mr. Eckerty's transcript?

22        A.   I think Parrish talks about it too,

23   that he -- that Mr. -- or Eckerty got beat up

24   by -- by Faye's husband.

 1        Q.   I'll stop you for one second, because

 2   this has been part of a protective order.   If

 3   you're going to testify about any specifics, I

 4   just want to make sure that this part of his

 5   transcript is protected like the other

 6   transcripts are protected.   That's why I'm

 7   cutting you off.

 8             Go ahead.

 9        A.   I believe that it was indicated in

10   Parrish's deposition also that he got -- that

11   Eckerty was beat up by Faye's husband when he

12   found about it, and I think, if memory serves

13   correctly, that the only thing that saved him is

14   he had to pull out his gun, and Faye's husband

15   backed off, and then I think that he was

16   possibly -- received some discipline for it.

17             That's -- off the top of my head,

18   that's my recollection.

19        Q.   So you recall the details of it, but

20   you don't recall when all of that took place?

21        A.   No, ma'am.

22        Q.   Okay.   Would you agree that if that,

23   in fact, took place years after this

24   investigation, that it should not have any

1   bearing on the opinions that you rendered in

2   relation to his work on this particular

3   investigation?

4        A.   No, ma'am.  All I said -- and I'll say

5   it again, because you -- is this report is

6   indicative of either a deliberate attempt to

7   cover up something or very sloppy investigative

8   work.  I don't know which it is, but it's one or

9   the other.

10       Q.   What about this report leads you to

11   believe that it shows some kind of deliberate

12   coverup?

13       A.   The fact that it wasn't typed up until

14   nine months later after the arrest of Steidl and

15   Whitlock, that I don't know what the motivation

16   for doing it at that time was, and obviously it

17   was sloppily done.  The dates weren't even

18   checked.

19            There were two investigators involved.

20   There was a significant gap.  I'm just saying

21   it's either one or the other.  It's sloppy

22   investigative working, the file wasn't complete,

23   or there was some evil intent.  I don't know

24   which it is.

1          Q.    Would you agree that Brady requires

2    that information be turned over to a criminal

3    defense attorney but after the person becomes a

4    criminal defendant?

5          A.    After the person is involved with the

6    criminal justice system, yes, ma'am.

7          Q.    Okay.  And would you agree that both

8    Whitlock and Steidl were arrested in February

9    of 1987?

10         A.    Yes, ma'am.

11         Q.    So the fact that these reports were

12   typed up in March of 1987 would you agree wasn't

13   a big time lag between the time that they were

14   arrested and the time that they were typed up?

15         A.    The time they were arrested and the

16   time they were typed up?  It's over a month.  I

17   would say there's some issue there, that that

18   would be inappropriate.

19         Q.    What's inappropriate about it?

20         A.    I don't know.  It's either sloppy --

21   these were created after the fact for whatever

22   reason.  There was no documentation -- no timely

23   documentation in the file, if these are the sole

24   representations.

1           If they're not, if there was

2    handwritten notes in the file which indicated

3    this which they were operating off of, then not a

4    real problem.

5        Q.   So are you testifying here that right

6    now at this point in time you don't know either

7    way whether it's sloppy or whether it was

8    inappropriate, because you don't know all the

9    facts and circumstances surrounding the creation

10   of these reports?

11           MR. TAYLOR:  Objection.

12   Mischaracterizes his testimony.

13           THE WITNESS:  Ma'am, I wasn't -- all I

14   know is the dates on the report, they were not

15   there in the file in that form.  They were

16   sloppily done.

17           That particular report was not

18   available or it was fabricated, those two

19   reports, so I don't know other than that what

20   it's indicative of.  I know that it's

21   problematic, but I don't know what it's

22   indicative of.

23   BY MS. EKL:

24       Q.   And, Mr. Waller, I don't mean any

1    disrespect, but I mean you are here today as an

2    expert witness, and many people have opinions

3    about different things that my clients and other

4    defendant in this case did.

5             I'm just trying to get at what your

6    expert is, so if your expert opinion is that this

7    was sloppy, then that's what it is.

8             If you don't know if it was sloppy or

9    it's misconduct, then I need to know that.

10            If you believe it was misconduct based

11   on the information that you know, then I need to

12   know that, and I need to know why you believe it

13   was misconduct.

14            That's what I'm trying to flush out,

15   so I need to know if you have an opinion, or if

16   you don't have an opinion, or if it's just

17   unusual or smells, then I need to know that.

18       A.   I agree with your characterization.

19   It's unusual.  It smells.

20            Now, as I've told you repeatedly, and

21   I'll tell you one more time, that it's one or the

22   other or both.  It's very sloppy work,

23   investigative work, or it's indicative of a

24   coverup.

1        Q.    Is it your opinion that it's --

2        A.    Yes, ma'am, it is my opinion.  I've

3   told you repeatedly that's my opinion.

4        Q.    You keep saying it's one or the other,

5   sir.  I'm just trying to get at --

6        A.    I don't know which it is.  I wasn't

7   there.  I wasn't involved in a criminal

8   conspiracy with them.  I don't know.

9        Q.    Would you agree that ultimately that's

10   something that the jury is going to have to

11   decide?

12        A.    Everything about this is something for

13   the jury to decide.

14             MR. TAYLOR:  Is this a good time to

15   take an afternoon break?  It's been over an hour

16   and a half.

17             MS. EKL:  Yeah.

18             (At this point a short recess was

19             taken.)

20   BY MS. EKL:

21        Q.    Other than information related to the

22   Rhoads homicides investigation, did you receive

23   any other evidence or are you basing your opinion

24   about the Paris Police Department's pattern and

1    practice of failing to train, supervise, direct,

2    and discipline police personnel on any

3    information or any conduct outside of the Rhoads

4    homicides investigation?

5        A.   I don't recall any, ma'am, so it was

6    just the course of conduct through this rather

7    lengthy investigation.

8        Q.   On page 15 of your report, if you

9    could turn to that page, the question on

10   paragraph 5 you state:  When Parrish first spoke

11   to Debra Rienbolt on February 16th, 1987, about

12   her knowledge of the homicide, he did not write

13   up any notes or report of the initial interview.

14            Parrish also did not record the

15   information he received from Ann Parrish about

16   Rienbolt.

17            What information are you referring to

18   when you say that there's information from Ann

19   Parrish?

20       A.   I don't know.  He didn't write it up.

21   You have Rienbolt subsequently making a statement

22   that she made some offhand comment in front of

23   Ann Parrish, and Ann Parrish then told Jim

24   Parrish that she could be -- that Rienbolt could

1    be a suspect, and then Rienbolt -- or Jim Parrish

2    arranged for Ann Parrish to bring Rienbolt to Jim

3    Parrish at his home.

4            Now, certainly, and I would have to

5    look back at -- at Ann Parrish's deposition, but

6    certainly there was no documentation by --

7    obviously there were no notes at all about this

8    event, but that certainly any background that he

9    may have received from Ann Parrish was not

10   recorded.

11       Q.   And so that's just based on your

12   assumption that there was some information

13   provided from Ann to Jim?

14       A.   We know there had to be some

15   information.  I mean you bring this person home

16   which is highly unusual.  She's a parolee, an

17   alcoholic, a drug addict, got some severe mental

18   issues, and you're going to bring her to your

19   home?

20           So I mean -- so I would expect, and,

21   again, I would have to go back and look at

22   Parrish -- or Ann Parrish's deposition, but what

23   did she specifically say?  It's not recorded.

24   How did she preface this?  It wasn't recorded.

1    Should it have been?  Yes.

2         Q.   If I represent to you, take it as a

3    hypothetical, that Debra Rienbolt went to Ann

4    Parrish and told her that she needed to talk to

5    Ann Parrish's husband but did not provide her

6    with any details of why it was she needed to talk

7    to Jim Parrish, so, therefore, Ann didn't have

8    any information from Debbie to relate to Jim,

9    would you agree that Jim couldn't write anything

10   down if he didn't receive any information from

11   Ann?

12            MR. TAYLOR:  Objection.  Incomplete

13   and inaccurate hypothetical based on facts not in

14   the record.

15            THE WITNESS:  It is a rather sparse

16   hypothetical.

17            Certainly he would have got some

18   information after the fact, but, again, you don't

19   bring somebody like that to your house.  Why

20   wouldn't she just go then -- I mean I want to

21   know the first thing is why couldn't you meet me

22   at the police department or why couldn't I meet

23   you somewhere else.  Those were things.

24            I mean if I were still a police

1    officer and my wife brought somebody like that

2    home, I would be rather upset.

3    BY MS. EKL:

4        Q.   Right.  But you're having to make an

5    assumption, you have to make an assumption, no

6    matter how strong you think that assumption is,

7    that Ann told Jim something in order to say that

8    he failed to write it down.

9            MR. TAYLOR:  Objection.  He already

10   testified that there was evidence from Rienbolt

11   that she did.

12           THE WITNESS:  Rienbolt indicates -- in

13   one of the versions of her many stories indicates

14   that she told Parrish -- Ann Parrish heard her --

15   overheard her saying something about cutting up

16   somebody or cutting another female and so

17   indicated to Jim Parrish that she might be a

18   possible suspect.  That's why Ann Parrish

19   arranged for her to come to talk to Jim.

20           Now, that was Rienbolt's story.

21       Q.   Rienbolt never said I told Ann Parrish

22   what you just related, and then Ann Parrish told

23   Jim.  Correct?  There's no testimony that

24   Rienbolt was aware of Ann Parrish telling Jim

1   Parrish anything?

2       A.   I don't know that that was ever

3   presented, and I guess that specific question

4   wasn't asked to Rienbolt, wasn't asked to Ann

5   Parrish, or whatever.

6            The point is Jim Parrish did not write

7   any notes which cover those facts.

8       Q.   Okay.  On the next page on 16,

9   subparagraph E at the top it says, you talk about

10  Parrish did not recall running a criminal history

11  on Rienbolt, speaking with his wife about

12  Rienbolt's mental health history, or otherwise

13  taking measures to make an informed determination

14  about her credibility.

15           Do you see that paragraph?

16      A.   Yes.

17      Q.   Okay.  Is it your testimony that Jim

18  Parrish had a duty back in 1987 to determine the

19  credibility of Debbie Rienbolt?

20      A.   I think if she's going to be a

21  principal witness in the arrest of two guys and

22  one of the sole basis or the primary basis for

23  the arrest of two guys on a homicide, certainly.

24  You want to do that on any potential witness.

         1          Q.   And I'm not -- again, I'm not talking

         2     about, you know, best practices that you want to

         3     know that in general, but as far as did he have a

         4     duty as a police officer to determine

         5     credibility?

         6          A.   If he's going to base that -- base the

         7     arrest of two individuals who could possibly face

         8     a death sentence, then I think he does.

         9               I think before he takes action based

        10     on this person I think that that -- that would be

        11     a typical practice.  Does she have some kind of

        12     axe to grind?  Let me know the background about

        13     her?  Could she have been -- is it conceivable

        14     that she was or had interacted with these people?

        15     Was she in a position to know?

        16               All those things, I think that that's

        17     step one.

        18          Q.   On what are you basing your opinion

        19     that he had a duty in 1987 to determine

        20     credibility?  On what standards out in the law

        21     enforcement community are you basing that

        22     opinion?

        23          A.   I think that you have -- the duty goes

        24     back to determining the truth about what

1    happened, and one of the reasons that you have to

2    determine credibility and the basis for her

3    testimony and how much she knows is is it -- is

4    it -- is it possible that she could have been in

5    the position to know this?  Part of that goes to

6    her credibility.

7              A lot of times you have -- on major

8    cases that get a lot of notoriety you have a lot

9    of people walk in and confess.  You don't really

10   want to clog up the criminal justice system with

11   these people who say, yeah, I did it, da, da, da,

12   da, da, da, da and make false confessions.

13             You also have Parrish was aware that

14   money had been offered in the bars.

15             Here you have a person who is an

16   alcoholic, who is a drug addict, so certainly

17   that was a potential issue to determine

18   credibility.  What's the motivation?  How come

19   she's coming forward now, and she didn't come

20   forward in the past?

21        Q.   Let me have my question read back.

22             I am sorry, Barb.  Could you read that

23   question back?

24             MR. TAYLOR:  Objection.  You

1    consistently interrupt him when he's in mid

2    answer when you don't like the answer or have

3    some feeling that he's not responding to exactly

4    what you asked.

5            I ask that you let him finish his

6    answers before you go on to your next question.

7            MS. EKL:  Okay.  And I just ask, with

8    all due respect, that you listen carefully to my

9    question.  If you could read it back?

10           (At this point the court reporter read

11               aloud the requested portion of the

12               transcript.)

13           THE WITNESS:  Could you read my

14   answer, please, when she disrupted my train of

15   thought?

16   BY MS. EKL:

17       Q.   Well, I'm just going to ask you the

18   question again.

19           Are there any standards in the law

20   enforcement community in 1987 that required that

21   a law enforcement officer determine a witness's

22   credibility?

23           MR. TAYLOR:  I object.  The witness

24   asked to have his answer read back, and you're

1    telling him he can't have it read back after you

2    have the question read back.  I don't think

3    that's fair.

4            MS. EKL:  I reasked a different

5    question, Flint.  I moved on.

6            We're going to be here all night,

7    unless you're going to let us keep going until

8    midnight, because I think Mr. Johnston and

9    Mr. Raub and Mr. Mancini all have questions they

10   want to ask as well, and I'm trying to wrap up.

11           MR. BALSON:  I don't think midnight is

12   a good idea.

13           THE WITNESS:  The bottom line is the

14   standard then, the standard now is to determine

15   the truth about what happened.  I think that's an

16   integral part of determining the truth about what

17   happened.  I think that was a basic step that

18   investigators are trained to do.

19           You use nebulous terms such as duty.

20   The duty is to determine the truth about what

21   happened.

22   BY MS. EKL:

23       Q.   And in your expert opinion, how far

24   does a law enforcement officer have to go in

1    order to determine credibility?

2         A.   I think you go -- take reasonable

3    steps.  You know, I think that certainly is not

4    checking her background or not documenting her

5    background, is that consistent with failing to

6    document appropriately the series of her

7    statements which she told another party, who

8    happened to pass a polygraph, that, you know, I

9    simply parroted back to the police the

10   information they gave me, and that's something

11   that you can see happening.  Every step, every

12   change in the story, she had at least the

13   potential for getting more information from the

14   police to fabricate her story.

15         Jack Eckerty said it extremely well.

16   Somebody like Rienbolt there's only two possible

17   ways that she could know the information that she

18   knew.  That's from being there or from an

19   investigator telling her, so it certainly is

20   consistent with investigators telling her, her

21   parroting back, she had a motive, the reward, so

22   determining the truth about what happened,

23   documenting it, those are all consistent.

24         Parrish's actions are inconsistent

1    with that.

2         Q.   Are you basing your opinion on the

3    factual -- on the factual determination that

4    Rienbolt knew about the reward?  Is that a fact

5    that you're -- upon which you rely upon?

6         A.   It's one possibility.  Do I know that

7    as a fact?  No.

8              Does another witness indicate that he

9    had a discussion with Rienbolt, and she

10   acknowledged that?  Yes.

11             Did he pass a polygraph?  Yes.

12             Did they give Rienbolt a polygraph?

13   No.

14             Has she recanted, unrecanted,

15   recanted, unrecanted multiple times?  Yes.

16             Everybody agrees she's not credible.

17        Q.   Well, I disagree with that.

18        A.   You think she is?

19        Q.   You state in subparagraph B on page 16

20   that significant information provided by

21   Herrington in the first interview was

22   deliberately not made available for evaluation by

23   the grand jury or subsequently for evaluation and

24   possible use by the defense.  Do you see that?

1          A.    No, ma'am.  I missed the page you were

2     on.

3          Q.    Sure.  It's page 16 at the very

4     bottom, the very last sentence.

5          A.    Okay.

6          Q.    Assuming that the information

7     Herrington provided in the first interview was

8     the same as the information provided at the

9     second interview, would your opinion be the same?

10         A.    No, and we know it's not.

11         Q.    What information -- in your

12    understanding, what information was different

13    between the first interview and the second

14    interview?

15         A.    Jim and Ed were the first people he

16    named as suspects.

17         Q.    Other than the statements --

18         A.    Ma'am, ma'am, ma'am, ma'am, please.

19    Jim and Ed was the key thing.  The rest of his

20    statement was not documented.

21              How would he know what else he said

22    and how that was altered?  He was -- stated

23    subsequently in August of '87 that he was kept in

24    isolation, that he was given alcohol, that he --

1    that wasn't '87.  That was somewhere else, but

2    Herrington subsequently said that, and that --

3    and that what he said was not true.

4         It was in one of his recantations, so

5    if it's not documented, how do we know

6    specifically what he said and what they told him?

7         Q.   If you don't know, Mr. Waller, then

8    please just say that.

9         My question was what information do

10   you know was different between the first

11   interview and the second interview, and you said

12   Jim and Ed.

13        Is there anything else besides Jim and

14   Ed that you're aware of?

15        A.   It was not documented, so we don't

16   know what else was -- that was specific, but they

17   talked to him for five hours.  He said he was

18   extremely -- my understanding is he was extremely

19   intoxicated.  That's why they gave him a ride to

20   begin with.

21        Q.   On page 17 on the second -- second

22   bullet point and then under Subsection A it says:

23   Detective Wheat stated he learned that there was

24   nothing of evidentiary value; that there was no

1    need to generate paperwork.

2              Do you agree with that statement?

3         A.    How do you know what is of evidentiary

4    value at the time?  You should be documenting as

5    you go so that you have something to base future

6    interviews, future items of potential evidence,

7    measure for inconsistencies, all those sorts of

8    things.

9         Q.    In 1987 was it the common practice

10   within the law enforcement community to document

11   every single little thing that was done in the

12   course of an investigation?

13        A.    No, ma'am.  You don't document when

14   you go to the rest room.  You don't document when

15   you fold your napkin.  You don't document

16   whatever.

17             When you're having significant

18   interaction with the suspect that you are

19   potentially guarding, then, yes, you do document

20   that.  You document what he says.

21        Q.    When you say significant --

22        A.    And when you were present when he's

23   being interviewed by two other people, then, yes,

24   I think you have an obligation to do that so you

1   can remember what was said.

2          Q.   Do you agree with the statement that

3   if there's nothing of evidentiary value, that

4   does not need to be documented?

5                MR. TAYLOR:  Objection.  He just

6   answered that.  He said how do you know whether

7   it was evidentiary value at the time that you're

8   taking the statement.  I object.  Asked and

9   answered.

10               THE WITNESS:  You keep asking the same

11   question over and over again, ma'am.

12               MS. EKL:  I'm looking for an answer,

13   sir.

14               THE WITNESS:  You got one.

15               MR. TAYLOR:  Objection.

16   BY MS. EKL:

17          Q.   You indicated that if he sat through a

18   significant interview, that that had to be

19   documented, that was your words, so my question

20   is if it's an significant contact, does that need

21   to be documented?

22          A.   I just got through saying if you have

23   to use the rest room, if you're folding your

24   napkin, obviously not.

1              If you're providing him with alcohol,

2     if you're doing other things to influence his

3     behavior, yeah, you should be doing that.

4         Q.   Would you agree that a law enforcement

5     officer has to use their discretion in

6     determining what to document and what not to

7     document?

8         A.   To a certain degree, yes, and I think

9     that because something is not of evidentiary

10    value is not a valid criterion.  I think it may

11    go to something else, so what is the individual

12    saying?

