1            IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
2                    STATE OF ILLINOIS
3    GORDON RANDY STEIDL,
4            Plaintiff,
5        -vs-                    No. 05 CV 2127
6    CITY OF PARIS, Present and
     Former Paris Police Officials
7    Chief Gene Ray and Detective
     James Parrish; former Illinois
8    State Trooper Jack Eckerty;
     former Edgar County State's
9    Attorney Michael McFatridge;
     EDGAR COUNTY; and Illinois State
10   Police Officials Steven M. Fermon,
     Diane Carper, Charles E. Brueggemann,
11   Andre Parker and Kenneth Kaupus,
12           Defendants.
13   HERBERT WHITLOCK,
14           Plaintiff,
15       vs.                    No. 08 CV 2055
16
     CITY OF PARIS, et al.,
17
                 Defendants
18
19
            CONTINUED DEPOSITION OF DENNIS WALLER
20
                 November 19th, 2009
21                    2:00  PM
22        Deann K. Parkinson:  CSR 84-002089
23      Area Wide Reporting & Video Conferencing
                 301 West White
24         Champaign, Illinois  61820          (800)747-6789

```
 1                        APPEARANCES:
 2
       PRESENT IN PERSON:
 3
       MS. JAN SUSLER and
 4     MR. FLINT TAYLOR
       People's Law Office
 5     1180 N. Milwaukee Avenue, 3rd Floor
       Chicago, IL  60622
 6     Appearing on behalf of Gordon Randy Steidl
 7     MR. RON BALSON
       Michael Best & Friedrich, LLP
 8     Two Prudential Plaza
       180 North Stetson Avenue Suite 2000
 9     Chicago, IL  60601
       Appearing on behalf of Herbert Whitlock
10
       MR. IAIN JOHNSTON
11     Johnston Greene
       542 South Dearborn Street, Suite 1310
12     Chicago, IL  60605
       Appearing on behalf of Steven Fermon, Diane
13     Carper, Charles Bruggemann, Andre  Parker, Kenneth
       Kaupus, and Jeffrey Marlow
14
       MR. MICHAEL RAUB
15     Heyl, Royster, Voelker & Allen
       102 East Main Street
16     PO Box 129
       Urbana, IL  61801
17     217-344-9295
       Appearing on behalf of Edgar County
18
       MS. ELIZABETH EKL
19     James G. Sotos & Associates
       550 East Devon Suite 150
20     Itasca, IL  60143
       Appearing for City of Paris, James Parrish, Jack
21     Eckerty and Gene Ray
22
23
24
```

```
 1    PRESENT BY TELEPHONE:

 2    MR. VINCENT MANCINI

      Ekl Williams

 3    901 Warrenville Road Suite 175

      Lisle, IL  60532

 4    Appearing for Michael McFatridge

 5    MS. KARA WADE

      Webber & Thies

 6    202 Lincoln Square

      Urbana, IL  61801

 7    Appearing for certain ISP officials

 8

 9

10                    INDEX
```

```
11    EXAMINATION BY MR. JOHNSTON.......PAGE 372

      EXAMINATION BY MS. EKL...........PAGE 437

12    EXAMINATION BY MR. RAUB..........PAGE 489

      EXAMINATION BY MR. TAYLOR.........PAGE 492

13

14    Exhibit No. 7.....................PAGE 372
```

```
15

16

17

18

19

20

21

22

23

24
```

1

CONTINUED DEPOSITION

2

3          The Deposition of DENNIS WALLER, a

4   citizen of the State of Wisconsin, a witness of

5   lawful age; produced, sworn, and examined upon his

6   corporeal oath, at 100 E. Wisconsin, Milwaukee,

7   Wisconsin on November 19th, 2009, before Deann K.

8   Parkinson, CSR, Notary Public in and for the

9   County of Champaign and State of Illinois, as a

10  witness in a certain suit and matter now pending

11  and undetermined in the United States District

12  Court for the Central District of Illinois.

13          CSR License No. 84-002089

14

15

16

17

18

19

20

21

22

23

24

```
 1          (Whereupon the deposition began at 2:14 PM.)

 2                     DENNIS WALLER,

 3     the deponent herein, called as a witness, after

 4     having been first duly sworn, testified as

 5     follows:

 6                  DIRECT EXAMINATION

 7                  BY MR. JOHNSTON:

 8        Q.    I will be starting with the September

 9     27th letter, so that's pretty much all I got.  Let

10     the record reflect this is the continuation of the

11     deposition of Mr. Waller taken pursuant to

12     agreement.

13        A.    First can we go off the record for a

14     minute?

15        Q.    Sure.

16             (At this point there was an off the

17     record discussion.)

18     BY MR. JOHNSTON:

19        Q.    Mr. Waller, I believe the September

20     27th, 2009 letter was marked as Exhibit No. 7.  I

21     don't know if you have a copy in front of you.  I

22     have a got a couple extra copies just in case.

23        A.    I do.

24        Q.    I think that was No. 7, right?
```

1              MR. TAYLOR:  It is.

2         Q.    Mr. Waller, this, you've seen a copy of

3    this letter before, right?

4         A.    Yes, sir.

5         Q.    I'm not going to go through the

6    foundational things because Flint already went

7    through most of them.  The first letter, or first

8    line of this letter says, "thank you for coming to

9    Chicago and meeting with us on Friday."  Would

10   that have been Friday, September 25th?

11        A.    It would have been the Friday

12   immediately preceding that date.

13        Q.    So if I told you September 27th was a

14   Sunday, any reason to doubt that?

15        A.    No, sir.

16        Q.    And so you met basically one week before

17   the report was due, is that right?

18        A.    That was one of the meetings, yes, sir.

19        Q.    Okay.  How long did you meet on

20   September 25th, 2009?

21        A.    Probably from ten o'clock until, oh, I'm

22   guessing about 2:30.  Something like that.

23        Q.    Okay.  And where did this meeting take

24   place?

1      A.      Michael Best and Friedrich office in

2   Chicago.

3      Q.      And who was present?

4      A.      The best I recollect would be Mr.

5   Balson, Mr. Taylor, Miss Susler, I believe Miss

6   Hall, and I'm not sure if any of the other staff

7   from Michael Best were there or not.

8      Q.      And did you bring your file with you to

9   this meeting on September 25th, 2009?

10      A.      I probably brought some materials.  I

11   did not bring the file because --

12      Q.      Too voluminous?

13      A.      Yes, it's basically one whole bookcase.

14      Q.      Okay.  Do you remember specifically what

15   documents you did bring?

16      A.      Not specifically, no, sir.  I probably

17   had a notebook with selected things in it.  I

18   don't recall specifically.  I've reshuffled these

19   notebooks probably half a dozen or more times.

20      Q.      Did you take notes during this meeting

21   on September 25th, 2009?

22      A.      I don't recall.

23      Q.      If you would have taken notes, would

24   those notes have been provided?

1      A.      I don't recall.  Sometimes I'll take

2   notes on a post-it.  Sometimes I'll take notes on

3   a legal pad as I go through it and check off.  I

4   generally toss them.

5      Q.      Were you told to bring certain documents

6   to this meeting?

7      A.      No.  I understood it was going to be a

8   working meeting that we flesh out various issues.

9      Q.      Do you remember what specific documents

10  you went over during this approximately four hour

11  meeting?

12     A.      Specifically, I don't know that we went

13  over specific documents.  I think it was more a

14  discussion about the issues.

15     Q.      Did you have a draft of your report at

16  that point?

17     A.      No, sir.

18     Q.      Had you started writing your report as

19  of September 25th, 2009?

20     A.      I may have, but it was probably just

21  like a skeleton, with just the general categories.

22     Q.      And was there an agenda prepared for

23  this meeting?

24     A.      No, sir.  Not that I'm aware of.

1      Q.     The last page of Exhibit No. 7 states,

2  "we also include a chronology of the legal

3  proceedings and will send a summary of the

4  evidentiary points discussed."

5           Do you recall when you received the

6  chronology of the legal proceedings?

7      A.     I probably received it contemporaneous

8  with that, and I may have already received it

9  beforehand.

10     Q.     When you say contemponraneous with that,

11 what's that?

12     A.     With the September 27th, 2009 --

13     Q.     Letter?

14     A.     Letter.

15     Q.     Thank you.  And how about the summary of

16 the evidentiary points discussed; when did you

17 receive that?

18     A.     I think that was at the same time that I

19 received this.

20     Q.     And those have been provided?

21     A.     I believe so.  I think those are labeled

22 bullets for Waller.  Maybe they were-- they may

23 have been afterward.  Because I see that there is

24 a document dated October 1, 2009.

1        Q.    When you say "they" may have been dated

2    afterwards, what are you referring to?

3        A.    The document bullets for Waller.

4        Q.    Could you just -- thank you, Mr. Waller.

5    And this is a six-page document, as you mentioned,

6    titled "bullets for Waller" dated October 1st,

7    2009?

8        A.    Yes, sir.

9        Q.    And who prepared that document?

10       A.    I'm assuming that the attorneys.

11       Q.    Do you know which attorneys?

12       A.    Not specifically, no.  No.  I don't.

13       Q.    Did you rely upon that document labeled

14   "bullets for Waller"?

15       A.    I looked at it as a guideline.  It's

16   very difficult for me to -- I use both of these

17   documents basically as a guide post of what issues

18   to cover.  And this case is so big and complex

19   that I looked at it kind of as a checklist to make

20   sure that I was covering the key things.  There

21   was some time considerations.  And --

22       Q.    When you say "these documents", you mean

23   the bullets for Waller and the September 27th,

24   2009 are the documents you used as guide posts?

1       A.      Yes, sir.

2       Q.      Okay.  The pages aren't numbered, but if

3   you go to the third page of the September 27th,

4   2009 letter.

5       A.      The one that starts off with regard to

6   post May 2000 ISP defendants?

7       Q.      Correct, sir.

8       A.      Yes, sir.

9       Q.      As you just read, it starts with, "with

10  regard to the post May 2000 ISP defendants, you

11  and we identified the following issues," and then

12  it goes on.

13              And over the next two pages there's 13

14  numbered paragraphs, is that correct?

15      A.      Yes, sir.

16      Q.      Are there specific paragraphs within

17  these thirteen that you specifically identified?

18      A.      I don't understand your question.

19      Q.      Well, were these thirteen paragraphs

20  that are listed here, were they created through a

21  collaborative process?  Was there a brain storming

22  session?  Did individual people identify them?

23  That's what I'm getting at.

24      A.      I think that that was an attempt to give

 1    a synopsis and/or summary of the discussion on

 2    that Friday, so that I would have a list of the

 3    various issues that we talked about.

 4         Q.    Okay.  And so do you understand my

 5    question now is of these thirteen paragraphs, are

 6    there one or more of these paragraphs where you

 7    specifically identified the issue?

 8         A.    Probably in many of them.  I mean, I

 9    couldn't separate and say that Ron said, brought

10    this one up, and Flint did this one, and Jan -- it

11    wasn't that type of thing.  It was just a give and

12    take.  Then they went over afterward, and

13    attempted to list the topics that we discussed.

14         Q.    So the 13 paragraphs is essentially a

15    collaboration of you and the attorneys identifying

16    the issues?

17         A.    Our discussion, yes, sir.

18         Q.    The first paragraph on the third page

19    says, "with regard to the post May 2000 ISP

20    defendants, you and we identified the following

21    issues that are germane to the question of whether

22    these defendants at various stages from 2000 to

23    the present sought, in Director Nolan's words,

24    truth and justice, or rather first refused to

1    investigate, then later improperly continued to

2    focus on Steidl and Whitlock despite their

3    knowledge that they had no credible evidence

4    against them."  I'm just going to stop right

5    there.

6            Did you ever see, correct me if I asked

7    you this, did you ever see the interview of

8    Kristin Mazely before September 27th, 2009?

9            MR. TAYLOR: Iain, at this point I'm

10   going to object.  You did ask, and go into some

11   detail on that.  If it's just for background --

12       Q.    It's background, I'm not going to --

13   we're not going to retread a lot of the same

14   ground.

15           MR. TAYLOR: With that objection, you may

16   answer.

17       A.    I don't recall at what specific point.

18       Q.    As you sit here today do you recall

19   seeing Kristin Mazely --

20       A.    I believe I did.  I don't have a

21   specific recollection of it right at this point.

22       Q.    So if you have no specific recollection,

23   do you have any opinion about whether what she

24   stated in her interview to Jeff Marlow was

1    credible or not?

2              MR. BALSON: Object to the form of the

3    question.  The interview was a long interview and

4    she stated a whole lot of things.

5              MR. TAYLOR: I also think that that was

6    asked and answered.  Do you know, Iain?  You

7    probably read it pretty closely.  Can I just ask

8    you a question.  Do you have a transcript of the

9    last -- do we have a transcript?  Nobody has it.

10   So we are all playing with notes here?

11             MR. JOHNSTON: Right.

12        A.   First of all, it's not my purview to

13   determine credibility.

14        Q.   Okay.

15        A.   If I recall correctly, Marlow and one

16   other investigator did a lengthy interview.  And I

17   don't have that in front of me right now.  So, I'm

18   kind of operating -- I believe, if I recall

19   correctly, that was something about Whitlock and

20   Bud Dujay following.

21        Q.   Herbert Whitlock and Ovid Chambers?

22        A.   I believe so.  Excuse me, yeah, Ovid,

23   not Bud.

24        Q.   As you sit here today you can't recall

1    drawing any credibility determinations regarding

2    Kristin Mazely?

3         A.    Well, it just -- to attempt to go back

4    and get specific information from 14 years plus,

5    and with it being predicated that Marlow still

6    considered Whitlock and Steidl as suspects, and

7    their involvement, so with that predisposition,

8    and looking at some of the other interviews that

9    he did, and tactics that he used, I don't know

10   about her credibility or her motivation.

11        Q.    Did you see any tactics, to use your

12   term, used by Jeff Marlow in Kristin, Miss Kristin

13   Mazely's interview, that you thought were

14   improper?

15        A.    I don't recall that being reduced to a

16   transcript.  I think that that was just a report

17   if I'm remembering correctly.  So, obviously those

18   things would not be included.

19        Q.    Okay.  I'm asking about what, when you

20   saw the video of the interview of Kristin Mazely,

21   did you see any tactics used by Jeff Marlow that

22   you thought were improper?

23        A.    I don't believe I saw the video.

24        Q.    Okay.  Fair answer.  As you sit here now

1    do you recall seeing the video interview of Mr.

2    Dunlap?

3        A.    I don't believe so.

4        Q.    Did you ever read the 7th Circuit's

5    opinion regarding Mr. Whitlock's habeas petition?

6        A.    Whitlock's?

7        Q.    Correct?

8        A.    I don't believe I was provided with

9    that.  Or if I was, I just didn't get to it.

10       Q.    Okay.  Did anybody tell you that the 7th

11   Circuit's opinion in Mr. Whitlock's habeas

12   petition stated that the new evidence that Mr.

13   Whitlock presented did not undercut Whitlock's

14   highly damaging admissions.  Anybody tell you

15   that?

16       A.    No, sir.

17       Q.    Would a court of appeals

18   characterization of a person's statements as

19   highly damaging admissions be an important fact

20   for you to consider?

21           MR. BALSON: I object to the form of the

22   question, and the quote is taken out of context.

23       A.    It may or may not.  I think you would --

24   we would all agree that what goes before the

1    courts is a very limited version of everything

2    that is available in most cases.  And it's

3    structured for the specific events at that time.

4    So not having a better understanding of what the

5    context, and specifically what was addressed, I

6    couldn't answer your question.

7         Q.    Okay.  Do you know in a habeas petition

8    whether the trial transcripts are presented to the

9    federal court?

10        A.    I would imagine in some cases they are,

11   and other cases they may not be.

12        Q.    As you sit here now you don't know

13   whether or not they were presented in Mr.

14   Whitlock's habeas?

15        A.    That's correct.

16        Q.    The paragraph that starts with Arabic

17   number one states the efforts of defendants

18   Parker, Carper, Fermon and Brueggemann to prevent

19   Callahan from properly reinvestigating the Rhoads

20   case despite Callahan's findings that Steidl and

21   Whitlock were not proven guilty beyond a

22   reasonable doubt, and were most likely innocent

23   because the case was quote, "too politically

24   sensitive," closed quote.  Going to ask you some

1    questions about that.

2              I think you already testified you

3    reviewed the May 2 and May 17th memorandum written

4    by Michale Callahan, correct?

5        A.    Yes, sir.

6        Q.    Do you know if Michale Callahan stated

7    anywhere in the May 2, 2000 memoranda, that

8    Herbert Whitlock was not proven guilty beyond a

9    reasonable doubt?

