E-FILED
Friday, 29 October, 2010  10:58:39 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT

# A

E-FILED

Monday, 15 February, 2010 11:52:58 PM

Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| Herbert Whitlock, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No 08 CV 2055 |
| | ) | Honorable Harold A. Baker |
| City of Paris, et al., | ) | Judge Presiding |
| | ) | |
| Defendants. | ) | |

**MOTION OF DEFENDANTS BRUEGGEMANN, CARPER, FERMON, KAUPAS AND
PARKER FOR SUMMARY JUDGMENT**

### I.     INTRODUCTION

Herbert Whitlock has brought this case based on his arrest, conviction, and imprisonment

for the murder of Karen Rhoads in 1986. In September 2007, Whitlock's conviction was vacated

by the Illinois Appellate Court in his second state postconviction proceeding. After the Office of

the Illinois State's Attorneys' Appellate Prosecutor ("ISAAP") decided to *nolle prosequi* the

charges against him, he was released from prison in January 2008.

Whitlock has sued, *inter alia*, defendants and former Illinois State Police ("ISP") officers

Charles Brueggemann, Diane Carper, Steve Fermon, Ken Kaupas, and Andre Parker

(collectively, the "ISP Officials") for their alleged roles, beginning, at the very earliest, in 2000,

related to Whitlock's postconviction and clemency proceedings.

Whitlock claims the ISP Officials deliberately failed to turn over exculpatory, material

evidence, known to police at the time of Whitlock's trial in 1987, and unknown to him and

unavailable to him through reasonable diligence, to prosecutors and/or to the Governor's staff

with authority related to clemency, who were themselves unaware of this evidence. Whitlock

brings a § 1983 claim against the ISP Officials, alleging this failure violated Whitlock's

Carper to follow which prohibited the reopening of the Rhoads case, that Parker did not instruct

Carper that no investigative activities were to be permitted on the Rhoads homicide file, and that

Parker never used the phrase "too politically sensitive" in reference to the Rhoads homicides or

Morgan. SOF ¶643

It is undisputed that Carper did not tell anybody that the Rhoads case was too politically

sensitive to be reopened or to reinvestigate, and that she did not set strict parameters regarding

the Rhoads case that prohibited the reopening of the Rhoads case or conducting investigative

activities. SOF ¶644

It is also undisputed that Callahan testified about these supposed orders at Whitlock's

postconviction proceeding in 2005. SOF ¶606

### 26. Fermon's Statements about Opening Case and About Clemency (Fermon)

It is undisputed that Fermon did not voice his opinion during this meeting as to whether

Steidl or Whitlock should be granted a pardon or clemency, and that he did not have an opinion

on the subject. It is undisputed that Fermon did not tell those attending the meeting that he did

not believe Steidl and Whitlock should receive clemency. SOF ¶461

### 27. Clutter's March 2000 Letter to ISP Director Nolen (Parker)

It is undisputed that Carper disclosed this letter, along with the Paris Police Department's

report regarding Betty and Darrell Herrington, and notes on Herrington Drywall letterhead, and

Callahan's May 2, 2000 memo to the AG's Office on May 12, 2000. SOF ¶135

It is further undisputed that Clutter became Whitlock's agent no later than 2003.

### III.    ARGUMENT

**A. Whitlock's §1983 *Brady* Claim Is Factually Baseless and Legally Deficient.**

**1.  General *Brady* Framework**

The essential purpose of *Brady* is to protect a defendant's Fourteenth Amendment due process "right to a fair trial by ensuring the reliability of any criminal verdict against him." *U.S. v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001). "The government therefore has a so-called '*Brady* obligation' only where non-disclosure of a particular piece of evidence would deprive a defendant of a fair trial." *Id.* at 140. Thus, *Brady* is not a "free-floating" right; it can only be implicated in relation to a judicial proceeding. Absent a trial or some other kind of legal proceeding, *Brady* simply does not come into play. *See Strickler v. Greene,* 527 U.S. 263, 280 (1999) (evidence must be disclosed "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.").

Thus, with respect to the ISP Officials, even if they failed to disclose a particular piece of evidence, the pertinent inquiry is whether, had they disclosed it, the result of Whitlock's postconviction proceeding – in which he prevailed – would have been different.

Moreover, to the extent that *Brady* applies at all after a conviction, it only applies to evidence available at the time of the original trial - not to evidence developed after the original trial. *See Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007) (emphasizing that "the [available for the trial] qualification is important....").[3]

A *Brady* violation has three elements: "(1) the government suppressed evidence; (2) the evidence was favorable to the defense, either because it was exculpatory or had impeachment value; and (3) the evidence was material to an issue at trial." *Ienco v. Angarone*, 429 F.3d 680,

---

[3] To the extent that the *Steidl* Court left open the possibility of a broader application of *Brady* after conviction, the Supreme Court definitively foreclosed that possibility in *District Attorney's Office for the Third Judicial District v. Osborne,* 129 S. Ct. 2308 (2009), as discussed *infra.* Indeed, in *Osborne*, the Supreme Court flatly rejected the application of *Brady* after conviction, without any qualifications such as narrow application of *Brady* as in *Steidl*. Thus, as discussed *supra*, even the Seventh Circuit's narrow application of *Brady* after conviction is doubtful.