13             At least a synopsis of what the

14    individual is saying about what, so forth and so

15    on.  That way later on if he says something

16    different, you have a basis for determining

17    whether the person is taking you down a path or

18    possibly telling you the truth, because people

19    who lie have a difficult time repeating it,

20    unless they practice over and over and over again

21    like maybe five to ten mock trials, that sort of

22    thing.

23        Q.   Was there anything about Gary Wheat's

24    interaction with Herrington, any statements that

1    Herrington made to Gary Wheat that you believe

2    that he should have documented that he did not?

3        A.   I don't know, because he didn't

4    document them.

5            He was -- they were talking to him and

6    prepping him for the subsequent situation that

7    occurred on September 21st, so the 20th, the

8    evening of the 20th, the morning of the 20th,

9    they're giving him alcohol.  They're talking to

10   him.  I would want to know what the basis of that

11   was.

12       Q.   And if they were not having any

13   conversations with him regarding to what he

14   observed the night of the Rhoads homicides and

15   that he was having just general chitchat with

16   Gary Wheat, would you agree that that's not

17   something that needs to be documented?

18       A.   Then why was he?

19       Q.   That's my -- can you answer my

20   question?

21       A.   Yeah, I mean my question would be why

22   was he there?  Why did they take him out of town?

23   Why did they keep him full of alcohol?  Why did

24   they hold him isolated from everybody else until

1   such time as they were going to take a statement.

2        Q.   Are your opinions in this case in

3   relation to Herrington premised on the assumption

4   that Darrell Herrington was full of alcohol

5   through that time period?

6        A.   He was -- my understanding is he

7   was -- there are many different versions; that he

8   was an extreme alcoholic, and it didn't change

9   until '87 or '88, that the one time that he was

10  -- I believe it was Carol Robinson, she couldn't

11  remember the specific date, even though Parrish

12  and McFatridge were pressing her on it, but that

13  it was very unusual, because Herrington was

14  sober -- I figured it was probably the night he

15  was wearing the wire that he was sober, and he

16  was buying drinks for Steidl, even though Steidl

17  was supposed to be his ride home, and Herrington

18  was sober.

19            That's why it was so unusual, and that

20  usually that was the only time she had ever

21  remembered seeing them together.

22            I think that that -- you know, that is

23  significant.  I think references -- ongoing

24  references to him being the town drunk,

1    ongoing -- the credibility issues, the difference

2    before and after, the significant life change.

3              I think, yeah, my understanding is he

4    was a drunk, that his prior testimony he said

5    that he had drank for 12 hours on July 5th, 1986.

6         Q.   Are you drawing a parallel between the

7    phrase full of alcohol and being a drunk?

8         A.   Full of alcohol and being a drunk.

9         Q.   You used the words full of alcohol.

10   I'm just trying to make sure I understand in what

11   context you're assuming that he was full of

12   alcohol or what that means.

13        A.   My understanding is when he was

14   initially talked to, which there was no record

15   made, on July -- on September 19th, he was drunk,

16   kind of stumbling, falling down drunk.

17             He was maintained, shall we will say,

18   in isolation through the following day.  Wheat

19   acknowledges that he bought beer and whiskey that

20   was given to him on that day and on the 21st, so

21   how much and what amounts, I have no idea, just

22   the fact that he was given alcoholic beverages.

23             Now, by his testimony on the night of

24   the incident, he was drunk.  Ray's testimony and

1    I believe Parrish's he was drunk when they picked

2    him up on the Friday night, so that was his

3    reputation.  Bartenders, different people talking

4    about, yeah, he just comes in.  He gets hammered.

5    That's what he does.

6        Q.   Just so I'm clear too is it your

7    understanding that Herrington talked to Gene Ray

8    and Jim Parrish on that Friday night when he was

9    drunk and that he was then the next day taken out

10   to the hotel with Gary Wheat?  Is that what you

11   just testified to?

12       A.   My understanding, if I understand that

13   correctly, is on the end of the night of the

14   19th, and I could have that -- that wrong, I

15   would have to go back, but around midnight he was

16   picked up.  That was a Friday night.  He was

17   talked to until about 5:00 in the morning by

18   Parrish and Ray.  That was not documented.

19            At some point then Wheat took him down

20   to Charleston.  He was -- spent that day in

21   Charleston, that night in Charleston, came back

22   the next day, monitored in some way, shape, or

23   form, and then that following evening he was

24   taken out to Ray's house, I believe, and that's

1    where they -- McFatridge, Eckerty, and Parrish

2    spoke to him.

3         Q.   Where did you get this chronology,

4    that the Gary Wheat out at the motel took place

5    before the interview at Ray's house?

6         A.   That was my -- that's my recollection.

7    I can look to see if I'm incorrect on that, if

8    you'd like.

9         Q.   Would your opinions change if I told

10   you that the chronology was Friday night --

11   Friday night he's picked up by Gene and Parrish.

12   Sunday after he's had time to sober up he is

13   interviewed by them, and it's documented, and

14   then it was just prior -- several days later just

15   prior to the eavesdrop that he was taken out to

16   the motor inn so that no one would know that he

17   was going to be wired up for the eavesdrop?

18              MR. TAYLOR:  Objection.

19   Mischaracterizes Wheat's testimony.

20              THE WITNESS:  Yeah, that's my

21   recollection of what it was.  It's been some

22   time.

23   BY MS. EKL:

24        Q.   My question is is your opinion based

1    on what you related earlier?

2         A.   I would have to go back and look.

3    That was my general understanding of it.

4         Q.   Would it change if it was the way I

5    just told you?  Would that change anything?

6         A.   Ma'am, I understand what you're doing.

7    You're trying to, you know, pick certain things,

8    and I don't know if you're deliberately

9    misrepresenting it, but it's not consistent with

10   my recollection.

11        Q.   Okay.  I will represent to you -- I'm

12   absolutely not misrepresenting anything to you.

13        A.   Okay.

14        Q.   It's based on the transcripts.  I'm

15   just trying to see if your opinion would change

16   if the facts are different than what you believe

17   them to be.

18        A.   I don't know that that would be

19   significant.  I know that he was held in

20   isolation, and we can get a clarification.  If we

21   had the clarification, and I looked at it, maybe

22   I could tell you if that would change it or not.

23             I don't know.  If you want me to take

24   the time, I'll --

          1          Q.    No, that's okay.   I didn't see in the

          2    documents I reviewed were you provided with

          3    Parrish's third transcript?   It appeared from

          4    what I saw that you reviewed his first two

          5    transcripts, but...

          6               MR. TAYLOR:   Could we save some time?

          7    I think in his listing he has Parrish's

          8    depositions and exhibits without differentiating

          9    which volumes, so I'm pretty sure, almost

         10    positive we gave him all three days that

         11    Parrish -- of the Parrish's deposition.

         12               MS. EKL:   This took place prior to

         13    Parrish's third deposition, so if he was

         14    provided --

         15               MR. TAYLOR:   I'm looking at his

         16    opinions on page 3.

         17               THE WITNESS:   Is it through page 906?

         18               MR. TAYLOR:   Yeah, that would be all

         19    three days.

         20    BY MS. EKL:

         21          Q.    Are you sure?   Do you recall reading

         22    Parrish's testimony regarding his explanation of

         23    those notes that were written about Darrell

         24    Herrington and Paula Myers in August of 1987?

1      A.   His explanation for it?

2      Q.   Right.

3      A.   No, I don't recall specifically his

4   explanation for it.  I know that they weren't put

5   in the report.

6      Q.   You don't recall reading his

7   description of what those notes represented?

8      A.   According to my notes, page 902, Gene

9   Ray was with me when I -- when we interviewed

10  Herrington, took notes on Herrington's

11  stationery, aware, did not write a report.

12           Morgan no longer a suspect when

13  received this information.  If could prove Morgan

14  gave Herrington money to keep mouth shut, and he

15  saw Morgan at the bottom of the stairs, then

16  Morgan would be suspect again.

17     Q.   You're reading from notes that you

18  took?

19     A.   That's my summary, yes, ma'am.

20     Q.   When did you create that summary?

21     A.   When I read the deposition.

22     Q.   When you read the depositions?

23     A.   Sometime after.  This has been an

24  ongoing process.  I've read the depositions, and

1    then at different times throughout I have created

2    summaries.

3         Q.   Is there any reason why those

4    summaries weren't provided in response to our

5    subpoena?

6         A.   Summaries that were prepared at the

7    time that I gave you all the information were.

8    Some of these have been completed since.

9         Q.   Have you seen those?

10        A.   You got the notebooks.  They took

11   them.  I don't know if they didn't copy them.

12             MR. RAUB:  We never got anything

13   anywhere close to that volume.

14             THE WITNESS:  I mean they came, and

15   they took the whole file on two different days.

16   I mean -- and they --

17             MR. JOHNSTON:  We don't have them.

18   I'm not saying you didn't give them.

19             THE WITNESS:  What I'm saying is the

20   tabs were misplaced and different things too,

21   so -- I mean.

22             MR. TAYLOR:  By they, why don't you

23   clarify for the record who they is that came and

24   took them?

1              THE WITNESS:  Kinko, Fed Ex.  I'm

2    assuming that was the local place that you

3    contracted with.

4    BY MS. EKL:

5         Q.   What's your understanding of what a

6    law enforcement officer's Brady duty was

7    post-trial back in 1987?

8         A.   The same thing is to determine the

9    truth about what happened.  If you found

10   something out that was significant that would

11   alter your understanding of the facts previously

12   that would be exculpatory or mitigate the

13   circumstance, I think you have an obligation to

14   present that information to the prosecutor, and I

15   think you have an obligation and to -- good form

16   is -- to cover your own behind is to do it in

17   writing.

18        Q.   If the information was provided to the

19   prosecutor, would you agree that that would

20   alleviate the officers or would fulfill the

21   officer's Brady duty?

22        A.   If it was appropriately applied to --

23   or provided to the prosecutor, and you were not

24   aware of any inappropriate conduct, yes, I

1    believe it would.

2        Q.   If an officer after a murder case took

3    place, this is a hypothetical, learned that there

4    were rumors going around town about other facts

5    about the case and you heard these rumors and

6    tried to look into the rumors to see if they were

7    true and found out that they weren't true, that

8    there was denials about the information, would he

9    have any duty to turn over something that was

10   just rumor and speculation with no basis of

11   truth?

12       A.   I really don't understand what you're

13   talking about, ma'am.

14       Q.   Sure.  If, for instance, witness A

15   says I heard from witness B that witness C has

16   additional information, so we're talking about

17   third -- three parties down, and this gets back

18   to a law enforcement officer, and he says, well,

19   I'll look into it.

20            I'm going to go back and talk to

21   witness C and see if they really said this thing

22   that's been travelling around as a rumor, and

23   witness C denies it, is there a duty to write up

24   a report and say I heard a rumor about something

 1    happening, and I conferred with the person, and

 2    they denied it?

 3              MR. BALSON:  I'm going to object to

 4    the hypothetical and also it assumes facts not in

 5    evidence.

 6              THE WITNESS:  I don't really

 7    understand your hypothetical, ma'am.  You would

 8    have to give me more of a situation or give me a

 9    factual situation where I could comment on it.

10    Based on what you said, I can't give you a

11    response.

12    BY MS. EKL:

13         Q.   The fact that a witness has a drug

14    problem, would that cause you to not want to hear

15    them out in terms of any information that they

16    might have?

17         A.   No, I think what you have to remember

18    about people who are drug addicts and have a hard

19    core problem is they'll do or say anything to

20    keep their habit going, and they're very, very

21    convincing, so that is certainly a factor to be

22    taken into consideration.

23         Q.   As long as the fact that the person is

24    a drug addict is provided to the defense so that

1    they can explore the issue of the witness's

2    credibility at trial, do you see any problem in

3    using that witness as a -- that person as a

4    witness?

5         A.   I think you have given me a very

6    limited thing here.  I think if you're using a

7    drug addict, you're aware that the person is a

8    drug addict, you have to understand the

9    motivation or try to figure out the motivation

10   for doing that.  I think you have an obligation

11   to check on that person and verify to the extent

12   possible in a comprehensive manner whatever they

13   tell you.

14        And then certainly that verification,

15   that subsequent investigation should be provided

16   to the State's Attorney, so, you know, and do it

17   in a conscientious manner.

18        To me, should you not consider the

19   information?  Absolutely you should consider the

20   information.

21        Should you verify and confirm to the

22   extent possible why and how is that person being

23   truthful?  Are they credible?  Absolutely.  I

24   think you have that obligation.

1  Q. Would it be proper for an officer to

2 try to -- try to assure that a person is sober at

3 the point in time when they interview them or

4 when they learn the information?

5  A. You know, I read a ton of depositions,

6 as do you guys, and frequently I see it prefaced,

7 "Are you under the influence of any mind altering

8 substance, drug, alcohol, et cetera, that would

9 prevent you from answering these questions

10 truthfully and accurately," so I think the same

11 thing goes.

12  At some point you need these people to

13 be in a coherent manner.  Should you close your

14 ears when they're trying to tell you something if

15 they're under the influence?  No.

16  Then it's extremely important that you

17 validate and verify whatever information they

18 gave you, and at some point, hopefully, if

19 they're going to be, you know, that same

20 information, and one way you do that is you

21 record the information specifically that they

22 give you when they're under the influence and so

23 that you can verify what they're saying later.

24  Q. Have you, yourself, ever testified

1    before the grand jury or a grand jury?

2         A.   I think so.  Grand juries are very

3    unusual in Florida.  I think I was called once,

4    and I don't recall if I just spoke to the State's

5    Attorney or I testified.  I don't remember.  It's

6    been a long, long time ago.

7         Q.   Even when you -- after you left

8    Florida were you -- did you have other officers

9    who would go and testify before the grand jury

10   that worked under your supervision and control?

11        A.   Again, it wasn't a frequent manner of

12   bringing people -- in North Carolina and

13   Wisconsin, it wasn't widely used for that.  In

14   Wisconsin it's more of an exception, much more of

15   an exception.  You just go to the DA's office.

16        Q.   So you're not familiar with the manner

17   in which the grand jury is then used in the

18   Illinois state court system.  Is that fair to

19   say?

20        A.   No, I'm familiar with it.  I

21   understand the process, that you present it to a

22   grand jury, and they make the determination.

23             I'm also familiar with the adage that

24   a prosecutor could probably indict a ham

1    sandwich, because they control -- there are no

2    safeguards in a grand jury, and like the

3    misleading testimony that was given in this case,

4    you have -- you know, you don't show the grand

5    jury your liabilities.

6            Darrell and Debra, they don't get a

7    chance to look at them.  You just have Parrish

8    paraphrasing and somewhat misleading and

9    misdirecting the grand jury.

10       Q.   Do you know that that's common

11   practice in Illinois to have an officer testify

12   to the statements of witnesses rather than have

13   witnesses testify live in front of the grand

14   jury?

15       A.   I would hope that the common practice

16   in the state of Illinois is that the officers

17   would testify truthful and accurately --

18       Q.   I'm assuming that they are testifying

19   truthfully and accurately.  My question is do you

20   know that it's a common practice to have the

21   officer testify to the statements of the

22   witnesses?

23       A.   I'm familiar with that practice, yes,

24   ma'am.

1          Q.   Okay.  When you say that Parrish

2     testified in a sanitized manner, what do you mean

3     by that?  You know, actually, strike that.

4               I'm going to move on.  I don't want to

5     eat up too much time here?

6          A.   I object.  I think you already have.

7          Q.   Page 23, subparagraph E you say that

8     deliberate indifference to the consequences of

9     the systemic failure to appropriately conduct

10    police investigations was observed by the policy

11    maker of the Paris Police Department and ignored.

12              My specific question in regard to that

13    is your use of the word systemic failure.  You've

14    previously testified in regard to policy and

15    practice that you were only specifically

16    referring to action taken in the Rhoads homicides

17    investigation.  Use of the word systemic failure

18    in paragraph E, are you still referring to things

19    all related to the Rhoads homicides

20    investigation, or are you talking about systemic

21    failure in other cases?

22          A.   No, you already asked me that

23    question, ma'am.  I'm not aware of other cases,

24    so this investigation took place -- well, I mean

1    in subsequent issues that were relating to it

2    took over a year, so you have -- there was a

3    consistent practice.

4            Did they do the -- something similar

5    in every case that was presented before the Paris

6    Police Department, I do not know, but I think

7    that there were a significant number of examples

8    to show that this was systemic and a practice.

9        Q.   You state in the next page on page 24,

10   subparagraph F:  For whatever reason law

11   enforcement investigators involved in this matter

12   failed to conduct a complete and thorough

13   investigation necessary to determine the truth

14   about what happened.

15           What else do you think that the

16   officers should have done to conduct a complete

17   and thorough investigation?

18       A.   Well, you had 14 years later Eckerty

19   says Morgan is a suspect, was then, continues to

20   be now.  It should be looked into.

21       Q.   If Morgan was looked into --

22       A.   Ma'am, ma'am, ma'am, this would go a

23   lot smoother if you let me answer the question.

24           That was one of my answers.  Go ahead.

1    If you have an argument, let's argue, and then

2    I'll go on.

3         Q.   I'm just trying to stop you, and then

4    I'll let you go on, because, otherwise, you go

5    on, and I have to go back to the beginning.

6         A.   No, you're misleading.

7         Q.   Other than investigating Bob Morgan,

8    what other things do you think could have been

9    done to complete --

10        A.   I was trying to tell you that, and you

11   interrupted.

12        Q.   I'm trying to go step by step,

13   Mr. Waller.  Please, can we just keep going

14   through this?  I'm trying to get through it.

15        A.   Could you read back the initial

16   question and my answer, please?

17             (At this point the court reporter read

18              aloud the requested portion of the

19              transcript.)

20             THE WITNESS:  Okay.  You had, for

21   whatever reason, based on the two primary

22   witnesses, Herrington and Rienbolt, they

23   developed that a motive was this drug buy, this

24   drug theory as a basis for the Rhoads being

1    murdered.

2                 These two people recanted their story

3    several times.  Certainly there's nothing to

4    indicate that -- in the investigation that --

5    well, if you compare Whitlock and Steidl to the

6    Board brothers where they're digging up bodily

7    remains from their yard, and they were suspects

8    in other murders, and you compare the two.

9                 If you're looking at somebody who is

10   involved in potential drugs and to do a hired

11   killing, you sure wouldn't look at Whitlock and

12   Steidl.  You would look more at somebody like --

13   comparable to the Board brothers or other

14   associates, the motorcycle gang members.

15                The different variations of the

16   stories that were presented by Herrington were

17   not pursued, particularly, again, you tie him

18   back into Morgan.  Whenever you mention Morgan's

19   name, the investigation goes elsewhere.  It did

20   originally.  It subsequently did with the ISP

21   command staff.

22                The -- those leads were never pursued

23   in a timely manner in any kind of a comprehensive

24   manner.

1           Smoke Burba was never interviewed.

2  You had the opportunity, I believe, to -- and it

3  escapes me at the exact moment now when Whitlock

4  offered to take a polygraph.  I think it was

5  early on.  That wasn't recorded, and he was

6  never -- never provided with one.

7  BY MS. EKL:

8       Q.   I'm sorry.  Let me just ask you.

9  Where did you get that information --

10      A.   I don't recall it.

11      Q.   -- in the initial investigation

12  Whitlock ever said that he would be polygraphed?

13      A.    I thought that one of them might have

14  said that when they were rousted on July 9th, but

15  I could be wrong as far as the timing.  Of

16  course, it wasn't included in the report.

17           The -- you created -- and here's a key

18  thing:  Whitlock and Steidl were created as

19  suspects, even though there was no substantiated

20  basis for doing that.