10       A.    I think initially he said that about

11   Steidl, if memory serves correctly without looking

12   at the document.  He did not say that about

13   Whitlock initially.

14       Q.    In fact, no where in the May 2, 2000

15   memoranda does Mr. Callahan state that Mr.

16   Whitlock was not proven guilty beyond a reasonable

17   doubt, right?

18       A.    Not to my recollection it does not.

19       Q.    And in the May 17th, 2000 memorandum Mr.

20   Callahan again states no where in that document

21   that Mr. Whitlock was not proven guilty beyond a

22   reasonable doubt, correct?

23       A.    My understanding that the May 17th

24   document is simply a rehash of the May 2 document

1     where Carper or other people at the regional level

2     removed Callahan's request or suggestion that the

3     matter be reinvestigated.  So, if it didn't say it

4     in the May 2nd, it would not say it in May 17th.

5          Q.     And again, you're only assuming that

6     Diane Carper removed certain aspects from the May

7     2nd memorandum, correct?

8          A.     I believe Lieutenant Callahan indicated

9     that that's what occurred.

10         Q.     Where did Mr. Callahan indicate that

11    that's what occurred?

12         A.     In his testimony in the procedure of

13    March 21st, 2005, State versus Whitlock, Callahan

14    indicated that he prepared the memo of May 2nd,

15    2000.  The memo was altered by Region.  And then

16    made reference to the May 17th, 2000 memo.  And

17    indicated he had recommended that the ISP

18    reinvestigate the case.  Indicated that that had

19    been removed.

20         Q.     But, he did not state that Diane Carper

21    removed that, correct?

22         A.     He said it went to Region and it was

23    removed there.  Diane Carper was the Region

24    commander, so that -- did he say specifically that

1     it was Carper?  Not in that context.  That was my

2     understanding.

3          Q.    So, you're assuming that it was Diane

4     Carper?

5          A.    That it was either she did it directly,

6     or it was under her control.

7          Q.    That is your assumption, correct?

8          A.    She is the person in charge of that

9     Region's investigations, and that's the way the

10    memo was revised.

11         Q.    And so it's an assumption based upon

12    you, that you are making?

13         A.    I just said it was an assumption.

14         Q.    That's all I'm asking.  And in fact, the

15    May 17th and the May 2nd memoranda specifically

16    referred to Mr. Whitlock as still being a suspect,

17    correct?

18         A.    Based on the very short time that he had

19    to review the information, I believe it did.

20         Q.    No where in the May 2nd, 2000 memoranda,

21    does Mr. Callahan preface his belief that Mr.

22    Whitlock is a suspect based upon the brief time

23    that he had to review the material, does he?

24              MR. BALSON: Object to the form of the

1    question and the phrase, brief time.

2        A.    And I apologize to you, but I also found

3    a different citation which supports what I said

4    earlier.  And then I'll get back to your question.

5    On page 152 of his transcript --

6        Q.    Which transcript, sir?

7        A.    Callahan's deposition.

8        Q.    Sorry, there's two depositions.  Which

9    deposition?

10       A.    Would be the first one.

11       Q.    In his case?

12       A.    No, I believe it would be for this

13   matter.

14       Q.    The one in 2008?

15       A.    I'm guessing, because I don't have it in

16   front of me.

17       Q.    Okay.

18       A.    But, he indicated on page 152 that the

19   5-17-2000 memo was an altered version of the

20   5-2-2000 memo.  It was altered per instructions of

21   Carper.  His recommendation to reopen the

22   investigation was removed.  So that's Lieutenant

23   Callahan.

24       Q.    Have you ever read Lieutenant Callahan's

1    interrogatory answers in his lawsuit?

2        A.    I don't believe so.

3        Q.    Has anybody told you that in his

4    interrogatory answers in his lawsuit he states

5    that the May 17th, 2000 memorandum, was in fact

6    his and only his memorandum?

7        A.    The substance of it was his as I

8    understand it.  I think his recommendation

9    obviously was removed.

10       Q.    Can you answer my question I asked

11   earlier?

12       A.    I'm sorry, could you repeat it, please.

13       Q.    Sure.  I believe my previous question

14   was, is there anywhere in Mr. Callahan's May 2,

15   2000 memorandum, where he prefaces his statement

16   that Mr. Whitlock is still a suspect by saying he

17   didn't have sufficient time to review the file?

18       A.    No, sir.

19       Q.    Is there anything in the May 17th, 2000

20   memorandum, where Mr. Callahan prefaces a

21   statement that Mr. Whitlock is still a suspect by

22   stating he didn't have sufficient time to review

23   the file?

24       A.    As I stated to you before, I think that

1    the May 17th memo is -- I didn't compare it word

2    for word, but pretty much identical to the May

3    2nd, other than his recommendations were removed

4    to reopen the investigation.  So, if it didn't say

5    it in May 2nd, it wouldn't say it in May 17th.

6        Q.    So the answer is it's not in there,

7    right?

8        A.    So the answer is, you're not talking

9    about a separate memo.  You're talking about one

10    that was altered by the Region, and it would not

11    reflect any different than what it did on May 2nd.

12        Q.    As you sit here do you recall anything

13    in the May 2nd, 2000 memoranda which states that

14    Callahan believed Mr. Whitlock was most likely

15    innocent?

16        MR. TAYLOR: I would note an objection at

17    this point because these are questions that I

18    think you need to or could have asked at the last

19    deposition, but not necessarily linked to the

20    document which you which may or may not have had

21    before the last deposition.

22        MR. JOHNSTON: Your objection is noted.

23    I would state I'm quoting verbatim from the letter

24    "most likely", so it's right there.

1          MR. BALSON: But, Iain, the letter

2   doesn't limit itself to the May 2nd memorandum.

3   All your questions are limiting to the May 2nd

4   memorandum.  Callahan made statements over a two

5   or three year period.  He changed his statements

6   as he went along.  You did ask him and he was

7   asked about the May 2nd memorandum at his first

8   deposition.

9          MR. JOHNSTON: All right.  Well, I'm

10  asking him about specific verbiage used in this

11  letter.

12         MR. BALSON: Well, that's my point.  My

13  point is, that this particular paragraph you're

14  asking him about does not limit itself to the May

15  2nd memorandum.

16         MR. JOHNSTON: Well, if you want to

17  follow-up with him on redirect, go ahead.  Then

18  I'll recross him.

19         MR. BALSON: Well, I think you're missing

20  the point.

21     A.    He said at one point that Whitlock was

22  still a viable suspect if the time line for the

23  murders is accurate.  Among other things.

24     Q.    Okay.  I'm sorry.  My question, Mr.

1    Waller, as you sit here today, do you recall

2    seeing anything in the May 2nd, 2000 memorandum,

3    where Mr. Callahan states that Mr. Whitlock was

4    quote, "most likely innocent"?

5        A.    I already answered that.  And I said no.

6        Q.    Okay.  Thank you.  Do you recall

7    anything in the May 17th, 2000 memorandum where

8    Mr. Callahan states that Mr. Whitlock was quote,

9    "most likely innocent"?

10       A.    I already told you.  The May 17th memo

11   is a rehash of the May 2nd, so there was nothing

12   -- no significant changes that I noted, other than

13   the removal by Region; and by Region, I mean

14   Colonel Carper, that the recommendations for

15   reopening the investigation.  So, if it didn't say

16   it in May 2nd, it wouldn't say it in May 17th.

17       Q.    So those three words are not in the May

18   17th, 2000 memorandum?

19            MR. BALSON: Asked and answered several

20   times.

21       A.    Yes, I did answer that several times.

22   And they are not in May 2nd.  They are not in May

23   17th to the best of my knowledge.

24       Q.    Thank you.  The next paragraph, Arabic

 1   number two, we are back to the September 27th,

 2   2009, page three?

 3        A.    Okay.  Which paragraph?

 4        Q.    Arabic number two.  I can't see the

 5   document you're looking at.

 6        A.    Same thing you are.

 7        Q.    This refers to Tim Harney's September

 8   2001 memorandum, do you see that there?

 9        A.    Yes, sir.

10        Q.    And Arabic number two says the ignoring

11   and suppression first by the ISP change of

12   command, including Carper, then by defendant

13   Kaupus of Tim Harney's September 2001 analysis

14   that found that given the testimony of the

15   witnesses at the original trial, it was nearly

16   quote, "impossible", closed quote, for Steidl and

17   Whitlock to have committed the crime.  I'm going

18   to ask you some questions about that, all right,

19   Mr. Waller?

20        A.    Sure.

21        Q.    What's your understanding of when Diane

22   Carper first saw the September 2001 memorandum

23   written by Tim Harney?

24        A.    My understanding, it went up the chain

1      of command.  Do I know specifically when she

2      reviewed it?  I'd have to go back and look at the

3      deposition summary for her, if that was

4      referenced, but I don't know exactly when she did

5      see that.  I know at some point it went up through

6      the chain of command.

7          Q.    Do you know that when Diane Carper first

8      learned of the September 2001 memorandum from Tim

9      Harney she provided it to Ed Parkinson of the

10     Illinois State's Attorney's appellate prosecutor?

11             MR. TAYLOR: Objection, that assumes

12     facts certainly not in evidence as far as we know.

13         A.    No, I do not know that she did provide

14     it to him.  I can take a quick look at her

15     summary, but I don't believe that that was

16     referenced in there.

17         Q.    All right.  I was going to ask you about

18     Mr. Kaupus, but if you want to take a moment to

19     look, go ahead.

20         A.    I don't see -- I don't readily see a

21     reference to that.

22         Q.    All right.  What's your understanding of

23     when Mr. Kaupus saw Tim Harney's September 2001

24     memorandum?

1      A.    He indicated that he received a copy in

2   January of '03.

3      Q.    What's your understanding of when Mr.

4   Kaupus provided Tim Harney's September 2001

5   memorandum to the US Attorney's office?

6      A.    I'm sorry, could you repeat it?

7      Q.    What is your understanding of when Mr.

8   Kaupus provided the September 2001 memorandum to

9   the US Attorney's office?

10          MR. TAYLOR: Objection, certainly assumes

11   facts not in the record as far as we know.

12      A.    Again, I wasn't aware that he did to the

13   US Attorney.

14      Q.    What is your understanding of when Ken

15   Kaupus provided Tim Harney's September 2001

16   memorandum to the Illinois State's Attorney

17   appellate prosecutor?

18          MR. TAYLOR: Same objection.

19      A.    I don't see a specific point in time in

20   my notes that indicated if or when that he did

21   that.

22      Q.    Okay.  What's your understanding of when

23   Andre Parker saw Tim Harney's September 2001

24   memorandum?

1          MR. BALSON: Mr. Waller, if you don't

2     remember the answer to a question he's asking and

3     you can't put your fingers on it right away, then

4     just tell him that.  Otherwise we can be here

5     until midnight tonight with you fishing through

6     thousands of documents.

7          A.    I can't lay my hands on that if or when

8     that he did.  I was looking for the particular

9     time that he left the Illinois State Police to see

10    if it was within that time range.

11         Q.    Are you finished?  I don't want to

12    interrupt you.

13         A.    Yes, sir.

14         Q.    What is your understanding of when Steve

15    Fermon first saw Tim Harney's September 2001

16    memorandum?

17         A.    I don't recall specifically off the top

18    of my head.

19         Q.    What is your understanding of when

20    Charles Brueggemann first saw Tim Harney's

21    September 2001 memorandum?

22         A.    I believe that Fermon and Brueggmann

23    would have been made aware of it in the briefing

24    that Callahan provided to the assembled command

1    staff on January 9th of '03, if not before.  He

2    was involved in the investigations component at a

3    higher level, so he may have been aware of it

4    before then.  But, I'm reasonably certain that

5    Callahan would have included that in his briefing.

6         Q.    Are you assuming that Callahan included

7    Tim Harney's 2001 memorandum in his briefing?

8              MR. TAYLOR: Objection, that's what he

9    just said.  Or did I miss that?

10        A.    He presented the materials that he had

11   available to command staff at that point.  It's my

12   understanding that he had that available to him at

13   that time.  So, yes, I would assume that he had.

14   I should note further that the particular

15   information that was provided at that briefing was

16   not provided to us through discovery.

17        Q.    Do you know that the information that,

18   and the documents that Callahan presented at the

19   January 9th, 2003 academy meeting were provided to

20   Ellen Mandeltort of the Attorney General's office?

21             MR. TAYLOR: Objection, again, I don't

22   believe that the evidence supports that factual

23   basis.

24        A.    I don't recall specifically, and I don't

1    see that readily available, or that noted in my

2    summary, at least not in a manner that is readily

3    available.

4         Q.    Do you know that Mr. Callahan -- strike

5    that.  Do you know that the information Mr.

6    Callahan provided at the January 9th, 2003 academy

7    meeting, including the documents, were provided to

8    Tom Londrigan of the governor's office?

9              MR. TAYLOR: Same objection.

10             MR. BALSON:  Does he know whether or not

11   they were?  Is that what you're asking him?

12        Q.    Yes.

13        A.    I don't recall if they were.

14        Q.    Going to go back to the letter now that

15   you have in front of you, Arabic number three.

16   Defendants Brueggemann, Fermon and Carper's

17   refusal to permit Callahan to officially present

18   to the governor his findings when the governor was

19   on the verge of granting Steidl and Whitlock

20   innocence pardons in January of 2003.  I'm going

21   to ask you some questions about that, Mr. Waller.

22             Do you know if anybody from Governor

23   Ryan's office ever contacted anybody at the

24   Illinois State Police after the January 9th, 2003

1    academy meeting?

2        A.    If I recall correctly, it was within a

3    day or two of Governor Ryan leaving office.  So,

4    I'm not aware if they did.  And certainly the sum

5    and substance of what they provided was not

6    provided through discovery, if indeed they did

7    provide anything.

8        Q.    You don't even know if the governor's

9    office asked for anything from any of the ISP

10   defendants after January 9th, 2003?

11       A.    I think what was requested was an

12   assessment of Steidl and Whitlock that was not of

13   that investigation, the investigations of the

14   Rhoads homicide.  And that was not provided to the

15   governor's staff, as I recollect.  At least that

16   specific information was not provided through

17   discovery.

18       Q.    Did the governor's office ask for that

19   assessment?

20            MR. TAYLOR: Objection in terms of time.

21       Q.    Okay.  That's a fair objection, Flint.

22   Did the governor's office, the office of George

23   Ryan, ask for that assessment at any time after

24   January 9th, 2003?

1      A.    I don't know.

2      Q.    Okay.  On the second line Arabic number

3   three, it says, "officially present".  Do you see

4   the first word?  Do you know what it means by

5   officially present rather than just present?

6      A.    In the -- from his position as a

7   lieutenant within the Illinois State Police.

8      Q.    But, it's your understanding that Mr.

9   Callahan was not prevented from stating his

10   personal view to the governor's office as to his

11   beliefs regarding Mr. Whitlock and Mr. Steidl?

12          MR. TAYLOR: Objection, again, not

13   supported by the evidence.

14          MR. BALSON: Let me make an objection to

15   form of the question.  Prevented by who or what?

16      A.    And I recall something that Callahan

17   stated in one of the various forums, that

18   indicated that he did not present information

19   contrary to the wishes of ISP command because if

20   you did so you ended up being transferred to a

21   place where you didn't want to be.  So, I think it

22   was reflected that he understood that he was

23   either given permission to present from his

24   official position, or he was denied, and then it

1     was discouraged that he do anything else based on

2     the activities of ISP command dealing with other

3     personnel.

4          Q.    You read Michale Callahan's deposition

5     in this case, correct?

6          A.    Yes, sir.

7          Q.    Do you recall reading in that deposition

8     that first deputy director Doug Brown told Michale

9     Callahan he could voice his, meaning Mr.

10    Callahan's, personal opinions regarding Steidl and

11    Whitlock?

12              MS. SUSLER: What page are you on, Iain?

13         Q.    299.

14              MR. BALSON: You are asking him if he

15    remembers reading that?

16         Q.    Yes?

17         A.    Yes, sir, I do.

18         Q.    Okay.  So based upon Mr. Callahan's

19    deposition testimony, Doug Brown, the first deputy

20    director, told Callahan he could voice his

21    personal opinion as to Steidl and Whitlock,

22    correct?

23              MR. BALSON: Object to the form of the

24    question.

1        A.    Are you ignoring my previous testimony?

2        Q.    I'm not ignoring anything, sir.  I'm

3    just asking a simple question.

4        A.    If that's what it said, that's what it

5    said.