683 (7th Cir. 2005). And in a civil suit under § 1983, the material must have been deliberately

withheld. *Newsome v. McCabe*, 260 F.3d 824, 825 (7th Cir. 2001).

Evidence is "exculpatory" only if it is exculpatory to the criminal defendant on its face *of*

*the crime of which he is accused. Harris v. Kuba*, 486 F.3d 1010, 1016 (7th Cir. 2007). "*Brady*

does not require that police officers or prosecutors explore multiple potential inferences to

discern whether evidence that is not favorable to a defendant could become favorable." *Id.*

Moreover, once a prosecutor receives the information from any source, the information is

not required to be disclosed to the prosecutor again. *Porter v. White*, 483 F.3d 1294, 1310 (11th

Cir. 2007). Likewise, there is no duty to disclose material already in the possession of the

criminal defendant, including the defendant's own statement. *Gauger v. Hendle*, 349 F.3d 354,

360 (7th Cir. 2003). Further, there is no *Brady* violation when a criminal defendant "could have

obtained [the evidence] before trial through the exercise of reasonable diligence." *U.S. v. Senn*,

129 F.3d 886, 893 (7th Cir. 1997). And the knowledge of an agent is imputed to his principal,

even where the agent's knowledge was obtained prior to forming an agency relationship with the

principal. *Shenandoah Valley Poultry Co. v. Armour & Co.*, 854 F.2d 1013, 1018 (7th Cir. 1988).

With respect to the second prong, for law enforcement officers such as the ISP Officials,

their duty is only to disclose *Brady* materials to "competent authorities," *i.e.*, prosecutors. *Steidl,*

494 F.3d at 630-31.  Although Whitlock appears to attempt to stretch the definition of

"competent authorities" beyond prosecutors, the ISP Officials are aware of no court holding that

broadens the definition beyond prosecutors. *Id.* at 630 (adding emphasis to Steidl's allegation in

his complaint that *Brady* material was withheld from "post trial prosecutors"); *Brady v. Dill*, 187

F.3d 104, 114 (1st Cir. 1999).  And when a state police officer is working with a federal

prosecutor, he can fulfill his *Brady* obligation by making disclosure to the federal prosecutor. *See*

*Limone v. United States*, 271 F. Supp. 2d 345, 356 & n.12 (D. Mass. 2003).

With respect to the third prong, evidence is "material" only "if there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding

would have been different." *Strickler*, 527 U.S. at 280. For this reason, *Brady* does not require

the disclosure of polygraph results, which are inadmissible as a matter of law. *Wood v.*

*Bartholomew*, 516 U.S. 1, 6 (1995); *People v. Gard*, 158 Ill.2d 191, 204 (1994).

And because of this focus, with respect to materiality, on the outcome of the proceeding,

Whitlock does not have a viable *Brady* claim as a matter of law with respect to any alleged

nondisclosures relating to his habeas proceeding, in which he prevailed. *Ambrose v. New York*,

623 F. Supp. 2d 454, 468-73 (S.D.N.Y. 2009). Although the Seventh Circuit has been skeptical

of the minority position, that such a claim might exist, but only if the prosecutor would have

abandoned the case had the police made the disclosure to the prosecutor, it has not decided the

issue. *E.g., Bielanski v. County of Kane*, 550 F.3d 632, 644-45 (7th Cir. 2008).

Thus, in summary, to the extent that Whitlock's *Brady* claim against the ISP Officials

survives the Supreme Court's *Osborne* decision, and to the extent this Court follows the

minority[4] approach rejected by every Court of Appeals to have considered it, to prevail on his

*Brady* claim, Whitlock must prove:

1) The individual ISP Official knew of a document or information before September 6, 2007 (when Whitlock's conviction was vacated); *and*

2) That the document or information was known to the police at the time of Whitlock's original trial in May 1987; *and*

---

[4] Of course, if this Court follows the majority approach (that a criminal defendant who prevails in a proceeding, as Whitlock did in his postconviction proceeding, cannot bring a §1983 *Brady* claim based on that proceeding) then Whitlock has no claim against the ISP Officials.

129

3) That the document or information is material and exculpatory or impeaching <u>on its face</u> to Whitlock's conviction of the Karen Rhoads homicide; *and*

4) That the document or information was unknown to prosecutors before September 6, 2007 from any source; *and*

5) That the document or information was unknown to Whitlock before September 6, 2007 from any source; *and*

6) That the document or information was not available to Whitlock before September 6, 2007 through reasonable diligence; *and*

7) That ISP Official deliberately withheld the document or information; *and*

8) Had the prosecutors responsible for Whitlock's postconviction been aware of the document or information before September 6, 2007, that those prosecutors would have not opposed Whitlock's postconviction petition.

If Whitlock fails to sustain his burden *on any single one* of these prongs, then his *Brady* claim fails as a matter of law. It is against this framework that the evidence Whitlock claims the ISP Officials did not disclose must be analyzed.