21           On July 9th, they were rousted from a

22  bar.  They were dragged in.  Everybody in town

23  said Steidl and Whitlock are the suspects.

24  They're the ones that did the murders.  Rumors

1  run rampant.

2            You would have thought that who

3  called, that would have been an important thing

4  to record.  Who dropped a dime on them?  Who said

5  they're talking about this at the tavern?

6            Who -- that would be documented.  You

7  would go back and find out everybody present

8  to -- that was in the tavern and take statements

9  from them.  It would be very interesting.

10           I mean Steidl says almost immediately

11  before the police came to roust us, Morgan came

12  in and came right up to me and asked me about a

13  reward and did I know anything about the Rhoads

14  murders, so somebody called a short time later.

15  They say, yeah, we'll come down and talk to you,

16  and they're rousted.

17           I mean I would like to see that

18  connection.  Whenever you have Morgan's name come

19  up, you have people get very protective.  You get

20  selective documentation or no documentation, so

21  that's an ongoing basis.

22           So everybody says that once the

23  investigation focused on Steidl and Whitlock,

24  Morgan was no longer considered a suspect.  I

1    think Eckerty and Parrish say McFatridge said

2    Morgan is no longer a suspect, because we have

3    Steidl and Whitlock.

4              Eckerty said Steidl and Whitlock

5    became suspects because of something supposedly

6    said in a bar on July 9th, 1986.  What that was,

7    nobody seems to know.  Who it was said to, nobody

8    seems to know.

9              It wasn't documented -- who made the

10   call to the PD was not documented.  It was

11   interesting that they had a number of officers

12   that were available to go down and drag them

13   out -- or why did they drag them out unless they

14   were trying to create suspects.

15             And just for the document, Sergeant

16   Eckerty said in his deposition on page 133 there

17   were two ways to learn about a crime scene being

18   there and being told by the investigator.  That's

19   significant.

20             Okay.  That's about it for now.  Those

21   post-its weren't available then.  Those were

22   recent.

23             MR. JOHNSTON:  We need to supplement

24   them.

1          MS. SUSLER:  We can make copies for

2     you.  If you want them now, we can do them right

3     now.

4     BY MS. EKL:

5          Q.   Is there anything in your report that

6     since you've written it you've looked back at and

7     you feel is inaccurate or that you no longer --

8     you no longer hold to be an opinion?

9          A.   Not that I recall offhand, if you have

10    something, I'll be glad to discuss it with you.

11         Q.   Other than what you've discussed, is

12    there anything else that you can think of now

13    that the investigators Parrish, Eckerty, and

14    Chief Ray should have done to conduct a thorough

15    and complete investigation?

16         A.   I think we've covered it pretty well.

17    I think they should have documented every step of

18    it.

19              They should have particularly -- you

20    had a corrupted investigation.  You have

21    convictions based not on any physical evidence.

22    You had the creation of two suspects under very

23    suspicious circumstances that were not documented

24    until months later, until after they were

1    arrested and indicted.

2            You had multiple versions or multiple

3    interviews of both really interesting witnesses,

4    alleged eyewitnesses.  The eyewitnesses don't see

5    each other.  They're present but don't know

6    anything about each other.  I think Herrington

7    even indicated at one point he didn't even know

8    who Rienbolt was until she showed up in court.

9            There's no indication that they did

10   anything to link Rienbolt to Whitlock or Steidl.

11   Initially Rienbolt never said anything about

12   Steidl, just Whitlock, so that really wasn't

13   documented in a coherent manner.

14           You have the failure to follow up on

15   potential validation of stories by Rienbolt.  For

16   example, she initially -- one version she said

17   she didn't go to work that day.  Another one she

18   said, well, she left early that day.

19           Another version was the Bev Johnson

20   punched her in, punched her out.  Bev Johnson

21   said I may have done that once, but I don't know

22   what day it was, and they turned out that Bev

23   Johnson was on vacation on July 5th, and then

24   they checked her time cards, and the writing was

1   consistent with hers, and the primary person --

2   her name escapes me at this minute, but the

3   supervisor there confirmed that Rienbolt was

4   present on July 5th.

5           Rienbolt says, yeah, in one version I

6   drank 18 beers.  I smoked three joints.  I did

7   codeine, yet, you know, I had all these

8   interactions, you know.  In the meantime, she was

9   supposedly at work.

10          You had supposedly with Barb Furry,

11  Barb Furry says, no, I never went out with her.

12  I never went to the bars with her.

13          You have all these things -- you have

14  Rienbolt saying first I took the one car, the

15  little station wagon.  Then she changes that

16  later on and she has Della Wakefield's car.

17          Incidentally, Della Wakefield is

18  accused of sexually assaulting one of Rienbolt's

19  kids, and McFatridge mysteriously reduces the

20  charges on what I would call a significant sexual

21  assault on a child in return for Della

22  Wakefield's cooperation.

23          You have a whole plethora of things.

24  You have the overhears.  They wire up Herrington.

1    They wire up Rienbolt.

2            Wow, that stuff is missing now.  Where

3    is it?  That was pretty significant.  I mean I'd

4    like to see that.  I'd like to hear it.  I'd like

5    to -- I understand that, you know, when -- at the

6    subsequent --

7       Q.   I'm sorry, Mr. Waller, would you

8    answer my question as to what else they could

9    have done that they didn't do, because I feel

10   like we're getting really far field.

11           I know there's other questions that

12   need to be asked.  I don't want to cut you off,

13   but I feel like we're now not answering my

14   question at all.  It's time to yield the floor to

15   someone else.

16           If there's anything else that you need

17   to say that they didn't do that they should have

18   done, other than not documenting certain

19   things...

20      A.   Well, I was trying to do that when you

21   once again interrupted, ma'am, in which you seem

22   to do with great regularity.

23           The -- you asked the question.  I was

24   trying to give you the best answer.  I could go

1    on, but if you want to pass the floor, then pass

2    the floor.

3            MS. EKL:  I'll pass the floor.

4         EXAMINATION CONDUCTED

5          BY:  MR. JOHNSTON

6         Q.   You say you're a CHLEA trained

7    assessor?

8         A.   Yes, sir.

9         Q.   Do you know if you still have that

10   license?

11        A.   I don't know that it was a license.

12        Q.   Do you know if you're stilled

13   accredited?  Do you know if you still have that?

14        A.   Have what?

15        Q.   Your assessor status with CHLEA.

16        A.   No, sir, I don't.

17        Q.   Okay.  When the was the last time you

18   had accreditation from CHLEA?

19        A.   I never have been.

20        Q.   Have you ever been involved in an

21   OCDETF investigation?

22        A.   In a what?

23        Q.   OCDETF investigation?

24        A.   You're talking about Organized

1    Criminal Drug Enforcement Task Force?

2        Q.    Correct.

3        A.    That's an acronym that's used in

4    Illinois.  For about four and a half years I was

5    involved as a board member of a drug task force

6    in the State of Wisconsin.

7        Q.    So the answer is, no, you've never

8    been a task force member of an OCDETF

9    investigation?

10       A.    No, sir, my answer was -- don't

11   misstate it.  That's an acronym that's used in

12   Illinois.  I was not involved in Illinois.

13            I've testified earlier that I was not

14   in law enforcement in Illinois.

15            I testified now that I was a member of

16   a drug task force on the board that supervised it

17   for four and a half years in Wisconsin.

18       Q.    And that was pursuant to the organized

19   drug enforcement task force documentation that

20   you need to sign off on?

21       A.    Sir, I've never heard of that before

22   other than in Illinois.

23       Q.    So you've never heard of it?  You've

24   never been a member of one?

1          A.    Sir, I've already said that.   I.

2          Q.    Have you ever been involved in a RICO

3   investigation?

4                MS. SUSLER:   We're trying to get done.

5   Not at the cost of interrupting the witness.

6   BY MR. JOHNSTON:

7          Q.    All right.   Go ahead.

8          A.    Repeat the question, please.

9          Q.    Have you ever been involved in a

10  criminal RICO investigation?

11         A.    Yes, sir.

12         Q.    When was that?

13         A.    In -- when I told you the -- in Miami

14  when I worked for Carol Management.

15         Q.    As a private citizen?

16         A.    Yes, sir.

17         Q.    Okay.   Any other criminal RICO

18  investigations you've been involved in?

19         A.    No, sir.

20         Q.    Have you ever been involved in a RICO

21  investigation as a law enforcement officer?

22         A.    You just asked me that question.   I

23  said -- have I been in any others, I said no,

24  sir.   Now, you're asking me the same question.

1        Q.    It's a different question.

2        A.    No, it isn't.  It's the same question.

3        Q.    What's your answer?

4        A.    No, sir.

5        Q.    Have you ever been on a 6E list?

6        A.    A what?

7        Q.    6E list.  Do you know what a 6E list

8   is?

9        A.    I saw some reference to that, but I

10   don't recall right now what it is.

11       Q.    All right.  Okay.  As you sit here

12   today, you don't know if you've been on a 6E

13   list?

14       A.    If -- okay.  You're referring to the

15   access to information and a federal investigation

16   that Fermon was -- I guess that Callahan made a

17   complaint about Fermon's improprieties with

18   organized crime figures, I don't know that I

19   have.

20       Q.    Have you ever taught any classes on

21   cold case investigation?

22       A.    Criminal investigation, not

23   specifically cold case investigation, no, sir.

24       Q.    Have you ever taken a class regarding

1    cold case investigation?

2          A.    Not a specific class, no, sir.

3          Q.    Have any of the officers who worked

4    for you over the years ever taken a cold case

5    investigation class?

6          A.    I don't recall that.

7          Q.    Do you know of any recognized experts

8    in the field of cold case investigations?

9          A.    Probably do.  The names don't come to

10   mind right now.

11         Q.    Have you ever read the book Practical

12   Homicide Investigation?

13         A.    By whom?

14         Q.    Vernon Geberth.

15         A.    Portions of it.

16         Q.    Never read the whole thing?

17         A.    I don't recall specifically whether I

18   did or not.

19         Q.    When was the last time you read

20   portions of Practical Homicide Investigation by

21   Vernon Geberth?

22         A.    I believe it's in my library.  I refer

23   to different things at different times.

24         Q.    Have you ever taken a class from

1    Vernon Geberth?

2         A.   No, sir.

3         Q.   Is Vernon Geberth considered an expert

4    in the field of homicide investigation?

5         A.   He wrote a textbook.  I'm sure that

6    he's considered as an expert by some people.

7         Q.   Okay.  Do you consider him an expert

8    in a homicide investigation?

9         A.   I don't know him that well.  I know

10   who he is.  I know he wrote a book.  I believe he

11   was out of NYPD, if that's the same guy I'm

12   thinking of.  I don't recall much other than

13   that.

14        Q.   And it's a book you've relied upon?

15        A.   I didn't say that.  I said I've

16   referred to it.  It's been in my library.

17        Q.   Are you aware of the National

18   Guidelines For Death Investigations?

19        A.   I think I've seen different things

20   that relate to that.  I'm not sure exactly what

21   you're referring to.

22        Q.   Have you ever seen a document called

23   national guidelines for death investigations?

24        A.   Based on that description, I don't

 1    really know right now.

 2         Q.    Have you ever taught a class on the

 3    use of DNA evidence in investigations?

 4         A.    A portion of a seminar, yes.  Not an

 5    entire class.

 6         Q.    And when was that portion of a seminar

 7    that you taught?

 8         A.    It was probably 1990.

 9         Q.    Any other times?

10         A.    No, sir.

11         Q.    And who did you teach to?

12         A.    It was at the University of

13    Wisconsin-Platteville in the criminal justice

14    program.  I was a guest lecturer in one of the

15    classes.

16         Q.    And how long did you teach this

17    portion of the seminar, and how long did it last?

18         A.    One class session.

19         Q.    How long is that?  How many hours?

20         A.    I don't recall.  It was either one or

21    three.

22         Q.    Have you ever taken a class regarding

23    the use of DNA evidence in an investigation?

24         A.    I've taken classes where it was

1    discussed.   Never one specifically geared toward

2    DNA.

3          Q.    How many of those classes do you

4    recall where it was discussed?

5          A.    I don't recall specifically.

6          Q.    What was the general discussion in

7    which DNA was discussed generally?

8          A.    The use, the applications of it.  It's

9    been an ongoing development.  Obviously things in

10   1990 were -- I guess the last one would have been

11   in 19 -- or -- it was either 2008 or 2007,

12   investigating sexual assaults, an IACP class that

13   was in New Hampshire; International Association

14   of Chiefs of Police.

15         Q.    And how long did that class last?

16         A.    Three days.

17         Q.    And what -- how much of that three-day

18   class related to DNA?

19         A.    A portion of the -- I actually only

20   attended one day, because it was a family

21   emergency, but portion of the -- that one day

22   dealt with the use -- the analysis and use of

23   DNA.

24         Q.    Was it less than eight hours?

1          A.    Yes, sir.

2          Q.    Did you ever -- were you ever involved

3    in the investigation in which DNA evidence was

4    used to convict a suspect?

5          A.    No, sir.

6          Q.    Were you ever involved in an

7    investigation in which DNA evidence was used to

8    exonerate a suspect?

9               MR. TAYLOR:  Objection in the sense of

10   vagueness.  Do you mean while he was an officer?

11              MR. JOHNSTON:  Ever.

12              MR. TAYLOR:  Okay.

13              THE WITNESS:  No, sir.

14   BY MR. JOHNSTON:

15         Q.    Is it your understanding that DNA

16   evidence can be used to inculpate a suspect?

17         A.    Yes, sir.

18         Q.    Is it your understanding that DNA

19   evidence can be used to exclude suspects?

20         A.    Yes, sir.  Well, that you can

21   establish that that particular bit of evidence

22   did not come from that person and not exclude

23   them from the total -- totality of circumstances.

24         Q.    That's a fair answer.  I understand

1    what you're saying.

2              Are you familiar with cases in which

3    DNA evidence has been used to exonerate people

4    who have been convicted of crimes?

5         A.   Yes, sir.

6         Q.   As you sit here today, do you know if

7    DNA evidence or the use of DNA evidence is a

8    proper investigative tool in a homicide

9    investigation?

10        A.   Yes, sir.

11        Q.   And it is?  I'm sorry that was kind of

12   an unclear question.  It is a proper tool to use?

13        A.   Sure.  I think if the purpose is to

14   determine the truth, anything that will

15   facilitate that should be used, and I'd like to

16   go back and just clarify a previous answer.

17        Q.   Sure.

18        A.   You asked me -- I've not been involved

19   as an investigator.  I've been involved as a

20   consultant in cases where DNA has been used on

21   wrongful convictions.  There were several in

22   Texas, so not as a criminal investigator but as a

23   consultant after the fact.

24        Q.   When you were -- who you were working

1   for on those cases in Texas?

2        A.   The attorney representing the people

3   that had been convicted.

4        Q.   And were you involved in the DNA

5   aspect of that case as a consultant?

6        A.   Other than to review the results of

7   that and the subsequent -- you had the

8   convictions based on investigative procedures and

9   then the subsequent reanalysis of the DNA based

10  on developments.

11            In other words, you can get a lot more

12  information from DNA now than you could 15, 20

13  years ago, so the -- the prisoners -- there were

14  several petitioned.  The DNA was examined.  It

15  was established that they couldn't have been the

16  subject, were excluded as being the subject.

17  They were subsequently released.

18            MS. SUSLER:  I just want to put on the

19  record it's 5:00, and we've been going for about

20  six and a half hours.

21            MR. JOHNSTON:  I don't believe it's

22  six and a half hours.

23            MR. TAYLOR:  Six hours and 15 minutes

24  exactly.

1    BY MR. JOHNSTON:

2         Q.   Well, we'll let the court reporter

3    determine, but I'm not saying you're wrong.

4    We'll move forward.

5              Have you in your experience ever been

6    taught in a class that a police officer's Brady

7    duties required the police officer to disclose

8    exculpatory evidence directly to a defense

9    attorney?

10        A.   No, sir.

11        Q.   Have you ever taught any police

12   officers that their duty is to disclose directly

13   to a defense attorney?

14        A.   No, sir.

15        Q.   Have you ever trained police officers

16   of their duties under Brady versus Maryland?

17        A.   Yes, sir.

18        Q.   When?  How many times?

19        A.   I don't have an exact number, but I've

20   taught the criminal investigation component a

21   number of times in training sessions and also

22   that was included in constitutional law and

23   criminal investigation.

24        Q.   I'm sorry.  Would it be more than ten

1      or less than ten?

2            A.    Probably less than ten.

3            Q.    And when you taught -- I think you

4      said taught police officers their duties under

5      Brady.  I'm not sure if I said that, though.  I

6      think I just asked you if you taught a class

7      regarding duties under Brady.  Right?

8            A.    I believe so.  That was my

9      understanding.

10                 MS. SUSLER:  You said police.

11     BY MR. JOHNSTON:

12           Q.    Besides teaching the police officers,

13     have you taught anybody else particular people's

14     duties under Brady versus Maryland?

15           A.    At the college level.

16           Q.    Okay.

17           A.    Again, that would be either

18     constitutional law for police or criminal

19     investigation.

20           Q.    Again, how many times?

21           A.    Probably four to six times.

22           Q.    And when were these times?

23           A.    The mid '80s to early '90s.

24           Q.    And where?

 1        A.    Marion College in Wisconsin;

 2   University of Wisconsin at Platteville; I think

 3   Southwestern Technical -- Southwestern Wisconsin

 4   Technical College.

 5        Q.    By Reedsburg, in that area?

 6        A.    South of there.  Closer to

 7   Mississippi.  That's what I recollect off the top

 8   of my head.

 9        Q.    Do you still have those training

10   materials that you used?

11        A.    Oh, and Mount Scenario.  They used to

12   have a college.  They had an off campus program,

13   so Mount Scenario Marion College.

14              I don't in isolation.  I might have

15   portions of it, you know, mixed in with other

16   things.

17        Q.    All right.  Have you personally ever

18   disclosed exculpatory evidence directly to a

19   defense attorney?

20        A.    Yes, sir.

21        Q.    When was that?

22        A.    As a private investigator.

23        Q.    Have you personally as a law

24   enforcement officer ever disclosed exculpatory

1    material directly to a defense attorney?

2        A.   I don't recall ever doing that.

3    Probably would not have.  If there was a

4    situation, I would have dealt with the

5    prosecutor, State's Attorney.

6        Q.   Do you know if there's any CHLEA

7    standards that would require an officer to

8    disclose directly to a defense attorney?

9        A.   I'm sure there aren't, because CHLEA

10   standards don't require people to do anything.

11   They simply say you need a written directive to

12   cover that issue, and you need the practice --

13   well, you're supposed -- the practice is supposed

14   to be consistent with the directive.

15       Q.   When was the last time you received

16   training on Brady versus Maryland?

17       A.   I don't recall specifically.

18       Q.   Did you ever specifically receive

19   training as a law enforcement officer regarding

20   what your duties are as a law enforcement officer

21   regarding Brady following a conviction?

22       A.   Following a conviction?  No, sir, I

23   mean other than your basic ethical

24   considerations.

1        Q.    Was that specific to Brady?

2        A.    No, it was specific to telling the

3    truth and being concerned about the

4    constitutional rights of all people, due process,

5    fundamental fairness, that sort of thing.

6        Q.    In your years of teaching classes

7    about law enforcement, have you ever talked about

8    the presumption of innocence?

9        A.    Yes, sir.

10       Q.    Okay.  A basic tenet of our

11   constitutional system.  Right?