6        Q.    Thank you.  Let's go to Arabic number

7    six.  It says, "in early 2004, Kaupus, Brueggemann

8    and Carper met with the new governor's counsel and

9    once again refused to recommend pardons or

10   clemency for Steidl and Whitlock", correct?

11       A.    Yes, sir.  That's what it says in

12   substance.

13       Q.    Do you know if the governor's counsel in

14   early 2004 asked Ken Kaupus for his views in

15   recommending pardon or clemency to Steidl and

16   Whitlock?

17       A.    Was that Londrigan?

18       Q.    Correct.  Tom Londrigan?

19       A.    I believe that that was billed as the,

20   if I remember correctly, that was billed as the

21   purpose of the meeting.  And then he, according to

22   various command people present, he then only asked

23   questions about the investigation of Robert

24   Morgan, if I recall correctly.

1    Q.    So, as you sit here today do you know of

2   any evidence in the record which shows that Tom

3   Londrigan asked Ken Kaupus about his views

4   regarding pardon or clemency for Steidl and

5   Whitlock?

6    A.    Well, I think that that came from

7   Kaupus, Brueggemann and Carper.  I think that the

8   stated purpose of that meeting was to discuss

9   clemency issue with regard to Steidl and Whitlock.

10   They're saying it wasn't discovered.

11   Q.    You mean discussed?

12   A.    Discussed, excuse me.

13   Q.    Well, do you know of any evidence

14   anywhere, where Tom Londrigan asked Ken Kaupus for

15   his recommendation or opinion regarding pardons or

16   clemency for Steidl or Whitlock?

17   A.    Other than that was the stated purpose

18   of the meeting, and obviously they weren't there,

19   and I didn't read anything from Tom Londrigan's

20   statement.  So according to my recollection of the

21   statements of Kaupus, Brueggemann and Carper, they

22   did not.  Or he did not; Londrigan did not.

23   Q.    And so there's nothing in the record to

24   show that Tom Londrigan asked Charles Brueggemann

1    about his opinions or recommendations regarding

2    pardon or clemency for Steidl or Whitlock in 2004?

3         MR. TAYLOR: Objection, asked and

4    answered.

5         A.    My understanding is they acknowledged

6    that that was the stated purpose of the meeting,

7    and I believe that they stated that they could not

8    give the opinion.  That would have to come from

9    the director.  So, exactly what transpired is not

10   clear.  Whether they were asked and did not

11   answer.  Whether something else, it was a

12   subterfuge for another avenue of inquiry by

13   Londrigan.  Or they are just making the best case

14   possible for not following the basic tenets of

15   attempting to determine the truth, and serve

16   justice.  I don't know.

17        Q.    I'm baffled by your answer, so let me

18   see if I can rephrase it.  Do you have any

19   evidence, do you know of any evidence anywhere,

20   which shows that Tom Londrigan asked anybody at

21   this meeting in early 2004 with Kaupus,

22   Brueggemann and Carper, for their opinions or

23   recommendations regarding pardons or clemency for

24   Steidl and Whitlock?

1              MR. TAYLOR: Objection, he stated three

2      or four times what his evidence is.  That is, that

3      was the stated purpose of the meeting.  I object.

4          Q.    That is a speaking objection.

5              MR. BALSON: It's not.  Whoa.  I join in

6      the objection.  And also I object to the form of

7      the question, because you're asking for evidence

8      in the record when there is no record of that

9      meeting.

10         Q.    That's not true, but do you have --

11             MR. BALSON: Well, nothing that I've

12     seen.  If there is record of that meeting, that

13     hasn't been produced to me.

14         Q.    It has been.  I'll rephrase this so we

15     can get through these objections.

16             Is there, do you know of any evidence,

17     any document, that you've been provided with,

18     which shows that Tom Londrigan asked Kaupus,

19     Brueggemann or Carper for their opinions or

20     recommendations as to pardon or clemency for

21     Steidl and Whitlock in 2004?  Is there anything

22     you've been provided with that shows that?

23         A.    My recollection is that Kaupus and/or

24     Brueggmann and/or Carper attended the meeting at

1    the request of Londrigan to determine the ISP

2    opinion with regard to the innocence of Steidl and

3    Whitlock.  That was the stated purpose of the

4    meeting as I recollect.  I was not provided with

5    any record of what happened or any document that

6    stated that, the content of that specific content

7    of that meeting; any recordation that was done

8    contemporaneous with the meeting or shortly

9    afterward.

10           There was testimony by some or all of

11   those three ISP command personnel that, as I

12   recall, that it was the innocence of Steidl and

13   Whitlock was not discussed.  There were questions

14   from Londrigan about Robert Morgan, the

15   investigation of Robert Morgan.

16       Q.    Thank you.  If you were to learn that

17   Tom Londrigan did not want to know the opinion of

18   Kaupus, Carper or Brueggmann as to the innocence

19   or guilt of Steidl and Whitlock, would that affect

20   any of your opinions?

21           MR. BALSON: I object to the question.  I

22   object to the improper hypothetical and facts not

23   in evidence and contrary to the evidence.

24           MR. TAYLOR: Join in that objection.

1      A.     My understanding is that a clemency

2  petition based on innocence was being considered

3  at the time by the governor.  The request of the

4  governor's assistant was, the stated purpose of

5  the meeting was, to determine what the ISP opinion

6  was at that time.  If he had an ulterior motive

7  I'm not aware of it, but --

8      Q.     When you say "he" had an ulterior

9  motive?

10      A.     Meaning Londrigan.

11      Q.     I'm sorry, when you said "he", just

12  clarifying.

13      A.     So you have in Illinois the last three

14  governors, two are in prison, or have been in

15  prison, and one is indicted.  So I don't know what

16  the motivation would be.  The stated purpose of

17  the meeting was to discuss clemency petition based

18  on innocence.  He may have had an ulterior motive,

19  he may not have.  I don't know if it was discussed

20  or it was not discussed.  I didn't, I don't recall

21  a deposition of Londrigan or, again, it may be a

22  credibility issue there.  I assume if somebody is

23  being considered for clemency and they make a

24  request to know about it, that that would

1    typically be discussed.

2        Q.    A deposition of Tom Londrigan would be

3    helpful to flesh out this issue, wouldn't it?

4        A.    It may or may not.

5        Q.    Arabic number seven.  On the eve of

6    Steidl's release in late May of 2004 Kaupus and

7    Marlow, through a jail house snitch named James

8    Flat, unsuccessfully attempted to develop evidence

9    against Steidl that would defeat his release.  I

10   read that correctly, right?

11       A.    Yes, sir.

12       Q.    Do you know if James Flat in fact

13   informed Illinois Department of Corrections

14   investigators that Mr. Steidl did make threats

15   against Michael McFatridge?

16       A.    Do I know for a fact that he did?  No, I

17   don't.  It was reported that -- that he had made,

18   he had provided some type of information, I don't

19   recall what it was specifically, about the time

20   that Steidl was to be released.

21       Q.    Were you provided with any documents

22   which show that James Flat did not tell Illinois

23   Department of Corrections investigators that Randy

24   Steidl made threats about Michael McFatridge?

1        A.    My recollection is, A, we're talking

2    about a jail house snitch, that they acknowledge

3    that they do either make up stuff or sometimes

4    even tell the truth in an attempt to gain favor.

5    There was an attempt, I believe, to wire Mr. Flat.

6    It was unsuccessful.  So, they had nothing to

7    verify what he said was truthful.  Nothing that he

8    could say, other than Flat was saying that Steidl

9    said something.  So, there was no way to verify or

10   confirm that.  And certainly Flat's credibility

11   was in issue.

12       Q.    I think you are jumping a little ahead

13   of me, I know what you're saying.  What I'm asking

14   is, do you have any documents, anything showing

15   that Flat didn't say that Steidl didn't make the

16   threats against McFatridge?  I understand your

17   point that there is nothing verifying that Steidl

18   said those.  What I'm doing is the first step in

19   this analysis, which is whether Flat, there is any

20   evidence that Flat did not say that?  Do you get

21   what I'm driving at, Mr. Waller?

22       A.    I think so.  It's my understanding that

23   something came from Flat.  Whether it was

24   solicited or he volunteered it, I don't know the

1    entire circumstances.  I know that there was a

2    series of interviews of people who had been in

3    proximity to, or shared cell space with Steidl and

4    Whitlock.  And I don't know exactly when that all

5    occurred.  I don't recall specifically.

6        Q.   And those interviews of cellees could

7    have occurred after Steidl was released, right?

8        A.   It probably occurred before, during and

9    after.

10       Q.   Have you seen any documents which show

11   that interviews of cellees were conducted before

12   Steidl's release from, say, January 1st, 2000

13   forward?

14            MR. TAYLOR: Objection to the form of the

15   question.

16       A.   January 1st, 2000?

17       Q.   Yeah.

18       A.   Well, obviously there were from since

19   July 1st, 2000.

20       Q.   Okay.  Let's back up here.  Do you know

21   --

22       A.   Let me clarify one thing.  When you say

23   cellee, are you referring to a cell mate?

24       Q.   Yeah, I'm sorry, I apologize.  Are you

1    aware of any interviews of Randy Steidl's cell

2    mates which occurred between January 1st, 2000,

3    and May 28th, 2004?

4        A.    Again, I don't have the specific --

5    obviously there had to be some kind of interview

6    with Flat before Steidl was released, otherwise

7    they wouldn't know about it.

8        Q.    Do you know if Flat was a cell mate of

9    Randy Steidl?

10        A.    Either a cell mate or somebody in

11    proximity to.  It's my understanding.

12        Q.    And he could have been anybody in

13    general population, couldn't he have?

14        A.    Well, he's somebody that had contact or

15    alleged that he had contact with Steidl.  And my

16    understanding is he attempted to, he wore a wire,

17    attempted to get Steidl to go outside where the

18    wire could be monitored, and that was not

19    successful.  So, there was no documentation of

20    anything that he said, or any verification of

21    anything Flat said.

22        Q.    And Flat would not have necessarily to

23    be a cell mate to do that, right?

24        A.    Somebody that came into contact or in

1    proximity of Steidl, otherwise he -- there

2    wouldn't be any -- I mean, if you're talking about

3    some guy in cell block four of building 27, and

4    Steidl is in cell block one in building one, and

5    he's saying, yeah, I heard Steidl say this,

6    there's probably not going to be -- there's not

7    going to be any credibility whatsoever.  But my

8    understanding is he was in proximity.  Their cells

9    were in proximity to each other, or they had

10   contact with each other at sometime during the

11   day.

12       Q.    That's all I'm getting at, Mr. Waller.

13   It doesn't have to necessarily be a cell mate,

14   correct?

15       A.    That's correct.

16       Q.    That's all I'm looking for.  Thank you.

17            Is it your opinion that Kaupus and

18   Marlow should have ignored the information

19   allegedly provided by Flat?

20            MR. TAYLOR: Objection to the form of the

21   question.  Improper hypothetical and incomplete.

22       A.    That they should have ignored that?  If

23   they obtained information that Flat was alleging

24   that Steidl was planning on harming McFatridge?

1          Q.     Correct.

2          A.     No, I think it would be appropriate to

3     look into that.

4          Q.     Thank you.  Go to Arabic number eight.

5     It says, "at no time did ISP defendants make any

6     effort to investigate the police and prosecutorial

7     misconduct committed at the original trials

8     despite the evidence developed and obtained by

9     Callahan, Harney, Marlow and Kaupus that clearly

10    demonstrated its existence."

11            Do you know if the Attorney General's

12    office of Illinois made any effort to investigate

13    alleged police or prosecutorial misconduct

14    committed at the original trial?

15         A.     I think at some point the assistant AG,

16    Ellen Mandeltort, filed a complaint with the body

17    that dealt with attorney misconduct in Illinois.

18    And something to do with Brady violations, if I

19    recollect correctly.

20         Q.     Do you know if Miss Mandeltort

21    investigated it or she just filed a complaint with

22    the ARDC?

23         A.     I don't know if she investigated it.  I

24    think she became aware of that issue, and my

1 understanding is both the attorney general and the

2 assistant attorney general had security because

3 they were concerned about McFatridge and wanted

4 witnesses whenever he was around.  So to the

5 extent that they investigated it, they may have

6 reviewed the various findings.  But, they, you

7 know, I don't know what to any extent that they

8 investigated.  I know that she -- my recollection

9 is that she filed a complaint.  And that there was

10 a basis for her complaint.

11    And that had something to do with the

12 Brady violations during the initial prosecutions.

13  Q. Is it your understanding that the

14 attorney general, Lisa Madigan, and Lisa Madigan's

15 assistant, had security around them because they

16 were fearful of McFatridge?

17  A. That whenever they were going to, or

18 believed to be in contact, they had security,

19 either former or current AG investigators because

20 his behavior was so bizarre and also as a witness

21 to any conversation that occurred.  That's my

22 understanding.

23  Q. Contact with whom?  With Mr. McFatridge?

24  A. Yes, sir.

1          Q.      When did the attorney general have

2     personal contact with Mr. McFatridge?

3          A.      I don't know specifically at what point.

4     I know that McFatridge even long after the time

5     when he was State's Attorney had a number of

6     communications, telephone calls, etc., to the

7     attorney general's office, and very

8     uncomplimentary about the attorney general

9     Madigan.

10         Q.      Do you know that attorney general

11    Madigan always travels with security?

12         A.      She may or may not.  I don't know.

13         Q.      Do you know if the United States

14    Attorney's office ever made any effort to

15    investigate the police and prosecutorial

16    misconduct committed at the original trials?

17         A.      The US attorney?

18         Q.      Correct.

19         A.      No, sir.  I do not.

20         Q.      Do you know if the Illinois State

21    Attorney's appellate prosecutor made any effort to

22    investigate the police and prosecutorial

23    misconduct committed at the original trials?

24         A.      I don't know.

1      Q.    Arabic number nine on the next page.

2  You beat me there.  It says, "after Steidl's

3  release, Kaupus and Marlow under Carper and

4  Brueggemann's supervision continued to focus on

5  Steidl and Whitlock in their continued attempt to

6  recharge and reconvict Steidl and defeat

7  Whitlock's post-conviction despite their admitted

8  knowledge that the original case against them was

9  created and fabricated."  I think that I read that

10  correctly.  I'm going to ask you some questions

11  about that.

12        Where does Kaupus admit to having

13  knowledge that the original case against Steidl

14  and Whitlock was created and fabricated?

15      A.    I was just looking through this.

16  According to --

17      Q.    When you say "this", what are you

18  referring to?

19      A.    Ken Kaupus's deposition summary

20  indicated that they were the -- he was the one

21  that told Flat that Steidl intended to murder

22  McFatridge.  Page 314.

23      Q.    Could you say that again?

24      A.    Kaupus indicated that he was the one

1    that told Flat that Steidl intended to murder

2    McFatridge.  That he had heard that from other

3    sources within DOC, Department of Corrections, and

4    Flat confirmed that Steidl was talking about this.

5    So, according to his deposition, at least my

6    summary, it indicates that he is the one that

7    provided the information to Flat first.

8              But, as far as Kaupus, that he

9    acknowledged that the two witnesses used in the

10   prosecution lacked credibility.  That there was

11   many, many contradictions.  That he acknowledged

12   that Harney's memo was consistent with Callahan's

13   conclusions.  That he was aware that Callahan felt

14   the initial investigation was flawed.  He

15   indicated or conceded that inducing someone to

16   make false statements or conceal information is a

17   serious transgression.

18             These are all consistent with the case

19   being created and fabricated.  He was aware that

20   the crime scene photos and negatives were missing

21   from the Steidl file.

22   Q.    How does that create or fabricate

23   anything?  The fact that the crime scene photos

24   are missing?

 1      A.    The original case was created and

 2  fabricated and you had evidence which might

 3  indicate that.  I mean, I think it's rather

 4  peculiar that key evidence is missing after the

 5  fact when you have a case that was doctored to

 6  this extent.

 7      Q.    Do you know that Captain Kaupus made

 8  efforts to find the original photographs that were

 9  missing from the case file?

10      A.    I think there was an indication that he

11  was advised that there was -- certainly there was

12  an attempt.  It was never established where it

13  went or -- he indicates that there were other

14  interviews and things that indicated Reinbolt and

15  Herrington were not observed together on the night

16  of July 5th, '86, which again would be something

17  that would be in conflict with the witnesses

18  testimony.  He was aware that both Herrington and

19  Reinbolt had recanted.  Reinbolt a number of

20  times.

21      Q.    Wasn't he also aware that they had

22  retracted the recantations?

23      A.    Well, you know, when you lie under oath,

24  and then you lie under oath, we've established

1    that you're a liar.  So, whether she lied at the

2    trial, whether she lied at the recantation,

3    whether she lied at the recantation of the

4    recantation, we've established that she's a liar,

5    and has no credibility.