The ISP Officials address Whitlock's categories *seriatim*, omitting categories of documents it is undisputed that none of the ISP Officials saw (the ISP Officials whom Whitlock contends the category applies and who saw the document is identified in parentheses).

1) **Callahan Memos (Carper, Fermon, Kaupas, Parker)**

Whitlock cannot prove one or more of the 8 prongs discussed *supra* with respect to this category. Carper ordered the disclosure of both the May 2, 2000 memo and May 17, 2000 memo to prosecutors in May 2000, and that Steidl received a copy of the May 2, 2000 memo shortly thereafter. SOF ¶135-7 It was thus reasonably available to Whitlock, who was represented by Zellner since at least 1998, and by Kling, who also appeared on behalf of Whitlock on June 30, 2000. SOF ¶69, 181 In any event, Clutter's knowledge of it is imputed to Whitlock no later than 2003, when Clutter became Whitlock's agent.

And Clutter, Whitlock's agent, had the only information in the July 12, 2000 memo about the Rhoads homicide as far back as 1992. SOF ¶48 In any event, the July 12, 2000, August 15, 2001, and December 30, 2002 memos were disclosed to federal prosecutors in January 2003, SOF ¶658, to Asst. AG Mandeltort in June 2003, SOF ¶642 and to the ISAAP on about October 20, 2004, SOF ¶642, all before Whitlock's postconviction proceeding in 2005.

Moreover, the disclosures of information to prosecutors relevant to the Rhoads homicides were not limited to the Callahan memos themselves. Given the nature of the ISP's involvement (coming over a dozen years after Whitlock's conviction), ISP investigators regularly updated and informed prosecutors about their investigation. SOF ¶594, 599

And disclosures were not only made to prosecutors. The memos and other documents were also disclosed to the Illinois Governor's Office. SOF ¶553-56

It is not just the ISP Officials who are saying that now in retrospect. It is undisputed that the prosecutors who received and reviewed the materials, including two sitting judges and two Assistant U.S. Attorneys, did not consider them to be required to be disclosed pursuant to *Brady*. SOF ¶419, 528

## 2) August and September 2001 Harney Assessments (Carper, Fermon, Kaupas)

Whitlock cannot prove one or more of the 8 prongs discussed *supra* with respect to this category. These documents, which are substantively identical to each other, as well as to an October 10, 2001 assessment, were based solely on the case file. SOF ¶342, 637, 648, 655 Clutter had access to the entire case file, SOF ¶96, 107 and thus the entire case file was reasonably available to Whitlock, who was represented by Zellner since at least 1998, and by Kling, who also appeared on behalf of Whitlock on June 30, 2000. SOF ¶69, 181 In any event,

Clutter's knowledge of the case file is imputed to Whitlock no later than 2003 – before

Whitlock's 2005 postconviction proceeding.

In any event, the 2001 memo was provided to federal prosecutors in around January

2003, to Asst. AG Mandeltort in June and December 2003, and to the AG's Office and ISAAP in

October 2004 – all before Whitlock's 2005 postconviction proceeding.

### 4) January 2003 Briefing Book Meeting and Callahan's Statements (Brueggemann, Carper, Fermon, and Kaupas)

Whitlock cannot prove one or more of the 8 prongs discussed *supra* with respect to this

category. The Briefing Book is a 351 page conglomeration of various documents. Of the

documents contained in the Briefing Book and not included in other categories (such as the

Callahan memos), the only documents which any of the ISP Officials saw are (the ISP Official or

Officials who saw the document is identified in parentheses):

a)   Clutter's March Letter to ISP Director Nolen (Carper, Fermon, and Parker);

*Inter alia,* this letter came from Clutter, Whitlock's agent. At the very least it was

reasonably available to Whitlock, who was represented by Zellner since at least 1998, and by

Kling, who also appeared on behalf of Whitlock on June 30, 2000. SOF ¶69, 181 In any event,

Carper personally faxed this letter to Asst. AG Rick Stock on May 17, 2000. SOF ¶642

b) Clutter's 1998 interviews and articles (Carper);

It is undisputed that Clutter, Whitlock's agent, had all of these documents since at least

1998. SOF ¶67-8 These documents, and Meyers's testimony at Steidl's 1998 postconviction

proceeding, SOF ¶81, were thus reasonably available to Whitlock, who was represented by

Zellner since at least 1998, and by Kling, who also appeared on behalf of Whitlock on June 30,

2000. SOF ¶69, 181 In any event, Clutter's knowledge is imputed to Whitlock no later than

2003, when Clutter became Whitlock's agent. Moreover, Carper disclosed these documents to

the AG's Office and ISAAP in 2004, prior to Whitlock's postconviction hearing in 2005. SOF ¶641 Moreover, Murphy testified about the substance of the interview memo at Whitlock's postconviction proceeding in 2005. SOF ¶588

    c)  A December 10, 1987 letter from Jim Parrish to Deborah Reinbolt (Carper),

        Steidl had this letter prior to 2000, SOF ¶74, and it was thus reasonably available to Whitlock, who was represented by Zellner since at least 1998, and by Kling, who also appeared on behalf of Whitlock on June 30, 2000. SOF ¶69, 181 In any event, Clutter's knowledge is imputed to Whitlock no later than 2003, when Clutter became Whitlock's agent. Moreover, from a temporal aspect, this December 1987 letter was not available to the police at the time of Whitlock's trial in June 1987. And regardless, it contains no material, exculpatory information.