12       A.    Yes, sir.

13       Q.    Have you ever taught any of your

14   students about what the presumption is once

15   somebody has been convicted?

16       A.    I don't believe I have.

17       Q.    What's your understanding of the

18   presumption of a person once they've been

19   convicted?

20       A.    I don't have a formal -- my personal

21   thing, my personal concept would be if they were

22   convicted and there was -- there were a number of

23   issues that were improper or inappropriate that

24   weren't dealt with originally.  Those should be

1    dealt with.

2              Technically, legally you probably have

3    to prove that you're innocent versus -- or come

4    with some appealable issue to overcome that, but

5    I think morally and ethically if you have some

6    real issues about somebody that was convicted and

7    the impropriety that was involved, I think you

8    have a moral issue to go and deal with that.

9         Q.   Is it your understanding that once

10   somebody has been convicted there's a presumption

11   of guilt?

12        A.   Yes.

13        Q.   Are you a certified polygraph

14   examiner?

15        A.   No, sir.

16        Q.   Do you have an opinion on the

17   reliability of polygraph exams?

18        A.   They're kind of like computers.  It's

19   garbage in, garbage out.  They're basically a

20   tool for a good skilled interviewer or

21   interrogator.

22              If you have somebody who is very good,

23   it's a tool to be used.  If you have somebody

24   that isn't good, it's not much use at all.

1          Q.    Have you ever used a polygraph

2     examination in an investigation?

3          A.    I'm not a polygraph examiner.  Have I

4     contracted to do that?

5          Q.    Correct.

6          A.    Yes, sir.

7          Q.    How many times?

8          A.    Two or three, probably.

9          Q.    When was the last time you did that?

10         A.    Probably when I was with South Miami

11    Police Department in the mid '70s.

12         Q.    Do you know who Fred Hunter is?

13         A.    Pardon?

14         Q.    Do you know who Fred Hunter is?

15         A.    Just anecdotally.

16         Q.    And anecdotally who do you believe

17    Fred Hunter to be?

18         A.    He's a well-respected polygraph

19    examiner.

20         Q.    So you know his reputation to be well

21    respected in that field?

22         A.    Anecdotally, yes, sir.

23         Q.    Do you know if Fred Hunter ever gave

24    Bob Morgan a polygraph examination regarding the

1    Rhoads homicides?

2         A.   I recall reading that he did.

3         Q.   Okay.  Do you recall the results of

4    Fred Hunter's polygraph examination of Bob

5    Morgan?

6         A.   I recall that there was some issue

7    about that.  I don't recall what it was.  I just

8    recall that there was an issue.

9         Q.   Okay.  So you -- as you sit here

10   today, you don't know whether or not Bob Morgan

11   passed the polygraph examination that Fred Hunter

12   gave him regarding the Rhoads homicides?

13        A.   I understand that he represented that

14   he did.  I don't -- obviously, I didn't see the

15   reports, the questions that were asked.  My

16   recollection is there was some concern about how

17   it was done.

18        Q.   And who raised the concerns about how

19   it was done?

20        A.   I don't recall that specifically.

21        Q.   Do you know if it was Michale Callahan

22   who raised concerns about how it was done?

23        A.   It might have been.  I don't recall.

24        Q.   Do you know if Michale Callahan

1    originally suggested that Randy Steidl should be

2    polygraphed by Fred Hunter?

3        A.    Somebody -- I mean Steidl was willing

4    to do that initially, and I know my understanding

5    is ISP command staff precluded that.  Now,

6    whether it was with Fred Hunter or somebody else,

7    I don't know.

8        Q.    What's your basis for your belief that

9    ISP command prevented Randy Steidl from being

10   polygraphed?

11       A.    Statements from Callahan.

12       Q.    Do you know if Bob Morgan has ever

13   been indicted in the last 15 years?

14       A.    No, sir, I don't.

15       Q.    Do you know if he's ever been

16   convicted?

17       A.    No, sir, I don't.

18       Q.    You know what an FBI 302 is.  Right?

19       A.    It's their basic report, investigative

20   report.

21       Q.    Have you read the FBI 302s relating to

22   the Rhoads homicides?

23       A.    I don't recall, and it would be

24   unusual, since it would be some tangential issue,

1    because they wouldn't have primary jurisdiction.

2         Q.   But you don't recall?

3         A.   I may have read something, but, again,

4    the issue would be tangential, because they

5    wouldn't have primary jurisdiction.

6         Q.   Do you know as you sit here today that

7    the FBI interviewed family members of Dyke and

8    Karen Rhoads?

9         A.   They may have, and, again, I recall

10   reviewing something.

11        Q.   Have you ever talked to Michale

12   Callahan?

13        A.   No, sir.

14        Q.   Ever met him at all?

15        A.   No, sir.

16        Q.   Read his book?

17        A.   Just a small portion.

18        Q.   What portion did you read?

19        A.   Just skipped through a few pages.

20        Q.   Do you remember what those pages

21   related to?

22        A.   Just the general introduction.

23        Q.   Who provided you with that book?

24        A.   I bought it.

1          Q.    Have you ever listened to Michale

2    Callahan on the radio?

3          A.    No, sir.

4          Q.    Has anybody told you that Michale

5    Callahan embellishes?

6          A.    No, sir.

7          Q.    Anybody ever tell you Michale Callahan

8    exaggerates things?

9          A.    No, sir.

10         Q.    Anybody tell that you Michale Callahan

11   had a sexual relationship with Andrea Trapp

12   sometime between 2000 and 2003?

13         A.    No, sir.

14         Q.    Did you read all of Michale Callahan's

15   reports?  Do you know what?  That's really not a

16   fair question.

17         A.    No, it's not.

18         Q.    Because there's so many.  So let me

19   try to go through them.

20         A.    Wait a minute.  Are you

21   differentiating reports or memos, and are you

22   talking about strictly related to the Rhoads

23   homicides?

24         Q.    I'll back up to that.  All right.  Did

1    you ever read Michale Callahan's memo dated

2    May 2nd, 2000?

3         A.    Yes, sir.

4         Q.    Did you read Michale Callahan's memo

5    dated May 17th, 2000?

6         A.    Yes, sir, but my understanding is that

7    went up to region, which equates to Carper.

8    Carper modified it.  Then it became the sanitized

9    version.

10              The primary differences between May

11   2nd and May 17th, just from what I could tell,

12   just dealt with the removal of the

13   recommendations for further investigation.

14        Q.    What's your basis for your belief that

15   the memo went to Carper who sanitized it?  Who

16   said that?

17        A.    I don't recall specifically, but I

18   thought I saw a series of e-mails that made

19   reference to that, that it went up, then it came

20   back down, and that portion had been removed.

21        Q.    Okay.  What are the dates of those

22   e-mails?

23        A.    I don't recall specifically.

24        Q.    Other than those e-mails that you

```
 1    think that you recall relating to the memo going

 2    up and coming back down, do you have any other

 3    basis for your statement that Diane Carper

 4    sanitized the memo?

 5         A.   No, I think it said it went to region,

 6    was changed, and then it became -- and I

 7    equated -- she was the regional report for

 8    Callahan and Strohl, and she was the one that was

 9    monitoring that, so that's what I equated that

10    with.

11              I don't know if anybody said

12    specifically with -- that Carper did it, and I

13    don't recall the exact reference that was from.

14         Q.   And so when it refers to region, you

15    just assumed it was Diane Carper?

16         A.   Yes, sir.

17         Q.   And when you say sanitized, I think

18    you said that it was the removal of the

19    recommendations at the back of the memo.

20    Correct?  Is that right?

21         A.   Actually, it was at the front of the

22    memo.

23         Q.   Besides removing the recommendations

24    there at the front of the memo, how are the memos
```

1    different?

2         A.   I think from what I could tell,

3    without word by word comparison, it was primarily

4    the same thing with that.

5         Q.   Did you read Michale Callahan's memo

6    of August 2001?

7         A.   I believe so.

8         Q.   Did you read Michale Callahan's

9    memorandum of July 7th, 2000?

10        A.   Which one was that?  I mean -- I

11   mean -- I don't equate them, you know, more to

12   subject matter or issues than --

13        Q.   It's a two or three-page memo.

14        A.   Who was it to?

15        Q.   It was from Michale Callahan to John

16   Strohl.

17        A.   I think I did.

18        Q.   Okay.  Any other memos you recall

19   reading from Michale Callahan?

20        A.   And while he's looking, do you have

21   any estimate --

22             MR. RAUB:  It's 5:20 right now.

23             MR. TAYLOR:  My watch says 5:18 from

24   3:53 plus five hours and 12 minutes, so --

1             THE WITNESS:  The August 15th, 2001,

2    did you ask that?

3    BY MR. JOHNSTON:

4         Q.   Yep.

5         A.   And the December 30th, 2002, to

6    Captain Fermon.

7         Q.   Okay.

8         A.   I think that's --

9         Q.   That's December 30th, 2002.  Does it

10   specifically say it's to Captain Steve Fermon?

11        A.   Yes, sir.

12        Q.   Okay.

13        A.   Mine does.

14        Q.   All right.  And then you

15   differentiated the difference between a

16   memorandum and a report?

17        A.   Yes, sir.

18        Q.   What reports of Michale Callahan have

19   you read?

20        A.   That's what I was going to clarify.  I

21   don't recall that I did.  He was precluded from

22   writing reports, according to him.

23        Q.   And what's your understanding --

24   what's the basis for your belief that he was

1    precluded from writing reports?

2        A.   He was ordered not to investigate, not

3    to interview.  Any follow-up was very limited,

4    either obtaining intel from the federal people --

5    I mean at different time frames there were

6    different directives, but primarily he was

7    ordered that he could not reopen the case --

8    wait.  There were two --

9        Q.   To go back to my question is what do

10   you recall about him not -- what is the source of

11   your belief that he was ordered not to write a

12   report?  That was the question.

13       A.    That he was ordered not to

14   investigate.

15       Q.   Okay.  All right.  Anything specific

16   that you recall about him being ordered not to

17   write a report?

18       A.    No, I mean that would be a logical...

19       Q.   Did you ever wonder if he was not

20   allowed to investigate how it was he wrote all of

21   these memos?

22       A.    Yeah, he was assigned to review that

23   initially at different times.  He was asked to

24   make presentations to the command staff.

1          Q.    And he wrote a memo in August 2001.

2   Right?

3          A.    Is that the one to --

4          Q.    August 15th.

5          A.    Yes.  Yes, sir.

6          Q.    And what's your understanding of the

7   August 15th, 2001, memo?  Does it have

8   information relating to the Rhoads homicides?

9          A.    I believe so.

10         Q.    Did you ever wonder how it was he

11  would have been able to include information

12  related to the Rhoads homicides if he wasn't

13  investigating it?

14         A.    I, again, would have to look at

15  various memos to see what the content was.  My

16  understanding is that he was -- had reviewed the

17  materials that ISP had and, again, I'd have to

18  look at each one to determine -- I can't do that

19  off the top of my head.

20         Q.    As you sit here right now, do you know

21  if there's a difference between the August 15th,

22  2001, memo and the May 17th, 2000, memo?

23         A.    Again, I'd have to look and compare.

24  I think that by and large the sum and substance

1    of the May 17th one was contained in the

2    subsequent one.

3          Q.    You used the phrase, correct me if I

4    am wrong, gathering intelligence from the feds, I

5    think you said?

6          A.    Yes, sir.

7          Q.    Okay.  What is gathering intelligence?

8          A.    They were doing an investigation at

9    various times, ATF, FBI, IRS of Morgan.  ISP was

10   invited to join the investigations, the task

11   forces.

12              My understanding is that Colonel

13   Carper advised Callahan that he should be

14   involved and report any information back to

15   Carper but that he was not to be operational or

16   do anything specific.

17              He was just basically to pass on

18   whatever information he could learn and pass it

19   on back to Colonel Carper.

20         Q.    What's operational mean?

21         A.    Doing an actual investigation.

22         Q.    Are there certain activities that

23   would reflect an actual investigation?  Do you

24   understand my question?

1         A.    Yes, sir.  I mean the development of

2    informants, the interviewing potential witnesses,

3    for example, using wires or cameras or any number

4    of things.

5         Q.    Using wires or cameras, that would be

6    indicia of an actual investigation?

7         A.    Could be, yes, sir.

8         Q.    How about aerial surveillance, would

9    that be indicia of an actual investigation?

10        A.    May or may not.  I mean if you're

11   developing it for reference purposes, framework,

12   maybe not.

13              If you're preparing to do -- I mean

14   that would be more prep, in my opinion, for

15   operations.

16              Operations would be the active

17   development of information.  That would be a

18   preparatory effort that you would -- you would be

19   doing.

20        Q.    You would start that prefatory effort

21   so you could do an investigation?

22        A.    If you get the green light to go, yes,

23   sir.

24        Q.    How about participating in an arrest

1    warrant, is that being involved in an

2    investigation?  Is that indicia of an

3    investigation?

4           A.   I think so.

5           Q.   How about participating in a search

6    warrant, is that indicia of an investigation?

7           A.   May certainly be.

8           Q.   How about conducting cabinet checks?

9           A.   I wasn't sure what that really was.  I

10   know that's a local buzz word, but I wasn't sure.

11           A cabinet check was a way to access

12   certain information, but it's not a term of art

13   that I was really familiar with.  I assume that

14   it was some kind of information gathering

15   procedure.

16           Q.   Are you aware that a cabinet check is

17   an investigation done of border crossings

18   conducted by the United States Department of

19   Treasury?

20           A.   Could be.  Again, it's a term of art.

21           Q.   How about DNR, dial number reportings,

22   is that part of an investigation?

23           A.   Go back and look and see who has

24   called whom, yes, sir.

1          Q.    How about pen registers?

2          A.    Same thing, you're recording the

3    contacts.

4          Q.    Are you familiar with the databases or

5    software Watson and Rapid Start?

6          A.    That what?

7          Q.    Watson and Rapid Start.

8          A.    Not specifically.  In general terms, I

9    think I know what they are.

10         Q.    Have you ever used Watson?

11         A.    No, sir.

12         Q.    Have you ever used Rapid Start?

13         A.    No, sir.

14         Q.    Do you know what a homicide assessment

15   is?

16         A.    Again, that would be -- a homicide

17   assessment?

18         Q.    Correct.

19         A.    I think that would probably be a local

20   term.  I'm not familiar with it.

21         Q.    How about a link chart, do you know

22   what a link chart is?

23         A.    Yes, sir.

24         Q.    Would that be part of an

1    investigation?

2         A.   Can be.  Looking for relationships.

3         Q.   Is intelligence gathering and

4    investigation mutually exclusive?

5         A.   It may be.  If you're not going to act

6    on it, it could be.  It also could be a preface

7    to an investigation or a component of it.

8         Q.   So it may be, may not be?

9         A.   Yes, sir.

10        Q.   What would be the purpose of gathering

11   intelligence if you didn't have the ultimate goal

12   of doing an investigation?

13        A.   One potential thing, prevent from

14   being embarrassed.

15        Q.   Anything else?

16        A.   Determination of the status of a

17   particular matter at a particular time.

18        Q.   How are cases closed?

19        A.   Usually by arrest and/or conviction or

20   exceptionally cleared.  For example, you know who

21   did something, but you -- you never are going to

22   be able to make the arrest, or it can be pending,

23   or they can be administratively closed.

24             I mean it depends on the procedures --

1    cleared by arrest and exceptionally cleared of

2    the FBI criteria.

3         Q.    Cleared and closed, do you use those

4    synonymously?

5         A.    Pretty much, yes, sir.

6         Q.    Okay.  Have you ever investigated a

7    closed case?

8         A.    Yes, sir.

9         Q.    How many times?

10        A.    It would be a half dozen.

11        Q.    When was the last one?

12        A.    Well, I had as an investigator.  As a

13   policeman I think we did open -- I think we may

14   have done it once or twice when I was the chief

15   in Ripon or on past cases that had been closed,

16   and basically we reopened them.

17             I remember clearly one time the chief

18   reopened one, and I was in South Miami, and I was

19   given the time and the resources to push it to

20   the wall, because it involved a city council

21   member.

22        Q.    So in your status as a law enforcement

23   officer, you've worked on two cases that you

24   reopened?

```
1          A.    Maybe three or four, but...

2          Q.    What are the other two or three?

3          A.    I don't know.

4          Q.    Did any of them involve a homicide?

5          A.    No, sir.

6          Q.    Did any of the two or three or four

7    cases that you reopened involve a matter where

8    somebody had been convicted of a crime?

9          A.    Yes.

10         Q.    Which one?

11         A.    The one in South Miami.

12         Q.    What's the name of that case?

13         A.    I don't know.  It was 35 years or more

14   ago.

15         Q.    Who was your chief at that time?

16         A.    Sal Vizzini.

17         Q.    Did you reopen them, or did you just

18   work on a matter that was closed?

19         A.    No, it was reopened.

20         Q.    And procedurally what did you do to

21   reopen it?

22         A.    I didn't.  My boss did who was the

23   lieutenant.

24         Q.    Procedurally what did your lieutenant
```

1   do to reopen the case?

2       A.   I don't recall.

3       Q.   Okay.  Procedurally did you do

4   anything to reopen the case?

5       A.   No.  I did the follow-up

6   investigation.

7       Q.   Substantively did you investigate any

8   differently once it was reopened, the reopened

9   case compared to any other case?

10      A.   Yes, sir.  I think -- because I was

11  moving back there was -- from what I recall, it

12  involved a stolen firearm, and I don't recall why

13  or how the city council man was involved, but he

14  was.

15           That was the motivation for reopening

16  this case, and the gun was covered -- recovered

17  like ten years after it was stolen, and so I was

18  charged with bringing it back to the various

19  involvements and people of the gun back to the

20  point where it was taken.

21      Q.   Did you ever work on any case

22  involving -- did you ever work as a law

23  enforcement officer in a case where a conviction

24  had been vacated?

 1          A.    I don't recall.

 2          Q.    And what does reopen mean?

 3          A.    You take it from its status of either

 4    closed or inactive or administratively cleared,

 5    and you start investigating again.

 6          Q.    Can you investigate a case that's in a

 7    closed status?

 8          A.    If you have the authorization to, I

 9    suppose you could.  It becomes problematic what

10    to do with the reports administratively.

11                I think you could probably do that.

12          Q.    Put the reports in a closed file?

13          A.    You could, I would imagine.

14          Q.    Do you know of any homicide cases that

15    have been reopened when an individual had already

16    been convicted and was still in prison?

17          A.    I can't think of any offhand.  I'm

18    sure that there are a number that should be, but

19    it isn't always done.

20          Q.    And you can't think of any right now?

21          A.    Not off the top of my head, no, sir.

22    If you have any of those cases where the

23    Innocence Project has got somebody who was

24    improperly convicted, they were released, those

1    are all cases which should be -- if they had the

2    wrong person, should be reopened, whether as cold

3    cases or whatever.

4            I don't have -- whether it's done or

5    not is one thing.  Should they be done?  Should

6    it be done?  Yes, because you had the wrong

7    person charged, and you now have an open case, so

8    is it traditionally done?  No.  I mean a lot of

9    those cold case investigations are examples of

10   that.

11       Q.   And those are cold case investigations

12   that you've never done?

13       A.   Correct.

14            MR. TAYLOR:  Seven hours is up at 5:41

15   on my watch, and I have 5:35 right now.

16            MS. EKL:  I'm confused.  It seems like

17   we took 40 minutes for lunch, at least, and then

18   we had breaks.

19            (At this point there was an off the

20             record discussion.)

21   BY MR. JOHNSTON:

22       Q.   Mr. Waller, in your capacity as a law

23   enforcement supervisor have you ever transferred

24   employees beneath you?