6              So, and you've established that she is

7    prone to making things up.  So, does it matter

8    whether she recanted her recantation?  We've

9    established that she is a liar and at some point

10   perjured herself.  She obviously wasn't charged

11   with it, but that's another interesting point.

12   Q.    So, does it --

13             MR. BALSON: He's not finished.  He's

14   still talking.

15   Q.    So does it matter whether or not --

16             MR. BALSON:  He hasn't finished his

17   answer.

18             MR. JOHNSTON: No, no, no, no, no.

19             MR. BALSON: Let him --

20             MR. JOHNSTON: You can not go off on a

21   tangent in the middle of a question and then say,

22   I'm still going to answer and rattle on.

23             MR. BALSON: No, when you asked him a

24   question and he was giving an answer you have to

```
 1    let him finish his answer.  You can't cut him off

 2    in the middle and then come back to the record and

 3    say this is what you answered in response to my

 4    question.

 5            MR. JOHNSTON: He's the one that left.

 6    I'll let him come back.  He's going to answer the

 7    question.

 8            MR. BALSON: We're not going to get very

 9    far here if you keep cutting him off.

10            MR. JOHNSTON: I'm not cutting him off.

11    He's sitting there reading deposition transcripts

12    because he can't remember anything that he read.

13    He's having to go through all of his deposition

14    transcripts.  He's going off on tangents.  And

15    when he throws out a gratuitous comment it's my

16    right to ask him a question, what he means by

17    that.  And so it's a very simple question.

18            MR. BALSON: Yes, it is, but write it

19    down and come back to it.  You can't cut him off

20    in the middle of his answer

21            MR. JOHNSTON: It's a very simple

22    question.  Does it matter if somebody retracts a

23    recantation?  If it does, yes; if it doesn't, no;

24    just tell me.
```

1           MR. BALSON: Before we get to your

2     question, let him finish his answer and you can

3     ask it.

4           MR. TAYLOR: I want the record to reflect

5     that he was answering a question, that he had

6     already interrupted him once and asked him, this

7     is an interruption question he was answering, now

8     this is the second interruption on his original

9     answer.  And so that you now have got an

10    interruption on an interruption.  So, as they say

11    on ESPN, pardon the interruption.

12          MR. JOHNSTON: I'll pardon the

13    interruption.  But let the record reflect, and

14    it's painfully obvious that this witness refuses

15    to answer questions that are posed to him.  What

16    he does is get on his soap box and give a speech

17    and talks about whatever he wants to talk about

18    and then does not answer the question, which

19    requires Miss Ekl and myself, and every other

20    defense attorney, to constantly circle back around

21    and ask a very simple question, without getting

22    two pages of transcripts.

23          MR. TAYLOR: Obviously we object.

24          MR. BALSON: I object to those comments

1    and do not see it that way.

2              MR. JOHNSTON: I understand.

3              MR. BALSON: I think that he is answering

4    questions.  Many of the questions you're asking

5    him require him to recall specifics from hundreds

6    of pages of documents, and he either can't recall

7    them offhand, or he is fishing through his

8    documents trying to find them.  There's nothing

9    wrong with that.

10             MR. JOHNSTON: Okay.

11             MS. SUSLER: Did he finish his answer?

12             MR. TAYLOR: Before you start looking, I

13   would ask has he finished his answer?

14             MR. JOHNSTON: That's what we are going

15   to ask him that so he can finish his answer.

16             MR. BALSON: We're going back to the

17   question that he was answering before he was

18   interrupted with the question.  So the question

19   that we want to go back to is the question that

20   got him off on what Mr. Johnson refers to as a

21   tangent.

22        A.    No, I thought the --

23             (At this point the court reporter read

24   the requested portion of the record.)

1      A.    No, I thought the original question was

2   about the original case against Steidl and

3   Whitlock being created and fabricated.

4   BY MR. JOHNSTON:

5      Q.    I think the original question is, where

6   does Kaupus admit knowledge that the original case

7   file was created and fabricated?

8      A.    I think that based on those things that

9   I was giving you, it's very obvious that it was.

10   I don't recall a specific time, or I haven't

11   located a specific time as of this point where he

12   said, I know, or he acknowledged verbally that the

13   original case was created and fabricated.

14      Q.    Thank you.  Let's go to Arabic number

15   ten.  This relates to clemency and pardon hearings

16   before the prisoner review board in late 2005 and

17   early 2006.

18          What evidence do you know of showing

19   that Andre Parker took any actions to influence

20   the prisoner review board in late 2005 and early

21   2006?

22      A.    I don't have anything that would

23   indicate Parker's involvement in 2005 and 2006

24   that I recall; his involvement was at a much

1    earlier stage, in 2000, 2001.  And that was Parker

2    with a "P", not Carper with a "C".

3        Q.    Let's go to Carper with a "C".  Is it

4    your understanding in late 2005 Diane Carper

5    removed herself from any involvement whatsoever

6    with the Rhoads homicide or Randy Steidl or

7    Herbert Whitlock's proceedings?

8            MR. TAYLOR: Objection, that's contrary

9    to the evidence.  That evidence --

10           MR. JOHNSTON: That's a sufficient

11   objection.

12           MR. TAYLOR: No, you don't need to tell

13   me when I have a sufficient objection.

14           MR. JOHNSTON: I don't want you making

15   another speaking objection.  We got a list of

16   them.  I'm sorry, did you finish the objection?

17           MR. BALSON: I would object to the

18   foundation of the question because 2005 is a long

19   time.  Can you be specific?

20           MR. JOHNSTON: That's what this thing

21   says, is late 2005, early 2006.

22           MR. BALSON: If you're saying late 2005,

23   okay.

24           MR. JOHNSTON: That's what I'm saying.

1     A.    I don't have any basis for believing

2     that that happened or confirming if Colonel Carper

3     indicated that that is what happened.

4     Q.    Well, what actions did Diane Carper take

5     in late 2005 and early 2006 that prevented the

6     prisoner review board from making their findings

7     or recommending to the governor that innocence

8     pardons should be granted?

9     A.    That ISP command still did not provide

10    the information that they had developed, which,

11    you know, I don't think the ISP has to have an

12    opinion with regard to clemency.  I think that

13    they would be required to provide all the

14    information to the governor's office based on

15    their investigation with the warts, etc.; the

16    mishandled improper initial investigation, the

17    lost or concealed evidence.  Harney's memos.

18    Callahan's memos.  Recommendation that it be

19    reopened.  Certainly their reluctance for four

20    years not to reopen the investigation.

21         Whatever it was that they had at that

22    point in time.  The fact that there was never

23    really any basis or any sound basis for Steidl and

24    Whitlock to become suspects initially.  Certainly

1     none that was documented.

2             And so you have all this information,

3     the recantations by the key witnesses, the failure

4     to follow-up investigations on somebody who was

5     considered a primary suspect from day one.  And

6     who should still be, according to various people,

7     considered a primary suspect today.  The failure

8     to do all of those things.

9             All that information should have been

10    available in one format or other to the governor's

11    office.  It was not.  Not that they refused to say

12    we recommend or we don't recommend, but simply all

13    the information that was developed in the course

14    of their investigation or their refusal to

15    investigate.

16    Q.    And it's your understanding that all of

17    the material that Callahan presented at the

18    January 9th, 2003 academy meeting was not

19    presented to the governor's office?

20    A.    I don't know what specifically was, was

21    not; whether -- I know that Callahan's initial

22    memo of 5-2-2000 was provided to assistant AG

23    Spence, and he got reprimanded for that, even

24    though he indicated he was following orders.

1          As far as the other memos, I don't

2     recall specifically what were provided; whether

3     Harney's memos which support Callahan's

4     conclusions were provided.  And certainly not the

5     totality of the investigation.

6          Q.    Can you read back -- sorry, are you

7     finished?

8          A.    Hasn't stopped you from interrupting in

9     the past.  Go ahead.

10          MR. BALSON: No, no, let's not banter; if

11     you're finished, you're finished.  Just tell him.

12          MR. JOHNSTON: Read it back, please.

13          (At this point the court reporter read

14     the requested portion of the record.)

15          MR. BALSON: I think that's a fair

16     answer.

17     BY MR. JOHNSTON:

18          Q.    Of course you do.  Is it your

19     understanding that Tim Harney's memo, and

20     Callahan's memo of May 17th and Callahan's memo of

21     May 2nd, and those materials were not presented to

22     the governor's office before late 2005 and early

23     2006?

24          A.    I don't know that they were.

1      Q.     Okay.  Do you know that by late 2005 and

2    early 2006 Callahan's memorandum of May 2nd, 2000

3    and May 17th, 2000, were already in the public?

4              MR. BALSON:  In the public?

5      Q.     Yes.  Public domain?

6              MR. BALSON: Public domain.

7      A.     Based on his, Callahan's lawsuit against

8    the Illinois State Police.

9      Q.     Sure.

10     A.     I'm sure that they probably were.

11     Q.     Do you know that in fact during Herbert

12   Whitlock's post-conviction proceeding Callahan's

13   memorandum were used as exhibits in 2005, spring

14   of 2005?

15     A.     No, sir.  I did not.  Certainly that

16   doesn't mean that the governor or his staff was

17   aware of it.

18     Q.     It certainly doesn't mean that they were

19   being hidden?  Marked as an exhibit and presented

20   to a judge?

21             MR. TAYLOR: Objection, arguing with the

22   witness.

23     A.     It doesn't mean that it was provided to

24   the governor or his staff at their request for

1    specific information.

2        Q.    Do you know if Diane Carper, prior to

3    late 2005 and early 2006, provided the State's

4    Attorney's appellate prosecutor with all the

5    documents that Callahan presented at the January

6    9th, 2003 academy meeting?

7        A.    I don't recall.

8        Q.    Do you know that in May of 2000 Diane

9    Carper faxed Michale Callahan's May 2nd, 2000

10   memorandum to the Attorney General's office?

11       A.    Say that again, please?

12       Q.    Read it back, please.

13             (At this point the court reporter read

14   the requested portion of the record.)

15       A.    I don't believe that was the case.  I

16   think that the May 17th -- my understanding is

17   that the May 17th memo may have been provided to

18   the

19   AGs office at that time, not the May 2nd.

20       Q.    Isn't it true that the May 17th

21   memorandum was faxed to the Edgar County State's

22   Attorney, Matt Sullivan, at the direction of Diane

23   Carper and Andre Parker?

24       A.    I recall something -- it may have, yes,

1   sir.

2        Q.    Let's go to 13.  The only ISP

3   investigation conducted other than his continuing

4   attempts to recharge or reconvict Steidl and

5   Whitlock was the DII investigation of late 2005

6   and early 2006 which was conducted under

7   Brueggemann's command, which was designed to

8   determine who released Marlow's critical e-mail to

9   the press, rather than to look into serious

10  allegations of police and prosecutorial

11  misconduct, creation and suppression of evidence

12  and camaraderie.  Ask you a couple questions about

13  that.  Particularly the phrase, "which was

14  conducted under Brueggemann's command."

15            Is it your understanding that by late

16  20005 and early 2006 Charles Brueggemann had

17  removed himself from any involvement relating to

18  the Rhoads murders or Steidl and Whitlock?

19       A.    I believe he so stated.

20       Q.    Do you have any evidence that he did not

21  remove himself from anything related to the Rhoads

22  murders or Steidl and Whitlock?

23       A.    I don't think -- well, a couple things.

24  I don't think it's practical that you can

1   accurately do that.  And then there was still

2   materials that were being sent to him directly

3   with regard to that, including the results of the

4   DII investigation into Marlow's e-mail.

5       Q.    Will you read back the question?

6             (Whereupon the reporter read the

7   requested portion of the transcript.)

8             MR. BALSON: He answered that question.

9   Would you read back his answer, please.

10            MR. JOHNSTON: I'm just asking what the

11  question was.  Take a chill.

12            MR. TAYLOR: In the past every time you

13  read it back --

14            MR. BALSON: Okay.  Never mind.

15            MR. JOHNSTON: Try the decaf; a little

16  jumpy.

17      Q.    The only document that you know of

18  relating to Steidl and Whitlock and the Rhoads

19  murders that Mr. Brueggmann received was the

20  investigation, the DII investigation, correct?

21            MR. TAYLOR: Objection in terms of time

22  frame.

23      A.    I'm aware of that specific example.  I

24  don't recall any other specifically.

1      Q.    Okay.  And as to that specific example,

2   the DII investigation, do you recall seeing

3   Charles Brueggemann's memo stating that he had

4   removed himself from Steidl and Whitlock and the

5   Rhoads murders, and he had not reviewed the

6   investigation or its attachments?

7      A.    I recall a comment that he made

8   forwarding that to some other deputy or lieutenant

9   colonel.  That's all.

10     Q.    Are you aware that lieutenant colonel

11  Mike Snyders prevented all information regarding

12  the Rhoads homicide and Steidl and Whitlock from

13  reaching Colonel Brueggemann, except for this DII

14  investigation?

15          MR. BALSON: Object to the form.

16     A.    No, sir, I'm not aware of that.  And I

17  think that that would be virtually impossible.

18     Q.    Do you know Lieutenant Colonel Michael

19  Snyders?

20     A.    No, sir.

21     Q.    Ever met him?

22     A.    No, sir.

23     Q.    Ever hear him talk?

24     A.    No, sir.

1      Q.      Know anything about the man?

2      A.      No, sir.

3      Q.      Do you know how many tons of marijuana

4    he seized from drug runners?

5              MR. BALSON: Does this have something to

6    do with this case?

7      Q.      Yep.

8      A.      No, sir.

9      Q.      Do you know if Michael Snyders was given

10    the instructor of the year award from the drug

11    interdiction assistance program multiple times?

12     A.      No, sir.

13     Q.      Ever met Charles Brueggemann?

14     A.      Not knowingly.

15     Q.      Ever do anything to learn -- well,

16    strike that.

17             Outside of the attorneys, did you ever

18    ask anybody about Charles Brueggemann's

19    reputation?

20     A.      I don't recall any information about Mr.

21    Brueggemann, other than through the materials

22    provided through this case.

23     Q.      Do you know who Charles Brueggemann's

24    administrative assistant is?

1        A.    I'm sure he has had several through the

2   course of his different positions.  What time are

3   you speaking?

4        Q.    Are you assuming he has had several?

5        A.    I said I'm assuming that he has had

6   several.  Of what time are you speaking?

7        Q.    Between -- let's say, January 9th, 2003

8   and today, do you know who Charles Brueggemann

9   administrative assistant is?

10       A.    Not offhand, no, sir.

11       Q.    Know anything about her?

12       A.    I said not offhand, no, sir.

13       Q.    Know anything about Michael Snyders

14  administrative assistant?

15       A.    Not offhand, no, sir.

16       Q.    Let's take a quick break.

17             (Break taken at 3:54 PM.)

18             (Deposition resumed at 4:09 PM.)

19  BY MR. JOHNSTON:

20       Q.    Back on the record.  Mr. Waller, do you

21  know what Tim Harney -- do you know what documents

22  Tim Harney relied upon to draft his September 2001

23  memorandum?

24       A.    As best I understand, it was the same

1 materials that Lieutenant Callahan had when he

2 drafted his May 2nd, 2000 memo.

3   Q. Which was the case file, right?

4   A. Yes, sir.

5   Q. And --

6   A. Because they were precluded from doing

7 any further investigation.

8   Q. Tim Harney was precluded from doing

9 further investigation?

10   A. ISP personnel were precluded, as I

11 understand it.

12   Q. Any idea if -- strike that.  Do you know

13 if Tim Harney believed he was doing an

14 investigation?

15   A. He was an intelligence analyst, or is an

16 intelligence analyst, so my understanding that was

17 acceptable, and was not considered an active or

18 operational aspect of an investigation.

19   Q. Do you know if Tim Harney believed that

20 his actions were part of an ongoing investigation?

21   A. I don't know what he believed, sir.

22   Q. And did you know if the case file that

23 Tim Harney reviewed had been provided to Steidl

24 and Whitlock's attorneys before September 2001?

1     A.    No, I don't.

2           MR. TAYLOR: For September 2001?

3     Q.    Correct.

4           MR. TAYLOR: That's the date on the memo.

5     Q.    It's not September 1st, right?  The case

6     file.

7           MR. TAYLOR: I'm sorry, I thought you

8     said the document.

9     Q.    No, the case file.  Do you know of any

10    written document before June 16th, 2003, in which

11    Callahan says he was not allowed to write reports

12    regarding the Rhoads homicide?