        In any event, Carper first learned of this document in December 2003, and disclosed it to the AG's Office and the ISAAP in October 2004 – prior to Whitlock's postconviction hearing. SOF ¶641

    d)  List of campaign contributions (Carper);

        Because Clutter had Morgan campaign contribution information in 2000, SOF ¶160-61, and because this information is available on the Internet, SOF ¶162, this information was thus reasonably available to Whitlock, who was represented by Zellner since at least 1998, and by Kling, who also appeared on behalf of Whitlock on June 30, 2000. SOF ¶69, 181 Moreover, Kling's strategy since at least 2001 was to tie Morgan to the Rhoads homicides. SOF ¶268 And Clutter's knowledge is imputed to Whitlock no later than 2003. SOF ¶416 In any event information about campaign contributions during the 1990s could not have been available to the police in 1987.

And Carper learned of this document in December 2003 and provided it to the AG's

Office and the ISAAP in October 2004 – prior to Whitlock's 2005 postconviction hearing. SOF

¶641

   e) Paris Police Department Offense Report (Carper, Fermon (portion));

   Because Clutter had this report since at least 1998, SOF ¶61, it was reasonably available

to Whitlock, who was represented by Zellner since at least 1998, and by Kling, who also

appeared on behalf of Whitlock on June 30, 2000. SOF ¶69, 181 In any event, Clutter's

knowledge is imputed to Whitlock no later than 2003.

   In any event, Carper faxed this report to Asst. AG Stock on May 12, 2000. SOF ¶642

   f) June 26, 1987 FBI Report regarding statements made by Steidl and Whitlock (Carper);

   Because Steidl used this document as an exhibit in his postconviction proceedings, prior

to 2000, SOF ¶80, it was reasonably available to Whitlock, who was represented by Zellner since

at least 1998, and by Kling, who also appeared on behalf of Whitlock on June 30, 2000.  SOF

¶69, 181 In any event, Clutter's knowledge is imputed to Whitlock no later than 2003.

   Moreover, Clutter referred to it in and attached it to his March 2000 letter to Nolen,

which Carper faxed to Asst. AG Stock on May 12, 2000. SOF ¶642 In any event, *Brady* does not

require the disclosure of one's own statements. *Gauger*, 349 F.3d at 360.

   g) Various newspaper articles and court filings in May of 2000 (Carper)

   *Inter alia,* these newspaper articles and court filings were clearly available to Whitlock

through reasonable diligence. Moreover, they are not exculpatory.

   h) Affidavits of Carol Robinson and Michael Baden (Carper)

   *Inter alia,* Carol Robinson's affidavit was taken by Clutter, Carol Robinson testified at

Steidl's postconviction hearing in 1998, SOF ¶81, and Baden's affidavit was filed in that

proceeding. SOF ¶82 As such, these were reasonably available to Whitlock, who was represented by Zellner since at least 1998, and by Kling, who also appeared on behalf of Whitlock on June 30, 2000. SOF ¶69, 181 In any event, Clutter's knowledge is imputed to Whitlock no later than 2003. Moreover, Clutter provided Baden's affidavit to one of Whitlock's lawyers in February 2005, SOF ¶585, and Baden himself testified at Whitlock's postconviction hearing in 2005. SOF ¶588

Regardless, Carper learned of them in June 2003 and disclosed them (prior to Whitlock's 2005 postconviction hearing) to Asst. AG Mandeltort in June 2003, to the AG's Office in December 2003, and to the ISAAP on about October 20, 2004. SOF ¶642

i) A portion of the Investigative Group International memorandum (Fermon)

This document, a private investigative report of Mark and Kevin Savoree, is not exculpatory. Steidl, Whitlock, and the Rhoads are not mentioned at all. SOF ¶475 And this 1999 document was obviously not available to police at the time of Whitlock's trial in 1987.

j) An intelligence summary of Morgan (Fermon);

This document is not exculpatory. Steidl, Whitlock, and the Rhoads are not mentioned at all. Ex. 71 And this 2003 document was obviously not available to police at the time of Whitlock's trial in 1987.

k) the October 10, 2001, Rhoads homicide assessment (Fermon)

This document is discussed *infra*.

l) February 27, 2002 Executive Summary (Fermon);

This document, Callahan's summary of his investigation, is not exculpatory. The only mention of Steidl, Whitlock, or Rhoads is that Morgan was considered a suspect in that case. Ex.