1          A.    Yes, sir.

2          Q.    Have you ever transferred -- as a

3    supervisor, have you ever transferred an employee

4    in -- a law enforcement officer from

5    investigations to patrol?

6          A.    Yes, sir.

7          Q.    Have you ever transferred a law

8    enforcement officer from patrol to

9    investigations?

10         A.    Yes, sir.

11         Q.    Have you ever transferred an officer

12   from patrol to investigations as a form of

13   punishment?

14         A.    From patrol to investigations?  No.

15   Usually that's considered an improvement, because

16   you get regular hours and weekends off.

17         Q.    Have you ever transferred somebody

18   from investigations to patrol?  Have you ever

19   transferred somebody from investigations to

20   patrol as a form of punishment?

21         A.    No, sir.

22         Q.    Have you ever been transferred from

23   patrol to investigations?

24         A.    Yes, sir.

1    Q.    Have you ever been transferred from

2    investigations to patrol?

3    A.    Yes, sir.  It was a promotion or a

4    request from my boss.

5    Q.    When Ms. Ekl was asking you questions

6    earlier today you used the phrase, and you

7    correct me if I am wrong here, of flipping a

8    witness and going up the food chain.  Do you

9    recall words similar to that effect?

10    A.    Probably.

11    Q.    What did you mean by that?

12    A.    Usually if you get some -- get a

13    charge on somebody, particularly a street officer

14    if you're working, you're working at the lowest

15    level, like drug users or petty dealers, hookers,

16    that sort of thing, you have a criminal charge on

17    them, so for in return for not either charging

18    them or working with the prosecutor they'll --

19    they give you information, and you can make a

20    case on somebody else.

21        You know, basically flipping a -- that

22    person would be and working up the food chain

23    would be to go to somebody that's more involved

24    in more serious crime, whether it's the same type

1    or different, so you're basically bartering off a

2    get out of jail free or a reduction of something,

3    if they cooperate.

4         Q.   Is flipping a witness so you can move

5    up the food chain a proper investigative

6    technique?

7         A.   Can be.

8         Q.   When would it not be?

9         A.   If you -- if it's done for

10   inappropriate reasons, like personal -- you like

11   the person, or you -- you're not going up the

12   chain.  You're just using it as an excuse.

13        Q.   Suspect classification?

14        A.   Pardon?

15        Q.   Suspect classification, race,

16   somebody's religion, you don't like them?

17        A.   Yeah, it's subject to abuse,

18   obviously.  I was just trying to think of

19   something offhand that -- if it's done for the

20   proper purpose of getting evidence or a basis for

21   charges against somebody who is committing a more

22   serious crime, then it's appropriate.

23             If it's -- you're trying to give this

24   person a pass because you want them to lay it on

 1     somebody else because you don't like that other

 2     person, then it would be inappropriate.

 3          Q.   Okay.  And when you've flipped

 4     witnesses to move up the food chain, you've done

 5     it for proper purposes which makes it proper

 6     investigative technique.  Right?

 7          A.   Yes, sir.

 8          Q.   Did you review the entire Illinois

 9     State Police file from document No. 1 through

10     document 3005?

11          A.   I can't answer that, because I don't

12     think I was provided that as a separate document.

13     I think it was in the course of different

14     exhibits.

15          Q.   Have you reviewed the entire forensics

16     case file relating to the Rhoads homicides?

17          A.   Again, I did not receive an item that

18     I believe was identified specifically as that,

19     and I'm not saying I didn't, but I don't recall

20     it.

21          Q.   You just don't know.  Okay.  Did you

22     review Randy Steidl's deposition transcripts in

23     this case?

24          A.   Yes, sir.

1          Q.    Okay.  Did you review Herbert

2     Whitlock's deposition transcripts in this case?

3          A.    Yes, sir.

4          Q.    Why don't you go to what's been marked

5     as Exhibit No. 3?

6          A.    Okay.

7          Q.    Pages 2 and 3 of your report.

8          A.    Okay.

9          Q.    Page 2 it says materials reviewed.

10    Right?

11         A.    Yes, sir.

12         Q.    And then following that is all the

13    materials you reviewed for your opinions?

14         A.    Yes, sir.

15         Q.    Where on pages 2 and 3 does it

16    indicate that you reviewed Randy Steidl's

17    deposition testimony?

18         A.    I don't believe it does.  I hadn't

19    reviewed them at that point in time.

20         Q.    Did you review Randy Steidl's

21    deposition testimony prior to issuing your

22    October 2nd, 2009, report that's been marked as

23    Exhibit No. 3?

24         A.    No, sir.

1          Q.    Did you review Herbert Whitlock's

2    deposition testimony before issuing your October

3    2nd, 2009, report which is marked as Exhibit

4    No. 3?

5          A.    No, sir.

6          Q.    Why didn't you?

7          A.    I didn't -- I ran out of time.

8          Q.    Okay.

9          A.    I have done it subsequently.

10         Q.    Did you review the trial transcripts

11   in People versus Steidl?

12         A.    I believe it was just Steidl's

13   testimony.

14         Q.    Randy Steidl's personal testimony?

15         A.    Yes, sir.

16         Q.    None of the other witnesses?

17         A.    I don't believe so.

18         Q.    And why is that not indicated on pages

19   2 and 3 of your report?

20         A.    Because I hadn't reviewed it at that

21   point in time.

22         Q.    Okay.  And why hadn't you reviewed

23   Randy Steidl's personal transcripts -- or the

24   transcript of Randy Steidl's personal testimony

1    in People versus Steidl before writing your

2    October 2nd, 2009, report?

3         A.   I ran out of time.

4         Q.   Did you review the trial transcripts

5    in People versus Whitlock?

6         A.   I don't believe so.

7         Q.   And why not?

8         A.   I'm not sure.  I may have them, but I

9    didn't -- if I did, I did not print them up.

10        Q.   Did you review the post-conviction

11   testimony in any matter relating to Steidl?

12        A.   I think possibly portions of

13   testimony, but I don't recall specifically what

14   they were.

15        Q.   Is there a reason why that's not

16   indicated on pages 2 and 3 of your report?

17        A.   I hadn't done it at that time.

18        Q.   And why hadn't you read the

19   post-conviction testimony in Steidl's matter

20   before issuing your October 2nd, 2009, report?

21        A.   There were just thousands and

22   thousands pages of documents I tried to

23   prioritize and do what I could.  This isn't my

24   only case.

1        Q.    Did you read Kristen Mazely

2    Fitzgerald's deposition?

3        A.    I don't believe so.  I've read

4    references to that.  I don't believe I did read

5    hers.

6        Q.    Why not?

7        A.    I'm not sure I have it.  I don't

8    believe I do.

9        Q.    Did you view Kristen Mazely

10   Fitzgerald's interview conducted by Jeff Marlow?

11       A.    I believe I did.

12       Q.    And is there a reason why that's not

13   indicated on pages 2 and 3 of your report?

14       A.    It would be -- I probably had not done

15   it by the time I wrote the report.

16       Q.    And why hadn't you reviewed Jeff

17   Marlow's interview of Kristen Mazely Fitzgerald

18   before issuing your October 2nd, 2009, report?

19       A.    Again, just ran out of time.

20       Q.    Did you review Michael Dunlap's

21   deposition?

22       A.    I read his statement.  I don't recall

23   whether I did his deposition or not.  I don't

24   believe so.

1         Q.   Is there a reason why you did not

2    review Michael Dunlap's deposition before issuing

3    your October 2nd, 2009, report?

4         A.   No, I'm not sure if I was provided

5    with it or not.

6         Q.   Did you read Rick Cox's deposition?

7         A.   Whose?

8         Q.   Rick Cox.

9         A.   I don't believe so.

10         Q.   Was there a reason why not?

11         A.   I'm not sure I was provided with it.

12         Q.   Did you read Bill Clutter's

13    deposition?

14         A.   Yes, sir.

15         Q.   All right.  Why is that not indicated

16    on your report?

17         A.   Because I hadn't read it prior to

18    drafting the report.

19         Q.   And why didn't you read Bill Clutter's

20    deposition before issuing your October 2nd, 2009,

21    report?

22         A.   Ran out of time.

23         Q.   When you read Michale Callahan's

24    memorandum -- memoranda, did you have an opinion

1   as to whether they were well-written documents?

2       A.   I understood that to be a very short

3   turnaround, that he had to do the review and

4   draft a document within about two weeks while he

5   did also his other work with a relatively new

6   assignment, so I took that into consideration.

7       Q.   Setting aside your consideration,

8   having read it did you consider Michale

9   Callahan's May 2nd, 2000, memorandum to be a

10  well-written document?

11      A.   I thought it was functional.  I don't

12  necessarily call it well written.  Functional for

13  the purpose.

14      Q.   Okay.  How about the August 15th,

15  2001, memorandum, did you consider this to be a

16  well-written document?

17      A.   I would have to look at it.  I don't

18  recall grading them.

19      Q.   Okay.  When you read them, did you

20  draw an opinion?

21      A.   No, sir, I was just looking for --

22  basically looking for facts and basis.  I mean it

23  certainly wasn't -- they weren't the easiest

24  things to read.  I'll grant you that.

1        Q.    They were hard to follow?

2        A.    I believe so.

3        Q.    You indicate you reviewed a 48 Hours

4    CD.  Do you know which 48 Hours you reviewed?

5        A.    The one that dealt -- that was --

6    aired on or about May 15th, 2000.

7        Q.    Do you know that there are other --

8    subsequent 48 Hours episodes?

9        A.    I don't recall, you know, if there was

10   any follow-up on that or not.  It was kind of

11   academic for me, other than an awareness.

12       Q.    During a couple times during Ms. Ekl's

13   questioning you had mentioned the fact that both

14   Darrell Herrington and Debbie Rienbolt claimed to

15   be at the scene of the murders, that neither one

16   claims to have seen each other.  Is that fair to

17   say?

18       A.    Yes, sir.

19       Q.    And tell me if I'm wrong, the fact

20   that Darrell Herrington and Debbie Rienbolt both

21   claim to be at the scene of the murders but don't

22   see each other has caused you to draw an opinion

23   as to their credibility.  Correct?

24       A.    That's only one aspect.

1        Q.    I understand.  That's just one aspect

2   of drawing a determination on their credibility.

3   Is that right?

4        A.    Yes, sir.

5        Q.    Is the fact that Darrell Herrington

6   and Debbie Rienbolt claim to have been at the

7   scene of the murders but don't see each other an

8   important fact in the opinions you've drawn in

9   this case?

10        A.    I think certainly it is a factor, and

11   I guess you could categorize it as an important

12   fact.

13        Q.    Do you know that the fact that Darrell

14   Herrington and Debbie Rienbolt both claim to have

15   been at the scene of the murders but didn't see

16   each other was presented to the jury in People

17   versus Steidl?

18        A.    I think I'm aware of that, yes, sir.

19        Q.    Are you aware of the fact that that

20   was also presented to the jury in People versus

21   Whitlock?

22        A.    I was aware that something had been

23   presented in one or both cases, but specifically

24   what, no, I was not.

1          Q.    Are you aware of the fact that the

2    fact that Debbie Rienbolt and Darrell Herrington

3    both claim to be at the scene of the murders but

4    didn't see each other was presented as an

5    argument to the Illinois Supreme Court?

6          A.    I recall something about that.

7          Q.    Okay.  The fact that apparently two

8    juries didn't -- well, strike that.

9               I'll leave it there.

10              Did you have enough time to write this

11   October 2nd, 2009, report?

12         A.    No, I was in a crunch.

13         Q.    In fact, the fax cover sheet shows a

14   fax line faxing around 11:00 p.m. on October 2nd,

15   2009.  Right?

16         A.    Yes, sir.

17         Q.    All right.  When did you finish

18   writing your report that's been marked as Exhibit

19   No. 3?

20         A.    Probably within minutes of faxing it.

21         Q.    Okay.  Did you create prior versions

22   of your report?

23         A.    It would have been included in that

24   same -- that was the end product.  I mean

1    typically I'll write like a skeleton report and

2    flesh it out, and I make changes.  Usually I have

3    more time and go back and reflect, and this was

4    just --

5          Q.    You didn't have that time?

6          A.    I didn't have that luxury in this

7    case.

8          Q.    Okay.

9          A.    But there are no other drafts, if

10   that's what you're asking.

11         Q.    That's what I was going to ask you.

12   How long have you been in the education business?

13         A.    I don't know that I am now.

14         Q.    Okay.  How long were you in the

15   education business?

16         A.    I think full or part-time, probably

17   17, 18 years.

18         Q.    And in your experience during those 17

19   and 18 years did you come to form an opinion as

20   to the quality of work you would receive from

21   your students when it was rushed or provided to

22   you at the last minute?

23         A.    Not always but usually.

24         Q.    And what is the opinion that you drew

1    when your students would provide you with their

2    work product at the last minute?

3          A.   It would go on a case-by-case basis.

4    I mean you had some people that could really pull

5    it together and put it -- put it in and spit it

6    out, and you had others that it was very obvious

7    by the composition, construction, et cetera.

8          Q.   That it was poor work product?

9          A.   It was a rushed work product.

10   Sometimes it was poor.

11         Q.   Give me a second.  I'll see if I can

12   just not ask whole chunks.

13              Did you review Tim Harney's memoranda?

14         A.   Yes, sir.

15         Q.   And is there a reason why that's not

16   in pages 2 and 3 of your report?

17              MR. TAYLOR:  For the record, I think

18   it's one of the exhibits.

19              THE WITNESS:  It's in the exhibits.  I

20   was looking for where it was, but, yes, I think

21   it was in Brueggemann's exhibits -- or one of the

22   command officers.

23   BY MR. JOHNSTON:

24         Q.   You used the phrase throughout the

1   report ISP command.  Is that right?

2          A.   Yes, sir.

3          Q.   Is Jeff Marlow ISP command?

4          A.   No, sir.

5          Q.   Are you aware of when Andre Parker

6   left the ISP to be Chief of Police in Richmond,

7   Virginia?

8          A.   I think I could look specifically at

9   his deposition, but roughly I believe it was

10  sometime in 2002.

11         Q.   In your capacity as a supervisor of

12  law enforcement personnel whose decision is it to

13  determine how the department's resources are

14  allocated?

15         A.   Well, it's at different levels.  I

16  mean if you're in a particular unit and you have

17  resources, then that person at that level would

18  determine the utilization of the resources based

19  on priorities.

20              It could be department overly broad,

21  you know, broad department policies, or they

22  could be specific priorities, excuse me, to

23  the -- for that unit, but there's always a finite

24  number of -- amount of resources and personnel.

1          Q.   I'm sorry.  When you say there's a

2    finite number or amount of resources and

3    personnel, do you mean basically you can't

4    investigate everything?

5          A.   Yes, sir.

6          Q.   And at the end of the day in a

7    department who ultimately determines how to

8    allocate resources in that department?

9          A.   The administration.

10          MR. JOHNSTON:  That's not going to

11    happen, so I'll pass.

12          EXAMINATION CONDUCTED

13          BY:  MR. MANCINI

14          Q.   Mr. Waller, I'll try to be as quick as

15    I can.

16          I represent Mike McFatridge in the

17    case.  My name is Vince Mancini.  If you have any

18    misunderstanding as to my question, please let me

19    know.  It's late in the day.  My words may

20    stumble.  Your words may stumble.  Let's try to

21    be as receptive to each other at this point,

22    because we're both tired.  Okay?

23          A.   Yes, sir.

24          Q.   If you take a look at your opinion on

1      page 9, Subsection Capital B, do you have that in

2      front of you?

3            A.   Yes, sir.

4            Q.   Just from a structural standpoint

5      Section B is followed by subsections 1, 2, et

6      cetera, and within 1, 2 and the numeric

7      subsections there are small letters subsections

8      within those numeric subsections.  Is that

9      correct?

10           A.   Yes, sir.

11           Q.   Am I to understand that the numeric

12     and small letter subsections are evidence in

13     support of the opinion evidenced in Section B?

14           A.   Yes, sir.

15           Q.   Okay.  And in that Subsection B you

16     opine that the investigative team was composed of

17     State's Attorney Michael McFatridge, Jack

18     Eckerty, Jim Parrish, and Gene Ray.  Is that

19     correct?

20           A.   Yes, sir.

21           Q.   Have you ever been asked previously to

22     render an opinion as to whether or not a

23     prosecutor was an investigator in a case?

24           A.   Not that I recall.

1          Q.    This is your first instance of that?

2          A.    Actually, this is the first time I've

3     really become aware of that happening in a --

4     other than a -- maybe an organized crime task

5     force or something.

6          Q.    In rendering the opinion concerning

7     Mr. McFatridge, what factors did you rely on in

8     making that opinion?

9          A.    Well, the totality of my experience in

10    the past, obviously the information that I

11    referenced, his involvement, those types of

12    things, the specific, you know, commentary from

13    those involved.

14         Q.    Did you rely on any legal opinions or

15    rulings from any courts as to what constitutes an

16    investigator?

17         A.    Well, no, I relied on -- I mean part

18    of my business is to function as an investigator,

19    and I was a police investigator, detective, and

20    you look at what he was doing, his involvement,

21    and it's consistent with what an investigator

22    does.

23         Q.    Are you finished?

24         A.    Yes, sir.

1      Q.   I don't want to step over you.

2          What were you asked to do in

3  evaluating Mr. McFatridge's involvement in this

4  case?

5      A.   Nothing specifically.  I was given

6  copies of both complaints, asked to look at -- as

7  a basis for the issues there was discussion to

8  try to -- I mean this is huge in comparison to

9  the vast majority of cases that I deal with, both

10  in scope of time and complexity.

11      Q.   So were you asked to render an opinion

12  as to whether or not Mr. McFatridge was an

13  investigator?

14      A.   I believe that that was an issue

15  referenced, and I would have to look at the -- at

16  the complaints.  I don't believe so specifically.

17  I think I may have come up with that one on my

18  own.

19      Q.   For the first time in your career?

20      A.   I've never encountered anything like

21  this to that extent or where it was basically an

22  issue.

23      Q.   You're not rendering an opinion as to

24  whether or not Mr. McFatridge engaged in any

1   misconduct.  Are you?

2       A.   I think that certainly the prosecution

3   was slanted.  It was focused.  It was the

4   emphasis was taken away from determining the

5   truth about what happened to focusing on Steidl

6   and Whitlock and creating a scenario where there

7   was evidence to convict them where there wasn't

8   any to begin with.  I think his conduct

9   throughout was highly un -- probably highly

10   irregular.

11       I don't know of any prosecutors who

12   become pen pals with the people they convict or

13   with the Dear Mike and Dear Debbie letters and

14   visits and so forth, or why you would not charge

15   somebody who admitted an involvement in a first

16   degree murder, the only one where you have a

17   solid evidence of her statement, that, yes, I

18   held them while these people stabbed her, you

19   know, that whole issue, that whole question is to

20   me is a bit -- certainly it was, you know,

21   influenced to a great extent by McFatridge.

22       Q.   I don't know if you answered my

23   question, so I'm going to ask it differently and

24   hopefully get the answer that is responsive, at

 1    least in my mind.

 2              Are you alleging or opining that

 3    Mr. McFatridge engaged in misconduct,

 4    prosecutorial misconduct in this case?

 5         A.    That's beyond my area of expertise.

 6    I'm saying he was acting as an investigator

 7    throughout before Steidl and Whitlock were

 8    charged.

 9         Q.    And I see that in your report.  And I

10    just wanted to know what the limit of that was.

11         A.    Yeah, I'm not going into prosecutorial

12    misconduct.  That's -- that's not my area.