13    A.    Any written documents?

14    Q.    Correct.

15    A.    He was ordered not to write reports, so

16    there wouldn't be any.  I think what he put the

17    information in was -- if anything, were the memos.

18    Q.    What I'm asking you is, is there any

19    documentation in writing that shows that he was

20    ordered not to write a report?

21          MR. BALSON: Could you read that question

22    back.

23          (At this point the court reporter read

24    the requested portion of the record.)

1          MR. BALSON: Let me make an objection

2    because to the extent that question is different

3    from the previous question.  The previous question

4    said prior to June of '03.

5        Q.    That's fair.

6          MR. BALSON: There's obvious all sorts of

7    things in writing now.

8        Q.    That's fair.  Let me amend the question.

9    Do you know of any written documentation Callahan

10   created before January 16th, 2003, where he states

11   that he was ordered not to write reports?

12       A.    I don't recall any off the top of my

13   head.

14          MR. JOHNSTON: Beth, you ready?  I have

15   no further questions.

16                   EXAMINATION BY

17                    MS. EKL:

18       Q.    Good afternoon, Mr. Waller.

19       A.    Good afternoon.

20       Q.    We will try to keep this as brief as

21   possible.  I just have some follow-up questions to

22   the questions that Mr. Taylor asked you about this

23   September 27th, 2009 letter.  I believe that you,

24   in response to his questions, articulated some new

1    opinions that we didn't discuss prior to Mr.

2    Taylor asking you questions.  Do you remember

3    that?

4            MR. TAYLOR: I object to that

5    characterization, but --

6       A.    Yeah, I wouldn't agree with that

7    characterization either.  I recall responding to

8    the questions from Mr. Taylor.

9       Q.    Okay.  Well, let me go through these

10   specifically.  Mr. Taylor asked you about number

11   one in the letter, which states whether these

12   defendants fabricated, coerced, suggested to and

13   manipulated witnesses, particularly Darrell

14   Herrington, Deborah Reinbolt and Ferlin Lester

15   Wells, and just backing up a little bit.  This is

16   in relation to the defendants Parrish, Ray,

17   Eckerty and McFatridge, and it says and other

18   Paris and ISP investigators who played a secondary

19   role.  Do you see that portion of the letter?

20      A.    Yes, ma'am.

21      Q.    And I believe that you told Mr. Taylor

22   that you did have an opinion regarding that

23   particular issue, correct?

24      A.    No.  I thought that it was clear that I

1    indicated that that was part of my opinions,

2    already part of my opinion report.

3        Q.     And your opinion was that the defendants

4    did in fact fabricate, coerce, suggest to and

5    manipulate witnesses, particularly Darrel

6    Herrington, Deborah Reinbolt and Ferlin Lester

7    Wells?

8        A.     Yes, ma'am.

9        Q.     You are aware that each of those

10   allegations has been denied by the defendants in

11   this case, correct?

12             MR. BALSON: Objection to the phrase,

13   "defendants".  Which defendants are you talking

14   about?

15       Q.     The ones that I just referenced;

16   defendants Parrish, Ray, Eckerty and McFatridge

17   and any other Paris and ISP investigators who

18   played a secondary role.

19       A.     I would be surprised if they hadn't.  I

20   don't recall specifically looking at the denial

21   for that.  But --

22       Q.     Did you have a chance to read the

23   testimony, any of the testimony of Darrell

24   Herrington?

1     A.     The interview by Marlow and -- let's

2   see, I think that's all that I had.

3     Q.     Are you aware that Mr. Herrington has

4   never testified under oath that the defendants in

5   this case fabricated, coerced, suggested to or

6   manipulated him?

7          MR. TAYLOR: Objection, that certainly is

8   not -- that is your conclusion, but it certainly

9   isn't the only conclusion that can be drawn from

10   the various testimonies and statements that he has

11   given.

12     A.     Under oath I don't recall any.  I recall

13   statements made by him that what he testified to

14   wasn't the truth.  And I believe that -- at least

15   anecdotally he had told other people that he had

16   not told the truth; that it didn't occur the way

17   he said it occurred, and I think he had some

18   unkind references to Reinbolt.  But, that was all

19   anecdotal.

20     Q.     Okay.  I'm asking specifically because

21   I'm trying to focus on the fact that my clients in

22   this case are being charged with wrong doing, so

23   whether or not Darrell Herrington told a lie isn't

24   my question, just so that it's clear.

441

1          My question is whether Darrell

2     Herrington has ever, to your knowledge, indicated

3     that the defendants in this case fabricated,

4     coerced, suggested to or manipulated him?

5          A.    Whether he specifically said in those

6     words, no.  Were his actions consistent with that

7     conduct?  Yes.

8          Q.    Have you read the deposition of Debbie

9     Reinbolt that was taken this year in relation to

10    these civil cases?

11         A.    Yes, sir; ma'am.

12         Q.    Are you aware that she denied that her

13    statements were coerced or manipulated by the

14    police?

15         A.    Well, her deposition said that they were

16    not.  One of her recantations indicated that it

17    was.  And then also the conversation with, I

18    believe it was Philip Sinclair.  He indicated that

19    she made it up for the purpose of obtaining the

20    reward, or was hoping to get the reward, and then

21    kind of got sucked into it.  But all she gave the

22    police was the information that they would give

23    her, and that's what -- and that would be

24    consistent with the development of her story, or

1    her stories, from the first day, February 16th,

2    1987, which was not reported, to the subsequent

3    interviews and statements where I mean such things

4    as Steidl isn't mentioned, and Steidl becomes a

5    part of it.  She is not involved, just casually

6    witnesses Whitlock at that location.  Then the

7    next thing you know she's holding down Karen

8    Rhoads while she's being stabbed.  She provides

9    several different versions of where she got the

10   knife.

11            So, I would have to look it up.  But I

12   think Agent Marlow had a very colorful description

13   of her testimony and credibility.  And it wasn't

14   very kind.

15       Q.    My question was specific to whether you

16   read her deposition.  So, again, I'm trying to

17   move quickly through this.  I know there is a lot

18   of things that you want to say, I don't want to

19   cut you off, but you have a tendency to go on and

20   say things that have nothing to do with the

21   question.  I believe you answered the question and

22   then --

23            MR. BALSON: I object to that.

24            MR. JOHNSTON: Don't interrupt her.

1      Q.     Can you let me finish?  I just ask that

2  you listen carefully to my question and answer

3  only what I'm asking you.  Counsel can follow up

4  and elicit more information if they feel it's

5  necessary, but we are going to be here a lot

6  longer if you go on these diatribes.

7          MR. TAYLOR: Objection.

8      Q.     Did you have an occasion to read the

9  deposition of Ferlin Lester Wells?

10     A.     Yes, ma'am.

11     Q.     And are you aware that during his

12  deposition testimony, and again I'm asking you not

13  to get into whatever else, it's a simple yes or no

14  question, during his deposition did he -- is it

15  not correct that he denied that he was ever

16  coerced or manipulated into testifying in the

17  manner that he did at trial?

18          MS. SUSLER: Objection, mischaracterizes

19  his testimony.

20     A.     I didn't understand your question at

21  all, ma'am.

22     Q.     Sure.  In his deposition testimony, are

23  you aware that he denied the defendants ever

24  fabricated, coerced, suggested to or manipulated

1    his testimony?

2            MS. SUSLER: Same objection.

3       A.    I don't recall that specific question

4    being asked.

5       Q.    What is it about your qualifications

6    that uniquely qualifies you to render an opinion

7    regarding the factual issue of whether or not the

8    defendants in this case fabricated, coerced,

9    suggested to or manipulated witnesses?

10           MR. TAYLOR: Objection to the form of the

11   question.  Go to the use of the word "unique".

12      A.    That's not my job, ma'am.  My job is to

13   show the actions of the police; were they

14   consistent or inconsistent with various stated

15   practices, policies and procedures, ethical

16   guidelines, etc.

17      Q.    I think we can all agree that if a

18   witness is -- if the defendants fabricated,

19   coerced, suggested to or manipulated witnesses,

20   that that is not in accordance with proper police

21   procedures.  You are opining that the defendants

22   in fact engaged in that conduct, so I am trying to

23   determine what uniquely qualifies you as an expert

24   to testify to that?  Now, if you're agreeing with

1    me that that is a question for the jury, then I

2    guess we would all be in agreement that that is

3    something that you shouldn't be allowed to opine

4    during trial.  So I will go back to my question,

5    which was --

6              MR. BALSON: I'm going to make an

7    objection to that statement and instruction, that

8    that isn't something that he should be allowed to

9    opine.  There is no -- nothing in the rules which

10   prevents a witness from opining to an issue which

11   will ultimately be decided by a jury.  That's an

12   incorrect statement of the law.  And we do not all

13   agree at that.  And other than that, I would hope

14   that you would refrain from trying to tell this

15   witness what the law is relative to what experts

16   can and can not opine to.

17        Q.    Well, do you believe that there is any

18   more qualifications that you have, other than the

19   jury, to make that determination?

20        A.    Which determination, ma'am?

21        Q.    That whether the defendants fabricated,

22   coerced, suggested to and manipulated witnesses,

23   particularly Darrell Herrington, Deborah Reinbolt

24   and Ferlin Lester Wells?

1              MR. BALSON: Object to the form.

2         A.    Are you saying that I am specifically

3    stating that as an opinion?

4         Q.    Well, you tell me.  I thought you stated

5    that that was your opinion.

6         A.    No, these are issues that were included

7    in my opinions.  And those are considerations that

8    I made when I drafted my opinion letter.  That's

9    what I said.

10        Q.    Okay.  And that's where I go back to, I

11   was asking you if these were actual opinions,

12   because that's the way the question was phrased by

13   Mr. Taylor was whether that was your opinion.  And

14   so if I'm now clarifying, this isn't your opinion;

15   you're basing your opinions on what you believe to

16   be these issues?

17             MR. TAYLOR: Objection to form.

18             MR. BALSON: Objection to that, that

19   misstates his testimony.

20        Q.    That's my question.

21             MR. BALSON: Well, the question misstates

22   his testimony.

23        A.    Could you repeat the question, please.

24             (At this point the court reporter read

1       the requested portion of the record.).

2               MR. BALSON: I don't really understand

3       that question.  I object to the form.

4               A.    I'm not sure I really understand what

5       you're asking.

6               Q.    Is number one an opinion or is that

7       something that you based an opinion on?

8               A.    It was an issue that I wanted to address

9       in my opinion reports.  I think that it's covered

10      in them.  I didn't specifically say what is said

11      in item number one.  And I'm not saying that these

12      are my opinions.  I said these issues are

13      reflected in my opinions.

14              Q.    Okay.  I believe Mr. Taylor also asked

15      you about issue number two, whether competent

16      police investigators would recognize Herrington,

17      Reinbolt and Wells to be completely incredible,

18      unreliable and unworthy of belief.  Similar to

19      issue number one, are you rendering an opinion

20      regarding issue number two, or is that something

21      you considered in rendering your opinions?

22              A.    Well, again, I think it's reflected in

23      my opinions. And I could go forth.  But I think

24      that -- the best attempt at brevity, I think it's

 1    reflected in my opinions.  And certainly reflected

 2    by anecdotally by other law enforcement personnel

 3    and investigators who have looked at the case.

 4         Q.    When you have looked at the case in

 5    reference to defendants Parrish, Ray, Eckerty and

 6    McFatridge, and considering the issue of whether

 7    or not they should have recognized Herrington,

 8    Reinbolt and Wells to be credible or incredible,

 9    do you look at it taking into consideration all

10    the facts that were provided to you, or did you

11    look at it from the standpoint of the facts that

12    were known to those investigators at the point in

13    time when the defendants were arrested?

14         A.    I guess I looked at it from the point of

15    view of would a competent professional officer,

16    knowing the same facts as those investigators at

17    the time, would they come to that conclusion.  And

18    you have the town drunk.  You have a drug addict

19    drunk, severe mentally disturbed individual.

20              You have, you know, whatever the

21    motivations were, it certainly wouldn't be a case

22    where I think a competent, professional

23    investigator would have relied on to, those two

24    witnesses would have relied on to make a case.

1    So, and I think that's reflected in my opinion

2    report.

3        Q.    Is it your opinion that a person who, as

4    you said is mentally disturbed, could not ever

5    provide competent testimony?

6        A.    Did I say that?  I did not say that.

7        Q.    That's my question.  Okay.  So the

8    answer is no?

9        A.    I did not answer that question.

10            MR. BALSON: He didn't say no.

11       Q.    Well, then could you answer the

12   question?

13       A.    That person may be able to give

14   information about what they saw or observed.  And

15   you would have to determine the credibility of

16   that within the totality of the circumstances.  If

17   that person said initially the carpet is blue.

18   And then they say no, it's red.  Then they say

19   it's green.  Then they say no, it's blue.  And you

20   go and look at the carpet and it's none of those

21   colors.  Then obviously that person -- you know is

22   not reliable or credible.

23            And, you know, you rely on what that

24   person, you know, when you're interviewing and

1    interrogating, you're not supposed to be giving

2    information, you're supposed to be obtaining

3    information.

4            And I think as Eckerty said, there's

5    only two ways to get it.  These people had to be

6    there or they got the information from the

7    investigators.

8        Q.    If a law enforcement officer comes

9    across a drunk person, a person who is

10   intoxicated, and that intoxicated person is trying

11   to provide them with information, do you think

12   that law enforcement officer has any duty or

13   responsibility in relation to the collection of

14   that evidence from this person?

15           MR. BALSON: Object to the form of the

16   question, and the hypothetical.

17           MR. TAYLOR: This was all gone into in

18   the first deposition as well, and I think we are

19   going over the same ground, and I object on that

20   basis as well.

21       A.    I think it was covered last Friday ad

22   nauseum, and also I don't understand your

23   question.  Now, what are you specifically asking

24   for?

1    Q.    I'm asking you what a competent police

2    officer should have done in relation to gathering

3    information from a person who first comes to them

4    in an intoxicated state?

5         MR. TAYLOR: Same objection.

6         MR. BALSON: I'm okay with that question.

7    A.    Comes to them?  If they're talking about

8    the biggest case of the century or whatever, a

9    major homicide, I think you have an obligation to

10   document whatever they say.  And certainly to

11   follow-up at a later time when they're in a

12   different place.  Whether they're sober or what

13   have you.

14        But, certainly a competent professional

15   officer on a double homicide, where you have no

16   information of somebody starting to talk about it,

17   you definitely document that information

18   contemporaneously about what they're talking

19   about, with what they're saying.

20   Q.    And would you agree that a competent

21   police officer should reinterview that person when

22   they are in a sober state to determine the

23   credibility of the information they received from

24   the person when they were in an intoxicated state?

1        A.      Well, certainly in a sober state, and

2    that would -- I mean, it would also imply that you

3    weren't giving them alcohol, so that would impact

4    the condition they were in when you were

5    questioning them.  If the purpose is, you've

6    already got information from them when they were

7    obviously intoxicated and impaired, and you want

8    to try to compare that with what you get when

9    they're not impaired, then you don't make -- give

10   the person alcohol to make them impaired again.

11   You make it so that he's not in an impaired state.

12       Q.      And that was my question.  You would

13   want to talk to him when he's not in an impaired

14   state, correct?

15       A.      Yes, ma'am.

16       Q.      Would you agree that in the course of an

17   investigation there's certain -- it's proper for

18   law enforcement officers to try to safeguard the

19   other -- let me rephrase this.  To try to keep

20   certain information private from the public until

21   the crime is solved?

22       A.      That's the standard practice, ma'am.

23       Q.      And that, for instance, if you had an

24   eyewitness that came forward, and it was a break

1    in the case, you may not want that information to

2    get out to the public immediately?

3           MR. TAYLOR: I'm going to object again.

4    This is not -- this is questions that could have

5    or were gone into in the first deposition.  I

6    don't think they arise from the letter.

7           A.    Could you repeat the question, please.

8           Q.    Sure.  Would you agree that it would be

9    important for a law enforcement officer that if a

10   person came forward and was a break in the case,

11   that it may be important for the law enforcement

12   officers to keep that person's identity and the

13   fact that they came forward out of the public

14   domain until they have a chance to develop more

15   evidence, and actually solve the crime?

16          MR. BALSON: You're speaking in a general

17   sense?

18          Q.    Right.  Right.

19          A.    Yeah, you probably wouldn't want to put

20   that in the paper and, you know, and list

21   specifically what information they gave you,

22   particularly if the original information was

23   conflicting with subsequent information.  But,

24   that information should go into police reports and

1    should go to the prosecutor.