71 In any event, it was provided to federal prosecutors in around January 2003, – prior to

Whitlock's 2005 postconviction hearing. SOF ¶655

    m) A timecard for Deborah Reinbolt (Kaupas); and

    This timecard was used as Whitlock's Exhibit 8 at his trial in May 1987. SOF ¶13

    n) July 1986 report of interview of Steidl (Kaupas).

    This document was disclosed prior to Whitlock's 1987 trial. SOF ¶15 In any event, *Brady*

does not require the disclosure of one's own statements. *Gauger*, 349 F.3d at 360.

### 6 and 7)  A June 8, 2001 Memo to Carper from Casella (Carper, Fermon) and a February 16, 2001 Email from Carper to Casella (Carper)

    Whitlock cannot prove one or more of the 8 prongs discussed *supra* with respect to these

documents. *Inter alia*, the June 8, 2001 memo contained no information not contained in

Callahan's August 15, 2001 memo, SOF ¶278, which was disclosed to federal prosecutors in

around January 2003, to Asst. AG Mandeltort in June 2003, to the AG's Office again in about

late December of 2003, and to the ISAAP on about October 20, 2004. SOF ¶637, 655 Carper

also provided the February 16, 2001 email to the AG's Office in about late December of 2003.

SOF ¶637

    Moreover, the February 16, 2001 email is about the operational aspects of the ongoing

investigation – it contains no substantive evidence or information about the Rhoads homicides.

SOF ¶258

### 8)  December 12, 2001, December 18, 2002, and May 2003 Fermon Documents (Carper, Fermon)

    Whitlock cannot prove one or more of the 8 prongs discussed *supra* with respect to this

category. *Inter alia*, these documents are not exculpatory; they do not contain substantive

information about the Rhoads homicides. SOF ¶258 Nor do they contain any information known

to the police at the time of the Whitlock's 1987 trial. In any event, Carper and Fermon, the only

ISP Officials who saw these documents, provided them to the AG's Office in late 2003, prior to

Whitlock's 2005 postconviction proceeding. SOF ¶637, 659

**11) Campaign Contributions by Morgan (Carper, Fermon, Kaupas, Parker)**

See *infra.*

**12) 2004 Londrigan Meeting (Brueggemann, Carper and Kaupas)**

Whitlock cannot prove one or more of the 8 prongs discussed *supra* with respect to this

category. *Inter alia*, it is undisputed that Londrigan did not ask for any information that was not

provided, and that he did not solicit any opinions about clemency and no opinions were given.

SOF ¶558-565

**14) Information about 2004 Statements by Eckerty (Kaupas)**

Whitlock cannot prove one or more of the 8 prongs discussed *supra* with respect to this

category. *Inter alia*, it is undisputed that whatever Eckerty said in this 2004 meeting (prior to

Whitlock's 2005 postconviction proceeding) he said it in the presence of ISAAP prosecutor

Rands, who was present for the meeting. SOF ¶583

**15) Information about Eckerty's Handling of Evidence (Carper and Kaupas)**

Whitlock cannot prove one or more of the 8 prongs discussed *supra* with respect to this

category. *Inter alia*, it is undisputed that, in January 2004, when three exhibits were found in the

Zone 5 vault, that information was immediately disclosed to the AG's Office, and that the

exhibits themselves were turned over to the AG's Office in March 2004 – all prior to Whitlock's

postconviction proceeding in 2005.  SOF ¶566

### 18) Polygraph of Herrington and Notes (Carper)

Whitlock cannot prove one or more of the prongs discussed *supra* with respect to this
document. Carper only saw the polygraph. SOF ¶641

And Clutter had these documents as early as June 1998. SOF ¶61 As such, they were
reasonably available to Whitlock, who was represented by Zellner since at least 1998, and by
Kling, who also appeared on behalf of Whitlock on June 30, 2000. In any event, Clutter's
knowledge is imputed to Whitlock no later than 2003. Indeed, Murphy testified on his polygraph
and notes at Whitlock's postconviction proceeding in 2005. SOF ¶588 Moreover, information
about the polygraph was contained in the May 2, 2000 Callahan memo, which was disclosed to
the AG's Office on May 12, 2000, and subsequently to the Illinois Appellate Court. SOF ¶137

And when Carper first saw the polygraph in about late December of 2003, when she
provided to the AG's Office, and later to the ISAAP in October 2004. SOF ¶641 In any event,
polygraphs are not required to be disclosed under *Brady*. *Wood*, 516 U.S. at 6.

### 24) Kaupas's January 5, 2005 Memo to Carper (Carper)

Whitlock cannot prove one or more of the 8 prongs discussed *supra* with respect to this
category. *Inter alia*, this memo, written by Kaupas as he was transitioning out of his role with
respect to the Rhoads investigation, contains no material, exculpatory information known to
police at the time of Whitlock's trial, not disclosed to prosecutors, and not known to Whitlock or
available through reasonable diligence. Moreover, it is undisputed that Kaupas regularly kept
prosecutors advised of his activities relating to the federal task force and the ISP's investigative
support of the ISAAP. SOF ¶652

### 25) Supposed Orders from Parker and Carper Regarding Case (Carper, Fermon, Kaupas and Parker)

Whitlock cannot prove one or more of the 8 prongs discussed *supra* with respect to this category. *Inter alia*, these orders did not occur, SOF ¶643-4, and even if they did, would not have been known to police at the time of Whitlock's trial in 1987.