13         Q.    You're not qualified, in your mind, to

14    render an opinion in that regard?

15         A.    Probably not.

16         Q.    You testified earlier that there were

17    instances when prosecutor would be asked legal

18    opinions or legal standards by investigators in a

19    police department, things of that nature.  Is

20    that correct?

21         A.    As an advisor, certainly.

22         Q.    When a prosecutor engages with police

23    in that capacity, is he an investigator, in your

24    opinion?

1          A.    When they're simply giving advice on a

2    legal matter, no, sir, I don't believe so.

3          Q.    If you would look at Subsection B1(A)?

4          A.    Yes, sir.

5          Q.    You're referencing Sergeant Eckerty's

6    deposition where he -- where there's some

7    reference to working as an investigative team

8    with Parrish, Ray, and McFatridge?

9          A.    Yes, sir.

10         Q.    That's not in quotes, so I take it

11   you're not quoting Eckerty word for word on that?

12         A.    It's a paraphrase, I believe.

13         Q.    Is it safe to presume that throughout

14   this report where it's not in quotes you're

15   paraphrasing testimony that you've read?

16         A.    Yes, sir.

17         Q.    Is there a particular work that

18   Eckerty references that McFatridge did as part of

19   the investigative team, to your knowledge?

20         A.    Well, I mean he was present when they

21   were -- both Herrington -- well, when Herrington

22   was interviewed, he would -- I think he said join

23   him for drinks on a regular basis, he would be

24   involved in the strategizing of the

 1    investigation.

 2         Q.    We'll get to those line items.   I'm

 3    just talking about this single line item.   Do you

 4    remember there being a particular type of work

 5    being referenced by Eckerty?

 6         A.    No, I don't remember the specific

 7    reference.

 8         Q.    Okay.   And do you recall whether or

 9    not Eckerty used the term investigative team?

10         A.    Specifically, no.   I think that it

11    was -- there was a reference to that.   Did he

12    specifically say it?   I don't recall.

13         Q.    Does the term investigative team aid

14    your opinion that McFatridge was part of that

15    investigative team that you've opined to?

16         A.    Can you say that again, please?

17         Q.    Sure.   The use of the term

18    investigative team in Subsection A here, does

19    that lend or buttress your opinion that

20    McFatridge was part of an investigative team as

21    you've opined in Subsection B?

22         A.    Yes, sir, doing investigative work.

23         Q.    But that work in not enunciated by

24    Eckerty pursuant to this particular subsection?

1        A.    Again, we've been going however many

2    hours, and you're asking me to refer back.   I

3    would have to look at the deposition.

4        Q.    McFatridge's presence than at

5    interviews is something that you found to be

6    determinative?

7        A.    That's one aspect, particularly since

8    there were so many stages of that that

9    Whitlock -- or, excuse me, Herrington and

10   Rienbolt were each interviewed on a number of

11   occasions, and the information was -- was

12   developed.

13            You know, there are additional things

14   involved there too.   I mean the hypnosis, the

15   riding down to St. Louis, all those types of

16   things.

17       Q.    Do you believe McFatridge was present

18   for more than one Darrell Herrington interview?

19       A.    Yes, sir.

20       Q.    Do you believe whether or not

21   Mr. McFatridge was present for more than one

22   Debra Rienbolt interview prior to the indictment?

23       A.    I don't believe so.

24       Q.    Do you believe he was involved with

1    Debra Rienbolt's interviews at all prior to the

2    indictment?

3         A.    I think so.  Again, that's my

4    recollection now, not the initial one on the

5    16th, but subsequent to that, I believe he was.

6         Q.    Are you talking about February 16th?

7         A.    Correct.

8         Q.    They were indicted February 19th --

9         A.    18th or 19th.

10        Q.    So --

11             MR. TAYLOR:  They were charged.

12             THE WITNESS:  Or charged, excuse me.

13   BY MR. MANCINI:

14        Q.    You're right.  Do you have any

15   evidence to indicate that McFatridge in any way,

16   shape, or form interviewed any witnesses prior to

17   the charging or indictment of Mr. Whitlock and

18   Mr. Steidl?

19             MR. TAYLOR:  Objection.  Other than

20   what he already said?

21             MR. MANCINI:  He didn't say interview.

22   He said present for.

23             THE WITNESS:  Certainly I think going

24   however far it was from 140 or 180 miles in the

 1    same car, Parrish, Eckerty, McFatridge, and

 2    Herrington in the same car, they're going down.

 3    It's going to be the topic.

 4         Obviously, it wasn't specifically

 5    recorded or reported, but I would think that

 6    certainly would be a topic on the way.

 7    BY MR. MANCINI:

 8         Q.   Okay.  But other than your

 9    presumptions, do you have evidence that

10    McFatridge presented any witness prior to the

11    charges being filed or indictment?

12         A.   I don't recall any offhand.

13         Q.   You rely on the fact that McFatridge

14    would have drinks with the investigators and meet

15    with them on occasion to talk about the

16    investigation.  That's a factor you're

17    considering in opining that he's part of the

18    investigative team.  Is that correct?

19         A.   Well, I think the investigator said he

20    was helping us with the investigation.  He was

21    telling us what to do.  He was part of those

22    regular sessions.

23         All of those would be indicative of

24    his involvement as an investigator.

1          Q.    To your recollection, what did

2     Mr. McFatridge tell the investigators to do?

3          A.    I don't recall specific -- that that

4     was specifically referenced.

5          Q.    Is it uncommon for State's Attorneys

6     and police officers or State Police to have

7     drinks and discuss cases, in your experience?

8          A.    On an everyday basis, yes, sir.

9          Q.    That's uncommon?

10         A.    I believe so.  I'm not aware of it.

11         Q.    Are you also aware of something called

12    felony review where a State's Attorney is asked

13    his input to whether or not to file charges,

14    whether or not to seek an indictment, whether or

15    not to issue warrants, things of that nature?

16    Are you familiar with that process?

17         A.    The Cook County deal?

18         Q.    It's done in other counties other than

19    Cook, for example.

20         A.    I'm aware of it, I mean, but it's --

21    they're making an assessment of the case based on

22    the information and possibly speaking with

23    somebody.  They're not integrally involved in the

24    entire investigation.  You're talking about

1    something that lasted for months.

2        Q.   Okay.  So a State's Attorney who is in

3    his capacity reviewing evidence and charges is

4    not acting as an investigator.  Is that fair to

5    say?

6        A.   If you're on that limited basis of

7    determining what to charge, you know, the

8    appropriate charges, I don't think so.  I think

9    as you're developing the case and actively

10   involved on an incremental basis, then I think

11   you are.

12       Q.   Is it uncommon for a prosecutor to be

13   called to a crime scene?

14       A.   I think -- not necessarily to be

15   called to a crime scene to look at it,

16   particularly a major crime.  I think the

17   reference was the investigative team gathered,

18   including the State's Attorney's office.

19       Q.   Okay.  Is it uncommon for a State's

20   Attorney to be involved in the obtaining of an

21   overhear warrant?

22       A.   Not the actual process of obtaining

23   it.  Making the determination, you know, of -- I

24   think -- my experience has been when you needed

1    the legal procedures, like a search warrant or an

2    arrest warrant or subpoena power, that sort of

3    thing, you went to the DA's office.  They

4    facilitated that, but you were -- you were

5    running the investigation not the prosecutor.

6         Q.    When that occurred, in your history,

7    didn't the prosecutor ask you questions to fill

8    out the warrant application?

9         A.    Either that or reviewed the

10   sufficiency of the affidavit to determine

11   probable cause so you had the checks and the

12   balances.  He wasn't necessarily creating the

13   probable cause.

14        Q.    Sometimes the State's Attorney would

15   prepare the affidavits for the eavesdrop,

16   wouldn't they, based on your -- as a police

17   officer's testimony your reports, is what I'm

18   saying?

19        A.    Well, or the warrant, I mean.  Based

20   on the information or your report, yes.

21        Q.    Throughout this analysis that you

22   conducted as to whether or not Mr. McFatridge was

23   an investigator, did you find evidence that would

24   indicate that he was not an investigator?  If you

1    need an example, I can give you one.

2         A.    Go ahead.

3         Q.    The fact that he was just present at

4    interviews and not interviewing anybody, was that

5    significant to evaluating whether or not he's an

6    investigator?

7              MR. TAYLOR:  Objection.

8    Mischaracterizes the evidence.

9              THE WITNESS:  No, the active

10   involvement in the whole procedure would be

11   consistent with being an investigator.

12             I mean not everybody at an interview

13   will ask questions, but part of the analysis of

14   the information, the determination of where to go

15   from that I think the -- certainly an indication

16   that he was integrally involved in the

17   investigation when he told them not to record

18   negative evidence, evidence that would show the

19   innocence of the suspects, certainly that's an

20   involvement in the investigation.

21        Q.    Who testified that they were not to

22   record evidence of innocence?

23        A.    I believe it was Eckerty indicated

24   that McFatridge told them not to put in anything

1   which might indicate the innocence of Steidl and

2   Whitlock, and that's, again, a paraphrase.

3        Q.   We've talked about aspects of being a

4   prosecutor that are innocent -- or not innocent

5   but not related to the investigation; obtaining

6   warrants, things of that nature.  They occurred

7   in this case.  Correct?  Some of those things?

8        A.   Some of those things, yes, sir.

9        Q.   And did those factor in your

10   evaluation as to whether or not Mr. McFatridge

11   was acting as an investigator?

12        A.   No, I think those would be appropriate

13   for a prosecutor to do.

14        Q.   How did you draw the line between the

15   two based on your history and your past

16   experience?

17        A.   In certain cases him telling them what

18   not to record, certainly that crosses the line.

19   Being involved in the investigation on an

20   everyday basis, the -- pushing the investigation

21   toward a particular set of suspects and

22   eliminating the primary -- or what I think a

23   number of the investigative people looked at as a

24   primary suspect, referring to Morgan, you have

1    all those factors.

2        Q.   You testified or what evidence do you

3    have that McFatridge steered the investigation

4    away from Morgan?

5        A.   I believe Eckerty did.  That may have

6    been anecdotal through Callahan, but according to

7    Callahan, Eckerty, I think indicated that.

8        Q.   Did you rely on anecdotal evidence in

9    determining whether or not McFatridge was an

10   investigator?

11       A.   I would have to go back and look at --

12   I think that I also included a number of

13   commentary from the various participants.

14   Mr. Eckerty was one of them.

15       Q.   In your report you -- if you need me

16   to reference the page, I can, page 13,

17   subparagraph 6, you talk about the newspaper

18   articles as being a basis for your opinion that

19   McFatridge was directly involved in the

20   investigation.  Is that fair to say?

21       A.   I think that was one aspect.  He was

22   referred to as part of the investigative team was

23   developed.  There was other commentary.

24            Certainly the indication that

1    McFatridge told the officers to bring Steidl and

2    Whitlock to the Paris Police Department.

3         Q.   That's not a news release.  Is it?

4         A.   No, you were asking me of other

5    indications, his involvement in the --

6         Q.   This is a prior question that you're

7    answering, because I'm asking about the news

8    releases.

9         A.   Okay.  And I apologize, but, yes, to

10   go back, that would be another indication, him

11   directing them to bring them in.

12        Q.   I can read your report.  I'm asking

13   you particularly about the news releases, and you

14   believe that that played a role in your

15   determination that McFatridge was an

16   investigator, correct, page 13?

17        A.   That that certainly would be

18   consistent.

19        Q.   Is it usual for the State's Attorney's

20   office or the prosecutor to issue press releases

21   on cases?  I said usual, not unusual, just so

22   it's clear.

23        A.   Yeah, usually it is.  I mean --

24        Q.   If you look at subset B of that

1    Section 6, you note a news article that's dated

2    July 25th, 1986.  It says:  The final autopsy

3    reports confirm the investigator's initial

4    belief.

5              This is apparently a quote from

6    McFatridge.  Correct?

7         A.   Yes, sir.

8         Q.   Are you interpreting the term

9    investigators to include McFatridge?

10        A.   Yes, sir.

11        Q.   So he's referring to himself in the

12   third person?

13        A.   As he was previously referred to as

14   part of the investigative team, yes, sir.

15        Q.   In this article, he was?

16        A.   Well, or another article.  I don't

17   recall that -- the whole content of that article.

18        Q.   So to interpret this particular news

19   article, you were relying on another article or

20   some other aspect of testimony?

21        A.   The fact that he was giving out the

22   information and determining what information to

23   be giving out during the arrest, that he was

24   guiding the arrest -- or, excuse me, the

1    investigation, that in my opinion he was acting

2    in a manner consistent with -- as an

3    investigator, yes, sir.

4         Q.   Would it be uncommon for the State's

5    Attorney to see the autopsy during the

6    investigation, and I said would it be uncommon?

7         A.   On a who done it homicide, I don't

8    know that it would be common.  I think it would

9    be unusual for them to actively be involved in an

10   autopsy.  Most, you know, I know that

11   investigators usually have a representative but

12   not -- not the prosecutors.

13        Q.   You've never heard of a State's

14   Attorney viewing an autopsy of a serious crime?

15        A.   I'm sure that they have on occasion.

16   I'm just saying I think it's more unusual or

17   uncommon than common.

18        Q.   Does the aspect of viewing an autopsy

19   prior to the indictment render a prosecutor an

20   investigator?

21        A.   Not in and of itself.  I think it

22   would be indicative of as it would be consistent

23   with performing an investigative function.

24        Q.   I'm trying to be as fast as I can.  If

1    you look at page 19, directing your attention to

2    subset D, and I want you to look at 1, D1.

3              It says:  However motivated, State's

4    Attorney Michael McFatridge exerted undue,

5    inappropriate, and irresponsible pressure on law

6    enforcement to make arrests, prosecute, and

7    crusade against Mr. Steidl and Mr. Whitlock.

8              Do you see that?

9         A.   Yes, sir.

10        Q.   Are you aware that every investigator

11   in this case in their deposition denied being

12   pressured by McFatridge in any way, shape, or

13   form?

14             MR. TAYLOR:  Objection.  Misstates the

15   evidence in the record.

16             THE WITNESS:  Are you talking in

17   response to a particular question or in general

18   terms?

19   BY MR. MANCINI:

20        Q.   In terms of pressured to make an

21   arrest, that they all have denied that they felt

22   undue, inappropriate, or irresponsible pressure

23   from McFatridge?

24        A.   I don't recall them denying that, no,

1  sir.

2      Q.    What evidence do you have that

3  McFatridge exercised undue, inappropriate, or

4  irresponsible pressure on law enforcement prior

5  to the criminal charges being filed against

6  Mr. Steidl and Mr. Whitlock and/or the

7  indictments being rendered?

8      A.    Well, certainly if he advised them not

9  to -- that he didn't want any negative evidence

10  indicating the innocence of Steidl or Whitlock

11  incorporated in the reports, obviously that was

12  -- that was one principal thing.

13          There was the -- instead of McFatridge

14  indicated that he directed them not to give a

15  second -- my understanding, a second polygraph to

16  Herrington, that he pushed for the hypnosis,

17  again, that would be an investigative --

18  consistent with an investigative function, and I

19  think probably an inappropriate influence.

20      Q.    Wait.  Inappropriate influence on the

21  police investigators?

22      A.    Yes.  I mean they're trying to

23  determine the truth about what happened not

24  necessarily develop a conviction of individual

1    people, so if you have a key witness, and you

2    have indication of deception, A, you would

3    want -- you know, the report of the polygraph

4    should be presented, and then, B, if there's a

5    recommendation that a second polygraph be

6    conducted, certainly that should be followed.

7         That wasn't done.  It was, you know,

8    it was switched around.  There was a big delay,

9    and then, okay, let's try hypnosis, which, again,

10   you have some real credibility issues.

11        Q.   Did you review Mr. McFatridge's

12   testimony concerning the hypnosis?

13        A.   Yes, sir.

14        Q.   I'll leave it at that.

15        A.   Okay.

16        Q.   Are you aware that certain documents

17   including polygraph reports of other suspects

18   were presented to the court in camera and sealed

19   as part of the court file?

20        MR. TAYLOR:  Objection.  That

21   inaccurately states the record.

22        THE WITNESS:  I understood that there

23   was motions in limine which precluded that

24   evidence from being discoverable, yes, sir.

1   BY MR. MANCINI:

2          Q.   Did that factor in any way, shape, or

3   form into your opinion that McFatridge was either

4   acting as an investigator or otherwise violated

5   constitutional regulations?

6          A.   It indicated to me that he was trying

7   to limit the information available, and I thought

8   that was inappropriate considering Brady, but --

9          Q.   And the judge granting that motion,

10  did that implicate the judge in that same --

11         A.   At any given time, at any given time

12  the law is what the judge says it is.  I mean,

13  you know --

14         Q.   But you're not passing judgment on

15  either Mr. McFatridge or the judge for either

16  presenting that motion or ruling on that motion.

17  Are you?

18         A.   I think that's consistent with

19  McFatridge hiding information and not presenting

20  it consistent with the requirements of Brady,

21  both the spirit and the letter.

22         Q.   And, in this instance, it was approved

23  by the court?

24         A.   As far as I understand, it was.

1          Q.    I think I'm done.  Give me a second.

2     I tried to get through that as fast as I could.

3     I'm not sure how much time we have left.

4              Last question or last maybe a few

5     questions.  You're aware that Mr. McFatridge

6     presented alibi witnesses to the grand jury.

7     Correct?

8          A.    That he presented?

9          Q.    Yes, defense alibi witnesses to the

10     grand jury.

11         A.    That McFatridge presented defense

12     alibi witnesses?

13         Q.    Yes, sir.

14         A.    I didn't review the trial transcript.

15         Q.    Would that be indicative of somebody

16     trying to hide something?

17              MR. BALSON:  Objection to form.

18              THE WITNESS:  It could be a trial -- I

19     mean calling people adversely trying to diminish

20     their impact, certainly.  The big issue was

21     sufficiency of counsel.

22     BY MR. MANCINI:

23         Q.    That's a trial tactic?

24         A.    There's a lot of different trial

1    tactics.  I think that certainly that would be a

2    trial tactic.

3            MR. MANCINI:  Okay.  On that, I have

4    no further questions.

5          RE-EXAMINATION CONDUCTED

6          BY:  MR. RAUB

7        Q.   While you were with the -- I'm Mike

8    Raub.  I'm here on behalf of Edgar County.

9        A.   Okay.

10       Q.   While you were with the North Carolina

11   Fairgrounds Police, did you investigate any

12   murders?

13       A.   No, sir.

14       Q.   At any time while you were an active

15   police officer were you ever in charge of an

16   investigation as large and complex as the Rhoads

17   murder investigation?

18       A.   Well, you say large and complex.

19       Q.   Let me define that by the terms of

20   number of witnesses interviewed and the fact that

21   there was no immediate suspects available for

22   interview.

23           MS. SUSLER:  Object.  That misstates

24   the evidence.

```
 1              THE WITNESS:  I think that the one

 2    that I was making reference to was similar, and

 3    it was a who done it, and we had dozens and

 4    dozens, if not hundreds, of people that we

 5    interviewed in the course of the investigation.

 6    BY MR. RAUB:

 7         Q.   Is this the old lady down in Florida

 8    who got killed?

 9         A.   The elderly female.

10         Q.   Right.  Okay.

11         A.   Yes, sir.

12         Q.   That would be the closest one as far

13    as complexity goes?

14         A.   Well, when you say complexity, it's

15    kind of a who done it, and there we didn't have

16    any motive, and we didn't have initial suspects,

17    unlike you had a potential motive with the Rhoads

18    homicides that wasn't really ever fully explored,

19    at least in a timely manner.

20         Q.   Do you call the Rhoads homicides a who

21    done it?

22         A.   Yes, sir.

23         Q.   In reviewing your prior testimonial

24    history I noticed you've testified in a number of
```

1    cases involving the City of Chicago?