2         Q.    And that's not my question.   You

3    answered the first part of the question.   Would

4    you agree that in a proper investigation, law

5    enforcement shouldn't just stop after one person

6    comes forward and says, you know, I know about the

7    crime, that this doesn't necessarily mean the end

8    of the investigation.

9         A.    The purpose of an investigation is to

10   determine the truth about what happened, ma'am.

11        Q.    And would you agree that there is a

12   number of law enforcement tools that can be used

13   to help determine the truth?

14        A.    Are you referring to polygraphs?

15        Q.    I'm just saying in general.

16        A.    I don't understand your question.   I

17   mean, the most basic one is to do subsequent

18   interviews after you've recorded them and look for

19   any inconsistencies.   That's the most basic.   The

20   other one is to look at any evidence and document

21   any discrepancies.   Obviously then you have other

22   things such as polygraphs, and particularly if you

23   really question the credibility of that particular

24   purpose.

1      Q.     And would another investigative tool be

2    the use of an eavesdrop?

3      A.     It could.  But, you know, then you have

4    an obligation to include that in the file.

5      Q.     Okay.  And taking aside, I know that you

6    want to talk about the documentation, I'm talking

7    specifically about the investigation; if a law

8    enforcement officer intends to do an eavesdrop of

9    a potential suspect, wouldn't you agree that it's

10   important to keep the plan or the -- the plan to

11   conduct the eavesdrop secret from the person who

12   is the subject of the eavesdrop?

13          MR. BALSON: I'm sorry to interrupt, but

14   you prefaced that question by saying I'm asking

15   specifically about the investigation.  I don't

16   know what that means.

17     Q.     I'm sorry.  Let me rephrase.

18   Specifically about an investigation, as opposed to

19   documentation of the investigation?

20     A.     That didn't help.

21     Q.     You keep tending to want to talk about

22   -- you keep answering my question, then going on

23   and talking about documentation.  I'm just talking

24   about the course of an investigation at this point

1    in time.   Investigative tools that can be used.

2            So my question was specifically in

3    regard to keeping the identity of an informant or

4    person who is going to be used in a wire secret

5    from a potential suspect who is the subject of the

6    wire?

7            MR. TAYLOR: Beth, I'm going to object,

8    and my objection is I'm looking at this letter,

9    and can you tell us where this question fits into

10   anything that's --

11       Q.    Yeah, number eight and number nine,

12   which talks about an inadequate investigation.

13           MR. TAYLOR: Okay.   Thank you.

14       Q.    But I'm talking in general, I haven't

15   gotten to that yet, but that's what this is

16   leading up to.

17       A.    You would record it, not necessarily

18   release it.   So, you would have a factual basis

19   for subsequent comparisons.   So you would have,

20   certainly in a drug investigation, for example,

21   you're not going to tell the person we have a

22   confidential informant that's going to want to

23   talk to you.   So, just for fundamental fairness,

24   just so you're aware.   Obviously you're not going

1     to do that.  But, you document the credibility of

2     the reliability of your informant, and then you

3     keep track of that informant, what they're doing,

4     where they're going, who they speak to, da, da,

5     da, and that's all documented and included in the

6     file.  And if you get inculpatory evidence or

7     information you put that in the file.  If you get

8     exculpatory evidence or information you put that

9     in the file so that you have a basis for

10    subsequent comparison.

11        Q.    But my question was, it's important to

12    keep the identity of the informant secret from the

13    potential suspect, correct?

14        A.    I answered your question, ma'am.

15        Q.    It's a yes or no.  You talked about

16    documentation.  I'm asking you --

17        A.    I said of course you would not reveal

18    the confidential informant to the person you were

19    trying to get information from.

20        Q.    Okay.  That's my question.

21        A.    That's what I answered you.

22        Q.    You reference, you made reference to

23    what you called the town drunk.  Would you agree

24    there are certain circumstances in which a person,

1    even if they are by all accounts the town drunk,

2    could be a reliable witness?

3        A.    I made reference to him based on

4    references that were made by pretty much everybody

5    who knew him, that he had reliability issues, and

6    he was known as the town drunk.

7        Q.    I'm talking generalities.  I think you

8    are talking specifically.  I'm saying in general,

9    in an investigation, someone who could be

10   characterized as a town drunk, or in other words,

11   an alcoholic or person who drinks a lot?

12           MR. TAYLOR: I'm going to object.  That

13   is an incomplete hypothetical in terms of the

14   facts of this case.

15       Q.    I'm saying is there a factual scenario

16   under which a person who could be a called a town

17   drunk or who is an alcoholic or who drinks a lot

18   could be a competent witness?

19           MR. BALSON: I'll have to join in that

20   objection.  It is not a proper hypothetical in

21   this case.  It's incomplete.

22       A.    Again, I'd need more information.

23       Q.    Well, my question is, is there a

24   scenario where you could, where that person could

1    be competent?  Any scenario?

2         A.    I would need more information, ma'am.

3         Q.    Well, the fact that a person is an

4    alcoholic or is considered the town drunk, does

5    that necessarily make them unreliable?

6         A.    Not per se.  But, again, you would have

7    to have additional information before you could

8    determine that they were reliable or credible.

9         Q.    Okay.  And one of the techniques that

10   law enforcement officers could use to determine

11   the credibility of that information would be to

12   see whether or not the person they have pointed

13   out as a suspect, say makes a statement admitting

14   that they were involved in the crime?

15        A.    Again, I mean that could be in part.

16   But, that's an incomplete hypothetical.  And

17   certainly you would need a lot more information

18   than that.  You know, if you're going to -- if you

19   have a person with credibility issues initially,

20   you have a lot to overcome.  And you need to keep

21   that sanitary.  You need to document it as you go

22   along to keep it sanitary.

23        Q.    Would you agree that one of the things

24   you would want to do, and I believe if I restate

1   you correctly, you stated this earlier, is to see

2   if there's consistency among the statements that

3   they make to law enforcement over say repeated

4   interviews?

5       A.    That's one thing.  But you have to start

6   with the documentation of the first statement,

7   particularly if it significantly changes from the

8   first to subsequent ones in any manner.

9       Q.    Well, assuming that we're talking about

10  the totality of what's known to say one law

11  enforcement officer, we'll call him officer A;

12  regardless of whether the first interview is

13  documented or not, officer A is involved in three

14  interviews.

15          Would you agree that he would want to,

16  in helping him determine whether this alcoholic or

17  town drunk is credible, he would want to see

18  whether there's consistency among the three

19  interviews, of which he is aware?

20      A.    I think that's typical law enforcement

21  tactic or technique.

22      Q.    And would you agree that just because

23  someone has an inconsistency won't necessarily

24  make them incompetent?

1        A.      It may or may not.  It depends on the

2   basis and it depends on a bunch of other things.

3        Q.      That it's all based on the totality of

4   each particular circumstance, correct?

5        A.      The totality of circumstances.

6        Q.      And when trying to determine the

7   competency of witnesses, would it be a fair thing

8   for that law enforcement officer to look at if

9   there's corroboration for the facts that are given

10  by the witness?

11       A.      Definitely.

12       Q.      For instance, if the witness describes a

13  crime scene, the law enforcement officers would

14  want to compare that to facts that are known about

15  the crime scene to see if they're consistent?

16       A.      Certainly.

17       Q.      Would you agree that a person who is a

18  jail house snitch is not necessarily an

19  incompetent witness?

20       A.      They may not be.  But, I think there

21  would be a presumption that before you could act

22  on what they said you would have to validate that

23  information in some way; verify it, corroborate,

24  validate, what have you.

1     Q.    Would you say that that is basically

2  what you would want to do in regard to any

3  witness?  You would want to try to corroborate

4  what it was that they were saying?

5     A.    Certainly.  Do they have a motive?  For

6  example, a reward?  Do they have, are they aware

7  of information that may have been leaked either

8  intentionally or unintentionally?  So when you

9  evaluate that information, what do they know about

10 the crime scene?  First of all, how many people

11 were at the crime scene?  Oh, it's a volunteer

12 fire department in this case.  So there's a lot of

13 people that were there.

14        So, some of that information is probably

15 very widely known public.  Is there something

16 else?  Who are the likely suspects?  Well, in this

17 case, for example, the officers rousted Steidl and

18 Whitlock.  So, okay, let me give them Steidl and

19 Whitlock.  Or Jim and Ed.  You know, then you want

20 to look at the consistency in statements and then

21 the availability of that information.

22    Q.    One of the questions that Mr. Taylor

23 asked you about, I think specifically he asked you

24 questions about number nine, talking about, I'm

1    sorry, number eight, which was another question

2    and it dealt with whether there was a policy and

3    practice of the City of Paris.

4         And I think that I covered this

5    extensively in the last deposition, but I just

6    want to make sure that we're clear.   In regard to

7    any opinions you have regarding policy and

8    practice, any opinions at all in this case, is it

9    accurate to say that all of those opinions are

10   based on what you have reviewed in relation to the

11   investigation in this particular case, meaning the

12   Rhoads investigation?   As opposed to any other

13   murder or robbery or any other case that was

14   investigated in the Paris police department?

15        MR. TAYLOR: Excuse me, I object; that is

16   because his prior testimony was, maybe you mean

17   this, and that is not just the conduct of the

18   investigation in this case, but the training and

19   all the background --

20        MS. EKL: Can you let him answer the

21   questions?

22        MR. TAYLOR: No, not if you're going to

23   ask a question like this.

24        MS. EKL: You don't get to answer, Flint.

1    I'm asking him to clarify, you don't get to answer

2    for him.

3              MR. TAYLOR: I object and instruct him

4    not to answer.  You asked and answered last time

5              MR. JOHNSTON: You're instructing him not

6    to answer?

7              MR. RAUB:  Is there an attorney client

8    privilege?

9              MS. EKL: I'm asking regarding a

10   question -- well, regarding issue number eight,

11   which Mr. Taylor asked you about specifically at

12   the end at approximately 6:30 on last Friday,

13   which states whether there is inadequate and/or

14   corrupt investigation which had from the beginning

15   the active participation of the Paris chief of

16   police, Gene Ray, therefore constituted a policy

17   and practice of the City of Paris.  Do you see

18   that issue?

19        A.    Yes, ma'am.

20        Q.    I believe that you testified in response

21   to Mr. Taylor's question that you believe that A,

22   that there was an inadequate and/or corrupt

23   investigation, correct?

24        A.    That there was?

1     Q.     Correct.

2     A.     Yes, ma'am.

3     Q.     And you also testified, I believe, and

4     correct me if I'm wrong, that you thought that

5     therefore constituted a policy and practice of the

6     City of Paris?

7     A.     No, ma'am.  I said the totality of all

8     of that.  The awareness by the chief policy maker

9     of what was going on; that interviews were being

10    conducted and not reported.  That information was

11    provided which contradicted other information, was

12    not further investigated.  Information about

13    another major suspect that was not followed up on.

14           The statement by Chief Ray that

15    acknowledging that no reports were made of the

16    first interviews of Mr. Herrington and Miss

17    Reinbolt, and also acknowledging -- if there's no

18    reports, then the defense can't -- they don't know

19    what to make inquiries about.  So they're not

20    going to be aware of that.

21           So, he was very much aware.  Also, the

22    investigators indicating that they were not

23    trained.  And we went through that ad nauseum.

24    But, their statements were they received no

1    training in criminal investigation.  The

2    acknowledgement of Detective Parrish that he

3    really didn't know what a Brady violation was or

4    anything about it.

5          So, those were all indications that you

6    take one investigation encompassing thousands of

7    man hours, hundreds of reports over a period of

8    over a year, even post conviction where you are

9    still getting information, and still concealing

10   it, that would indicate the inadequate or corrupt

11   investigative practices of, as a pattern and

12   practice of the City of Paris police department.

13   Q.    Are you aware of any evidence to show

14   that there was any inadequate investigations

15   conducted by any members of the Paris police

16   department prior to July 6th of 1986?

17         MR. TAYLOR: Objection, asked and

18   answered at the prior deposition.

19   A.    I don't believe so, ma'am.

20   Q.    Were you aware of any investigations

21   that were conducted by any members of the Paris

22   police department prior to July of 1986 that

23   evidenced a corrupt -- that were corrupt?

24   A.    Again, anecdotally by other people

1    indicating that the City of Paris was corrupt.  It

2    was in the pocket of Robert Morgan.  That Robert

3    Morgan could influence the course of an

4    investigation.  Those were all anecdotal bits that

5    would indicate the reputation for.  But as far as

6    specific investigations, or reports of

7    investigations, the only one that comes to mind

8    would be the Stark suicide, which wasn't really

9    incorporated into, although he was considered to

10   be a primary suspect, and physical evidence was

11   submitted, it seems like that information about

12   that was kind of subverted.

13        Q.    You are aware that the Stark

14   investigation took place in January of 1987 --

15        A.    Yes, ma'am.  Before --

16        Q.    My question was before?

17        A.    Before what?

18        Q.    Before July 6th of 1986.

19        A.    Okay.

20        Q.    You've testified that you believe this

21   investigation was inadequate or corrupt.  Do you

22   have an opinion as to whether it was one or the

23   other?  I think in every question that's been

24   lumped together.  Can you distinguish between the

1  two?

2      A.     I think that it certainly was

3  inadequate.   Those aren't mutually exclusive

4  terms.   And you can conduct an inadequate

5  investigation to conceal the intent to corrupt the

6  investigation.   So, certainly the withholding of

7  evidence, the multiple stories, the failure to

8  document, all those, you know, you could say are

9  inadequate and you could also say they were

10  corrupt.

11      Q.     My question is, is what is your opinion?

12  Is your opinion that they were in fact corrupt and

13  inadequate?   Or that you don't know which of the

14  two, but it's one of the two?

15          MR. BALSON: Object to the form.

16      A.     I believe that it would be consistent

17  with a corrupt investigation by the failure to do

18  a substantive investigation into Robert Morgan as

19  a primary suspect.   I would think that the

20  concealment of and the failure to do initial

21  documentations of the interviews, even though this

22  is particularly by Parrish.   Parrish testified

23  under oath in his deposition that he knew he is

24  supposed to report everything.   He deliberately

1    did not do reports of the first contact with

2    Reinbolt and the first contact with Herrington.

3            So, it's consistent with a corrupt

4    investigation.

5        Q.    My question is, is do you have an

6    opinion that it is in fact a corrupt

7    investigation, not whether it is consistent with?

8    And maybe there is no distinction, but are you

9    saying that it's consistent with or that you

10   believe in this particular case there was a

11   corrupt investigation?

12           MR. BALSON: Asked and answered.

13       A.    I think it's consistent with.  I don't

14   know, I mean certainly if their motivation was to

15   protect Morgan, and they were being paid off in

16   some manner, then certainly.  But, I don't know

17   their specific motive.  It was consistent with a

18   corrupt investigation.

19       Q.    And do you have any evidence to show

20   that they were in fact paid off in this case?

21       A.    No, ma'am.  Parrish and Eckerty -- no.

22   I think that is an issue with, to decide about

23   McFatridge, and possibly Ray, with subsequent

24   employment through Morgan.  But, I don't have any

1    specific information about Eckerty or Parrish.

2       Q.    Would you agree that a proper

3    investigation of a homicide case maybe with an

4    unknown suspect initially may be to start with

5    interviewing neighbors, friends and co-workers?

6          MR. BALSON: I object, wait a minute; to

7    the extent that is a general question, I object to

8    the form.  And to the extent it's a hypothetical,

9    it's incomplete.

10      Q.    If there are no known suspects to a

11   homicide, in general who should a law enforcement

12   officer begin interviewing?

13      A.    Again, friends and family members;

14   neighbors, people who may have had the opportunity

15   to see something.  And you document that.  But,

16   you know, and you don't know where it's going to

17   turn up, particularly when it's at the who-done-it

18   stage, so you make sure you document.  That's

19   critical.  You don't make value assessments that

20   somebody is nuts on the one hand, and so you don't

21   take a statement from a potential witness that

22   links potentially much better suspects than the

23   ones that were subsequently rousted a few days

24   later.  And then get a critical witness who is

1    nuts, and say that that person is very credible,

2    and document a great deal of what she says.  I

3    mean, if you compare what they did with Mary

4    Eastham and Deborah Reinbolt, both of them are

5    described as mentally challenged.

6           And yet, the one is the primary witness

7    in the prosecution and the other one isn't even

8    recorded as giving what could have been

9    substantial evidence.

10    Q.    Although my question was actually in

11    relation to an investigation in general, I do want

12    to ask you a question about Mary Eastham.  Did you

13    read her deposition transcript?

14    A.    No, ma'am.

15    Q.    Okay.  Are you aware by perhaps talking

16    to counsel, that Mary Eastham denies that she ever

17    spoke to any law enforcement officers at the time

18    of the investigation?  Initial investigation when

19    they were canvassing?