Whitlock knew about these supposed orders, Callahan testified about these supposed orders at Whitlock's postconviction proceedings. SOF ¶606 Any nondisclosure of them by any of the ISP Officials could thus have had no impact on Whitlock.

### 26) Fermon's Statements about Reopening the Case and Clemency (Fermon)

Whitlock cannot prove one or more of the 8 prongs discussed *supra* with respect to this category. *Inter alia*, Fermon did not voice an opinion about clemency at the January 2003 meeting. SOF ¶461 In any event, these statements are not even evidence, much less evidence known to the police at the time of Whitlock's trial in 1987.

### 27) Clutter's March 2000 Letter to ISP Director Nolen (Parker)

Whitlock cannot prove one or more of the 8 prongs discussed *supra* with respect to this category. *Inter alia*, Carper disclosed this letter, along with the Paris Police Department's report regarding Betty and Darrell Herrington, and notes on Herrington Drywall letterhead, and Callahan's May 2, 2000 memo to the AG's Office on May 12, 2000. SOF ¶135

This memo was thus reasonably available to Whitlock, through his counsel, and, in any event, Clutter's knowledge of it is imputed to Whitlock no later than 2003.

In sum, *none* of the documents Whitlock contends were required to be disclosed were actually required to be disclosed under *Brady*. In any event, most were disclosed, some multiple times. The ISP Officials are entitled to summary judgment on Whitlock's *Brady* claim.

**2.   Whitlock's *Brady* Claim Is Legally Flawed.**

**a)   *Osborne* Forecloses Application of *Brady* To Postconviction Proceedings.**

As discussed *supra*, Whitlock's §1983 claim is premised on alleged *Brady* violations for

failure to disclose exculpatory information *after* Plaintiff was already convicted. In *Steidl v.*

*Fermon*, 494 F.3d 623 (7th Cir. 2007), the Seventh Circuit allowed this claim to proceed, but

emphasized that *Brady* obligations in the postconviction proceeding context *only* extended to

evidence known to the police *at the time of the original trial. Id.* at 630. In reaching this

conclusion, the Seventh Circuit relied on *Brady* itself and *Penn. v. Ritchie*, 480 U.S. 39 (1987).

But since then, the Supreme Court has held that *"Brady* is the wrong framework" in cases

involving the right to obtain evidence post-conviction, and rejected the Ninth Circuit's similar

reliance on *Ritchie* to hold that *Brady* applied post-conviction. *Osborne*, 129 S. Ct. at 2315-16,

2320.

In *Osborne*, a convicted prisoner brought a §1983 suit to seek testing of certain trial

evidence, arguing that he had a right to such evidence. *Id*. at 2315. The Supreme Court reversed

the Ninth Circuit, which, "while acknowledging that [Supreme Court] precedents 'involved only

the right to *pre-trial* disclosure,' [] concluded that the Due Process Clause also 'extends the

government's duty to disclose ... to *post-conviction* proceedings.'" *Id*. at 2315-16.

The Supreme Court stated that the Ninth Circuit "went too far ... in concluding that the

Due Process Clause requires that certain familiar preconviction trial rights be extended to protect

Osborne's postconviction liberty interest." *Id*. at 2319; *accord Barnes v. Hennepin County Dist.*

*Attys. Office*, 2010 WL 395214, at *1 (8th Cir. Feb. 5, 2010) (affirming dismissal of § 1983

*Brady* claim based on not providing access to witness statements, even where those witness

statements were available to police at the time of trial, relying on *Osborne*); *Cunningham v. Dist.*

140

*Attys. Office for Exambia County*, --- F.3d ---, 2010 WL 21180, at *21 (11th Cir. Jan. 6, 2010) (citing *Osborne*, "Postconviction relief proceedings do not require the full range of procedural rights that are available at trial, and [*Brady*] has no application in the postconviction context.").

The ISP Officials did not become involved in Whitlock's case until 2000, at the very earliest, 13 years after he was convicted in 1987. His *Brady* claim fails as a matter of law.

**b)  Whitlock Has No *Brady* Claim As He Prevailed In His Habeas Proceeding.**

Whitlock's *Brady* claim is premised, if at all, on a failure to disclose exculpatory information, available at the time of trial, to the prosecutors handling his state postconviction proceeding. *Steidl*, 494 F.3d at 630.  But as discussed *infra*, because Whitlock *prevailed* in his habeas proceeding, he has no viable *Brady* claim. *Ambrose*, 623 F. Supp. 2d at 468-73.

In *Ambrose*, the Court after a thorough overview of the jurisprudence, concluded that there is no constitutional violation where the criminal defendant (civil plaintiff) prevails, and therefore no §1983 claim, because *Brady*'s purpose is to ensure the reliability of the criminal verdict, a conclusion held by every Circuit Court to have considered the issue. *Id.* at 469-72 (collecting cases, including the First, Sixth, Tenth and Eleventh Circuit Courts).