2         A.   Yes, sir.

3         Q.   You've testified in a number of cases

4    in the collar counties around Chicago?

5         A.   Yes, sir.

6         Q.   Have you ever acted as an a consultant

7    in a rural Illinois county, a case arising from a

8    rural Illinois county other than this one?

9         A.   Yes, sir, in southern Illinois around

10   the St. Louis area.

11        Q.   The Metro East area?

12        A.   Pardon?

13        Q.   The Metro East area as it's called?

14        A.   I don't know.  It's both the --

15   it's -- it's the counties surrounding St. Louis,

16   a couple maybe one or two removed.

17        Q.   Madison or St. Clair counties?

18        A.   I believe so.

19        Q.   Okay.  Have you ever been involved in

20   a county in Illinois where more of the land is

21   used for agricultural purposes than industrial,

22   residential, shopping?  The Metro East is not

23   rural, in my judgment.

24        A.   I have been as a consultant.  I don't

1    know that those resulted in testimony.

2          Q.   In Illinois?

3          A.   Yes, sir.

4          Q.   And what county was that?

5          A.   I don't recall.  Well, there was --

6    well, I've been in a couple involving -- around

7    Mattoon.

8          Q.   Coles County?

9          A.   Huh?

10         Q.   Coles County?

11         A.   You have me.  I think one involved an

12   Illinois state trooper, and I think I gave a

13   deposition.  I don't ever know what happened to

14   the case.

15              There was a couple others in rural --

16   more northern Illinois between the Mississippi

17   and the urban area.  Exactly where they were...

18         Q.   One final question.  You're aware that

19   in order to obtain a conviction a prosecutor must

20   prove a defendant guilty beyond a reasonable

21   doubt?

22         A.   Well, that's the legal standard.  You

23   must convince the jury, however motivated, to go

24   along with that, but that is the legal standard,

1    yes, sir.

2         Q.   And would you believe it appropriate

3    that before a prosecutor brings an indictment and

4    invests resources in trying to pursue a

5    conviction that the prosecutor personally see the

6    main eyewitnesses and see how they appear, how

7    they testify?

8         A.   I don't have an issue about

9    determining credibility.  I have an issue about

10   actively involved in the investigation.

11        Q.   And one way to determine credibility

12   would be to sit in and watch while the police

13   interview witness?

14        A.   Or read reports and look for

15   inconsistencies if such were provided.

16        Q.   You can't determine how a person

17   appears by reading a typewritten report.  Can

18   you?

19        A.   At times you can, particularly if

20   there's many inconsistencies.  It depends on what

21   you do with the depositions.

22             MR. RAUB:  That's all I have.

23             MR. TAYLOR:  I have a few questions.

24             MR. RAUB:  Time is up.  We're leaving.

1           EXAMINATION CONDUCTED

2           BY:  MR. TAYLOR

3           Q.   Now, one of the counsel for the

4    defense asked you about whether you were under a

5    time crunch given all the information that you

6    had to look at and the deadlines that you had to

7    meet.  Do you remember those questions?

8           A.   Yes, sir.

9           Q.   And you certainly said that, yes, your

10   opinions and your comprehension of the facts have

11   been a work in progress.  Is that correct?

12          A.   Yes, sir.

13          Q.   And that has continued from the time

14   you rendered the opinion in October to the

15   present.  Isn't that right?

16          A.   Yes, sir.

17          Q.   And in fact could you tell us -- give

18   us an estimate of how much additional time you

19   have spent in formulating the opinions that you

20   have testified to here today after October 2nd, I

21   believe, is the date that you filed the opinion?

22          A.   I have well over 300 hours in the

23   case.  I think it's probably closer to 350, and a

24   lot of that was since the deposition.

1          Q.    Okay.  And --

2                MR. MANCINI:  You said deposition.

3                THE WITNESS:  I'm sorry, the -- thank

4    you, I'm getting a little tired.  Submitting the

5    opinion report.

6    BY MR. TAYLOR:

7          Q.    And you also testified on several

8    occasions prior to October you met with

9    Mr. Balson, myself, and Ms. Susler in Chicago.

10   Is that right?

11         A.    Yes, sir.

12         Q.    And did we have a meeting just prior

13   to -- the week prior to October 2nd where we

14   discussed and formulated questions for you to

15   answer in your opinions?

16         A.    Defining the issues, yes, sir.

17         Q.    And, in fact, did I and Ms. Susler

18   send you a letter that memorialized those issues?

19         A.    Yes, sir.

20               MR. TAYLOR:  And I want to mark this

21   as exhibit -- what are we up to?

22               COURT REPORTER:  Seven.

23               MR. TAYLOR:  Seven.

24

```
 1              (At this point the court reporter

 2              marked Waller Exhibit No. 7 for

 3              purposes of identification.)

 4   BY MR. TAYLOR:

 5        Q.   And does this --

 6        A.   That was in the stuff that went to the

 7   copy.

 8        Q.   Yeah.  Well, let's do this on the

 9   record.  And did you -- is that a copy of the

10   letter that Ms. Susler, myself, and Mr. Balson

11   sent you a few days after the meeting in Chicago.

12   Is that right?

13        A.   Yes, sir.

14        Q.   And in fact you received this by fax

15   or e-mail on or about the 27th of September which

16   was several days before you rendered your

17   opinions.  Is that right?

18        A.   Yes, sir.

19        Q.   And you've testified that you made

20   available to defense counsel the materials that

21   they requested?

22        A.   Yes, sir.

23        Q.   And when did you make those available?

24        A.   I think it was a Friday-Monday.  I
```

 1    don't recall the specific date, but it was such

 2    that I could work on the information -- I could

 3    work on the file over the weekend.  I don't

 4    recall.

 5         Q.   Was it two weeks ago, three weeks ago,

 6    last weekend?

 7         A.   I'm thinking it was about three weeks

 8    ago.  I don't recall specifically.

 9         Q.   And this was at the request --

10         A.   It may have been even longer than

11    that.

12         Q.   Okay.  Was this at the request of

13    defense counsel that you supplied them with all

14    the materials?

15              MR. JOHNSTON:  I'll object to the

16    leading form of the question.

17    BY MR. TAYLOR:

18         Q.   Your objection is noted.

19              Was this in response to a request of

20    defense counsel?

21         A.   Yes.

22         Q.   And did you make available among those

23    materials to be copied at their behest this

24    particular letter?

1          A.    Yes, sir.

2          Q.    And so it's your understanding that

3     that -- those -- this particular letter was

4     tendered to defense counsel along with all the

5     materials that you gave to the copier?

6          A.    Yes, sir, I had everything in my files

7     put into banker's boxes.  They took about

8     two-thirds the first day.

9               They came back the following day, and

10    I think I was maybe out of town for a trial, and

11    they picked up the rest, and it was back when I

12    returned, and that was on a Tuesday.

13              I could try to recreate what date, but

14    I think it was -- I'm thinking it was the

15    Friday-Monday after the -- after the date of

16    the -- whatever the subpoena, the request was.

17         Q.    Okay.  And was there attached to that

18    a chronology, a Steidl litigation chronology?  Do

19    you remember that?

20         A.    Yes, sir.

21              MR. TAYLOR:  Okay.  And could you have

22    the court reporter mark that for the record as

23    Exhibit 8?

24

```
 1                    (At this point the court reporter

 2                    marked Waller Exhibit No. 8 for

 3                    purposes of identification.)

 4    BY MR. TAYLOR:

 5         Q.   And was that also in the materials

 6    that you gave to the copy company that was

 7    working on behalf of the defendants' lawyers?

 8         A.   Yes, sir.

 9         Q.   Okay.  So it's your understanding that

10    both the letter and the attachment, which was

11    Exhibit 7 and 8, was tendered to defense counsel

12    approximately three weeks ago.  Is that right?

13         A.   Yes, sir.

14              MS. EKL:  Do you have an extra copy of

15    that attachment?  This is different than the one

16    that I have.

17              MR. RAUB:  Yours was a timeline.

18              MS. EKL:  I have a Whitlock litigation

19    chronology -- or Whitlock chronology.  We have a

20    Steidl timeline.

21              MR. JOHNSTON:  We don't have that.

22              MR. BALSON:  I think you have a bone

23    to pick with your copy service.

24              MR. JOHNSTON:  We'll see.
```

BY MR. TAYLOR:

     Q.   In any event, and in your -- in your
opinions did you, as best as you could, did you
attempt to address these particular issues that
we formulated in our meeting?

          MR. JOHNSTON:  I'll object to the form
of the question.  Leading.

          MR. TAYLOR:  You can have a standing
objection, because I'll probably be leading some
more before I'm done.

          MR. JOHNSTON:  I'll keep objecting.

          THE WITNESS:  I attempted to do my
best to incorporate all the issues that we had
discussed or identified.

BY MR. TAYLOR:

     Q.   Okay.  And that included the some 13
issues in this letter.  Is that correct?

          MR. JOHNSTON:  Same objection.

          THE WITNESS:  Yes, sir.

BY MR. TAYLOR:

     Q.   All right.  And specifically with
regard to whether the -- looking at the No. 1
with regard to Parrish, Ray, Eckerty, and
McFatridge, did you form an opinion as to whether

1    the defendants coerced certain witnesses,

2    particularly Darrell Herrington, Debbie Rienbolt,

3    and Ferlin Lester Wells based on your review of

4    evidence?

5         A.   Certainly coerced at times,

6    manipulated at times.  Manipulated, definitely.

7         Q.   Okay.  And with regard to point 2,

8    whether competent police investigators would

9    recognize Herrington, Rienbolt, and Wells to be

10   completely incredible, unreliable, and worthy of

11   belief, you addressed that today in your

12   testimony.  Is that correct?

13             MR. JOHNSTON:  Objection to the form

14   of the question.

15             THE WITNESS:  I believe so.  Yes, sir.

16   BY MR. TAYLOR:

17        Q.   Do you have a specific opinion with

18   regard to that question?

19        A.   That -- excuse me.

20        Q.   I realize --

21        A.   Could you read it back, please?

22             (At this point the court reporter read

23              aloud the requested portion of the

24              transcript.)

1              THE WITNESS:  Yes, sir, I do.

2    BY MR. TAYLOR:

3         Q.   And that opinion is what you've

4    testified to periodically over this entire

5    deposition.  Is that right?

6         A.   And I believe it's included in my

7    report, yes, sir.

8         Q.   Okay.  And that opinion is --

9         A.   That I don't know that any competent,

10   ethical, professional police investigator would

11   base a case solely, primarily on these two

12   witnesses without substantial corroboration,

13   verification, and additional evidence.

14        Q.   And it's based on their credibility?

15        A.   Yes.

16        Q.   There were several points here with

17   regard to these -- the policies and practices of

18   the City of Paris.  Is that right?  I'm looking

19   at 4.  I'm looking at --

20        A.   6, 7, 8, 9, 13, yes, sir.

21        Q.   Now, your opinion that -- both written

22   and as you've testified today, did they -- did

23   you attempt to and address those particular

24   points?

1          A.    Yes, sir.

2          Q.    Okay.  And did you and do you have an

3    opinion whether the failure to document by Ray,

4    Parrish, and other Paris officers evidence a

5    pattern and practice of the City of Paris Police

6    Department?

7          A.    Yes, sir.

8          Q.    And what is that opinion?

9          A.    That it was the actual practice as

10   evidenced over an extensive period of time,

11   approximately a year or more.

12               The chief policy maker of the city was

13   aware of the practice, was aware that it was

14   improper, did nothing to correct it or prevent

15   it; in fact, encouraged it.

16               MR. JOHNSTON:  At this point, have you

17   finished?  I don't want to interrupt.

18               THE WITNESS:  I believe so.

19               MR. JOHNSTON:  What time are we at?

20               COURT REPORTER:  It's 6:53.

21               MR. JOHNSTON:  This document, I'm

22   going to have at least an hour and a half

23   follow-up questions.  I'm just putting it on the

24   record.

```
 1   BY MR. TAYLOR:

 2       Q.   No. 6 -- and No. 4 deals with failure

 3   to document.  No. 6 deals with a failure to

 4   disclose by the chief of police, Lead Detective

 5   Parrish, and other Paris officers.  Whether that

 6   evidenced the pattern and practice by Paris

 7   Police Department, is that addressed in your

 8   opinions both given here today and in the written

 9   opinion?

10       A.   I believe it was.

11       Q.   Okay.  To make it -- could you tell us

12   what your opinion is with regard to that?

13           MS. EKL:  I'm going to object to

14   foundation.

15           THE WITNESS:  There is testimony that

16   certain evidence he wasn't documented, certain

17   evidence was excluded.  The -- both during the

18   investigation and subsequent to the

19   investigation.

20           I believe it was the August 1987

21   information that was gathered from Herrington,

22   his wife, and one other party, I think her name

23   was Myers, and the -- that certainly the -- the

24   course of the interviews, the initial interviews
```

1    of both Herrington and Reinhart (sic.) were not

2    documented and disclosed.

3    BY MR. TAYLOR:

4         Q.   Okay.  Now, with regard to point 7, I

5    recall various points of your testimony where you

6    discussed the investigation that was conducted by

7    Parrish, Eckerty, Ray, and McFatridge to be

8    completely inadequate and corrupt.  Is that

9    correct?

10             MR. MANCINI:  Object as to form and

11   foundation.

12             THE WITNESS:  Yes, sir.

13   BY MR. TAYLOR:

14        Q.   In fact, as to point 8, did you draw a

15   conclusion or an opinion as to whether this

16   inadequate and corrupt investigation which had

17   the active participation of Chief Ray constituted

18   a practice in fact of the City of Paris?

19             MS. EKL:  Objection.  Form,

20   foundation.

21             THE WITNESS:  Yes, sir, I did.

22   BY MR. TAYLOR:

23        Q.   And what was that opinion?

24        A.   That it was inadequate.  It was

1    inconsistent with the accepted standard of

2    practice of attempting to determine the truth of

3    what happened, and it was defective from the

4    get-go.

5          Q.   Okay.  And did you form an opinion

6    specifically about whether it evidenced a policy

7    and practice of the City of Paris?

8                MS. EKL:  Objection.  Foundation.

9                THE WITNESS:  Yes, sir.  It was done

10   with the chief's knowledge, acquiescence, and

11   participation.

12   BY MR. TAYLOR:

13         Q.   And with regard to No. 9, given all of

14   the evidence that you've discussed today and the

15   opinions that you've formulated, did you come to

16   a conclusion as to whether the City of Paris

17   Police Department at the time of the Rhoads

18   investigation had grossly inadequate procedures

19   for handling and evaluating witnesses, suspects,

20   and other evidence?

21         A.   Yes, sir.

22         Q.   And what particular opinion did you

23   come to with regard to that?

24         A.   Well, they didn't --

1              MR. MANCINI:  Object to form and

2    foundation.

3              THE WITNESS:  They didn't follow

4    established procedures.  They didn't document.

5    They were aware that it should be documented.

6    The chief was -- indicated that it should have

7    been reported.

8              He was aware it wasn't reported.  He

9    was -- in fact indicated that something to the

10   effect that if it's not in the report, then the

11   other side doesn't know what to ask for or look

12   for.

13   BY MR. TAYLOR:

14        Q.   So in fact your opinion is, correct me

15   if I am wrong, that the evidence that you saw

16   establishes that the City of Paris Police

17   Department had grossly inadequate procedures for

18   handling and evaluating witnesses and suspects?

19              MS. EKL:  Objection.

20              MR. JOHNSTON:  Objection to the form

21   of the question.

22              THE WITNESS:  Yes, sir.

23   BY MR. TAYLOR:

24        Q.   Calling your attention to 10, and,

1    again, I think you've answered this generally,

2    but I want you to specifically focus on this

3    issue:  Whether a competent police investigator

4    would have had sufficient credible evidence

5    against Steidl and Whitlock to present for arrest

6    or prosecution at the following stages of the

7    investigation which are set forward, and that

8    being when Herrington gave his first documented

9    statement, after Rienbolt gave her first

10   documented statement at the grand jury in March,

11   after Rienbolt gave her second, and then again

12   after she gave her third documented statement.

13          At each of those five junctures, do

14   you have an opinion whether a competent police

15   investigator would have had sufficient credible

16   evidence against the plaintiffs in these cases to

17   present for arrest and prosecution?

18          MR. JOHNSTON:  Object to the form of

19   the question.

20          THE WITNESS:  In my opinion if they

21   had presented what they knew accurately,

22   objectively, and completely, that it would have

23   been insufficient to present for the prosecution.

24

1    BY MR. TAYLOR:

2         Q.   Okay.

3         A.   Before you go on.  I have to take an

4    extremely short break.

5              (At this point a short recess was

6               taken.)

7    BY MR. TAYLOR:

8         Q.   Now, and with regard to the second

9    part of your -- of this letter formulating issues

10   and points, that is about -- do you see that, on

11   page what would be 3 and 4 of this letter?

12        A.   Yes, sir.

13        Q.   Okay.  And those deal with --

14   primarily with the ISP and the ISP defendants.

15   Is that correct?

16             MR. JOHNSTON:  I object to the form of

17   the question.  Leading.

18             THE WITNESS:  Yes, sir.

19   BY MR. TAYLOR:

20        Q.   And, in fact, are these points

21   addressed in general in your opinions that you

22   both have tendered here today and also in your

23   report of October 2nd?

24             MR. JOHNSTON:  I object to the form of

1    the question.  Leading.

2              THE WITNESS:  In general terms, yes,

3    sir.

4    BY MR. TAYLOR:

5         Q.   Okay.  Now, and given the questions

6    that you were asked today and the examples that

7    you've given to support your opinions, do those

8    mean to be exhaustive of all the different

9    aspects of failure to document, failure to

10   produce, inadequacies in the investigation and

11   other bases?  Were you able in this entire -- you

12   know, in this deposition to be able to marshal

13   all of the factual bases for which you based your

14   opinions, on which you based your opinions?

15             MS. EKL:  Objection.

16             MR. JOHNSTON:  Objection to the form

17   of the question.

18             THE WITNESS:  No, sir.

19             MR. TAYLOR:  I have no further

20   questions.

21        RE-EXAMINATION CONDUCTED

22        BY:  MR. BALSON

23        Q.   Wait a minute now.  Just a couple

24   things just as a follow-up to what you were

1    doing.

2              The opinions on page 26, 27, and 28

3    which are critical of the Illinois State Police

4    of your opinion --

5         A.   Yes, sir.

6         Q.   This is Exhibit 3?

7              MR. RAUB:  Right.  Okay.

8    BY MR. BALSON:

9         Q.   Drawing your attention to what

10   Mr. Taylor has just been asking you about, just

11   this letter dated September 27th, 2009, would you

12   turn to the last page?

13             No. 12 says:  The ISP defendants

14   throughout the entire nine and a half year period

15   continued to suppress favorable evidence from

16   Steidl and Whitlock during periods where they had

17   various legal proceedings pending, that is

18   post-conviction, habeas corpus, clemency and

19   pardon procedures.

20             Is that an opinion that you formed in

21   this case?

22             MR. JOHNSTON:  Objection to the form

23   of the question.

24             THE WITNESS:  Yes, sir.

1    BY MR. BALSON:

2        Q.   And is that then consistent with what

3    you criticized ISP for on pages 26 and 27 of your

4    October 2nd letter?

5            MR. JOHNSTON:   Object to the form of

6    the question.