20           MR. TAYLOR: Objection, misstates the

21    evidence.

22    A.     I'm not aware of that, but I'm aware

23    that Charlie McGrew said he acknowledged talking

24    to her and that she was a 1096, that's why he

1    didn't write it.

2        Q.    Are you aware that Mary Eastham

3    specifically denied that the people that she now

4    claims that she saw outside of the Rhoads house,

5    that those people were the Board brothers?

6              MR. TAYLOR: Objection.

7              MR. BALSON: Objection.

8              MS. EKL: What is the basis for the

9    objection?

10             MR. TAYLOR: Same objection.

11             MS. EKL: I strongly disagree with that.

12             MR. BALSON: Misstates the evidence.

13       A.    I'm not aware of what she testified to,

14   ma'am; I'm also aware that there's a potential if,

15   for witnesses to be tampered with, or threatened,

16   and so I don't know what the circumstances are

17   with that.

18       Q.    Are you assuming that Mary Eastham was

19   tampered with or threatened in this case?

20       A.    No, I'm aware anecdotally that people in

21   Paris, the City of Paris, are afraid of Morgan.

22   That there have been people associated or linked

23   to the Boards have ended up dead.  They have

24   served search warrants on their property and dug

1  up human remains.  And I can see where a witness

2  might get selective amnesia, if brought to the

3  forefront, particularly if somebody attempts to

4  intimidate them.

5      Q.    Are you basing any of your opinions in

6  this case on any statements made or that you

7  believe were made by Mary Eastham?

8      A.    Mary Eastham was an initial witness.

9  Her statement, the information was not recorded.

10  It was acknowledged being received by the police

11  initially when it was a who-done-it and there were

12  no suspects.  Now, let me finish.  One of the

13  investigators involved, Charlie McGrew,

14  acknowledged that.  And said we didn't write it

15  down.  So, should they have written it down?

16  Should they have looked into it further?

17  Obviously, yes.

18      Q.    You reference statements made by Charlie

19  McGrew.  Where is that documented that Charlie

20  McGrew said that he talked to Mary Eastham in the

21  course of this investigation?

22      A.    I think it was one of those times when

23  he talked to Callahan and called him a very

24  uncomplimentary term, and/or could have been

1    before that.  But, he acknowledged that he had

2    talked to Mary Eastham.

3        Q.    So, you're basing your information on

4    something Mr. Callahan wrote about a conversation

5    he had with Charlie McGrew during which time

6    Charlie McGrew said something unfavorable to

7    Callahan, and then said by the way I talked to

8    Mary Eastham in the course of the initial

9    investigation?

10       A.    No, I said I didn't know if it was at

11   that particular time or an earlier time.  Charlie

12   McGrew contacted Callahan initially, not

13   vice-versa.  And I think there were a number of

14   interchanges, and I don't know that Callahan wrote

15   that down.  I don't recall specifically.  But, I

16   know that he responded to questions and indicated

17   that.

18       Q.    Do you find Mr. Callahan's account of

19   the facts in this case to be credible?

20       A.    I would -- credibility is the purview of

21   the jury.  I would say this:  His efforts to

22   investigate it exemplified or are most consistent

23   with the initial statement of the director, and

24   law enforcement code of ethics, the oath of an

1    officer for the Illinois State Police, and so --

2    and the nationally accepted standard of practice,

3    which would be to determine the truth of the

4    matter.  And certainly not consistent or

5    indicative or with covering it up or trying to

6    prevent information from getting out.

7            As far as credibility, it's a matter for

8    the jury.

9        Q.    Do you rely on any of the facts that are

10   created by Mr. Callahan in his memos in

11   formulating any of your opinions?

12       A.    When you say facts, you have to be more

13   descriptive, please.

14       Q.    Any of the factual information or the

15   alleged factual information contained in Mr.

16   Callahan's memos; do you rely on his statement of

17   facts, what he believes to be the facts in your

18   own opinions?

19       A.    I rely on the fact that he indicated

20   that he wanted to investigate it.  He was

21   precluded from doing so.  And that his review led

22   him to seriously question the initial

23   investigation.  And I think it's consistent with

24   the subsequent actions of the Illinois State

1    Police to conceal and cover up that information.

2    When you say a fact, I don't know.  If you talk

3    about the overall situation, certainly he has a

4    lot of credibility, and it's been consistent with

5    Harney indicated very similar things; Marlow, I

6    mean came to similar conclusions.

7         I believe even Kaupus said some things

8    that, about problems with the initial

9    investigation.  So, as a specific fact, I don't

10   know.  He was never allowed to investigate it.  I

11   don't know that he came up with specific facts.

12   He came up with information.  And yes, I would

13   rely in part on that information.

14        Q.   If Mr. Callahan had uncovered

15   information that inculpated Randy Steidl and/or

16   Herbert Whitlock and he did not document that

17   information, would you agree, hypothetically, that

18   that would be inconsistent with seeking the truth?

19        A.   First of all, he was told not to

20   investigate and ordered not to write reports.  If

21   he -- I mean, I think it would be as wrong for

22   Callahan to withhold information as it was wrong

23   for Eckerty and Parrish and Ray and McFatridge to

24   withhold information.

1    Q.    Would you agree that in the course of an

2    investigation, if certain suspects come to light,

3    it's a proper technique to interview those

4    suspects?

5    A.    It may or may not.  There has to be a

6    basis for that, and it certainly should be

7    documented.

8    Q.    If the police learn that --

9          MR. TAYLOR: Objection, I'm going to

10   again reassert our objection that you're not --

11   you're going far afield with regard to the purpose

12   of this continued deposition is.

13   BY MS. EKL:

14   Q.    And I'm-- I disagree.  So -- would you

15   agree that it would be proper to interview

16   witnesses, or interview potential suspects, if

17   it's been learned that they were making admissions

18   to a crime?  In general?

19   A.    It may or may not.  I mean, that's a

20   judgment about timeliness.  And particularly what

21   you knew.  And certainly that basis should be

22   documented somewhere.  The source of that

23   information.  I mean, that's kind of analogous to

24   serving a search warrant and knocking on the front

1    door and saying police.  And having another

2    officer in the backyard yelling come in.  It's not

3    a valid, appropriate way to conduct a search

4    warrant.  And certainly to make up things and not

5    document it, and use that as an excuse to pick out

6    suspects and make them suspects within the town,

7    is not appropriate if there is no basis for it.

8    Now, if there was a basis for it, I've yet to see

9    it.  I think Callahan said he's yet to see it.

10    And I don't know how or why Whitlock and Steidl

11    became the primary suspects.

12        Q.   What significance does it have to you

13    that Callahan has yet to see it if Callahan was

14    not allowed to adequately investigate the case?

15        A.   Because he looked over the initial

16    investigation, and all of the material in there.

17    It obviously wasn't documented when he looked it

18    over.  Because he couldn't lay his hands on it.  I

19    mean, I don't know -- I don't recall specifically

20    without going back, but I don't know that Parrish

21    or Eckerty have ever said why we believe Whitlock

22    and Steidl were suspects.  Or who gave the

23    information to the police on July 9th, 1986, or

24    why they were rousted, taken from a bar that was

1    fairly busy at the time, and identified as

2    suspects by the actions of the Paris police

3    department and the Illinois State Police.

4         Q.    Did you read Randy Steidl's account of

5    being taken out of that bar?

6         A.    His deposition?

7         Q.    Right?

8         A.    Yes, ma'am.

9         Q.    Did you read the other police officers

10   account of what happened when he was asked to come

11   down for questioning?

12        A.    I'm not sure I know what you're saying,

13   you're asking.  But, Steidl indicated he would

14   come down when he finished the game of pool.  And

15   within like two minutes there were a number of

16   police officers there, and they came down.  And

17   incidentally, it was a very short time period

18   after Morgan had approached him and asked him

19   about having information and telling him he had a

20   reward.

21        Q.    Did you read Curtis Smith's account of

22   what took place on that day?

23        A.    I don't recall.  Does he have a police

24   report that is in there?

1      Q.     Curtis Smith was a witness who was

2   present in the bar at the time that Randy Steidl

3   was asked to come down for questioning.  Do you

4   recall reading his testimony?

5      A.     Where would his testimony be, ma'am?

6      Q.     He gave deposition testimony in this

7   case.

8      A.     In the --

9      Q.     In the Steidl/Whitlock case?

10     A.     I think I saw the post-conviction

11  hearing.

12     Q.     My question is specific to deposition?

13     A.     I don't have his deposition, no.

14     Q.     Okay.  Would you agree that if a witness

15  is interviewed, or I'm sorry, if a suspect is

16  interviewed and they provide an alibi, that it

17  would be proper for the police to then interview

18  those alibi witnesses to see if they corroborate

19  what the suspect was saying?

20     A.     Again, it would be based on why are they

21  suspects?  What, you know, it may be, but not just

22  based on, you know, in general term.

23     Q.     Would you agree that it's proper, a

24  proper police technique in the course of an

1    investigation to polygraph witnesses?

2        A.    I don't see a problem with that.  I have

3    a problem if you conceal, when your primary

4    witness fails, or comes back like they're trying

5    to influence it, and you have alibi witnesses an

6    that information isn't provided, but, you know, I

7    don't think that that's fundamentally fair or

8    appropriate.  But, I think that a polygraph can be

9    a legitimate tool.

10       Q.    Do you think it's an improper police

11   technique, at least back under 1987 standards, to

12   put a witness under hypnosis?

13       A.    I don't think that that is appropriate.

14   Particularly when their initial -- there's a big

15   issue in question about their initial statements,

16   and their initial -- and the failure to document

17   what they initially said, versus what they've

18   subsequently said.

19            And you base sickly, I think if you --

20   if they're credible, and you're going to attempt

21   to use them as a witness at some point, I think

22   that hypnosis really takes away from their

23   credibility.  That becomes an issue.

24       Q.    Have you been trained in hypnosis and

1    ways to avoid or ways to -- let me just start with

2    the first part of the question.

3              Have you been trained in hypnosis?

4         A.    No, ma'am.

5         Q.    Are you aware that in this case aside

6    from Steidl -- I mean aside from Herrington and

7    Reinbolt, other witnesses came forward with

8    statements that were allegedly made by, for

9    instance, Randy Steidl?

10             MS. SUSLER: I'm going to object.  It's

11   5:15.

12             MS. EKL: I'm wrapping up.

13             MS. SUSLER: We came back here for you to

14   do this about the letter, which you said you

15   hadn't seen.  You are way far afield.

16             MR. BALSON: Go ahead.  There is a

17   question.  No one is preventing you from asking

18   the question.

19             (At this point the court reporter read

20   the requested portion of the record.)

21             MR. BALSON: Okay.  I object to the form

22   of that question.  Is that the question you want

23   to ask?  Aside from Steidl?

24        Q.    What?

1          MR. BALSON: Maybe I misunderstood it.

2      Q.    Would you read back the question.

3          (whereupon the record was read.)

4   BY MS. EKL:

5      Q.    I misspoke when I said Steidl the first

6   time.  So, aside from Reinbolt and Herrington, are

7   you aware that other witnesses came forward?

8      A.    Again, I'm aware that other witnesses

9   have -- I don't know if they came forward.  Some

10  may have come forward.  Others have been -- may

11  have been sought out.  But, yes, other witnesses

12  have said different things at different times.

13     Q.    And that those statements, it would be

14  proper for the law enforcement investigators to

15  consider that in trying to determine whether or

16  not there was enough evidence against Randy Steidl

17  and Herbert Whitlock?

18     A.    They may or may not.  I mean, you have

19  to go in the context of which the statements were

20  made.  You can't just take them as in a vacuum

21  statement, you know.  What's the motive of the

22  witness?  Why didn't they come forth early?  What

23  was the circumstances in which that person made

24  the statement?  You know, there's that whole

1    issue.  So it may have some value.  It may not.

2    But I think it has to be made in context.

3         Q.    You are aware that Mr. Clutter

4    investigated this case, correct?

5         A.    Yes, ma'am.

6         Q.    What is your understanding in terms of

7    how long a period of time the case was

8    investigated by Bill Clutter?

9         A.    Off and on over -- well, until 2000.  A

10   number of years.  I'm not exactly sure when he was

11   focusing on this, and when he was -- or how much

12   he was working on it, but I know over a period of

13   years.  Rather extensively.

14        Q.    Do you believe he completed a thorough

15   and complete investigation of the case?

16              MR. TAYLOR: I object, that is totally

17   outside of the scope of this.

18              MR. BALSON: I agree as being beyond the

19   scope.

20        Q.    No, they are prefatory.

21        A.    I'm not -- he made a rather in depth

22   investigation.  I don't know what the purpose and

23   -- I mean, I know what the purpose of why he was

24   investigating it.  But, he wasn't investigating it

1    in the same manner as the original police

2    investigators.  So, he was an investigator for the

3    defense attorneys.  And tracking down leads and

4    looking for other evidence and such.

5        Q.    Are you aware of whether he was

6    prevented from looking into any leads that he may

7    have uncovered?

8              MR. TAYLOR: That who may have uncovered?

9        Q.    Bill Clutter.

10             MR. TAYLOR: Objection, relevance.

11       A.    I think that certainly wasn't his

12   charge.  Whether he was prevented or not, I don't

13   know.  Whether he would have been paid to do that

14   or not, I don't know.

15       Q.    You are aware that he investigated, or

16   at least looked into, other potential suspects in

17   relation to the Rhoads homicide investigation,

18   correct?

19       A.    Yes, ma'am.

20       Q.    Are you aware of -- are you aware that

21   he's testified that even to this day he can't

22   identify a clear suspect in relation to the Rhoads

23   homicide investigation?

24             MR. TAYLOR: Objection to the relevance,

1    and I'm not sure that that completely states his

2    testimony.

3         MR. BALSON: I'm going to object, that

4    that is beyond the scope of this witness's

5    assignment in this case.

6         A.    I don't believe that that is necessarily

7    an accurate statement.  And certainly that's not

8    his charge.  And I -- I think he also agrees,

9    based on all his investigations, that there were

10   no bases for charging Steidl and Whitlock.

11        Q.    Right.  But my question, you testified

12   earlier that my clients failed to adequately

13   investigate all the -- or investigate leads.  So

14   my question is, in relation to Bill Clutter, are

15   there any leads that he up covered that you think

16   had my clients adequately conducted an

17   investigation in regard to certain people, would

18   have led to at least an arrest, if not a

19   conviction?

20        MR. BALSON: I object to the form; that's

21   confusing to me.

22        MS. SUSLER: Object to the form.

23        A.    Well, I don't know that it's a fair

24   question because he wasn't charged with doing

1     that.  He had a very limited scope in his

2     investigation.  He certainly didn't have the power

3     of the state to pursue that.  And I think that he

4     has been anecdotally, he has shared the results of

5     his information with law enforcement, who didn't

6     necessarily go and pursue it, at least for the

7     first four and a half years that it was made

8     available to them.

9         MR. BALSON: Let me also say this by way

10    of general objection here.  That the -- the

11    document that you're looking at which speaks to

12    his opinions that he has formed on behalf of both

13    Steidl and Whitlock, and now you're asking him

14    questions relative to Mr. Clutter, who really had

15    very little, if any, association with Whitlock

16    until well into the 2000s.  And the impact of

17    Clutter and what Clutter found out or didn't find

18    out during the period of time that he was hired by

19    an attorney who represented Steidl may not have

20    any connection with or impact on Whitlock.

21        MS. EKL: My question was in regard to --

22        MR. BALSON: You need to separate those

23    in your question and lumping them all together, I

24    think is objectionable.  Certainly as to

1    foundation.

2              MS. EKL: My question was --

3              MR. JOHNSTON: I'll object to the

4    objection because that misstates the testimony.

5              MS. EKL: And my question was not

6    specific as to evidence against Steidl or evidence

7    against Whitlock.  My question was whether he

8    uncovered evidence in relation to other people,

9    which would have an impact on both Steidl and

10   Whitlock?

11             MR. BALSON: Well, okay.

12   BY MS. EKL:

13       Q.    So, anyway, my question was what it was.

14   Do you have any evidence that there is any

15   information out there, any credible information,

16   that my clients failed to uncover or should have

17   uncovered that would have led to the arrest of

18   some other person?

19             MR. BALSON: Well, foundation, I have an

20   objection, foundation.

21       A.    I'm not aware of it, but I've not

22   reviewed their investigative file.  I'm aware that

23   they weren't actively investigating certain leads,

24   and that they -- as recently as a couple months

1    ago, they were still focusing on Steidl and

2    Whitlock as suspects without being able to

3    substantiate why.