As noted *supra*, the Seventh Circuit has not squarely decided the issue. Although it expressed skepticism, it has, for purposes of argument, analyzed cases to see if the facts before them supported the minority view – that a prevailing criminal defendant might have a §1983 *Brady* claim, but only when the prosecutor would have abandoned the case had the police made the disclosure. *Bielanski*, 550 F.3d at 644-45.

Thus, even if this Court were to adopt the minority position that Whitlock has a viable claim, Whitlock must nonetheless present evidence that had the undisclosed evidence been made

known to the prosecutors handling Whitlock's postconviction proceeding that they would have

not opposed his petition. This he cannot do.

### c) Whitlock Has No *Brady* Claim Related to Executive Clemency.

Nor is Whitock's clemency petition a "proceeding" within the meaning of the Due

Process Clause and *Brady*. *Osborne*,129 S. Ct. at 2319 ("readily dispos[ing] of" argument that

plaintiff had protected interest in clemency, "We have held that noncapital defendants do not

have a liberty interest in traditional state executive clemency, to which no particular claimant is

*entitled* as a matter of state law."); *Bowens v. Quinn*, 561 F.3d 671, 673 (7th Cir. 2009) (it is a

"well-established principle of constitutional law" that "[t]here is no Fourteenth Amendment

property or liberty interest obtaining a pardon in Illinois – no substantive entitlement, in other

words – and so no ground for a claim of denial of due process.").

Even if there were a due process claim based on clemency, the undisputed factual record

is that there was no interference with clemency. SOF ¶420-468, 552-565

### d) Whitlock Has No Due Process Right To An Investigation.

To the extent Whitlock's due process claim is based upon Whitlock's general

dissatisfaction with the method and manner of the ongoing investigation into the Rhoads

homicides, such a claim is factually and legally deficient. Factually, it is undisputed that there

*was* and is an extensive, thorough, ongoing investigation. *E.g.* SOF ¶173-414

Further, the Current ISP Officials were not required to re-open an investigation based

upon the opinion of one of their subordinates that plaintiff was innocent. *See Baker v. McCollan,*

443 U.S. 137, 145-46 (1979) (no duty to "investigate independently every claim of innocence");

*see Garcia v. City of Chi.,* 24 F.3d 966, 970 (7th Cir. 1994) ("[O]nce police officers have

142

discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence.").

### 3. The ISP Officials are Entitled to Qualified Immunity.

Qualified immunity applies to all of Whitlock's federal claims. Even if this Court were to reject the ISP Official's arguments, including regarding *Osborne*, *Ambrose*, and the applicability of *Brady* to clemency, and find that one or more of the items should have been disclosed and was not, qualified immunity would nonetheless bar Whitlock's due process claim. To find that qualified immunity applies, this Court need not even address the underlying legal issues; rather, as the Supreme Court recently held, this Court can simply recognize the effect of *Osborne*, *Ambrose*, and the cases also establishing the due process does not apply to clemency and that there is no right to an investigation. *Pearson v. Callahan*, 129 S. Ct. 808, 822-23 (2009).

Qualified immunity bars claims when officials are alleged to violate a constitutional right that is not clearly established. *Id.* at 823. To overcome qualified immunity, a plaintiff must demonstrate that it was clearly established, within the specific context of the facts alleged, that the alleged conduct violated the Constitution. *Id.* at 815-16. One way to establish this is to show that there was Supreme Court or Seventh Circuit precedent on point at the time of the alleged violation, or a clear trend in the law such that controlling precedent was only a matter of time. *Denius v. Dunlap*, 209 F.3d 944, 950-51 (7th Cir. 2000).

To show a clearly established right such that it destroys qualified immunity, Whitlock must also demonstrate that a reasonable official would understand that his actions violate a constitutional right. *Denius*, 209 F.3d at 950. Here, with respect to *Osborne* and the application of *Brady* to postconviction proceedings at all, it is important to note that it is the United States'

143

official position that *Brady* does not extend to the postconviction setting. Ex. 142 ("*Brady* is limited to the pre-trial – not postconviction – setting."). Considering this, the ISP Officials could not have reasonably been expected to understand that the failure to disclose evidence to Whitlock during his postconviction proceedings violated a constitutional right.

And with respect to *Ambrose*, the clear weight of authority is that Whitlock has no claim based on his habeas proceedings. If most courts have reached this conclusion, then the ISP Officials cannot have been expected to have had a better understanding of the law. *Kelley v. Myler*, 149 F.3d 641, 647 (7th Cir. 1998). As the Supreme Court reiterated just last year, "if judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Pearson*, 129 S. Ct. at 823.

The ISP Officials are not aware of a closely analogous case that holds that due process applies to clemency applications, or that due process entitled Whitlock to an investigation. And to the extent that the implications of *Osborne* are unsettled, the ISP Officials are still entitled to qualified immunity. *See Wilson*, 526 U.S. at 618 ("Given such an undeveloped state of the law, the officers ... cannot have been 'expected to predict the future course of constitutional law.'").