7            THE WITNESS:   Yes, sir.

8    BY MR. BALSON:

9        Q.   And also back on Mr. Taylor's Exhibit

10   No. 13 said the only ISP investigation conducted

11   other than this continuing attempts to recharge

12   and reconvict Steidl and Whitlock was the DII

13   investigation.

14            Is that consistent with your opinion?

15       A.   Yes, sir.

16       Q.   Okay.

17       A.   I said which was conducted under

18   Brueggemann's command, yes, sir.

19            MR. BALSON:   I have no further

20   questions.

21          RE-EXAMINATION CONDUCTED

22          BY:  MS. EKL

23       Q.   When you met with Mr. Taylor and the

24   other attorneys on the Friday before this letter

1   was written on September 27th of 2009 had you had

2   prior conversations with them in which they had

3   formulated the issues that you were supposed to

4   be looking at?

5         A.   We had several meetings where we

6   discussed the overall issues, the magnitude of

7   the case, attempted to -- we discussed different

8   aspects of the case attempting to define it and

9   try to put it in a manageable context, I guess.

10         Q.   Is it fair to say that up until this

11   point in time your focus was primarily on trying

12   to get a grasp of all of the facts that have

13   taken place over the last 20 some years in

14   connection with the investigation?

15               MR. BALSON:  Let me object to the

16   form.  What point in time are you talking about?

17   BY MS. EKL:

18         Q.   September 27th, 2009, or this meeting

19   that took place.

20         A.   I think it was both:  attempting to

21   put it into perspective and to get a grasp of the

22   materials so that I could address those issues.

23               You know, I mean I've done large

24   complex cases before but never with the volume

1    that this was, and I probably haven't, you know,

2    I'm sure that I've reviewed probably ten to

3    20,000 pages of documents and depositions easy,

4    and you could spend literally years just doing

5    this, as I'm sure some of you have.

6            Q.    This letter that you received from

7    Mr. Taylor where it outlines the issues in the

8    case, this was received by you, what, just five

9    days before your opinion was issued on October

10    2nd?

11            A.    My understanding it was designed to

12    help me structure both the materials and the

13    issues, frame the issues.

14            Q.    Why is it that there's issues that

15    were raised in this letter that you've rendered

16    opinions on in response to Mr. Taylor's questions

17    this evening that weren't contained within your

18    report?

19               MR. TAYLOR:   Objection.

20               MR. BALSON:   I object to that too.

21    They might not have been contained in the same

22    words, but they were continued in your report.

23               MR. JOHNSTON:   That's a speaking

24    objection.

1          MS. EKL:  I object to your speaking

2     objection.

3          THE WITNESS:  I did my very best to

4     incorporate the ideas or the content into my

5     report within the time frame that I had.

6          Obviously, had I been given -- had I

7     had more time, you know, I think I could have

8     addressed them in a more refined manner and a

9     more comprehensive manner or maybe more

10    specifically, but I did the best I could with the

11    time I had.

12        Q.   In response to Mr. Taylor's questions

13    you indicated just now that you felt that the

14    defendants fabricated coerced, or at least

15    coerced and manipulated witnesses, including

16    Herrington, Rienbolt, and Wells.  Is that

17    correct?

18        A.   Yes, ma'am.

19        Q.   Would you agree that in order to

20    render that opinion you have to basically accept

21    a certain set of facts within this case?

22        A.   I gave you my understanding of the

23    facts.

24        Q.   I know.  My question is you have to --

1    you have to accept a certain set of facts.  You

2    understand these are disputed facts and that you

3    have to set -- you have to come up with your own

4    set of facts that you believe to be true in order

5    to render that opinion.

6              MR. BALSON:  Object to the form of

7    coming up with his own set of facts.

8              THE WITNESS:  I don't agree with that,

9    ma'am.  I think that if you look at the

10   information, there is coercion.  There is

11   manipulation.  There is the manufacturing of

12   testimony and evidence.

13   BY MS. EKL:

14        Q.   So it's your belief that those are

15   undisputed facts in the case?

16        A.   It's my -- I think the opinions were

17   consistent with the facts as I understand them

18   and that are represented.  Obviously, if you

19   change the facts, you may change the opinions.

20        Q.   What about your training and

21   experience makes you uniquely qualified to render

22   a credibility decision in terms of whether or not

23   certain -- whether or not a witness was coerced

24   or not?

1              MR. BALSON:  Object to the form.

2              THE WITNESS:  Well, one thing is when

3     the witness says they were coerced into doing it,

4     I think that that's indicative, and you had

5     Rienbolt's recantations where she indicated that

6     she was.

7              You had recantations by Herrington.

8     Of course, then you had recantations of their

9     recantations.

10             The -- so I think certainly that is.

11    You can see the manipulation, the quid pro quo.

12    The -- you do this for me to help convict them,

13    I'll do this for you.  You have that initially.

14             The sweetheart deal that somebody

15    confesses to a murder and gets a get out of jail

16    free card, doesn't get locked up; doesn't -- you

17    know, gets a police escort wherever they're

18    going, gets a police officer taking her to detox.

19             You have -- once that -- you get those

20    people are paid for their testimony, that's not

21    presented.  That doesn't come out.

22             You have a number of factors that

23    certainly indicated an inappropriate influence.

24    You have the potential threat for coercion.

1    Look, you confessed.  You brought the knife.  We

2    can charge you with murder.  You tow the line.

3              That's always implied, whether it was

4    actually made.

5              How do you -- you know, as far as the

6    credibility issues, that's up to the jury to make

7    that determination.

8              Would a jury knowing that information

9    about Herrington and Rienbolt, would they think

10   that they're credible?  I think, you know,

11   that's -- that's the jury's prerogative to make.

12       Q.   Well, that's my point.  So the issue

13   of whether or not these witnesses were coerced is

14   an issue for the jury to decide based on what --

15   who they believe when they listen to the

16   testimony.  Correct?

17             MR. TAYLOR:  Objection.  He's answered

18   that question both before you and now.

19             MS. EKL:  So your objection is asked

20   and answered.  Please stop the speaking

21   objections, Flint.

22             MR. TAYLOR:  I'm going to finish my

23   objection.  We're here, and it's eight hours now.

24             MR. JOHNSTON:  It's going to be

1   another eight.

2           MR. TAYLOR:  It is not.  You had this

3   document.

4           MR. JOHNSTON:  No, we didn't.

5           MR. TAYLOR:  The man testified that

6   you had it.

7           MS. EKL:  We have never seen it.

8           MR. JOHNSTON:  We have documents right

9   in front of him that we have never seen.

10           MR. TAYLOR:  Because you didn't go

11   through all of his documents.

12           MR. JOHNSTON:  He said he created

13   those post-it notes after the documents.

14           MR. TAYLOR:  But he testified that he

15   turned this over.  That's different.  He

16   testified when he gave you stuff, and he's

17   testified when he had only three weeks to prepare

18   this document.

19           MR. JOHNSTON:  Objection is noted.

20           MR. TAYLOR:  I haven't finished.  My

21   point is he spent about 20 minutes talking about

22   the appropriateness of credibility determinations

23   by an investigator, and that's my point, so now

24   you're going back into it.

1          I think it's inappropriate.  If you

2   have something new to ask, then you can ask it,

3   but he went in length about fabrication, about

4   suggestion and manipulation of these witnesses on

5   his direct examination, and if you're going to

6   start to do that, then I think we should end the

7   deposition.

8          MR. RAUB:  Let's go fight with the

9   judge later.

10          MR. BALSON:  Wait a minute.  Let's

11   focus this --

12          MR. JOHNSTON:  Do you have another

13   question?

14          MS. EKL:  I do, but I want that

15   question answered.

16          MR. BALSON:  What question?

17          MS. EKL:  The question that was

18   pending before Mr. Taylor just went off on his a

19   ten minute tirade.

20          MR. TAYLOR:  I didn't go on a tirade.

21          MR. BALSON:  My question was do the

22   two of you contemplate extensive recross here --

23   redirect or whatever?

24          MR. JOHNSTON:  Absolutely.

1          MR. BALSON:  Being a few hours?

2          MR. JOHNSTON:  Yes.

3          MR. BALSON:  I think we need to make

4     plans to have another session.

5          MR. TAYLOR:  I think what we need is

6     for you to go through all of the materials that

7     you got from him and make a good faith

8     representation that this letter isn't in there,

9     because the man has testified that it is.

10          MR. MANCINI:  I did, Flint, and I have

11     a binder with all correspondence that was in the

12     folder from your office to Mr. Waller, and I can

13     make a good faith statement that, in fact, that

14     letter that you introduced as Exhibit 7, I

15     believe --

16          MS. EKL:  Yes.

17          MR. MANCINI:  -- was not included in

18     those correspondence.  Here it is in

19     chronological order.

20          MR. RAUB:  Beth, you'll make available

21     whatever Kinko's sent to you --

22          MS. EKL:  Right.

23          THE WITNESS:  That wasn't in the

24     correspondence.  That was in the stuff that was

1    copied by Kinko's.

2              MR. MANCINI:  I took all

3    correspondence out.

4              MS. SUSLER:  Maybe you have to talk to

5    Kinko's and find out what happened.

6              MR. JOHNSTON:  Let's answer Ron's

7    questions.  My answer is yes.

8              MR. BALSON:  For us to sit here and

9    argue about what was included in the five hundred

10   documents that you got and what wasn't included,

11   it's not going to get us anywhere tonight.  We're

12   obviously not going to go another three or four

13   hours tonight, because it's Friday night.

14             We've been here for over eight or nine

15   hours, given our breaks, and I think everybody is

16   kind of tired.

17             It would make sense to me if, in fact,

18   you do have this in your binders, go back and

19   look at it.  If you want to recross on this, I

20   don't think that we can reasonably object to

21   that, so long as the questions are new and

22   related to this document.

23             I don't know what you think about

24   this, Flint, or whether you would object to that,

1    but, to me, if --

2              MR. JOHNSTON:  I think that's

3    reasonable.

4              MR. BALSON:  If they're in good faith

5    complaining that they didn't see this document or

6    their copy service didn't copy it or whatever --

7              MS. SUSLER:  Let's cut to the chase.

8              MR. JOHNSTON:  I think that's

9    reasonable.

10             MS. SUSLER:  Let's get our books out

11   and talk about --

12             MR. TAYLOR:  Can we set a time limit?

13   Two hours.  It's one document.

14             MR. RAUB:  It's more than one

15   document.

16             MS. EKL:  There's new opinions in

17   here.

18             MR. TAYLOR:  They're all included in

19   one way or another.

20             MR. BALSON:  I think we should set

21   some sort of limit on it.

22             MS. EKL:  That's fair.  The last thing

23   you asked him was were you able to articulate all

24   the factual bases for your opinions, and now he's

```
 1    saying no, so that's going to be something else I

 2    want to cross him on.  I want to make sure that I

 3    know what they all are.

 4              MR. TAYLOR:  He's testified about

 5    20,000 pages.

 6              MR. BALSON:  He's an important

 7    witness.  I don't think we reasonably can stop

 8    the defendants from thoroughly questioning him,

 9    because ultimately they could go to the judge and

10    say we haven't had enough time, so...

11              MS. SUSLER:  Do you think two hours?

12              MR. BALSON:  And the last thing I want

13    to get into an argument about in a court is --

14              MR. JOHNSTON:  No more than two for

15    me.

16              MR. RAUB:  Let's agree to four hours

17    then.

18              MR. TAYLOR:  Three.

19              MR. RAUB:  No, four.

20              MR. TAYLOR:  No, three.

21              MS. SUSLER:  Let's get realistic about

22    when we can do it.

23              MR. BALSON:  Let's just say that it's

24    a half a day.  It's a half a day more, and it's
```

1    focused on this letter, questions about this

2    letter and not rehashing the old stuff.

3              MR. RAUB:  We have Dr. Rubin's

4    deposition set a week from Monday in Chicago.

5    Would next Tuesday work?

6              (At this point there was an off the

7               record discussion.)

8              MR. JOHNSTON:  We'll put on the record

9    that it's the 19th at 2:00.

10             (Deponent is excused at 7:22 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                        CERTIFICATE

 2

 3          I, BARBARA A. GLOVER, Certified
     Shorthand Reporter, do hereby certify that DENNIS
 4   WALLER, the deponent herein, was by me first duly
     sworn to tell the truth, the whole truth and
 5   nothing but the truth in the aforementioned cause
     of action.
 6          That the foregoing deposition was
     taken on behalf of the Defendant on November 13,
 7   2009.
            That said deposition was taken down in
 8   stenograph notes and afterwards reduced to
     typewriting under my instruction and said
 9   transcription is a true record of the testimony
     given.
10          I do hereby certify that I am a
     disinterested person in this cause of action;
11   that I am not a relative of any party or any
     attorney of record in this cause, or an attorney
12   for any party herein, or otherwise interested in
     the event of this action, and am not in the
13   employ of the attorneys for either party.
            Dated this 18th day of November, 2009.
14

15
                     _____
16                   Barbara A. Glover, CSR, RPR
                     CRR, CCR
17

18

19

20

21

22

23

24
```

## ERRATA SHEET

Following are the changes I wish to make to my testimony:

| PAGE | LINE | | |
|------|------|--|--|
| 7 | 10 | CHANGE | "form" to "forum" |
| | | REASON | Transcription error. |
| 25 | 10 | CHANGE | "and" to "an" |
| | | REASON | Transcription error. |
| 69 | 7 | CHANGE | enforcement, opportunities |
| | | REASON | Clarification. |
| 79 | 9 | CHANGE | "scaled" to "scale" |
| | | REASON | Transcription error. |
| 82 | 12 | CHANGE | "place in" to "placement" |
| | | REASON | Transcription error. |
| 83 | 10-11 | CHANGE | background, academic, in training |
| | | REASON | Clarification. |
| 86 | 22 | CHANGE | "fianc" to "fiancé" |
| | | REASON | Transcription error. |
| 93 | 8 | CHANGE | "why" to "what" |
| | | REASON | Transcription error. |
| 119 | 3-4 | CHANGE | "you followed" to "you failed to follow" |
| | | REASON | Transcription error. |

## ERRATA SHEET

Following are the changes I wish to make to my testimony:

<u>PAGE</u>    <u>LINE</u>

122    16   CHANGE  "they're" to "there is"

_____  ____ REASON  Transcription error.

174    19   CHANGE  "Steinbolt" to "Steidl"

_____  ____ REASON  Transcription error.

177    3    CHANGE  involved in, all three

_____  ____ REASON  Clarification.

251    6    CHANGE  "CHLEA" to "CALEA"

_____  ____ REASON  Change CHLEA to CALEA in all subsequent uses
                    Transcription error.

252    16   CHANGE  Force, on

_____  ____ REASON  Clarification.

264    6-7  CHANGE  Closer to "the" Mississippi (ref. to River)

_____  ____ REASON  Transcription error.

381    20   CHANGE  Dujay   -  ???

_____  ____ REASON  Transcription error.

454    24   CHANGE  "purpose" to "person"

_____  ____ REASON  Transcription error.

481    19   CHANGE  "sickly   -  ???

_____  ____ REASON  Transcription error.

498

1
2                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE CENTRAL DISTRICT OF ILLINOIS
3                         STATE OF ILLINOIS

4        GORDON RANDY STEIDL,

5                Plaintiff,

6            -vs-                          No. 05 CV 2127

7        City of Paris, Present and
         Former Paris Police Officials
8        Chief Gene Ray and Detective
         James Parrish; former Illinois
9        State Trooper Jack Eckerty;
         former Edgar County State's
10       Attorney Michael McFatridge;
         EDGAR COUNTY; and Illinois State
11       Police Officials Steven M. Fermon,
         Diane Carper, Charles E. Brueggemann,
12       Andre Parker and Kenneth Kaupus,

13                Defendants.

14                    This is to certify that I have read the
         transcript of my deposition taken in the
15       above-entitled cause, and that the foregoing
         transcript taken on November 13th and 19th, 2009
16       accurately states the questions asked and the
         answers given by me, with the exception of the
17       corrections noted, if any, on the attached errata
         sheet(s).

18                                    _____
                                        DENNIS WALLER
19
20       Subscribed and Sworn before
         me this __4th__ day of
21       __January__,_____, 2009.
         _____
22       Notary Public
         My Commission Expires: 10/03/2010
23

24

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| **GORDON RANDY STEIDL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 05 CV 02127** |
| | ) | |
| **CITY OF PARIS, et al.,** | ) | **Judge Harold A. Baker** |
| | ) | **Magistrate Judge Bernthal** |
| **Defendants.** | ) | |

_____

| | | |
|---|---|---|
| **HERBERT WHITLOCK,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 08 CV 2055** |
| **v.** | ) | |
| | ) | |
| **CITY OF PARIS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a copy of the foregoing November 13, 2009 Deposition Transcript of Dennis Waller was served upon the following counsel via the Court's CM/ECF system on the 19th day of March 2010:

Attorneys for City of Paris, Gene Ray, James Parrish and Jack Eckerty:
James G. Sotos
Elizabeth Ekl
Sara Cliffe
Elizabeth K. Barton
John J. Timbo
James G. Sotos & Associates, Ltd.
550 East Devon Avenue, Suite 150
Itasca, IL 60143
jsotos@jsotoslaw.com
eekl@jsotoslaw.com
scliffe@jsotoslaw.com
ebarton@jsotoslaw.com
jtimbo@jsotoslaw.com

Attorneys for Steven M. Fermon, Diane Carper, Charles E. Brueggemann, Andre Parker,
<u>Kenneth Kaupas and Jeff Marlow</u>:
 Iain D. Johnston
 Phil Ackerman
 Heidi Steiner
 Johnston Greene LLC
 542 South Dearborn Street, Suite 1110
 Chicago, IL 60605
 ijohnston@johnstongreene.com
 packerman@johnstongreene.com
 hsteiner@johnstongreene.com


<u>Additional Attorneys for Andre Parker and Jeff Marlow</u>:
 David C. Thies
 John E. Thies
 Kara J. Wade
 Webber & Thies, P.C.
 202 Lincoln Square
 P.O. Box 189
 Urbana, IL 61803
 dthies@webberthies.com
 jthies@webberthies.com
 kwade@webberthies.com


<u>Attorneys for Michael McFatridge</u>:
 Terry A. Ekl
 Vincent C. Mancini
 Terry Stanker
 Ekl Williams PLLC
 901 Warrenville Road, Suite 175
 Lisle, IL 60532
 tekl@eklwilliams.com
 vmancini@eklwilliams.com
 tstanker@eklwilliams.com


<u>Attorneys for Edgar County</u>:
 Michael E. Raub
 Brian Smith
 Heyl Royster Voelker & Allen
 P.O. Box 129
 Urbana, IL 61801-0129
 mraub@hrva.com
 bsmith@hrva.com

The undersigned, an attorney, hereby certifies that a copy of the foregoing November 13, 2009 Deposition Transcript of Dennis Waller was served upon the following counsel via email on the 19th day of March 2010:

G. Flint Taylor
Jan Susler
Ben Elson
People's Law Office
1180 North Milwaukee
Chicago, IL 60622
flint.taylor10@gmail.com
jsusler@aol.com
elsonben@aol.com

The undersigned, an attorney, hereby certifies that a copy of the foregoing November 13, 2009 Deposition Transcript of Dennis Waller was served upon the following defendant via U.S. first-class mail on the 20th day of March 2010:

Deborah Rienbolt
2116 East Keys Avenue
Springfield, IL 62702

s/ Carrie A. Hall