4        Q.    Would you agree that in most homicide

5    investigations law enforcement officers don't have

6    the luxury of following every single lead to its

7    furthest end?  That there has to come a point in

8    time based on resources and time, that you make a

9    determination of how far you're going to go into

10   looking into a potential suspect?

11       A.    I think those decisions are made to a

12   greater or lesser degree, based on the totality of

13   circumstances every day.

14                     EXAMINATION BY

15                     MR. RAUB:

16       Q.    I just have a very, very few.  Have you

17   ever visited Edgar County Illinois at any time in

18   your life, to your knowledge?

19                MS. SUSLER: I'm sorry, I missed the

20   question.

21       Q.    Have you ever visited Edgar County

22   Illinois at any time in his life?

23       A.    Not -- willfully or knowingly?

24       Q.    It doesn't have an interstate highway

1    going through it, so --

2         A.    It does?

3         Q.    It does not.

4         A.    Okay, then --

5         Q.    Probably not?

6         A.    In all probability, not.

7         Q.    You testified several times today, or at

8    least once today, that there were three ways a

9    witness could get information?  He could see the

10   event?  Or could get the information from

11   investigators?

12              MR. TAYLOR: That's two.

13        Q.    Excuse me, two ways of getting

14   information.  I was going to suggest a third, so I

15   got ahead of myself.

16        A.    I think that's -- I quoted Eckerty as

17   saying that there is two ways a witness could know

18   about a particular crime; that's having been there

19   and observed it, or from the investigator.

20        Q.    In fact there's a third way at least, is

21   there not?  And I'm going to suggest to you,

22   hearing it from someone other than the

23   investigators?  Facts about a crime?

24        A.    That's another potential, yes.

1      Q.    One of the documents you reference in

2    the materials you reviewed was the Supreme Court

3    case affirming Randy Steidl's conviction.  I think

4    it's --

5      A.    Give me -- which year are you referring

6    to?

7      Q.    142, Illinois 2nd, 2-04.

8      A.    Do you remember, was that the '91 or

9    '97?

10     Q.    That would be the first one.

11     A.    Okay.

12     Q.    Did you review that decision?

13     A.    Yes, sir.

14     Q.    And do you recall in that decision the

15   Illinois Supreme Court had a several page

16   discussion on the unreliability of witness

17   recantations?  I believe it was toward the end?

18     A.    I would have to go through it again, but

19   I'm not disputing it.

20     Q.    Okay.  That's all I have.  Thanks.

21           MR. BALSON: Anybody on the phone have a

22   question?

23           MR. TAYLOR: Anybody on the phone?

24           MS. WADE:  I don't think so.

1           MS. EKL: Vince?

2           MR. RAUB:  He said earlier that he may

3    not be coming back.

4           MR. TAYLOR: I have a couple of

5    questions.

6                  EXAMINATION BY

7                  MR. TAYLOR:

8       Q.    Mr. Waller, whether they're called

9    opinions, determinations, conclusions, sub

10   opinions, responses to significant issues, or

11   questions in the case, those answers that you gave

12   in response to my questions back on Friday's

13   session of this deposition with regard to the

14   letter of September 27th, 2009, those continue to

15   be your answers, do they not?

16          MS. EKL: Objection form.

17          MR. JOHNSTON: Objection form.

18      A.    My opinion report continues to be my

19   answers, and it's those issues that were in that

20   letter and are reflected in various parts of my

21   opinion report.

22      Q.    Right.  But my question was specifically

23   those answers you gave at the prior deposition

24   with regard to the letter continue to be your

1    answers, right?

2         MR. JOHNSTON: Objection to the form of

3    the question.

4         MS. EKL: Objection.

5    Q.    You understand me?

6    A.    Yes, sir.

7    Q.    And one final question.  And those

8    answers, however they are characterized, were part

9    of your opinions as you tendered them on October

10   2nd, is that right?

11        MS. EKL: Objection, form of the

12   question.  You are saying are his answers now what

13   he meant them to be when they were in the report,

14   even though he just testified today that things

15   weren't in his report?

16        MR. BALSON: No, no.  He did not testify

17   things weren't in his report.

18   Q.    Do you understand my question?

19        MS. EKL: They were opinions in his

20   report.

21   Q.    And those answers, however they're

22   characterized, those answers being the answers you

23   gave on the prior deposition?  They were part of

24   your opinions as you tendered them on October 2,

1    2009?

2              MR. JOHNSTON: Objection to the form.

3              MS. EKL: Objection to the form, and I

4    object to you trying to now create additional

5    opinions in his report that weren't there that we

6    were supposed to learn through the deposition or

7    now you are trying to incorporate in his original

8    report.

9              MR. RAUB:  I think that is all for the

10   judge to decide.

11             MR. TAYLOR: You may answer.

12             MR. JOHNSTON: I will join the objection

13   and find it highly inappropriate to try to

14   manufacture opinions on a recross.

15        A.    Yes, sir.

16             MR. JOHNSTON: The second day of a

17   follow-up on a letter that we got just found out

18   about.

19             MR. TAYLOR: That is a ridiculous

20   statement.

21             MR. JOHNSTON: That is not ridiculous.

22             MR. TAYLOR:  You had this letter from

23   the beginning.  And my final question is, and they

24   continue to be part of those opinions as you said

1    here today?

2              MS. EKL: Objection, form.

3              MR. JOHNSTON: Objection, form of the

4    question.  Misstates his prior testimony, asked

5    and answered.

6              MS. EKL: I object to you eliciting any

7    new opinions.

8              MR. JOHNSTON: I also object to the

9    eliciting new opinions.

10             MR. BALSON: I don't think he is

11   eliciting new opinions.

12             MR. TAYLOR: This is a ludicrous

13   objection.

14             MR. BALSON: What he is saying is all of

15   these were a part and parcel of the opinions that

16   you made.  And I think he has said that they were.

17             MS. EKL: He said were your answers to my

18   questions part of your original opinion.  His

19   original questions were, are these your opinions?

20   And today he said these aren't my opinions.  These

21   were issues I was asked to address in my opinion;

22   he addressed them in his opinion as he did.  But

23   now Mr. Taylor is trying to make these become his

24   opinions.  And that's not fair.

1           MR. TAYLOR: Now you're not listening.

2    My question was whether they're called opinions,

3    conclusions, determinations, sub opinions, or

4    responses to significant issues or questions in

5    the case, that's what I said.  And so what I'm

6    saying is, do they, however they're characterized,

7    do they continue to be part of your opinions as

8    you sit here today?

9           MR. JOHNSTON:  Object to the form of the

10   question.

11          MS. EKL: Objection, form.  If he can

12   even understand what that means, or recall your

13   prior questions.

14          MR. JOHNSTON: I will object to the form

15   of the question.

16          MR. BALSON: Okay, then answer.

17          MR. JOHNSTON: And especially the attempt

18   to create new opinions at this late hour.

19       A.   Yes, sir.  I understand it.  Yes, sir.

20   Those are components of my opinions.  And were

21   considerations when I made them.

22          MR. TAYLOR: Thank you.

23          MR. BALSON: That is what he said all

24   along.  Okay.

1            MR. JOHNSTON:  I'll object to that

2    comment because it's not, but go ahead.

3            MR. BALSON: Everybody finished asking

4    questions?

5            MR. TAYLOR: Phone?

6            MS. WADE: I have no questions.   Thank

7    you.

8            MR. RAUB:  Okay.  We're done.

9            MR. BALSON: I expect we will read this.

10            (Deposition adjourned at 5:28 PM.)

11            (Signature reserved.)

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                IN THE UNITED STATES DISTRICT COURT
 2             FOR THE CENTRAL DISTRICT OF ILLINOIS
                       STATE OF ILLINOIS
 3
      GORDON RANDY STEIDL,
 4
               Plaintiff,
 5
         -vs-                        No. 05 CV 2127
 6
      City of Paris, Present and
 7    Former Paris Police Officials
      Chief Gene Ray and Detective
 8    James Parrish; former Illinois
      State Trooper Jack Eckerty;
 9    former Edgar County State's
      Attorney Michael McFatridge;
10    EDGAR COUNTY; and Illinois State
      Police Officials Steven M. Fermon,
11    Diane Carper, Charles E. Brueggemann,
      Andre Parker and Kenneth Kaupus,
12
               Defendants.
13
               This is to certify that I have read the
14    transcript of my deposition taken in the
      above-entitled cause, and that the foregoing
15    transcript taken on November 13th and 19th, 2009
      accurately states the questions asked and the
16    answers given by me, with the exception of the
      corrections noted, if any, on the attached errata
17    sheet(s).
18                        _____
                              DENNIS WALLER
19
      Subscribed and Sworn before
20    me this _____ day of
      _____, 2009.
21    _____
      Notary Public
22
23
24
```

```
 1   STATE OF ILLINOIS    )
                          )   SS
 2   COUNTY OF CHAMPAIGN  )
 3              I, DEANN K. PARKINSON, a Notary Public
     in and for the County of Champaign State of
 4   Illinois, do hereby certify that DENNIS WALLER,
     the deponent herein, was by me first duly sworn to
 5   tell the truth, the whole truth and nothing but
     the truth in the aforementioned cause of action.
 6              That the foregoing deposition was taken
     on behalf of the Defendants on November 13th and
 7   19th, 2009.
                That said deposition was taken down in
 8   stenographic notes and afterwards reduced to
     typewriting under my instruction and said
 9   transcription is a true record of the testimony
     given; and that it was agreed by and between the
10   witness and attorneys that said signature on said
     deposition would be not waived.
11              I do hereby certify that I am a
     disinterested person in this cause of action; that
12   I am not a relative of any party or any attorney
     of record in this cause, or an attorney for any
13   party herein, or otherwise interested in the event
     of this action, and am not in the employ of the
14   attorneys for either party.
                In witness whereof, I have hereunto set
15   my hand and affixed my notarial seal November
     24th, 2009.
16
17                         _____
                           DEANN K. PARKINSON, CSR
18                         NOTARY PUBLIC
19
     "OFFICIAL SEAL"
20   DEANN K. PARKINSON
     Notary Public, State of Illinois
21   My Commission Expires 11-16-2012
22
23
24
```

## ERRATA SHEET

Following are the changes I wish to make to my testimony:

| PAGE | LINE | | |
|------|------|--|--|
| 7 | 10 | CHANGE | "form" to "forum" |
| | | REASON | Transcription error. |
| 25 | 10 | CHANGE | "and" to "an" |
| | | REASON | Transcription error. |
| 69 | 7 | CHANGE | enforcement, opportunities |
| | | REASON | Clarification. |
| 79 | 9 | CHANGE | "scaled" to "scale" |
| | | REASON | Transcription error. |
| 82 | 12 | CHANGE | "place in" to "placement" |
| | | REASON | Transcription error. |
| 83 | 10-11 | CHANGE | background, academic, in training |
| | | REASON | Clarification. |
| 86 | 22 | CHANGE | "fianc" to "fiancé" |
| | | REASON | Transcription error. |
| 93 | 8 | CHANGE | "why" to "what" |
| | | REASON | Transcription error. |
| 119 | 3-4 | CHANGE | "you followed" to "you failed to follow" |
| | | REASON | Transcription error. |

2:08-cv-02055-HAB-DGB   # 279   Page 134 of 138

## ERRATA SHEET

Following are the changes I wish to make to my testimony:

PAGE     LINE

122    16    CHANGE    "they're" to "there is"
             REASON    Transcription error.

174    19    CHANGE    "Steinholt" to "Steidl"
             REASON    Transcription error.

177    3     CHANGE    involved in, all three
             REASON    Clarification.

251    6     CHANGE    "CHLEA" to "CALEA"
             REASON    Change CHLEA to CALEA in all subsequent uses
                       Transcription error.

252    16    CHANGE    Force, on
             REASON    Clarification.

264    6-7   CHANGE    Closer to "the" Mississippi (ref. to River)
             REASON    Transcription error.

381    20    CHANGE    Dujay   -   ???
             REASON    Transcription error.

454    24    CHANGE    "purpose" to "person"
             REASON    Transcription error.

481    19    CHANGE    "sickly   -   ???
             REASON    Transcription error.

498

```
1              IN THE UNITED STATES DISTRICT COURT
2           FOR THE CENTRAL DISTRICT OF ILLINOIS
                       STATE OF ILLINOIS
3
     GORDON RANDY STEIDL,
4
                 Plaintiff,
5
                 -vs-                    No. 05 CV 2127
6
     City of Paris, Present and
7    Former Paris Police Officials
     Chief Gene Ray and Detective
8    James Parrish; former Illinois
     State Trooper Jack Eckerty;
9    former Edgar County State's
     Attorney Michael McFatridge;
10   EDGAR COUNTY; and Illinois State
     Police Officials Steven M. Fermon,
11   Diane Carper, Charles E. Brueggemann,
     Andre Parker and Kenneth Kaupus,
12
13              Defendants.

14              This is to certify that I have read the
     transcript of my deposition taken in the
15   above-entitled cause, and that the foregoing
     transcript taken on November 13th and 19th, 2009
16   accurately states the questions asked and the
     answers given by me, with the exception of the
17   corrections noted, if any, on the attached errata
     sheet(s).
18
                             _____
19                           DENNIS WALLER

20   Subscribed and Sworn before
     me this  4th  day of
21   January ,        200 9 .

     _____
22   Notary Public
     My Commission Expires: 10/03/2010
23

24
```

**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | | |
|---|---|---|
| **GORDON RANDY STEIDL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 05 CV 02127** |
| | ) | |
| **CITY OF PARIS, et al.,** | ) | **Judge Harold A. Baker** |
| | ) | **Magistrate Judge Bernthal** |
| **Defendants.** | ) | |

_____

| | | |
|---|---|---|
| **HERBERT WHITLOCK,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 08 CV 2055** |
| **v.** | ) | |
| | ) | |
| **CITY OF PARIS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned, an attorney, hereby certifies that a copy of the foregoing November 19, 2009 Deposition Transcript of Dennis Waller was served upon the following counsel via the Court's CM/ECF system on the 19th day of March 2010:

<u>Attorneys for City of Paris, Gene Ray, James Parrish and Jack Eckerty</u>:
  James G. Sotos
  Elizabeth Ekl
  Sara Cliffe
  Elizabeth K. Barton
  John J. Timbo
  James G. Sotos & Associates, Ltd.
  550 East Devon Avenue, Suite 150
  Itasca, IL 60143
  jsotos@jsotoslaw.com
  eekl@jsotoslaw.com
  scliffe@jsotoslaw.com
  ebarton@jsotoslaw.com
  jtimbo@jsotoslaw.com

Attorneys for Steven M. Fermon, Diane Carper, Charles E. Brueggemann, Andre Parker,
Kenneth Kaupas and Jeff Marlow:
  Iain D. Johnston
  Phil Ackerman
  Heidi Steiner
  Johnston Greene LLC
  542 South Dearborn Street, Suite 1110
  Chicago, IL 60605
  ijohnston@johnstongreene.com
  packerman@johnstongreene.com
  hsteiner@johnstongreene.com


Additional Attorneys for Andre Parker and Jeff Marlow:
  David C. Thies
  John E. Thies
  Kara J. Wade
  Webber & Thies, P.C.
  202 Lincoln Square
  P.O. Box 189
  Urbana, IL 61803
  dthies@webberthies.com
  jthies@webberthies.com
  kwade@webberthies.com


Attorneys for Michael McFatridge:
  Terry A. Ekl
  Vincent C. Mancini
  Terry Stanker
  Ekl Williams PLLC
  901 Warrenville Road, Suite 175
  Lisle, IL 60532
  tekl@eklwilliams.com
  vmancini@eklwilliams.com
  tstanker@eklwilliams.com


Attorneys for Edgar County:
  Michael E. Raub
  Brian Smith
  Heyl Royster Voelker & Allen
  P.O. Box 129
  Urbana, IL 61801-0129
  mraub@hrva.com
  bsmith@hrva.com

The undersigned, an attorney, hereby certifies that a copy of the foregoing November 19, 2009 Deposition Transcript of Dennis Waller was served upon the following counsel via email on the 19th day of March 2010:

G. Flint Taylor
Jan Susler
Ben Elson
People's Law Office
1180 North Milwaukee
Chicago, IL 60622
flint.taylor10@gmail.com
jsusler@aol.com
elsonben@aol.com

The undersigned, an attorney, hereby certifies that a copy of the foregoing November 19, 2009 Deposition Transcript of Dennis Waller was served upon the following defendant via U.S. first-class mail on the 20th day of March 2010:

Deborah Rienbolt
2116 East Keys Avenue
Springfield, IL 62702

s/ Carrie A. Hall