Moreover, qualified immunity must be analyzed, not in the abstract, but in light of the particularized facts of the case. *Brosseau v. Haugen*, 125 S. Ct. 596, 599-600 (2004). Thus, the specific documents and context must be taken into account. Here, respectfully, given the particularized facts and context of this case; including the 13 year time lag between Whitlock's conviction in 1987, and the multiple disclosures to multiple prosecutors and prosecuting agencies, to the extent that this Court determines that there is a dispute over whether a particular item should have been disclosed and was not, the ISP Officials are nonetheless entitled to qualified immunity.

### 4. Whitlock's §1983 Conspiracy Claim

For his § 1983 conspiracy claim, Whitlock must present evidence of "(1) an express or implied agreement among defendants to deprive plaintiff of his ... constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988). The first element requires a meeting of the minds such that "the conspirators [] act with a single plan, the general nature and scope of which is known to each would-be conspirator." *Hernandez v. Joliet Police Dept.*, 197 F.3d 256, 263 (7th Cir. 1999); *Vodak v. City of Chi.*, 624 F. Supp. 2d 933, 960 (N.D. Ill. 2009).

Absent proof of such a meeting of the minds, the ISP Officials are entitled to summary judgment. *Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 263-64 (7th Cir. 1999) (affirming summary judgment because there was no meeting of the minds, "nothing in this record explains why [the defendant police officer] would go out on a limb to prepare a false police report at [the other defendant police officer's] behest"); *Vodak*, 624 F. Supp. 2d at 960 (granting defendants' summary judgment because "evidence of various discussions between command personnel regarding the decision to begin making arrests and the charges to bring" could not "support a finding that there was a 'meeting of the minds' ... to violate Plaintiffs' constitutional rights.").

Moreover, because Whitlock has alleged a conspiracy between two distinct groups of actors separated over a decade (i.e., those involved in the original investigation and prosecution on the one hand and the ISP Officials on the other hand), Whitlock must present *direct* proof of such a conspiracy. *Hampton v. Hanrahan*, 600 F.2d 600, 622 (7th Cir. 1979) (where "defendants are named ... only for their participation in the ... coverup[sic][,]" such defendants are not liable for damages arising out of the initial conspiracy unless the plaintiff provides "direct proof that an agreement to conceal was part of the original conspiracy."); *Niehus v. Liberio*, 1989 WL 26831,

145

at *2 (N.D. Ill. Mar. 22, 1989) ("In order to prove that acts of concealment constitute part of the initial conspiracy, however, direct evidence of an express agreement to cover up is necessary.").

Not only is there no such direct proof, the undisputed facts are that the ISP Officials had no agreement. SOF ¶ The ISP Officials are entitled to summary judgment.

**B. Whitlock's State Law Claims Are Barred By Absolute Immunity**

Illinois common law affords a broad absolute immunity to police officials such as the ISP Officials from tort claims arising out of the scope of their official duties. *Harris v. News-Sun*, 269 Ill. App. 3d 648, 652-53, 646 N.E.2d 8, 11-12 (2d Dist. 1995). Absolute immunity "cannot be overcome by a showing of improper motivation...." *Geick v. Kay*, 236 Ill. App. 3d 868, 875, 603 N.E.2d 121, 127 (2d Dist. 1992). Absolute immunity applies to all of Whitlock's state law claims. *Morton v. Hartigan*, 145 Ill. App. 3d 417, 426-27, 495 N.E.2d 1159, 1165 (1st Dist. 1986) ("the absolute immunity doctrine has been applied to virtually every common law tort").

Because the actions Whitlock complains of arise out of the scope of the ISP Officials' official law enforcement duties, they are entitled to summary judgment. *Horwitz v. Bd. of Edu. of Avoca Sch. Dist.*, 260 F.3d 602, 617-18 (7th Cir. 2001); *Horner v. County Bd.*, 828 F. Supp. 604, 610 (C.D. Ill. 1993); *Conterras v. Woodridge*, 1995 WL 144413, at *6 (N.D. Ill. Mar. 30, 1995).

**C. Whitlock's State Law Claims.**

Based on the facts, law, and argument in Section III B (1-3) of McFatridge and Edgar County's Joint Motion for Summary Judgment, which the ISP Officials incorporate by reference, the ISP Officials are entitled to summary judgment on Whitlock's state law claims.

## IV.    CONCLUSION

Because of the foregoing reasons, the motion for summary judgment should be granted.

Respectfully submitted,

By: Iain D. Johnston

Iain D. Johnston
Johnston Greene LLC
542 S. Dearborn Street
Suite 1100
Chicago, IL  60605
(312) 341-3900
(312) 341-0700 Fax
Attorneys for Charles Brueggemann,
Diane Carper, Steven M. Fermon, Ken
Kaupas, and Andre Parker

By: David C. Thies

David C. Thies
Webber & Thies, P.C.
202 Lincoln Square
P.O. Box 189
Urbana, IL  61803-0189
(217) 367-1126
(217) 367-3752 Fax
Attorneys for Andre Parker